**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>      as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>                        Debtors.[1] | 3:17-BK-3283 (LTS)<br><br>PROMESA Title III<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>      as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY<br><br>                        Debtor. | 3:17-BK-4780 (LTS)<br><br>PROMESA Title III<br>(Jointly Administered) |
| LUMA ENERGY, LLC and LUMA ENERGY SERVCO, LLC<br><br>                        Plaintiffs.<br>      v.<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY and PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY,<br><br>                        Defendants. | Adv. Proc. No. _____ in 17 BK 4780-LTS |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## COMPLAINT[2]

LUMA Energy, LLC, and LUMA Energy Servco, LLC (together, "LUMA"), plaintiffs herein, for their Complaint against the Puerto Rico Public-Private Partnerships Authority ("P3A") and the Puerto Rico Electric Power Authority ("PREPA") (together, "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.      LUMA brings this action because the Parties disagree on the proper interpretation of certain dispute-resolution provisions in the June 22, 2020 Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement (as amended and supplemented, the "T&D OMA"). And, as discussed below, the Parties also disagree on how to properly resolve that disagreement.

2.      LUMA files this action in this Court because its resolution is related to the ongoing bankruptcy of PREPA. As discussed in more detail below, the claims in this action relate to the interpretation of the T&D OMA. The T&D OMA is the contract that governs the operation of PREPA's assets, as well as the collection and distribution of funds on behalf of and by PREPA. Because that contract governs the long-term operations of PREPA's assets, collection of fees, and payment of PREPA's vendors, among other things, it is integral to PREPA's restructuring and the Fiscal Plan. Thus, the outcome of the Parties' disagreement will directly affect the bankruptcy estate.

3.      Article 15 of the T&D OMA provides two separate paths for dispute resolution depending on the nature of the dispute. Disputes defined by the agreement as "Technical Disputes" are to be adjudicated in an expedited proceeding by a technical expert whose decision is final and

---

[2] Capitalized terms not otherwise defined herein shall have the meaning set forth in the T&D OMA.

binding. Disputes other than Technical Disputes—which are termed "Disputes"—follow a more traditional path of mediation and litigation.

4.      Thus, in order for the Parties to know which dispute-resolution path they must follow, there must first be a determination whether a particular dispute is actually a Technical Dispute or a Dispute. To the extent the Parties disagree about how a dispute is classified—like they do here—that disagreement is itself a Dispute (the "Threshold Dispute") subject to mediation and, if necessary, litigation. This is so because Section 15.1 of the T&D OMA contains a broad scope provision that defines "Dispute" as "any dispute among the Parties arising out of, relating to or in connection with this Agreement or the existence, interpretation, breach, termination or validity thereof." Because a disagreement about the classification of a dispute is a dispute relating to the interpretation of the T&D OMA, it is a "Dispute." As a consequence, Section 15.1 says that the Threshold Dispute, like every other Dispute, "shall be resolved in accordance with the procedures set forth in this Article 15." P3A has agreed with this interpretation of the T&D OMA in writing.

5.      P3A, as administrator for PREPA, notified LUMA of six issues of dispute. Defendants assert all six are Technical Disputes. LUMA asserts none of them are Technical Disputes.

6.      Defendants' misclassification of issues as "Technical Disputes" is designed to have the issues decided through a confidential, final, and binding process that was never intended for these sorts of issues. This is part of what has revealed itself to be a coordinated effort to manufacture a pretext to push LUMA out of the T&D OMA and return to the old days when PREPA acted as a monopoly and was subject to political control.

7.      Further, despite the fact that the Parties agree that they have a Threshold Dispute about which dispute-resolution path applies, Defendants have refused to resolve the Threshold

Dispute through the procedures in Article 15. Instead, they have stated that they intend to unilaterally classify their issues as "Technical Disputes" and initiate the procedures for resolution of Technical Disputes.

8.      That would be acceptable if everyone agreed they actually were Technical Disputes. But LUMA does not agree. And that disagreement is therefore a key threshold issue, a Dispute, that *must* be resolved before the Parties can move forward pursuant to the terms of the T&D OMA. The method for resolving the Threshold Dispute is the same as any other Dispute that is not a Technical Dispute: mediation and, if unsuccessful, the court. Although Defendants previously admitted so in writing, now they inexplicably refuse to even mediate the issue. That refusal constitutes a breach of Section 15.5 of the T&D OMA.

9.      LUMA thus files this lawsuit. It asks the Court to compel Defendants to mediate the Threshold Dispute and to enjoin Defendants from invoking the Technical Dispute procedures until the Threshold Dispute has been decided. Lastly, in the event that mediation is unsuccessful or is ultimately determined to be futile, LUMA requests that the Court issue declaratory relief construing the Parties' rights and responsibilities under the T&D OMA—specifically, to declare whether the issues set forth in P3A's July 22, 2025 Notice of Dispute are Technical Disputes or not.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 48 U.S.C. § 2166 because this action is a civil proceeding arising in or related to cases under PROMESA. This case is related to the PREPA Title III proceeding, Case No. 3:17-BK-4780 (LTS), because this suit will have an effect on the administration of the bankruptcy estate. Accordingly, this Court has "related to" jurisdiction here. *See, e.g.*, *Voya Institutional Tr. Co. v. Univ. of Puerto Rico,* 266 F. Supp. 3d 590, 598 (D.P.R. 2017).

11.     PREPA is a defendant and a debtor, but "related to" jurisdiction is so broad that the proceeding "need not [even] necessarily be against the debtor or against the debtor's property," if the outcome is one that "could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively)" and "impact[] . . . the handling and administration of the bankruptcy case." *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 631 B.R. 607, 610 (D.P.R. 2021).

12.     The T&D OMA is integral to PREPA's restructuring and is the contract that governs the operation of PREPA's assets by LUMA. This dispute is the first step in PREPA's publicly announced plan to terminate the T&D OMA and retake control of those assets, actions that will detrimentally impact PREPA's ongoing restructuring efforts. Further, the disputes that P3A has raised will negatively impact the assets that are necessary to PREPA's restructuring efforts, as well as the payments to PREPA's creditors and vendors under the currently pending Fiscal Plan. For example, P3A on behalf of PREPA demands that LUMA make numerous operational changes and incur substantial capital expenditures that will necessarily affect the assets available for PREPA's restructuring efforts, because PREPA will be LUMA's only source of funds for any such changes or expenditures.

13.     Those disputes can and should be adjudicated in this Court in full view of all parties with an interest in the estate—not in secret. Further, the resolution of the Threshold Dispute over where those disputes should be adjudicated therefore necessarily also relates to the administration of the estate. *See, e.g.*, *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) (relating to jurisdiction encompasses any dispute that "could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively)" and in some way "impact [] . . . the handling and administration of the bankruptcy estate").  Notably, this Court has already held that LUMA's claims for indemnification arising out of the T&D OMA establish "related to" jurisdiction. *See In*

*re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, Adv. Pro. No. 22-00050 (D.P.R. Jan. 18, 2023) [Docket No. 27 at 5] ("LUMA's plausible claim to indemnification under the T&D OMA sufficiently tethers this action to PREPA's Title III case to find 'related to' jurisdiction" but ordering remand for other reasons). The claims asserted in this action similarly meet the "related to" standard.

14.     Venue is proper in this District pursuant to 48 U.S.C. § 2167(a). This is an adversary proceeding pursuant to Rules 7001 and 7065 of the Federal Rules of Bankruptcy Procedure, made applicable to PROMESA by 48 U.S.C. § 2170.

## **PARTIES**

15.     Plaintiffs LUMA Energy, LLC and LUMA Energy ServCo, LLC are part of a private consortium formed by Quanta Services, Inc. and Canadian Utilities Limited with support from Innovative Emergency Management, Inc. ("IEM") to bid to operate PREPA's T&D System. LUMA Energy, LLC and LUMA Energy ServCo, LLC were registered on January 17, 2020, as domestic limited liability companies under the laws of the Commonwealth of Puerto Rico. Pursuant to the T&D OMA, LUMA Energy, LLC and LUMA Energy ServCo, LLC together are the "Operator" of the Puerto Rico T&D System as of June 1, 2021.

16.     Defendant P3A is a public corporation organized and existing under the laws of the Commonwealth of Puerto Rico. P3A serves as the "Administrator" of the T&D OMA, with duties to interact with LUMA and PREPA, and to oversee the operation of the T&D OMA. P3A may be served with a copy of this complaint and summons through its registered agent or Executive Direct at 300 Avenida José de Diego, San Juan, PR 00911. P3A's Executive Director, Josué A. Colón Ortiz, is the former Executive Director of PREPA from 2012 to 2013 and again from 2021 until he was appointed Executive Director of P3A in January 2025. He also currently serves as the

"Energy Czar" appointed by Puerto Rico Governor Jenniffer Gonzalez. Both Gonzalez and Colón publicly have pledged to cancel the T&D OMA by the end of the year.[3]

17.     Defendant PREPA is a public corporation organized and existing under the laws of the Commonwealth of Puerto Rico. It is a debtor in possession in the above-captioned Title III case, that can be served with a copy of this complaint and summons through its registered agent or Executive Director, Mary Carmen Zapata Acosta.

## **FACTUAL BACKGROUND**

### A.     **Background and History of the T&D OMA**

18.     Defendant PREPA is a public corporation and instrumentality of the Government of Puerto Rico created by Act No. 83 of May 2, 1941 ("Act 83"). Since the mid-1940s, after PREPA's predecessor, the Puerto Rico Water Resources Authority ("PRWRA"), acquired the two main private electric companies that existed in the island, PRWRA developed into the island-wide government-owned integrated electric utility in Puerto Rico. That was the beginning of the vertically integrated monopoly that became PREPA.

19.     PREPA owns an extensive transmission and distribution system with approximately 2,600 miles of transmission and sub-transmission lines (230 kV/115 kV/38 kV), over 16,000 miles of primary voltage distribution lines (13kV, 8kV, 4kV), and roughly 400 utility-owned substations.

20.     On May 27, 2014, the Legislative Assembly of Puerto Rico enacted Act 57-2014 ("Act 57"), the Puerto Rico Energy Transformation and Relief Act. Act 57 provides the legal and regulatory framework to enforce a thorough reform of the energy sector that promotes the

---

[3] *See, e.g.*, DailyEnergyInsider, *Beneath the Blackouts: Energy scandals and political theater in Puerto Rico*, *available at* https://dailyenergyinsider.com/news/49098-beneath-the-blackouts-energy-scandals-and-political-theater-in-puerto-rico/ (dated July 30, 2025); *see also* El Nuevo Dia, *Gobierno solicitará cancelar el contrato de LUMA Energy antes que termine este año* (translated: "The Government will request to cancel LUMA Energy's contract before the end of the year.") *available at* https://www.elnuevodia.com/noticias/legislatura/notas/gobierno-solicitara-cancelar-el-contrato-de-luma-energy-antes-que-termine-este-ano/ (dated May 21, 2025).

operation and administration of an efficient system at just and reasonable costs, considering that Puerto Rico is an isolated jurisdiction that needs to have a safe and stable electric power grid. The statute sought to overcome the fact that PREPA had become a monopoly that regulated itself, set its own rates without actual oversight or clarity in its invoices, and permitted numerous operational, managerial, and administrative deficiencies.

21.     For decades, PREPA faced operational, strategic, and financial challenges, allegations of systemic corruption, a deficient energy infrastructure, an aging and deteriorating T&D System, high and volatile fuel prices, high vulnerability to weather conditions, an underfunded pension system, and an eventual loss of access to capital markets. PREPA neglected the T&D System for decades, deferring maintenance and capital investments and thereby leaving the system unreliable and "falling apart quite literally."[4] PREPA, faced with political pressure to not increase rates in response to cost and investment needs, acquiesced to the political realities of its position as a state-run monopoly and sacrificed capital expenditures and preventative maintenance in order to attempt to stay afloat.[5]

22.     Many of PREPA's problems stemmed from the fact that PREPA's board, high-level positions, and even some technical and operational positions were political appointees who were replaced each time a new governor took office. That meant that operational and investment decisions were driven by the perceived political needs of the administration in power and not by the long-term best interests and needs of the electric system. Relatedly, the frequent changes in management led to repeated loss of institutional knowledge and decision-making that was unresponsive to market forces.[6] It similarly led to a lack of long-term planning.

---

[4] Synapse Report at 18, see also at 12, 26, available at
https://energia.pr.gov/wpcontent/uploads/sites/7/2016/11/Expert-Report-Revenue-Requirements-Fisher-and-Horowitz-Revised20161123.pdf.
[5] *See* Case No. CEPR-AP-2015-0001, Final Resolution and Order, at 4 (Jan. 10, 2017).
[6] *See* Kobre & Kim, The Financial Oversight & Management Board for Puerto Rico Special Investigation Committee Independent Investigator's Final Investigative Report, at 113 (Aug. 20, 2018).

23.     On July 2, 2017, the Puerto Rico Financial Oversight and Management Board filed a voluntary petition for relief for PREPA under PROMESA section 304(a), commencing PREPA's Title III restructuring. The Title III case is docketed as Case No. 17-4780 ("PREPA's Title III Case").

24.     Under PREPA's continued mismanagement, Hurricanes Irma and María in September 2017 led to the longest blackout in U.S. history.[7]

25.     To move Puerto Rico's electric system and economy forward, a complete transformation of the T&D System was needed to bring safe, reliable, and modern electric power services to Puerto Rico. That led to the T&D OMA and LUMA's involvement.

26.     On June 21, 2018, the Legislative Assembly of Puerto Rico enacted Act 120-2018 ("Act 120"), the Puerto Rico Electric Power System Transformation Act, which establishes the legal framework for the sale, disposition, and/or transfer of PREPA's assets, operations, functions, and services, including a transaction under which operations of the T&D System would be assumed by a private manager for a period of time, with ownership remaining at PREPA.

27.     LUMA was selected as the operation and maintenance service provider by a Partnership Committee assembled by P3A pursuant to Act 29-2009 and in accordance with the additional mandates of Act 120, following a competitive, public procurement process run by P3A as dictated by Act 29-2009 and Act 120. The Partnership Committee consisted of the then-Executive Directors of PREPA, the Puerto Rico Fiscal Agency and Financial Advisory Authority, and the Puerto Rico Central Office for Recovery, Reconstruction, and Resiliency, as well as the President of the Board of Directors of PREPA and the Chairman of the Puerto Rico Energy Bureau (Puerto's Rico's energy regulator). The T&D OMA was approved by the Boards of Directors of P3A and PREPA, as well as the Governor of Puerto Rico, the Financial Oversight and Management

---

[7] *See* U.S. Government Accountability Office, Puerto Rico Electricity Grid Recover: Better Information and Enhanced Coordination Is Needed to Address Challenges, at 2 (Oct. 8, 2019).

Board for Puerto Rico, and other key stakeholders. The Puerto Rico Energy Bureau also issued the

Energy Certificate of Compliance required under Act 120 after evaluating the T&D OMA.

**B. Defendants and their political masters want LUMA out so they can revert to the old system that failed Puerto Rico.**

28.     The problems LUMA inherited are hard to overstate. When it signed the T&D

OMA, Puerto Rico's electric infrastructure was crumbling and storm-battered. None of those

problems are insurmountable. Working together, with the appropriate funding that Defendants

agreed to provide in the T&D OMA, and with plenty of hard work, all of that could be overcome.

29.     Lamentably for the citizens of Puerto Rico, LUMA has not received meaningful

cooperation from the old-guard stakeholders.

30.     Almost from the outset, LUMA faced systematic headwinds from its "partner,"

PREPA, and more recently also from P3A and other government stakeholders. Underfunding, lack

of cooperation, active opposition by its "partner" PREPA during rate-making proceedings—each

has gone on incessantly. Most damagingly, PREPA has consistently failed to fund LUMA's

service accounts, meaning that LUMA has had to divert money from critical system repairs and

upgrades to continue to run the system day-to-day and respond to storms and emergencies. For a

grid that already suffered at least 30 years of deferred maintenance, further delay is untenable.

Defendants and other stakeholders have led what amounts to an active boycott against LUMA

since the beginning to undermine LUMA's performance in the eyes of the public and, with it,

public perception of LUMA, thus making a return to a PREPA monopoly more palatable.

31.     Meanwhile, the old-guard stakeholders have tried to advance their agenda making

LUMA the new scapegoat, even though the blame for past and current reliability issues falls

squarely at Defendants' feet. Presumably P3A's goal is for LUMA to be replaced with a PREPA-

adjacent entity, or at least an operator more malleable to the political whim of the day, thus setting

Puerto Rico on a backwards course while the lights flicker and fail. There has even been an attempt

to amend Act 57 to modify and weaken PREB's role as regulator, showing the concerted efforts to set the stage for empowering PREPA's monopoly again. It has thus become popular (even populist) to blame LUMA for PREPA's failings.

32.     But the law stands as an impediment to this coordinated scheme to return to the old days of an unsupervised, unregulated, monopolist PREPA. LUMA cannot be removed as Operator except for *cause*. And there is no cause. Unlike PREPA's numerous funding defaults, LUMA has never given any cause to cancel the T&D OMA. Instead, LUMA has worked miracles under impossible conditions for years. The problems with the grid are not those of LUMA's making.

33.     But that doesn't stop Defendants from trying. The "Disputes" Defendants identified, which are summarized below, are nothing more than a series of trumped-up pretexts to further their improper goal of removing LUMA. There is no merit to any of them.

34.     But more to the point for this Complaint, Defendants are insisting that the "Disputes" are actually all "Technical Disputes." That misclassification too is specious. But it's purposeful speciousness. Defendants want to remove, as much as possible, the greater protections, public visibility, and judicial scrutiny afforded to "Disputes," and have their pretextual claims heard in a confidential, non-appealable process designed for *technical* issues only. Doing so is improper for the reasons explained below.

### C. **The T&D OMA**

35.     On June 22, 2020, the Parties signed the T&D OMA, a true and correct copy of which is attached hereto as **Exhibit A**. The T&D OMA provides for LUMA to assume the operation and management of PREPA's T&D System, while PREPA retains ownership of the T&D System. P3A is designated as the Administrator charged with overseeing the contract's operation and liaising between LUMA and PREPA.

36.     Article 15 of the T&D OMA is titled "Dispute Resolution." Section 15.1 defines

the broad scope of Article 15. It states that "any dispute among the Parties arising out of, relating

to or in connection with this Agreement or the existence, interpretation, breach, termination or

validity thereof (a 'Dispute') shall be resolved in accordance with the procedures set forth in this

Article 15 (Dispute Resolution), which shall constitute the sole and exclusive procedures for the

resolution of such Disputes."

37.     Article 15 provides two paths to resolve disputes depending on the type of dispute.

The process begins the same way for both types: with a Notice of Dispute under Section 15.2(a),

followed by good-faith negotiations between "Designated Persons" from the Parties. If, after 30

days, negotiations prove unsuccessful, then the paths diverge. "Technical Disputes" go one way

and all remaining "Disputes" go another. Technical Disputes go to an "Independent Expert" who

"is not an arbitrator" and whose decision, which is required in 60 days, is "final and binding." *See*

T&D OMA § 15.4. The process is strictly confidential. *Id.* All other Disputes that are not Technical

Disputes go to mediation and then litigation if they cannot be resolved. *Id.* § 15.5-.7. Like virtually

all civil litigation, litigation under the T&D OMA would be an open and transparent process, so

the public could learn about the Parties' claims and defenses.

38.     A disagreement about the classification of any dispute is, by definition under

Section 15.1 a "Dispute." That includes the Threshold Dispute between the Parties that is at issue

in this action.

39.     Technical Dispute is defined in Section 15.3(b)(i) as "any Front-End Transition

Service Fee Estimate Dispute, Front-End Transition Service Fee Dispute, Back-End Transition

Service Fee Estimate Dispute, Back-End Transition Service Fee Dispute, Handover Checklist

Dispute, Administrator Dispute, Service Fee Dispute, Budget Dispute, Service Account Dispute,

Disallowed Costs Dispute or Force Majeure Event Dispute" as well as "any engineering or

technical dispute Operator and Administrator mutual agree in writing is a Technical Dispute . . . ."

*Id.* § 15.3(b)(i).

40.     Each of the capitalized terms in the definition of Technical Dispute is itself a defined term. The definition of each is provided in the table below along with a reference for the section in which each is defined.

| Defined Term | Definition | T&D OMA § |
|---|---|---|
| Front-End Transition Service Fee Estimate Dispute | In the event a Dispute arises between Operator and Administrator in connection with Operator's estimate of the anticipated Front-End Transition Service Fee, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (Dispute Resolution) (any such Dispute, a "Front-End Transition Service Fee Estimate Dispute"). | 4.6(c)(ii) |
| Front-End Transition Service Fee Dispute | Operator shall provide promptly to Administrator such additional supporting documentation evidencing the provision of the Front-End Transition Services, if any, and the calculation of the Front-End Transition Service Fee related thereto as Administrator may reasonably request and as may be required by Applicable Law. Administrator shall promptly advise Operator of any disputed invoice amounts, and all such disputes which Operator and Administrator are unable to resolve shall be subject to resolution as a Technical Dispute in accordance with Article 15 (Dispute Resolution) (any such Dispute, a "Front-End Transition Service Fee Dispute"). | 4.6(d)(ii) |
| Back-End Transition Service Fee Estimate Dispute | In the event a Dispute arises between Operator and Administrator in connection with Operator's estimate of the anticipated Back-End Transition Service Fee, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (Dispute Resolution) (any such Dispute, a "Back-End Transition Service Fee Estimate Dispute"). | 16.4(c)(iii) |
| Back-End Transition Service Fee Dispute | Operator shall provide promptly to Administrator such additional supporting documentation evidencing the provision of the Back-End Transition Services, if any, and the calculation of the Back-End Transition Service Fee related thereto, as Administrator may reasonably request and as may be required by Applicable Law. Administrator shall promptly advise Operator of any disputed invoice | 16.4(d)(ii) |

| Defined Term | Definition | T&D OMA § |
|---|---|---|
| | amounts, and all such disputes which Operator and Administrator are unable to resolve shall be subject to resolution as a Technical Dispute in accordance with Article 15 (Dispute Resolution) (any such Dispute, a "Back-End Transition Service Fee Dispute"). | |
| Handover Checklist Dispute | ManagementCo shall provide Administrator with prompt written notice (with a copy to PREB), including a completed Handover Checklist, at such time as ManagementCo determines it has satisfactorily completed all items on the Handover Checklist and is therefore ready to perform all O&M Services under this Agreement. Administrator shall respond within ten (10) Business Days whether Administrator confirms or disputes the completion of any item on the Handover Checklist, together with a written statement providing reasonable detail and supporting evidence for the basis of any dispute. In the event Administrator disputes completion of any item(s) on the Handover Checklist, ManagementCo may advise Owner of its disagreement with Administrator's decision. The Parties shall attempt to resolve in good faith any disputed item(s) and, in the event the Parties are unable to resolve such disputed item(s) within thirty (30) days, such disputed item(s) only shall be subject to resolution as a Technical Dispute in accordance with Article 15 (Dispute Resolution) (any such Dispute, a "Handover Checklist Dispute"). | 4.7(a) |
| Administrator Dispute | In the event of a Dispute among the Parties with respect to clauses (ii) through (xi) of Section 6.2(a) (Rights and Responsibilities of Administrator – Generally), such Dispute shall be subject to resolution as a Technical Dispute in accordance with Article 15 (Dispute Resolution) (any such Dispute, an "Administrator Dispute"). | 6.2(b) |
| Service Fee Dispute | In addition to Owner's funding or payment of T&D Pass-Through Expenditures, Generation Pass-Through Expenditures, Capital Improvements, Outage Event Costs and any other amounts that become due and owing to Operator hereunder, from and after the Service Commencement Date, as compensation for the performance of the O&M Services, Owner shall, in accordance with this Agreement, pay ManagementCo a management service fee consisting of the Fixed Fee and the Incentive Fee (collectively, the "Service Fee"). . . . | 7.1 (for Service Fee), 7.1(e) |

| Defined Term | Definition | T&D OMA § |
|---|---|---|
| | The Parties hereby agree that, in the event that a Dispute arises between Operator and Administrator in connection with the Service Fee (including any adjustments thereto as permitted by this Agreement), the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (Dispute Resolution) (any such Dispute, a "Service Fee Dispute"). | |
| Budget Dispute | The Parties hereby agree that, in the event that a dispute arises between Operator, Owner and Administrator in connection with a Budget (including proposed amendments thereto or the need for amendments thereto), the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (Dispute Resolution) (any such Dispute, a "Budget Dispute"). The Parties acknowledge and agree that, in connection with a proposed Budget pursuant to Section 7.3(a) (Budgets - Generally) or an amended Budget pursuant to Section 7.3(e) (Budgets – Amendments to Budgets), Owner, Administrator and Operator shall have the right to present to PREB any Expert Technical Determination pursuant to Section 15.4 (Expert Technical Determination Procedure for Technical Disputes) with respect to a Budget Dispute; provided that this shall in no way (i) limit PREB's right to approve, deny or propose modifications to such proposed or amended Budgets or (ii) otherwise affect PREB's statutory rights and responsibilities under Applicable Law. | 7.3(f) |
| Service Account Dispute | The Parties hereby agree that, in the event that a dispute arises in connection with a Service Account, the Front-End Transition Account or the Back-End Transition Account, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (Dispute Resolution) (any such Dispute, a "Service Account Dispute"). | 7.5(g) |
| Disallowed Costs Dispute | The Parties hereby agree that, in the event that a dispute arises in connection with Disallowed Costs, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (Dispute Resolution) (any such Dispute, a "Disallowed Costs Dispute"). In such event, Operator may continue to withdraw such T&D PassThrough Expenditures from the applicable Service Account; provided Operator shall be responsible to reimburse Owner promptly (and in any event within five (5) Business Days) any T&D Pass-Through Expenditures that are determined to be | 7.6(b) |

| Defined Term | Definition | T&D OMA § |
|---|---|---|
| | Disallowed Costs pursuant to resolution as a Technical Dispute in accordance with Article 15 (Dispute Resolution). | |
| Force Majeure Event Dispute | The Claiming Party shall bear the burden of proof as to the existence and impact of the Force Majeure Event, and shall furnish promptly in writing (if and to the extent available to it) any additional documents or other information relating to the Force Majeure Event reasonably requested by the other Party. While the Force Majeure Event continues, the Claiming Party shall give notice to the other Party before the first day of each succeeding month updating the information previously submitted with respect to the nature, cause, impact and potential duration of the Force Majeure Event pursuant to this Section 17.1 (Notice; Mitigation). The Parties hereby agree that, in the event that a Dispute arises between the Parties in connection with whether and to the extent an event, circumstance or condition constitutes a Force Majeure Event, or whether such Force Majeure Event continues, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (Dispute Resolution) (any such Dispute, a "Force Majeure Event Dispute"). | 17.1(c) |

## D. **Defendants' pretextual "Disputes"**

41.     Defendants have identified six categories of dispute, which they set forth in a Notice of Dispute dated July 22, 2025. *See* 3PA Notice of Dispute, attached as **Exhibit B**.

42.     Those topics can be summarized as follows:

| Dispute No. | Description | Brief Summary of Defendants' Allegations |
|---|---|---|
| 1 | Federal Funds | Defendants allege that LUMA has failed to comply with federal funding obligations, delayed securing reimbursements, reconciling accounts, and providing required documentation for federally funded projects. |
| 2 | Insufficient Revenue | Defendants allege that LUMA has failed to generate sufficient revenues, obtain federal reimbursements, and manage service account funding, resulting in liquidity crises for PREPA. |
| 3 | April 16, 2025 Blackout | Defendants allege that LUMA failed to comply with its contractual obligations following the island-wide blackout of |

| Dispute No. | Description | Brief Summary of Defendants' Allegations |
|---|---|---|
| | | April 16, 2025. Although not stated explicitly, they imply a failure to meet reporting requirements under Article 5. It appears Defendants may also be alleging a failure of vegetation management. |
| 4 | Vegetation Management | Defendants allege that LUMA has failed to appropriately manage vegetation, failed to address certain high voltage lines, failed to inspect certain assets in advance of the hurricane season, and failed to adequately maintain and plan for public lighting. |
| 5 | Financial Statements/Audits | Defendants allege that LUMA failed to comply with certain audit and financial reporting obligations. |
| 6 | Pole Fees | Defendants allege that LUMA failed to collect certain pole attachment fees from third-party telecommunications and cable entities. |

### E. LUMA challenges Defendants' classification of their disputes as Technical Disputes and demands that the Threshold Dispute follow Article 15's procedures.

43.     By letter dated July 25, 2025, LUMA disputed P3A's claims and stated its position that none of these disputes fall under the definition of Technical Dispute in the T&D OMA. That letter also notified Defendants that they should consider it a "Notice of Dispute" on those issues. Defendants nonetheless maintain that they are all Technical Disputes, and have insisted on employing the dispute-resolution path for Technical Disputes.

44.     Defendants' position is incorrect. None of these topics of dispute fall into any of the Technical Dispute categories in the table above. One can simply take the disputes one by one and compare them to the defined terms in the table. There are no matches. Thus, they are "Disputes" and not "Technical Disputes" as those terms are defined in the T&D OMA. And, therefore, they correctly belong in the public dispute-resolution path set forth in Sections 15.5 and 15.6, and not Section 15.4, hidden away out of the public and judicial eye.

45.     Following LUMA's July 25, 2025 letter, P3A responded on August 2, 2025. It reasserted Defendants' position that issues noted in the July 22, 2025 Notice of Dispute were all "Technical Disputes." Notably, the letter also admitted that the definition of "Dispute" under the T&D OMA is broad and encompasses "any dispute among the parties arising out of, relating to or in connection with" that agreement—such as the Threshold Dispute.

46.     Thereafter, the Parties' designated representatives met and discussed both the Threshold Dispute and the substance of Defendants' allegations as required by Section 15.3 of the T&D OMA. No issues were resolved.

47.     On August 15, 2025, P3A sent another letter. Consistent with the assertion in its August 2, 2025 letter, P3A admitted that "any disagreement over classification"—i.e., whether a disagreement is a Dispute or Technical Dispute—"is itself a 'Dispute' subject to the same process."

48.     That, of course, is correct. The Threshold Dispute is a Dispute subject to mediation and litigation under Sections 15.5 and 15.6 of the T&D OMA. Accordingly, on August 15, 2025, LUMA demanded mediation with respect to the Threshold Dispute.

49.     Inexplicably, on August 20, 2025, P3A sent a letter in which it refused to participate in mediation. Instead, it simply proclaimed that all of the issues in Defendants July 22, 2025 Notice of Dispute were Technical Disputes and stated that it intends to proceed to appoint an Independent Expert under the rules of the ICC International Center for ADR under Section 15.4(b)(i) regardless of the fact that the Threshold Dispute still exists. It also incorrectly claimed that LUMA failed to participate in good-faith negotiations.

50.     Subsequently, on August 22, 2025, P3A sent yet another letter insisting on the Technical Dispute process and presenting a schedule to exchange Independent Expert candidates and selecting him or her, or otherwise applying to the ICC International Centre for ADR to designate such expert.  P3A's August 22, 2025 letter also falsely and conveniently asserts that

LUMA has not identified which of P3A's six disputes LUMA considers non-technical. LUMA has repeatedly stated that it regards all six disputes as non-technical. LUMA took this position in its July 25, 2025 notice of disputes, during the meeting of the parties' designated representatives on August 6, 2025, and in LUMA's August 15, 2025 demand for mediation. Finally, P3A's letter falsely asserts that LUMA is attempting to use "procedural uncertainty" to "manufacture ambiguity" over dispute classification for the purpose of delay. To the contrary: LUMA has been and remains ready and willing to promptly proceed with resolving P3A's six disputes through the contractually mandated process for non-technical Disputes. Defendants' insistence that the Disputes should be shoehorned into the Technical Disputes process that was not designed or intended for them is what has brought us here.

51.     In light of this, LUMA was forced to file this lawsuit.

### CLAIMS FOR RELIEF

### COUNT I – Breach of Contract
### Article 15: Failure to Mediate

52.     LUMA realleges and incorporates by reference as though fully set forth herein the allegations contained in each of the preceding paragraphs.

53.     The T&D OMA is a valid and binding agreement entered into between and among LUMA, P3A, and PREPA.

54.     LUMA performed all of its duties and obligations under the T&D OMA or was excused therefrom by Defendants' own conduct.

55.     Article 15 of the T&D OMA sets out the exclusive procedures for resolving "any dispute among the Parties arising out of, relating to or in connection with [the T&D OMA] or the existence, interpretation, breach, termination or validity thereof (a "Dispute")." *See* T&D OMA § 15.1.

56.     The Parties have a Dispute about the proper classification of the issues set forth in P3A's July 22, 2025 Notice of Dispute.

57.     That Dispute is subject to the strictures of Article 15 like any other Dispute. LUMA has sent a Notice of Dispute per Section 15.2. It has held unsuccessful negotiations under Section 15.3. And it therefore has demanded mediation under Section 15.5.

58.     Defendants have expressly refused to participate in mediation under Section 15.5. Instead, they have stated that they intend to seek appointment of an Independent Expert under Section 15.4.

59.     Defendants have, accordingly, breached Article 15 of the T&D OMA.

60.     LUMA has suffered or will suffer damages as a result of the breach.

## COUNT II – DECLARATORY JUDGMENT
### Construction of Article 15 Concerning the Threshold Dispute

61.     LUMA realleges and incorporates by reference as though fully set forth herein the allegations contained in each of the preceding paragraphs.

62.     The T&D OMA is a valid and binding agreement entered into between and among LUMA, P3A, and PREPA.

63.     LUMA performed all of its duties and obligations under the T&D OMA or was excused therefrom by Defendants' own conduct.

64.     There is an actual controversy among the Parties because they disagree over the proper interpretation of the dispute-resolution mechanism in Article 15 of the T&D OMA. More specifically, the Parties disagree on whether the Threshold Dispute regarding the classification of the Disputes set forth in P3A's July 22, 2025 Notice of Dispute is itself a Dispute that is subject to Article 15.

65.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, this Court is vested with the power to declare the rights of the parties with respect to the T&D OMA. A declaratory

judgment is both necessary and proper to determine the rights, obligations, and liabilities between the parties with respect to the T&D OMA.

66.     LUMA, therefore, asks this Court to issue a declaratory judgment as follows:

a.   The T&D OMA is a valid and binding contract between P3A, PREPA and LUMA;

b.   Article 15 of the T&D OMA governs the resolution of disputes between the Parties; and

c.   The Parties' Threshold Dispute over the classification of the issues raised in P3A's July 22, 2025 letter is a Dispute subject to the dispute-resolution procedures in Section 15.5 and 15.6.

## COUNT III – DECLARATORY JUDGMENT
## Construction of Article 15 Concerning the Issues in P3A's Notice of Dispute

67.     LUMA realleges and incorporates by reference as though fully set forth herein the allegations contained in each of the preceding paragraphs.

68.     The T&D OMA is a valid and binding agreement entered into between and among LUMA, P3A, and PREPA.

69.     LUMA performed all of its duties and obligations under the T&D OMA or was excused therefrom by Defendants' own conduct.

70.     There is an actual controversy among the Parties because they disagree over the proper interpretation of the dispute-resolution mechanism in Article 15 of the T&D OMA with respect to the Disputes set forth in P3A's July 22, 2025 Notice of Dispute.

71.     Article 15 provides two distinct paths for dispute resolution: one for "Technical Disputes" and one for all other "Disputes."

72.     Technical Dispute is a defined term that consists, in turn, of other defined terms, each of which have specific meanings. Those terms are all reproduced above.

73.     None of the issues in P3A's July 22, 2025 Notice of Dispute falls under the definition of "Technical Dispute." Accordingly, they are "Dispute[s], other than a Technical Dispute" under Section 15.5(a). Resolution of the issues in P3A's July 22, 2025 Notice of Dispute is, therefore, governed by the provisions of Sections 15.5 and 15.6, not 15.4.

74.     Assuming that mediation is unsuccessful or deemed to be futile, then this Court must decide this threshold issue before the Parties can further engage in the dispute-resolution process.

75.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, this Court is vested with the power to declare the rights of the parties with respect to the T&D OMA. A declaratory judgment is both necessary and proper to determine the rights, obligations, and liabilities between the parties with respect to the T&D OMA.

76.     LUMA, therefore, asks this Court to issue a declaratory judgment as follows:

d.   The T&D OMA is a valid and binding contract entered into between and among P3A, PREPA and LUMA;

e.   Article 15 of the T&D OMA governs the resolution of disputes between the Parties;

f.   The disputes set forth in P3A's July 22, 2025 Notice of Dispute are not "Technical Disputes," but instead are "Disputes" as those terms are defined in the T&D OMA;

g.   Accordingly, the dispute-resolution procedures in Section 15.5 and 15.6 of the T&D OMA govern resolution of the Disputes set forth in P3A's July 22, 2025 Notice of Dispute; and

h.   The dispute-resolution procedures in Section 15.4 of the T&D OMA do not apply to the Disputes set forth in P3A's July 22, 2025 Notice of Dispute.

**<u>RELIEF REQUESTED</u>**

**WHEREFORE**, LUMA respectfully requests that the Court:

1)      Enter a judgment in favor of LUMA on each of its claims;

2)      Grant the declaration sought in Count II above;

3)      Order the Parties to mediate the Threshold Dispute about the proper classification of the issues from P3A's July 22, 2025 Notice of Dispute;

4)      Grant injunctive relief prohibiting Defendants from invoking the dispute-resolution process for Technical Dispute in Section 15.4 of T&D OMA with respect to the Disputes set forth in P3A's July 22, 2025 Notice of Dispute until the Threshold Dispute about the proper classification of the issues from P3A's July 22, 2025 Notice of Dispute has been resolved;

5)      If mediation is unsuccessful or deemed to be futile, grant the declarations sought in Count III above;

6)      Award LUMA damages related to its legal fees and expenses incurred in connection with this action; and

7)      Grant LUMA such other and further relief as this Court deems just and proper.


*[Remainder of Page Left Intentionally Blank]*

Dated: August 25, 2025

Respectfully submitted,

*/s/ Brett Ingerman*
Brett Ingerman
PHV Admitted
**DLA PIPER LLP (US)**
Harbor East
650 S. Exeter Street, Ste. 1100
Baltimore, MD 21202-4576
T: (410) 580.4177
F: (410) 580.3001
brett.ingerman@us.dlapiper.com

*/s/ Mariana Muñiz Lara*
Mariana Muñiz Lara (local counsel)
Puerto Rico Bar No. 18262
**DLA Piper (Puerto Rico) LLC**
500 Calle de la Tanca, Suite 401
San Juan, Puerto Rico 00901-1969
T: (787) 945.9106
F: (787) 945.9102
mariana.muniz@us.dlapiper.com

***Attorneys for LUMA Energy, LLC, and
LUMA Energy Servco, LLC***