# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>                         Debtors.[1] | 3:17-BK-3283 (LTS)<br><br>PROMESA Title III<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>     as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY<br><br>                         Debtor. | 3:17-BK-4780 (LTS)<br><br>PROMESA Title III<br>(Jointly Administered) |
| LUMA ENERGY, LLC and LUMA ENERGY SERVCO, LLC<br>                         Plaintiffs.<br>         v.<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY and PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY,<br><br>                        Defendant. | Adv. Proc. No. _____ in 17 BK 4780-LTS |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>MOTION FOR PROVISIONAL RELIEF</u>

Plaintiffs LUMA Energy, LLC and LUMA Energy Servco, LLC (together, "LUMA") respectfully move for Provisional Relief under the Parties' operative agreement against Defendants Puerto Rico Electric Power Authority ("PREPA") and Puerto Rico Public-Private Partnerships Authority ("P3A").

The Parties disagree on the proper interpretation of certain dispute-resolution provisions in the June 22, 2020 Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement (as amended and supplemented, the "T&D OMA") in the context of six categories of dispute identified in P3A's July 22, 2025  Notice of Dispute. More specifically, Defendants claim each of the six categories are "Technical Disputes" as defined in the T&D OMA. LUMA asserts that none are Technical Disputes, which means they are therefore classified as "Disputes." This motion refers to that disagreement as "the Threshold Dispute."

That distinction in classification is a critical threshold matter because it governs which dispute-resolution procedures apply. Disputes defined by the agreement as "Technical Disputes" must be adjudicated in a confidential, expedited proceeding by a technical expert whose decision is final, binding, and non-appealable. Disputes other than Technical Disputes—which are simply termed "Disputes"—follow a more traditional path of mediation and litigation in court.

Relevant to this motion, the Threshold Dispute about classification is itself a "Dispute" under Section 15.1, which must be adjudicated in the same way as any other Dispute before the six categories of dispute identified by P3A can be adjudicated. Defendants seemingly agreed to this uncontestable proposition—████████████████████. But now they are inexplicably rejecting that obvious, common-sense reading of the T&D OMA and refusing to mediate the Threshold Dispute, as required by the T&D OMA. They have also stated that ████████████

███████████████████████████████████████████████████████,
notwithstanding LUMA's objection that they are pursuing the wrong process.

By pursuing this course without first resolving the Threshold Dispute, Defendants are breaching the T&D OMA. Indeed, they have already breached Article 15 by refusing to mediate the Threshold Dispute. The risk of irreparable harm here from Defendants' breach is urgent and serious. LUMA faces a Hobson's choice. If LUMA refuses to participate in the Technical Dispute process initiated by P3A (a confidential, expedited, non-appealable process before a technical expert), then it risks losing the opportunity to defend itself on the merits if the Court later determines that one or more of the disputes considered by the technical expert were, in fact, Technical Disputes. But if LUMA participates in the Technical Dispute process, then it risks waiving its challenge to that process and forfeiting its day in court.

That risk is also imminent. Defendants have expressly refused to mediate and stated that ████████████████████████████████████████████████████. Thus, LUMA was forced to file the underlying lawsuit and to seek provisional relief from this Court as permitted under Section 15.8 of the T&D OMA.

Why are Defendants doing this? The disputes raised by Defendants are the first step in their publicly announced effort to oust LUMA as the operator of Puerto Rico's T&D System. The Technical Dispute process is a confidential process before a privately selected decision-maker. LUMA has no doubt that Defendants believe that process will be a more favorable and pliant forum for Defendants, and that, after having publicly circulated their own lengthy list of gripes against LUMA, they want to muzzle LUMA while they continue to stoke public sentiment against it. If Defendants' disputes are aired and fairly adjudicated in a public forum—as the T&D OMA requires—Defendants' own conduct (including their efforts to starve LUMA of funds) will be

publicly scrutinized. Defendants obviously want to prevent that from happening, while simultaneously tilting the scales in their favor.

The relief sought here is straightforward. First, LUMA respectfully requests that the Court enjoin Defendants from initiating or continuing any of the dispute-resolution procedures in Article 15 with respect to issues in P3A's July 22, 2025  Notice of Dispute unless and until the Threshold Dispute is decided—either by agreement or through the dispute-resolution process. And, second, LUMA respectfully requests that the Court order Defendants to mediate the Threshold Dispute as required by Section 15.5 of the T&D OMA.

## I.      BACKGROUND

### A.      The T&D OMA and the Parties' relationship.

On June 22, 2020, the Board of Directors of the P3A, the Puerto Rico Energy Bureau ("PREB"), the PREPA Governing Board, and the Governor of Puerto Rico approved the T&D OMA between LUMA and Defendants. Under the T&D OMA, LUMA assumed the operation and management of PREPA's T&D System, while PREPA retained ownership of the T&D System. P3A was designated as the Administrator with duties for overseeing the contract's operation and liaising between LUMA and PREPA. LUMA took over the operation of PREPA's electric power transmission and distribution system on June 1, 2021.

#### 1.      The T&D OMA's Dispute resolution process.

Article 15 of the T&D OMA sets out "the sole and exclusive procedures for the resolution of . . . Disputes," which are defined as "any dispute among the Parties arising out of, relating to or in connection with this Agreement or the existence, interpretation, breach, termination or validity thereof." T&D OMA § 15.1, Exhibit A. Any party to the T&D OMA may initiate the Article 15 Dispute Resolution Procedure "by giving a written notice of the Dispute to the other Party (a 'Notice of Dispute')." *Id.* § 15.2(a). After receiving a Notice of Dispute, the parties are required to

designate representatives to "negotiate in good faith and attempt to resolve the Dispute within thirty (30) days after the date on which the Notice of Dispute was issued." *Id.* § 15.3(a).

"If the Dispute remains unresolved thirty (30) days after the Notice of Dispute is issued (or such longer period as Operator and Administrator may mutually agree in writing) (the 'Negotiation Period')," then the next step in the process depends on whether or not the Dispute is classified as a "Technical Dispute." *See id.* §§ 15.3(b)(i)–(ii).

- Technical Disputes are "referred to the Expert Technical Determination procedure set forth in Section 15.4 (*Expert Technical Determination Procedure for Technical Disputes)* for a final and binding determination." *Id.* § 15.3(b)(i). The Expert Technical Determination is a confidential, expedited process in which an independent expert, selected through agreement of the parties or, if the parties cannot agree, by appointment of the ICC, must determine the Technical Dispute within 60 days of appointment. *See id.* § 15.4. The expert's determination is final, binding, and non-appealable. *Id.*

- All other Disputes "proceed to mediation pursuant to Section 15.5 (*Mediation),* and if necessary, litigation pursuant to Section 15.6 (*Litigation as a Final Resort),* for a final and binding determination." *Id.* § 15.3(b)(ii). A party "may refer the Dispute to mediation through a written notice of mediation." *Id.* § 15.5. It "may not initiate a civil action as provided in Section 15.6 (*Litigation as a Final Resort)* (other than provisional relief sought on an expedited basis) unless" (i) the matter has first been submitted to mediation, or (ii) the party "would be barred from asserting its claim in a civil action if it were required to submit to mediation." *Id.* If the parties are unable to resolve the Dispute "within ninety (90) days after the date the mediator

is selected," either party "may initiate a civil action in the Commonwealth Court

and in accordance with all applicable rules of civil procedure." *Id.* § 15.6

Finally, Section 15.8 contains a special provision for emergency or provisional relief:

> Notwithstanding any other provision in this Agreement, no Party shall be precluded from initiating a proceeding in the Commonwealth Court for the purpose of obtaining any emergency or provisional remedy to protect its rights that may be necessary and that is not otherwise available under this Agreement, including temporary and preliminary injunctive relief, restraining orders and other remedies to avoid imminent irreparable harm, provide uninterrupted electrical and other services or preserve the status quo pending the conclusion of such negotiation, mediation or litigation. The commencement of or participation in an action for provisional relief with regard to Technical Disputes shall not constitute a waiver of the requirements or procedures of Section 15.5 (*Mediation).*

### 2.   The T&D OMA's definition of a "Technical Dispute."

The T&D OMA defines a "Technical Dispute" as:

> [A]ny Front-End Transition Service Fee Estimate Dispute, Front-End Transition Service Fee Dispute, Back-End Transition Service Fee Estimate Dispute, Back-End Transition Service Fee Dispute, Handover Checklist Dispute, Administrator Dispute, Service Fee Dispute, Budget Dispute, Service Account Dispute, Disallowed Costs Dispute or Force Majeure Event Dispute (each a 'Technical Dispute'), or any engineering or technical dispute Operator and Administrator mutually agree in writing is a Technical Dispute.

*Id.* § 15.3(b)(i). Each of the capitalized terms in the definition is itself a defined term. The

definition of each is provided in the table below, along with a reference to the section in which

each is defined:

| Defined Term | Definition | T&D OMA § |
|---|---|---|
| Front-End Transition Service Fee Estimate Dispute | A dispute "in connection with [LUMA's] estimate of the anticipated Front-End Transition Service Fee" | 4.6(c)(ii) |
| Front-End Transition Service Fee Dispute | A dispute over "invoice amounts" for "the provision of the Front-End Transition Services" or "the calculation of the Front-End Transition Service Fee related thereto" | 4.6(d)(ii) |

| Defined Term | Definition | T&D OMA § |
|---|---|---|
| Back-End Transition Service Fee Estimate Dispute | A dispute "in connection with [LUMA's] estimate of the anticipated Back-End Transition Service Fee" | 16.4(c)(iii) |
| Back-End Transition Service Fee Dispute | A dispute over "invoice amounts" for "the provision of the Back-End Transition Services" or "the calculation of the Back-End Transition Service Fee related thereto" | 16.4(d)(ii) |
| Handover Checklist Dispute | A dispute over "the completion of any item on the Handover Checklist" | 4.7(a) |
| Administrator Dispute | A dispute "with respect to clauses (ii) through (xi) of Section 6.2(a) (Rights and Responsibilities of Administrator – Generally)" | 6.2(b) |
| Service Fee Dispute | A dispute "in connection with the Service Fee (including any adjustments thereto as permitted by this Agreement)" | 7.1, 7.1(e) |
| Budget Dispute | A dispute "in connection with a Budget (including proposed amendments thereto or the need for amendments thereto)" | 7.3(f) |
| Service Account Dispute | A dispute "in connection with a Service Account, the Front-End Transition Account or the Back-End Transition Account" | 7.5(g) |
| Disallowed Costs Dispute | A dispute "in connection with Disallowed Costs" | 7.6(b) |
| Force Majeure Event Dispute | A dispute "in connection with whether and to the extent an event, circumstance or condition constitutes a Force Majeure Event, or whether such Force Majeure Event continues" | 17.1(c) |

If a Dispute does not meet one of the above definitions, then (absent agreement of the parties) it is not a Technical Dispute.

**B.      The Six Disputes.**

Defendants are engaged in a coordinated effort to starve LUMA of the funds necessary to operate the T&D system while simultaneously challenging LUMA's performance under the T&D OMA—all part of a publicly announced strategy to manufacture a basis to terminate the T&D OMA. For approximately 2.5 years, PREPA has underfunded LUMA's service accounts, i.e., the accounts LUMA draws on to pay for the operational and capital expenditures necessary to provide Puerto Rico with electric service. Beginning in August 2024, PREPA allowed the accounts' funding to drop to such a low level that PREPA breached—and has continued to breach—the T&D

OMA. PREPA has steadfastly refused LUMA's pleas to correct this funding deficiency. As a

result, LUMA has had to divert money from critical system upgrades to continue to run the system,

leading to further deterioration of a grid that already suffered at least 30 years of deferred

maintenance.

On July 22, 2025, P3A, as administrator for PREPA, notified LUMA by letter of six

purported disputes. *See* P3A July 22, 2025 Notice of Dispute, Exhibit B. LUMA contends that

none of these issues are Technical Disputes as that term is defined in the T&D OMA. Defendants

insist they are all Technical Disputes. A summary is below.

| Dispute No. | Description | Brief Summary of Defendants' Allegations |
|---|---|---|
| 1 | Federal Funds | Defendants allege that LUMA has failed to comply with federal funding obligations, delayed securing reimbursements, reconciling accounts, and providing required documentation for federally funded projects. |
| 2 | Insufficient Revenue | Defendants allege that LUMA has failed to generate sufficient revenues, obtain federal reimbursements, and manage service account funding, resulting in liquidity crises for PREPA. |
| 3 | April 16, 2025 Blackout | Defendants allege that LUMA failed to comply with its contractual obligations following the island-wide blackout of April 16, 2025. Although not stated explicitly, they imply a failure to meet reporting requirements under Article 5. It appears Defendants may also be alleging a failure of vegetation management. |
| 4 | Vegetation Management | Defendants allege that LUMA has failed to appropriately manage vegetation, failed to address certain high voltage lines, failed to inspect certain assets in advance of the hurricane season, and failed to adequately maintain and plan for public lighting. |
| 5 | Financial Statements/Audits | Defendants allege that LUMA failed to comply with certain audit and financial reporting obligations. |
| 6 | Pole Fees | Defendants allege that LUMA failed to collect certain pole attachment fees from third-party telecommunications and cable entities. |

**C.    The Threshold Dispute arises, and Defendants refuse to comply with Article 15 of the T&D OMA.**

On July 25, 2025, LUMA informed Defendants in writing ███████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████ That letter also notified Defendants that they should consider it a "Notice of Dispute" on the issue of Defendants' classification of each dispute as a "Technical Dispute" pursuant to Section 15.2 of the T&D OMA. *Id.*

P3A responded to LUMA's July 25, 2025 Notice of Dispute on August 2, 2025. *See* P3A August 2, 2025 Letter, Exhibit D. It ███████████████████████████████ ████████████████ *Id.* Notably, the letter also ███████████████████████ ████████████████████████████████████████████████████████ ██████████████████████—such as this one. *Id.*

Thereafter, the Parties' designated representatives met and discussed both the Threshold Dispute and the substance of Defendants' allegations as required by Section 15.3 of the T&D OMA. No issues were resolved.

On August 15, 2025, P3A sent another letter. Consistent with the assertion in its August 2, 2025 letter, P3A ██████████████████████████████████████████ ████████████████████████████████████████████████████████████████ *See* P3A August 15, 2025 Letter, Exhibit E. That, of course, is correct. The Threshold Dispute is a Dispute subject to mediation and litigation. Accordingly, on August 15, 2025, LUMA demanded mediation with respect to the Threshold Dispute. *See* LUMA August 15, 2025 Notice of Mediation, Exhibit F.

Inexplicably, on August 20, 2025, P3A sent a letter in which it refused to participate in mediation of the Threshold Dispute—█████████████████████████████████ █████████████████████████████. Instead, it ██████████████████████████ ████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████. *See* P3A

August 20, 2025 Letter, Exhibit G. Of course, any issue in P3A's July 22 letter that is ultimately

determined **not** to be a Technical Dispute does **not** go through the ICC process.

Defendants' refusal to participate in mediation on the Threshold Dispute is a breach of

Section 15.5 of the T&D OMA.

## II.    ARGUMENT

**A.    This Court has subject matter jurisdiction to decide the Threshold Dispute.**

As noted above, the T&D OMA calls for Disputes that are not Technical Disputes to be

adjudicated in the Commonwealth Court. T&D OMA § 15.6, Exhibit A. However, this Court has

"related to" jurisdiction in this particular instance because this suit will have a substantial effect

on the administration of PREPA's Title III case. *See, e.g.*, *Voya Institutional Tr. Co. v. Univ. of*

*Puerto Rico,* 266 F. Supp. 3d 590, 598 (D.P.R. 2017). The proceeding "need not necessarily be

against the debtor or against the debtor's property"; if the outcome is one that "could alter the

debtor's rights, liabilities, options, or freedom of action (either positively or negatively)" and

"impact[] . . . the handling and administration of the bankruptcy case," then the proceeding is

"related to" the bankruptcy. *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 631 B.R. 607, 610

(D.P.R. 2021).

Here, PREPA is a defendant, and the T&D OMA is integral to PREPA's restructuring. The

T&D OMA literally governs the operation of PREPA's transmission and distribution assets; it and

PREPA's agreement with Genera PR are PREPA's most important contracts. This dispute is the

first step in Defendants' publicly announced plan to terminate the T&D OMA and retake control

over those assets, actions that will indubitably harm—and likely derail—PREPA's ongoing

restructuring efforts.

Further, the disputes that P3A has raised will negatively impact the assets that are necessary to PREPA's restructuring efforts and the payments to PREPA's creditors under the currently pending Fiscal Plan. For example, P3A demands that LUMA make numerous operational changes and incur substantial capital expenditures that will necessarily affect the assets available for PREPA's restructuring efforts, because PREPA will be the source of funds for any such changes or expenditures. *See* P3A July 22, 2025 Notice of Dispute at 20, Exhibit B (demanding that LUMA immediately halt the use of seconded employees on federally funded work), 46 (demanding that LUMA develop a corrective-action program to address root causes of all island-wide or major outages since June 2024), 50–51 (demanding LUMA clear certain easement intrusions and engage a third-party expert to certify compliance monthly), 80 (demanding changes to pole-attachment revenue collection). Those disputes can and should be adjudicated in this Court in full view of all parties with an interest in the estate—not in secret. The resolution of a dispute over where those disputes should be adjudicated therefore necessarily also relates to the administration of the estate. *See, e.g.*, *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir. 1984) (relating to jurisdiction encompasses any dispute that "could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively)" and in some way "impact [] . . . the handling and administration of the bankruptcy estate").

In addition, in the course of responding to P3A's allegations, LUMA will likely raise defenses of Owner Fault,[2] failure by Owner to perform under the OMA, and perhaps even negligence or willful misconduct by PREPA and P3A. Any such defenses, if successful (and

---

[2] "Owner Fault" is a defined term in the T&D OMA that encompasses any breach of the T&D OMA, failure of compliance or non-performance, and any negligence, tort or willful misconduct by PREPA or P3A that "has had, or is reasonably expected to have, a material adverse effect on [LUMA's] performance or cost of performance . . . or on the operation or maintenance of the T&D System." T&D OMA § 1.1, Exhibit A. A finding of Owner Fault excuses a variety of LUMA's performance obligations under the T&D OMA.

LUMA expects they would be) will give rise to an indemnification obligation by PREPA. *See* T&D OMA § 18.2(a), Exhibit A. This Court has already held that LUMA's claims for indemnification arising out of the T&D OMA establish "related to" jurisdiction. *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, Adv. Pro. No. 22-00050 (D.P.R. Jan. 18, 2023) [Docket No. 27 at 5] ("LUMA's plausible claim to indemnification under the T&D OMA sufficiently tethers this action to PREPA's Title III case to find 'related to' jurisdiction" but ordering remand for other reasons).

**B.    Provisional Relief is necessary to protect the status quo and enforce LUMA's substantive contractual rights.**

Section 15.8 of the T&D OMA permits the Court to issue "temporary and preliminary injunctive relief, restraining orders and other remedies to avoid imminent irreparable harm, provide uninterrupted electrical and other services or preserve the status quo pending the conclusion of such negotiation, mediation or litigation." *See* T&D OMA § 15.8, Exhibit A. Injunctive relief is also available pursuant to Section 105(a) of the Bankruptcy Code and Rule 7065 of the Bankruptcy Rules.

The general purpose of injunctive relief is to prevent future acts or omissions of the non-movant that constitute violations of the law or harmful conduct. *Chevron Puerto Rico, LLC v. Perez-Rosado*, 673 F. Supp. 2d 69, 72 (D.P.R. 2009) (citing *United States v. Oregon Med. Soc.*, 343 U.S. 326, 333 (1952)). The United States Court of Appeals for the First Circuit has set forth a four-part test for considering whether to grant preliminary injunction requests. *Id.* (citing *Lanier Prof. Serv's, Inc. v. Ricci,* 192 F.3d 1 (1st Cir. 1999); *Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 5 (1st Cir. 1991)). A preliminary injunction is appropriate if: (1) the petitioner has exhibited a likelihood of success on the merits; (2) the petitioner will suffer irreparable injury if the injunction is not granted; (3) such injury outweighs any harm which granting injunctive relief

12

would inflict on the respondent; and (4) the public interest will not be adversely affected by granting the injunction. *See, e.g.*, *id.*; *Narragansett Indian Tribe*, 934 F.2d at 5; *Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 892 (1st Cir. 1988); *Hypertherm, Inc. v. Precision Products, Inc.*, 832 F.2d 697, 699 & n. 2 (1st Cir. 1987). Whether to issue an injunction depends on balancing equities where the requisite showing for each of the four factors turns, in part, on the strength of the others. *See Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 611–13 (1st Cir. 1988).

**C.     The Court should temporarily enjoin Defendants from proceeding with any further dispute-resolution proceedings before resolving the Threshold Dispute. It should also compel mediation of the Threshold Dispute.**

**1.     LUMA is likely to succeed on the merits.**

Under Puerto Rico law, courts construe a contract based on its plain language if there is no ambiguity. *Gallo v. Fritz*, 2022 WL 18861582, at *8 (D.P.R. Dec. 6, 2022). Here, Article 15's dispute-resolution provisions require all Disputes that are not Technical Disputes to begin with a Notice of Dispute, be negotiated, then proceed to mediation and, if all those initial processes are unsuccessful, proceed to litigation. *See* T&D OMA, Art. 15, Exhibit A.

The Parties have a Dispute. They disagree about the proper classification of the issues from P3A's July 22, 2025 Notice of Dispute. Defendants claim they are Technical Disputes. LUMA says they are Disputes.

What is seemingly not in dispute—indeed, what is indisputable—is that the Threshold Dispute is itself a "Dispute" subject to the requirements of Article 15. As noted above, ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ *See* P3A

August 15, 2025 Letter, Exhibit E.

The Threshold Dispute is ripe. LUMA sent its Notice of Dispute on the Threshold Dispute per Section 15.2. *See* LUMA July 25, 2025 Notice of Dispute, Exhibit C. The Parties' Designated Representatives have unsuccessfully discussed the issue as required by Section 15.3 of the T&D OMA. Thus, per Section 15.3(b)(ii), following an unsuccessful negotiation, "the Dispute shall proceed to mediation pursuant to Section 15.5 (*Mediation*), and if necessary, litigation pursuant to Section 15.6 (*Litigation as a Final Resort*), for a final and binding determination." *See* T&D OMA, § 15.3(b)(ii), Exhibit A.

As required by the T&D OMA, LUMA accordingly delivered a Notice of Mediation of the Threshold Dispute under Section 15.5. *See* LUMA August 15, 2025 Notice of Mediation, Exhibit F. But Defendants refused to mediate and insisted that ███████████████████████████ ████████████████████████████████████████, notwithstanding LUMA's objection and without first resolving the Threshold Dispute. *See* P3A August 20, 2025 Letter, Exhibit G.

Defendants therefore stand in breach of Article 15 for failing to mediate the Threshold Dispute and otherwise stating ███████████████████████. As noted above, they have ████████████████████████████████████████████████ ██████████ Thus, LUMA is likely to succeed on the merits of its claim with respect to the Threshold Dispute.

### 2.    LUMA will suffer irreparable injury if the injunction is not granted.

An injury will be considered irreparable if no adequate remedy for the injury exists at law. *See Foxboro Co. v. Arabian Am. Oil Co.*, 805 F.2d 34, 36 (1st Cir. 1986). That is the case here. The procedure to resolve Technical Disputes that Defendants have stated they intend to invoke is found in Section 15.4 of the T&D OMA. That Section requires the appointment of an Independent Expert and also states "the Independent Expert shall determine the Technical Dispute

within sixty (60) days after his or her appointment or as otherwise agreed by the Parties" and "the determination by the Independent Expert on any Technical Dispute shall be final and binding on the Parties hereto." *See* T&D OMA § 15.4(a)-(b), Exhibit A. It also makes the decision non-appealable. *See id.*

In other words, if Defendants are not enjoined, any ruling by an Independent Expert would come swiftly, potentially arriving well before an adjudication of the Threshold Dispute. And, at least per the strict terms of the T&D OMA, it would be "final and binding." That would occur, of course, before any proper adjudication of whether those issues even belong before an Independent Expert in the first place.

Defendants' insistence on proceeding with the Technical Dispute process before the Threshold Dispute is adjudicated puts LUMA in an impossible position. If LUMA refuses to participate in that process (because it genuinely believes the disputes are not Technical Disputes and should be resolved through mediation and a public court proceeding), it risks forfeiting its ability to defend itself on the merits should the Court ultimately determine that one or more of the disputes *are* Technical Disputes. But if LUMA submits to the Technical Dispute process and participates in it, then it risks waiving its challenge to that process. If LUMA is correct, ***none*** of the issues in the July 22, 2025 Notice of Dispute belong in the Technical Disputes process. Instead, LUMA should have its day in court to fight Defendants' scurrilous accusations in a public forum with full due process. Defendants' strategy of trying to deny LUMA its day in court is precisely the type of harm that qualifies as irreparable.

**3.      Holding Defendants to the benefit of their bargain causes no harm.**

Weighing the merits of potential harm is easy here because Defendants will suffer none. Holding them to the benefit of their bargain is harmless. The issues they raise in their July 22, 2025 Notice of Dispute will be resolved in due course after the Threshold Dispute is decided. They may complain about delay, but that is just a consequence of their misclassification and attempt to ramrod issues through the Technical Disputes process that don't belong there. In any event, P3A, a sophisticated party, drafted the T&D OMA, and it should not now be allowed to walk back from its own agreement. Giving the Parties the benefit of their bargain is the point here. If some delay results from following the contract, then so be it. In balancing hardships, courts should give little weight to self-inflicted injuries. *McNeil-PPC, Inc. v. Merisant Co*., 2004 WL 3316380, at *26 (D.P.R. July 29, 2004).

**4.      Injunctive relief is in the public interest.**

Finally, the public interest supports granting the injunction. "Importantly, the public interest in the integrity of contractual relations is furthered by the issuance of the preliminary injunction in a case such as this, because the public has an interest in seeing that contracts between consenting parties are honored." *Lucas-Insertco Pharm. Printing Co. of Maryland LLC v. Salzano*, 124 F. Supp. 2d 27, 32 (D.P.R. 2000) (citing *Boston Celtics Ltd. Partnership v. Shaw*, 908 F.2d 1041, 1049 (1st Cir. 1990)). Moreover, Puerto Rico's energy supply is of the utmost public concern, and any disputes related to the functioning of the grid should be held in the public eye— what LUMA seeks here (and what Defendants are seeking to avoid).

**III.    CONCLUSION**

For the reasons stated above, LUMA respectfully requests that the Court (1) enjoin Defendants from initiating or continuing any of the dispute-resolution procedures in Article 15 with respect to issues in P3A's July 22, 2025 Notice of Dispute unless and until the Threshold

Dispute is decided—either by agreement or through the dispute-resolution process—and (2) order

Defendants to mediate the Threshold Dispute as required by Section 15.5 of the T&D OMA.

Dated: August 25, 2025                        Respectfully submitted,

                                              */s/ Brett Ingerman*
                                              Brett Ingerman
                                              **DLA PIPER LLP (US)**
                                              Harbor East
                                              650 S. Exeter Street, Ste. 1100
                                              Baltimore, MD 21202-4576
                                              T: (410) 580.4177
                                              F: (410) 580.3001
                                              brett.ingerman@us.dlapiper.com

                                              */s/ Mariana Muñiz Lara*
                                              Mariana Muñiz Lara (local counsel)
                                              Puerto Rico Bar No. 18262
                                              **DLA Piper (Puerto Rico) LLC**
                                              500 Calle de la Tanca, Suite 401
                                              San Juan, Puerto Rico 00901-1969
                                              T: (787) 945.9106
                                              F: (787) 945.9102
                                              mariana.muniz@us.dlapiper.com

                                              ***Attorneys for LUMA Energy, LLC, and
                                              LUMA Energy Servco, LLC***

# Exhibit A

*Execution Version*

PRIVILEGED AND CONFIDENTIAL

---

**PUERTO RICO TRANSMISSION AND DISTRIBUTION SYSTEM**

**OPERATION AND MAINTENANCE AGREEMENT**

**dated as of**

**June 22, 2020**

**by and among**

**THE PUERTO RICO ELECTRIC POWER AUTHORITY**
as Owner,

**THE PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY**
as Administrator,

**LUMA ENERGY, LLC**
as ManagementCo,

**and**

**LUMA ENERGY SERVCO, LLC**
as ServCo

---

CONFIDENTIAL

## TABLE OF CONTENTS

**Page**

**ARTICLE 1 DEFINITIONS; INTERPRETATION** ................................................................. **2**

Section 1.1        Definitions.............................................................................................. 2
Section 1.2        Interpretation; Construction .................................................................. 32

**ARTICLE 2 PURPOSE; EFFECTIVE DATE; TERM** ............................................................ **34**

Section 2.1        Purpose................................................................................................... 34
Section 2.2        Effective Date ......................................................................................... 34
Section 2.3        Term........................................................................................................ 35

**ARTICLE 3 OWNERSHIP OF THE T&D SYSTEM** ............................................................ **36**

Section 3.1        Ownership ............................................................................................... 36
Section 3.2        Engagement of Operator ........................................................................ 36
Section 3.3        Use of T&D System ............................................................................... 36
Section 3.4        Liens....................................................................................................... 36
Section 3.5        Right of Access ...................................................................................... 36
Section 3.6        Exclusivity ............................................................................................. 37
Section 3.7        Essential Public Service ........................................................................ 37
Section 3.8        Reporting Obligations ........................................................................... 37
Section 3.9        Qualified Management Contract ............................................................ 37

**ARTICLE 4 FRONT-END TRANSITION PERIOD** ............................................................. **40**

Section 4.1        Front-End Transition Period Generally ................................................. 40
Section 4.2        ManagementCo Responsibilities ........................................................... 44
Section 4.3        Owner and Administrator Responsibilities ............................................ 49
Section 4.4        Governmental Approvals and Tax Matters............................................. 51
Section 4.5        Conditions Precedent to Service Commencement Date ......................... 52
Section 4.6        Front-End Transition Period Compensation .......................................... 55
Section 4.7        Closing the Front-End Transition Period ............................................... 57
Section 4.8        Failure of Service Commencement Date Conditions.............................. 57
Section 4.9        Subcontractors During the Front-End Transition Period ....................... 60

**ARTICLE 5 O&M SERVICES** ............................................................................................. **62**

Section 5.1        Services Generally ................................................................................. 62
Section 5.2        System Contracts ................................................................................... 62
Section 5.3        Billing and Collection ........................................................................... 63
Section 5.4        System Remediation .............................................................................. 64

CONFIDENTIAL

## TABLE OF CONTENTS
(continued)

Page

Section 5.5      Capital Improvements.................................................................... 64
Section 5.6      System Regulatory Matters........................................................... 66
Section 5.7      Safety and Security ...................................................................... 68
Section 5.8      Labor and Employment; Employee Benefits................................ 69
Section 5.9      Procurement and Administration of Federal Funding ................. 69
Section 5.10     Environmental, Health and Safety Matters.................................. 71
Section 5.11     Accounting and Financial Services............................................... 73
Section 5.12     Legal Matters ................................................................................ 73
Section 5.13     Generation-Related Services......................................................... 73
Section 5.14     Emergency Action ......................................................................... 75
Section 5.15     Information .................................................................................... 76
Section 5.16     Bill Payments ................................................................................ 77
Section 5.17     Compliance with Obligations ....................................................... 77
Section 5.18     Energy Policy under Act 17 .......................................................... 78
Section 5.19     Acquisition of Easements, Fee Interests and Concession Rights ................. 78
Section 5.20     Other Services ............................................................................... 79

**ARTICLE 6 RIGHTS AND RESPONSIBILITIES OF OWNER AND
ADMINISTRATOR**......................................................... **80**

Section 6.1      Rights and Responsibilities of Owner........................................... 80
Section 6.2      Rights and Responsibilities of Administrator ............................... 82
Section 6.3      Reporting; Audits.......................................................................... 83
Section 6.4      Staffing Levels .............................................................................. 84

**ARTICLE 7 COMPENSATION; BUDGETS**................................................ **86**

Section 7.1      Service Fee ..................................................................................... 86
Section 7.2      Pass-Through Expenditures .......................................................... 88
Section 7.3      Budgets ......................................................................................... 88
Section 7.4      Budget Policy ................................................................................ 90
Section 7.5      Service Accounts ........................................................................... 91
Section 7.6      Disallowed Costs .......................................................................... 96
Section 7.7      Unfunded Amounts....................................................................... 97
Section 7.8      Owner Credit Rating ..................................................................... 97
Section 7.9      Owner Payment of Administrator Costs ....................................... 98

**ARTICLE 8 CREDIT SUPPORT** ................................................................. **99**

Section 8.1      Guarantee ...................................................................................... 99
Section 8.2      Guarantor Reports ........................................................................ 99

CONFIDENTIAL

## TABLE OF CONTENTS
(continued)

Page

**ARTICLE 9 COMPLIANCE WITH APPLICABLE LAW** ........................................... **100**

Section 9.1        Compliance Obligations..................................................... 100
Section 9.2        Anti-Corruption and Sanctions Laws............................................ 100
Section 9.3        Commonwealth Requirements ................................................ 101
Section 9.4        Non-Discrimination Laws .................................................... 101
Section 9.5        Non-Collusion and Acceptance .............................................. 101
Section 9.6        Commonwealth Tax Liabilities............................................... 101
Section 9.7        Certifications Required by Commonwealth Contractor Requirements ....... 101
Section 9.8        Duty to Inform of Criminal Investigations .................................. 101
Section 9.9        Act 120............................................................................ 102

**ARTICLE 10 INSURANCE** ................................................................... **103**

Section 10.1       Insurance Generally ......................................................... 103
Section 10.2       Commercial Availability...................................................... 103
Section 10.3       Additional Named Insureds ................................................. 103
Section 10.4       Warranties ..................................................................... 104
Section 10.5       Certificates of Insurance, Policies and Notice .......................... 104

**ARTICLE 11 SUBCONTRACTORS AND CONTRACTORS** ............................... **105**

Section 11.1       Ability to Subcontract and Contract ...................................... 105
Section 11.2       Subcontract and Contract Terms........................................... 106
Section 11.3       Indemnity for Subcontractor Claims....................................... 106

**ARTICLE 12 TAXATION** .................................................................... **108**

Section 12.1       Withholding Tax ............................................................. 108
Section 12.2       Tax Obligations............................................................... 108

**ARTICLE 13 INTELLECTUAL PROPERTY; PROPRIETARY INFORMATION** ...... **109**

Section 13.1       Intellectual Property....................................................... 109
Section 13.2       Proprietary Information ..................................................... 115
Section 13.3       Data Security................................................................. 119

**ARTICLE 14 EVENTS OF DEFAULT; REMEDIES** ...................................... **121**

Section 14.1       Events of Default by Operator ............................................. 121
Section 14.2       Termination for Operator Event of Default ............................... 122
Section 14.3       Events of Default By Owner................................................. 123
Section 14.4       Termination for Owner Event of Default.................................. 124

CONFIDENTIAL

## TABLE OF CONTENTS
(continued)

Page

Section 14.5      Additional Termination Rights ................................................................... 125
Section 14.6      Remedies Upon Early Termination ............................................................ 126

**ARTICLE 15 DISPUTE RESOLUTION** ............................................................... **129**

Section 15.1      Scope ............................................................................................................ 129
Section 15.2      Commencement of the Dispute Resolution Procedure ............................ 129
Section 15.3      Negotiation .................................................................................................. 129
Section 15.4      Expert Technical Determination Procedure for Technical Disputes ........... 130
Section 15.5      Mediation ..................................................................................................... 131
Section 15.6      Litigation as a Final Resort ........................................................................ 132
Section 15.7      Waiver of Jury Trial ................................................................................... 133
Section 15.8      Provisional Relief ....................................................................................... 133
Section 15.9      Continuing Obligations .............................................................................. 133

**ARTICLE 16 BACK-END TRANSITION** ............................................................. **134**

Section 16.1      Successor Operator ..................................................................................... 134
Section 16.2      Back-End Transition Services ..................................................................... 134
Section 16.3      Transfer Obligation ..................................................................................... 137
Section 16.4      Back-End Transition Period Compensation ............................................... 137
Section 16.5      Surrender of the T&D System .................................................................... 139

**ARTICLE 17 FORCE MAJEURE EVENTS** ......................................................... **140**

Section 17.1      Notice; Mitigation ...................................................................................... 140
Section 17.2      Relief ........................................................................................................... 140

**ARTICLE 18 INDEMNIFICATION** ...................................................................... **142**

Section 18.1      Indemnification by Operator ...................................................................... 142
Section 18.2      Indemnification by Owner .......................................................................... 143
Section 18.3      Limitation on Liability ................................................................................ 144
Section 18.4      Insurance and Other Recovery .................................................................... 145
Section 18.5      Liability Limitation for Certain Damages ................................................... 146
Section 18.6      Additional Liability Limitation for Certain Damages ................................ 146

**ARTICLE 19 REPRESENTATIONS AND WARRANTIES** ................................ **148**

Section 19.1      Representations and Warranties of Owner .................................................. 148
Section 19.2      Representations and Warranties of Operator .............................................. 149

CONFIDENTIAL

# TABLE OF CONTENTS
(continued)

Page

**ARTICLE 20 MISCELLANEOUS** ........................................................................................... **153**

Section 20.1          Fees and Expenses ...................................................................... 153
Section 20.2          Notices ......................................................................................... 153
Section 20.3          Amendments ............................................................................... 154
Section 20.4          Entire Agreement ...................................................................... 154
Section 20.5          Relationship of the Parties .................................................... 155
Section 20.6          Assignment and Transfer ....................................................... 155
Section 20.7          Interest on Overdue Obligations .......................................... 156
Section 20.8          Waivers ....................................................................................... 156
Section 20.9          Severability ................................................................................ 156
Section 20.10        Survival ....................................................................................... 156
Section 20.11        No Third-Party Beneficiaries ................................................ 156
Section 20.12        Remedies ..................................................................................... 157
Section 20.13        Counterparts .............................................................................. 157
Section 20.14        Office of the Comptroller ........................................................ 157
Section 20.15        Governing Law .......................................................................... 157
Section 20.16        Commonwealth Obligations ................................................... 158
Section 20.17        PREB Authority ........................................................................ 158

**ANNEXES**

Annex I Scope of Services
Annex II Front-End Transition Plan
Annex III Back-End Transition Plan
Annex IV Operator Employment Requirements
Annex V Front-End Transition Hourly Fully Allocated Rates
Annex VI GenCo Shared Services
Annex VII ManagementCo Costs
Annex VIII Service Fee
Annex IX Performance Metrics
Annex X Calculation of Incentive Fee
Annex XI T&D Pass-Through Expenditures
Annex XII Insurance Specifications
Annex XIII Operator Termination Fee Multiplier
Annex XIV Operator Marks
Annex XV Owner Marks

**CONFIDENTIAL**

## TABLE OF CONTENTS
(continued)

**Page**

**EXHIBITS**

Exhibit A Form of Federal Funding Certifications
Exhibit B Form of Commonwealth Certifications
Exhibit C Form of Anti-Corruption Certifications
Exhibit D Form of Guarantee Agreement
Exhibit E Form of Sworn Statement
Exhibit F -1  Form of Tax Opinion – Effective Date
Exhibit F -2  Form of Final Tax Opinion
Exhibit G Form of Reliance Letter
Exhibit H Term Sheet for GridCo-GenCo PPOA

CONFIDENTIAL

## PUERTO RICO TRANSMISSION AND DISTRIBUTION SYSTEM OPERATION AND MAINTENANCE AGREEMENT

This PUERTO RICO TRANSMISSION AND DISTRIBUTION SYSTEM OPERATION AND MAINTENANCE AGREEMENT (this "Agreement") is made and entered into as of this 22nd day of June, 2020 by and among: (i) the Puerto Rico Electric Power Authority ("Owner"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, created by Act No. 83 of the Legislative Assembly of Puerto Rico, enacted on May 2, 1941; (ii) the Puerto Rico Public-Private Partnerships Authority ("Administrator"), a public corporation of the Commonwealth of Puerto Rico, created by Act No. 29 of the Legislative Assembly of Puerto Rico, enacted on June 8, 2009; (iii) LUMA Energy, LLC ("ManagementCo"), a limited liability company organized under the laws of Puerto Rico; and (iv) LUMA Energy ServCo, LLC ("ServCo" and, together with ManagementCo, "Operator" and, together with Owner, Administrator and ManagementCo, the "Parties" and each a "Party"), a limited liability company organized under the laws of Puerto Rico. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in Article 1 (*Definitions; Interpretation*).

## RECITALS

WHEREAS, Owner owns and operates Owner's transmission and distribution system and related facilities, equipment and other assets related to the transmission and distribution system in which Owner has an ownership or leasehold interest (the "T&D System");

WHEREAS, pursuant to, and under the terms and conditions contained in, Act No. 29 of the Legislative Assembly of Puerto Rico, enacted on June 8, 2009 ("Act 29") and Act No. 120 of the Legislative Assembly of Puerto Rico, enacted on June 21, 2018 ("Act 120"), Owner is authorized to execute and deliver this Agreement, perform its obligations hereunder and enter into the transactions contemplated hereby;

WHEREAS, in accordance with Act 120, Owner desires to transform Puerto Rico's energy system into a modern, sustainable, reliable, efficient, cost-effective and resilient system;

WHEREAS, Owner desires to engage Operator to provide the O&M Services for the T&D System in accordance with the terms of this Agreement and has designated Administrator as a Representative of Owner for purposes of this Agreement; and

WHEREAS, Operator desires to provide the O&M Services for the T&D System in accordance with the terms of this Agreement and ManagementCo has formed ServCo, a subsidiary service company, to provide substantially all of the services required under this Agreement.

NOW THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements contained herein and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties covenant and agree as follows:

CONFIDENTIAL

# ARTICLE 1
## DEFINITIONS; INTERPRETATION

**Section 1.1    Definitions**. As used in this Agreement, the following capitalized terms have the respective meanings set forth below.

"AAFAF" means the Puerto Rico Fiscal Agency and Financial Advisory Authority.

"Act 2" means Act No. 2 of the Legislative Assembly of Puerto Rico, enacted on January 4, 2018.

"Act 3" means Act No. 3 of the Legislative Assembly of Puerto Rico, enacted on January 23, 2017.

"Act 17" means Act No. 17 of the Legislative Assembly of Puerto Rico, enacted on April 11, 2019.

"Act 26" means Act No. 26 of the Legislative Assembly of Puerto Rico, enacted on January 27, 2017.

"Act 29" has the meaning set forth in the Recitals.

"Act 57" means Act No. 57 of the Legislative Assembly of Puerto Rico, enacted on May 17, 2014.

"Act 66" means Act No. 66 of the Legislative Assembly of Puerto Rico, enacted on June 17, 2014.

"Act 120" has the meaning set forth in the Recitals.

"Act 173" has the meaning set forth in Section 9.3(a) (*Commonwealth Requirements – Practice of Engineering, Architecture and Other Professions in the Commonwealth*).

"Administrative Determination" has the meaning set forth in Section 4.5(t)(i) (*Conditions Precedent to Service Commencement Date – Tax Matters*).

"Administrator" has the meaning set forth in the introductory paragraph.

"Administrator Dispute" has the meaning set forth in Section 6.2(a)(xi) (*Rights and Responsibilities of Administrator – Disputes*).

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, including through one or more intermediaries, Controls, is Controlled by or is under common Control with such Person; provided, that each Equity Participant and its Affiliates will be deemed "Affiliates" of Operator.

"Agreement" has the meaning set forth in the introductory paragraph.

CONFIDENTIAL

"Anti-Corruption Laws" has the meaning set forth in Section 9.2(a) (*Anti-Corruption and Sanctions Laws – Anti-Corruption*).

"Applicable Law" means any foreign, national, federal, state, Commonwealth, municipal or local law, constitution, treaty, convention, statute, ordinance, code, rule, regulation, common law, case law or other similar requirement enacted, adopted, promulgated or applied by any Governmental Body, including any Environmental Law, PROMESA and any order issued by the Title III Court, in each case applicable to the Parties.

"Audit" means a review with respect to any matter relating to the T&D System, the O&M Services or this Agreement, including compliance with the terms of this Agreement, conducted in accordance with applicable United States audit practices customarily accepted in the electric sector and the terms of this Agreement or as required by Applicable Law.

"Authorized Inspector" has the meaning set forth in Section 6.3(a) (*Reporting; Audits – Generally*).

"Back-End Transition Account" has the meaning set forth in Section 16.4(c)(i) (*Back-End Transition Period Compensation – Funding*).

"Back-End Transition Commencement Date" has the meaning set forth in Section 16.1 (*Successor Operator*).

"Back-End Transition Plan" has the meaning set forth in Section 4.2(i) (*ManagementCo Responsibilities – Back-End Transition Plan*).

"Back-End Transition Service Fee" has the meaning set forth in Section 16.4(b) (*Back-End Transition Period Compensation – Back-End Transition Service Fee*).

"Back-End Transition Service Fee Dispute" has the meaning set forth in Section 16.4(d)(ii) (*Back-End Transition Period Compensation – Invoices*).

"Back-End Transition Service Fee Estimate Dispute" has the meaning set forth in Section 16.4(c)(iii) (*Back-End Transition Period Compensation – Funding*).

"Back-End Transition Services" means services provided under this Agreement in order to complete the transition and handover of the O&M Services, and other rights and responsibilities with respect to the T&D System, back to Owner or to a successor operator upon the expiration or early termination of the Term, including the services contemplated by the Back-End Transition Plan; provided that the Back-End Transition Services shall not be O&M Services.

"Bankruptcy Code" means the United States Bankruptcy Code, 11 U.S.C. 101 et seq. "Bankruptcy Code" shall also include (i) Title III of PROMESA, (ii) any similar state or Commonwealth law relating to bankruptcy, insolvency, the rights and remedies of creditors, the appointment of receivers or the liquidation of companies and estates that are unable to pay their debts when due and (iii) any similar insolvency or bankruptcy code applicable under the laws of any other jurisdiction.

CONFIDENTIAL

"Baseline Environmental Study" has the meaning set forth in Section 4.5(f) (*Conditions Precedent to Service Commencement Date – Pre-Existing Environmental Conditions*).

"Budget" means each of the Operating Budget, the Capital Budget – Federally Funded, the Capital Budget – Non-Federally Funded and the Generation Budget, and "Budgets" means, collectively, all of them.

"Budget Dispute" has the meaning set forth in Section 7.3(f) (*Budgets – Budget Disputes*).

"Business Day" means any day that is not a Saturday, a Sunday or a day observed as a holiday by either the Commonwealth or the United States federal government.

"Capital Account – Federally Funded" has the meaning set forth in Section 7.5(b)(i) (*Service Accounts – Capital Account – Federally Funded*).

"Capital Account – Non-Federally Funded" has the meaning set forth in Section 7.5(c)(i) (*Service Accounts – Capital Account – Non-Federally Funded*).

"Capital Budget – Federally Funded" means, for any given Contract Year, the capital budget for such Contract Year, together with the projected capital budget for the following two (2) Contract Years, in each case setting forth in detail planned Federally Funded Capital Improvements, including monthly budgets of such expenditures and cash flows, as such budget may be amended or adjusted from time to time in accordance with the terms and conditions of this Agreement, which shall include, among other things: (i) a description of the proposed Federally Funded Capital Improvements; (ii) a schedule for the implementation of such Federally Funded Capital Improvements; (iii) an estimate of the costs for the project to be incurred in each Contract Year in the event the project requires more than a year to complete; (iv) the impact of such Federally Funded Capital Improvements on the T&D System, including rates charged to T&D Customers; (v) an explanation of the relationship to other planned or subsequently required Capital Improvements; (vi) the anticipated useful life of each Federally Funded Capital Improvement; and (vii) the economic and engineering justifications for such project.

"Capital Budget – Non-Federally Funded" means, for any given Contract Year, the capital budget for such Contract Year, together with the projected capital budget for the following two (2) Contract Years, in each case setting forth in detail planned Non-Federally Funded Capital Improvements, including monthly budgets of such expenditures and cash flows, as such budget may be amended or adjusted from time to time in accordance with the terms and conditions of this Agreement, which shall include, among other things: (i) a description of the proposed Non-Federally Funded Capital Improvements; (ii) a schedule for the implementation of such Non-Federally Funded Capital Improvements; (iii) an estimate of the costs for the project to be incurred in each Contract Year in the event the project requires more than a year to complete; (iv) the impact of such Non-Federally Funded Capital Improvements on the T&D System, including rates charged to T&D Customers; (v) an explanation of the relationship to other planned or subsequently required Capital Improvements; (vi) the anticipated useful life of each Non-Federally Funded Capital Improvement; and (vii) the economic and engineering justifications for such project.

4

CONFIDENTIAL

"Capital Budgets" means, for any given Contract Year, collectively, the Capital Budget – Federally Funded and the Capital Budget – Non-Federally Funded.

"Capital Costs" means, collectively, Capital Costs – Federally Funded and Capital Costs – Non-Federally Funded.

"Capital Costs – Federally Funded" has the meaning set forth in Section 7.5(b)(i) (*Service Accounts – Capital Account – Federally Funded*).

"Capital Costs – Non-Federally Funded" has the meaning set forth in Section 7.5(c)(i) (*Service Accounts – Capital Account – Non-Federally Funded*).

"Capital Improvement" means any repair, replacement, improvement, removal and retirement, alteration and addition that (i) constitutes a capital property unit in accordance with the T&D System's capitalization policy, consistently applied (other than any repair, replacement, improvement, removal and retirement, alteration and addition constituting ordinary course repair or maintenance of the T&D System), including all Public Works Improvements that have been approved in accordance with this Agreement, and (ii) have an expected useful service life of more than one (1) year from the date of installation. For the avoidance of doubt, (x) a "capital property unit" shall be understood to mean a capitalizable expenditure that adds to or increases the value of Owner's capital assets and (y) the "T&D System capital policy" shall be understood to refer to the PREPA capitalization policy, adapted as needed and agreed to by Owner and Operator during the Front-End Transition Period.

"Cash Management Agreement" shall mean an agreement reasonably satisfactory to Owner and Operator to be executed by Owner and Operator in lieu of a Servicing Contract at the time that a Servicing Contract would have been required to be entered into hereunder.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 et seq.

"Change in Law" means any of the following events or conditions occurring on or after the Proposal Submission Date that has had, or is reasonably expected to have, a material adverse effect on the performance or the cost of performance by the Parties of their respective obligations under this Agreement (other than payment obligations), or on the operation or maintenance of the T&D System:

(i)       the adoption, promulgation or issuance of a modification or written change in the Applicable Law or the administrative or judicial interpretation thereof, unless such modification or written change was duly adopted, promulgated or issued in final form prior to the Proposal Submission Date and becomes effective without any further action by any Governmental Body or governmental official having jurisdiction;

(ii)       any order or judgment of any Governmental Body to the extent such order or judgment is not the result of willful misconduct or negligent action or omission or lack of reasonable diligence of the Party claiming the occurrence of a Change in Law; provided, however, that the contesting in good faith or the failure in good faith to contest any such order or judgment

CONFIDENTIAL

shall not constitute or be construed as such a willful misconduct or negligent action or omission of, or lack of reasonable diligence by, the Party; or

(iii)    the denial of an application for, the delay in the review, issuance or renewal of, or the suspension, termination, interruption, imposition of a new condition in connection with the issuance, renewal or the failure of issuance or renewal of any Governmental Approval to the extent that such denial, delay, suspension, termination, interruption, imposition of a new condition or failure (A) interferes with the performance of this Agreement and (B) is not the result of willful misconduct or negligent action or omission or a lack of reasonable diligence of the Party claiming the occurrence of a Change in Law; provided, however, that the contesting in good faith or the failure in good faith to contest any such denial, delay, suspension, termination, interruption, imposition of a new condition or failure shall not be construed as such a willful misconduct or negligent action or omission of, or lack of reasonable diligence by, the Party;

provided that "Change in Law" shall not include (x) the imposition of a Tax, or an increase in Taxes, unless such imposition or increase has a materially disproportionate impact on any of Operator, the T&D System or private operators of transmission and distribution systems in the Commonwealth or Contractors (as defined in Act 29) compared to any other entities that operate in the Power and Electricity sector in the Commonwealth; or (y) the delay or denial of any request to approve a Budget, Rate Order, a change in Performance Metrics or performance relief.

"Change in Regulatory Law" means any change, amendment or modification to any Commonwealth Applicable Law (and not, for the avoidance of doubt, the Applicable Law of any other jurisdiction) or any adoption of, or change to, any administrative or judicial interpretation (having the force of law) of any Commonwealth Applicable Law or any regulation or regulatory action under any Commonwealth Applicable Law, in each case occurring on or after the Proposal Submission Date, that:

(i) alters the scope of PREB's statutory oversight over Operator or Owner in a manner that materially and adversely affects Operator's ability to perform its obligations under this Agreement;

(ii) renders unenforceable or invalid, in whole or in part, any right or privilege granted to Operator under this Agreement, including by invalidating Operator's selection under the RFP;

(iii) subjects Operator (or any of its Affiliates or Subcontractors that provides O&M Services hereunder) to rate or other substantive regulation by PREB in a manner that materially and adversely affects Operator's ability to perform its obligations under this Agreement to the extent not otherwise mitigated by the terms of this Agreement, or that constitutes a default by the FOMB under the terms of the FOMB Protocol Agreement, provided, that written notice of such default has been given to FOMB by Operator and such default continues unremedied for a period of thirty (30) days following such written notice, provided, further, that any such default by the FOMB shall constitute a Change in Regulatory Law regardless of whether the conditions in the introductory paragraph of this definition are satisfied;

CONFIDENTIAL

(iv) caps or has the effect of capping rates charged to T&D Customers, other than a temporary cap on rates to address an Outage Event; or

(v) rescinds, or in any way amends in a manner materially adverse to Operator, the Liability Waiver.

"Change of Control" means, with respect to Operator, whether accomplished through a single transaction or a series of related transactions and whether accomplished directly or indirectly, (i) a change in ownership resulting in more than 50% of the direct or indirect voting or economic interests in Operator being transferred to another Person or group of Persons acting in concert that did not have such direct or indirect voting or economic interests immediately prior to such transaction or transactions, (ii) the power directly or indirectly to direct or cause the direction of management and policy of Operator, whether through ownership of voting securities, by contract, management agreement or common directors, officers or trustees or otherwise, being transferred to another Person or group of Persons acting in concert that did not have such power immediately prior to such transaction or transactions or (iii) the merger, consolidation, amalgamation, business combination involving Operator or sale of substantially all of the assets of Operator for the purpose of or with the effect contemplated in clauses (i) or (ii) above; provided, however, that, notwithstanding anything to the contrary set forth in this definition, so long as either (x) Operator continues to provide the Guarantee, or (y) Parent Company continues to directly or indirectly own or operate an electric utility (other than the T&D System) serving at least 250,000 customers, none of the following shall constitute a "Change of Control" for the purposes of this Agreement:

(A)     transfers of direct or indirect ownership, voting or economic interests in Operator between or among Persons that are Affiliates of each other or Persons who are under common Control;

(B)     transfers or sales of shares of Operator or the direct or indirect shareholders of Operator pursuant to bona fide open market transactions (including block trades) on the New York Stock Exchange, NASDAQ, London Stock Exchange or comparable United States or foreign securities exchange, including any such transactions involving an initial or "follow on" public offering;

(C)     transfers of direct or indirect ownership interests in Operator by any Equity Participant or its beneficial owner(s) to any Person so long as the Equity Participants or their respective beneficial owner(s) having ownership interests in Operator (as of the later of (1) the Effective Date or (2) the date on which Administrator most recently approved a Change of Control) together retain, in the aggregate, 50% or more of the direct or indirect voting or economic interests in Operator or the power directly or indirectly to direct or cause the direction of management and policy of Operator, through ownership of voting securities or common directors, officers or trustees;

(D)     a transfer of the direct or indirect ownership interest in Operator, including any events contemplated in (i), (ii) and (iii) of this definition above, or any Affiliates of Operator; and

(E)      a transfer of shares of Operator contemplated by Section 16.3 (*Transfer Obligation*).

"Claiming Party" has the meaning set forth in Section 17.1(a) (*Notice; Mitigation – Notice*).

"Commencement Date Governmental Approvals" has the meaning set forth in Section 4.4(a) (*Governmental Approvals and Tax Matters – Generally*).

"Commonwealth" means the Commonwealth of Puerto Rico.

"Commonwealth Court" means the Commonwealth Court of First Instance, San Juan Part.

"Confidential Information" means data or information in any form disclosed by one Party to the other Party by any means, if and for so long as the data and information are protectable as trade secrets by the disclosing Party or are otherwise confidential. As a non-exhaustive list of examples, "Confidential Information" includes non-public information regarding a Party's Intellectual Property, financial condition and financial projections, business and marketing plans, product plans, product and device prototypes, the results of product testing, research data, market intelligence, technical designs and specifications, secret methods, manufacturing processes, source code of proprietary software, the content of unpublished patent applications, customer lists, vendor lists, internal cost data, the terms of contracts with employees and third parties, and information tending to embarrass the disclosing Party or tending to tarnish its reputation or brand. For the avoidance of doubt, information in this list of examples is only considered "Confidential Information" for so long as it has not been made known to the general public by the disclosing Party or through the rightful actions of a third party.

"Contingency Reserve Account" has the meaning set forth in Section 7.5(f) (*Service Accounts – Contingency Reserve Account*).

"Contingency Reserve Amount" means an amount equal to the average anticipated T&D Pass-Through Expenditures for one and a half (1.5) months in the initial Contract Year, as determined based on the initial Operating Budget.

"Contract" means an agreement or purchase order between Operator, as agent for Owner, and a third party, including Contracts as defined in 2 CFR 200.22.

"Contract Nullification or Cancellation" has the meaning set forth in Section 14.6(c)(i) (*Remedies Upon Early Termination – Termination Fee*).

"Contractor" means a party that enters into a Contract with Operator, as agent for Owner, including Contractors as defined in 2 CFR 200.23.

"Contractor Intellectual Property" has the meaning specified in Section 13.1(a) (*Intellectual Property – Operator Intellectual Property, Contractor Intellectual Property and Subcontractor Intellectual Property*)

CONFIDENTIAL

"Contract Standards" means the terms, conditions, methods, techniques, practices and standards imposed or required by: (i) Applicable Law; (ii) Prudent Utility Practice; (iii) applicable equipment manufacturer's specifications and reasonable recommendations; (iv) applicable insurance requirements under any insurance procured pursuant to this Agreement; (v) the Procurement Manuals, as applicable, and (vi) any other standard, term, condition or requirement specifically contracted in this Agreement to be observed by Operator.

"Contract Year" means the period from July 1 through June 30 for each year during that portion of the Term commencing on the Service Commencement Date; provided, however, that (i) the initial Contract Year shall commence on the Service Commencement Date and (ii) the final Contract Year shall end on the fifteenth (15th) anniversary of the Service Commencement Date. Any computation made on the basis of a Contract Year shall be adjusted on a Pro Rata basis to take into account any Contract Year of less than 365/366 days.

"Control", "Controlled by" and similar expressions mean the power, directly or indirectly, to direct or cause the direction of the management and policies of an entity, whether through the ownership of outstanding share capital (or equivalent interest), by contract or otherwise. Without limiting the foregoing, a Person shall be deemed to control another Person (i) if such Person has directly or indirectly designated a majority of the board of directors (or equivalent governing body) of such other Person or (ii) if such Person has the direct or indirect power whether through ownership of outstanding share capital (or equivalent interest), by contract or otherwise to designate a majority of the board of directors (or equivalent governing body) of such other Person.

"Copyright" means the exclusive legal rights held by the owner of a copyright including the rights to copy, publicly perform, publicly display, distribute, adapt, translate, modify and create derivative works of copyrighted subject matter, including the rights to any registrations and applications therefor, together with all renewals, extensions, translations, adaptations, derivations and combinations therefor, works of authorship, publications, documentation, website content, rights in fonts and typefaces and database rights.

"COR3" means the Central Office for Recovery Reconstruction and Resiliency of Puerto Rico.

"Covered Contract" means any contract: (i) for management, service, or incentive payment arrangement between Owner, Administrator, or Operator and another Person under which such Person provides services involving all, a portion of, or any function of, the T&D System, (ii) for the sale, lease, or use of assets of the T&D System and (iii) to sell electricity if the term of such contract is in excess of three (3) years; provided that "Covered Contract" shall not include any (A) Subcontract in which the compensation to the Subcontractor is paid by Operator solely out of the Service Fee, (B) contract for services that are solely incidental to the primary governmental function or functions of the T&D System (such as contracts for janitorial, tree trimming, equipment repair, bookkeeping, physical security, or similar services), (C) contract for services performed exclusively during the Front-End Transition Period or pursuant to Article 16 (*Back-End Transition*), (D) contract to design, build, rehabilitate or purchase property, assets, equipment or supplies, (E) contract to acquire electric capacity or energy, natural gas, coal or fuel oil, (F) contract for management, service or incentive payment arrangement or for consulting services under which

CONFIDENTIAL

the compensation consists entirely of a fixed fee and/or fees at hourly rates, (G) a negotiated, arm's length contract with a term of less than fifty (50) days, and (H) sales of assets (other than real property) in the ordinary course of business at the end of their expected useful lives.

"CPI Factor" means the amount equal to (i) CPI Value for the calendar year immediately prior to the date of any adjustment *divided by* (ii) the CPI Value for the calendar year two (2) years prior to the date of such adjustment rounded to the fifth decimal place; provided, however, that in no case shall be the CPI Factor for any adjustment period be less than 1.000. For illustrative purposes only, if an amount is to be adjusted for inflation on July 1, 2019, for the one-year period of July 1, 2019 through July 1, 2020, the amount shall be multiplied by a CPI Factor equal to 1.02140 or the CPI Value for calendar year 2018 (which is 257.565) divided by the CPI Value for calendar year 2017 (which is 252.169).

"CPI Value" for any year means the "Annual Value" of such year obtained from "Consumer Price Index—All Urban Consumers—U.S. All Items Less Food and Energy (CUUR0000SA0L1E)" published by the Bureau of Labor Statistics of the United States Department of Labor, which is the calendar year 12-month average rounded to three decimal places; provided, however, that: (i) if such index is changed so that the base year thereof changes, such index shall be converted in accordance with the conversion factor published by the Bureau of Labor Statistics of the United States Department of Labor; (ii) if such index is discontinued or revised during the Term, such other index or computation with which it is replaced shall be used in order to obtain substantially the same result as would be obtained if such index had not been discontinued or revised; and (iii) any such revision shall not result in the retroactive adjustment of any amounts paid or payable pursuant to this Agreement prior to such revision. For illustrative purposes only, the CPI Value for the calendar year 2018 is 257.565, which can be obtained directly as an annual value or computed using monthly values with data from the official website of the Bureau of Labor Statistics of the United States Department of Labor.

"Customer Database" has the meaning set forth in Section 5.15(a) (*Information – System Information and Computer Database*).

"Cybersecurity Breach" means any successful act to gain unauthorized access to, disrupt or misuse an Information System or information stored on such Information System.

"Data Security Plan" has the meaning set forth in Section 4.2(h) (*ManagementCo Responsibilities – Physical Security Plan, Data Security Plan and Vegetation Management Plan*).

"Declared Emergency or Major Disaster" means an event declared as an emergency or major disaster in accordance with the provisions of the Stafford Act.

"Default Budget" has the meaning set forth in Section 7.3(d) (*Budgets – Default Budget*).

"Delay Liquidated Damages" has the meaning set forth in Section 4.8(a) (*Failure of Service Commencement Date Conditions – Remedy for Delay of Service Commencement Date Conditions*).

CONFIDENTIAL

"Delay Period Date" has the meaning set forth in Section 4.8(a) (*Failure of Service Commencement Date Conditions – Remedy for Delay of Service Commencement Date Conditions*).

"Designated Person" means each Representative of Operator or Administrator who is designated as such for the purposes of Article 15 (*Dispute Resolution*).

"DHS OIG" means U.S. Department of Homeland Security Office of Inspector General.

"Disallowed Costs" has the meaning set forth in Section 7.6(a) (*Disallowed Costs – Generally*).

"Disallowed Costs Dispute" has the meaning set forth in Section 7.6(b) (*Disallowed Costs – Disallowed Costs Disputes*).

"Dispute" has the meaning set forth in Section 15.1 (*Scope*).

"Dispute Resolution Procedure" has the meaning set forth in Section 15.1 (*Scope*).

"Easement" means those certain real property rights vested or to be vested in Owner or GridCo, whether or not recorded in the Registry of the Property of Puerto Rico, that: (i) encumber land portions or estates for the benefit of the T&D System to permit the ingress to and egress from each T&D System Site to the public road; (ii) grant air rights; (iii) constitute restrictive use and construction covenants (*servidumbres en equidad*) for the operation of the T&D System; and (iv) allow for the construction and installation of above- or below-ground improvements and equipment and for the addition to, or maintenance, repair, restoration, replacement or alteration of, the T&D System or any other service for the T&D System.

"Effective Date" has the meaning set forth in Section 2.2(a) (*Effective Date – Execution of the Agreement*).

"Emergency" or "Emergency Event" means (i) any Outage Event, (ii) any Declared Emergency or Major Disaster and (iii) any other circumstance defined as an Emergency in the Emergency Response Plan to be prepared pursuant to Section 4.2(g) (*ManagementCo Responsibilities – Emergency Response Plan*).

"Emergency Response Plan" has the meaning set forth in Section 4.2(g) (*ManagementCo Responsibilities – Emergency Response Plan*).

"Energy Compliance Certificate" means the certificate issued by the PREB certifying that this Agreement complies with Act 120 and the regulatory framework, including Act 17.

"Environmental Claim and Cleanup Liability" means: (i) any liabilities, costs or expenses arising from or relating to any claim by a Governmental Body or other third-party pursuant to any Environmental Law for personal injury, property damage or damage to natural resources or the environment (whether based on negligent acts or omissions, statutory liability or

CONFIDENTIAL

strict liability without fault or otherwise) in connection with the T&D System or the O&M Services; (ii) any liabilities, costs or expenses arising from or relating to any investigation, study, remediation or abatement of any Release of Hazardous Materials, to the extent required by any Environmental Law or to meet the published cleanup standards of any Governmental Body with jurisdiction over such Release, in connection with the T&D System or the O&M Services; (iii) any fines or penalties assessed for non-compliance with any Environmental Law in connection with the T&D System or the O&M Services; or (iv) any liabilities, costs or expenses necessary to achieve or maintain compliance with any Environmental Law.

"Environmental Law" means (i) any law, statute, ordinance, code, rule, regulation, order, writ, injunction, decree, ruling, determination, award, standard, permit or variance of any Governmental Body, or any binding agreement with any Governmental Body, and (ii) any consent order or decree, settlement agreement or other similar agreement between Owner and the Puerto Rico Department of Natural and Environmental Resources, EPA or other relevant Governmental Body, in each case having the force of law and applicable from time to time, relating to (A) the conservation, protection, pollution, contamination or remediation of the environment or natural resources, (B) any Hazardous Material, including investigation, study, remediation or abatement of such Hazardous Material, (C) the storage, treatment, disposal, recycling or transportation of any Hazardous Material, or (D) human health or safety.

"EPA" means the United States Environmental Protection Agency.

"Equity Participant" means any Person who holds any shares of capital stock or securities of, or units, partnership interests, membership interests or other equity interests in, Operator.

"Event of Default" means an Operator Event of Default or an Owner Event of Default, as the case may be.

"Excess Expenditures" has the meaning set forth in Section 7.3(b) (*Budgets – Flexibility to Overrun*).

"Expert Technical Determination" has the meaning set forth in Section 15.4(a) (*Expert Technical Determination Procedure for Technical Disputes – Generally*).

"Extension Term" has the meaning set forth in Section 2.3(b) (*Term – Extension*).

"Federal Funding" means any funding for the repair, replacement, restoration, improvement, resiliency, construction or hazard mitigation of the T&D System received or to be received by or for the benefit of Owner from any U.S. federal agency, including FEMA and HUD.

"Federal Funding Procurement Manual" has the meaning set forth in Section 4.1(e) (*Front-End Transition Period Generally – Federal Funding Procurement Manual*).

"Federal Funding Requirements" has the meaning set forth in Section 5.5(b) (*Capital Improvements – Federal Funding Eligibility*).

CONFIDENTIAL

"Federally Funded Capital Improvement" means Capital Improvements that are funded with Federal Funding.

"Fees-and-Costs" means reasonable and documented fees and expenses of attorneys, expert witnesses, engineers and consultants with respect to any Legal Proceeding.

"FEMA" means the U.S. Federal Emergency Management Agency.

"Fixed Fee" has the meaning set forth in Section 7.1(b)(i) (*Service Fee – Fixed Fee*).

"Fitch" means Fitch Ratings, Ltd.

"FOMB" means the Financial Oversight and Management Board for Puerto Rico.

"FOMB Protocol Agreement" means a protocol agreement among Operator, Administrator, Owner, and the FOMB, which shall include provisions governing the FOMB's interaction with the Parties with respect to the respective duties of the FOMB and Owner under PROMESA, which shall apply only during the period the FOMB is in existence and Owner is a covered territorial instrumentality pursuant to PROMESA.[1]

"Force Majeure Event" means any act, event, circumstance or condition (other than lack of finances) whether affecting the T&D System, the System Power Supply, Owner, Operator or any of Owner's Contractors or subcontractors or Operator's Subcontractors that (i) is beyond the reasonable control of and unforeseeable by, or which, if foreseeable, could not be avoided in whole or in part by the exercise of due diligence by, the Party relying on such act, event or condition as justification for not performing an obligation or complying with any condition required of such Party under this Agreement, and (ii) materially interferes with or materially increases the cost of performing such Party's obligations hereunder, to the extent that such act, event, circumstance or condition is not the result of the willful or negligent act, error or omission or breach of this Agreement by such Party; provided, however, that the contesting in good faith or the failure in good faith to contest such action or inaction shall not be construed as a willful or negligent act, error or omission or breach of this Agreement by such Party. Notwithstanding anything to the contrary in the foregoing, the imposition of a Tax or an increase in Taxes that is the result of a revocation of the Tax Assurance or an amendment or other modification of the Tax Assurance that is materially adverse to Operator or its Equity Participants shall be deemed a Force Majeure Event.

Subject to the requirements specified in the foregoing paragraph, Force Majeure Event will include, by way of example and without limitation, the following acts, events or conditions:

(A)   an act of God, Outage Event, landslide, lightning, earthquake, fire, explosion, flood or similar occurrence;

---

[1] Note to Draft: The FOMB Protocol Agreement will have a set of rules for the period during Title III and a separate set of rules triggered by the Title III Exit.

CONFIDENTIAL

(B)      war, armed conflict, invasion, acts of terror, acts of civil or military authority, sabotage or similar occurrence, computer sabotage or virus, acts of a public enemy, acts of a foreign enemy, extortion, blockade, embargo, revolution, interference by military authorities, quarantine, epidemic, insurrection, riot or civil commotion or disturbance or civil disobedience;

(C)      to the extent not covered by (A) or (B) above, any event that causes any federal or Commonwealth Governmental Body to declare any portion of the geographic area of the T&D System part of a "disaster zone," "disaster area," "state of emergency" or any similar pronouncement;

(D)      a Change in Law;

(E)      the failure of any appropriate Governmental Body or private utility having operational jurisdiction in the area in which the T&D System is located to provide and maintain services to any facility comprising part of the T&D System, which services are required for the performance of this Agreement, if such failure results in a delay or curtailment of the performance of any of the O&M Services, the Front-End Transition Services or the Back-End Transition Services;

(F)      any failure of title to any portion of the T&D System Sites, any revocation or termination or invalidity of any Easement or other access right, any other failure or restriction of access to the T&D System Sites, or any enforcement of any Lien on the T&D System Sites or on any improvements thereon not consented to in writing by, or arising out of any action or agreement entered into by, the Party adversely affected thereby;

(G)      the preemption of materials or services by a Governmental Body in connection with a public emergency or any condemnation or other taking by eminent domain of any portion of the T&D System;

(H)      the presence of archeological finds, endangered species or Hazardous Material at the T&D System Sites, except to the extent Operator caused or knew of such presence, or the Release of any reportable quantity, as defined under applicable Environmental Law, of Hazardous Material or of any other Release that could reasonably be expected to result in material Losses to Owner;

(I)      strikes, boycotts, work stoppages, lockouts or other labor or employment disputes or disturbances with respect to the employees of ServCo, but only if occurring in the eighteen (18) months immediately following the Service Commencement Date; and

(J)      an unanticipated, significant and sustained interruption or curtailment of System Power Supply outside the ordinary course.

It is specifically understood that _none_ of the following acts, events or conditions shall constitute a Force Majeure Event:

(1)      reasonably anticipated weather conditions for the geographic area of the T&D System, except to the extent such weather condition otherwise falls under one of the circumstances described in clauses (A) or (C) above;

CONFIDENTIAL

(2)      general economic conditions, interest or inflation rates, increases in wage rates of Operator's employees and Subcontractors, insurance costs, commodity prices or currency fluctuations, exchange rates or PREB-approved changes in T&D Customer rates;

(3)      the financial condition of Owner, Operator, Guarantor(s), any of their Affiliates or any Contractors or Subcontractors;

(4)      any increase for any reason in premiums charged by Operator's insurers or the insurance markets generally for the required insurance that are compensated as T&D Pass-Through Expenditures;

(5)      the failure of Operator to secure Patents or licenses in connection with the technology necessary to perform its obligations under this Agreement, if available on commercially reasonable terms;

(6)      equipment malfunction or failure (unless caused by an event that would otherwise constitute a Force Majeure Event);

(7)      union or labor work rules, requirements or demands relating to Operator's employees which have the effect of increasing the number of employees employed at the T&D System, reducing the operating flexibility of Operator or otherwise increasing the cost to Operator of performing the O&M Services;

(8)      any impact of prevailing wage laws on Operator's operation and maintenance costs with respect to wages and benefits;

(9)      the failure of any Contractor or Subcontractor or supplier to furnish labor, materials, services or equipment for any reason (unless caused by an event that would otherwise constitute a Force Majeure Event); and

(10)      strikes, boycotts, work stoppages, lockouts or other labor or employment disputes or disturbances with respect to the employees of ServCo, but only if occurring from and after the date that is eighteen (18) months immediately following the Service Commencement Date.

"Force Majeure Event Dispute" has the meaning set forth in Section 17.1(c) (*Notice; Mitigation – Burden of Proof*).

"Front-End Subcontractors" has the meaning set forth in Section 4.9(a) (*Subcontractors During the Front-End Transition Period – General*).

"Front-End Transition Account" has the meaning set forth in Section 4.6(c) (*Front-End Transition Period Compensation – Funding*).

"Front-End Transition Period" means the period of time from and including the Effective Date to and excluding the Service Commencement Date.

CONFIDENTIAL

"Front-End Transition Plan" has the meaning set forth in Section 4.1(a) (*Front-End Transition Period Generally – Role of ManagementCo*).

"Front-End Transition Service Fee" has the meaning set forth in Section 4.6(b) (*Front-End Transition Period Compensation – Front-End Transition Service Fee*).

"Front-End Transition Service Fee Dispute" has the meaning set forth in Section 4.6(d)(ii) (*Front-End Transition Period Compensation – Invoices*).

"Front-End Transition Service Fee Estimate Dispute" has the meaning set forth in Section 4.6(c)(ii) (*Front-End Transition Period Compensation – Funding*).

"Front-End Transition Service Fixed Fee" has the meaning set forth in Section 4.6(b) (*Front-End Transition Period Compensation - Front-End Transition Service Fee*).

"Front-End Transition Services" means services provided by ManagementCo under this Agreement prior to the Service Commencement Date in order to complete the transition and handover to Operator of the operation, management and other rights and responsibilities with respect to the T&D System pursuant to this Agreement, including the services contemplated by the Front-End Transition Plan; provided that the Front-End Transition Services shall not be O&M Services.

"Fuel Account" has the meaning set forth in Section 7.5(e)(i) (*Services Accounts – Generation Expenditures Accounts*).

"Funding Shortage" has the meaning set forth in Section 7.5(f)(i) (*Service Accounts – Contingency Reserve Account*).

"GAAP" means generally accepted accounting principles, as in effect in the United States from time to time applied on a consistent basis.

"GenCo" means the entity, which may be directly or indirectly owned by Owner or an Affiliate of Owner, that acquires or obtains ownership of the Legacy Generation Assets after the reorganization of PREPA.

"GenCo Shared Services" means those certain administrative services that Operator shall, on behalf of Owner, provide to GenCo in accordance with the terms and conditions of the Shared Services Agreement and Applicable Law.

"Generation Budget" means, for any given Contract Year, the budget of the Generation Pass-Through Expenditures for such Contract Year, together with the projected budget of the Generation Pass-Through Expenditures for the following two (2) Contract Years, in each case, including monthly budgets of such expenditures and cash flows, as such budget may be amended or adjusted from time to time in accordance with the terms and conditions of the GridCo-GenCo PPOA, the Shared Services Agreement and any Generation Supply Contract.

"Generation Expenditures Accounts" has the meaning set forth in Section 7.5(e)(i) (*Services Accounts – Generation Expenditures Accounts*).

CONFIDENTIAL

"Generation Pass-Through Expenditures" has the meaning set forth in Section 7.2(b) (*Pass-Through Expenditures – Generation Pass-Through Expenditures*).

"Generation Project" means any and all projects or transactions with respect to any function, service or facility of Owner related to the generation of Power and Electricity, including the repair, replacement, improvement, sale, removal and retirement, alteration and addition of any generation asset, and in respect of which Owner or the Government of Puerto Rico may enter into a Partnership Contract (as defined in Act 29).

"Generation Supply Contracts" means any contract between Owner and an IPP relating to the sale and purchase of Power and Electricity, including power purchase agreements.

"Governmental Approvals" means all orders of approval, permits, licenses, authorizations, consents, certifications, exemptions, registrations, rulings and entitlements issued by a Governmental Body of whatever kind and however described that are required under Applicable Law to be obtained or maintained by any Person with respect to the performance of the O&M Services.

"Governmental Body" means any U.S. federal, state, Commonwealth, regional, municipal or local legislative, executive, judicial or other governmental board, agency, authority, commission, bureau, administration, court, instrumentality or other duly authorized body, including PREB and the FOMB (if then in existence), other than Owner and, in its capacity as such under this Agreement, Administrator, or any official thereof having jurisdiction with respect to any subject of this Agreement.

"Grant Manager" means the relevant Governmental Body and any third-parties, in either case, authorized by Owner, and reasonably acceptable to ManagementCo, to act as grant manager to administer Federal Funding.

"GridCo" means the entity, which may be directly or indirectly owned by Owner or an Affiliate of Owner, that acquires or obtains ownership of the T&D System after the reorganization of PREPA.

"GridCo-GenCo PPOA" means the power purchase and operating agreement between GridCo and GenCo providing for expense reimbursement, power delivery and other services related to the generation, sale and purchase of Power and Electricity from the Legacy Generation Assets and the operation and maintenance thereof, which will have terms and conditions substantially consistent with those set forth in Exhibit H (*Term Sheet for GridCo-GenCo PPOA*).

"Guarantee" means the guarantee agreement, dated as of the date hereof, by and between Guarantor(s) and Owner in the form of Exhibit D (*Form of Guarantee Agreement*).

"Guarantor" means each of Quanta Services, Inc., a corporation duly organized and validly existing under the laws of Delaware, and Canadian Utilities Limited, a federal company duly organized and validly existing under the laws of Canada, and, as determined pursuant to the terms and conditions of the Guarantee, any of their respective permitted successors and assigns.

CONFIDENTIAL

"Handover Checklist" means the handover checklist set forth in Annex II (*Front-End Transition Plan*), which details all of the requirements for ManagementCo to complete the Front-End Transition Services by the Target Service Commencement Date.

"Handover Checklist Dispute" has the meaning set forth in Section 4.7(a) (*Closing the Front-End Transition Period – Notice of Service Commencement Date*).

"Hazardous Material" means: (i) any waste, substance, object or material deemed hazardous under Environmental Law, including "hazardous substances" as defined in CERCLA and "hazardous waste" as defined in RCRA and any local counterpart law; (ii) any oil or petroleum product, lead-based paint or polychlorinated biphenyl; and (iii) any other pollutant, contaminant, material, substance or waste that is listed, defined or is subject to regulation under any Environmental Law.

"Hired Former Employees of Owner" has the meaning set forth in Section 4.2(k) (*ManagementCo Responsibilities – Employment Offers*).

"HUD" means the U.S. Department of Housing and Urban Development.

"ICC" has the meaning set forth in Section 15.4(b)(i) (*Expert Technical Determination Procedure for Technical Disputes – Procedures*).

"Incentive Fee" has the meaning set forth in Section 7.1(c)(i) (*Service Fee – Incentive Fee*).

"Incentive Fee Report" has the meaning set forth in Section 7.1(c)(ii) (*Service Fee – Incentive Fee*).

"Indemnifying Party" means (i) in the case of a claim for indemnification by Operator Indemnitee, Owner and (ii) in the case of a claim for indemnification by an Owner Indemnitee, Operator.

"Independent Expert" has the meaning set forth in Section 15.4(a) (*Expert Technical Determination Procedure for Technical Disputes – Generally*).

"Information System" means a discrete set of electronic information resources organized for the collection, processing, maintenance, use, sharing, dissemination or disposition of electronic information, including, such resources organized as any specialized system such as industrial/process controls systems, telephone switching and private branch exchange systems, and environmental control systems, and "Information Systems" means more than one Information System.

"Initial Budgets" means, collectively, the Operating Budget, the Capital Budgets and the Generation Budget, in each case, for the initial Contract Year, and together with the projected budget for the following two (2) Contract Years.

"Initial Term" has the meaning set forth in Section 2.3(a) (*Term – Initial Term*).

CONFIDENTIAL

"Insurance Proceeds Account" has the meaning set forth in Section 10.3 (*Additional Named Insureds*).

"Integrated Resource Plan" means the integrated resource plan contemplated under Act No. 57 of the Legislative Assembly of Puerto Rico, enacted on May 27, 2014.

"Intellectual Property" means all (i) Patents, (ii) Trademarks, (iii) domain names, URLs and any other addresses for use on the Internet or any other computer network or communication system, (iv) Copyrights, (v) rights of publicity, rights of privacy and moral rights, (vi) Know-How, (vii) other intellectual property or similar corresponding or equivalent right to any of the foregoing or other proprietary or contract right relating to any of the foregoing (including remedies against infringements thereof and rights of protection of interest therein under the laws of all jurisdictions) and (viii) copies and tangible embodiments thereof (including Software), in each case whether or not the same are in existence as of the date of this Agreement or developed after such date and in any jurisdiction throughout the world.

"Internal Revenue Code" means the United States Internal Revenue Code of 1986.

"Interview Deadline" has the meaning set forth in Section 4.2(j) (*ManagementCo Responsibilities – Employment Evaluations*).

"IPP" means a producer of electric power that is not owned by Owner, GenCo or any of their respective Affiliates.

"Investment Grade Rating" means a rating of BBB- or higher by S&P, Baa3 or higher by Moody's, BBB- by Fitch, or the equivalent of such global ratings by S&P, Moody's or Fitch.

"Key Performance Metrics" means the "Key Performance Metrics" to be agreed upon during the Front-End Transition Period and set forth in Annex IX (*Performance Metrics*).

"Know-How" means proprietary rights in all, trade secrets, confidential or proprietary information, including confidential or proprietary concepts, ideas, knowledge, rights in research and development, financial, marketing and business data, pricing and cost information, plans (including business and marketing plans), algorithms, formulae, inventions, processes, techniques, technical data, designs, drawings (including engineering and AutoCAD drawings), specifications, databases, blueprints and customer and supplier lists and information, in each case whether patentable or not and whether or not reduced to practice.

"Legacy Generation Assets" means any power plants and any facilities, equipment and other assets related to the generation of Power and Electricity existing as of the date hereof and in which Owner or GenCo has an ownership or leasehold interest.

"Legal Proceeding" means any claim, litigation, action, suit (whether civil, criminal, administrative, judicial or investigative), audit, hearing, investigation, binding arbitration or mediation or proceeding, in each case commenced, brought, conducted, heard before or otherwise involving any Governmental Body, arbitrator or mediator.

CONFIDENTIAL

"Liability Waiver" has the meaning set forth in Section 4.1(g) (*Front-End Transition Period Generally – Liability Waiver*).

"Lien" means any and every lien, pledge, security interest, claim, mortgage, deed of trust, lease, charge, option, right of first refusal, easement or other real estate declaration, covenant, condition, restriction or servitude, transfer restriction under any encumbrance or any other restriction or limitation whatsoever, including mechanics', materialmen's, laborers' and lenders' liens.

"Losses" means any and all actual out-of-pocket (i) losses, damages, costs, expenses, liabilities, interest, deficiencies, awards, judgments, fines, assessments, penalties, forfeitures, obligations, deposits, Taxes, costs, offsets, expenses or other charges of any kind, including Fees-and-Costs, Environmental Claim and Cleanup Liability and costs of enforcing any right to indemnification hereunder or pursuing any insurance providers and (ii) settlements in connection with Section 18.1 (*Indemnification by Operator*) and Section 18.2 (*Indemnification by Owner*), the amount of which either has been agreed by Operator and Administrator or is below a specified amount to be agreed by Operator and Administrator from time to time.

"Major Outage Event" has the meaning set forth in Annex IX (*Performance Metrics*).

"Major Outage Event Performance Metrics" means the "Major Outage Event Performance Metrics" to be agreed upon during the Front-End Transition Period and set forth in Annex IX (*Performance Metrics*).

"ManagementCo" has the meaning set forth in the introductory paragraph.

"ManagementCo Service Commencement Date Conditions" has the meaning set forth in Section 4.5(a) (*Conditions Precedent to Service Commencement Date – ManagementCo Responsibilities*).

"Material Contractor" has the meaning set forth in Section 11.1(b) (*Ability to Subcontract and Contract – Contractors Generally*).

"Material Front-End Subcontractor" has the meaning set forth in Section 4.9(a) (*Subcontractors During the Front-End Transition Period – General*).

"Material Subcontractor" has the meaning set forth in Section 11.1(a) (*Ability to Subcontract and Contract – Subcontractors Generally*).

"Material System Contract" has the meaning set forth in Section 5.2(d) (*System Contracts – Additional System Contracts or Expired System Contracts After Service Commencement Date*).

"Mediation Rules" has the meaning set forth in Section 15.5(b) (*Mediation – Procedures*).

"Minimum Performance Threshold" means the "Minimum Performance Level" set forth in Annex IX (*Performance Metrics*) with respect to any Performance Metrics.

"Minimum Performance Threshold Default" has the meaning set forth in Section 14.1(k) (*Events of Default By Operator – Failure to Meet Minimum Performance Threshold*).

"Moody's" means Moody's Investors Services, Inc.

"Negotiation Period" has the meaning set forth in Section 15.3(b)(i) (*Negotiation – Negotiation Period*).

"Non-Federal Funding Procurement Manual" has the meaning set forth in Section 4.1(f) (*Front-End Transition Period Generally – Non-Federal Funding Procurement Manual*).

"Non-Federally Funded Capital Improvements" means all Capital Improvements other than Federally Funded Capital Improvements.

"Notice of Dispute" has the meaning set forth in Section 15.2(a) (*Commencement of the Dispute Resolution Procedure – Notice*).

"Notice of Mediation" has the meaning set forth in Section 15.5(a) (*Mediation – Generally*).

"O&M Services" has the meaning set forth in Section 5.1 (*Services Generally*).

"Obligated" means a definite commitment that creates (i) a legal liability on the part of the government of the United States for the disbursement of Federal Funding or (ii) a legal duty on the part of the government of the United States that could mature into a legal liability by virtue of actions on the part of the other party beyond the control of the government of the United States.

"Occupational Safety and Health Act" shall mean the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 et seq.

"Operating Account" has the meaning set forth in Section 7.5(a)(i) (*Service Accounts – Operating Account*).

"Operating Budget" means, for any given Contract Year, the budget of the T&D Pass-Through Expenditures required to perform the O&M Services (exclusive of the cost of Capital Improvements and Outage Events) for such Contract Year, together with the projected budget for the following two (2) Contract Years, in each case, including monthly budgets of such expenditures and cash flows, as such budget may be amended or adjusted from time to time in accordance with the terms and conditions of this Agreement.

"Operating Budget Overrun Default" has the meaning set forth in Section 14.5(e) (*Additional Termination Rights – Operating Budget Overrun*).

21

CONFIDENTIAL

"Operator" has the meaning set forth in the introductory paragraph.

"Operator Confidential Information" has the meaning set forth in Section 13.2(a) (*Proprietary Information – Confidentiality Obligation*).

"Operator Event of Default" has the meaning set forth in Section 14.1 (*Events of Default By Operator*).

"Operator Indemnitee" has the meaning specified in Section 18.2 (*Indemnification by Owner*).

"Operator Intellectual Property" has the meaning specified in Section 13.1(a) (*Intellectual Property – Operator Intellectual Property and Subcontractor Intellectual Property*).

"Operator Marks" means Operator's Trademarks listed in Annex XIV (*Operator Marks*), as may be revised by Operator from time to time.

"Operator Related Parties" means Operator, Parent Company, Guarantor(s), their Affiliates and any of their respective employees, directors and officers.

"Operator Termination Fee" means an amount equal to (i) the sum of the Fixed Fee and the maximum Incentive Fee (in each case in 2020 Dollars, as defined in Annex VIII (*Service Fee*)) for the Contract Year in which this Agreement is terminated *multiplied by* (ii) the multiplier applicable for such Contract Year as set forth in Annex XIII (*Operator Termination Fee Multiplier*).

"Other Employees" has the meaning set forth in Section 4.2(k) (*ManagementCo Responsibilities – Employment Offers*).

"Outage Event" means an event as a result of which (i) at least twenty thousand five hundred (20,500) T&D Customers are interrupted or (ii) at least one hundred fifty (150) outage jobs for the T&D System are logged, in each case within a twenty-four (24) hour period and due to an act of God or, in case of a storm, a storm that is designated as such by the U.S. National Weather Service, and shall end when a state in which fewer than one thousand (1,000) T&D Customers remain interrupted for a continuous period of eight (8) hours following an Outage Event is achieved.

"Outage Event Costs" has the meaning set forth in Section 7.5(d)(i) (*Service Accounts – Outage Event Reserve Account*).

"Outage Event Reserve Account" has the meaning set forth in Section 7.5(d)(i) (*Service Accounts – Outage Event Reserve Account*).

"Overdue Rate" means the lower of (i) the Prime Rate *plus* two percent (2%) and (ii) the highest rate permitted by Applicable Law.

"Oversight" means, with respect to any matter relating to the T&D System, the O&M Services or this Agreement, the performance of such reviews, investigations, inspections,

CONFIDENTIAL

or examinations relating to such matters as are reasonably necessary in the circumstances, conducted, in each case, in accordance with generally accepted contract administration practices used in the electric utility industry.

"Owner" has the meaning set forth in the introductory paragraph.

"Owner Confidential Information" has the meaning set forth in Section 13.2(a) (*Proprietary Information – Confidentiality Obligation*).

"Owner Employees" has the meaning set forth in Section 4.2(j) (*ManagementCo Responsibilities – Employment Evaluations*).

"Owner Event of Default" has the meaning set forth in Section 14.3 (*Events of Default By Owner*).

"Owner Fault" means (i) any breach (including any breach of any representation and warranty set forth in any Transaction Document), (ii) any failure of compliance or nonperformance by Owner or Administrator with its respective obligations under any Transaction Document or (iii) any negligence, tort or willful misconduct by Owner or Administrator with respect to performance of its respective obligations under any Transaction Document (whether or not attributable to any officer, trustee, member, agent, employee, representative, contractor, subcontractor of any tier or independent contractor of Owner or Administrator other than Operator and its Subcontractors), which has had, or is reasonably expected to have, a material adverse effect on Operator's performance or cost of performance or on Operator's rights or obligations under this Agreement or on the operation or maintenance of the T&D System.

"Owner Indemnitee" has the meaning specified in Section 18.1 (*Indemnification by Operator*).

"Owner Intellectual Property" means any Work Product and other Intellectual Property owned by Owner or its Affiliates.

"Owner Licensed Intellectual Property" means any Intellectual Property licensed by Owner from a third-party not a party to this Agreement.

"Owner Marks" means Owner's Trademarks listed in Annex XV (*Owner Marks*), as may be revised by Owner from time to time.

"Owner Patents" has the meaning set forth in Section 13.1(d)(iv) (*Intellectual Property – Work Product*).

"Owner Personal Information" means any and all personally identifiable information, in any form, collected by or provided to Operator, Operator Related Parties or Subcontractors in connection with the provision of O&M Services or services under this Agreement and that, alone or in combination with other information, uniquely identifies a current, former or prospective director, trustee, officer, employee, elected official, supplier, retiree of Owner, Owner Related Party or a T&D Customer (e.g., names, addresses, telephone numbers, other information in the Customer Database or any other personally identifiable information as

CONFIDENTIAL

otherwise defined under Applicable Law), including (i) copies of such information or materials to the extent containing such information or (ii) such information Owner notifies Operator in advance in writing is subject to a duty of confidentiality that Owner owes to Owner's customers or pursuant to contracts of Owner or Owner Related Parties.

"Owner Related Parties" means Owner, its Affiliates and any of their respective employees, directors, trustees, elected officials and officers.

"Owner Service Commencement Date Conditions" has the meaning set forth in Section 4.5(b) (*Conditions Precedent to Service Commencement Date – Owner and Administrator Responsibilities*).

"Owner Termination Fee" means the following: (a) during Contract Years one (1) through five (5), an amount equal to US$20,000,000 in 2020 Dollars; and (b) during any subsequent Contract Year, an amount equal to US$10,000,000 in 2020 Dollars. For purposes of this definition, the phrase "2020 Dollars" means that the relevant amount will be adjusted to account for inflation, at the start of each Contract Year, by the respective annual CPI Factor(s) to reflect a nominal value for the Contract Year. For illustrative purposes only, if Contract Year four (4) starts in calendar year 2023, then the adjustment for inflation would be as follows: Contract Year four (4)'s Owner Termination Fee (as set forth in this definition, in 2020 Dollars) *multiplied by* the CPI Factor for 2021 *multiplied by* the CPI Factor for 2022 *multiplied by* the CPI Factor for 2023.

"Parent Company" means each of Quanta Services, Inc. and Canadian Utilities Limited and any of their respective successors and assigns.

"Party" has the meaning set forth in the introductory paragraph.

"Patents" means the exclusive legal rights held by the owner of a patent (including utility and design patents) to exclude others from using, making, having made, selling, offering to sell, and importing patented subject matter and to practice patented methods. Patents include all legal rights in any patent applications, PCT filings, patent disclosures, issued patents and all related extensions, continuations, continuations-in-part, divisions, reissues and reexaminations, utility models, certificates of invention and design patents, and all extensions thereto.

"Performance Metrics" has the meaning set forth in Section 7.1(c)(i) (*Service Fee – Incentive Fee*).

"Permitted Liens" means (i) Liens arising by operation of law that are either contested in good faith and for which Operator or any Subcontractor has established adequate reserves or that are discharged promptly, (ii) Liens existing as of the Effective Date, if any, (iii) Liens that result from any act or omission by any Owner Related Party, Administrator or any other Governmental Body, (iv) purchase money Liens or similar Liens securing rental payments under capital lease arrangements, and (v) Liens on System Revenues specified in or permitted under any Title III Plan and its related implementing documents.

CONFIDENTIAL

"Person" means any individual (including the heirs, beneficiaries, executors, legal representatives or administrators thereof), firm, corporation, company, association, partnership, limited partnership, limited liability company, joint stock company, joint venture, trust, business trust, unincorporated organization or other entity or a Governmental Body.

"Physical Security Plan" has the meaning set forth in Section 4.2(h) (*ManagementCo Responsibilities – Physical Security Plan, Data Security Plan and Vegetation Management Plan*).

"Power and Electricity" means the electrical energy, capacity and ancillary services available from the System Power Supply.

"PRDH" means the Puerto Rico Department of Housing, also known as the *Departamento de la Vivienda de Puerto Rico*.

"PREB" means the Puerto Rico Energy Bureau, also known as the *Negociado de Energia de Puerto Rico*, an independent body created by Act No. 57 of the Legislative Assembly of Puerto Rico, enacted on May 27, 2014.

"PREB Actions" has the meaning set forth in Section 3.9(c) (*Qualified Management Contract – PREB Actions*).

"Pre-Existing Environmental Condition" means the presence of Hazardous Materials in environmental media anywhere in, at, from, as a result of, on or under the T&D System or the T&D System Sites on the Service Commencement Date.

"Prime Rate" means a variable per annum rate equal, as of any date of determination, to the rate as of such date published in the "Money Rates" section of The Wall Street Journal as being the "Prime Rate" (or, if more than one rate is published as the "Prime Rate," then the highest of such rates), or a mutually agreeable alternative source of the prime rate if it is no longer published in the "Money Rates" section of The Wall Street Journal or the method of computation thereof is substantially modified.

"PRIRC" means the Internal Revenue Code for a New Puerto Rico of 2011.

"Pro Rata" and similar expressions mean an adjustment to a cost, payment or other amount due over a period of time to account for it accruing over only a portion of such period.

"Procurement Manuals" means the Federal Funding Procurement Manual and the Non-Federal Funding Procurement Manual.

"PROMESA" means the Puerto Rico Oversight, Management and Economic Stability Act enacted on June 30, 2016 (P.L. 114-187).

"Proposal" means the proposal submitted in response to the RFP.

"Proposal Submission Date" means November 25, 2019.

CONFIDENTIAL

"Prudent Utility Practice" means, at any particular time, the practices, methods, techniques, conduct and acts that, at the time they are employed, are generally recognized and accepted by companies operating in the United States electric transmission and distribution business as such practices, methods, techniques, conduct and acts appropriate to the operation, maintenance, repair and replacement of assets, facilities and properties of the type covered by this Agreement. The interpretation of acts (including the practices, methods, techniques, conduct and acts engaged in or approved by a significant portion of the electrical utility industry prior thereto) shall take into account the facts and the characteristics of the T&D System and System Power Supply known at the time the decision was made. Prudent Utility Practice is not intended to be limited to the optimum or minimum practice, method, technique, conduct or act, to the exclusion of all others, but rather to be a spectrum of possible practices, methods, techniques, conduct or acts that a prudent operator would take to accomplish the intended objectives at just and reasonable cost consistent with reliability, safety, expediency and good customer relations.

"Public Information Disclosure Requirements" means any Applicable Law requiring the disclosure of public documents or information.

"Public-Private Partnerships Authority's Ethical Guidelines" means the "Public-Private Partnerships Authority's Guidelines for the Evaluation of Conflicts of Interest and Unfair Advantages in the Procurement of Public-Private Partnership Contracts," promulgated by the Public-Private Partnerships Authority and dated as of December 19, 2009.

"Public Works Improvements" means Capital Improvements performed as a result of requirements or requests of a Governmental Body.

"Purchased Power Account" has the meaning set forth in Section 7.5(e)(i) (*Services Accounts – Generation Expenditures Accounts*).

"Rate Order" has the meaning set forth in Section 5.6(g) (*System Regulatory Matters – PREB Rate Proceedings*).

"Rating Agency" means each of S&P, Moody's and Fitch.

"Rating Downgrade" has the meaning set forth in Section 7.8(b) (*Owner Credit Rating – Reinstatement of Federal Funding*).

"RCRA" means the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.

"Regulation 6955" means Regulation 6955 of March 18, 2005.

"Release" means any emission, spill, seepage, leak, escape, leaching, discharge, injection, pumping, pouring, emptying, dumping, disposal, migration or release of Hazardous Materials from any source into or upon the environment.

"Reliance Letter" means a letter from tax counsel, substantially in the form set forth in Exhibit G (*Form of Reliance Letter*) that shall accompany a Tax Opinion and shall permit Operator to rely on such Tax Opinion.

CONFIDENTIAL

"Remedial Action" means any investigation, clean-up, removal action, remedial action, restoration, repair, abatement, response action, corrective action, monitoring, sampling and analysis, installation, reclamation, closure or post-closure in connection with the suspected, threatened or actual Release of Hazardous Materials.

"Representative" means, with respect to any Person, any director, officer, employee, official, lender (or any agent or trustee acting on its behalf), partner, member, owner, agent, lawyer, accountant, auditor, professional advisor, consultant, engineer, contractor, Subcontractor, other Person for whom such Person is responsible at law or other representative of such Person and any professional advisor, consultant or engineer designated by such Person as its "Representative."

"Required Insurance" has the meaning set forth in Section 10.1 (*Insurance Generally*).

"Resource Adequacy" means the procurement obligations with regards to electric capacity, energy and ancillary services of load serving entities.

"Revenue Procedure 2017-13" means the revenue procedure issued by the United States Internal Revenue Service that provides safe harbor conditions under which a management contract does not result in private business use under § 141(b) of the Internal Revenue Code or subsequent guidance from the United States Internal Revenue Service.

"RFP" means the Puerto Rico Electric Power Transmission and Distribution System Request for Proposals 2019-2 issued by the Puerto Rico Public-Private Partnerships Authority.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc.

"Sanctioned Country" has the meaning set forth in Section 19.2(h)(iv) (*Representations and Warranties of Operator – Applicable Law Compliance*).

"Sanctioned Person" has the meaning set forth in Section 19.2(h)(iv) (*Representations and Warranties of Operator – Applicable Law Compliance*).

"Sanctions" has the meaning set forth in Section 19.2(h)(iv) (*Representations and Warranties of Operator – Applicable Law Compliance*).

"Securitization SPV" means any entity established by the Government of Puerto Rico to issue secured debt in connection with Owner's Title III Plan and its successors and assigns, as applicable.

"ServCo" has the meaning set forth in the introductory paragraph.

"ServCo Benefit Plans" has the meaning set forth in Section 5.8(a) (*Labor and Employment; Employee Benefits – Employee Plans*).

CONFIDENTIAL

"<u>ServCo Employees</u>" has the meaning set forth in Section 4.2(k) (*ManagementCo Responsibilities – Employment Offers*).

"<u>Service Accounts</u>" means, collectively, the Operating Account, the Capital Account – Federally Funded, the Capital Account – Non-Federally Funded, the Outage Event Reserve Account, the Generation Expenditures Accounts and the Contingency Reserve Account, each of which is a "<u>Service Account</u>."

"<u>Service Account Dispute</u>" has the meaning set forth in Section 7.5(g) (*Service Accounts – Service Account Disputes*).

"<u>Service Commencement Date</u>" has the meaning set forth in Section 4.7(b) (*Closing the Front-End Transition Period – Establishment of Service Commencement Date*).

"<u>Service Commencement Date Conditions</u>" has the meaning set forth in Section 4.5 (*Conditions Precedent to Service Commencement Date*).

"<u>Service Fee</u>" has the meaning set forth in Section 7.1(a) (*Service Fee – Generally*).

"<u>Service Fee Dispute</u>" has the meaning set forth in Section 7.1(e) (*Service Fee – Service Fee Disputes*).

"<u>Servicing Contract</u>" means any servicing contract by and between Operator and the Securitization SPV, as applicable, in form and substance reasonably acceptable to Operator.

"<u>Shared Services Agreement</u>" has the meaning set forth in Section 4.5(s) (*ManagementCo Responsibilities – Shared Services Agreement*).

"<u>Software</u>" means computer programs, proprietary software, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, operating systems, design documents, website code and specifications, flow-charts, user manuals and training materials relating thereto and any translations thereof.

"<u>Stafford Act</u>" means the Robert T. Stafford Disaster Relief and Recovery Act, enacted on November 23, 1988.

"<u>Subcontract</u>" means an agreement or purchase order by Operator to a Subcontractor or a Subcontractor to Operator, as applicable.

"<u>Subcontractor</u>" means every Person (other than employees of Operator) employed or engaged by Operator or any Person directly or indirectly in privity with Operator for the performance of any portion of the Front-End Transition Services, the O&M Services or the Back-End Transition Services, whether for the furnishing of labor, materials, equipment, supplies, services or otherwise. For the avoidance of doubt: (i) Subcontractors includes personnel from Operator's Affiliates assigned to perform the Front-End Transition Services, the O&M Services or the Back-End Transition Services under this Agreement, and (ii) Subcontractors does not include third parties merely providing commercially available "off-the-shelf" Software or Information Systems to Operator (directly or as a service).

CONFIDENTIAL

"Subcontractor Intellectual Property" has the meaning specified in Section 13.1(a) (*Intellectual Property – Operator Intellectual Property, Contractor Intellectual Property and Subcontractor Intellectual Property*).

"Sworn Statement" means a sworn statement in the form set forth as Exhibit E (*Form of Sworn Statement*).

"System Contracts" means (i) the contracts, leases, licenses, permits and other similar arrangements of all types related to the T&D System that have been entered into by Owner (or pursuant to which Owner otherwise has rights) and remain in effect as of the Service Commencement Date and (ii) any other contracts, leases, licenses, permits and similar arrangements of all types entered into by Owner, or by Operator on behalf and as agent of Owner, related to the T&D System or O&M Services pursuant to Section 4.3(d) (*Owner and Administrator Responsibilities– Additional System Contracts and Generation Supply Contracts Between Effective Date and Service Commencement Date*) and/or Section 5.2(d) (*System Contracts – Additional System Contracts or Expired System Contracts After Service Commencement Date*), including contracts related to:

    (A)    the ownership and operation and maintenance of the T&D System (including interconnection and other related agreements);

    (B)    the ownership of or access to any T&D System Sites (including all right of way, crossing, access, Easement and other related agreements);

    (C)    all information technology hardware and software used to operator or administrate the T&D System;

    (D)    vegetation management, fuel for fleet vehicles, fleet vehicles, meters, call centers and engineering, procurement and construction;

    (E)    T&D Customers; or

    (F)    T&D System operation or ancillary services.

For the avoidance of doubt, System Contracts shall not include (x) any agreements between GenCo and a third party, Generation Supply Contracts, the GridCo-GenCo PPOA or collective bargaining agreements with union labor or (y) any arrangements that would have been considered System Contracts under clauses (i) or (ii) above but which have been rejected by Owner in the Title III Case prior to the Title III Exit.

"System Information" means any and all information relating to the T&D System, including: (i) income statements, balance sheets, statements of cash flow and changes in financial position, details regarding revenues generated by the T&D System (including information regarding the collection thereof), operating income, expenses, capital expenditures and budgeted operating results relating to the O&M Services; (ii) all certificates, correspondence, data (including test data), documents, facts, files, information, investigations, materials, notices, plans, projections, records, reports, requests, samples, schedules, statements, studies, surveys, tests and test results analyzed, categorized, characterized, created, collected, generated, maintained, processed, produced, prepared, provided, recorded, stored or used by Operator or any of its Representatives in connection with the T&D System or the O&M Services; and (iii) books,

CONFIDENTIAL

records, accounts and documents relating to the O&M Services, including any information that is stored electronically or on computer-related media but not including (A) Operator Confidential Information or other information that Operator reasonably believes is subject to attorney-client or other legal privilege, confidentiality restrictions or trade secret protections, (B) personally identifiable information protected by Applicable Law, other than Owner Personal Information, (C) correspondence between employees or other Representatives of Operator, (D) information and records pertaining to the Service Fee, or (E) information or records pertaining to any dispute with Owner or Administrator or their respective Representatives.

"System Operation Principles" has the meaning set forth in Section 4.1(h) (*Front-End Transition Period Generally – System Operation Principles*).

"System Power Supply" means electric capacity, energy and ancillary services from any power supply sources authorized under Applicable Law to operate in the Commonwealth.

"System Remediation Plan" has the meaning set forth in Section 4.1(d)(ii) (*Front-End Transition Period Generally – Transition to Standard of Performance*).

"System Revenues" has the meaning set forth in Section 3.2 (*Engagement of Operator*).

"T&D Customers" means customers of the T&D System.

"T&D Pass-Through Expenditures" has the meaning set forth in Section 7.2(a) (*Pass-Through Expenditures – T&D Pass-Through Expenditures*).

"T&D System" has the meaning set forth in the Recitals.

"T&D System Sites" means the real property and interests therein upon which the components of the T&D System are and will be located.

"Target Service Commencement Date" means (i) January 1, 2021 in the event the Effective Date is on or before February 16, 2020 or (ii) the date that is 320 days after the Effective Date in the event the Effective Date is after February 16, 2020.

"Tax" means all U.S. federal, state, Commonwealth, municipal, local and non-U.S. taxes and similar governmental charges, imposts, levies, fees and assessments, however denominated (including income taxes, business asset taxes, franchise taxes, net worth taxes, capital taxes, estimated taxes, withholding taxes, use taxes, value added tax, gross or net receipt taxes, sales taxes, transfer taxes or fees, excise taxes, real and personal property taxes, ad valorem taxes, payroll related taxes, employment taxes, unemployment insurance, social security taxes, minimum taxes and import duties and other obligations of the same or a similar nature), together with any related liabilities, penalties, fines, additions to tax or interest imposed by a Governmental Body.

"Tax Assurance" has the meaning set forth in Section 4.5(t) (*Conditions Precedent to Service Commencement Date – Tax Matters*).

CONFIDENTIAL

"Tax Opinion" means an opinion, substantially in the form set forth in Exhibit F-1 (*Form of Tax Opinion - Effective Date*) or Exhibit F-2 (*Form of Final Tax Opinion*), as applicable, of Nixon Peabody LLP as counsel to the FOMB or other tax counsel reasonably acceptable to Administrator, rendered in connection with this Agreement and providing that neither this Agreement nor any provision hereof, nor the performance by each Party of its obligations hereunder (including Operator's administration of the System Contracts), adversely affects the exclusion from gross income of interest on obligations of Owner, its Affiliates or another Governmental Body for federal income tax purposes under the Internal Revenue Code.

"Tax Return" means any report, return, information return, form, declaration, statement or other information (including any amendments thereto and including any schedule or statement thereto) required to be filed or maintained by Applicable Law in connection with the determination, assessment or collection of any Tax.

"Technical Dispute" has the meaning set forth in Section 15.3(b)(i) (*Negotiation – Negotiation Period*)

"Term" means the Initial Term together with the Extension Term, if any.

"Third-Party Intellectual Property" means Intellectual Property that is licensed to Operator by a third-party that is not an Affiliate of Operator or a Subcontractor and is used in the performance of this Agreement.

"Third-Party Payments" has the meaning set forth in Section 18.4(a) (*Insurance and Other Recovery – Generally*).

"Title III Approvals" means any findings, approvals and protections of the Title III Court or any other applicable court authorizing or approving Owner's entry into and performance of this Agreement and that are otherwise necessary to the Parties' performance of this Agreement.

"Title III Case" means Owner's case under Title III of PROMESA in the U.S. District Court.

"Title III Court" means the U.S. District Court presiding over the Title III Case.

"Title III Exit" means the consummation and effectiveness of a confirmed Title III Plan.

"Title III Plan" means a plan of adjustment in the Title III Case.

"Trademarks" means the exclusive legal rights to use and display any marks, names or symbols in association with businesses, products or services as an indication of ownership, origin, affiliation, or sponsorship, including trademarks, service marks, trade dress, brand names, certification marks, logos, slogans, rights in designs, industrial designs, corporate names, trade names, business names, geographic indications and other designations of source, origin, sponsorship, endorsement or certification, together with the goodwill associated with any of the foregoing, in each case whether registered or unregistered, and all applications and registrations therefor.

CONFIDENTIAL

"Transaction Documents" means this Agreement, the Guarantee, the FOMB Protocol Agreement, any Servicing Contract and any other agreement entered into by Operator, Owner or Administrator from time to time in connection with the transactions contemplated hereby and expressly designated a "Transaction Document" by the parties thereto.

"U.S. District Court" means the United States District Court for the District of Puerto Rico.

"United States" or "U.S." means the United States of America.

"Vegetation Management Plan" has the meaning set forth in Section 4.2(h) (*ManagementCo Responsibilities – Physical Security Plan, Data Security Plan and Vegetation Management Plan*).

"Work Product" has the meaning set forth in Section 13.1(d)(i) (*Intellectual Property – Work Product*).

**Section 1.2     Interpretation; Construction.**

(a)     Headings. The table of contents, articles, titles and headings to sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement. Except as otherwise indicated, all references in this Agreement to "Articles", "Sections", "Annexes" and "Exhibits" are intended to refer to Articles and Sections of this Agreement and Annexes and Exhibits to this Agreement.

(b)     Annexes and Exhibits. The Annexes and Exhibits referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein. In the event of an irreconcilable conflict, discrepancy, error or omission, the following descending order of precedence will govern: (i) this Agreement, (ii) the Annexes and (iii) the Exhibits.

(c)     Construction. For purposes of this Agreement: (i) "include", "includes" or "including" shall be deemed to be followed by "without limitation"; (ii) "hereof", "herein", "hereby", "hereto" and "hereunder" shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (iii) "extent" in the phrase "to the extent" shall mean the degree to which a subject or other item extends and shall not simply mean "if"; (iv) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including"; (v) "dollars" and "US$" shall mean United States Dollars; (vi) the singular includes the plural and vice versa; (vii) reference to a gender includes the other gender; (viii) "any" shall mean "any and all"; (ix) "or" is used in the inclusive sense of "and/or"; (x) reference to any agreement, document or instrument means such agreement, document or instrument as amended, supplemented and modified in effect from time to time in accordance with its terms; (xi) reference to any Applicable Law means such Applicable Law as amended from time to time and includes any successor legislation thereto and any rules and regulations promulgated thereunder; and (xii) reference to any Person at any time refers to such Person's permitted successors and assigns.

CONFIDENTIAL

(d)     <u>Days and Time</u>. All references to days herein are references to calendar days, unless specified as Business Days, and, unless specified otherwise, all statements of or references to a specific time in this Agreement are to Atlantic Standard Time.

(e)     <u>Accounting Principles</u>. All accounting and financial terms used herein, unless specifically provided to the contrary, shall be interpreted and applied in accordance with then generally accepted accounting principles in the United States, consistently applied.

(f)     <u>Negotiated Agreement</u>. The Parties have participated jointly in the negotiation and drafting of this Agreement with the benefit of competent legal representation, and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent. In the event that an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provisions hereof.

(g)     <u>References to Transmission and Distribution of Power</u>. The phrases "transmit", "transmitted", "transmitting" and "transmission" and any similar phrases herein, when used with respect to Power and Electricity, shall mean and refer to the operation of the T&D System in accordance with this Agreement to transmit Power and Electricity. The phrases "distribute", "distributed", "distributing" and "distribution" and any similar phrases herein, when used with respect to Power and Electricity, shall mean and refer to the operation of the T&D System in accordance with this Agreement to distribute Power and Electricity.

(h)     <u>Actions Taken Pursuant to Agreement</u>. The Parties acknowledge that this Agreement sets forth procedures and intended results with respect to various circumstances that may arise during the Term. Such circumstances include the "wheeling", "transmission" or "distribution" of Power and Electricity; Changes in Law and Force Majeure Events; the preparation, revision and updating of the Budgets, the Performance Metrics, the System Remediation Plan, the System Operation Principles, the Procurement Manuals and any other such plan, manual, schedule or similar document to be prepared or amended under Article 4 (*Front-End Transition Period*); the provision of the Front-End Transition Services and the Back-End Transition Services; the provision of the O&M Services and additional services; and the assignment and transfer of this Agreement. Unless otherwise agreed to by the Parties, any correspondence, report, submittal, revision update, consent or other document or communication given pursuant to this Agreement on account of such a circumstance shall be considered as among the Parties to be an action taken pursuant to this Agreement and not an amendment hereto.

(i)     <u>Owner as Applicant</u>. Notwithstanding anything to the contrary in this Agreement, Owner shall remain the applicant for any requests for reimbursement from FEMA, unless formally amended and approved by FEMA.

CONFIDENTIAL

## ARTICLE 2
## PURPOSE; EFFECTIVE DATE; TERM

**Section 2.1      Purpose**. Owner hereby contracts with Operator for the provision of (i) O&M Services, including the services listed in Article 5 (*O&M Services*) and Annex I (*Scope of Services*) commencing on the Service Commencement Date, (ii) the Front-End Transition Services and (iii) the Back-End Transition Services, in each case, subject to the terms and conditions of this Agreement. The Parties acknowledge and agree that (i) this Agreement is a "Partnership Contract" as defined in Act 29, (ii) Operator is a "Contractor" as defined in Act 29, entitled to all of the benefits, rights and protections granted to a "Contractor" thereunder and (iii) Operator is not a "Contractor" as that term is defined in Section 1.1 (*Definitions*).

**Section 2.2      Effective Date**.

(a)      Execution of the Agreement. This Agreement shall become effective on the date that it is executed by the Parties, by which execution the Parties acknowledge and agree that the conditions in Section 2.2(b) (*Effective Date – Conditions to Execution*) have been satisfied (the "Effective Date").

(b)      Conditions to Execution. The following conditions shall have been satisfied prior to the Effective Date:

(i)      receipt by the Parties of an Energy Compliance Certificate issued by PREB;

(ii)      receipt by the Parties of a resolution adopted by the board of directors of Administrator, in form and substance reasonably acceptable to Administrator and ManagementCo, authorizing the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

(iii)      receipt by the Parties of a resolution adopted by the board of directors of Owner, in form and substance reasonably acceptable to Administrator and ManagementCo, authorizing the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

(iv)      receipt by the Parties of authorization from the FOMB, in form and substance reasonably acceptable to Administrator and ManagementCo, of the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

(v)      receipt by the Parties of approval from the Governor of the Commonwealth or his/her delegate, in form and substance reasonably acceptable to Administrator and ManagementCo, for the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

(vi)      receipt by Owner of the Guarantee;

(vii)    receipt by Owner of a copy of a certificate as to certain matters of Commonwealth law in the form set forth as Exhibit B (*Form of Commonwealth Certifications*), duly executed by Operator;

(viii)    receipt by Owner of a Tax Opinion and receipt by ManagementCo of a Reliance Letter;

(ix)    evidence reasonably satisfactory to Operator that an amount equal to at least four and a half (4.5) months of the estimated Front-End Transition Service Fee has been deposited by Owner in the Front-End Transition Account; and

(x)    receipt by ManagementCo of (A) a list of the project worksheets related to the T&D System prepared by FEMA pursuant to Section 428 of the Stafford Act as of such date or (B) a summary of the costs estimates or preliminary costs estimates for Federally Funded Capital Improvements established as of such date.

(c)    <u>Outside Date</u>. If the Effective Date has not occurred by the date specified in the RFP or such later date as the Parties may mutually agree in writing, the Bid Security (as defined in the RFP) shall be held, drawn or returned as provided in the RFP.

**Section 2.3    Term**.

(a)    <u>Initial Term</u>. This Agreement shall be in effect from the Effective Date through the fifteenth (15th) anniversary of the Service Commencement Date (such period of time, the "<u>Initial Term</u>"), unless extended or earlier terminated in accordance with the terms hereof.

(b)    <u>Extension</u>. Operator and Owner (or Administrator acting on Owner's behalf) may mutually agree to extend the Initial Term for an additional period to be determined at the time and on terms and conditions to be agreed in good faith (the "<u>Extension Term</u>"); <u>provided</u> that (i) the Extension Term shall not exceed the maximum term permitted under Act 29 at the time of such extension, (ii) a Tax Opinion shall have been delivered to Owner and a Reliance Letter shall have been received by ManagementCo in connection with such Extension Term and (iii) to the extent required by Applicable Law, the Extension Term shall not be effective until approved by the PREB.

CONFIDENTIAL

## ARTICLE 3
## OWNERSHIP OF THE T&D SYSTEM

**Section 3.1    Ownership**. The T&D System is and shall be owned by Owner throughout the Term, and Operator shall have no ownership interest therein.

**Section 3.2    Engagement of Operator**. Operator shall perform the O&M Services as an independent contractor and shall not have any legal, equitable, tax, beneficial or other ownership or leasehold interest in the T&D System. The only compensation payable by Owner to Operator for providing the O&M Services for the T&D System shall be the Service Fee. Owner shall also fund the Service Accounts in the manner contemplated hereunder for Operator's payment of T&D Pass-Through Expenditures (including Excess Expenditures), Capital Costs and Outage Event Costs (without limiting Owner's indemnity or other obligations hereunder). All amounts collected by Operator or any Contractor or Subcontractor on behalf of Owner from T&D Customers pursuant to this Agreement or any Servicing Contract (the "System Revenues") shall be the property of Owner (subject only to Liens on System Revenues specified in the Title III Plan and the related disclosure statement) and shall be deposited by Operator daily in such account(s) specified in accordance with the Servicing Contract or, if no Servicing Contract is in effect, pursuant to the account structure as agreed to between Owner and Operator pursuant to Section 4.5(n) (*Conditions Precedent to Service Commencement Date – Account Structure*). In collecting the System Revenues, Operator and any Contractor or Subcontractor shall act solely as an agent for Owner and shall have no right or claim to the System Revenues. Without limiting the generality of the foregoing, Operator and any Contractor or Subcontractor shall have no right to assert a claim of set-off, recoupment, abatement, counterclaim or deduction against System Revenues for any amounts that may be owed to Operator hereunder or with respect to any other matter in dispute hereunder. Operator is unconditionally and absolutely obligated to pay or deposit the System Revenues as directed by Administrator.

**Section 3.3    Use of T&D System**. From the Service Commencement Date and for the remainder of the Term thereafter, Operator, Contractors and its Subcontractors shall have the exclusive right (except as set forth in this Agreement), subject to Section 3.5 (*Right of Access*), to enter upon, occupy and use the T&D System and the T&D System Sites for the sole purpose of performing the O&M Services in accordance with the terms hereof. Owner shall ensure that Operator, Contractors and its Subcontractors are provided with all necessary access to exercise such right.

**Section 3.4    Liens**. From the Service Commencement Date and for the remainder of the Term thereafter, Operator shall keep the T&D System free and clear of any and all Liens (other than Permitted Liens) arising out of or in connection with any acts, omissions or debts of Operator, Guarantor(s) or their Affiliates that are unrelated and independent from the provision of O&M Services hereunder. Nothing in this Agreement shall be deemed to create any Lien in favor of Operator on any asset of Owner, including the T&D System, as security for the obligations of Owner hereunder.

**Section 3.5    Right of Access**. Upon reasonable notice to Operator, at reasonable times during normal business hours and at their own respective cost and risk, each of Owner, Administrator, PREB and their respective Representatives shall have the right to access the T&D

36

CONFIDENTIAL

System assets and all System Information for Oversight of Operator's performance of the O&M Services and to otherwise carry out their obligations under Applicable Law; provided that such access shall not interfere with Operator's performance of the O&M Services and may be provided by read-only access where available, or a reasonably equivalent form of access to such information. Owner, Administrator and their respective Representatives shall comply with all of Operator's access, security (including cybersecurity) and safety procedures when exercising such right of access. Owner shall be responsible for the security of all access credentials provided to, and each access made and use and disclosure of System Information by, Owner, Administrator, PREB and their respective Representatives hereunder. At Administrator's request and sole cost and expense, Operator shall provide Administrator with dedicated on-site office space and access to and use of office facilities and equipment located at Operator's facilities in the Commonwealth or another suitable site mutually agreed upon; provided that such space is reasonable and adequate to enable Administrator to exercise its Oversight rights and responsibilities under this Agreement.

**Section 3.6    Exclusivity**. The Parties covenant and agree that Operator, Contractors, Subcontractors and their respective Representatives shall be the sole and exclusive providers of O&M Services with respect to the T&D System and that Operator shall not (a) transmit or distribute Power and Electricity using the T&D System other than Power and Electricity obtained by, on behalf of or with the approval of Owner (or Administrator, if applicable) or PREB in accordance with Applicable Law, or (b) use the T&D System (i) for any purpose other than the purposes contemplated hereby or (ii) to serve or benefit any person other than Owner and T&D Customers.

**Section 3.7    Essential Public Service**. The Parties acknowledge that Owner's provision of the Power and Electricity requirements of the Commonwealth constitutes an essential public service; it being understood that such acknowledgement shall not impose any obligation on the Parties other than those set forth in this Agreement. Owner acknowledges that Operator will rely on (i) the certifications, resolutions, authorizations and approvals referred to in Section 2.2 (*Effective Date*) and (ii) the funding of the Service Accounts by Owner in the manner contemplated hereunder, in each case in order for Operator to (A) perform the O&M Services under this Agreement and (B) have the opportunity to earn the Service Fee in full.

**Section 3.8    Reporting Obligations**. In accordance with Section VI of Annex I (*Scope of Services*) Operator shall provide (i) System Information (both financial and operational), as available, to support Owner's financing activities, including Owner's administration of debt service and Owner's required disclosure and tax requirements, and (ii) assistance to Owner and Administrator in connection with Owner's preparation of reports and other documents to satisfy Owner's reporting requirements.

**Section 3.9    Qualified Management Contract**.

(a)    Generally. The T&D System has been financed with obligations the interest on which is exempt from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code. The Parties intend for this Agreement to constitute a "qualified management contract" under Revenue Procedure 2017-13, such that the provision of O&M Services by Operator under this Agreement does not adversely affect the exclusion from gross income for federal income tax purposes under the Internal Revenue Code of the interest on such

obligations. The Tax Opinion and the Reliance Letter delivered as of the Effective Date have been delivered on such basis.

(b)     Covenants.

(i)     Operator covenants and agrees that: (A) neither it nor any direct or indirect owner of an equity interest in it is entitled to any U.S. federal income tax benefits relating to the T&D System that are available to an owner or lessor of the T&D System covered by this Agreement; (B) it shall not take any tax position inconsistent with it being a service provider with respect to such T&D System; and (C) it shall not, and shall not permit or enable any direct or indirect owner of any equity interest in it to, claim any depreciation or amortization deduction, investment tax credit or deduction for any payment as rent, with respect to the T&D System.

(ii)    Owner, Administrator and Operator each covenant and agree that the terms of this Agreement shall be construed so as to comply with the requirements of Revenue Procedure 2017-13. To the extent that this Agreement is determined to fail to comply with Revenue Procedure 2017-13 for any reason or otherwise is determined to result in private business use of the T&D System within the meaning of Section 141 of the Internal Revenue Code, the Parties agree that they shall use reasonable efforts to amend the terms of this Agreement in order to comply with Revenue Procedure 2017-13; provided, however, that if any such amendment shortens or has the effect of shortening the Initial Term, including if any such amendment is required to secure the delivery of the Tax Opinion required by Section 4.5(v) (*Conditions Precedent to Service Commencement Date – Tax Opinion*), then: (A) the Fixed Fee payable to ManagementCo under Annex VIII (*Service Fee*) shall be adjusted by adding US$7,000,000 in 2020 Dollars per month to each month for that number of months equal to the number of months by which the Initial Term is less than fifteen (15) years counting back from the end of the as-amended Initial Term; and (B) the maximum Incentive Fee payable to ManagementCo under Annex VIII (*Service Fee*) shall be adjusted by adding US$1,333,333 in 2020 Dollars per month to each month for that number of months equal to the number of months by which the Initial Term is less than fifteen (15) years counting back from the end of the as-amended Initial Term. By way of illustration only, if the fifteen (15)-year anniversary of the Service Commencement Date is September 1, 2035, but the Parties are required to amend this Agreement such that the Initial Term expires on June 1, 2035, then the adjustments required by the preceding sentence shall be made in each of March, April and May, 2035.

(iii)   The adjustments to the Fixed Fee and the Incentive Fee provided in subsection (b)(ii) shall not apply if the Initial Term is subsequently extended as provided in this subsection (b)(iii) to the term provided in Section 2.3(a) (*Term - Initial Term*).  If the Initial Term has been shortened as provided in subsection (b)(ii), the Initial Term shall automatically be extended to the term provided in Section 2.3(a) (*Term - Initial Term*) upon receipt by the Parties, at the expense of Owner or Administrator, of (A) an opinion of Sargent and Lundy or other nationally recognized engineering firm acceptable to the Parties, which sets forth, among other things, the reasonably expected weighted average economic life of the T&D System as of the date of that opinion, (B) an opinion of Nixon Peabody LLP as counsel to the FOMB or other nationally recognized tax counsel reasonably acceptable to Administrator, providing that the extension of the term of this Agreement to the original Initial Term does not adversely affect the exclusion from gross income of interest on tax-exempt obligations of the Owner, its Affiliates or another

CONFIDENTIAL

Governmental Body for federal income tax purposes under Section 103 of the Internal Revenue Code, and (C) a Reliance Letter from such tax counsel accompanying the opinion described in clause (B).

(c)　　　PREB Actions. The Parties hereby acknowledge and agree that to the extent PREB (i) is not permitted under Applicable Law to carry out its rights, duties and obligations under this Agreement ("PREB Actions"), all of which PREB is deemed to have acknowledged by delivery of the Energy Compliance Certificate, or (ii) ceases to be an entity of the government of the Commonwealth, the related PREB Actions shall automatically become the rights, duties and obligations of Administrator. In the event that such PREB Actions become the rights, duties and obligations of Administrator, Administrator shall exercise such rights, duties and obligations (x) taking into account the standards, processes and procedures previously used by PREB with respect to the PREB Actions, (y) in a manner that does not adversely affect the exclusion from gross income of interest on obligations of Owner, its Affiliates or another Governmental Body for federal income tax purposes under the Internal Revenue Code and (z) taking into account any obligations under Section 10.1 of Act 120, to the extent applicable.

CONFIDENTIAL

## ARTICLE 4
## FRONT-END TRANSITION PERIOD

**Section 4.1     Front-End Transition Period Generally**.

(a)     Role of ManagementCo. Throughout the Front-End Transition Period, ManagementCo shall not provide the O&M Services or otherwise be responsible for the T&D System, but shall, subject to and conditioned upon Owner providing funding pursuant to Section 4.6(b) (*Front-End Transition Period Compensation – Front-End Transition Service Fee*), solely provide the Front-End Transition Services as described in the front-end transition plan set forth in Annex II (*Front-End Transition Plan*) (the "Front-End Transition Plan"). The Front-End Transition Services are intended to ensure an orderly transition of the responsibility for the management, operation, maintenance, repairs, restoration and replacement of the T&D System to Operator by the Target Service Commencement Date, without disruption of customer service and business continuity, and shall be provided in a manner consistent with the Front-End Transition Plan and Applicable Law.

(b)     Owner and Administrator Cooperation. Each of Owner and Administrator shall take all such actions as may be reasonably necessary to enable or assist ManagementCo in providing the Front-End Transition Services, including (i) providing ManagementCo's Representatives with a designated space and facilities at Owner's principal offices for their use throughout the Front-End Transition Period, (ii) allowing access, during normal business or operational hours (as may be applicable and relevant) and at such other times as are required, to Owner's premises for the purpose of providing the Front-End Transition Services, (iii) cooperating with and assisting, and causing its Representatives to cooperate with and assist, ManagementCo in its performance of the Front-End Transition Services and its efforts to timely satisfy the ManagementCo Service Commencement Date Conditions and (iv) encouraging and facilitating a positive and cooperative working relationship with respect to the implementation and completion of the Front-End Transition Plan and the performance of the Front-End Transition Services.

(c)     Administrative Expense Treatment.

(i)     No later than ten (10) Business Days after the Effective Date, Owner shall file a motion with the Title III Court seeking administrative expense treatment for any accrued and unpaid amounts required to be paid by Owner under this Agreement during the Front-End Transition Period, including the Front-End Transition Service Fee.

(ii)     ManagementCo shall have the right to terminate this Agreement upon not less than thirty (30) days' prior written notice to Administrator (with a copy to PREB) (A) if such motion has not been approved by the Title III Court on or before the date that is ninety (90) days following the date on which such motion is filed, which ninety (90) day period may be extended for an additional forty-five (45) days by Administrator at its sole discretion, or such later date as the Administrator and ManagementCo may agree or (B) if such approval has been reversed on appeal.

(iii)     In the event of the termination of this Agreement pursuant to this Section 4.1(c) (*Front-End Transition Period Generally – Administrative Expense Treatment*),

CONFIDENTIAL

ManagementCo shall retain any Front-End Transition Service Fee earned as of the effective date of such termination, and shall within five (5) Business Days of the effective date of such termination, return to Administrator any amounts held in the Front-End Transition Account in excess of any earned Front-End Transition Service Fee. This Agreement (other than with respect to the aforementioned payment obligations and any limitations on liability set out elsewhere in this Agreement, each of which shall continue in effect) shall thereafter become void and have no effect, without any liability on the part of any Party or its Affiliates or Representatives in respect thereof, except that nothing herein shall relieve any party from liability that cannot be waived as a matter of Applicable Law, claims of fraud or intentional breach or misrepresentation; provided that, in any such event, the limitations of liability specified in this Agreement (including Section 14.6(d) (*Remedies Upon Early Termination – Additional Remedies*), Section 18.3(a) (*Limitation on Liability – Operator General Limitations*) and Section 18.3(b) (*Limitation on Liability – Gross Negligence; Willful Misconduct*)) shall, notwithstanding the foregoing, continue to apply. Furthermore, the remedies provided in this Section 4.1(c) (*Front-End Transition Period Generally – Administrative Expense Treatment*) shall be the sole and exclusive remedies of the Parties for any termination of this Agreement pursuant Section 4.1(c) (*Front-End Transition Period Generally – Administrative Expense Treatment*).

        (d)        <u>Transition to Standard of Performance</u>.

        (i)        The Parties acknowledge and agree that (A) certain components of the T&D System and the manner in which the T&D System is operated do not currently meet the standards of performance required under this Agreement, including the fact that certain matters related to the T&D System or T&D System Sites and certain general operating and administrative practices may not comply with Contract Standards, and (B) a period of review, planning, remediation, repair and replacement will be required to enable Operator to achieve the Contract Standards.

        (ii)        In light of such circumstances, promptly (and in any event within thirty (30) days) following the Effective Date, the Parties shall establish a planning team composed of representatives of each of the Parties, and ManagementCo, with input from such team, shall (A) review the current state of the T&D System, including the control, monitoring and information equipment, systems, practices, services (including related hardware, Information Systems and Software) and general operating and administrative practices used in connection therewith, (B) develop a plan (taking into account the Capital Budgets and any Federally Funded Capital Improvements) to remediate, repair, replace and stabilize such equipment, systems, practices and services, as may be needed, to enable Operator to perform the O&M Services in compliance with the Contract Standards as soon as reasonably possible and at a reasonable cost to Owner (such plan, the "<u>System Remediation Plan</u>") and (C) submit such System Remediation Plan to Administrator for its review and approval, acting reasonably. The System Remediation Plan shall detail the scope, resources, timelines, milestones, costs estimates and achievement criteria for each activity or project required to enable Operator to perform the O&M Services in compliance with Contract Standards, including the deadlines by which each such activity or project shall be fully implemented. The Parties acknowledge and agree that any prior studies or reports of Owner relating to the remediation, repair, replacement and stabilization of the T&D System may be considered for purposes of preparing the System Remediation Plan, but the findings of such studies or reports shall not limit the Parties' discretion to develop the System Remediation Plan.

CONFIDENTIAL

(iii)     Within thirty (30) days following its receipt of such proposed System Remediation Plan, Administrator, acting reasonably, shall provide ManagementCo comments on the appropriateness of the proposed System Remediation Plan and recommend any changes or modifications it believes are necessary or appropriate. If Administrator does not respond within such thirty (30) day period, Administrator shall be deemed to have no objection to such proposed System Remediation Plan being submitted by ManagementCo to PREB. The Parties agree that, within thirty (30) days following receipt of Administrator's comments, if any, or the end of Administrator's review period described in the immediately preceding sentence, if Administrator has no comments, Operator shall submit for PREB's review the proposed System Remediation Plan, incorporating or rejecting any of the modifications or changes suggested by Administrator, together with an explanation of any of Administrator's comments, as ManagementCo shall reasonably deem appropriate in its sole discretion. PREB shall review and approve, deny or propose modifications to the proposed System Remediation Plan. Operator shall be required to respond promptly to any changes or modifications from PREB to the System Remediation Plan and submit any updates to the proposed System Remediation Plan to PREB for its approval. If PREB does not respond within ninety (90) days after receipt of the proposed System Remediation Plan or any update thereto, ManagementCo may proceed for purposes of this Agreement as if PREB had approved such System Remediation Plan.

(iv)     The Budgets, including the Initial Budgets, and the Performance Metrics, each as amended and approved from time to time, shall include the costs and expenses required by, and associated with, the preparation and implementation of the System Remediation Plan.

(e)     <u>Federal Funding Procurement Manual</u>.

(i)     Promptly (and in any event within sixty (60) days) following the Effective Date, the Parties shall establish a planning team composed of representatives of each of the Parties and COR3, and ManagementCo, with input from such team, shall prepare a manual that describes (i) the procurement guidelines to be applied to, and contractual provisions to be included in, any contract involving Federal Funding and (ii) procedures for contract administration and oversight, including standards and methods for (A) addressing employee and organization conflicts of interest, (B) avoiding acquisition of unnecessary or duplicative items, (C) granting awards to responsible contractors, (D) maintaining records of procurement history, (E) managing time-and-materials contracts, (F) resolving disputes, (G) selecting transactions for procurement, (H) conducting technical evaluations and (I) if an Emergency Event relates, or could potentially relate, to an event that may be or has been declared a Declared Emergency or Major Disaster, seeking to ensure that any response to such Emergency Event complies with the Federal Funding Requirements (such manual, the "<u>Federal Funding Procurement Manual</u>"). The Parties shall update the Federal Funding Procurement Manual in accordance with Section 5.9(d) (*Procurement and Administration of Federal Funding – Federal Funding Procurement Manual*) to reflect any changes in Applicable Law that affect Federal Funding.

(ii)     Upon ManagementCo finalizing the Federal Funding Procurement Manual, ManagementCo shall submit such Federal Funding Procurement Manual to Administrator. Administrator, acting reasonably, shall provide ManagementCo comments on the appropriateness of the proposed Federal Funding Procurement Manual and recommend any

CONFIDENTIAL

changes or modifications it believes are necessary or appropriate. Within thirty (30) days following receipt of Administrator's comments, if any, or the end of forty-five (45) days following Administrator's receipt of the proposed Federal Funding Procurement Manual, if Administrator has no comments, ManagementCo shall submit to COR3 for its review and approval the revised Federal Funding Procurement Manual, incorporating or rejecting any of the modifications or changes suggested by Administrator, together with an explanation of any of Administrator's comments, as ManagementCo shall reasonably deem appropriate in its sole discretion.

     (f)     <u>Non-Federal Funding Procurement Manual</u>.

     (i)     Promptly (and in any event within sixty (60) days) following the Effective Date, the Parties shall establish a planning team composed of representatives of each of the Parties, and ManagementCo, with input from such team, shall prepare a manual that describes (i) the procurement guidelines to be applied to, and contractual provisions to be included in, any contract for a Non-Federally Funded Capital Improvement and (ii) procedures for contract administration and oversight, including standards and methods for (A) addressing employee and organization conflicts of interest, (B) avoiding acquisition of unnecessary or duplicative items, (C) granting awards to responsible contractors, (D) maintaining records of procurement history, (E) managing time-and-materials contracts, (F) resolving disputes, (G) selecting transactions for procurement and (H) conducting technical evaluations (such manual, the "<u>Non-Federal Funding Procurement Manual</u>"). The Parties shall update the Non-Federal Funding Procurement Manual as necessary to reflect any changes in Applicable Law that affect Non-Federally Funded Capital Improvements.

     (ii)     Upon ManagementCo finalizing the Non-Federal Funding Procurement Manual, ManagementCo shall submit such Non-Federal Funding Procurement Manual to Administrator for its review and approval. Administrator, acting reasonably, shall provide ManagementCo comments on the appropriateness of the proposed Non-Federal Funding Procurement Manual and recommend any changes or modifications it believes are necessary or appropriate. Within thirty (30) days following receipt of Administrator's comments, if any, or the end of forty-five (45) days following Administrator's receipt of the proposed Non-Federal Funding Procurement Manual, if Administrator has no comments, ManagementCo shall submit to Administrator for its review and approval the revised Non-Federal Funding Procurement Manual, incorporating or rejecting any of the modifications or changes suggested by Administrator, together with an explanation of any of Administrator's comments, as ManagementCo shall reasonably deem appropriate in its sole discretion.

     (g)     <u>Liability Waiver</u>. In connection with the submission of the Initial Budgets to PREB, the Parties agree to apply for inclusion in the Rate Order that the associated tariff or terms of service include: (i) a waiver of Owner's, ManagementCo's and ServCo's liability to customers or any Person receiving Power and Electricity for any Losses arising in any way out of or in connection with the operation of the T&D System and the provision of Power and Electricity including any events of interrupted, irregular or defective electric service due to Force Majeure Events, other causes beyond Owner's, ManagementCo's or ServCo's control or ordinary negligence, gross negligence or willful misconduct of Owner, ManagementCo or ServCo, or their respective employees, agents or contractors; and (ii) a waiver in all cases of responsibility for any loss of profits or revenues, special, exemplary, punitive, indirect, incidental or consequential

CONFIDENTIAL

damages, including loss of revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime, business interruption, spoilage of goods, claims of customers of electric customers or other economic harms, in each case howsoever and whensoever arising, including where caused by any of Owner's, ManagementCo's or ServCo's ordinary negligence, gross negligence or willful misconduct (collectively the "Liability Waiver").

(h)    System Operation Principles. Promptly (and in any event within sixty (60) days) following the Effective Date, the Parties shall establish a planning team composed of representatives of each of the Parties, and ManagementCo, with input from such team, shall (i) prepare principles related to the dispatch of Power and Electricity (such principles, the "System Operation Principles"), which principles shall be generally consistent with those set forth in Schedule 1 (*System Operation Principles*) to Annex I (*Scope of Services*), and (ii) submit such proposed System Operation Principles to Administrator for its review and approval. Within thirty (30) days following its receipt of such proposed System Operation Principles, Administrator, acting reasonably, shall provide ManagementCo comments on the appropriateness of the proposed System Operation Principles and recommend any changes or modifications it believes are necessary or appropriate. If Administrator does not respond within such thirty (30) day period, Administrator shall be deemed to have no objection to such proposed System Operation Principles being submitted by ManagementCo to PREB. The Parties agree that, within thirty (30) days following receipt of Administrator's comments, if any, or the end of Administrator's review period described in the immediately preceding sentence, if Administrator has no comments, Operator shall submit for PREB's review the proposed System Operation Principles, incorporating or rejecting any of the modifications or changes suggested by Administrator, together with an explanation of any of Administrator's comments, as ManagementCo shall reasonably deem appropriate in its sole discretion. PREB shall review and approve, deny or propose modifications to the proposed System Operation Principles. ManagementCo shall be required to respond promptly to any changes or modifications from PREB to the proposed System Operation Principles and submit any updates to the proposed System Operation Principles to PREB for its approval. If PREB does not respond within ninety (90) days after receipt of the proposed System Operation Principles or any update thereto, ManagementCo may proceed for purposes of this Agreement as if PREB had approved such proposed System Operation Principles. The System Operation Principles shall be subject to further review and update pursuant to Section 5.13(c) (*Generation-Related Services – Review of System Operation Principles*).

**Section 4.2    ManagementCo Responsibilities**. As soon as practicable after the Effective Date but in any event prior to the Target Service Commencement Date (subject to Owner and Administrator complying with their obligations set forth in Section 4.3 (*Owner and Administrator Responsibilities*)), ManagementCo shall satisfy the following conditions precedent to (i) Owner's obligations to handover to Operator the O&M Services and other rights and responsibilities with respect to the T&D System pursuant to Section 4.7(b) (*Closing the Front-End Transition Period – Establishment of Service Commencement Date*) and (ii) the occurrence of the Service Commencement Date:

(a)    Front-End Transition Plan. ManagementCo shall carry out and complete ManagementCo's obligations in the Front-End Transition Plan, and shall provide or Subcontract for all management, technical, administrative, engineering, labor relations and other personnel necessary in connection therewith.

(b)      Handover Checklist. On or prior to the tenth (10th) day of each month, ManagementCo shall provide Administrator (with copy to PREB) written monthly reports with respect to ManagementCo's performance of the Front-End Transition Services, including a copy of the Handover Checklist updated to reflect the progress of each item listed therein. From time to time during the Front-End Transition Period, in light of experience developed up to such point in the Front-End Transition Period, the Handover Checklist shall be adjusted, updated or otherwise modified by ManagementCo and Administrator, each acting reasonably, as necessary to reflect such experience.

(c)      Confirmation of Guarantee. ManagementCo shall execute and deliver a confirmation to Administrator that the Guarantee remains in full force and effect.

(d)      Required Insurance. ManagementCo shall submit to Administrator certificates of insurance for all Required Insurance to be effective as of the Service Commencement Date.

(e)      Initial Budgets. As soon as practicable following the Effective Date, ManagementCo shall prepare and submit to Administrator the proposed Initial Budgets; provided that for purposes of the Generation Budget, ManagementCo shall only be required to submit (if received by ManagementCo) the Generation Budget as prepared by Owner and delivered to ManagementCo by Owner. ManagementCo shall have a reasonable time to review such Generation Budget prior to completing and submitting the balance of the Initial Budgets to Administrator hereunder. Within thirty (30) days following its receipt of such proposed Initial Budgets, Administrator, acting reasonably, shall provide ManagementCo comments on the appropriateness of the proposed Initial Budgets and recommend any changes or modifications it believes are necessary or appropriate. If Administrator does not respond within such thirty (30) day period, Administrator shall be deemed to have no objection to such proposed Initial Budgets being submitted by ManagementCo to PREB. The Parties agree that, within thirty (30) days following receipt of Administrator's comments, if any, or the end of Administrator's review period described in the immediately preceding sentence, if Administrator has no comments, Operator shall submit for PREB's review the revised Initial Budgets, incorporating or rejecting any of the modifications or changes suggested by Administrator, together with an explanation of any of Administrator's comments, as ManagementCo shall reasonably deem appropriate in its sole discretion. PREB shall review, and approve, deny or propose modifications to, such proposed Initial Budgets in accordance with Applicable Law. ManagementCo shall be required to respond promptly to any changes or modifications from PREB to the proposed Initial Budgets and submit any updates to the proposed Initial Budgets to PREB for its approval. If PREB does not respond within ninety (90) days after receipt of the proposed Initial Budgets or any update thereto, ManagementCo may proceed for purposes of this Agreement as if PREB had approved such proposed Initial Budgets.

(f)      Performance Metrics. Promptly (and in any event within sixty (60) days) following the Effective Date, the Parties shall establish a planning team composed of representatives of each of the Parties, and ManagementCo, with input from such team, shall prepare a revised Annex IX (Performance Metrics), including (i) proposed baseline, target and minimum performance levels for certain Performance Metrics, (ii) Key Performance Metrics and (iii) Major Outage Event Performance Metrics, together with an explanation of the basis for each

CONFIDENTIAL

of the foregoing. ManagementCo shall submit to Administrator the proposed revised Performance Metrics and, within thirty (30) days following its receipt of such proposed revised Annex IX (*Performance Metrics*), Administrator, acting reasonably, shall provide ManagementCo comments on the appropriateness of the proposed Annex IX (*Performance Metrics*) and recommend any changes or modifications it believes are necessary or appropriate. If Administrator does not respond within such thirty (30) day period, Administrator shall be deemed to have no objection to such proposed revised Annex IX (*Performance Metrics*) being submitted by ManagementCo to PREB. The Parties agree that, within thirty (30) days following receipt of Administrator's comments, if any, or the end of Administrator's review period described in the immediately preceding sentence, if Administrator has no comments, Operator shall submit for PREB's review the proposed revised Annex IX (*Performance Metrics*), incorporating or rejecting any of the modifications or changes suggested by Administrator, together with an explanation of any of Administrator's comments, as ManagementCo shall reasonably deem appropriate in its sole discretion. PREB shall review, and approve, deny or propose modifications to, such proposed revised Annex IX (*Performance Metrics*) in accordance with Applicable Law. ManagementCo shall be required to respond promptly to any changes or modifications from PREB to the proposed revised Annex IX (*Performance Metrics*) and submit any updates to the proposed revised Annex IX (*Performance Metrics*)to PREB for its approval. If PREB does not respond within ninety (90) days after receipt of the proposed revised Annex IX (*Performance Metrics*) or any update thereto, ManagementCo may proceed for purposes of this Agreement as if PREB had approved such proposed revised Annex IX (*Performance Metrics*). The illustrative Performance Metrics, as identified in Annex IX (*Performance Metrics*) shall be revised and replaced accordingly on, or prior to, the Service Commencement Date

(g)     <u>Emergency Response Plan</u>. Operator shall provide Administrator and PREB, for their information, with a plan of action meeting Contract Standards that takes effect from the Service Commencement Date and outlines the procedures and actions necessary for responding to any emergency affecting or reasonably likely to affect the T&D System after the Service Commencement Date (the "<u>Emergency Response Plan</u>"), including fire, weather, environmental, health, safety and other potential emergency conditions, which Emergency Response Plan shall become effective on the Service Commencement Date. The Emergency Response Plan shall (i) provide for appropriate notice of any such emergency to PREB and all other Governmental Bodies that ManagementCo is notified in writing have jurisdiction over the T&D System, (ii) establish measures that facilitate coordinated emergency response actions by all appropriate Governmental Bodies, (iii) specifically include outage minimization and response measures, and (iv) assure the timely availability of all personnel required to respond to any emergency in accordance with (A) Contract Standards and (B) the Federal Funding Procurement Manual if the Emergency Event relates, or could potentially relate, to an event that may be or has been declared a Declared Emergency or Major Disaster. Such Emergency Response Plan shall be updated by Operator from time to time as necessary or appropriate.

(h)     <u>Physical Security Plan, Data Security Plan and Vegetation Management Plan</u>. ManagementCo shall develop and provide Administrator and PREB, for their information, with plans of action meeting Contract Standards that outline the procedures and actions necessary for maintaining (i) the physical security of the T&D System after the Service Commencement Date (the "<u>Physical Security Plan</u>"); (ii) data security, cyber security and information security relating

46

CONFIDENTIAL

to the T&D System (the "Data Security Plan"); and (iii) a comprehensive vegetation management program (the "Vegetation Management Plan"), each of which shall become effective on the Service Commencement Date; provided that as long as each of the Physical Security Plan, Data Security Plan, and Vegetation Management Plan are substantially complete on the Service Commencement Date, their finalization shall not delay the Service Commencement Date from occurring if all other Service Commencement Date Conditions have been satisfied or waived. For the avoidance of doubt, the Data Security Plan shall be subject to the System Remediation Plan, including the approach for implementation outlined in Section 4.1(d) (*Front-End Transition Period Generally – Transition to Standard of Performance*).

(i)        Back-End Transition Plan. ManagementCo shall prepare and submit to Administrator (with copy to PREB), for its information and approval, a detailed back-end transition plan consistent with the back-end transition outline set forth in Annex III (*Back-End Transition Plan*), which plan shall: (i) include reasonably acceptable arrangements relating to the (A) possible hiring of ServCo Employees by a successor operator and (B) the treatment of severance costs associated with any ServCo Employees not hired by a successor operator in connection with the early termination or expiration of this Agreement; and (ii) provide for the transition and handover of the O&M Services and other rights and responsibilities with respect to the T&D System, back to Owner or to a successor operator upon the expiration or early termination of the Term (the "Back-End Transition Plan"), which Back-End Transition Plan shall become effective on the Service Commencement Date. Such Back-End Transition Plan shall be updated by Operator, subject to approval by Administrator, on an annual basis as necessary or appropriate.

(j)        Employment Evaluations. As soon as reasonably practicable following the Effective Date but not less than ninety (90) days prior to the Target Service Commencement Date (the "Interview Deadline"), ManagementCo shall use commercially reasonable efforts to interview and evaluate as candidates for employment at ServCo, effective as of the Service Commencement Date, the regular employees of Owner and its Affiliates (other than Owner's generation employees, including certain administrative and plant operations personnel) who (i) are currently and remain employed by Owner and its Affiliates (other than Owner or its Affiliates generation station employees) as of the Interview Deadline or are hired by Owner or its Affiliates on or after the Effective Date in the ordinary course of business consistent with the past practices of Owner and its Affiliates to replace any existing employee of Owner, and (ii) apply to ServCo in a job category ServCo wishes to fill (collectively, the "Owner Employees"). For the avoidance of doubt, neither ManagementCo nor ServCo shall be liable for severance or other pay or benefits for Owner Employees who are not hired by ServCo, including those to whom an offer of employment is made but who do not accept such offer. Owner and its Affiliates shall waive any non-competition, confidentiality or other obligation arising under any employment contract between Owner or Affiliate and any Owner Employee that may otherwise restrict any of Owner Employee's rights to be employed by ServCo. Owner shall provide ManagementCo with the following information regarding Owner Employees promptly on request: (x) job description for current and any prior positions occupied by such Owner Employee, (y) date of employment and (z) current salary.

(k)        Employment Offers. ServCo shall give priority in hiring to any Owner Employees who meet Operator's stated requirements for employment as set forth in Annex IV (*Operator Employment Requirements*) over other equally qualified and equally evaluated applicants for the same job category that are not Owner Employees, it being understood that (i)

CONFIDENTIAL

ServCo shall not be required to hire all or substantially all of the Owner Employees and (ii) the determination of which Owner Employees to hire shall be made by ServCo in ServCo's sole discretion, acting in good faith. Each Owner Employee who accepts an offer of employment with ServCo pursuant to this Section 4.2(k) (*ManagementCo Responsibilities – Employment Offers*) shall be referred to as a "Hired Former Employee of Owner." On the Service Commencement Date and during the Term, ServCo shall employ such other employees, including any employees of Operator or any of its Affiliates as of the Effective Date hired for the operation of the T&D System ("Other Employees" and, together with the Hired Former Employees of Owner, the "ServCo Employees"), as are necessary to provide the O&M Services. The following initial terms and conditions of employment shall apply to the Hired Former Employees of Owner, but not to any Other Employees:

(i)  Offers of employment shall remain open for a period of ten (10) Business Days. Any such offer which is accepted within such ten (10) Business Day period shall thereafter be irrevocable until the Service Commencement Date.

(ii)  Offers of employment shall provide for employment with ServCo on terms and conditions that are set at ServCo's sole discretion, but shall in all cases provide for (A) a base salary or regular hourly wage rate at least equal to the base salary or wage rate provided by Owner or its Affiliates (as applicable) to the Owner Employee immediately prior to the Service Commencement Date and (B) the employee fringe benefits established in Act 26, and (C) any other benefits required to be offered to Owner Employees pursuant to Act 120, as any such benefits may have been restricted, conditioned, modified or annulled by Act 3, Act 26 and Act 66.

(l)  Periodic Reports.

(i)  ManagementCo shall provide Administrator (with copy to PREB) with detailed weekly, monthly and other periodic reports as Administrator may reasonably request from time to time with respect to ManagementCo's performance of the Front-End Transition Services, including the progress against the Handover Checklist and any other completion schedules and milestones included in the Front-End Transition Plan. In connection therewith, ManagementCo shall provide Administrator (with copy to PREB) with any other information that (A) Administrator may reasonably request, including performance reports related to any of the Front-End Transition Services, and (B) may be reasonably produced from records maintained by ManagementCo in the normal course of business consistent with the provisions of this Agreement relating to document retention.

(ii)  ManagementCo shall promptly advise Administrator (with copy to PREB) of any actual or potential failure or inability to achieve milestones by the dates set forth in the Front-End Transition Plan, and shall promptly report to Administrator (with copy to PREB) any problems encountered in performing the Front-End Transition Services that ManagementCo has been unable to promptly and adequately resolve.

(m)  Representations. The representations of Operator set forth in Section 19.2 (*Representations and Warranties of Operator*) and Guarantor(s) set forth in its Guarantee shall be true and correct in all material respects as of the Service Commencement Date (other than any representations that are expressly made as of an earlier date), as if made on and as of the Service

CONFIDENTIAL

Commencement Date, and both Operator and Guarantor(s) shall deliver to Administrator a certificate of an authorized officer to that effect.

(n)      Notice of Default. ManagementCo shall provide to Administrator, promptly following the receipt thereof, copies of any notice of default, breach or noncompliance received under or in connection with any Governmental Approvals, if any, or Subcontract pertaining to the Front-End Transition Period.

**Section 4.3    Owner and Administrator Responsibilities**. As soon as practicable after the Effective Date but in any event prior to the Target Service Commencement Date and at such time and in such manner as to permit Operator to perform its obligations under Section 4.2 (*ManagementCo Responsibilities*), Owner and Administrator shall, at Owner's sole cost, satisfy the following conditions precedent (i) to Operator's obligations to take over the O&M Services and other rights and responsibilities with respect to the T&D System pursuant to Section 4.7(b) (*Closing the Front-End Transition Period – Establishment of Service Commencement Date*) and (ii) to the occurrence of the Service Commencement Date:

(a)      Representations. The representations of Owner set forth in Section 19.1 (*Representations and Warranties of Owner*) shall be true and correct in all material respects as of the Service Commencement Date as if made on and as of the Service Commencement Date (other than any representations that are expressly made as of an earlier date), and Owner shall deliver to ManagementCo a certificate of an authorized officer to that effect.

(b)      Access. Owner shall provide ManagementCo, its Front-End Subcontractors and their Representatives with access to the T&D System and the T&D System Sites for the sole purpose of performing the Front-End Transition Services in accordance with the terms hereof.

(c)      Identification of System Contracts and Generation Supply Contracts. From and after the Effective Date, but in any event by the date that is one hundred eighty (180) days following the Effective Date, ManagementCo, Administrator and Owner shall together (i) identify all material existing System Contracts and all Generation Supply Contracts and provide ManagementCo and Administrator with copies thereof and (ii) identify which of the material existing System Contracts and Generation Supply Contracts do not comply with the Federal Funding Requirements and provide ManagementCo and Administrator with a list thereof.

(d)      Additional System Contracts and Generation Supply Contracts Between Effective Date and Service Commencement Date. During the Front-End Transition Period, the Parties agree that it is the intent that Owner and Administrator shall not amend or enter into any new System Contracts or Generation Supply Contracts; provided, however, that:

(i)      prior to the date ManagementCo submits the Initial Budgets to PREB for its approval, if Owner and Administrator identify a need to do so, then Administrator shall notify ManagementCo of such need and work with ManagementCo to implement any such amendment or new System Contract or Generation Supply Contract. Following such consultation process, Administrator shall ultimately determine if such amendment or new System Contract or Generation Supply Contract is required;

CONFIDENTIAL

(ii)      after the date ManagementCo submits the Initial Budgets to PREB for its approval, if Owner and Administrator determine that an amendment or new System Contract or Generation Supply Contract is necessary, the Parties shall follow the process in clause (i) above; provided that as part of such consultation process (A) the Parties shall review the impact of any such amendment or new System Contract and Generation Supply Contract on the Initial Budgets and (B) ManagementCo shall, as soon as practicable following receipt of Owner's notice of such requirement, prepare and submit to Administrator any proposed amendment to the Initial Budgets arising therefrom. Following delivery of such proposed amendment, the Parties shall follow the same process for such amendment to the Initial Budget that was followed for the Initial Budgets as set out in Section 4.2(e) (*ManagementCo Responsibilities – Initial Budgets*); and

(iii)      a Tax Opinion and a Reliance Letter shall have been obtained, at the expense of Owner or Administrator, with respect to any System Contract that is a Covered Contract and is entered into, extended or amended after the Effective Date. Owner shall promptly deliver to Operator a copy of each executed System Contract entered into pursuant to clauses (i) and (ii) above.

(e)      Notices with respect to System Contracts and Generation Supply Contracts. Owner shall (i) notify each counterparty to a System Contract and Generation Supply Contract in writing of Owner's delegation of authority to Operator with respect to such System Contract in the manner contemplated by Section 5.2(a) (*System Contracts – Generally*) and with respect to such Generation Supply Contract in the manner contemplated by Section 5.13(a) (*Generation-Related Services – Power Supply Dispatch and Management*) and (ii) have obtained all required consents from such counterparties as may be required thereby in connection with such delegation of authority and (iii) take all such other actions as may be necessary for Operator to be able to comply with its obligations under Section 5.2(a) (*System Contracts – Generally*) and Section 5.13 (*Generation-Related Services*).

(f)      Review of Initial Budgets. Administrator, on behalf of Owner, shall review and, if applicable, provide comments on the Initial Budgets in the manner contemplated by Section 4.2(e) (*ManagementCo Responsibilities – Initial Budgets*).

(g)      Front-End Transition Plan. Owner and Administrator shall perform all obligations of Owner and Administrator specified in the Front-End Transition Plan.

(h)      Labor. Owner and Administrator shall use commercially reasonable efforts to provide Operator the opportunity to hire Owner Employees in a manner consistent with the Proposal submitted by Operator or its Affiliate.

(i)      Service Accounts. Owner shall provide evidence satisfactory to ManagementCo that it has opened the Service Accounts and that each Service Account shall have been funded by such date and in an amount not less than the amount required to be funded in accordance with Section 7.5 (*Service Accounts*).

(j)      Federal Funding and Integrated Resource Plan Uncertainty. Owner acknowledges and agrees that details regarding (i) the nature and scope of Federal Funding potentially available for the T&D System and the availability of such Federal Funding to

CONFIDENTIAL

implement the System Remediation Plan, and (ii) the status of the Integrated Resource Plan and its potential effects on the T&D System or the O&M Services, remain uncertain. In light of such uncertainty, promptly (and in any event within thirty (30) days) following the Effective Date, the Parties shall establish a planning team composed of representatives of each of the Parties and COR3 to: (A) review the current status of the Federal Funding, including project worksheets related to the T&D System prepared by FEMA in connection with or pursuant to Section 428 of the Stafford Act and estimated timing and schedules of Federal Funding to implement the System Remediation Plan and develop a plan (taking into account the System Remediation Plan) to utilize Federal Funding in the most efficient and effective way to enable Operator to perform the O&M Services in compliance with this Agreement, and (B) review the current status of the Integrated Resource Plan and its impact on the T&D System and the O&M Services. ManagementCo, acting reasonably, may request, to the extent permitted under Applicable Law, changes or modifications to the Federal Funding (including modifications to, or reallocations between, the project worksheets related to the T&D System prepared by FEMA pursuant to Section 428 of the Stafford Act) or the Integrated Resource Plan.

(k)       Description and Demarcation of the T&D System and Insurance Specifications. Owner shall prepare and provide Operator a description and demarcation of the T&D System. The Parties will jointly consider any amendments, adjustments and refinements to Annex XII (*Insurance Specifications*) in light of the description and demarcation of the T&D System.

**Section 4.4      Governmental Approvals and Tax Matters**.

(a)       Generally. The Parties intend that all Governmental Approvals shall continue to name Owner as the permittee or applicant and that Operator shall only be a permittee, applicant, co-permittee or co-applicant if and to the extent required by Applicable Law. Promptly following the Effective Date, ManagementCo, Administrator and Owner shall coordinate identifying the Governmental Approvals required for the commencement on the Service Commencement Date of the O&M Services (the "Commencement Date Governmental Approvals"). Once the Parties have identified the Commencement Date Governmental Approvals: (i) (A) ManagementCo shall coordinate with Owner and Administrator to prepare for and support Owner's efforts related to the transfer or assignment, to the extent required by Applicable Law, or the reissuance or assistance with the issuance of the Commencement Date Governmental Approvals, (B) Owner, with Operator's assistance, shall submit complete applications and take all other steps necessary under Applicable Law to obtain and maintain all required Commencement Date Governmental Approvals, and (C) Owner shall provide ManagementCo and Administrator with copies of any such Commencement Date Governmental Approvals; and (ii) ManagementCo and Administrator shall cooperate with Owner in good faith in identifying, preparing, applying for, obtaining and maintaining the Commencement Date Governmental Approvals.

(b)       Tax Assurance. From and after the Effective Date, the Parties agree that (i) Operator shall seek a Tax Assurance and (ii) at Operator's expense, Owner and Administrator shall cooperate with Operator and use their commercially reasonable efforts to support and assist Operator in securing such Tax Assurance.

CONFIDENTIAL

**Section 4.5    Conditions Precedent to Service Commencement Date**. The Service Commencement Date shall not occur, and the obligations of the Parties to proceed with their respective obligations hereunder on, and after, the Service Commencement Date shall not commence, until all of the following conditions precedent (the "Service Commencement Date Conditions") are, unless otherwise mutually agreed between the Parties in writing, either satisfied as determined, or waived in writing, by (i) Administrator, in the case of Section 4.5(a) (*Conditions Precedent to Service Commencement Date – ManagementCo Responsibilities*), (ii) ManagementCo, in the case of Section 4.5(b) (*Conditions Precedent to Service Commencement Date – Owner and Administrator Responsibilities*), or (iii) both Administrator and ManagementCo, in the case of Section 4.5(c) (*Conditions Precedent to Service Commencement Date – Governmental Approvals*), Section 4.5(d) (*Conditions Precedent to Service Commencement Date – Acceptability and Effectiveness of Documents*), Section 4.5(e) (*Conditions Precedent to Service Commencement Date – No Governmental Prohibitions or Injunctions*), Section 4.5(f) (*Conditions Precedent to Service Commencement Date – Pre-Existing Environmental Conditions*), Section 4.5(g) (*Conditions Precedent to Service Commencement Date – Initial Budgets and Rate Order*), Section 4.5(h) (*Conditions Precedent to Service Commencement Date – Performance Metrics*), Section 4.5(i) (*Conditions Precedent to Service Commencement Date – Federal Funding*), Section 4.5(j) (*Conditions Precedent to Service Commencement Date – Federal Funding Procurement Manual*), Section 4.5(k) (*Conditions Precedent to Service Commencement Date – System Remediation Plan*), Section 4.5(l) (*Conditions Precedent to Service Commencement Date – System Operation Principles*), Section 4.5(m) (*Conditions Precedent to Service Commencement Date – Servicing Contract*), Section 4.5(n) (*Conditions Precedent to Service Commencement Date – Account Structure*), Section 4.5(o) (*Conditions Precedent to Service Commencement Date – Title III Approvals*), Section 4.5(p) (*Conditions Precedent to Service Commencement Date – Third Party Claims*), Section 4.5(q) (*Conditions Precedent to Service Commencement Date – PREPA Reorganization*), Section 4.5(s) (*Conditions Precedent to Service Commencement Date – Shared Services Agreement*), Section 4.5(t) (*Conditions Precedent to Service Commencement Date – Tax Matters*), Section 4.5(u) (*Conditions Precedent to Service Commencement Date – FOMB Protocol Agreement*) and Section 4.5(v) (*Conditions Precedent to Service Commencement Date – Tax Opinion*).

(a)    ＭanagementCo Responsibilities. ManagementCo shall have fulfilled all of its obligations with respect to the Front-End Transition Period under this Agreement, including Section 4.2 (*ManagementCo Responsibilities*) (the "ManagementCo Service Commencement Date Conditions").

(b)    Owner and Administrator Responsibilities. Owner and Administrator shall have fulfilled all of their respective obligations with respect to the Front-End Transition Period under this Agreement, including Section 4.3 (*Owner and Administrator Responsibilities*) (the "Owner Service Commencement Date Conditions").

(c)    Governmental Approvals. All Commencement Date Governmental Approvals shall have been issued or obtained by the Parties and shall be in full force and effect.

(d)    Acceptability and Effectiveness of Documents. All of the documents and instruments identified in this Article 4 (*Front-End Transition Period*) shall be in form and

CONFIDENTIAL

substance reasonably satisfactory to Administrator and ManagementCo and shall be valid, in full force and effect and enforceable against each party thereto on the Service Commencement Date. No such document, instrument or agreement shall be subject to the satisfaction of any outstanding condition precedent except those expressly waived in writing or to be satisfied after the Service Commencement Date. No party to any such document, instrument or agreement shall have repudiated or be in default thereunder, and each Party shall have received such certificates or other evidence reasonably satisfactory to it of such facts as such Party shall have reasonably requested.

(e) <u>No Governmental Prohibitions or Injunctions</u>. No Governmental Body shall have enacted, issued, promulgated or enforced any Applicable Law that shall be in effect, and no injunction shall be in effect, which, in each case, would make it illegal for, or otherwise prohibit or enjoin, any Party's performance of its obligations hereunder in accordance with the terms of this Agreement from and after the Service Commencement Date.

(f) <u>Pre-Existing Environmental Conditions</u>. Owner shall have engaged a qualified environmental consultant, and such consultant shall have prepared and issued a final baseline environmental study reasonably identifying Pre-Existing Environmental Conditions that present a risk of material liability (the "<u>Baseline Environmental Study</u>").

(g) <u>Initial Budgets and Rate Order</u>. The Initial Budgets (including any amendment thereto pursuant to Section 4.3(d)(ii) (*Owner and Administrator Responsibilities – Additional System Contracts and Generation Supply Contracts Between Effective Date and Service Commencement Date*)) shall have been approved by PREB or otherwise finalized for purposes of this Agreement in accordance with Section 4.2(e) (*ManagementCo Responsibilities – Initial Budgets*) and PREB shall have issued a Rate Order sufficient to fund the Initial Budgets.

(h) <u>Performance Metrics</u>. The proposed revised Annex IX (*Performance Metrics*) pursuant to Section 4.2(f) (*ManagementCo Responsibilities – Performance Metrics*) shall have been approved by PREB or otherwise finalized for purposes of this Agreement in accordance with Section 4.2(f) (*ManagementCo Responsibilities – Performance Metrics*).

(i) <u>Federal Funding</u>. Owner shall have, or shall have access to, adequate funding for Capital Costs for the first three (3) years of the Term, as such Capital Costs are detailed in the Initial Budgets approved by the Parties.

(j) <u>Federal Funding Procurement Manual</u>. The Parties shall have finalized a mutually agreeable Federal Funding Procurement Manual, and COR3 shall have approved the Federal Funding Procurement Manual. The Parties shall have requested review and approval of the Federal Funding Procurement manual from FEMA and DHS OIG.

(k) <u>System Remediation Plan</u>. The System Remediation Plan shall have been approved by PREB or otherwise finalized for purposes of this Agreement in accordance with Section 4.1(d)(iii) (*Front-End Transition Period Generally – Transition to Standard of Performance*).

CONFIDENTIAL

(l)        System Operation Principles. The System Operation Principles shall have been approved by PREB or otherwise finalized for purposes of this Agreement in accordance with Section 4.1(h) (*Front-End Transition Period Generally – System Operation Principles*).

(m)       Servicing Contract. In the event a Title III Plan has been confirmed providing for the Securitization SPV to issue new secured debt, Owner shall have received a copy of the Servicing Contract, duly executed by Operator.

(n)        Account Structure. Consistent with the terms of either the Cash Management Agreement or the Servicing Contract, as applicable, Owner and Operator shall have agreed on the manner in which System Revenues will be allocated into one or more accounts of Owner to be managed by Operator.

(o)        Title III Approvals. Owner shall have received Title III Approvals from the Title III Court reasonably acceptable to ManagementCo.

(p)        Third Party Claims. A Liability Waiver generally consistent with Section 4.1(g) (*Front-End Transition Period Generally – Liability Waiver*) shall have been approved and implemented by PREB and shall be in full force and effect.

(q)        PREPA Reorganization. A final plan for the reorganization of PREPA into GenCo and GridCo shall have been approved by the applicable Governmental Bodies, and the GridCo-GenCo PPOA shall have become effective.

(r)        [Reserved.]

(s)        Shared Services Agreement. The Parties shall mutually develop and negotiate in good faith a shared services agreement consistent with the provisions set forth in Annex VI (*GenCo Shared Services*) (the "Shared Services Agreement"), which agreement shall provide the terms and conditions pursuant to which Operator, as agent of Owner, shall provide the GenCo Shared Services to GenCo until the Legacy Generation Assets are retired or until certain of GenCo's operations, including the operating, administrative and/or maintenance functions related to the Legacy Generation Assets, are transferred to one or more private partners, the term of which agreement not to exceed three (3) years from its effective date (unless otherwise extended with the consent of Operator).

(t)        Tax Matters. The Puerto Rico Treasury Department shall have issued one of the following (each a "Tax Assurance"):

(i)        Operator and the Secretary of the Puerto Rico Treasury Department shall have entered into a closing agreement in form and substance satisfactory to Operator, acting reasonably, executed pursuant to Section 6051.07 of the PRIRC among Operator, the Equity Participants and the Puerto Rico Treasury Department that (A) incorporates all matters set forth in administrative determination No. 20-06 issued by the Secretary of the Puerto Rico Treasury Department (the "Administrative Determination") that are applicable to Operator and the Equity Participants and (B) provides that (x) the Front-End Transition Service Fixed Fee, the Service Fee and the Back-End Transition Service Fee are treated in the same manner as management fees are

CONFIDENTIAL

treated under Section III(A) of the Administrative Determination and (y) the Operator Termination Fee is treated in the same manner as termination payments are treated under Section III(A) of the Administrative Determination; or

(ii)     Operator shall have received a private letter ruling in form and substance satisfactory to Operator, acting reasonably, from the Puerto Rico Treasury Department that (A) incorporates all matters set forth in the Administrative Determination that are applicable to Operator and the Equity Participants and (B) provides that (x) the Front-End Transition Service Fixed Fee, the Service Fee and the Back-End Transition Service Fee are treated in the same manner as management fees are treated under Section III(A) of the Administrative Determination and (y) the Operator Termination Fee is treated in the same manner as termination payments are treated under Section III(A) of the Administrative Determination.

(u)     FOMB Protocol Agreement. Each of Operator, Owner, Administrator and the FOMB shall have duly executed a FOMB Protocol Agreement in form and substance satisfactory to the Parties.

(v)     Tax Opinion. At the expense of Owner or Administrator, Owner shall have caused (i) Owner to have received a Tax Opinion and (ii) ManagementCo to have received a Reliance Letter, including by having caused all conditions to the delivery of such Tax Opinion and Reliance Letter to have been met.

### Section 4.6     Front-End Transition Period Compensation.

(a)     General. As compensation for the Front-End Transition Services provided by ManagementCo, Owner shall pay ManagementCo the Front-End Transition Service Fee. The Parties acknowledge and agree that Federal Funding shall not be used to pay the Front-End Transition Service Fee. The Front-End Transition Service Fee shall not be subject to any abatement, deduction, counterclaim or set-off of any kind or nature.

(b)     Front-End Transition Service Fee. The "Front-End Transition Service Fee" shall be an aggregate amount equal to: (i) the hourly fully allocated cost rate for each category of ManagementCo employee or Affiliate personnel providing Front-End Transition Services, as set out in Annex V (*Front-End Transition Hourly Fully Allocated Rates*); *multiplied by* (ii) the number of hours worked by each ManagementCo employee or Affiliate personnel in such category providing Front-End Transition Services; *plus* (iii) a fixed fee in the amount of US$60,000,000 (the "Front-End Transition Service Fixed Fee") (payable in monthly installments equal to one-twelfth (1/12) of the Front-End Transition Service Fixed Fee, commencing on the Effective Date, and in the event of a partial month, the monthly installment shall be adjusted on a Pro Rata basis; provided that: (A) in the event the first month is a partial month, then any balance of the Front-End Transition Service Fixed Fee outstanding in the twelfth month shall be paid with the last installment of the Front-End Transition Service Fixed Fee; and (B) if the Service Commencement Date occurs prior to the expiration of the twelfth (12th) month following the Effective Date, then any balance of the Front-End Transition Service Fixed Fee then outstanding shall be paid in full to Operator on the Service Commencement Date); *plus* (iv) all other reasonable and documented costs and expenses incurred by ManagementCo (without markup for profit) that are necessary and reasonable in the course of providing the Front-End Transition Services and satisfying the Service

CONFIDENTIAL

Commencement Date Conditions, including the cost of any Front-End Subcontractors providing Front-End Transition Services.

(c)    Funding.

(i)    Owner shall establish one or more accounts from which Owner shall draw funds from time to time to pay Operator the Front-End Transition Service Fee (collectively, the "Front-End Transition Account"). Promptly after the Effective Date (and in any event within five (5) Business Days), Operator shall deliver to Administrator an estimate of the anticipated Front-End Transition Service Fee for the following four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*). Within ten (10) days of delivery of such estimate, and prior to and as a condition to the commencement of any Front-End Transition Services, Administrator shall provide Operator evidence reasonably satisfactory to Operator that an amount equal to the sum of the anticipated Front-End Transition Service Fee for the following four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*), has been funded in the Front-End Transition Account by Owner. Prior to the end of each month during the Front-End Transition Period, Operator shall deliver to Administrator an estimate of the anticipated Front-End Transition Service Fee for the following four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*). No later than the tenth (10th) Business Day of each month during the Front-End Transition Period, Owner shall replenish the Front-End Transition Account so as to maintain a balance in the Front-End Transition Account at the end of each calendar month equal to the sum of the anticipated Front-End Transition Service Fee for the subsequent four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*), and so on subsequently until the Front-End Transition Services conclude.

(ii)    In the event a Dispute arises between Operator and Administrator in connection with Operator's estimate of the anticipated Front-End Transition Service Fee, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Front-End Transition Service Fee Estimate Dispute").

(d)    Invoices.

(i)    On or prior to the tenth (10th) day of each month during which Operator is performing the Front-End Transition Services, Operator shall provide Administrator with a monthly invoice describing in reasonable detail the prior calendar month's Front-End Transition Services and the corresponding Front-End Transition Service Fee for such prior calendar month. All invoices shall comply with the requirements set forth in Section 9.2(c) (*Anti-Corruption and Sanctions Laws – Policies and Procedures*).

(ii)    Operator shall provide promptly to Administrator such additional supporting documentation evidencing the provision of the Front-End Transition Services, if any, and the calculation of the Front-End Transition Service Fee related thereto as Administrator may reasonably request and as may be required by Applicable Law. Administrator shall promptly advise Operator of any disputed invoice amounts, and all such disputes which Operator and Administrator are unable to resolve shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Front-End Transition Service Fee Dispute").

CONFIDENTIAL

(iii)     Payments of undisputed amounts under any invoice shall be due within thirty (30) days of Administrator's receipt of such invoice.

(e)     Audits. At any time and from time to time during and until the expiration of six (6) years following the end of the Front-End Transition Period, Administrator may, upon reasonable prior notice, Audit (or cause to be Audited) the books and records of Operator or any Subcontractor in connection with any requests for payment of the Front-End Transition Service Fee, together with the supporting vouchers and statements, and the calculation of the Front-End Transition Service Fee. Subject to the dispute resolution provisions in Article 15 (*Dispute Resolution*), each payment made by Owner hereunder shall be subject to subsequent adjustment. Following the determination that any such payment adjustment is required, the Party required to make payment shall do so within thirty (30) days of the date of such determination.

### Section 4.7     Closing the Front-End Transition Period.

(a)     Notice of Service Commencement Date. ManagementCo shall provide Administrator with prompt written notice (with a copy to PREB), including a completed Handover Checklist, at such time as ManagementCo determines it has satisfactorily completed all items on the Handover Checklist and is therefore ready to perform all O&M Services under this Agreement. Administrator shall respond within ten (10) Business Days whether Administrator confirms or disputes the completion of any item on the Handover Checklist, together with a written statement providing reasonable detail and supporting evidence for the basis of any dispute. In the event Administrator disputes completion of any item(s) on the Handover Checklist, ManagementCo may advise Owner of its disagreement with Administrator's decision. The Parties shall attempt to resolve in good faith any disputed item(s) and, in the event the Parties are unable to resolve such disputed item(s) within thirty (30) days, such disputed item(s) only shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Handover Checklist Dispute").

(b)     Establishment of Service Commencement Date. The "Service Commencement Date" shall be the date on which a handover to Operator of the O&M Services occurs, which shall be (i) the first (1st) Business Day of a calendar month that is at least three (3) Business Days following the date on which Administrator delivers a certificate to Operator confirming that all Service Commencement Date Conditions have been met or (ii) such other date as the Parties may agree. The satisfaction or waiver of all the Service Commencement Date Conditions is required for the achievement of the Service Commencement Date.

### Section 4.8     Failure of Service Commencement Date Conditions.

(a)     Remedy for Delay of Service Commencement Date Conditions. If any of the ManagementCo Service Commencement Date Conditions are not satisfied or waived by Administrator on or before the date that is three (3) months following the Target Service Commencement Date or such later date as Administrator and ManagementCo may agree (such date, the "Delay Period Date"), and the failure to satisfy any outstanding ManagementCo Service Commencement Date Condition(s) is not caused by any Force Majeure Event or Owner Fault, and the other Service Commencement Date Conditions have been or are immediately capable of being satisfied or waived by the Delay Period Date, ManagementCo shall pay to Owner, as Owner's sole

CONFIDENTIAL

and exclusive remedy for all monetary damages, costs, losses and expenses of whatever type or nature arising from or related to such failure of ManagementCo Service Commencement Date Conditions to occur by the Delay Period Date, liquidated damages (the "<u>Delay Liquidated Damages</u>") in the amount of US$769,231 per week for each week (or for any portion of a week on a Pro Rata basis) the Target Service Commencement Date is delayed beyond the Delay Period Date, up to a maximum of US$40,000,000. ManagementCo shall not be required to pay Delay Liquidated Damages after the earlier of (i) the date on which the ManagementCo Service Commencement Date Conditions are satisfied by ManagementCo or waived by Administrator or (ii) the date of termination of this Agreement pursuant to Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*); <u>provided</u> that ManagementCo shall pay any accrued and unpaid Delay Liquidated Damages as of such earlier date. It is understood and agreed by the Parties that if any of the ManagementCo Service Commencement Date Conditions are not satisfied or waived by the Delay Period Date, Owner's damages would be difficult or impossible to quantify with reasonable certainty, and accordingly, the payment provided for in this Section 4.8(a) (*Failure of Service Commencement Date Conditions – Remedy for Delay of Service Commencement Date Conditions*) is a payment of liquidated damages (and not penalties), which is based on the Parties' estimate of damages Owner would suffer or incur. ManagementCo hereby irrevocably waives any right it may have to raise as a defense that the Delay Liquidated Damages are excessive or punitive.

(b)        <u>Termination for Failure of Service Commencement Date Conditions</u>.

(i)        Administrator shall have the right, subject to approval by PREB, to terminate this Agreement upon not less than thirty (30) days' prior written notice to ManagementCo if all of the Owner Service Commencement Date Conditions are satisfied but any of the ManagementCo Service Commencement Date Conditions are not satisfied by ManagementCo or waived by Administrator (unless such failure to satisfy the ManagementCo Service Commencement Date Conditions is the result of the acts, omissions or breach of Owner) by the date that is six (6) months following the Target Service Commencement Date or such later date as Administrator and ManagementCo may agree.

(ii)        ManagementCo shall have the right to terminate this Agreement upon not less than thirty (30) days' prior written notice to Administrator (with copy to PREB) if all of the ManagementCo Service Commencement Date Conditions are satisfied but any of the Owner Service Commencement Date Conditions are not satisfied by Owner or waived by Operator (unless such failure to satisfy the Owner Service Commencement Date Conditions is the result of the acts, omissions or breach of Operator) by the date that is six (6) months following the Target Service Commencement Date or such later date as Administrator and ManagementCo may agree.

(iii)        Each of Administrator and ManagementCo shall have the right to terminate this Agreement upon not less than thirty (30) days' prior written notice to Operator or Administrator (with copy to PREB), respectively, if any of the Service Commencement Date Conditions (other than those referred to in Section 4.8(b)(i) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*) and Section 4.8(b)(ii) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*)) are not satisfied or waived by each of Administrator

CONFIDENTIAL

and Operator by the date that is nine (9) months following the Target Service Commencement Date or such later date as Administrator and ManagementCo may agree.

(iv)     Notwithstanding anything to the contrary in this Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*), if the Service Commencement Date Conditions are satisfied or waived prior to any such termination right being exercised, then neither Administrator nor Operator shall have the right to terminate this Agreement pursuant to this Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*).

(v)     In the event of the termination of this Agreement pursuant to this Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*), (A) ManagementCo shall retain any Front-End Transition Service Fee earned as of the effective date of such termination, and shall within five (5) Business Days of the effective date of such termination, return to Administrator any amounts held in the Front-End Transition Account in excess of any earned Front-End Transition Service Fee and (B) ManagementCo shall pay any accrued and unpaid Delay Liquidated Damages as of the effective date of such termination. This Agreement (other than with respect to the aforementioned payment obligations and any limitations on liability set out elsewhere in this Agreement, each of which shall continue in effect) shall thereafter become void and have no effect, without any liability on the part of any Party or its Affiliates or Representatives in respect thereof, except that nothing herein shall relieve any party from liability that cannot be waived as a matter of Applicable Law, claims of fraud or intentional breach or misrepresentation; provided that, in any such event, the limitations of liability specified in this Agreement (including Section 14.6(d) (*Remedies Upon Early Termination – Additional Remedies*), Section 18.3(a) (*Limitation on Liability – Operator General Limitations*) and Section 18.3(b) (*Limitation on Liability – Gross Negligence; Willful Misconduct*)) shall, notwithstanding the foregoing, continue to apply. Furthermore, the remedies provided in this Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*) shall be the sole and exclusive remedies of the Parties for any termination of this Agreement pursuant to Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*).

(vi)     In addition to and notwithstanding anything to the contrary in this Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*), in the event this Agreement is terminated prior to the Service Commencement Date other than as a result of the acts, omissions or breach of Operator, (A) any balance of the Front-End Transition Service Fixed Fee then outstanding shall be deemed to have been earned and shall be paid in full to ManagementCo and (B) ManagementCo shall be reimbursed for any reasonable and documented costs and expenses incurred by ManagementCo (without markup for profit) that are necessary and reasonable in the course of terminating the activities undertaken in connection with the Front-End Transition Services, including reasonable and documented breakage fees for Front-End Subcontractors providing Front-End Transition Services.

CONFIDENTIAL

(c)        Effect of Force Majeure Events or Owner Fault. The dates in Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*) shall each be extended on a day-for-day basis for the period of any Force Majeure Event or any Owner Fault (except in the case of clauses (ii) and (iii) of Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*), in which case Owner shall not receive any such extension where the delay is caused by any Owner Fault).

### Section 4.9    Subcontractors During the Front-End Transition Period.

(a)        General. ManagementCo shall have the right to engage Subcontractors to perform certain Front-End Transition Services (the "Front-End Subcontractors"); provided that Subcontracts related to the provision of any Front-End Transition Services that are eligible for reimbursement with Federal Funding, if any, shall comply with the Federal Funding Requirements, including any competitive bidding processes required for the award of any such Subcontracts. Operator shall provide Administrator (with copy to PREB) with a list of Front-End Subcontractors that Operator has engaged or intends to engage for the performance of any of the Front-End Transition Services in excess of US$250,000 (each, a "Material Front-End Subcontractor"). Administrator shall have the right to approve any Material Front-End Subcontractor engaged by ManagementCo, which approval shall not be unreasonably withheld, delayed or conditioned. If Administrator does not respond to Operator within ten (10) Business Days after being notified of Operator's engagement or intention to engage a Front-End Subcontractor, Administrator shall be deemed to have no objection to the engagement of such Front-End Subcontractor.

(b)        Identification. Promptly following the Effective Date, as part of its Subcontractor background checks, ManagementCo shall provide Administrator all information requested by Administrator, to the extent reasonably available to ManagementCo, pertaining to the proposed Front-End Subcontractors in the following areas: (i) any conflicts of interest, (ii) any record of felony criminal convictions or pending felony criminal investigations and (iii) any final judicial or administrative finding or adjudication of non-performance of contracts with Owner or Administrator, in each case, to the knowledge of ManagementCo. In addition, to the extent any conflicts of interest may be identified, ManagementCo, Owner and Administrator shall cooperate in good faith to avoid, mitigate and neutralize any such conflicts.

(c)        Approval. If a proposed Material Front-End Subcontractor is approved for the Front-End Transition Period, such Subcontractor shall be deemed to be approved for the specified categories of potential work for the duration of the Front-End Transition Period, unless Administrator otherwise notifies ManagementCo. Subject to the foregoing, the approval or rejection by Administrator of any proposed Material Front-End Subcontractor shall not create any liability of Owner or Administrator to ManagementCo, such Material Front-End Subcontractor, any third-parties or otherwise. When engaging Front-End Subcontractors, ManagementCo shall not be relieved from its responsibility under this Agreement and liability for any error, fault or inconsistency in the provisions of the Front-End Transition Services hereunder. All such subcontracts shall be subject to Applicable Law and shall be assignable to Owner at Administrator's sole discretion following termination of this Agreement. All Front-End Subcontractors shall be required to furnish a Sworn Statement.

CONFIDENTIAL

        (d)      <u>Affiliate Personnel</u>. ManagementCo shall have the right to use personnel from its Affiliates to perform the Front-End Transition Services at the hourly fully allocated cost rate for each category of Affiliate personnel providing Front-End Transition Services, as set out in Annex V (*Front-End Transition Hourly Fully Allocated Rates*).

CONFIDENTIAL

# ARTICLE 5
# O&M SERVICES

**Section 5.1    Services Generally**. Commencing on the Service Commencement Date, and in exchange for Owner's payment to Operator of all amounts owing to Operator under this Agreement, Operator shall (i) provide management, operation, maintenance, repair, restoration and replacement and other related services for the T&D System, in each case that are customary and appropriate for a utility transmission and distribution system service provider, including the services set forth in this Article 5 (*O&M Services*) (excluding the GenCo Shared Services) and Annex I (*Scope of Services*), and (ii) establish policies, programs and procedures with respect thereto (all such services, the "O&M Services"), in each case, in accordance with the Contract Standards. It is the Parties' intent that except for the rights and responsibilities reserved to Owner and Administrator as set forth in Article 6 (*Rights and Responsibilities of Owner and Administrator*) or as may otherwise be expressly provided in this Agreement, Operator shall (A) be entitled to exercise all of the rights and perform the responsibilities of Owner in providing the O&M Services, and (B) have the autonomy and responsibility to operate and maintain the T&D System and establish the related plans, policies, procedures and programs with respect thereto as provided in this Agreement. The Parties acknowledge that Operator's obligations to provide O&M Services under this Agreement are subject to the System Remediation Plan.

**Section 5.2    System Contracts**.

(a)    <u>Generally</u>. Operator, as agent for and on behalf of Owner, shall administer and perform System Contracts and Owner's payment obligations thereunder, which shall be an expense that is paid by Operator as a T&D Pass-Through Expenditure. Notwithstanding the foregoing, (i) Operator shall administer and perform Owner's rights and obligations under such System Contracts in such a manner so as not to expand or increase the liabilities assumed by Owner thereunder, other than with respect to an amendment, renewal or expansion of existing System Contracts as required to provide the O&M Services hereunder, and in compliance with the requirements described in the Federal Funding Procurement Manual to the extent such System Contract involves Federal Funding, and (ii) Owner shall administer and perform any rights and obligations under such System Contracts to the extent that Applicable Law requires Owner's performance of such functions or Applicable Law or such System Contract prohibits Owner from delegating such functions. Owner hereby authorizes Operator to enforce Owner's rights under any such System Contracts.

(b)    <u>Agent Designation</u>. Owner hereby designates and appoints Operator as its agent, and Operator hereby accepts such designation and appointment, for the purpose of entering into System Contracts on behalf of and for the account of Owner, as may be necessary or appropriate to operate and maintain the T&D System and to make such additions and extensions thereto in accordance with the terms of this Agreement.

(c)    <u>Powers</u>. In such capacity as Owner's designated agent pursuant to Section 5.2(b) (*System Contracts – Agent Designation*), Operator shall have full power and authority to act on Owner's behalf and to legally bind Owner, subject, in each case, to (i) Operator's action in such regard being consistent with Prudent Utility Practice and (ii) Owner's rights and responsibilities provided in Section 6.1 (*Rights and Responsibilities of Owner*) and the

other terms of this Agreement. Operator and Owner shall promptly implement such policies and procedures as may be necessary or appropriate to effect the activities contemplated by this Section 5.2 (*System Contracts*) and to separately identify and segregate the equipment, material, supplies and services that Operator is purchasing as agent of Owner from those Operator (or its Affiliates) may be purchasing for its own or another Person's account. Where necessary or required by a Governmental Body or Person, Operator and Owner shall execute and deliver such instruments, agreements, certificates or other evidence confirming Operator's designation, appointment and authority to act as Owner's agent as provide in this Section 5.2 (*System Contracts*).

(d)     Additional System Contracts or Expired System Contracts After Service Commencement Date. After the Service Commencement Date, if any System Contracts are required: (i) for the operation and maintenance of the T&D System, to deliver services to T&D Customers or to comply with the provisions of this Agreement or Contract Standards or (ii) to replace any existing System Contract that has expired or has been terminated, then, in each case, Operator shall be responsible for obtaining such System Contract in Owner's name and on Owner's behalf; provided that any new or replacement System Contract that provides for payments in excess of US$10,000,000 in any Contract Year or US$30,000,000 in the aggregate (each a "Material System Contract") shall be subject to approval by Administrator, such approval not be unreasonably withheld, delayed or conditioned, following which such proposed System Contract shall be executed by Owner; provided further that a Tax Opinion and a Reliance Letter shall have been obtained, at the expense of Owner or Administrator, with respect to any new, extended, amended or replacement System Contract that is a Covered Contract. Operator shall ensure that any System Contract involving Federal Funding and obtained in Owner's name and on Owner's behalf under this Section 5.2(d) (*System Contracts – Additional System Contracts or Expired System Contracts After Service Commencement Date*) complies with the Federal Funding Requirements, including the Federal Funding Procurement Manual.

(e)     Reporting Obligations. Operator shall on or about the fifth (5th) Business Day of each Contract Year provide to Administrator a report documenting each Material System Contract, Material Contractor and Material Subcontractor, which report shall include the name of the third-party, the term, if applicable, of the System Contract, Contract or Subcontract, a description of the services or goods to be procured and the estimated amount payable thereunder.

(f)     Conditions on Term. Any System Contract entered into by Operator on behalf of Owner in connection with the O&M Services, including contracts with Subcontractors, shall, unless otherwise approved in writing by Administrator, such approval not to be unreasonably withheld, delayed or conditioned, either (i) be for a term that is no longer than the Term or (ii) provide that such contract is terminable at will (subject to any notice requirements) without cost or penalty.

### Section 5.3     Billing and Collection.

(a)     Generally. Operator shall perform all billing and collection services for the T&D System in accordance with the Contract Standards, including the requirements set forth in Annex I (*Scope of Services*).

(b)      Collection of Charges. All funds received by Operator from billing and collection services hereunder shall be deposited on the same day as receipt in one or more bank accounts designated by Administrator. Any funds received after 4:00 p.m. on any given day or on a day that is not a Business Day shall be deposited at the opening of business on the immediately following Business Day. All such funds and any revenues generated by the T&D System are and shall remain the property of Owner at all times (subject only to Liens on System Revenues specified in the Title III Plan and the related disclosure statements).

(c)      Enforcement of Collections. Owner and Administrator shall cooperate with Operator and use commercially reasonable efforts to take all actions requested by Operator in all collection matters and, to the extent Applicable Law does not permit delegation thereof to Operator, shall exercise its statutory powers pertaining to any and all remedies granted to it under Applicable Law for purposes of collection, including the imposition of interest and penalties on unpaid charges and the termination of services. Subject to Applicable Law, Operator may suspend or terminate services to any customer of the T&D System who has failed to comply with its obligations to pay the established rates in accordance with their terms, including suspensions provided for under Regulation 8818 of September 27, 2016 (*Reglamento Sobre la Contribucion en Lugar de Impuestos (CELI)*).

(d)      Servicing Contract. Operator shall at all times conduct the billing and collection services in compliance with the terms of any Servicing Contract then in effect. In the event of any conflict or issue of interpretation between such Servicing Contract and this Agreement in connection with Operator's obligations for billing and collection services, the Servicing Contract shall prevail over this Agreement.

**Section 5.4    System Remediation**. Operator shall implement the System Remediation Plan in accordance with such plan. All costs associated with the implementation of the System Remediation Plan, and the activities and projects thereunder, shall be T&D Pass-Through Expenditures. Notwithstanding any provision to the contrary herein: (i) Operator shall perform the O&M Services in accordance with Contract Standards, taking into account the implementation of the System Remediation Plan and the characteristics of the T&D System at a particular time, and (ii) under no circumstances shall Operator be held responsible hereunder for the performance of any commercially available third-party control, monitoring or information equipment, systems or services (including, related hardware and Software), to the extent any Losses result from any defect therein. Any amendments to the System Remediation Plan approved by PREB or otherwise finalized in accordance with Section 4.1(d)(iii) (*Front-End Transition Period Generally – Transition to Standard of Performance*) shall be subject to approval by PREB.

**Section 5.5    Capital Improvements**.

(a)      Generally. Subject to Section 4.1(c) (*Front-End Transition Period Generally – Transition to Standard of Performance*), Operator shall:

(i)      recommend (A) Federally Funded Capital Improvements in compliance with Obligated projects, (B) Non-Federally Funded Capital Improvements and (C) capital projects related to new generation in accordance with the Integrated Resource Plan;

CONFIDENTIAL

(ii)     monitor the approved annual Capital Budget – Federally Funded and Capital Budget – Non-Federally Funded;

(iii)     prepare risk assessments and analyses in support of prioritization and planning for Capital Improvements and other capital projects, which shall take into account the Integrated Resource Plan, load and energy forecasts, fuel price and quantity forecasting, long and short range system plans, and proposed annual operating and maintenance plan (and which assessments and analyses PREB may request from time to time);

(iv)     prepare long and short range transmission and distribution planning analyses and forecasts to determine the need for Federally Funded Capital Improvements and Non-Federally Funded Capital Improvements, including the introduction of smart grid and other emerging technologies and project management services to ensure the technical performance and reliability of the T&D System, which shall take into account the Integrated Resource Plan to the extent applicable (and which analyses and forecasts PREB may request from time to time);

(v)     prepare analyses and forecasts to determine the need for generation-related capital projects, if applicable, in accordance with Section 5.13(d) (*Generation-Related Services – Procurement of Generation Projects and Generation Supply Contracts*) and the Shared Services Agreement, including the need for Owner to enter into new Generation Supply Contracts; and

(vi)     perform and supervise Capital Improvements, including engineering and related design and construction management services.

(b)     <u>Federal Funding Eligibility</u>. Owner shall notify Operator in writing of any Capital Improvements that may be eligible for Federal Funding. In such case, Owner and Operator shall cooperate with each other to address and comply with federal agency requirements, including any requirements set forth in the Federal Funding Procurement Manual (all such requirements, the "<u>Federal Funding Requirements</u>"), so as not to jeopardize the T&D System's eligibility to receive Federal Funding. Such cooperation shall include Owner (i) providing Operator with such documents and information it requests with respect to the Federal Funding Requirements, (ii) sharing with Operator any specific requirements imposed by the relevant funding agency to maintain eligibility to receive Federal Funding and (iii) making requests to such federal agencies to review Owner and Operator's systems and plans to comply with Federal Funding Requirements.

(c)     <u>Capital Asset Control</u>. In each Contract Year, Operator shall conduct a review of the Capital Improvements made in the prior Contract Year. Such review shall measure the accuracy of the plant records, maps and maintenance databases concerning capital assets. Operator shall also conduct a physical inventory of all capital assets from time to time in accordance with the Contract Standards. Operator shall provide the results of each such review to Owner and Administrator promptly following the completion of such reviews.

(d)     <u>Option to Propose Operator-Owned Capital Improvements</u>. Operator may from time to time during the Term propose to PREB certain Capital Improvements that would be made, owned and funded by Operator or its designated Affiliate; <u>provided</u>, <u>however</u>, that (i) the costs and expenses relating to any such Capital Improvements shall not be considered, or otherwise

CONFIDENTIAL

treated as, T&D Pass Through Expenditures and (ii) no such Capital Improvements shall be made that would in any manner jeopardize the exclusion from gross income of interest on Owner's or its Affiliates' obligations under the Internal Revenue Code. Operator shall provide PREB, with copy to Administrator, with a description of the Operator-owned Capital Improvement in sufficient detail to enable PREB to make a fully informed assessment and analysis thereof; provided that any such proposal shall contemplate Operator having the opportunity to earn a reasonable rate of return thereon consistent with the returns permitted to be earned by companies operating in the United States electric transmission and distribution business on similar investments. Any such proposed Capital Improvement shall be subject to review, and approval or rejection, by PREB in accordance with Applicable Law and shall be accompanied by an opinion of tax counsel to Administrator providing that such Capital Improvement shall not adversely affect the exclusion from gross income of interest on obligations of Owner, its Affiliates or another Governmental Body for federal income tax purposes under the Internal Revenue Code. In reviewing any such proposed Capital Improvement, PREB may request additional information or reports from Operator, and may require that any such proposed Capital Improvement be presented as part of a rate review proceeding. The inclusion of the provisions of this Section 5.5(d) (*Capital Improvements – Option to Propose Operator-Owned Capital Improvements*) shall in no way constitute an obligation by any of PREB, Owner or Administrator to agree to or pursue any Operator-owned Capital Improvement or require Owner or Administrator to pay for or reimburse the cost or expenses of pursuing any proposed Operator-owned Capital Improvement or an obligation of Operator to propose or pursue any Operator-owned Capital Improvement.

**Section 5.6    System Regulatory Matters**.

(a)      General. From the Service Commencement Date and during the duration of the Term thereafter, Operator shall function as agent of Owner, and Owner hereby irrevocably authorizes Operator to (i) represent Owner before PREB with respect to any matter related to the performance of any of the O&M Services provided by Operator under this Agreement, (ii) prepare all related filings and other submissions before PREB and (iii) represent Owner before any Governmental Body and any other similar industry or regulatory institutions or organizations having regulatory jurisdiction.

(b)      Applications and Submittals. Operator, as agent of Owner, shall make all filings and applications and submit all reports necessary to obtain and maintain all Governmental Approvals in the name of Owner or, if required by Applicable Law, Operator. Owner and Administrator shall cooperate with Operator in fulfilling such obligations, including by promptly (and in any event within thirty (30) days) providing any necessary information to Operator and making all such filings and applications and submitting such reports requested by Operator in cases where Applicable Law does not permit Operator to do so. With respect to Governmental Approvals that are obtained or maintained in the name of Owner, Operator shall: (i) prepare the application and develop and furnish all necessary supporting material, data and information that may be required; (ii) familiarize itself with the terms and conditions of such Governmental Approvals; (iii) attend all meetings and hearings required to obtain such approvals; and (iv) take all other action necessary or otherwise reasonably requested by Administrator in order to assist and support Owner in obtaining, maintaining, renewing, extending and complying, as may be relevant, with the terms of such Governmental Approvals. Operator shall agree to be named as a co-permittee on any Governmental Approval if so required by the issuing Governmental Body.

CONFIDENTIAL

(c)     <u>Data and Information</u>. All data and information required to be supplied and actions required to be taken in connection with the Governmental Approvals required for the O&M Services shall be supplied and taken by Operator on a timely basis considering the requirements of Applicable Law, the System Remediation Plan and the responsibilities of Owner as the legal and beneficial owner of the T&D System. The data and information supplied by Operator (as agent for Owner) to Owner, Administrator and all regulatory agencies in connection therewith shall be correct and complete in all material respects; <u>provided</u>, <u>however</u>, that Operator shall be entitled to rely upon, and shall not be liable for, any such data and information derived from or comprising data and information supplied by or on behalf of Owner or Administrator. For the avoidance of doubt, the requirement that all data and information supplied by Operator be correct shall be subject to the System Remediation Plan, including the process for implementation outlined in Section 4.1(d) (*Front-End Transition Period Generally – Transition to Standard of Performance*); <u>provided</u> that Operator shall nevertheless be required to identify to Owner any known material inaccuracies in the information supplied to Owner at the time such information is provided.

(d)     <u>Non-Compliance and Enforcement</u>. Operator shall, subject to the System Remediation Plan, report to Administrator in writing, as soon as possible upon obtaining actual knowledge thereof (but in no event more than forty-eight (48) hours (or such shorter period within which notice is required to be given to a Governmental Body under Applicable Law) after obtaining such knowledge), all material violations of the terms and conditions of any Governmental Approval.

(e)     <u>Reports to Governmental Bodies</u>. Operator, as agent for Owner and subject to the System Remediation Plan, shall prepare all periodic and annual reports, make all information submittals and provide, on a timely basis, all notices to all Governmental Bodies required by all Governmental Approvals and under Applicable Law with respect to the T&D System; <u>provided</u>, <u>however</u>, that Operator shall be entitled to rely upon, and shall not be liable for, any such data and information derived from or comprising data and information supplied by or on behalf of Owner or Administrator or from errors or omissions in such information. Such reports shall contain all information required by the Governmental Body and may be substantially similar or identical to comparable reports previously prepared for Administrator if such are acceptable to the Governmental Body.

(f)     <u>Integrated Resource Plan</u>. From time to time, or as otherwise required by Applicable Law or ordered by PREB, Operator, as agent for Owner, shall prepare a proposed Integrated Resource Plan for review and approval by PREB. PREB shall review, and approve, deny or propose modifications to, such proposed Integrated Resource Plan. The proposed Integrated Resource Plan shall comply with all Applicable Law requirements. The proposed Integrated Resource Plan shall be designed in accordance with Applicable Law and in a manner to ensure that, if approved by PREB and subject to the assumptions specified therein, Operator is able to provide safe and adequate transmission and distribution service at the lowest reasonable rates consistent with budgetary and T&D System requirements, and with sound fiscal operating practices.

(g)     <u>PREB Rate Proceedings</u>. From time to time, or as otherwise required by Applicable Law or ordered by PREB, Operator may apply to PREB to request that a change in customer rates or charges be made, which, if approved by PREB pursuant to Applicable Law, may

CONFIDENTIAL

result in a change in customer rates or charges consistent with the scope of PREB's approval. Any such application shall be prepared and undertaken in accordance with the relevant requirements set forth under Applicable Law. Each of Owner and Administrator shall support Operator's proposed rate changes to ensure that adequate amounts are available for inclusion in any Budget and provided that the rates are reasonable and customary. Each of Operator, Owner and Administrator shall abide by any rate order reflecting determinations and directives of, and requirements established by, PREB through its review of such application and the rate review proceeding (a "Rate Order"). Any Budget submitted by Operator to Administrator and approved by Administrator in accordance with Section 7.3(a) (*Budgets – Generally*), shall be consistent with any then-current Rate Order.

(h)      Authority to Adjust Rates. Nothing in this Agreement is intended to, nor shall it in any way, impair or restrict PREB's right to approve final rates and charges to T&D Customers in accordance with Applicable Law.

(i)      Temporary Rate. In the event that Operator files a rate modification request, PREB shall exercise its discretion in establishing a temporary rate as provided for in Section 6.25(d) of Act 57 or any other Applicable Law.

**Section 5.7      Safety and Security**.

(a)      Safety. Consistent with the Contract Standards, Operator shall: (i) take all reasonable precautions for the health and safety of, and provide all reasonable protection to prevent physical damage, bodily injury or loss as a result of the operation of the T&D System to, (A) all members of the public, including Persons involved in providing the O&M Services, (B) all materials and equipment used in the provision of the O&M Services and under the care, custody or control of Operator and (C) other property constituting part of the T&D System and under the care, custody or control of Operator; (ii) establish and enforce all reasonable applicable safeguards for health and safety and protection, including posting danger signs and other warnings against hazards and promulgating health and safety regulations; (iii) provide all notices and comply with all Applicable Law relating to the health and safety of Persons or property or their protection from physical damage, bodily injury or loss; (iv) designate qualified and responsible employees, in such numbers as Operator shall determine at its sole discretion in accordance with Prudent Utility Practice, whose duty shall be the supervision of health and safety at the T&D System; (v) operate all equipment in a manner consistent with the manufacturer's safety recommendations; (vi) provide for safe and orderly vehicular movement; and (vii) develop and carry out a site-specific health and safety program, including employee training and periodic inspections, designed to implement the requirements of this Section 5.7(a) (*Safety and Security – Safety*).

(b)      OSHA. Operator shall take all actions which may be required in order to bring the T&D System into and maintain compliance with the applicable Commonwealth and federal requirements in accordance with and related to the Occupational Safety and Health Act.

(c)      Security. Operator shall implement the Physical Security Plan in accordance with such plan. In accordance with the Physical Security Plan, Operator shall guard against and be responsible for all physical damage to the T&D System caused by trespass, theft, negligence, vandalism, malicious mischief or cyber-attacks of third-parties. For the avoidance of doubt,

CONFIDENTIAL

Operator's responsibility for physical damage to the T&D System caused by cyber-attacks shall be subject to the System Remediation Plan, including the process for implementation outlined in Section 4.1(d) (*Front-End Transition Period Generally – Transition to Standard of Performance*). Operator shall guard against and be responsible for, in each case to the extent of Operator's negligence, all physical damage to the T&D System caused by trespass, theft, vandalism or malicious mischief of third-parties. Any cost arising therefrom shall be treated as T&D Pass-Through Expenditures hereunder, except to the extent such costs are costs are Disallowed Costs. The Physical Security Plan shall be updated by Operator from time to time as necessary or appropriate.

### Section 5.8    Labor and Employment; Employee Benefits.

(a)    <u>Employee Plans</u>. ServCo shall provide employee benefits to ServCo Employees pursuant to the plans created by ServCo to provide benefits to ServCo Employees (collectively, the "<u>ServCo Benefit Plans</u>"). Operator shall not assume nor shall it be responsible for any obligations or debts of Owner under Owner's retirement plans. ServCo shall, pursuant to Act 29, make any employer contributions it is permitted to make under Applicable Law to Owner's retirement plan with respect to any Hired Former Employee of Owner that elects to continue participating in Owner's defined benefit retirement plan.

(i)    Hired Former Employees of Owner shall not receive credit for their service prior to the Service Commencement Date for purposes of benefit accrual except as otherwise required by Act 120.

(ii)    ServCo shall exercise commercially reasonable efforts to cause the ServCo Benefit Plans to waive all limitations as to pre-existing conditions and actively-at-work exclusions and waiting periods for transitioned employees (and their eligible dependents).

(b)    <u>Exclusivity</u>. Operator shall not, without the prior written approval of Administrator, such approval not to be unreasonably withheld, delayed or conditioned, utilize ServCo or its employees for any purpose other than providing the O&M Services under this Agreement and the GenCo Shared Services to be provided pursuant to the Shared Services Agreement, nor may it hire, for any other business of Operator or an Affiliate, any existing ServCo employees without Owner's prior written consent not to be unreasonably withheld, delayed or conditioned.

(c)    <u>Other</u>. Nothing in this Agreement is intended to amend any employee benefit plan or affect the applicable plan sponsor's right to amend or terminate any employee benefit plan pursuant to the terms of such plan.

### Section 5.9    Procurement and Administration of Federal Funding.

(a)    <u>General</u>. As among the Parties, Owner shall retain the exclusive right to receive amounts from all Federal Funding for the T&D System. Subject to the requirements of Section 5.5 (*Capital Improvements*), Operator shall (i) take steps to ensure that, except for Systems Contracts existing as of the Service Commencement Date, the O&M Services are performed in compliance with the Federal Funding Requirements, (ii) be responsible for contracting for any

CONFIDENTIAL

Capital Improvement financed in full or in part with available Federal Funding, and (iii) ensure that all contracting and work performed by Contractors related to such Capital Improvements the cost of which may be submitted for Federal Funding with the mutual agreement of Operator and Administrator in accordance with Article 7 (*Compensation; Budgets*), is done in compliance with the Federal Funding Requirements to maximize the potential realization of the Federal Funding anticipated or received and ensure such funding is administered in accordance with all such requirements.

(b)        Cooperation and Participation. The Parties shall cooperate and participate with any relevant Governmental Body and any Grant Manager in order to help seek, procure, administer, manage, deploy and apply any Federal Funding for the restoration of the T&D System and related costs. The Parties shall cooperate and participate in any audits or investigations performed by Commonwealth or federal authorities in connection with Federal Funding.

(c)        Compliance with Applicable Law, Regulation and Policy. Operator shall ensure that any work related to the T&D System, the cost of which may, with the mutual agreement of Operator and Administrator in accordance with Article 7 (*Compensation; Budgets*), be submitted for Federal Funding, shall be performed in compliance with (i) Applicable Law, including the procurement rules set forth in 2 C.F.R. Part 200 applicable to Owner, (ii) the provisions set forth in the Federal Funding Procurement Manual, as applicable, and each of (iii) existing and applicable Owner policy, (iv) existing and applicable COR3 policy and (v) existing and applicable PRDH policy, in the case of clauses (iii), (iv) and (v), to the extent Operator has received copies of such policies. Operator shall require any Contractors or Subcontractors engaged to complete work eligible for Federal Funding to execute a certification substantially in the form of Exhibit A (*Form of Federal Funding Certifications*) at the commencement of the Contract or Subcontract. Owner and Operator shall cooperate in good faith and take all steps reasonably required to ensure that Federal Funding Requirements, including the requirements described in the Federal Funding Procurement Manual, are met in relation to the performance of any Federally Funded Capital Improvements.

(d)        Federal Funding Procurement Manual. The Parties shall update the Federal Funding Procurement Manual every three (3) months, or as otherwise deemed necessary by the Parties, to reflect any changes in Applicable Law that affect Federal Funding.

(e)        Acknowledgments. The Parties hereby acknowledge and agree that:

(i)        Owner may, in accordance with Applicable Law, transfer its right to receive amounts from Federal Funding for the T&D System to Administrator or another Governmental Body (provided that any such transferee shall, as part of any such transfer, agree to be bound by Owner's obligations hereunder);

(ii)        Operator shall, with the prior written consent of Administrator and Owner, act as agent of Owner (and any permitted transferee) in connection with any Federal Funding requests related to the T&D System submitted to federal agencies;

(iii)        COR3 is the "Recipient" (as such term is defined in 2 C.F.R. Part 200.86) of all Federal Funding received from FEMA; and

CONFIDENTIAL

(iv)     PRDH is the "Recipient" (as such term is defined in 2 C.F.R. Part 200.86) of all HUD Community Development Block Grant – Disaster Recovery Federal Funding.

**Section 5.10   Environmental, Health and Safety Matters**.

(a)     <u>Generally</u>. Operator shall perform the following environmental health and safety activities related to the provision of electric service to T&D Customers: (i) managing an environmental, health and safety program for the T&D System in accordance with the Contract Standards; (ii) coordinating, overseeing, ensuring and maintaining compliance of the T&D System with Environmental Law, including documentation thereof; (iii) monitoring emerging federal, state, Commonwealth, municipal and local Environmental Law to ensure future and ongoing compliance and operational efficiencies; (iv) performing analyses of proposed Environmental Law to ensure future compliance thereunder; and (v) providing environmental permitting services to support operations; <u>provided</u>, <u>however</u>, that Operator shall not be responsible for any of the foregoing activities with respect to any Pre-Existing Environmental Condition, all of which shall be obligations of Owner, except to the extent Operator exacerbates a Pre-Existing Environmental Condition and such exacerbation is attributable to Operator's gross negligence or willful misconduct.

(b)     <u>Pre-Existing Environmental Conditions</u>.

(i)     Operator shall perform the O&M Services so as not to exacerbate the effect or costs of any Pre-Existing Environmental Condition disclosed with reasonable specificity by Owner pursuant to Section 4.5(f) (*Conditions Precedent to Service Commencement Date – Pre-Existing Environmental Conditions*). Discovery of a Pre-Existing Environmental Condition by Operator shall not be deemed an exacerbation of such condition. If at any time a Pre-Existing Environmental Condition is determined to exist that (A) requires an action under Applicable Law, (B) materially interferes with the performance of the O&M Services or (C) materially increases the cost of performing the O&M Services, then Administrator shall, as soon as reasonably practicable given the condition in question, after written notice from any Governmental Body or Operator of the presence or existence thereof, commence and diligently prosecute such actions as are required by Applicable Law or to prevent future material interference with the performance of the O&M Services or material increases in costs of performing the O&M Services.

(ii)     Administrator shall have the right to contest any determination of a Pre-Existing Environmental Condition and shall not be required to take any action under this Section 5.10 (*Environmental, Health and Safety Matters*) so long as (A) it is contesting any determination of a Pre-Existing Environmental Condition in good faith by appropriate proceedings conducted with due diligence and (B) Applicable Law permits continued operation of the T&D System pending resolution of the contest. In any contest regarding whether the presence of Hazardous Material is a Pre-Existing Environmental Condition, Administrator (or Owner, as the case may be), if Operator submits a sworn certification that, to the best of its knowledge, after due inquiry (which inquiry shall not require any further Environmental Studies (including any phase I or phase II studies)), the alleged Pre-Existing Condition did not arise from facts, circumstances, conditions, actions or omissions first occurring after the Service Commencement Date, then Owner

CONFIDENTIAL

shall bear the burden of proof by a preponderance of the evidence that the presence of such Hazardous Material is not a Pre-Existing Environmental Condition.

(iii)     Operator shall not be responsible for any Losses resulting from or related to any Pre-Existing Environmental Conditions, except to the extent such Losses are based in whole or in part on Operator's exacerbation of a Pre-Existing Environmental Condition resulting from Operator's gross negligence or willful misconduct with respect to the exacerbation of such Pre-Existing Environmental Condition that was disclosed by Owner or Administrator to Operator hereunder and then only to the extent attributable to such gross negligence or willful misconduct.

(c)     Notice and Remedial Action Requirements.

(i)     Operator shall, promptly upon obtaining knowledge thereof, report to Administrator, on a per occurrence basis, the Release of any reportable quantity, as defined under applicable Environmental Law, of Hazardous Material or of any other Release that could reasonably be expected to result in material Losses to Owner or Operator, and the location at which the Release has occurred, the time, the agencies involved, the damage that has occurred and the Remedial Action alternatives to be considered for decision-making by Administrator. Notice of any such Release, if initially delivered orally, shall be delivered to Administrator in writing promptly following Operator's actual knowledge of such Release. This reporting obligation shall be in addition to any other reporting obligation under Environmental Laws. Upon such notification, Administrator shall promptly propose the Remedial Action to Operator for its consideration. Operator and Administrator shall work in good faith to reach a prompt, written agreement for the pursuit of the Remedial Action, including terms assuring the pre-funding and prompt reimbursement of all of Operator's costs in effectuating the Remedial Action determined by Administrator, which costs shall be treated as T&D Pass-Through Expenditures hereunder, except to the extent such costs are Disallowed Costs. If such an agreement cannot be reached within ten (10) Business Days, or such other time as Administrator and Operator may agree, Administrator (or Owner, as the case may be) may proceed with the Remedial Action at its cost, including at such times and in a manner so as to not materially interfere with the performance of the O&M Services and Operator shall have no responsibility for such Remedial Action. In the event of a Pre-Existing Environmental Condition, Administrator and Operator may also reach an agreement whereby Operator is compensated for effectuating the Remedial Action proposed by Administrator after the presentation of Remedial Action alternatives by Operator for such condition. Subject to Applicable Law, in no event shall ownership of any Hazardous Material, including as stated on manifests, be in the name of Operator, or Operator's employees, contractors, guests or invitees, nor shall Operator be deemed to be arranging for any disposal of any Hazardous Material associated with such Remedial Action or otherwise.

(ii)     With respect to any Release caused by the gross negligence or willful misconduct of Operator or Operator's employees, contractors, guests or invitees in connection with the O&M Services, Operator shall promptly obtain the necessary Governmental Approvals for, and then commence and diligently pursue to completion all Remedial Action necessary to comply with Environmental Law. Operator shall keep Administrator reasonably informed of the progress of such Remedial Action and the schedule for completing it. In addition, in connection with such Remedial Action, Operator shall: (A) provide Administrator with a reasonable opportunity to comment in advance upon any material written communications, filings,

CONFIDENTIAL

reports, correspondence or other writings given to any Governmental Body and consider accurate and timely provided comments in good faith; (B) to the extent practical, provide Administrator with a reasonable opportunity to participate in any meetings with any Governmental Body regarding the Remedial Action; (C) comply with Applicable Law; (D) within five (5) Business Days of sending or receipt, use commercially reasonable efforts to provide to Administrator copies of all non-privileged material written communications, filings, reports, correspondence or other writings, photographs or materials sent by Operator to or received by Operator from any Person (including any Governmental Body) in connection with any such Remedial Action.

(iii)    Operator shall promptly notify Administrator, and any other Governmental Body as may be required by Environmental Law, in writing of its intention to handle, transport or dispose of Hazardous Material, other than in the ordinary course of business. Operator shall cause such Hazardous Material to be handled, transported and disposed of in accordance with Environmental Law.

**Section 5.11    Accounting and Financial Services**. Operator shall provide accounting and financial services in respect of the T&D System, including those services listed in Annex I (*Scope of Services*).

**Section 5.12    Legal Matters**. Operator shall manage Owner's legal matters in respect of the O&M Services, other than with respect to any dispute with, or other legal matters involving, Operator pursuant to this Agreement, and Owner's related reporting obligations, including those services listed in Annex I (*Scope of Services*). In performing this Agreement, nothing shall require, or shall be construed as requiring, Operator to act as legal counsel to, or to provide legal advice or representation to, Owner.

**Section 5.13    Generation-Related Services**.

(a)    Power Supply Dispatch and Management. As further detailed in, and in accordance with, the System Operation Principles, Operator, as agent for Owner, shall: (i) dispatch, schedule and coordinate Power and Electricity from available generation assets and provide related services; (ii) coordinate the scheduling of load requirements and Power and Electricity with IPPs pursuant to their respective Generation Supply Contracts and with GenCo pursuant to the GridCo-GenCo PPOA; (iii) implement and apply, on a continuous basis on the relevant time basis applicable, the System Operation Principles in order to ensure and coordinate the delivery of Power and Electricity; (iv) develop load and energy forecasts (including daily forecasts), scheduling requirements and capacity requirements taking into consideration unit outages; (v) request and consider information with respect to operational constraints; and (vi) perform any other services related to the dispatch, scheduling or coordination of Power and Electricity from existing and future available generation assets.

(b)    Power Supply Information. In connection with Operator's performance of the dispatch, scheduling and coordination of Power and Electricity, Operator shall have the right, with regards to Owner and GenCo, and may request the right from any IPP, as applicable, to reasonable access to information consistent with Prudent Utility Practice required to perform the dispatch and scheduling of Power and Electricity, which includes fuel availability, fuel cost, fuel inventory, unit availability, unit marginal cost, unit outage schedules, electric system reliability

CONFIDENTIAL

requirements, reserve requirements, identification of must-run generation resources and any other information reasonably requested by Operator consistent with Prudent Utility Practice required to perform the dispatch, scheduling and coordination of Power and Electricity.

(c)　　　Review of System Operation Principles. In connection with Operator's performance of the dispatch, scheduling and coordination of Power and Electricity, Operator and Administrator shall have the right from time to time to review the System Operation Principles, in coordination with Administrator or Operator, as applicable, taking into account Applicable Law, load and energy forecasts, long and short range system plans, proposed annual operating and maintenance plan, any limitation criteria, and the condition of the entire electric system. If Operator and Administrator determine upon review that the System Operation Principles should be revised, Operator shall prepare and submit revised System Operation Principles to PREB. PREB shall have the right to approve, deny or propose modifications to such revised System Operation Principles. Subject to and conditioned on PREB approval, Operator shall perform the services described in Section 5.13(a) (*Generation-Related Services – Power Supply Dispatch and Management*) in accordance with the revised System Operation Principles. In the event of an Emergency Event and on a temporary basis throughout the duration of the relevant emergency, Operator may deviate from the System Operation Principles as required to ensure public safety, employee safety and while minimizing customer outages. In such an Emergency Event, Operator shall notify Administrator ten (10) Business Days prior to submitting revised temporary System Operation Principles that reflect such deviation to PREB for its review. Such notice shall include a draft of the revised temporary System Operation Principles, and PREB shall have the right to approve, deny or propose modifications thereto.

(d)　　　Procurement of Generation Projects and Generation Supply Contracts. Operator shall maintain Resource Adequacy that may require new generation procurement for Generation Projects or Generation Supply Contracts, which procurement shall be done in accordance with the Integrated Resource Plan and Applicable Law. Any such Generation Project or Generation Supply Contract shall be subject to the applicable procurement processes and approval by PREB in accordance with Applicable Law. With respect to any such procurement, Operator shall:

(i)　　　prepare risk assessments and analyses in support of Resource Adequacy and Generation Project or Generation Supply Contract procurement prioritization and planning, which shall take into account the Integrated Resource Plan and Applicable Law (and which assessments and analyses PREB may request from time to time);

(ii)　　　prepare long and short-range transmission and distribution planning analyses and forecasts to determine the need for Generation Project or Generation Supply Contract procurement which shall take into account the Integrated Resource Plan to the extent applicable (and which analyses and forecasts PREB may request from time to time);

(iii)　　　meet with PREB on an annual basis to review and assess the prepared analyses, demand projections (prepared in accordance with the Integrated Resource Plan), existing System Power Supply, Legacy Generation Assets and generation assets owned by IPPs related to the supply of Power and Electricity, and determine whether additional power supply sources are needed; and

CONFIDENTIAL

(iv)     coordinate any start-up related services required from Owner in connection with any such Generation Project or Generation Supply Contract.

For the avoidance of doubt, in the event that Operator recommends new generation procurement for a Generation Project subject to Act 120, Operator shall undertake (i) through (iv) above, but Administrator (or any other entity required by Applicable Law to undertake such procurement) shall manage all aspects of the procurement process with the support of Operator, as necessary.

(e)     GenCo Shared Services. As requested by GenCo and approved by Administrator in its reasonable discretion, Operator, as agent for Owner, shall provide the GenCo Shared Services listed in Annex VI (*GenCo Shared Services*) pursuant to the Shared Services Agreement. As set forth in Section 4.5(s) (*ManagementCo Responsibilities – Shared Services Agreement*), the Parties shall negotiate in good faith, and enter into, the Shared Services Agreement during the Front-End Transition Period. Subject to the approval of Administrator, any GenCo Shared Service may be terminated or suspended earlier by GenCo for convenience, including as a result of GenCo contracting or engaging a third-party entity to provide such GenCo Shared Service; underlined that GenCo Shall provide written notice to Operator at least sixty (60) days prior to the proposed effective date of any termination or suspension of a GenCo Shared Service.

(f)     Powers Under GridCo-GenCo PPOA and Generation Supply Contracts. Owner shall provide Operator with copies of all Generation Supply Contracts and the GridCo-GenCo PPOA. Pursuant to the terms and conditions of each Generation Supply Contract and the GridCo-GenCo PPOA, Operator shall have such power and authority as delegated to it pursuant to the respective agreement; provided that no agreement relating to the supply of Power and Electricity may be terminated, modified or amended without the consent of Administrator in its reasonable discretion, such consent not to be unreasonably withheld, delayed or conditioned, and Owner shall give PREB notice of such termination, modification or amendment ten (10) Business Days before it is effective.

**Section 5.14   Emergency Action**.

(a)     Accidents. Operator shall promptly notify Administrator in writing of any material accident or incident related to the T&D System within twenty-four (24) hours of receiving knowledge of the occurrence thereof and promptly notify Administrator in writing of all material claims made by or against Operator of which Operator has knowledge, or potential material claims that Operator reasonably expects to make against, or to be made against it by, third-parties.

(b)     Emergencies. Operator shall promptly notify Administrator and PREB in writing of all Emergencies related to the T&D System upon receiving knowledge thereof. Notwithstanding anything to the contrary in this Agreement, if at any time Operator determines in good faith that an Emergency Event exists with respect to the T&D System such that immediate action must be taken to (i) protect the safety of the public, Owner's employees and Operator's employees, (ii) protect the safety or integrity of the T&D System or prevent or limit environmental harm, or (iii) mitigate the immediate consequences of such Emergency Event, Operator shall take all such action that it deems in good faith to be reasonable and appropriate under the circumstances in accordance with the Emergency Response Plan. As promptly thereafter as is reasonable,

CONFIDENTIAL

Operator shall notify Administrator and PREB in writing of Operator's response to such Emergency Event. For so long as the Emergency Event continues, Operator shall provide a weekly written update to Administrator and PREB (provided that PREB may otherwise request more frequent updates in accordance with Applicable Law) specifying the nature of the Emergency Event, the remediation measures being taken by Operator, the expected duration of the Emergency Event and an estimate of any increases in costs resulting therefrom. Operator shall notify Administrator and PREB in writing as soon as the Emergency Event has ended. All costs related to the remediation of the Emergency Event shall be T&D Pass-Through Expenditures and Operator shall be entitled to draw upon any Service Account, except the Capital Account – Federally Funded, to pay for such costs. As soon as practicable following the end of such Emergency Event, all such costs incurred shall be reflected in a proposed amendment to the approved Operating Budget or Capital Budgets, as applicable, subject to the provisions of Section 7.3(e) (*Budgets – Amendments to Budgets*).

**Section 5.15   Information**.

(a)      System Information and Computer Database. Operator shall, subject to the System Remediation Plan, maintain (i) an Information System to record, and to the extent practicable, provide retrieval for Administrator's review and copying of System Information, and (ii) a computer database containing information related to T&D Customers (the "Customer Database") that, at a minimum, shall specify each customer served by the T&D System, the service classification applicable to each customer, payment records and inquiries or complaints from, and any special services requested by or provided to, each customer. Subject to the provisions of Section 13.1 (*Intellectual Property*) and Section 13.2 (*Proprietary Information*), the information and content contained in the System Information and the Customer Database, exclusive of Operator's Confidential Information, Operator Intellectual Property, Subcontractor Intellectual Property and Third-Party Intellectual Property, shall constitute Intellectual Property and Confidential Information of Owner.

(b)      Ownership of Owner Personal Information. Any Owner Personal Information in existence as of the Service Commencement Date of this Agreement shall be considered Confidential Information of Owner and, as among the Parties, shall at all times remain the Intellectual Property of Owner. Any Owner Personal Information created during the Term shall constitute Work Product.

(c)      Information Access.

(i)      Operator shall, subject to the System Remediation Plan, provide Owner with timely read-only access where available, or a reasonably equivalent form of access to all information necessary to (A) maintain, protect and preserve the T&D System assets or (B) carry out any of Owner's responsibilities related to the T&D System under Applicable Law. For the avoidance of doubt, the access to information provided under this Section 5.15(c)(i) (*Information – Information Access*) shall be on the same basis as set out in Section 5.15(c)(ii) (*Information – Information Access*).

(ii)      To the extent necessary for Owner to carry out its responsibilities under this Agreement, Operator shall, subject to the System Remediation Plan, provide

CONFIDENTIAL

Administrator and its Representatives with (A) unrestricted read-only access where available, or a reasonably equivalent form of access to such information, to all System Information and all Owner Personal Information, in each case contained either in the Customer Database or any other database or system created or managed by Operator hereunder, and (B) to the extent that Operator has developed, compiled, collected, prepared or archived such information in the conduct of its services under this Agreement, full and complete access to such information, subject to confidentiality obligations applicable to Operator Confidential Information and provided that Administrator and its Representatives shall comply with all of Operator's access, security (including cybersecurity) and safety procedures when exercising such right of access. Administrator shall be responsible for the security of all access credentials provided to and each access made and use and disclosure of System Information by Administrator or its Representatives hereunder.

(d)      Restrictions. Operator may not use any System Information or Owner Personal Information for any purpose unrelated to the O&M Services without the prior written consent of Administrator, such approval not to be unreasonably withheld, delayed or conditioned. To the extent such consent is granted, Operator shall comply with all Applicable Law, and otherwise obtain any necessary consents, prior to any such permitted use. Notwithstanding the foregoing, unless required by Applicable Law or by a Governmental Body (in which case Operator shall provide Administrator with such advance notice as is practicable), none of Operator, an Operator Related Party or any Affiliate shall, or shall authorize any third-party to, (i) use the Customer Database or other customer Information Systems of Owner to extract, sort or otherwise use any information related to T&D Customers (including name, address, telephone number and energy usage or any other information contained in the Customer Database) or (ii) use mechanisms for customer access (including meter reading, customer representatives and service call centers), available solely as a result of Operator's role hereunder, to market any services unrelated to the T&D System to T&D Customers. To the extent information related to T&D Customers is available from other sources, neither Operator nor its Affiliates shall be precluded by this Agreement from using in its business such data obtained from other sources.

**Section 5.16   Bill Payments**. Subject to Section 7.5 (*Service Accounts*) and Section 7.7 (*Unfunded Amounts*) and to the extent not prevented from doing so by Owner Fault, Operator shall (i) timely pay all bills related to the T&D System, that are proper, appropriate and not otherwise disputed and (ii) assure that, to the extent within Operator's control, no mechanics' or similar Liens are filed against any portion of the T&D System. In the event that Operator fails to timely pay any such bill, Administrator shall have the right, but not the obligation, to instruct Owner to pay such bill and deduct an administrative fee in an amount of US$500 from the Incentive Fee otherwise due to Operator.

**Section 5.17   Compliance with Obligations**. Each Party shall use reasonable efforts to provide all representations, certifications, records and other documents necessary or appropriate for it and other Parties to comply with any obligations under Applicable Law (including obligations (i) with respect to PREB, (ii) with respect to the FOMB under PROMESA, (iii) related to the federal securities laws and (iv) related to maintaining the exclusion from gross income of interest on Owner's or its Affiliates' obligations for federal income tax purposes) or any of the agreements that Owner or its Affiliates may be party to from time to time that relate to the O&M Services.

CONFIDENTIAL

**Section 5.18 Energy Policy under Act 17**. As further detailed in Annex I (*Scope of Services*), in accordance with the Budget then in effect, Operator shall coordinate and assist with the services and operations contemplated under Act 17, including services and operations related to microgrids, distributed generation, renewable energy sources, net metering and energy cooperatives.

**Section 5.19 Acquisition of Easements, Fee Interests and Concession Rights**.

(a)     <u>Identification and Constitution of New Easement Areas</u>. Operator shall identify the areas that are required to be encumbered by Easements for the operation, maintenance, repair, restoration, replacements, improvements, additions and alterations of the T&D System. With respect to each Easement constitution, Operator shall: (i) develop all reasonably necessary supporting material, data and information that may be required, including surveys for the corresponding Easement areas that shall benefit the corresponding T&D System Site and the required appraisals under Regulation 6955; (ii) negotiate with fee owners and any lienholder or occupant of the servient tenements the terms and conditions of the instrument that shall constitute the Easement as a first priority lien on the servient tenement and establish the rights, obligations, undertakings and indemnification of the parties; (iii) procure any required Governmental Approvals and attend all meetings and hearings related to their procurement, with Operator named as a co-permittee on any Governmental Approval if legally required by the issuing Governmental Body; (iv) prepare the petition of condemnation to be filed by Owner or GridCo at the Commonwealth Court, if a consensual agreement is not reached and deliver the funds of the award to be deposited at the aforesaid Court, as required by Applicable Law; (v) cause the recordation of the Easements; and (vi) take all other action necessary or otherwise reasonably required to constitute the Easements. Owner shall either exercise or enable Operator to exercise Owner's rights under the Owner's regulations with respect to acquisition and constitution of new easements.

(b)     <u>Enforcement of Easement Rights</u>. Owner hereby authorizes Operator to enforce Owner's rights under the Easements. Operator, to the extent permitted by Applicable Law, may remove any obstruction of any kind or form hindering the area encumbered by an Easement.

(c)     <u>Identification and Acquisition of Target Properties</u>. Operator shall identify real properties or rights that need to be acquired for the O&M Services. With respect to each target property, Operator shall: (i) develop all reasonably necessary supporting material, data and information that may be required, including surveys for the target property and the required appraisals under Regulation 6955; (ii) negotiate with the fee owner or grantee of any real property rights, including leasehold estates, and any lienholder of the target property the terms and conditions of the purchase and sale transaction or assignment of rights and the release or cancellation of any lien or encumbrance affecting the target property or any real property rights, including leasehold estates; (iii) procure any required Governmental Approvals and attend all required meetings and hearings related to their procurement, with Operator being named as a co-permittee on any Governmental Approval if legally required by the issuing Governmental Body; (iv) prepare the petition of condemnation to be filed at the Commonwealth Court by Owner, GridCo, the Commonwealth or the Department of Transportation and Public Works, as the case may be, if a consensual agreement is not reached; (v) cause the recordation of the deed vesting title on Owner or the Commonwealth, as the case may be; and (vi) take all other action necessary

CONFIDENTIAL

or otherwise reasonably required to acquire such fee interests or real property rights, including leasehold estates.

(d)     Public Domain Real Estate Assets and Procurement of Concession Rights. Operator shall procure the required concession rights permitting the use of real estate assets under the public domain, including submerged lands, wetlands and areas designated as part of the maritime terrestrial zone by the Puerto Rico Department of Natural and Environmental Resources from time to time that are necessary for the operation, maintenance, repair, restoration, replacements, improvements, additions and alterations of the T&D System. With respect to each such real property, Operator shall: (i) develop all reasonably necessary supporting material, data and information that may be required, including surveys for the concession areas; (ii) negotiate with the corresponding Governmental Body the terms and conditions of the concession agreement; (iii) procure any required Governmental Approvals and attend all required meetings and hearings related to their procurement, with Operator being named as a co-permittee on any Governmental Approval if legally required by the issuing Governmental Body; (iv) cause the recordation of the concession over public lands and waterbodies, as the case may be; and (v) take all other action necessary or otherwise reasonably required to secure the grant of a recordable concession, including evaluation of any Pre-Existing Environmental Conditions.

**Section 5.20   Other Services**.

(a)     Implied Services. If any services, functions or responsibilities not specifically described in this Agreement are reasonably required for the proper performance and provision of the O&M Services in accordance with Contract Standards, they shall be deemed to be implied by and included within the O&M Services, except to the extent they are rights and responsibilities reserved to Owner or Administrator as set forth in Article 6 (*Rights and Responsibilities of Owner and Administrator*) or as otherwise expressly provided in this Agreement.

(b)     Additional Services. If requested by Administrator, Operator may perform such additional services reasonably related to the T&D System not included within O&M Services, based upon terms and conditions, including price and additional fees payable to Operator, agreed to by Operator and Administrator.

(c)     Exclusivity. Without the prior approval of Administrator, ServCo may not engage in any other business or activity other than to employ ServCo employees and to provide the O&M Services pursuant to this Agreement and the GenCo Shared Services to be provided pursuant to the Shared Services Agreement.

CONFIDENTIAL

# ARTICLE 6
## RIGHTS AND RESPONSIBILITIES OF OWNER AND ADMINISTRATOR

**Section 6.1     Rights and Responsibilities of Owner**.

(a)     <u>Generally</u>. From and after the Service Commencement Date, Owner shall have the following rights and responsibilities with respect to the operation, management and maintenance of the T&D System:

(i)     grant and assure Operator access to the T&D System for the performance of Operator's obligations hereunder;

(ii)     pay the Service Fee and any other amounts due Operator, and fund the Service Accounts, all in accordance with the terms and conditions of this Agreement;

(iii)     ensure that, to the extent PROMESA requires Owner to submit any budget to the FOMB for approval, such budget provides that Owner is authorized to pay amounts due to Operator under this Agreement and fund the Service Accounts in accordance with Section 7.5 (*Service Accounts*);

(iv)     cooperate with Operator such that the budgets and funds in support of O&M Services are sufficient in amount to enable Operator to meet the Contracts Standards and provide a reasonable opportunity for Operator to achieve the Performance Metrics;

(v)     (A) respond promptly (and in any event within thirty (30) days or shorter period required by this Agreement) to all requests of Operator with respect to all matters requiring the approval, review or consent of Owner (and in each such case, unless otherwise specifically stated in this Agreement, Owner shall not unreasonably withhold, delay or condition any such approval, review or consent) and as to such other matters relating to the obligations of Operator hereunder in respect of which Operator shall reasonably request the response of Owner in accordance with the provisions of this Agreement, (B) provide Operator with such information, data and assistance as may be reasonably necessary or appropriate for Operator to perform its obligations (including with respect to any PREB rate or other proceeding or requirement) hereunder, and (C) from time to time, as and when requested by Operator, execute and deliver, or cause to be executed and delivered, all such documents and instruments and take, or cause to be taken, all such reasonable actions, as may be reasonably necessary for Operator to perform its obligations under this Agreement;

(vi)     except as otherwise contemplated by Section 5.12 (*Legal Matters*), manage Owner's legal matters, including Owner's reporting and related legal compliance;

(vii)     cooperate with Operator and Administrator in obtaining and maintaining all Governmental Approvals;

(viii)     audit Operator's compliance with Federal Funding Requirements; <u>provided</u> that Owner shall reasonably coordinate with Administrator to avoid duplicative audits;

CONFIDENTIAL

(ix)     ensure that Operator, as an independent contractor, remains at all times during the Term a beneficiary to all Easements vested on Owner as provided in Regulation 7282 of January 25, 2007;

(x)     execute and file any condemnation proceeding reasonably requested by Operator to acquire any fee interest, real property right, including leasehold estates, or Easement; provided that (A) Operator shall submit a request to Administrator to approve such condemnation proceeding, including a statement of reasons supporting, and justification of Owner's right to initiate, any such proceeding, and (B) the cost and expense related to such condemnation proceeding shall be included in an amendment to then-current approved Budgets in accordance with Section 7.3(e) (*Budgets – Amendments to Budgets*);

(xi)     take all other actions, and cause its employees and other Representatives to take all other actions, reasonably required or reasonably requested by Operator to permit Operator to perform the O&M Services in compliance with the Contract Standards and this Agreement, including with respect to (A) the constitution of Easements and enforcement of rights thereunder and (B) the acquisition of fee interests or real property rights, including leasehold estates;

(xii)     exercise its statutory powers pertaining to any and all rights and remedies granted to it under Applicable Law, including doing so promptly when requested by Operator;

(xiii)     comply with all Applicable Law;

(xiv)     coordinate any Audits that Owner is entitled to perform hereunder with any Audits being undertaken by Administrator and any other Governmental Body that has the right under Applicable Law to perform an Audit; and

(xv)     to the extent reasonably requested by Operator, and to the extent consistent with Applicable Law, cooperate with Operator in its efforts to obtain and effectuate approvals of any Governmental Body having competent jurisdiction for the establishment of measures to prevent erosion of revenue associated with the T&D System or to enhance System Revenues, including attending meetings with appropriate officials of Governmental Bodies as may be reasonably requested by Operator for such purposes, identifying historical and potential governmental and quasi-governmental measures relevant to such purposes, and providing other cooperation, as may be reasonably requested by Operator, in pursuit of such purposes.

(b)     Authorization of Administrator. Owner hereby assigns and delegates to Administrator the rights and responsibilities under this Agreement necessary for Administrator to administer this Agreement and act as Owner's liaison with Operator in connection with the O&M Services; provided that such assignment and delegation shall not release Owner from any of its obligations set forth herein; and provided, further, that Owner shall be responsible for all acts and omissions of Administrator in connection with this Agreement and the other Transaction Documents, and the transactions contemplated hereby and thereby, in the same manner as if such acts and omissions were those of Owner.

CONFIDENTIAL

**Section 6.2     Rights and Responsibilities of Administrator**.

(a)      <u>Generally</u>. Operator shall be entitled to rely on the written directions of Administrator. Administrator shall be responsible for overseeing, in the manner provided for and subject to the terms and conditions of this Agreement, Operator's performance of the O&M Services under this Agreement. Without limiting the generality of the foregoing, from and after the Service Commencement Date, Administrator shall have the following rights and responsibilities with respect to the operation, management and maintenance of the T&D System:

(i)      as set forth in Section 7.3 (*Budgets*), review and approve Budgets, including modifications thereto, to ensure compliance with a Rate Order;

(ii)      review and approve the Incentive Fee payable to ManagementCo for a given Contract Year, including based on Administrator's evaluation of Operator's satisfaction of the Performance Metrics;

(iii)      cooperate with Operator such that the budgets and funds in support of O&M Services are sufficient in amount to enable Operator to meet the Contracts Standards and provide a reasonable opportunity for Operator to achieve the Performance Metrics;

(iv)      exercise Oversight in relation to Operator's compliance with Budgets, including T&D Pass-Through Expenditures and Generation Pass-Through Expenditures, in accordance with the procedures set forth in this Agreement; <u>provided</u> that, Administrator shall (i) reasonably coordinate with Owner to avoid duplicative Oversight and (ii) except to the extent provided under this Agreement, avoid exercising Oversight with respect to items that fall within the scope of PREB's statutory oversight;

(v)      exercise Oversight in relation to Operator's performance of its obligations hereunder, including performance of the O&M Services;

(vi)      exercise Oversight, as agent of Owner, in relation to Operator's compliance with Federal Funding Requirements;

(vii)      respond promptly (and in any event within thirty (30) days or shorter period required by this Agreement) to all requests of Operator with respect to matters requiring the approval, review or consent of Administrator (and in each such case, unless otherwise specifically stated in this Agreement, Administrator shall not unreasonably withhold, delay or condition any such approval, review or consent) and as to such other matters relating to the obligations of Operator hereunder in respect of which Operator shall reasonably request the response of Administrator in accordance with the provisions of this Agreement;

(viii)      (A) cooperate with Operator by providing Operator such information, data and assistance as may be reasonably necessary for Operator to perform its obligations hereunder and (B) from time to time, as and when requested by Owner, execute and deliver, or cause to be executed and delivered, all such documents and instruments and take, or cause to be taken, all such reasonable actions, as necessary for Operator to perform its obligations under this Agreement;

CONFIDENTIAL

(ix)     declare an Event of Default and exercise remedies under this Agreement, including termination of this Agreement upon the occurrence of an Operator Event of Default in accordance with Section 14.1 (*Events of Default By Operator*);

(x)     coordinate any Audits that Administrator is entitled to perform hereunder with any Audits being undertaken by Owner and any other Governmental Body that has the right under Applicable Law to perform an Audit; and

(xi)     to the extent reasonably requested by Operator, and to the extent consistent with Applicable Law, cooperate with Operator in its efforts to obtain and effectuate approvals of any Governmental Body having competent jurisdiction for the establishment of measures to prevent erosion of revenue associated with the T&D System or to enhance System Revenues, including attending at meetings with appropriate officials of Governmental Bodies as may be reasonably requested by Operator for such purposes, identifying historical and potential governmental and quasi-governmental measures relevant to such purposes, and providing other cooperation, as may be reasonably requested by Operator, in pursuit of such purposes.

(b)     Disputes. In the event of a Dispute among the Parties with respect to clauses (ii) through (xi) of Section 6.2(a) (*Rights and Responsibilities of Administrator – Generally*), such Dispute shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, an "Administrator Dispute").

(c)     Approvals and Consents. When any approval or consent by Owner to an Operator submission, request or report is required pursuant to the terms of this Agreement, the approval or consent shall be given by Administrator in writing, and such writing shall be conclusive evidence of such approval or consent and shall be binding on Owner.

(d)     Consultants. Subject to budgetary requirements and recognizing that priority shall be given to funding the Service Accounts and payment of the Service Fee, Administrator shall have the right, at Owner's or Administrator's sole expense, to engage third-party consultants to advise on its obligations under this Agreement; provided that Administrator shall not have the right to retain a consultant that (i) carries on business as a utility company or company providing utility services, Front-End Transition Services or O&M Services and (ii) may be a competitor to Operator, Operator's Affiliates or any Parent Company that may be a competitor to Operator or any Parent Company.

### Section 6.3     Reporting; Audits.

(a)     Generally. At the reasonable request of Administrator or its relevant consultant (each, an "Authorized Inspector"), at Administrator's sole cost and expense, at reasonable times during normal business hours, Operator shall: (i) make available or cause to be made available to such Authorized Inspector all information related to this Agreement or the T&D System as may be specified in such request and as shall be in the possession or control of Operator or its Representatives; (ii) permit such Authorized Inspector, upon ten (10) Business Days' prior notice to Operator, which notice shall identify the persons such Authorized Inspector requests to be present for an interview and describe with reasonable specificity the subject matter to be raised in the interview, to discuss the obligations of Operator under this Agreement with any of the

CONFIDENTIAL

directors, chief executive officer and chief financial officer of Operator and its Representatives, for the purpose of enabling such Authorized Inspector to determine whether Operator is in compliance with this Agreement; and (iii) otherwise provide such cooperation as may reasonably be required by such Authorized Inspector in connection with any such Audit of the information required to be maintained or delivered by Operator under this Agreement or required by Applicable Law. Such Authorized Inspector shall be entitled to make copies of the information related to the conduct of such Audit and to take extracts therefrom at such Authorized Inspector's sole cost and expense. Absent good cause or as may be required by Applicable Law, audits shall occur no more than once every Contract Year. In the course of performing its Audits hereunder, each Authorized Inspector and its Representatives shall avoid any disruption to Operator's performance of the O&M Services or Operator's rights or responsibilities under this Agreement, having regard to the nature of the Audits being performed, and when accessing the T&D System each Authorized Inspector and its Representatives shall do so at its own risk and shall comply with all of Operator's safety procedures.

(b)    Testing. At all reasonable times during normal business hours and subject to Operator's policies and procedures, upon reasonable prior notice, any Authorized Inspector shall, with the prior consent of Operator, be entitled to perform or cause to be performed any test, study or investigation in connection with the T&D System or the O&M Services as such Authorized Inspector may determine to be reasonably necessary under the circumstances and at the sole cost and expense of such Authorized Inspector. Operator shall, and shall cause its Representatives to, furnish such Authorized Inspector or its Representatives with every reasonable assistance in connection with the carrying out of such tests, procedures, studies and investigations. In connection with the foregoing, such Authorized Inspector shall, with the prior written consent of Operator, be entitled to install machines, equipment, systems, monitors, counters and other devices in, on, under, over or adjacent to the T&D System to permit and facilitate any test, study, monitor or Audits of or relating to the T&D System to the extent that the same does not interfere with the O&M Services or damage the T&D System.

(c)    Additional Audit Rights. At any time and from time to time, Owner, Administrator, PREB, COR3 or the DHS OIG may conduct a partial or full Audit related to all Federally Funded Capital Improvements and the Parties shall maintain all related records for such amount of time as may be necessary for any such Audit; provided that such records shall be maintained by the Parties for a minimum of at least three (3) years following the transmission of the final expenditure report by COR3 to FEMA pursuant to Public Law 105-124, Section 1216. For the avoidance of doubt, any costs incurred by the Operator in responding to an Audit under this Section 6.3(c) (*Reporting; Audits – Additional Audit Rights*) (including costs of Operator's Contractors' Subcontractors and Affiliates) shall be T&D Pass-Through Expenditures, except to the extent such costs are Disallowed Cost.

(d)    No Other Audit Rights. This Agreement does not provide any Governmental Body any rights to undertake any Audit other than those stated herein, and, without restricting the foregoing, this Agreement does not provide any regional, municipal or local body with any rights to perform any Audit in addition to those permitted by Applicable Law.

Section 6.4    Staffing Levels. From and after the Service Commencement Date and at all times during the Term, Owner and Administrator, including any of their Subcontracts, shall

CONFIDENTIAL

maintain staffing in connection with the O&M Services only at those levels strictly necessary for Owner and Administrator to timely and efficiently perform their obligations under this Agreement. Before the Service Commencement Date, Owner shall maintain staffing necessary to continue to perform its obligations at the same or higher level than it performed such obligations as of the Proposal Submission Date.

CONFIDENTIAL

# ARTICLE 7
# COMPENSATION; BUDGETS

**Section 7.1    Service Fee**.

(a)      <u>Generally</u>. In addition to Owner's funding or payment of T&D Pass-Through Expenditures, Generation Pass-Through Expenditures, Capital Improvements, Outage Event Costs and any other amounts that become due and owing to Operator hereunder, from and after the Service Commencement Date, as compensation for the performance of the O&M Services, Owner shall, in accordance with this Agreement, pay ManagementCo a management service fee consisting of the Fixed Fee and the Incentive Fee (collectively, the "<u>Service Fee</u>"). The Parties acknowledge and agree that: (i) the following costs and expenses shall be paid by ManagementCo from the Fixed Fee (or otherwise absorbed or paid for by ManagementCo without reimbursement hereunder): (A) the costs and expenses listed in Annex VII (*ManagementCo Costs*), (B) ManagementCo's corporate overhead costs and (C) any subcontract with respect to any service to be provided by ManagementCo between the Service Commencement Date and the expiration or early termination of the Agreement; and (ii) no Federal Funding shall be used to pay the Service Fee. The Service Fee shall not be subject to any abatement, deduction, counterclaim or set-off of any kind or nature.

(b)      <u>Fixed Fee</u>.

(i)      The fixed fee payable to ManagementCo for each Contract Year shall be as set forth in Annex VIII (*Service Fee*), adjusted on a Pro Rata basis for a partial Contract Year (the "<u>Fixed Fee</u>"). Owner and Administrator agree that an amount equal to the maximum amount of the Fixed Fee available in any given Contract Year shall be included in the Operating Budget for such Contract Year.

(ii)      Owner shall pay the Fixed Fee in monthly installments equal to (i) one-twelfth (1/12) of the Fixed Fee for a Contract Year of twelve (12) months or (ii) in the case of any partial Contract Year, an amount equal to one (1) divided by the number of months in such Contract Year. In the event of a partial month, the monthly installment shall be adjusted on a Pro Rata basis.

(iii)      On or prior to the tenth (10th) Business Day of each month of the Term, Operator shall submit to Administrator an invoice for the Fixed Fee payable in respect of the prior month. The invoice shall specify the monthly portion of the Fixed Fee for the relevant month, together with (A) the aggregate portion of the annual Fixed Fee paid through such month and (B) the accumulated payments to the date of such invoice. Owner shall pay the invoice by the last Business Day of the month on which the invoice was submitted. All invoices shall comply with the requirements set forth in Section 9.2(c) (*Anti-Corruption and Sanctions Laws – Policies and Procedures*) hereto.

(c)      <u>Incentive Fee</u>.

(i)      Based on Operator's ability to timely achieve or exceed the performance metrics set forth in Annex IX (*Performance Metrics*) (the "<u>Performance Metrics</u>"),

**CONFIDENTIAL**

Operator shall be entitled to earn the incentive fee in any given Contract Year ("Incentive Fee"), which fee shall be set forth in Annex VIII (*Service Fee*), adjusted on a Pro Rata basis for a partial Contract Year and calculated as set forth in Annex X (*Calculation of Incentive Fee*). Owner and Administrator agree that an amount equal to the maximum amount of the Incentive Fee available in any given Contract Year shall be included in the Operating Budget for such Contract Year.

(ii)     No later than sixty (60) days following the end of a Contract Year, Operator shall submit a report (the "Incentive Fee Report") to Administrator (with copy to PREB) with (A) supporting performance data, information and reports evidencing its achievement of one or more of the Performance Metrics and (B) based thereon, its good faith calculation of the proposed Incentive Fee, in each case for such Contract Year. The Incentive Fee Report shall comply with the requirements set forth in Section 9.2(c) (*Anti-Corruption and Sanctions Laws – Policies and Procedures*).

(iii)     Administrator shall have a period of sixty (60) days after receipt to review the Incentive Fee Report. During this period, Operator shall grant to Administrator reasonable access during normal business hours to all relevant personnel, Representatives of Operator, books and records of Operator and other items reasonably requested by Administrator in connection with the review of the Incentive Fee Report.

(iv)     If Administrator delivers to Operator a written statement describing any disagreements with the Incentive Fee Report during such sixty (60) day review period, then Operator and Administrator shall attempt to resolve in good faith any such disagreements. If (A) Administrator does not deliver such statement during such sixty (60) day review period (in which case it shall be deemed to have agreed with the Incentive Fee Report), (B) if Operator and Administrator reach a resolution with respect to such matters or (C) if Administrator has no disagreements with the Incentive Fee Report, then Owner shall pay the Incentive Fee in accordance with Section 7.1(c)(v) (*Service Fee – Incentive Fee*).

(v)     Once determined in accordance with Section 7.1(c)(iv) (*Service Fee – Incentive Fee*), Owner shall pay the Incentive Fee, or any portion thereof that is not subject to a Dispute, for a given Contract Year within ten (10) days of such determination and in any event within six (6) months following the end of the given Contract Year or, in the event of an early termination of this Agreement, six (6) months following the date of such termination.

(vi)     If any Major Outage Event (including, for the avoidance of doubt, a Major Outage Event that is a Force Majeure Event) prevents Operator from achieving one or more of the Performance Metrics, Operator shall be entitled to earn the Incentive Fee for the period that such Major Outage Event continues as long as, and to the extent that, Operator achieves the Major Outage Event Performance Metrics during such period of time.

(vii)     If any Force Majeure Event (other than a Force Majeure Event that is a Major Outage Event) prevents Operator from achieving one or more of the Performance Metrics, Operator shall be entitled to earn the Incentive Fee for the period that such Force Majeure Event continues as long as, and to the extent that, Operator achieves the Key Performance Metrics during such period of time.

CONFIDENTIAL

(viii)   If any Owner Fault or additional requirement imposed by Owner, Administrator or any other Governmental Body prevents Operator from achieving any Performance Metric, such Performance Metric shall be deemed to have been met for purposes of calculating the Incentive Fee for the applicable period.

(d)       Amendments to Performance Metrics. The Parties acknowledge and agree that PREB and Operator shall have the right to propose amendments to the Performance Metrics from time to time and that the Parties shall consider any proposed amendments in good faith (provided that such amendments do not reduce the likelihood of Operator's earning the Incentive Fee). In the event such an amendment is proposed, Operator shall prepare and submit to PREB proposed amended Performance Metrics, which amendment shall require and be subject to approval by PREB; provided that to the extent a new category of metrics is added or the methodology for calculating a given metric is modified as part of the amendment, a Tax Opinion and a Reliance Letter shall be obtained, at the cost of Owner or Administrator, with respect to any such amendment.

(e)       Service Fee Disputes. The Parties hereby agree that, in the event that a Dispute arises between Operator and Administrator in connection with the Service Fee (including any adjustments thereto as permitted by this Agreement), the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Service Fee Dispute").

### Section 7.2    Pass-Through Expenditures.

(a)       T&D Pass-Through Expenditures. For purposes of this Agreement, "T&D Pass-Through Expenditures" shall be the costs and expenses incurred by ServCo in the course of providing O&M Services pursuant to this Agreement (without markup for profit), including the costs and expenses set forth in Annex XI (*T&D Pass-Through Expenditures*); provided that T&D Pass-Through Expenditures shall not include any (i) Disallowed Costs, (ii) Generation Pass-Through Expenditures or (iii) costs payable by ManagementCo from the Fixed Fee pursuant to Section 7.1(a) (*Service Fee – Generally*). Operator shall pay T&D Pass-Through Expenditures in accordance with Section 7.5 (*Service Accounts*).

(b)       Generation Pass-Through Expenditures. For purposes of this Agreement, "Generation Pass-Through Expenditures" shall be the costs and expenses (without markup for profit) incurred by Owner in the course of providing Power and Electricity, including the costs and expenses under the GridCo-GenCo PPOA and Generation Supply Contracts. Subject to and conditioned on the Generation Expenditures Accounts being funded in accordance with Section 7.5(e) (*Service Accounts – Generation Expenditures Accounts*), Operator shall pay Generation Pass-Through Expenditures in accordance with Section 7.5 (*Service Accounts*).

### Section 7.3    Budgets.

(a)       Generally. For any Contract Year (other than the initial Contract Year, for which the procedures for the Initial Budgets set forth in Section 4.2(e) (*ManagementCo Responsibilities – Initial Budgets*) shall apply, or a year in which a rate adjustment approved by PREB enters into effect, in which case the Budgets used in connection with obtaining such rate

CONFIDENTIAL

adjustment shall be used), Operator shall, no later than ninety (90) days prior to the commencement of such Contract Year, submit to Administrator the proposed Budgets for such Contract Year; provided that if any proposed Budget requires a rate adjustment to be approved by PREB, Operator shall have the right, at its sole discretion, to submit the proposed Budgets for such Contract Year directly to PREB rather than to Administrator. As promptly as practicable in any Contract Year, and sufficiently in advance to allow Operator to comply with the ninety (90) day period set forth above, Owner shall prepare and deliver to Operator the Generation Budget for consolidation with the Operating Budget and the Capital Budgets submitted to Administrator. Administrator shall, acting reasonably, review such proposed Budgets to ensure compliance with the applicable Rate Order and Section 7.4 (*Budget Policy*). Within forty-five (45) days following its receipt of such Budgets, Administrator shall notify Operator whether the proposed Budgets are compliant with the applicable Rate Order and Section 7.4 (*Budget Policy*), and shall request, acting reasonably, any changes or modifications to the proposed Budgets to conform the proposed Budgets with the applicable Rate Order and Section 7.4 (*Budget Policy*). Administrator and Operator shall collaborate in good faith to resolve any differences with respect to such proposed Budgets as promptly as practicable.

(b)      Flexibility to Overrun. Each Budget shall include up to a maximum of two percent (2%) in excess of the total amount for excess expenditures that may arise in any Contract Year ("Excess Expenditures"); provided that such Excess Expenditures shall at all times be otherwise compliant with the applicable Rate Order. Any Excess Expenditures incurred by Operator during a Contract Year shall be treated as T&D Pass-Through Expenditures and as if initially budgeted for such Contract Year. Each reference herein to a Budget or Default Budget shall be deemed to include such Excess Expenditures to the extent such Excess Expenditures are incurred.

(c)      Flexibility to Reallocate. Operator shall have complete flexibility, subject to compliance with the Contract Standards and prior consultation with, but not subject to approval by, Administrator or PREB, to (i) reallocate, accelerate or postpone expenditures within the approved Operating Budget, (ii) reallocate, accelerate or postpone expenditures within the approved Capital Budget – Federally Funded, subject to the Federal Funding Requirements, and (iii) reallocate, accelerate or postpone expenditures within the approved Capital Budget – Non-Federally Funded, in each case, (x) in order to address changed operational or commercial circumstances or new legal or regulatory requirements and (y) in such a manner that the reallocations do not exceed five percent (5%) of the Budget in which such reallocations are made or the expenditures are not postponed for a period longer than one (1) year. Any such reallocated amounts shall be treated as if initially budgeted in the Budget in which such reallocations are made in all respects, including with respect to the associated Performance Metrics set forth in Annex IX (*Performance Metrics*).

(d)      Default Budget. In the event any Budget for a given Contract Year has not been finalized in accordance with Section 7.3(a) (*Budgets – Generally*) by July 1 of such Contract Year, the applicable approved Budget for the immediately preceding Contract Year (as the same may have been amended) as adjusted for inflation based on the CPI Factor (such Budget, a "Default Budget") shall remain in effect until such time as the applicable Budget for such Contract Year is so finalized.

CONFIDENTIAL

(e)      Amendments to Budgets. Operator may, from time to time, propose to amend the approved Operating Budget and Capital Budget for a given Contract Year, including to account for any for Federally Funded Capital Improvements that have been Obligated since the date the Capital Budget – Federally Funded then in effect was approved; provided that any such amendment shall be compliant with the applicable Rate Order. If, during a Contract Year, Operator becomes aware that T&D Pass-Through Expenditures or Generation Pass-Through Expenditures for such Contract Year are expected to exceed a Budget for such Contract Year (taking into account the allowances for Excess Expenditures), then (i) with respect to the Operating Budget and Capital Budget, Operator shall promptly notify PREB and Administrator and prepare and submit to PREB a proposed amended Operating Budget or Capital Budget for such Contract Year, as the case may be, which amendment shall require and be subject to approval by PREB, and (ii) with respect to the Generation Budget, (x) Operator shall notify PREB, Administrator and Owner and (y) Owner shall, as promptly as practical, prepare and submit to PREB a proposed amended Generation Budget, which amendment shall require and be subject to approval by PREB.

(f)      Budget Disputes. The Parties hereby agree that, in the event that a dispute arises between Operator, Owner and Administrator in connection with a Budget (including proposed amendments thereto or the need for amendments thereto), the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Budget Dispute"). The Parties acknowledge and agree that, in connection with a proposed Budget pursuant to Section 7.3(a) (*Budgets - Generally*) or an amended Budget pursuant to Section 7.3(e) (*Budgets – Amendments to Budgets*), Owner, Administrator and Operator shall have the right to present to PREB any Expert Technical Determination pursuant to Section 15.4 (*Expert Technical Determination Procedure for Technical Disputes*) with respect to a Budget Dispute; provided that this shall in no way (i) limit PREB's right to approve, deny or propose modifications to such proposed or amended Budgets or (ii) otherwise affect PREB's statutory rights and responsibilities under Applicable Law.

**Section 7.4      Budget Policy**. The Budgets and the related ServCo staffing levels for each Contract Year shall be designed to be adequate in both scope and amounts to reasonably assure that Operator is able to carry out the related O&M Services in accordance with the Contract Standards and have a reasonable opportunity to earn the Incentive Fee for achieving the Performance Metrics. The Parties further acknowledge and agree that, from time to time, it may be necessary or appropriate to amend or otherwise adjust the Performance Metrics or the Budgets as a result of (i) Force Majeure Events, (ii) Owner Fault, (iii) Outage Events or (iv) additional requirements imposed by Owner, Administrator or any other Governmental Body after approval of the Budgets, in the case of each of clauses (i) to (iv), which (A) have resulted (or are reasonably likely to result) in schedule delays or increased work scope or costs and (B) are not be attributable to Operator's gross negligence or willful misconduct. Operator shall provide notice to Administrator and PREB promptly following the occurrence of an event contemplated above and the Parties shall, in good faith and acting reasonably, consider necessary adjustments to the Performance Metrics or the Budgets that are based on rates that are reasonable and customary.

**Section 7.5     Service Accounts**.

(a)          Operating Account.

(i)          No later than ten (10) Business Days prior to the Service Commencement Date, Owner shall establish one or more operating accounts from which Operator shall draw funds from time to time to pay for T&D Pass-Through Expenditures actually incurred by Operator in performing the O&M Services and from which Owner shall pay the Service Fee (collectively, the "Operating Account"). Owner shall pay Operator the Service Fee in accordance with the terms of Section 7.1 (*Service Fee*) from funds available in the Operating Account.

(ii)          No later than ten (10) Business Days prior to the Service Commencement Date, Owner shall fund the Operating Account with an amount equal to the sum of (A) anticipated T&D Pass-Through Expenditures for the following four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*), based on the then-currently approved Operating Budget or the relevant Default Budget then in effect *plus* (B) the anticipated Service Fee for the following four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*). Thereafter, no later than the tenth (10th) Business Day of each month (beginning in the month following that in which the Service Commencement Date occurs), Owner shall replenish the Operating Account so as to maintain a funding level equal to the sum of anticipated T&D Pass-Through Expenditures for the subsequent four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*), under the Operating Budget or the relevant Default Budget then in effect and the anticipated Service Fee for the subsequent four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*).

(iii)          In each Contract Year, Operator shall be entitled to withdraw funds from the Operating Account for T&D Pass-Through Expenditures actually incurred under the approved Operating Budget or the relevant Default Budget then in effect; provided, however, that Operator shall notify Administrator in writing at least ten (10) Business Days in advance of any withdrawal related to any Excess Expenditure withdrawal, providing the details thereof and recommendations to mitigate any additional excess costs. Operator shall not withdraw funds from the Operating Account for T&D Pass-Through Expenditures that are not included in the then-currently approved Operating Budget or the relevant Default Budget then in effect; provided that such approval shall not be required in case of: (A) a Force Majeure Event, Owner Fault, Outage Event, Declared Emergency or Major Disaster; and (B) any circumstance, event or condition unforeseeable by Operator or which, if foreseeable, could not be avoided in whole or in part by the exercise of due diligence by Operator, requiring funding in excess of the amounts available for such matter in the then-currently approved Operating Budget or the relevant Default Budget then in effect and for which a prudent Person in the business of operating and managing the T&D System would expend funds prior to the time that the applicable Budget could reasonably be expected to be amended (including, by way of example, removal of trees having fallen on or otherwise damaged T&D System transmission and distribution lines); provided further, however, that Operator shall (x) notify Administrator in writing promptly upon Operator becoming aware of the occurrence of such circumstance, event or condition and (y) provide the details of such circumstance, event or condition and the amount of any withdrawal related thereto that Operator intends to make from the Operating Account.

CONFIDENTIAL

(iv)     Simultaneous with each withdrawal of funds from the Operating Account, Operator shall provide Administrator with written notice of such withdrawal, including a summary of T&D Pass-Through Expenditures being paid. Not later than ten (10) Business Days following each month end, Operator shall furnish Administrator with a full accounting setting forth in reasonable detail the T&D Pass-Through Expenditures actually incurred and paid during the prior month.

(b)     <u>Capital Account – Federally Funded</u>.

(i)     No later than ten (10) Business Days prior to the Service Commencement Date, Owner shall establish one or more capital accounts from which Owner shall draw funds from time to time, in accordance with the Federal Funding Procurement Manual, to pay Operator, as agent of Owner, for the cost of Federally Funded Capital Improvements ("<u>Capital Costs – Federally Funded</u>") related to the O&M Services (collectively, the "<u>Capital Account – Federally Funded</u>").

(ii)     Owner shall fund the Capital Account – Federally Funded with any or both of (A) Federal Funding received for the T&D System and (B) proceeds from any other financings or funds of Owner the use of which are designated for Capital Costs – Federally Funded.

(iii)     Prior to Operator commencing any Federally Funded Capital Improvement on behalf of Owner: (A) Owner shall ensure that either (x) the Capital Account – Federally Funded contains funds equal to the sum of anticipated Capital Costs – Federally Funded for Federally Funded Capital Improvements that have been Obligated and scheduled as of such date in accordance with the Federal Funding Requirements for the following four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*) based on the then-currently applicable and approved Capital Budget – Federally Funded or the relevant Default Budget then in effect, or (y) a credit facility reasonably acceptable to Operator is available to be drawn for Federally Funded Capital Improvements; and (B) Operator shall ensure that such Federally Funded Capital Improvement is within the approved scope consistent with the Federal Funding Requirements. Thereafter, no later than the tenth (10th) Business Day of each month, Owner shall replenish the Capital Account – Federally Funded so as to maintain a funding level equal to, or ensure the availability of a credit facility in an amount equal to or greater than, the sum of anticipated Capital Costs – Federally Funded for Federally Funded Capital Improvements that have been Obligated and scheduled as of such date in accordance with the Federal Funding Requirements for the subsequent four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*), under the Capital Budget – Federally Funded or the relevant Default Budget then in effect.

(iv)     In each Contract Year, Owner shall be entitled to withdraw funds from the Capital Account – Federally Funded to reimburse costs for Capital Costs – Federally Funded actually incurred under the approved Capital Budget – Federally Funded or the relevant Default Budget then in effect. Subject to Section 5.14(b) (*Emergency Action – Emergencies*), without the prior written approval of Administrator, which approval shall not be unreasonably withheld, delayed or conditioned, Owner shall not withdraw funds from the Capital Account – Federally Funded for Capital Costs – Federally Funded that are not included in the then-currently approved Capital Budget – Federally Funded or the relevant Default Budget then in effect.

CONFIDENTIAL

(v)     Not later than ten (10) Business Days following each month end during which Operator received funds withdrawn from the Capital Account – Federally Funded, Operator shall furnish Administrator with a full accounting setting forth in reasonable detail the Capital Costs – Federally Funded actually incurred and paid during the prior month.

(c)     <u>Capital Account – Non-Federally Funded</u>.

(i)     No later than ten (10) Business Days prior to the Service Commencement Date, Owner shall establish one or more capital accounts from which Operator shall draw funds, from time to time, to pay for the cost of Non-Federally Funded Capital Improvements ("<u>Capital Costs – Non-Federally Funded</u>") related to the O&M Services (collectively, the "<u>Capital Account – Non-Federally Funded</u>").

(ii)     Owner shall fund the Capital Account – Non-Federally Funded with any or both of (A) proceeds from draws on financing provided by Operator or its Affiliates, on terms to be agreed on by Operator and Owner and (B) proceeds from any other financings or any funds of Owner the use of which are designated for Capital Costs – Non-Federally Funded.

(iii)     Prior to Operator commencing any Non-Federally Funded Capital Improvement, Owner shall ensure that the Capital Account – Non-Federally Funded contains funds equal to the sum of anticipated Capital Costs – Non-Federally Funded for the following four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*), based on the then-currently approved Capital Budget – Non-Federally Funded or the relevant Default Budget then in effect. Thereafter, no later than the tenth (10th) Business Day of each month, Owner shall replenish the Capital Account – Non-Federally Funded so as to maintain a funding level equal to the sum of anticipated Capital Costs – Non-Federally Funded for the subsequent four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*), under the Capital Budget – Non-Federally Funded or the relevant Default Budget then in effect.

(iv)     In each Contract Year, Operator shall be entitled to withdraw from the Capital Account – Non-Federally Funded funds for Capital Costs – Non-Federally Funded actually incurred under the approved Capital Budget – Non-Federally Funded or the relevant Default Budget then in effect; <u>provided</u>, <u>however</u>, that Operator shall notify Administrator in writing at least ten (10) Business Days in advance of any Excess Expenditure withdrawal, together with the details thereof and recommendations for mitigating any additional excess costs. Subject to Section 5.14(b) (*Emergency Action – Emergencies*), without the prior written approval of Administrator, which approval shall not be unreasonably withheld, delayed or conditioned, Operator shall not withdraw from the Capital Account – Non-Federally Funded funds for Capital Costs – Non-Federally Funded that are not included in the then-currently approved Capital Budget – Non-Federally Funded or the relevant Default Budget then in effect.

(v)     Simultaneous with each withdrawal of funds from the Capital Account – Non-Federally Funded, Operator shall provide Administrator with written notice of such withdrawal, including a summary of Capital Costs – Non-Federally Funded being paid. Not later than ten (10) Business Days following each month end during which funds were withdrawn from the Capital Account – Non-Federally Funded, Operator shall furnish Administrator with a

CONFIDENTIAL

full accounting setting forth in reasonable detail the Capital Costs – Non-Federally Funded actually incurred and paid during the prior month.

    (d)    <u>Outage Event Reserve Account</u>.

    (i)    No later than ten (10) Business Days prior to the Service Commencement Date, Owner shall establish one or more Outage Event Reserve Accounts from which Operator shall draw funds from time to time to pay for costs in connection with an Outage Event ("<u>Outage Event Costs</u>") incurred by Operator (collectively, the "<u>Outage Event Reserve Account</u>").

    (ii)    No later than ten (10) Business Days prior to the Service Commencement Date, Owner shall fund the Outage Event Reserve Account with an amount equal to US$30,000,000. Promptly following a withdrawal, Owner shall replenish the Outage Event Reserve Account so as to maintain an amount equal to US$30,000,000.

    (iii)    Subject to the terms of this Section 7.5(d) (*Service Accounts – Outage Event Reserve Account*), Operator shall be entitled to withdraw funds from the Outage Event Reserve Account from time to time as necessary to fund payment for Outage Event Costs. Simultaneous with each such withdrawal, Operator shall provide Administrator with written notice of such withdrawal, including a summary of Outage Event Costs being paid. Not later than ten (10) Business Days following each month end during which funds were withdrawn from the Outage Event Reserve Account, Operator shall furnish Administrator with a full accounting setting forth in reasonable detail the Outage Event Costs actually incurred and paid during the prior month.

    (e)    <u>Generation Expenditures Accounts</u>.

    (i)    No later than ten (10) Business Days prior to the Service Commencement Date, Owner shall establish one or more generation expenditures accounts from which Operator shall draw funds from time to time to pay for actual Generation Pass-Through Expenditures, including:

    (A)    a Purchased Power Account from which Operator shall draw funds from time to time to pay for operation and management expenses incurred in connection with the GridCo-GenCo PPOA, any expenses incurred in connection with the Shared Services Agreement and any expenses incurred in connection with the Generation Supply Contracts, as applicable (the "<u>Purchased Power Account</u>"); and

    (B)    a Fuel Account from which Operator shall from time to time pay fuel supply expenses incurred in connection with the GridCo-GenCo PPOA and expenses incurred in connection with any fuel supply arrangement between GridCo and GenCo, as applicable (the "<u>Fuel Account</u>," and together with the Purchased Power Account and any other generation expenditure accounts, the "<u>Generation Expenditures Accounts</u>").

    (ii)    No later than ten (10) Business Days prior to the Service Commencement Date, Owner shall fund the Purchase Power Account with an amount equal to anticipated, applicable Generation Pass-Through Expenditures for the following two (2) months,

CONFIDENTIAL

subject to Section 7.8 (*Owner Credit Rating*), based on the then-currently approved Generation Budget or the relevant Default Budget then in effect. Thereafter, no later than the tenth (10th) Business Day of each month (beginning in the month following that in which the Service Commencement Date occurs), Owner shall replenish the Purchased Power Account so as to maintain a funding level equal to the sum of anticipated, applicable Generation Pass-Through Expenditures for the subsequent two (2) months, subject to Section 7.8 (*Owner Credit Rating*), under the Generation Budget or the relevant Default Budget then in effect. Owner shall fund the Fuel Account with an amount to be determined in accordance with the minimum working capital level set forth under the GridCo-GenCo PPOA and any fuel supply arrangement between GridCo and GenCo, as applicable.

(iii)     In each Contract Year, Operator shall be entitled to withdraw funds from the Generation Expenditures Accounts for Generation Pass-Through Expenditures actually incurred under the approved Generation Budget or the relevant Default Budget then in effect. Operator shall not withdraw funds from the Generation Expenditures Accounts for Generation Pass-Through Expenditures that are not included in the then-currently approved Generation Budget or the relevant Default Budget then in effect; provided that such approval shall not be required in case of any circumstance, event or condition unforeseeable by Operator or which, if foreseeable, could not be avoided in whole or in part by the exercise of due diligence by Operator, requiring funding in excess of the amounts available for such matter in the then-currently approved Generation Budget or the relevant Default Budget then in effect and for which a prudent Person in the business of operating and managing the T&D System would expend funds prior to the time that the applicable Budget could reasonably be expected to be amended; provided further, however, that Operator shall (x) notify Administrator in writing promptly upon Operator becoming aware of the occurrence of such circumstance, event or condition and (y) provide the details of such circumstance, event or condition and the amount of any withdrawal related thereto that Operator intends to make from the Generation Expenditures Account.

(iv)     Simultaneous with each withdrawal of funds from the Generation Expenditures Accounts, Operator shall provide Administrator with written notice of such withdrawal, including a summary of Generation Pass-Through Expenditures being paid. Not later than ten (10) Business Days following each month end, Operator shall furnish Administrator with a full accounting setting forth in reasonable detail the Generation Pass-Through Expenditures actually incurred and paid during the prior month.

(f)     Contingency Reserve Account.

(i)     No later than ten (10) Business Days prior to the Service Commencement Date, Owner shall establish an account (the "Contingency Reserve Account") from which Operator shall be entitled to draw funds from time to time in the event that at any time during the Term there are insufficient funds in the Operating Account, Capital Account – Federally Funded, Capital Account – Non Federally Funded, Outage Event Reserve Account or Generation Expenditures Accounts to pay for T&D Pass-Through Expenditures, Capital Costs, Outage Event Costs or Generation Pass-Through Expenditures (any such event, a "Funding Shortage")

(ii)     No later than the tenth (10th) Business Day of each month (beginning in the month in which the Service Commencement Date occurs) Owner shall fund the Contingency

CONFIDENTIAL

Reserve Account in an amount equal to 1/24 of the Contingency Reserve Amount, until such time as the Contingency Reserve Account is funded to the level of the Contingency Reserve Amount; provided that if, in any given month, Owner does not have sufficient funds to fund the Contingency Reserve Account in the required amount, the failure to so fund shall not constitute a default hereunder if Owner promptly funds the Contingency Reserve Account to the level that would have been maintained in the Contingency Reserve Account had no such insufficiencies occurred as soon as Owner has sufficient funds to do so.

(iii)      From time to time, Operator shall be entitled to withdraw such amounts of funds from the Contingency Reserve Account as is necessary to address a Funding Shortage; provided, however, that Operator shall (A) notify Administrator in writing immediately upon Operator becoming aware of a Funding Shortage and (B) provide the details of such Funding Shortage and the amount of any withdrawal that Operator intends to make from the Contingency Reserve Account.

(iv)      Following a withdrawal from the Contingency Reserve Account, Owner shall replenish the Contingency Reserve Account by depositing no later than the tenth (10th) Business Day of each month (beginning in the month following that in which the withdrawal occurred) an amount equal to 1/24 of the Contingency Reserve Amount until such time as the Contingency Reserve Account is funded to the level of the Contingency Reserve Amount; provided that if, in any given month, Owner does not have sufficient funds to fund the Contingency Reserve Account in the required amount, the failure to so fund shall not constitute a default hereunder so long as the Contingency Reserve Account is topped up to the level at which it should be in at any given point as soon as Owner has sufficient funds to do so.

(g)      Service Account Disputes. The Parties hereby agree that, in the event that a dispute arises in connection with a Service Account, the Front-End Transition Account or the Back-End Transition Account, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Service Account Dispute").

(h)      Withdrawals by Owner. Owner shall not withdraw funds held in (i) any Service Account (other than from the Operating Account for payment of the Service Fee due to Operator), (ii) the Front-End Transition Account (other than for payment of the Front-End Transition Service Fee due to Operator) or (iii) the Back-End Transition Account (other than for payment of the Back-End Transition Service Fee due to Operator), in each case without Administrator's and Operator's prior written approval.

### Section 7.6    Disallowed Costs.

(a)      Generally. Subject to the limitations on liability in Section 18.3 (*Limitation on Liability*), none of the following shall be treated as T&D Pass-Through Expenditures for purposes of payment from Owner to Operator, and each shall be the sole responsibility of Operator (collectively, "Disallowed Costs"):

(i)      any and all T&D Pass-Through Expenditures, Capital Costs, Outage Event Costs or Excess Expenditures incurred as a result of Operator's negligence (including gross negligence) or willful misconduct, except in connection with Section 5.10 (*Environmental, Health*

CONFIDENTIAL

*and Safety Matters*) where the applicable standard shall be gross negligence or willful misconduct to the extent provided therein;

(ii)     any and all fines, penalties or other similar payments or charges imposed by PREB on Operator, except to the extent Operator is performing its obligations under this Agreement in accordance with this Agreement; and

(iii)     other than as a result of Owner Fault, any and all Losses resulting from a denial by FEMA, HUD or a similar Governmental Body (such as COR3 or PRDH) of reimbursement of all or a portion of Capital Costs – Federally Funded on the grounds that actions taken by Operator were in violation of any Federal Funding Requirements, which denial becomes final, except that any Capital Costs – Federally Funded that were incurred in accordance with the Federal Funding Procurement Manual or approved by FEMA shall not be treated as a Disallowed Cost.

(b)     <u>Disallowed Costs Disputes</u>. The Parties hereby agree that, in the event that a dispute arises in connection with Disallowed Costs, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "<u>Disallowed Costs Dispute</u>"). In such event, Operator may continue to withdraw such T&D Pass-Through Expenditures from the applicable Service Account; <u>provided</u> Operator shall be responsible to reimburse Owner promptly (and in any event within five (5) Business Days) any T&D Pass-Through Expenditures that are determined to be Disallowed Costs pursuant to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*).

**Section 7.7    Unfunded Amounts**. Notwithstanding anything contained in this Agreement to the contrary, the Parties acknowledge and agree that Operator shall have no obligation or responsibility to incur or pay any costs or make expenditures in providing the O&M Services hereunder (other than Disallowed Costs) to the extent any of the Service Accounts do not contain sufficient funds to pay such costs and expenditures. Without limiting Operator's termination rights hereunder, and except to the extent Operator exercises its rights to cease providing the O&M Services pursuant to Section 14.4 (*Termination for Owner Event of Default*), to the extent sufficient funds are not available for withdrawal by Operator from the Service Accounts, the Front-End Transition Account or the Back-End Transition Account, as applicable, Operator shall take reasonable measures to maintain the continuity of the O&M Services in accordance with the Contract Standards to the extent possible in the absence of its receipt of such sufficient funding.

**Section 7.8    Owner Credit Rating**.

(a)     <u>Investment Grade Rating</u>. Notwithstanding anything contained in this Agreement to the contrary, the Parties acknowledge and agree that to the extent (i) any direct obligations of any Owner or any of its Affiliates or successors secured by System Revenues are assigned an Investment Grade Rating or (ii) any direct obligations of the Securitization SPV secured by System Revenues are assigned a rating of AA or the equivalent, in each case by two or more of the Rating Agencies, then (A) the level of pre-funding required pursuant to Section 4.6(c)(i) (*Front-End Transition Period Compensation – Funding*), Section 7.5(a)(ii) (*Service Account – Operating Account*), Section 7.5(b)(iii) (*Service Account – Capital Account –*

CONFIDENTIAL

*Federally Funded*), Section 7.5(c)(iii) (*Service Account – Capital Account – Non-Federally Funded*), Section 7.5(e)(ii) (*Service Account – Generation Expenditures Accounts*) and Section 16.4(c)(ii) (*Back-End Transition Period Compensation – Funding*) shall be reduced from four and a half (4.5) months to three (3) months and (B) there shall be no further obligation to deposit funds into the Contingency Reserve Account. Any funds that are released from any Service Account as a result of the operation of this Section 7.8(a) (*Owner Credit Rating – Investment Grade Rating*) shall, at Owner's sole discretion, be used for the repayment of existing debt of Owner, refunds to T&D Customers or other similar purposes.

(b)     Reinstatement of Pre-Funding. If at any time, (i) any direct obligations of any Owner or any of its Affiliates or successors secured by System Revenues are downgraded from an Investment Grade Rating by any Rating Agency that had provided an Investment Grade Rating or (ii) any direct obligations of the Securitization SPV secured by System Revenues are downgraded from a rating of AA or the equivalent by any Rating Agency that had provided such rating (in each case, a "Rating Downgrade"), then (A) the level of pre-funding required pursuant to Section 4.6(c)(i) (*Front-End Transition Period Compensation – Funding*), Section 7.5(a)(ii) (*Service Account – Operating Account*), Section 7.5(b)(iii) (*Service Account – Capital Account – Federally Funded*), Section 7.5(c)(iii) (*Service Account – Capital Account – Non-Federally Funded*), Section 7.5(e)(ii) (*Service Account – Generation Expenditures Accounts*) and Section 16.4(c)(ii) (*Back-End Transition Period Compensation – Funding*) shall be increased from three (3) months to four and a half (4.5) months and (B) the obligation to deposit funds into the Contingency Reserve Account pursuant to Section 7.5(f) (*Service Accounts – Contingency Reserve Account*) shall be reinstated; provided that if Owner does not have sufficient funds to fund Front-End Transition Account, the Service Accounts or the Back-End Transition Account in the required amount, the failure to so fund shall not constitute a default hereunder so long as the Front-End Transition Account, the Service Accounts and the Back-End Transition Account are topped up to the level at which it should be at any given point as soon as Owner has sufficient funds to do so and in any event within six (6) months of the date of the Rating Downgrade.

**Section 7.9    Owner Payment of Administrator Costs**. Owner shall be solely responsible for all costs and expenses of Administrator in connection with the performance of Administrator's obligations under this Agreement, and shall pay or reimburse Administrator promptly for any out-of-pocket or third-party costs and expenses.

CONFIDENTIAL

# ARTICLE 8
## CREDIT SUPPORT

**Section 8.1** **Guarantee**. Operator shall cause the Guarantee to be provided on or prior to the Effective Date and maintained thereafter throughout the Term.

**Section 8.2** **Guarantor Reports**. While any Guarantee is outstanding, Operator shall deliver to Administrator (with copy to PREB): (i) within sixty (60) days after the end of the second quarter of a Guarantor's fiscal year, a copy of the unaudited balance sheets of such Guarantor at the end of each such period and the related unaudited statements of income, changes in equity and cash flows for each such period, in a manner and containing information consistent with such Guarantor's current practices; and (ii) within one hundred twenty (120) days after the end of such Guarantor's fiscal year, a copy of the audited balance sheets of such Guarantor at the end of each such fiscal year, and the related audited statements of income, changes in equity and cash flows for such fiscal year, including, in each case, the notes thereto, in each case prepared in accordance with generally accepted accounting principles consistently applied in the United States (or the equivalent jurisdiction of such Guarantor), together with a certificate from such Guarantor's chief financial officer that such financial statements fairly present, in all material respects, the financial condition and the results of operations, changes in equity and cash flows of such Guarantor as at the respective dates of and for the periods referred to in such financial statements, all in accordance with generally accepted accounting principles in the United States (or the equivalent jurisdiction of such Guarantor) consistently applied. Such financial statements shall reflect the consistent application of such accounting principles throughout the periods involved, except as disclosed in the notes to such financial statements. In addition to the foregoing, Operator shall provide an opinion thereon of an independent public accountant of national stature in the United States (or the equivalent jurisdiction of such Guarantor) engaged by such Guarantor. If applicable, Operator shall also furnish Administrator copies of the quarterly and annual reports of Guarantor(s) filed with the U.S. Securities and Exchange Commission or with any other comparable international securities regulatory agency.

CONFIDENTIAL

# ARTICLE 9
# COMPLIANCE WITH APPLICABLE LAW

**Section 9.1    Compliance Obligations**. Operator shall perform, and shall cause all Contractors and Subcontractors to perform, the O&M Services in accordance with the Contract Standards and Applicable Law.

**Section 9.2    Anti-Corruption and Sanctions Laws**.

(a)    Anti-Corruption. Neither Operator, its subsidiaries, nor, when acting on behalf of Operator or its subsidiaries, any director or officer or employee of Operator or its subsidiaries, nor, in connection with this Agreement or the O&M Services, any Affiliates of Operator shall violate, conspire to violate, aid and abet the violation of any anti-bribery, anti-corruption or anti-money laundering law or regulation, including Act 2 and any other laws or regulation related to political activity, conflicts of interest, embezzlement, the misuse of public funds, or property or bidding on or otherwise seeking government contracts (collectively, the "Anti-Corruption Laws"). No funds transferred by Owner to Operator shall be transferred by Operator, directly or indirectly, in violation of any Anti-Corruption Laws. Operator acknowledges and agrees that it shall be subject to Title III of Act 2, known as the Code of Ethics for Subcontractors, Suppliers and Applicants for Economic Incentives of the Government of Puerto Rico.

(b)    Sanctions. Neither Operator, its subsidiaries or Parent Company, nor any director or officer of Operator, its subsidiaries or Parent Company are Sanctioned Persons or are located, organized or resident in a Sanctioned Country. Neither Operator nor its subsidiaries, nor any director, or officer or employee of Operator, its subsidiaries (when acting on behalf of Operator or its subsidiaries), shall directly or, knowingly, indirectly, engage in any transactions or business activity of any kind with a Sanctioned Person or a Person located, organized or resident in a Sanctioned Country. No funds transferred by Owner to Operator or its subsidiaries shall be transferred by Operator or its subsidiaries, directly or indirectly, to a Sanctioned Person, a Person located, organized or resident in a Sanctioned Country, or in violation of Sanctions.

(c)    Policies and Procedures. Operator and its subsidiaries shall maintain and implement policies, procedures and controls reasonably designed to ensure compliance by Operator and its subsidiaries with the Anti-Corruption Laws and Sanctions. Operator shall include in all invoices to Administrator a written certification substantially in the form of Exhibit C (*Form of Anti-Corruption Certification*), and acknowledges that any invoice not including such certification shall not be accepted by Administrator. Operator shall require any Contractors and Subcontractors engaged by Operator to execute at the commencement of the Contract or Subcontract (i) a Sworn Statement and (ii) a certification substantially in the form of Exhibit C (*Form of Anti-Corruption Certification*).

(d)    Notice. Operator shall promptly notify Administrator in writing in accordance with Section 20.2 (*Notices*) if, to Operator's knowledge, Operator, its subsidiaries, any director, officer or employee of Operator or its subsidiaries, or, in connection with this Agreement or the O&M Services, any Affiliates of Operator becomes subject to any investigation by law enforcement or regulatory authorities in connection with the Anti-Corruption Laws or Sanctions.

CONFIDENTIAL

**Section 9.3**     **Commonwealth Requirements**.

(a)     Practice of Engineering, Architecture and Other Professions in the Commonwealth. To the extent that performance of the O&M Services involves performance of architectural, engineering, land surveying and landscape architecture services governed by Act No. 173 of the Legislative Assembly of Puerto Rico, enacted on August 12, 1988 ("Act 173"), then (i) Operator shall comply (and shall require Contractors and Subcontractors or agents, if any, to comply) with Act 173 and (ii) Operator shall require that its Subcontractors and agents comply with Act 173.

(b)     Contractor and Supplier Contracts. To the extent permitted by Applicable Law, Operator shall include the provisions of this Article 9 (*Compliance with Applicable Law*) and Exhibit B (*Form of Commonwealth Certifications*) in every Contract, Subcontract and supply contract in order for such provisions to be binding on each Contractor, Subcontractor or supplier.

(c)     Local Goods and Services. As required by Article 10 of Act No. 14 of the Legislative Assembly of Puerto Rico, enacted on January 8, 2004, Operator shall use commercially reasonable efforts to use, to the extent available and applicable to the services provided hereunder, and to the extent permitted by Applicable Law and the Federal Funding Requirements, goods extracted, produced, assembled, packaged, bottled or distributed in the Commonwealth by businesses operating in the Commonwealth or distributed by agents established in the Commonwealth.

**Section 9.4     Non-Discrimination Laws**. Operator shall comply with all Applicable Law regarding non-discrimination.

**Section 9.5     Non-Collusion and Acceptance**. Operator attests, subject to the penalties for perjury, that no Representative of Operator, directly or indirectly, to the best of Operator's knowledge, entered into or offered to enter into any combination, conspiracy, collusion or agreement to receive or pay any sum of money or other consideration for the execution of this Agreement other than that which is expressly set forth in this Agreement.

**Section 9.6     Commonwealth Tax Liabilities**. Operator shall inform Administrator if, at any time during the Term, there are any material tax disputes with any Governmental Body of the Commonwealth (other than Commonwealth Tax liabilities for which Operator is not responsible under this Agreement, if any).

**Section 9.7     Certifications Required by Commonwealth Contractor Requirements**. Operator has (i) certified that it has complied and is in compliance with the provisions of the Public-Private Partnerships Authority's Ethical Guidelines and (ii) delivered the Sworn Statement upon execution hereof.

**Section 9.8     Duty to Inform of Criminal Investigations**. Operator shall inform Administrator if, at any time during the Term, it becomes aware that it is subject to investigation in connection with criminal charges related to acts of corruption, the public treasury, the public trust, a public function or charges involving public funds or property.

CONFIDENTIAL

**Section 9.9     Act 120**. Pursuant to Section 5(f) of Act 120 and subject to the provisions of this Agreement, Operator shall at all times comply with the public policy and regulatory framework applicable to the T&D System.

CONFIDENTIAL

## ARTICLE 10
## INSURANCE

**Section 10.1   Insurance Generally**. From the Service Commencement Date and for the remainder of the Term thereafter, and for such additional periods as may be specified, Operator shall maintain in effect, and cause any Contractor and Subcontractor performing any of the O&M Services to maintain in effect, for the benefit of Owner and Operator, as applicable, the insurance policies and limits of coverage specified in Annex XII (*Insurance Specifications*), and such additional coverage (i) as may be required by Applicable Law and (ii) that a prudent Person in the business of operating and managing the T&D System would maintain (the "Required Insurance"), and shall provide insurance management services, including placing insurance with carriers, and claims management and processing, as more fully described in Annex I (*Scope of Services*). All Required Insurance shall be in a form reasonably acceptable to Administrator and shall only be issued by generally recognized financially responsible insurers that (x) are authorized to do business in the Commonwealth or are otherwise authorized or permitted by the Office of the Commissioner of Insurance of Puerto Rico and (y) at a minimum have a rating of A(VIII) or better by A.M. Best Company or an equivalent rating by another similarly recognized insurance rating agency (unless Administrator consents to waive this requirement). All premiums, deductibles, and other fees, costs and expenses (including uninsured Losses that are not Disallowed Costs and losses in excess of insurance) shall be T&D Pass-Through Expenditures.

**Section 10.2   Commercial Availability**. Notwithstanding anything to the contrary herein, if any Required Insurance policy shall not be available at commercially reasonable rates, Operator shall promptly notify Administrator, in writing, but in no event less than sixty (60) days prior to the expiration of any Required Insurance and Operator shall have the right to request that Administrator consent to waive such requirement, which consent shall not be unreasonably withheld, delayed or conditioned. In the event that any Required Insurance policy is not available at commercially reasonable rates, as reasonably determined by Administrator, and Administrator consents to waive such requirement**,** any such waiver shall be effective only for so long as such insurance shall not be available at commercially reasonable rates; provided that during the period of such waiver, (i) Operator shall maintain the maximum amount of such insurance otherwise available at commercially reasonable rates and (ii) Administrator shall have the right to seek alternative coverage acceptable to Administrator. During the period of any such waiver, any loss that would otherwise have been insured shall be treated as a T&D Pass-Through Expenditure, and the Parties shall consider appropriate adjustments to the Budgets in accordance with Section 7.4 (*Budget Policy*). If Administrator elects to purchase alternative coverage for the period of such waiver (x) Operator shall use its commercially reasonable efforts to ensure that Administrator is able to timely obtain such coverage and (y) any excess cost of such alternative coverage shall be treated as a T&D Pass-Through Expenditure.

**Section 10.3   Additional Named Insureds**. Operator, Operator Indemnitees and Owner shall be included as additional named insureds, where commercially applicable and pertinent to the coverage, including as provided in Annex XII (*Insurance Specifications*), along with waivers of subrogation, breach of warranties or separation of insureds and contractual liability endorsements on any Required Insurance policies, which policies shall require thirty (30) days prior written notice to Administrator by Operator prior to the effective date of any change in or non-renewal or cancellation of such policies. Insurance coverage required pursuant to this

CONFIDENTIAL

Section 10.3 (*Additional Named Insureds*) shall be maintained with generally recognized financially responsible insurers that (i) are authorized to do business in the Commonwealth or are otherwise authorized or permitted by the Office of the Commissioner of Insurance of Puerto Rico and (ii) at a minimum have a rating of A(VIII) or better by A.M. Best Company or an equivalent rating by another similarly recognized insurance rating agency (unless Administrator consents to waive this requirement). In addition, Operator shall be named as a "loss payee" for each of the policies of insurance contemplated herein and shall be entitled to receive all proceeds of the Required Insurance. In the event of a Loss relating to the O&M Services, the T&D System or any T&D System Site, Owner shall open an account in which to deposit any proceeds of insurance for any such Losses (the "Insurance Proceeds Account"). If Operator receives any proceeds of insurance for any Losses relating to the O&M Services, the T&D System or any T&D System Site, Operator shall deposit such amounts into the Insurance Proceeds Account within three (3) Business Days of receipt of such proceeds. If Owner receives any proceeds of insurance for any Losses relating to the O&M Services, the T&D System or any T&D System Site, Owner shall hold such amounts in trust, for the benefit of Operator, and Owner shall deposit such amounts in the Insurance Proceeds Account within three (3) Business Days following the request of Operator. Funds in the Insurance Proceeds Account shall be used to remediate the T&D System in a manner consistent with Prudent Utility Practice and reasonably approved by Administrator.

**Section 10.4   Warranties**. Operator shall maintain and enforce any warranties or guarantees on any facilities, vehicles, equipment or other items owned or leased by Owner (to the extent made known to Operator), or purchased or leased on behalf of Owner and used by Operator in performing O&M Services under this Agreement. Operator shall not, by act or omission, negligently or knowingly invalidate in whole or part such warranties or guarantees without the prior approval of Administrator, such approval not to be unreasonably withheld, delayed or conditioned.

**Section 10.5   Certificates of Insurance, Policies and Notice**. Operator shall supply Administrator with copies of certificates of insurance promptly following issuance by the insurers. Not later than sixty (60) days prior to the beginning of each Contract Year following the Service Commencement Date and for the remainder of the Term thereafter, Operator shall furnish certificates of insurance to Administrator to confirm the continued effectiveness of the Required Insurance. Whenever a Contractor or Subcontractor is utilized, Operator shall either obtain and maintain on behalf of the Contractor or Subcontractor, or require the Contractor or Subcontractor to obtain and maintain, insurance in accordance with the applicable requirements of Annex XII (*Insurance Specifications*). Administrator's receipt of certificates that do not comply with the requirements stated herein, or Operator's failure to provide certificates, shall not limit or relieve Operator of the duties and responsibility of maintaining insurance in compliance with the requirements in this Article 10 (*Insurance*) and shall not constitute a waiver of any of the requirements in this Article 10 (*Insurance*).

CONFIDENTIAL

# ARTICLE 11
## SUBCONTRACTORS AND CONTRACTORS

**Section 11.1    Ability to Subcontract and Contract**.

(a)    <u>Subcontractors Generally</u>. Operator shall have the right, but not the obligation, to engage Subcontractors to perform the O&M Services, subject to Section 11.1(c) (*Ability to Subcontract and Contract – Federally Funded Capital Improvements*) in the case of Federally Funded Capital Improvements. Operator's payment obligations under any Subcontract shall be a T&D Pass-Through Expenditure (except to the extent Operator elects to subcontract any service to be provided by ManagementCo between the Service Commencement Date and the expiration or early termination of this Agreement, in which case any such payment obligation shall be paid by ManagementCo from the Fixed Fee). Operator shall provide Administrator (with copy to PREB) with a list of Subcontractors that Operator has engaged or intends to engage for the performance of any of the O&M Services the cost of which is expected to exceed US$10,000,000 per year or US$30,000,000 in the aggregate (each a "<u>Material Subcontractor</u>"). Administrator shall have the right to approve any Material Subcontractor engaged by Operator to perform any O&M Services, which approval shall not be unreasonably withheld, delayed or conditioned. ServCo shall be required to update such list on or about the fifth (5th) Business Day of each Contract Year. Operator shall ensure that: (i) any Subcontractor engaged by it exercises due diligence in the performance of the services subcontracted to such Subcontractor; (ii) any Subcontractor performing O&M Services shall be a licensed professional with experience in the performance of the work subcontracted to it; and (iii) Administrator receives any information that it reasonably requests in respect of any Subcontractor.

(b)    <u>Contractors Generally</u>. Operator shall have the right, but not the obligation, to engage Contractors as agent for Owner to perform the O&M Services, subject to Section 11.1(c) (*Ability to Subcontract and Contract – Federally Funded Capital Improvements*) in the case of Federally Funded Capital Improvements. Owner's payment obligations under any Contract shall be a T&D Pass-Through Expenditure. Operator shall provide Administrator (with copy to PREB) with a list of Contractors that Operator has engaged or intends to engage for the performance of any of the O&M Services the cost of which is expected to exceed US$10,000,000 per year or US$30,000,000 in the aggregate ("<u>Material Contractor</u>"). Administrator shall have the right to approve any Material Contractor engaged by Operator to perform any O&M Services, which approval shall not be unreasonably withheld, delayed or conditioned. ServCo shall be required to update such list on or about the fifth (5th) Business Day of each Contract Year. Operator shall ensure that: (i) any Contractor engaged by it exercises due diligence in the performance of the services subcontracted to such Subcontractor; (ii) any Contractor performing O&M Services shall be a licensed professional with experience in the performance of the work subcontracted to it; and (iii) Administrator receives any information that it reasonably requests in respect of any Contractor. Operator agrees that any Contractors engaged to perform O&M Services shall be required to comply with the applicable provisions of the Federal Funding Procurement Manual or Non-Federal Funding Procurement Manual, as applicable. For the avoidance of doubt, as permitted by Section 6(d)(ii) of Act 120, Operator, as agent for Owner, may engage Contractors to perform the O&M Services in a manner consistent with the Procurement Manuals notwithstanding any procurement requirements that would otherwise be applicable to Owner under Act No. 83 of May 2, 1941 (including any rules or regulations issued thereunder).

CONFIDENTIAL

(c)　　　Federally Funded Capital Improvements. Owner acknowledges and agrees that Operator may hire Contractors, as agent for and on behalf of Owner, to perform any Federally Funded Capital Improvements; provided that any Contracts related to the performance of any Federally Funded Capital Improvement shall comply with the Federal Funding Requirements, including the requirements described in the Federal Funding Procurement Manual and any competitive bidding processes required for the award of any such Contracts.

(d)　　　Non-Federally Funded Capital Improvements. Owner acknowledges and agrees that Operator may hire Contractors, as agent for and on behalf of Owner, to perform any Non-Federally Funded Capital Improvements; provided that any Contracts related to the performance of any Non-Federally Funded Capital Improvement shall comply with the Non-Federal Funding Procurement Manual.

**Section 11.2　Subcontract and Contract Terms**. A Tax Opinion and a Reliance Letter shall be obtained, at the expense of Owner or Administrator, with respect to any Subcontract or Contract that is entered into, extended or amended and is a Covered Contract. Operator shall use commercially reasonable efforts to ensure that all agreements with third-parties entered into after the Service Commencement Date in its own name or as agent for Owner that are material to Operator's performance of its obligations hereunder grant Owner or a Person designated by Administrator the right to own or license the goods and services to be provided thereunder. All contracts entered into with Subcontractors by Operator or with Contractors by Operator as agent for Owner, and all warranties and other rights related thereto, with respect to the T&D System shall be assignable to Administrator or a Person designated by Administrator, solely at Administrator's election and without cost or penalty, at the end of the Term or upon early termination of this Agreement, and each Subcontractor and Contractor shall acknowledge in writing the rights of Administrator to take such assignments. Operator shall be responsible for settling and resolving with all Subcontractors and Contractors all claims arising out of delay, disruption, interference, hindrance or schedule extension caused by Operator or inflicted on Operator or a Subcontractor or a Contractor by the actions of another Subcontractor or Contractor.

**Section 11.3　Indemnity for Subcontractor Claims**. Operator shall retain full responsibility to Owner and Administrator under this Agreement for all matters related to the O&M Services notwithstanding the execution or terms and conditions of any Subcontract. Subject to the limitations on liability set forth in Section 18.3 (*Limitation on Liability*), no failure of any Subcontractor used by Operator in connection with the provision of the O&M Services shall relieve Operator from its respective obligations hereunder to perform the O&M Services. Subject to Section 7.6 (*Disallowed Costs*) and Section 7.7 (*Unfunded Amounts*), Operator shall pay when due all undisputed claims and demands of Subcontractors, mechanics, materialmen, laborers and others for any work performed on, or materials delivered for incorporation into any part of, the T&D System by or on behalf of Operator, and shall promptly discharge all mechanics', materialmen's and other construction Liens registered against the T&D System. All such costs (other than Disallowed Costs) shall be treated as T&D Pass-Through Expenditures. No Subcontractor shall have any right against Owner or Administrator for labor, services, materials or equipment furnished after the Service Commencement Date for the O&M Services. Operator acknowledges that its indemnity obligations under Section 18.1 (*Indemnification by Operator*) shall extend to all claims for payment or damages by any Subcontractor that furnishes or claims to

**CONFIDENTIAL**

have furnished any labor, services, materials or equipment in connection with the O&M Services after the Service Commencement Date.

CONFIDENTIAL

# ARTICLE 12
## TAXATION

**Section 12.1   Withholding Tax**. Owner shall be entitled to (i) deduct and withhold (or cause to be deducted or withheld) from any consideration payable or otherwise deliverable pursuant to this Agreement, such amounts as may be required to be deducted or withheld therefrom under any provision of the U.S. federal, state, Commonwealth, municipal, local or non-U.S. Tax law or under any applicable legal requirement and (ii) request any necessary Tax forms or information, from Operator or any other Person to whom a payment is required to be made pursuant to this Agreement. To the extent such amounts are so deducted or withheld and paid to the applicable taxing authority, such amounts shall be treated for all purposes under this Agreement as having been paid to the Person to whom such amounts would otherwise have been paid. The Parties agree to cooperate in good faith to reduce or eliminate the amount of any applicable withholding Taxes. In the event any withholding Taxes are paid by Owner in respect of amounts payable to Operator, Owner shall use commercially reasonable efforts to provide Operator (x) receipts or other evidence of payment of such withholding taxes and (y) all informative statements required by Applicable Law.

**Section 12.2   Tax Obligations**.

(a)   <u>Payment of Taxes</u>. Operator and each of its subsidiaries shall prepare and timely file, or cause to be prepared and filed at its cost, all Tax Returns required to be filed by it under any Applicable Law and shall pay any Taxes required to be paid by it under Applicable Law (whether or not shown as due on such Tax Returns). Such Tax Returns shall be true, correct and complete in all material respects.

(b)   <u>Exemption from Taxes</u>. During the Term, Operator shall not be responsible for, and Operator and the T&D System shall not be subject to, (i) any real property Tax imposed on or measured by the value of the T&D System (including any real property constituting part of the T&D System) that is imposed by any Governmental Body of the Commonwealth or that is imposed on the "owner" of the T&D System (including relating to future expenditures for real property) or (ii) any personal property tax that is imposed by any Governmental Body of the Commonwealth on property owned by Owner and used by Operator exclusively for the T&D System or for the services or functions subject to this Agreement, all of which shall be obligations of Owner, if and to the extent any such Taxes are payable.

(c)   <u>Tax Deductions</u>. Operator and each of its subsidiaries shall comply with all applicable withholding, employment, social security and similar provisions of applicable U.S. federal, state, Commonwealth, municipal, local and foreign laws, and timely withhold and pay all Taxes that it is required to withhold and pay from any Person, including its employees and independent contractors. Owner shall not make any such withholdings or deductions on behalf of Operator.

CONFIDENTIAL

# ARTICLE 13
## INTELLECTUAL PROPERTY; PROPRIETARY INFORMATION

**Section 13.1   Intellectual Property**.

(a)      Operator Intellectual Property, Contractor Intellectual Property and Subcontractor Intellectual Property. Any Intellectual Property owned by or licensed to Operator, its Affiliates, a Contractor or a Subcontractor, that is (i) used in the performance of the O&M Services or in connection with the T&D System and (ii) is embedded in or otherwise necessary for the use of the Work Product (as defined herein) or for the operation of the T&D System, but which does not constitute "Work Product", shall remain the Intellectual Property of the owner thereof, and shall be referred to, as the case may be, as "Operator Intellectual Property" (if owned by, or licensed to, Operator or its Affiliates), "Contractor Intellectual Property" (if owned by, or licensed to, a Contractor) or "Subcontractor Intellectual Property" (if owned by, or licensed to, Subcontractor). Operator Intellectual Property and Subcontractor Intellectual Property include all derivatives and improvements thereto or therein (other than those constituting Work Product). For the sake of clarity, "improvements" means all developments and improvements Operator, its Affiliates or Subcontractors may make with respect to their Intellectual Property, respectively, and "derivatives" means any work based on or derived from one or more already existing works. Notwithstanding the foregoing, for certainty, Operator Intellectual Property, Contractor Intellectual Property and Subcontractor Intellectual Property do not include Third-Party Intellectual Property.

(b)      License of Operator Intellectual Property, Contractor Intellectual Property, and Subcontractor Intellectual Property. Except as Administrator and Operator may otherwise mutually agree, Operator and its Affiliates hereby grant to Owner, and shall cause its Affiliates to grant to Owner, a perpetual, non-exclusive, fully paid-up, royalty-free license and sublicense, under Operator Intellectual Property, Subcontractor Intellectual Property and Contractor Intellectual Property (as the case may be) solely in connection with the T&D System and related facilities and their related operations (including the O&M Services) by or on behalf of Owner or any successors or operators thereto to (i) make, have made, use, sell, offer for sale, export or import any product, service or apparatus and practice any method, and (ii) use, reproduce, distribute, perform, display, execute and create derivative works in any medium or format, whether now known or later developed, in connection with any of the foregoing. Owner shall not and shall ensure that its Affiliates do not sublicense, rent, lease, distribute or otherwise authorize the use of Operator Intellectual Property, Contractor Intellectual Property or Subcontractor Intellectual Property to, by or on behalf of anyone other than Owner and its Affiliates, any successors or operators thereto or any other third-party with whom Owner, its Affiliates or any successors or operators thereto contract solely for purposes of operating the T&D system and related facilities. Operator Intellectual Property and Subcontractor Intellectual Property are Operator Confidential Information to the extent disclosed to Owner and for so long as they are protectable as trade secrets or are otherwise confidential. Contractor Intellectual Property is Owner Confidential Information for so long as the information is protectable as trade secrets or are otherwise confidential.

(c)      Third-Party Intellectual Property. Operator shall use commercially reasonable efforts to ensure that any Third-Party Intellectual Property is sublicensable to Owner under terms substantially similar to those obtained by Operator for the use thereof in connection

CONFIDENTIAL

with the T&D System and related facilities and their related operations. The use of Third-Party Intellectual Property shall be subject to the license terms governing the use of such Intellectual Property. To the extent Operator wishes to use any non-commercially available Intellectual Property of any third-party in the provision of the O&M Services, the Front-End Transition Services or the Back-End Transition Services, Operator shall identify to Administrator, in writing in advance of any use of any such Intellectual Property, whether or not Operator has a right to sublicense same to Owner under the same terms as those of the foregoing license requirements.

(i)    If, despite using commercially reasonable efforts, Operator cannot secure such license or sublicense rights, then Operator shall (A) assist Owner in obtaining any necessary license directly from such third-party or (B) pursue licensing of a non-infringing alternative capable of accomplishing the same purpose in substantially the same manner, and, in the case of clause (A) and (B), Operator shall not use such Third-Party Intellectual Property or such alternative prior to Owner obtaining a sufficient license thereto.

(ii)    In no event shall Operator's inability to obtain a right to license or sublicense any non-commercially available Intellectual Property of any third-party excuse Operator's inability to perform or meet any deadline under this Agreement. Any applicable license of Operator or its Affiliates in connection with any non-commercially available third-party Intellectual Property relevant to the provision of the O&M Services, the Front-End Transition Services or the Back-End Transition Services hereunder shall be subject to Administrator's prior approval; provided that such approval shall not be unreasonably withheld, delayed or conditioned, and a complete copy of such licenses shall be provided to Administrator. Operator shall be excused for performance hereunder only to the extent such performance is impacted by Administrator's unreasonable withholding, conditioning or delaying of such approval. For the avoidance of doubt, nothing in this Section 13.2(c)(ii) (*Intellectual Property – Third Party Intellectual Property*) shall be interpreted to require Operator to infringe any Third-Party Intellectual Property.

(d)    Work Product.

(i)    The Parties hereby acknowledge and agree that, as between them, Owner shall own all right, title and interest in and to (A) all Intellectual Property, and derivatives thereof, regardless of format, created or produced in the performance of the O&M Services, the Front-End Transition Services or the Back-End Transition Services by Operator and its Affiliates if the cost of such creation or development is a T&D Pass-Through Expenditure and (B) to the extent the applicable third-party contracts so provide, any such Intellectual Property created by any of their Contractors or Subcontractors in connection therewith (collectively, "Work Product"), all of which shall, to the fullest extent under Copyright law, be considered works made for hire. For the avoidance of doubt, Work Product shall not include: (x) any Intellectual Property created or produced (A) prior to the Effective Date, (B) outside the performance of the O&M Services, the Front-End Transition Services or the Back-End Transition Services or (C) if the cost of such creation or development is not a T&D Pass-Through Expenditure; and (y) Operator Intellectual Property, Subcontractor Intellectual Property Contractor Intellectual Property or Third-Party Intellectual Property (which for certainty, includes all derivatives or improvements thereto or therein the cost of which is not a T&D Pass-Through Expenditure).

110

CONFIDENTIAL

(ii)     Unless otherwise agreed by the Parties, to the extent that ownership in any Work Product does not automatically vest in Owner, Operator shall transfer and assign, and shall cause its Affiliates to transfer and assign, and shall use commercially reasonable efforts to cause any Contractors or any of its or their Subcontractors to transfer and assign, and Operator does hereby assign all right, title and interest (including all Intellectual Property) in and to such Work Product to Owner. Operator shall, and shall cause its Affiliates and shall use commercially reasonable efforts to cause any applicable Contractors or Subcontractors, to execute all documents and take all actions requested by Administrator to transfer such ownership and otherwise assist Owner to register, patent and otherwise maintain and protect Owner's Intellectual Property rights in and to such Work Product anywhere in the world.

(iii)     Operator shall (A) use commercially reasonable efforts to ensure that relevant contracts with Contractors or Subcontractors properly reflect Owner's ownership of Work Product, and (B) in any event, ensure that contracts with Contractors or Subcontractors properly reflect the grant of licenses from such Contractors or Subcontractors (and Operator's right to sublicense) pursuant to Section 13.1(b) (*Intellectual Property – License of Operator Intellectual Property, Contractor Intellectual Property or Subcontractor Intellectual Property*) or, where Operator is not a party to the agreement with the respective Contractor, use commercially reasonable efforts to ensure where relevant that the contract between Owner and the Contractor includes a license from the Contractor to Owner of a scope consistent with the license granted in Section 13.1(b) (*Intellectual Property – License of Operator Intellectual Property, Contractor Intellectual Property or Subcontractor Intellectual Property*). For the avoidance of doubt, to the extent Operator arranges for a Contractor to perform any of its obligations under this Agreement, Operator shall negotiate terms of such contract that comply with, and are in accordance with, the terms of this paragraph. If any Contractor or Subcontractor refuses to include such a provision in a relevant contract, Operator shall notify Administrator in writing and, at Administrator's request, provided such request does not contravene Federal Funding Requirements, Operator shall not use such Contractor or Subcontractor for the provision of the O&M Services, the Front-End Transition Services or the Back-End Transition Services; provided that any increase in costs arising therefrom shall be deemed approved by Owner and Administrator as a T&D Pass-Through Expenditure so long as Operator uses commercially reasonable efforts to minimize such increase in costs.

(iv)     Operator shall promptly and fully disclose in writing to Owner all patentable Work Product and shall deliver to Owner all other Work Product created during the Term. Upon notification, Owner shall have the right, at its sole discretion and sole cost and expense, to patent such Work Product (the resulting Patents shall be "Owner Patents"); provided that such patenting shall not result in a disclosure of any of Operator, Contractor or Subcontractor's Confidential Information. Pursuant to this Section 13.1(d) (*Intellectual Property – Work Product*), Operator shall provide all necessary assistance for Owner to obtain, sustain and, from time to time, enforce such Owner Patents. The cost of such assistance shall be a T&D Pass-Through Expenditure.

(v)     Notwithstanding the foregoing, Owner acknowledges that nothing in this Agreement is intended to prevent Operator from developing, researching, or distributing any products or offerings similar to, and separate from, any Work Product developed for Owner. To the extent required to avoid Operator being prevented from using such Intellectual Property, Owner hereby grants to Operator a royalty-free, paid-up, non-exclusive, irrevocable, perpetual

CONFIDENTIAL

license to (A) use, make, have made, sell, offer to sell, import, and further sublicense such Intellectual Property, and (B) reproduce, distribute, create derivative works of, publicly perform and publicly display such Intellectual Property in any medium or format, whether now known or later developed, solely provided that Owner shall not be required under this Section to deliver to Operator any such Intellectual Property that is not Work Product. Operator acknowledges that nothing in this Agreement is intended to prevent Owner from developing, researching, or distributing any products or offerings similar to any such items developed by Operator.

(e)       License of Owner Intellectual Property. Subject to the terms and conditions of this Agreement, Owner hereby grants, and shall cause its Affiliates to grant, to Operator and its Affiliates a fully paid-up, royalty-free, nonexclusive, non-transferable, sub-licensable (only to Subcontractors), limited license and sublicense, under the Owner Intellectual Property and, to the extent sub-licensable, Owner Licensed Intellectual Property, during the Term, to: (i) use, sell, offer for sale, export or import any product, service or apparatus and practice any method, and (ii) use, reproduce, distribute, perform, display, execute and create derivative works, in the case of each of clause (i) and (ii), solely as necessary for Operator and its Affiliates to perform their obligations pursuant to this Agreement. The use of Owner Licensed Intellectual Property shall be subject to the license terms governing the use of such Intellectual Property. To the extent any Owner Licensed Intellectual Property cannot be licensed to Operator or its Affiliates, their Subcontractors or any Contractors for any reason, and where such Owner Licensed Intellectual Property is reasonably required for the performance of this Agreement, then Operator or its Affiliates, their Subcontractors or any Contractors shall promptly obtain their own third-party license for the relevant Intellectual Property at Owner's sole cost and expense.

(i)       Operator shall not and shall ensure that its Affiliates do not sublicense, rent, lease, distribute or otherwise authorize the use of Owner Intellectual Property or Owner Licensed Intellectual Property to, by or on behalf of anyone other than Operator and its Affiliates and Subcontractors or any Contractors, for the sole purpose of this Agreement, and otherwise shall not use Owner Intellectual Property or Owner Licensed Intellectual Property for any other purpose.

(ii)       Any sublicensee of Operator or any of its Affiliates with respect to Owner Intellectual Property or Owner Licensed Intellectual Property shall be approved in advance in writing by Administrator, such approval shall not be unreasonably withheld, delayed or conditioned. Unless Administrator otherwise agrees, sublicensee shall expressly agree in writing to be bound by any applicable terms of this Agreement. Operator shall be responsible for compliance by all of its Affiliates, and shall take commercially reasonable steps to ensure the Contractors' and Subcontractors' compliance, with the terms and conditions of this Section 13.1 (*Intellectual Property*) as if undertaken by Operator.

(iii)       Operator agrees to use commercially reasonable efforts to enforce, and shall cause all of its Affiliates to enforce, the terms of any sublicense agreement with respect to Owner Intellectual Property or Owner Licensed Intellectual Property against the sublicensee. It is understood and agreed, however, that Owner shall be a third-party beneficiary of all sublicense agreements relating to Owner Intellectual Property and Owner Licensed Intellectual Property, with the power to enforce relevant terms directly against any sublicensee. Each sublicense shall include

CONFIDENTIAL

a provision that, in the event this Agreement terminates, at Administrator's option, the sublicense shall become a direct license with Owner or Owner's designees.

(iv)    If Operator or any of its Affiliates becomes aware of any infringement or unauthorized use of Owner Intellectual Property or Owner Licensed Intellectual Property, then Operator shall promptly notify and shall cause its Affiliates to promptly notify Administrator thereof in writing and shall provide commercially reasonable assistance and cooperation as may be requested by Administrator, but at Owner's sole cost and expense. Any sublicense entered into between Operator or any of its Affiliates and a Contractor or Subcontractor pursuant to this Agreement with respect to Owner Intellectual Property or Owner Licensed Intellectual Property shall contain a notification provision consistent with the foregoing.

(v)    Reverse Engineering and Other Restrictions. Each Party shall not, and shall ensure that its Affiliates do not, and shall take commercially reasonable efforts to ensure that the Contractors and Subcontractors do not: (A) decompile, disassemble, decrypt or reverse engineer or attempt to reconstruct or discover any source code or underlying ideas or algorithms of any Software that is part of any Intellectual Property owned or licensed by the other Party, or provide any third-party with access to any such Software (including any source code therein) without the other Party's advance written consent, which may be withheld, delayed or conditioned in such Party's sole discretion; (B) except to the extent permitted under this Agreement or by Applicable Law, remove, alter or obscure any product identification, copyright or other intellectual property notices embedded within or on the Intellectual Property; or (C) publish, disclose, sell, rent, lease, lend, distribute, sublicense or provide Intellectual Property of the other Party to any third party, except as expressly permitted herein.

(f)    Owner Trademark License Grant. Notwithstanding the terms and conditions of Section 13.1(g) (*Intellectual Property – Branding; Customer and Public Communications*), and subject to the other terms and conditions of this Agreement, Owner hereby grants to Operator a fully paid-up, royalty-free, nonexclusive, non-transferable, sub-licensable (to Affiliates and Subcontractors of Operator or any Contractors), limited license for a period of one hundred and eighty (180) days following the Service Commencement Date of this Agreement (provided that, upon Operator's request, Owner shall not unreasonably withhold its consent to extend such 180-day period if Operator requires such extension for purposes of the rebranding described below) to use the Owner Marks to perform its obligations hereunder in accordance with the terms and conditions of this Agreement; provided that Operator rebrands the O&M Services to a mark that is not confusingly similar to any of the Owner Marks. Such license shall be subject to the following:

(i)    The Owner Marks are owned solely and exclusively by Owner, and all use of the Owner Marks by Operator, its Affiliates and any Contractor or Subcontractor, and all goodwill associated with the Owner Marks, shall inure to the benefit of Owner.

(ii)    Operator shall adhere, and shall use commercially reasonable efforts to cause its Affiliates and Subcontractors and any Contractors to adhere, to all quality control standards and trademark usage guidelines as established from time to time by Owner and Administrator, including as relating to the review and approval of any proposed new uses of the Owner Marks by Operator in connection with the O&M Services, the Front-End Transition

CONFIDENTIAL

Services or the Back-End Transition Services (such as any advertising or marketing campaigns). Subject to the System Remediation Plan, Operator shall and shall use commercially reasonable efforts to cause its Affiliates and Subcontractors and any Contractors to: (A) comply with Applicable Law in performing the services under the Owner Marks; (B) refrain from any actions that would harm the reputation of Owner or otherwise cause Owner or its Affiliates to fall into disrepute; and (C) not modify the Owner Marks, or file for any registration or application (including domain names or social media handles) using, incorporating or confusingly similar to any Owner Marks, other than with the prior consent of Owner (in which case any such registrations or applications shall be deemed Work Product hereunder and be deemed used solely under license from and under permission by Administrator during the term of this Agreement).

(iii)     Operator shall, and shall cause its Affiliates to, police any permitted sublicensee's use of the Owner Marks, promptly notify Administrator in writing of any noncompliance, and enforce the terms of the sublicense agreement relating to the Owner Marks against such sublicensee at Operator's own expense. It is understood and agreed, however, that Owner shall be a third-party beneficiary of all sublicense agreements relating to the Owner Marks, with the power to enforce the terms of this Section 13.1(f) (*Intellectual Property – Owner Trademark License Grant*) directly against any sublicensee.

(iv)     If Operator or any of its Affiliates learns of any infringement or unauthorized use of the Owner Marks, then Operator shall promptly notify Administrator in writing and shall provide commercially reasonable assistance and cooperation as may be requested by Administrator, at Owner's cost and expense.

(g)     Branding; Customer and Public Communications.

(i)     Commencing no later than the Service Commencement Date, the Operator and its management shall become publicly associated with the T&D System for the Term. To that end, the Operator Marks shall within one hundred and eighty (180) days of the Service Commencement Date, and for the duration of the Term, replace the Owner Marks, including on all signage, customer bills, vehicles, equipment, uniforms, letterhead, and on utility-related communications, advertisements, public announcements, websites and similar areas and the Operator shall have full authority to determine policies and procedures with respect to the use of the Operator Marks. Upon the expiration or earlier termination of this Agreement, the Operator Marks shall, as promptly as practicable and in any event within one hundred and eighty (180) days, be removed from the aforementioned areas, and all rights to the Operator Marks granted by the Operator to Owner (or to any entity other than the Operator and its Affiliates) under this Agreement, including any licenses or sublicenses with respect thereto, subject to the foregoing phase-out period, shall terminate, in each case unless otherwise agreed to in writing by the Operator.

(ii)     The Operator shall have direct responsibility for media and other public communications on all utility related matters, including communications with public officials and local municipalities and counties regarding storm preparation, management, coordination and response, customer communications, programs and complaints and related matters. Accordingly, the Operator shall have authority to determine communications policies and procedures relating to its provision of O&M Services under this Agreement; provided that

CONFIDENTIAL

Administrator may elect to review and approve (i) official press releases and (ii) statements to the media concerning Owner or any of its employees.

(iii)    Operator shall use the Operator Marks to perform its obligations hereunder in accordance with the terms and conditions of this Agreement, including with respect to the O&M Services, the Front-End Transition Services or the Back-End Transition Services (including any advertising or marketing campaigns).

(iv)    The Operator Marks are owned solely and exclusively by Operator. None of Owner, Administrator or any of their respective Affiliates shall use any of the Operator Marks without the written agreement of Operator. Upon request of Administrator, prior to the expiration or early termination of this Agreement, Operator shall be responsible for re-branding the T&D System to an Owner Mark or another trademark designated by Administrator, as part of the Back-End Transition Services.

(h)    _Other_. Notwithstanding anything to the contrary in this Agreement, any non-compliance, error or mistake of any Party with respect to any of its obligations under Section 5.15 (_Information_) or this Section 13.1 (_Intellectual Property_) shall not constitute an event of default or a breach under this Agreement if such non-compliance, error or mistake is (i) inadvertent, (ii) does not have, or would not reasonably be expected to have, a material and adverse effect on the performance by any Party of its obligations under this Agreement and (iii) is cured within thirty (30) days of such Party becoming aware of such non-compliance, error or mistake, or such longer period as may be required in light of the System Remediation Plan.

(i)    _Feedback_. Each Party may from time to time provide suggestions, comments or other feedback ("Feedback") to the other Party regarding the Intellectual Property of the Party receiving the Feedback. Each Party agrees that all Feedback is and shall be given entirely voluntarily. Feedback, even if designated as confidential by the Party offering Feedback, shall not, absent a separate written agreement, create any confidentiality obligation for the receiver of the Feedback. Furthermore, except as otherwise provided in a separate subsequent written agreement between the Parties, the receiver of the Feedback shall be free to use, disclose, reproduce, license or otherwise distribute, and exploit the Feedback provided to it, royalty free, entirely without obligation or restriction of any kind on account of intellectual property rights or otherwise.

**Section 13.2   Proprietary Information**.

(a)    Confidentiality Obligation.

(i)    Subject to the remainder of this Section 13.2 (_Proprietary Information_), any and all written, recorded or oral System Information furnished or made available in connection with this Agreement, or that constitutes Work Product, shall be deemed "Owner Confidential Information". Work Product shall be deemed Owner Confidential Information with respect to which Operator shall be deemed to be the receiving Party and Owner shall be deemed to be the disclosing Party. "Operator Confidential Information" includes Confidential Information pertaining to Operator Intellectual Property, Contractor Intellectual Property or Subcontractor Intellectual Property, or to Operator's policies and strategies. Confidential Information shall not include any of the foregoing that: (A) is when furnished, or thereafter becomes, available to the

CONFIDENTIAL

public other than as a result of a disclosure by the receiving Party or its Representatives; (B) is already in the possession of or become available to the receiving Party or its Representatives on a non-confidential basis from a source other than the disclosing Party or its Representatives; provided, that to the actual knowledge of the receiving Party or its Representatives, as the case may be, such source is not and was not bound by an obligation of confidentiality to the disclosing Party or its Representatives; or (C) the receiving Party or its Representatives can demonstrate has been independently developed without a violation of this Agreement.

(ii)     Subject to the remainder of this Section 13.2 (*Proprietary Information*), each receiving Party shall, and shall cause its Representatives to, (A) keep strictly confidential and take reasonable precautions to protect against the disclosure of all Confidential Information of the disclosing Party, and (B) use all Confidential Information of the disclosing Party solely for the purposes of performing its obligations under the Transaction Documents and not for any other purpose; provided, that:

(A)     a receiving Party may disclose Confidential Information of the disclosing Party to those of its Representatives who need to know such information for the purposes of performing the receiving Party's obligations under this Agreement if, but only if, prior to being given access to such Confidential Information, such Representatives are informed of the confidentiality thereof and the requirements of this Agreement and are obligated to comply with the requirements of this Agreement;

(B)     the foregoing shall not limit any rights or licenses granted under Article 13 (*Intellectual Property; Proprietary Information*); provided that the licensee shall treat any Confidential Information included in such license in a manner consistent with this Section 13.2 (*Proprietary Information*) and in any event with the same care as it would treat its own comparable information, acting reasonably; and

(C)     each Party shall be responsible for any breach of this Agreement by its Representatives.

(iii)     Operator may designate conspicuously any documents or other materials that it believes contain privileged, trade secret, commercially sensitive or other information that may be exempted from disclosure in response to a public records request under applicable Public Information Disclosure Requirements by placing "CONFIDENTIAL" in the header or footer of such page or record affected.

(b)     Permitted Disclosures.

(i)     Subject to the terms of this Section 13.2 (*Proprietary Information*), each receiving Party may disclose Confidential Information of the disclosing Party to a duly authorized Governmental Body where required to do so by Applicable Law. None of the Parties shall have any liability whatsoever to the other Party in the event of any unauthorized use or disclosure by a Governmental Body of any Confidential Information of another Party to the extent such disclosure was required by Applicable Law and was in accordance with the requirements of this Section 13.2 (*Proprietary Information*).

CONFIDENTIAL

(ii)     Subject to the terms of this Section 13.2 (*Proprietary Information*), each Party may disclose Confidential Information of the other Party to the extent necessary to comply with any subpoena or order of any Commonwealth Court or other judicial entity having jurisdiction over the receiving Party, or in connection with a discovery or data request of a party to any proceeding before any of the foregoing.

(iii)    For the avoidance of doubt, nothing is this Agreement shall prevent Administrator from disclosing Owner Confidential Information in its sole discretion; <u>provided</u> that Administrator shall not disclose Operator Intellectual Property, to the extent constituting Confidential Information, unless specifically authorized under this Section 13.2 (*Proprietary Information*). Additionally, nothing is this Agreement shall prevent Operator from disclosing Operator Confidential Information in its sole discretion; <u>provided</u> that Operator shall not disclose any Confidential Information derived from or embodying Owner Intellectual Property, to the extent confidential, unless specifically authorized under this Section 13.2 (*Proprietary Information*).

(c)     <u>Duty to Seek Protection</u>. To the extent permitted under Applicable Law:

(i)      if a request is made for disclosure of any document or other materials (A) that have been designated by Operator as "CONFIDENTIAL" or (B) which Owner, in exercising reasonable judgment, determines is likely to contain privileged, trade secret, commercially sensitive or other information of Operator, its Affiliate or Subcontractors or any Contractors then Owner shall notify Operator if it intends to disclose any such documents in accordance with Applicable Law, including any applicable Public Information Disclosure Requirements;

(ii)     in connection with requests or orders to produce Confidential Information protected by this Agreement in the circumstances provided in Section 13.2(b) (*Proprietary Information – Permitted Disclosures*), each Party receiving such a request or order (A) shall promptly notify the disclosing Party of the existence, terms and circumstances of such requirement(s) so that the disclosing Party may seek an appropriate protective order or waive compliance with the provisions of this Agreement, and (B) shall, and shall cause its Representatives to, cooperate fully with the disclosing Party in seeking to limit or prevent such disclosure of such Confidential Information; and

(iii)    if a receiving Party or its Representatives are, in the written opinion of its legal counsel, and notwithstanding compliance with Section 13.2(c)(i) (*Proprietary Information – Duty to Seek Protection*) compelled to make disclosure of Confidential Information of a disclosing Party in response to a requirement described in Section 13.2(c)(i) (*Proprietary Information – Duty to Seek Protection*) or stand liable for contempt or suffer other penalty, the compelled Person may disclose only that portion of such Confidential Information that it is legally required to disclose and shall exercise its best efforts to obtain reliable assurance that confidential treatment shall be accorded to such Confidential Information.

(d)     <u>Ownership and Return of Information</u>. Subject to the remainder of this Section 13.2 (*Proprietary Information*), Confidential Information shall be and remain the property of the Party disclosing it. Nothing in this Agreement shall be construed as granting any rights in

117

or to Confidential Information to the Party or Representatives receiving it, except the right to use it in accordance with the terms of this Agreement. Notwithstanding the foregoing, the Parties and Administrator shall have the right to retain copies of Confidential Information, subject to the confidentiality obligations in this Section 13.2 (*Proprietary Information*).

(e)     Public Information Disclosure Requirements-Related Obligations.

(i)     Operator acknowledges and agrees that any documents or other materials relating to this Agreement in Owner's possession may be considered public information subject to disclosure in accordance with applicable Public Information Disclosure Requirements. Operator shall then have the opportunity to either consent to the disclosure or assert its basis for non-disclosure and claimed exception under Applicable Law to Owner within the time period specified in the notice issued by Owner. Notwithstanding the foregoing, it is the responsibility of Operator to monitor requests for disclosure issued by Owner and related proceedings and make timely filings. Owner may make filings of its own concerning possible disclosure; provided, however, Owner shall be under no obligation to support Operator's positions.

(A)     By entering this Agreement, Operator consents to, and expressly waives any right to contest, the provision by Owner to Owner's counsel of all or any part of any documents or materials in Owner's possession in accordance with the Public Information Disclosure Requirements. Owner shall have no responsibility or obligation for Operator's failure to respond or to respond timely to any request for disclosure in accordance with the Public Information Disclosure Requirements, and other than the obligations of Owner expressly stated hereunder, Owner shall not be required, except where required under Applicable Law, to wait for a response before making a disclosure or otherwise taking action under the Public Information Disclosure Requirements.

(B)     Under no other circumstances shall Owner be responsible or liable to Operator or any other party as a result of disclosing any such documents or materials, including materials marked "CONFIDENTIAL", where the disclosure is required by Applicable Law or by an order of court.

(ii)     Nothing contained in this Section 13.2(e) (*Proprietary Information – Public Information Disclosure Requirements-Related Obligations*) shall modify or amend requirements and obligations imposed on Owner by the Public Information Disclosure Requirements, and the provisions of the Public Information Disclosure Requirements shall control to the extent of a conflict with the procedures under this Agreement or Owner's obligations with respect to Confidential Information. Owner shall not advise a submitting party or Operator as to the nature or content of documents or materials that may be entitled to protection from disclosure under the Public Information Disclosure Requirements, as to the interpretation thereof, or as to relevant definition (e.g., "trade secret").

(iii)     In the event of any proceeding or litigation concerning the disclosure of any documents or other materials in accordance with the Public Information Disclosure Requirements to third-parties, Owner's sole involvement shall be as a stakeholder retaining the material until otherwise ordered by a Commonwealth Court or other court or authority having jurisdiction. Operator shall be responsible for prosecuting or defending any action, acting on its

own behalf, concerning such documents or materials at its sole expense and risk; provided, however, that Owner may intervene or participate in the litigation in such manner as it deems necessary or desirable.

(f)　　　Customer Information. Notwithstanding anything contained in this Section 13.2 (*Proprietary Information*) or otherwise in this Agreement to the contrary, the Parties agree that Operator shall not, and shall ensure that Operator Related Parties do not, use or disclose any Owner Personal Information except as required in the performance of this Agreement or as otherwise directed by Administrator in accordance with Applicable Law or as may be required by Applicable Law.

(g)　　　Owner Confidential Information. Notwithstanding anything to the contrary in this Agreement, System Information shall be deemed Confidential Information of Owner. For certainty, such information shall not include any information comprising Operator Intellectual Property, Contractor Intellectual Property, Subcontractor Intellectual Property or Third-Party Intellectual Property.

(h)　　　Independent Development; Residuals. The disclosing Party acknowledges that the receiving Party may currently or in the future be developing information independently, or receiving information from other parties, that is similar or identical to the Confidential Information provided by the disclosing Party. Accordingly, nothing in this Agreement shall be construed as a representation or agreement that the receiving Party shall not develop or have developed for itself products, concepts, systems or techniques that are similar to or compete with the products, concepts, systems or techniques contemplated by or embodied in the Confidential Information, provided that the receiving Party does not violate any of its obligations under this Agreement in connection with such development. Additionally, Operator shall be free to use the residuals resulting from access to or work with Owner's Confidential Information for any purpose, provided that Operator shall not disclose Confidential Information (which excludes, for clarity, residuals) except as permitted pursuant to the terms of this Agreement, and Owner shall be free to use the residuals resulting from access to or work with Operator's Confidential Information for any purpose, provided that Owner shall not disclose Confidential Information (which excludes, for clarity, residuals) except as permitted pursuant to the terms of this Agreement. The term "residuals" means information retained in the unaided memory of persons employed or retained by either Party who have had access to or worked with the Confidential Information, including ideas, concepts, Know-How or techniques contained therein. Neither Party shall have any obligation to limit or restrict the assignment of such persons.

## Section 13.3   Data Security.

(a)　　　Cybersecurity Breaches. Subject to Section 4.1(c) (*Front-End Transition Period Generally – Transition to Standard of Performance*) and the System Remediation Plan, Operator shall comply with, and shall use commercially reasonable efforts to ensure that all Operator Related Parties and all Contractors and Subcontractors comply with the Data Security Plan, any other Contract Standards and all requirements of Applicable Law regarding data security, cyber security and information security in respect of the System Information and related Information Systems. Operator shall promptly notify, and shall use commercially reasonable measures to ensure that all Operator Related Parties, Contractors and Subcontractors promptly

CONFIDENTIAL

notify, Administrator and PREB (if possible, in writing) of any material Cybersecurity Breaches or any other material losses or theft of any data of which it has knowledge. At Administrator's direction, Operator shall (i) perform an analysis of the cause, (ii) remedy any Cybersecurity Breach including notification of consumers or government entities when required by Applicable Law, and (iii) cooperate fully with any civil or criminal authority in any investigation or action relating to such breach or attempted breach.

(b)      Cybersecurity Program. Without limiting the foregoing and subject to Section 4.1(c) (*Front-End Transition Period Generally – Transition to Standard of Performance*) and the System Remediation Plan, Operator shall update the Data Security Plan from time to time to be consistent with industry standards and such that the Data Security Plan: (A) incorporates reasonable and appropriate organizational, administrative, physical and technical measures in place to maintain the security of and to protect the internal and external integrity of the System Information and related Information Systems against any unlawful or unauthorized use, processing, destruction, loss, alteration, disclosure, theft or access (including to any data or information contained in or stored on such systems); (B) establishes and maintains backup, security and disaster recovery measures to safeguard the System Information and related Information Systems; (C) limits the risk of introducing or knowingly permitting the introduction of any virus, worm, bomb, Trojan horse, trap door, stop code or other harmful code, timer, clock, counter or other limiting design, instruction or routine, device, feature or function into the System Information and related Information Systems; and (D) requires security audits, at a frequency consistent with industry standards, to assess and confirm compliance with Section 13.3 (*Data Security*), (including using reputable third-party vendors to perform, penetration testing, cybersecurity audits and vulnerability assessments) and requires taking prompt measures to remedy any gaps that may be identified. Operator shall provide a summary of the security program as well as a copy of any written audit reports and remedial measures to Administrator. Any security audit information is Confidential Information of Owner, and neither Party shall disclose such security audit information without the consent of the other Party.

CONFIDENTIAL

# ARTICLE 14
# EVENTS OF DEFAULT; REMEDIES

**Section 14.1   Events of Default by Operator**. Each of the following shall constitute an event of default by Operator (an "Operator Event of Default"):

(a)   Involuntary Bankruptcy. An involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of Operator or Guarantor(s) or its debts, or of a substantial portion of its respective assets, under the Bankruptcy Code or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Operator or Guarantor(s) or for a substantial portion of its assets, and, in any such case, such proceeding or petition shall continue undismissed for a period of sixty (60) or more days or an order or decree approving or ordering any of the foregoing shall be entered;

(b)   Voluntary Bankruptcy. Operator or Guarantor(s) shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under the Bankruptcy Code, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in Section 14.1(a) (*Events of Default by Operator – Involuntary Bankruptcy*), (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Operator or Guarantor(s) or for a substantial portion of its respective assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(c)   Failure to Provide or Maintain the Guarantee. Operator shall fail to provide or maintain in full force and effect the Guarantee, which failure shall not be cured in a manner acceptable to Administrator within five (5) Business Days following receipt of written notice thereof;

(d)   Failure to Perform a Material Obligation. Operator shall fail to perform any material obligation, covenant, term or condition under this Agreement or Guarantor(s) shall fail to perform any material obligation, covenant, term or condition under the Guarantee (in each case other than a payment obligation as provided in Section 14.1(e) (*Events of Default By Operator – Failure to Pay*)), which failure shall not be cured within sixty (60) days following receipt of written notice thereof by Administrator; provided, however, that as long as Operator or such Guarantor, as the case may be, is diligently attempting in good faith to cure such failure and it is reasonably expected that such failure is curable, then Operator or such Guarantor, as the case may be, shall have an additional thirty (30) days to cure such default; provided, further, that any failure to perform which is not curable shall not be deemed an Operator Event of Default if (i) within sixty (60) days following receipt of written notice thereof, Operator or such Guarantor shall have diligently and in good faith taken measures to prevent such failure to perform from recurring and (ii) such failure to perform which is not curable is not a recurring failure for the same issue as a prior failure to perform that has previously (A) occurred and (B) not been deemed an Operator Event of Default;

(e)   Failure to Pay. Operator or Guarantor(s) shall fail to pay any undisputed amount required to be paid by Operator under this Agreement or by Guarantor(s) under the

CONFIDENTIAL

Guarantee, which failure shall not be cured within sixty (60) days following written notice thereof by Administrator; provided that if such payment relates to a T&D Pass-Through Expenditure (including any Excess Expenditures), Capital Cost or Outage Event Costs, an Operator Event of Default shall not be deemed to have occurred if sufficient funds for such payment are not available in the relevant Service Account;

(f)      False or Inaccurate Representation or Warranty. Any representation or warranty of Operator under this Agreement or any other document delivered in connection herewith or of Guarantor(s) under the Guarantee shall prove to have been false, inaccurate or misleading in any material respect when made, and the legality of this Agreement or such Guarantee or the ability of Operator or Guarantor(s) to carry out its obligations hereunder or thereunder shall thereby be materially and adversely affected, which condition shall not be cured within thirty (30) days following written notice thereof by Administrator;

(g)      Failure to Obtain or Maintain Insurance. Operator shall fail to obtain or maintain the Required Insurance, unless such failure is due to carrier insolvency or the fact that the Required Insurance is not available at commercially reasonable rates but only for such period of time and to the extent specified in Section 10.2 (*Commercial Availability*) (in which case no failure shall be understood to have occurred), which failure shall not be cured within ten (10) Business Days following written notice thereof by Administrator;

(h)      Change of Control. A Change of Control of Operator that is not permitted by this Agreement shall occur on or after the Effective Date;

(i)      Illegal Transfer. Operator shall enter into an agreement to, or shall assign, transfer, convey, lease, encumber or otherwise dispose of all or any portion of its rights or obligations under this Agreement other than (i) in accordance with the express terms of this Agreement or (ii) with the consent of Administrator and PREB;

(j)      Violation of Law. A court of competent jurisdiction shall have determined that Operator shall have violated any of the provisions of Article 3.2 of Act 2 or Operator shall be convicted by a court of competent jurisdiction, or shall enter a plea of *nolo contendere* with such court, with respect to any of the crimes listed in Section 19.2(h)(i)(B) (*Representations and Warranties of Operator – Applicable Law Compliance*); or

(k)      Failure to Meet Minimum Performance Threshold. Operator shall fail to meet the Minimum Performance Threshold for any three (3) Key Performance Metrics during three (3) or more consecutive Contract Years and no such failure shall have been excused by a Force Majeure Event, an Outage Event or Owner Fault (a "Minimum Performance Threshold Default").

### Section 14.2   Termination for Operator Event of Default

(a)      Termination for Involuntary Bankruptcy, Voluntary Bankruptcy or Violation of Law. Upon the occurrence of an Operator Event of Default under Section 14.1(a) (*Events of Default By Operator – Involuntary Bankruptcy*), Section 14.1(b) (*Events of Default By Operator – Voluntary Bankruptcy*) or Section 14.1(j) (*Events of Default By Operator – Violation*

CONFIDENTIAL

*of Law*), this Agreement shall immediately terminate without further action by Administrator, without need for a court decision or arbitral award confirming Administrator's right to terminate.

(b)     Termination for Other Operator Event of Default. Upon the occurrence of any other Operator Event of Default, Administrator may terminate this Agreement upon not less than one hundred twenty (120) days prior written notice to Operator, subject, to the extent required by Applicable Law, to the prior approval of PREB or the FOMB (if then in existence), without need for a court decision or arbitral award confirming Administrator's right to terminate; provided, however, that any such notice of termination with respect to an Operator Event of Default under Section 14.1(h) (*Events of Default By Operator – Change of Control*) must be given no later than thirty (30) days following Administrator's receipt of written notice from Operator of the occurrence of such Change of Control. If Administrator fails to give such notice to Operator within such thirty (30) day period, Administrator shall be deemed to have waived the Operator Event of Default with respect to such Change of Control and its termination rights with respect thereto (but not with respect to any subsequent Change of Control) shall expire and be of no further force or effect. For the avoidance of doubt, nothing in this Section 14.2 (*Termination for Operator Event of Default*) shall limit Operator's right to contest, pursuant to Article 15 (*Dispute Resolution*), whether an Operator Event of Default has occurred, or any of its other rights herein.

**Section 14.3   Events of Default By Owner**. Each of the following shall constitute an event of default by Owner (an "Owner Event of Default"):

(a)     Involuntary Bankruptcy. An involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of Owner or its debts, or of a substantial portion of its respective assets, under the Bankruptcy Code or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Owner or for a substantial portion of its assets, and, in any such case, such proceeding or petition shall continue undismissed for a period of sixty (60) or more days or an order or decree approving or ordering any of the foregoing shall be entered; provided, however, that the pursuit by creditors of Owner of relief from the automatic stay extant pursuant to section 362(a) of the Bankruptcy Code in the current Title III Case for the purpose of seeking appointment of a receiver under applicable law shall not constitute an Owner Event of Default unless and until any such receiver is duly appointed;

(b)     Voluntary Bankruptcy. Owner shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under the Bankruptcy Code  (other than the current Title III Case), (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in Section 14.3(a) (*Events of Default By Owner – Involuntary Bankruptcy*), (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Owner or for a substantial portion of its respective assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(c)     Failure to Perform a Material Obligation. Owner shall fail to perform any material obligation, covenant, term or condition under this Agreement (other than a payment obligation as provided in Section 14.3(d) (*Events of Default By Owner – Failure to Pay Service*

CONFIDENTIAL

*Fee*) or Section 14.3(e) (*Events of Default By Owner – Failure to Pay Other Undisputed Amount*) or a failure to fund the Front-End Transition Account or Service Account, or as provided in Section 14.3(f)) (*Events of Default By Owner – Failure to Fund Front-End Transition Account or Service Account*)), including the obligation to keep System Revenues free and clear of Liens other than Liens specified in the Title III Plan and the related disclosure statement, which failure shall not be cured within sixty (60) days following written notice thereof by Operator; provided, however, that as long as Owner is diligently attempting in good faith to cure such failure and it is reasonably expected that such failure is curable, then Owner shall have an additional thirty (30) days to cure such default; provided, further, that any failure to perform which is not curable shall not be deemed an Owner Event of Default if (i) within sixty (60) days following receipt of written notice thereof, Owner shall have diligently and in good faith taken measures to prevent such failure to perform from recurring and (ii) such failure to perform which is not curable is not a recurring failure for the same issue as a prior failure to perform that has previously (A) occurred and (B) not been deemed an Owner Event of Default;

(d)    Failure to Pay Service Fee. Owner shall fail to pay any undisputed Service Fees to be paid to Operator under this Agreement, which failure shall continue for thirty (30) days following written notice thereof by Operator;

(e)    Failure to Pay Other Undisputed Amount. Owner shall fail to pay any other undisputed amount required to be paid by Owner to Operator under this Agreement (other than as provided in Section 14.3(d) (*Events of Default By Owner – Failure to Pay Service Fee*)), which failure shall not be cured within sixty (60) days following written notice thereof by Operator;

(f)    Failure to Fund Front-End Transition Account or Service Account. Owner shall fail to fund the Front-End Transition Account or any Service Account in an amount equal to at least two-thirds (2/3) of the requisite funding for such Front-End Transition Account or Service Account, which failure shall not be cured within five (5) Business Days following written notice thereof by Operator; or

(g)    False or Inaccurate Representation or Warranty. Any representation or warranty of Owner under this Agreement or any other document delivered in connection herewith shall prove to have been false, inaccurate or misleading in any material respect when made, and the legality of this Agreement or the ability of Operator to carry out its obligations hereunder shall thereby be materially and adversely affected, which condition shall not be cured within thirty (30) days following written notice thereof by Operator.

**Section 14.4   Termination for Owner Event of Default**. Upon the occurrence of an Owner Event of Default under Section 14.3 (*Events of Default By Owner*), Operator may terminate this Agreement upon not less than one hundred twenty (120) days prior written notice to Administrator, without need for a court decision or arbitral award confirming Operator's right to terminate; provided that upon the occurrence of an Owner Event of Default under Section 14.3(f) (*Events of Default By Owner – Failure to Fund Front-End Transition Account or Service Account*) relating to funding of the Front-End Transition Account or the Operating Account, the Agreement shall terminate and, subject to Article 16 (*Back-End Transition*), Operator's obligation to perform the Front-End Transition Services or the O&M Services, as applicable, shall cease, upon the earlier of (i) the date that is one hundred twenty (120) days following the date on which Administrator

CONFIDENTIAL

receives written notice from Operator or (ii) the date on which there is no funding in the Front-End Transition Account or the Operating Account, as applicable, in each case without need for a court decision or arbitral award confirming Operator's right to terminate. For the avoidance of doubt, nothing in this Section 14.4 (*Termination for Owner Event of Default*) shall limit Owner's right to contest, pursuant to Article 15 (*Dispute Resolution*), whether an Owner Event of Default has occurred, or any of its other rights herein. Owner agrees the automatic stay extant in the Title III Case pursuant to section 362(a) of the Bankruptcy Code shall not apply to the exercise by Operator of its termination rights or other remedies under this Section 14.4 (*Termination for Owner Event of Default*), Section 14.5 (*Additional Termination Rights*) or Section 14.6 (*Remedies Upon Early Termination*).

**Section 14.5    Additional Termination Rights**.

(a)    T&D System Sale. Each of Administrator and Operator shall have the right to terminate this Agreement upon not less than one hundred twenty (120) days' prior written notice to Operator or Administrator, respectively, in the event ownership of the T&D System is sold, transferred or assigned, in whole or in part, to a private entity.

(b)    Failure of Service Commencement Date Conditions. As set forth in Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*), each of Administrator and Operator shall have the right to terminate this Agreement for failure to satisfy the Service Commencement Date Conditions, in accordance with and subject to the terms set forth in Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*) in all respects.

(c)    Extended Force Majeure Event. Each of Administrator and Operator shall have the right to terminate this Agreement upon not less than one hundred twenty (120) days' prior written notice to Operator or Administrator, respectively, in the event that a Force Majeure Event continues for a period in excess of eighteen (18) consecutive months and materially interferes with, delays or increases the cost of the Front-End Transition Services or the O&M Services.

(d)    Failure to Agree on Budget. Each of Administrator and Operator shall have the right to terminate this Agreement upon not less than one hundred twenty (120) days' prior written notice to Operator or Administrator, respectively, if (i) Operator has performed the O&M Services under a Default Budget with respect to an Operating Budget during three (3) or more consecutive Contract Years or (ii) Administrator and Operator shall fail to agree on the Operating Budget, and such failure results in an Budget Dispute, during three (3) or more consecutive Contract Years.

(e)    Operating Budget Overrun. Owner shall have the right to terminate this Agreement upon not less than one hundred twenty (120) days' prior written notice to Operator if Operator shall exceed, during three (3) or more consecutive Contract Years, the Operating Budget initially approved for a given Contract Year pursuant to Section 7.3(a) (*Budgets – Generally*), other than as a result of (i) Force Majeure Events, (ii) Owner Fault, (iii) Outage Events or (iv) additional requirements imposed by Owner, Administrator or any other Governmental Body after approval of the Budget, in each case, which (A) have resulted in schedule delays or increased work

CONFIDENTIAL

scope or costs and (B) are not attributable to Operator's gross negligence or willful misconduct (an "Operating Budget Overrun Default").

(f)     Change in Regulatory Law. Operator shall have the right to terminate this Agreement upon not less than one hundred twenty (120) days' prior written notice to Administrator in the event of a Change in Regulatory Law.

Section 14.6   Remedies Upon Early Termination.

(a)     Accrued and Unpaid Amounts. In the event of an early termination of this Agreement for any reason, Owner shall pay Operator any accrued and unpaid amounts required to be paid by Owner under this Agreement, including the Front-End Transition Service Fee, the T&D Pass-Through Expenditures, the Generation Pass-Through Expenditures, any Capital Costs, any Outage Event Costs, the Fixed Fee and the Incentive Fee, in each case, as of the effective date of such termination.

(b)     Back-End Transition Service Fee. In the event of an early termination of this Agreement pursuant to Section 14.2, (*Termination for Operator Event of Default*), Section 14.4 (*Termination for Owner Event of Default*) or Section 14.5, (*Additional Termination Rights*), and if Operator is performing the Back-End Transition Services, Owner shall be responsible for payment of the Back-End Transition Service Fee.

(c)     Termination Fee.

(i)     In the event this Agreement is (A) terminated, revoked, nullified, cancelled or otherwise rendered invalid by any duly enacted law of the Commonwealth, as determined by a final non-appealable judgment by a court of competent jurisdiction (a "Contract Nullification or Cancellation"), (B) terminated by Operator or Administrator pursuant to Section 14.5(a) (*Additional Termination Rights – T&D System Sale*) or (C) terminated by Operator pursuant to Section 14.5(f) (*Additional Termination Rights – Change in Regulatory Law*), but only if such termination is as a result of the circumstances described in clauses (ii), (iii) or (iv) of the definition of "Change in Regulatory Law", Owner shall pay Operator the Operator Termination Fee. For the avoidance of doubt, Owner shall have no obligation to pay the Operator Termination Fee other than in the circumstances described in clauses (A), (B) and (C) of the preceding sentence.

(ii)     In the event of an early termination of this Agreement by Administrator due to either (A) a Minimum Performance Threshold Default or (B) an Operating Budget Overrun Default, Operator shall pay Owner the Owner Termination Fee. For the avoidance of doubt, Operator shall have no obligation to pay the Owner Termination Fee other than in the event of an early termination of this Agreement by Administrator due to a Minimum Performance Threshold Default or an Operating Budget Overrun Default.

(iii)     The Parties hereby acknowledge and agree that, notwithstanding anything to the contrary in this Agreement:

(A)     if this Agreement is (1) terminated due to a Contract Nullification or Cancellation, (2) terminated by Operator pursuant to Section 14.5(a) (*Additional*

CONFIDENTIAL

*Termination Rights – T&D System Sale*) or (3) terminated by Operator pursuant to Section 14.5(f) (*Additional Termination Rights – Change in Regulatory Law*) (but only if such termination is as a result of the circumstances described in clauses (ii), (iii) or (iv) of the definition of "Change in Regulatory Law"), Operator's damages would be difficult or impossible to quantify with reasonable certainty, and accordingly, the payment to Operator of the Operator Termination Fee (x) is a payment of liquidated damages (and not penalties), which is based on the Parties' estimate of damages Operator would suffer or incur, and (y) shall constitute Operator's sole and exclusive remedy for all monetary damages, costs, losses and expenses of whatever type or nature arising from or related to this Agreement due to the events described in clauses (1), (2), and (3) of this sentence; and

(B)     if this Agreement is terminated by Administrator due to a Minimum Performance Threshold Default or an Operating Budget Overrun Default, Owner's damages would be difficult or impossible to quantify with reasonable certainty, and accordingly, the payment to Owner of the Owner Termination Fee (x) is a payment of liquidated damages (and not penalties), which is based on the Parties' estimate of damages Owner would suffer or incur, and (y) shall constitute Owner's sole and exclusive remedy for all monetary damages, costs, losses and expenses of whatever type or nature arising from or related to termination of this Agreement due to a Minimum Performance Threshold Default or an Operating Budget Overrun Default.

(iv)     Each of Operator and Owner hereby irrevocably waives any right it may have to raise as a defense that the Owner Termination Fee and Operator Termination Fee, respectively, are excessive or punitive.

(d)     <u>Additional Remedies</u>. The Parties agree that, except as otherwise provided in this Agreement (including the sole and exclusive remedies set forth in Section 4.1(c) (*Front-End Transition Period Generally – Administrative Expense Treatment*), Section 4.8 (*Failure of Service Commencement Date Conditions*) and Section 14.6(c) (*Remedies Upon Early Termination – Termination Fee*)) in which cases the remedy specified in such provision shall be the sole remedy available, in the event that the Agreement is terminated early due to an Event of Default in accordance with the terms hereof, any other Party may exercise any rights it has under this Agreement and under Applicable Law to recover damages, secure specific performance or obtain injunctive relief. Notwithstanding anything to the contrary herein, including any Party's rights otherwise available under this Agreement or Applicable Law:

(i)     except as specified in Section 18.3(a) (*Limitation on Liability – Operator General Limitations*) and Section 18.3(b) (*Limitation on Liability – Gross Negligence, Willful Misconduct*) for the Losses specified in each such provision, in which event the caps specified in Section 18.3(a) (*Limitation on Liability – Operator General Limitations*) and Section 18.3(b) (*Limitation on Liability – Gross Negligence, Willful Misconduct*), respectively, shall apply regardless of how or when any such Losses arise or occur, and except for the exclusive remedies set forth in the first sentence of this Section 14.6(d) (*Remedies Upon Early Termination – Additional Remedies*), any Losses payable by Operator to Owner howsoever and whensoever arising pursuant to this Agreement, including whether for breach of contract or otherwise, shall be limited to US$10,000,000; and

CONFIDENTIAL

(ii)     any Losses payable by Owner to Operator howsoever and whensoever arising pursuant to this Agreement, including whether for breach of contract or otherwise, shall be limited to the amount equal to the lesser of (A) the Fixed Fee paid to Operator in the immediately preceding Contract Year *plus* the Incentive Fee earned by Operator in the immediately preceding Contract Year and (B) an amount equal to the net present value of the Fixed Fee payable over the remainder of the Term discounted at a rate of six percent (6%) *plus* the Incentive Fee earned by Operator in the immediately preceding Contract Year, except for Losses related to gross negligence or willful misconduct of the Owner Indemnitees, which shall not be subject to any cap.

(e)     <u>Debarment</u>. Upon the termination of this Agreement pursuant to Section 14.2 (*Termination for Operator Event of Default*), Operator shall be disqualified from contracting with any Commonwealth Governmental Body for ten (10) years in accordance with Section 10(a)(15)(c) of Act 29.

# ARTICLE 15
## DISPUTE RESOLUTION

**Section 15.1   Scope**. Except as otherwise expressly provided in this Agreement, any dispute among the Parties arising out of, relating to or in connection with this Agreement or the existence, interpretation, breach, termination or validity thereof (a "Dispute") shall be resolved in accordance with the procedures set forth in this Article 15 (*Dispute Resolution*), which shall constitute the sole and exclusive procedures for the resolution of such Disputes (the "Dispute Resolution Procedure"), including as to the validity of any termination or effective date of any termination. Operator acknowledges and agrees that Administrator (or any Designated Person appointed by Administrator) shall be authorized to participate in or act for and on behalf of Owner in any Dispute Resolution Procedure contemplated by this Article 15 (*Dispute Resolution*). For the avoidance of doubt, the Dispute Resolution Procedures set forth in this Agreement shall not apply to any dispute between a Party and PREB, which disputes shall be subject to resolution in accordance with Applicable Law. Notwithstanding anything to the contrary herein, in the event that Operator disagrees with a decision of PREB, nothing shall prejudice, limit or otherwise impair Operator's right to exercise its rights pursuant to Act No. 38 of June 30, 2017 and Section 6.5(c) of Act 57.

**Section 15.2   Commencement of the Dispute Resolution Procedure**.

(a)      Notice. If a Dispute arises, any Party may initiate the Dispute Resolution Procedure by giving a written notice of the Dispute to the other Party (a "Notice of Dispute"). The Notice of Dispute shall contain a brief statement of the nature of the Dispute, set out the relief requested and request that the Dispute Resolution Procedure of this Article 15 (*Dispute Resolution*) be commenced.

(b)      Tolling. Any limitation period imposed by this Agreement or by Applicable Law in respect of a Dispute shall be tolled upon the delivery of a Notice of Dispute pursuant to this Section 15.2 (*Commencement of the Dispute Resolution Procedure*) for the duration of any Dispute Resolution Procedure pursuant to this Article 15 (*Dispute Resolution*).

**Section 15.3   Negotiation**.

(a)      Generally. Upon receipt of a Notice of Dispute from a Party, the Parties shall refer the dispute to the Designated Person of each Party. The Designated Persons shall negotiate in good faith and attempt to resolve the Dispute within thirty (30) days after the date on which the Notice of Dispute was issued, or such longer period as the Designated Persons may otherwise agree. All communications, negotiations and discussions pursuant to this Section 15.3 (*Negotiation*) shall be (i) confidential, (ii) without prejudice privileged, (iii) treated as compromise settlement discussions and negotiations and (iv) not used, offered or admissible as evidence in any subsequent proceeding without the mutual consent of the Parties.

(b)      Negotiation Period.

(i)      If the Dispute remains unresolved thirty (30) days after the Notice of Dispute is issued (or such longer period as Operator and Administrator may mutually agree in

CONFIDENTIAL

writing) (the "Negotiation Period"), then any Front-End Transition Service Fee Estimate Dispute, Front-End Transition Service Fee Dispute, Back-End Transition Service Fee Estimate Dispute, Back-End Transition Service Fee Dispute, Handover Checklist Dispute, Administrator Dispute, Service Fee Dispute, Budget Dispute, Service Account Dispute, Disallowed Costs Dispute or Force Majeure Event Dispute (each a "Technical Dispute"), or any engineering or technical dispute Operator and Administrator mutually agree in writing is a Technical Dispute shall be referred to the Expert Technical Determination procedure set forth in Section 15.4 (*Expert Technical Determination Procedure for Technical Disputes*) for a final and binding determination.

(ii)     If the Dispute, other than a Technical Dispute, remains unresolved after the end of the Negotiation Period, then the Dispute shall proceed to mediation pursuant to Section 15.5 (*Mediation*), and if necessary, litigation pursuant to Section 15.6 (*Litigation as a Final Resort*), for a final and binding determination.

**Section 15.4   Expert Technical Determination Procedure for Technical Disputes**.

(a)     Generally. Any Technical Disputes unresolved within the Negotiation Period shall be referred to an independent expert (the "Independent Expert") for a final and binding expert determination ("Expert Technical Determination").

(b)     Procedures.

(i)     For the purposes of this Section 15.4 (*Expert Technical Determination Procedure for Technical Disputes*), the Independent Expert shall be a reputable Person or Persons possessing expert knowledge and experience for the Expert Technical Determination of the Technical Dispute in question and shall be independent of and impartial as among the Parties. Operator and Administrator shall, in the first instance, attempt to agree on an Independent Expert through their respective Designated Persons. If Operator and Administrator cannot so agree within ten (10) days after the end of the Negotiation Period, the Parties shall promptly (and in any event within five (5) Business Days) apply to the ICC International Centre for ADR (the "ICC") for the appointment of an Independent Expert in accordance with the ICC Rules for the Appointment of Experts and Neutrals.

(ii)     Once selected by Operator and Administrator, neither Party shall communicate independently with the expert, and all communications the Parties make with the Independent Expert must be simultaneously copied to all other Parties.

(iii)     The Independent Expert shall, in consultation with the parties, determine the procedure to be undertaken in the Expert Technical Determination. The Independent Expert shall determine the Technical Dispute within sixty (60) days after his or her appointment or as otherwise agreed by the Parties. This sixty (60) day time period may be extended by the Independent Expert or by the agreement of the Parties. A failure to determine the matter within sixty (60) days shall not be a ground to challenge any award or determination by the Independent Expert.

(iv)     The determination by the Independent Expert on any Technical Dispute shall be final and binding on the Parties hereto. The costs of the Independent Expert shall

130

be borne by Operator (and, for the avoidance of doubt, shall not be a T&D Pass-Through Expenditure), to the extent that the Independent Expert resolves any dispute in Owner's favor, and by Owner, to the extent that the Independent Expert resolves any dispute in Operator's favor, or as determined by the Independent Expert if the dispute is not resolved entirely in favor of Owner or Operator. Notwithstanding any other provisions of this Article 15 (*Dispute Resolution*), enforcement of any determination of an Independent Expert may be sought by either of the Parties before any court of competent jurisdiction. To the extent permitted by law, any rights to appeal from or cause a review of any such determination by any Independent Expert are hereby waived by the Parties.

(c)      Not an Arbitrator. The Independent Expert is not an arbitrator and shall not be deemed to be acting in an arbitral capacity.

(d)      Confidentiality. The Parties agree that any Expert Technical Determination carried out pursuant to this Section 15.4 (*Expert Technical Determination Procedure for Technical Disputes*) shall be kept private and confidential, and that the existence of the Expert Technical Determination and any element of it (including the identity of the Parties, the identity of all witnesses and experts who may be called upon in the Expert Technical Determination, all materials created for the purposes of the Expert Technical Determination, all testimony or other oral submissions in the Expert Technical Determination, and all documents produced by a Party in connection with an Expert Technical Determination that were not already in the possession of the other Party) shall be kept confidential, except (i) with the consent of the Parties, (ii) to the extent disclosure may be lawfully required in *bona fide* judicial proceedings relating to the Expert Technical Determination, (iii) where disclosure is lawfully required by a legal duty, and (iv) where such information is already in the public domain other than as a result of a breach of this clause. The Parties also agree not to use any information disclosed to them during the Technical Dispute for any purpose other than in connection with the Expert Technical Determination.

**Section 15.5   Mediation**.

(a)      Generally. If a Dispute, other than a Technical Dispute, remains unresolved after the Negotiation Period, either Operator or Administrator may refer the Dispute to mediation through a written notice of mediation (the "Notice of Mediation"). Each Party to this Agreement agrees that it may not initiate a civil action as provided in Section 15.6 (*Litigation as a Final Resort*) (other than for provisional relief sought on an expedited basis) unless (i) the matter in question has first been submitted to mediation in accordance with the provisions of this Section 15.5(a) (*Mediation – Generally*) or (ii) such Party would be barred from asserting its claim in a civil action if it were required to submit to mediation pursuant to Section 15.3 (*Negotiation*).

(b)      Procedures.

(i)      The Parties shall, in the first instance, attempt to agree on a mediator through their respective Designated Persons. If the Parties cannot so agree within thirty (30) days after the Notice of Mediation is sent, either of the Parties may promptly apply to the ICC for appointment of a single mediator in accordance with the Mediation Rules of the International Chamber of Commerce (the "Mediation Rules"). Absent any written agreement to the contrary by the Parties, the mediator shall be an attorney or mediator authorized to practice law in the United

CONFIDENTIAL

States or the Commonwealth of Puerto Rico. The mediator shall be paid for the mediation services, and shall be reimbursed for all reasonable and documented out-of-pocket costs incurred in carrying out the mediation duties hereunder, including the costs of consultants. All Fees-and-Costs of the mediation shall be shared equally by the Parties (and, for the avoidance of doubt, shall not be a T&D Pass-Through Expenditure). The Parties shall request that the mediator schedule the mediation within thirty (30) days of the mediator's appointment, and shall comply with all procedures the mediator establishes for the conduct of the mediation. Absent any written agreement to the contrary by the Parties, if the Dispute is not resolved within ninety (90) days of the Notice of Mediation, the mediation shall be terminated.

(ii)    For the avoidance of doubt, absent the written agreement of the Parties, the Mediation Rules shall not apply to any mediation carried out pursuant to this Section 15.5(b) (*Mediation – Procedures*). Rather, the reference to the ICC and the Mediation Rules above should be understood as referring solely to the designation of the ICC as an appointing authority to appoint a mediator pursuant to the procedures set forth in the Mediation Rules in the event the Parties are unable to agree on a mediator within the timeframe specified.

(c)    <u>Confidentiality</u>. The Parties agree that any mediation carried out pursuant to this Section 15.5(b) (*Mediation – Procedures*) shall be kept private and confidential, and that the existence of the mediation and any element of it (including the identity of the Parties, the identity of all witnesses and experts who may be called upon at the mediation, all materials created for the purposes of the mediation, all testimony or other oral submissions at the mediation, and all documents produced by a Party in connection with a mediation that were not already in the possession of the other Party) shall be kept confidential, except (i) with the consent of the Parties, (ii) to the extent disclosure may be lawfully required in *bona fide* judicial proceedings relating to the mediation, (iii) where disclosure is lawfully required by a legal duty and (iv) where such information is already in the public domain other than as a result of a breach of this clause. The Parties also agree not to use any information disclosed to them during the mediation for any purpose other than in connection with the mediation.

### Section 15.6   Litigation as a Final Resort.

(a)    <u>Civil Action</u>. In the event that the Parties fail to resolve any Dispute, other than a Technical Dispute, within ninety (90) days after the date the mediator is selected pursuant to the procedures set forth in Section 15.5(b) (*Mediation – Procedures*) (or such longer period as the Parties may mutually agree), either Party may initiate a civil action in the Commonwealth Court and in accordance with all applicable rules of civil procedure. The Parties acknowledge and understand that, to resolve any and all claims arising out of this Agreement (other than any Technical Dispute), they may file a civil action, including actions in equity, in the Commonwealth Court. Owner and Operator each irrevocably consents to the exclusive jurisdiction of such courts in any such actions or proceedings, waives any objection it may have to the jurisdiction of any such action or proceeding, as well as objections or defenses based on sovereign immunity. The Parties acknowledge and agree that the terms and conditions of this Agreement have been freely, fairly and thoroughly negotiated.

(b)    <u>Costs and Expenses</u>. Except as required by Operator's indemnity obligations under Section 18.1 (*Indemnification by Operator*), each Party shall bear its own costs

CONFIDENTIAL

and expenses in any Legal Proceeding where it is the named defendant or in any Legal Proceeding among the Parties (and, for the avoidance of doubt, such costs and expenses shall not be a T&D Pass-Through Expenditure). Notwithstanding the foregoing, each Party retains its rights to bring any Legal Proceeding or to implead the other Party as to any matter arising hereunder.

**Section 15.7   Waiver of Jury Trial**. EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING BROUGHT UNDER THIS AGREEMENT. Each Party (i) certifies that no representative of any other Party has represented, expressly or otherwise, that such other Party would not, in the event of litigation, seek to enforce the foregoing waiver, and (ii) acknowledges that it and each other Party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Agreement.

**Section 15.8   Provisional Relief**. Notwithstanding any other provision in this Agreement, no Party shall be precluded from initiating a proceeding in the Commonwealth Court for the purpose of obtaining any emergency or provisional remedy to protect its rights that may be necessary and that is not otherwise available under this Agreement, including temporary and preliminary injunctive relief, restraining orders and other remedies to avoid imminent irreparable harm, provide uninterrupted electrical and other services or preserve the status quo pending the conclusion of such negotiation, mediation or litigation. The commencement of or participation in an action for provisional relief with regard to Technical Disputes shall not constitute a waiver of the requirements or procedures of Section 15.5 (*Mediation*).

**Section 15.9   Continuing Obligations**. The Parties agree that during the resolution of a Dispute pursuant to the Dispute Resolution Procedure, the Parties shall continue to perform their obligations under this Agreement; <u>provided</u> that such performance shall (i) be without prejudice to the rights and remedies of any of the Parties and (ii) not be read or construed as a waiver of a Party's right to claim for recovery of any loss, costs, expenses or damages suffered as a result of the continued performance of this Agreement.

CONFIDENTIAL

# ARTICLE 16
# BACK-END TRANSITION

**Section 16.1  Successor Operator**. After the Service Commencement Date, upon (i) Operator's receipt of a termination notice from Owner or Administrator's receipt of a termination notice from Operator, in each case under Article 14 (*Events of Default; Remedies*) or (ii) twelve (12) months prior to the expiry of the later of (A) the Initial Term or (B) the Extension Term (such date, the "Back-End Transition Commencement Date"), Administrator, on behalf of Owner, shall initiate efforts, including such procurement process as may be required, to identify and select a successor operator as promptly as practicable. Operator shall have the right to submit a proposal in such procurement on the same basis as other proponents. For the avoidance of doubt, if this Agreement is terminated prior to the Service Commencement Date, the Back-End Transition Commencement Date shall not occur.

**Section 16.2  Back-End Transition Services**.

(a)      Generally. Subject to Section 16.2(c) (*Back-End Transition Services – Transition Expiry Date*) and Section 16.4(c)(ii) (*Back-End Transition Period Compensation – Funding*), upon the occurrence of the Back-End Transition Commencement Date, Operator, in addition to providing the O&M Services, shall (i) perform the Back-End Transition Services specified in the Back-End Transition Plan, (ii) comply with the obligations set forth in Section 16.2(b) (*Back-End Transition Services – Certain Obligations*), (iii) reasonably cooperate with Administrator during any procurement process to identify a successor operator and (iv) commence preparations for an orderly transition of ServCo and the T&D System to Owner or Administrator (or their designee); provided that to the extent the Back-End Transition Services include performance of O&M Services after the Initial Term or, if applicable, the Extension Term, a Tax Opinion and a Reliance Letter shall be obtained, at the cost of Owner or Administrator, with respect to any such Back-End Transition Services.

(b)      Certain Obligations. Without limiting the generality of the Back-End Transition Services specified in the Back-End Transition Plan, Operator shall, in addition to or as part of the Back-End Transition Services:

(i)      subject to, and except as provided in Section 14.4 (*Termination for Owner Event of Default*), cease to perform the O&M Services on the date and to the extent specified by Administrator;

(ii)      collect all documentation and materials in Operator's care, custody or control associated with work in progress and provide a reasonably detailed status report on each such item to Administrator;

(iii)      sell at fair market value all existing materials and supplies utilized by Operator in the operation and maintenance of the T&D System (to the extent not owned by Owner or paid for as a T&D Pass-Through Expenditure) to Owner or the successor operator, as Administrator shall direct, if any;

CONFIDENTIAL

(iv)    in accordance with Prudent Utility Practice, promptly take all action as reasonably necessary to protect and preserve all materials, equipment, tools, facilities and other property at the T&D System Sites;

(v)    remove from the T&D System Sites all equipment, implements, machinery, tools, temporary facilities of any kind and other property owned or leased by Operator, if any, which are not to be transferred to Owner or any successor operator, and reasonably repair any damage caused by such removal;

(vi)    in accordance with Prudent Utility Practice, leave the T&D System Sites in a neat, safe, orderly and fully operational condition, subject to reasonable wear and tear;

(vii)    leave the T&D System Sites with consumables and spare parts in quantities consistent with Prudent Utility Practice and return to Owner any non-fixed assets in good working order and condition, subject to reasonable wear and tear;

(viii)    remove all employees of ManagementCo or its Affiliates (excluding ServCo) and any Subcontractors from the T&D System Sites;

(ix)    with respect to any ongoing Capital Improvements, promptly deliver to Administrator a list of all material supplies, materials, machinery, equipment, property and special order items previously delivered or fabricated by Operator or any Contractor or Subcontractor but not yet incorporated in the T&D System Sites;

(x)    deliver to Administrator all computer programs used at the T&D System Sites in the performance of O&M Services under the care, custody or control of Operator, including all revisions and updates thereto;

(xi)    deliver to Administrator a list of all books, records, customer lists, account information, personnel information, drawings, reports, plans and other data in Operator's possession or control relating to the performance of the O&M Services and copies thereof;

(xii)    deliver to Administrator copies of current maps of the T&D System in the custody of Operator;

(xiii)    provide Administrator with a list of all files, and access and security codes under Operator's care, custody or control with instructions and demonstrations which show how to open and change such codes;

(xiv)    promptly deliver to Administrator copies of all Contracts and Subcontracts, together with a statement of (A) the items ordered and not yet delivered pursuant to each such Contract or Subcontract, (B) the expected delivery date of all such items, (C) the total cost of each agreement and the terms of payment, and (D) the estimated cost of canceling each Contract or Subcontract;

(xv)    as Administrator shall direct, terminate or assign to Owner all Contracts and Subcontracts and make no additional agreements with Contractors or Subcontractors with respect to the T&D System without the prior written approval of Administrator;

CONFIDENTIAL

(xvi)   advise Administrator promptly of any special circumstances that might limit or prohibit cancellation of any System Contract, Contract or Subcontract;

(xvii)   as reasonably directed by Administrator, transfer to Owner by appropriate instruments of title, and deliver to the T&D System Sites (or such other place as Administrator may specify), all special order items pursuant to this Agreement for which Owner has made or is obligated to make payment;

(xviii)   as directed by Administrator, transfer or assign to Owner all warranties given by any manufacturer, Contractor or Subcontractor with respect to particular components of the O&M Services;

(xix)   notify Administrator in writing of any legal proceedings against Operator by any Contractor, Subcontractor or other third-parties relating to the termination of the O&M Services or any Contracts or Subcontracts;

(xx)   as directed by Administrator, provide written notice of termination, effective as of the date of termination of this Agreement, under each policy of Required Insurance (with a copy of each such notice to Owner and Administrator); provided that if Administrator elects to continue such policies in force thereafter for Owner and at Owner's expense, Operator shall use its commercially reasonable efforts to ensure that Administrator is able to do so;

(xxi)   to the extent requested by Administrator, and at the sole cost and expense of Owner, retain any or all senior management employees and make them available, for up to six (6) months following expiration or earlier termination of the Term, to provide on-site, real time consulting advice to a successor operator for the T&D System or Owner;

(xxii)   provide Owner, Administrator and, at Administrator's discretion, successor operator with copies of and access to all System Information, Customer Databases and other Work Product or tangible embodiments of Intellectual Property of Owner in Operator's care, custody or control in a form and medium that is reasonably acceptable to the successor operator and in a manner that such information and material may be accessed and used on same basis by the successor operator that it was used and accessed by Operator;

(xxiii)   provide reasonable technological and design advice and support, for up to six (6) months following expiration or earlier termination of the Term, and deliver any plans, drawings, renderings, blueprints, operating and training manuals, computer programs, spare parts or other information in ManagementCo's care, custody or control useful or necessary for Owner or any successor operator to perform the O&M Services; and

(xxiv)   take such other actions, and execute such other documents as may be necessary to effectuate and confirm the foregoing matters, or as may be otherwise necessary or desirable to provide for a safe, effective and efficient transition of the O&M Services to Owner or a successor operator, minimize Owner's costs, and take no action which shall increase any amount payable to Owner under this Agreement.

CONFIDENTIAL

(c)      Transition Expiry Date. Operator shall have no obligation to continue performing any Back-End Transition Services as of the earlier of (i) the date which is twelve (12) months following the expiration or early termination of the Term and (ii) the date on which there are no funds available in the Back-End Transition Account, without need for a court decision or arbitral award confirming Operator's right to terminate.

**Section 16.3   Transfer Obligation**. Immediately upon the expiration or earlier termination of this Agreement, at Administrator's election, in its sole discretion, ManagementCo shall transfer all the ownership interests in ServCo and all ServCo corporate books and records to Owner or, at Administrator's direction, its designee free and clear of all Liens and Administrator shall accept such transfer at no cost to Owner, Administrator or their designees. If Administrator elects such a transfer, the Parties shall mutually agree upon such instruments, agreements and other documents as may be reasonably necessary to effect such transfer. Following such transfer of the ServCo ownership interests, ManagementCo shall have no further legal or financial responsibility with respect to the performance of any contracts, leases or licenses held by or in the name of ServCo, or in relation to any pension, "other post-employment benefits" and other employee and vendor obligations, other than for liabilities or obligations which ManagementCo (distinguished from ServCo) may have specifically assumed for periods prior to such transfer that remain outstanding. In addition to and notwithstanding anything to the contrary in the foregoing, the Parties shall, immediately upon the expiration or earlier termination of this Agreement, implement any arrangements contemplated by the Back-End Transition Plan, including arrangements relating to (i) the possible hiring of ServCo Employees by a successor operator and (ii) the treatment of severance costs associated with any ServCo Employees not hired by a successor operator. For the avoidance of doubt, any properly incurred and ordinary course costs related to ServCo Employees that are (x) incurred up to the date of early termination or expiration of this Agreement and (y) reflected in then-currently approved Budget shall be T&D Pass-Through Expenditures in accordance with Section 7.2 (*Pass-Through Expenditures*) and Section 7.3 (*Budgets*).

**Section 16.4   Back-End Transition Period Compensation**.

(a)      General. As compensation for the Back-End Transition Services provided by Operator, Owner shall pay Operator the Back-End Transition Service Fee. The Parties acknowledge and agree that Federal Funding shall not be used to pay the Back-End Transition Service Fee. The Back-End Transition Service Fee shall not be subject to any abatement, deduction, counterclaim or set-off of any kind or nature.

(b)      Back-End Transition Service Fee. The "Back-End Transition Service Fee" shall be an aggregate amount equal to (i) the hourly fully allocated cost rate for each category of Operator employee or Affiliate personnel providing Back-End Transition Services *multiplied by* (ii) the number of hours worked by each Operator employee or Affiliate personnel in such category providing Back-End Transition Services *plus* (iii) ten percent (10%)of the product of (i) and (ii), *plus* (iv) all other reasonable and documented costs and expenses incurred by Operator (without markup for profit) that are necessary and reasonable in the course of providing the Back-End Transition Services, including the cost of any Subcontractors providing Back-End Transition Services.

CONFIDENTIAL

(c)      Funding.

(i)      Owner shall establish one or more accounts from which Owner shall draw funds from time to time to pay Operator the Back-End Transition Service Fee (collectively, the "Back-End Transition Account").

(ii)      Promptly after the Back-End Transition Commencement Date (and in any event within five (5) Business Days), Operator shall deliver to Administrator an estimate of the anticipated Back-End Transition Service Fee for the following four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*). Within ten (10) days of delivery of such estimate, and prior to and as a condition to the commencement of any Back-End Transition Services, Administrator shall provide Operator evidence reasonably satisfactory to Operator that an amount equal to the sum of the anticipated Back-End Transition Service Fee for the following four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*), has been funded in the Back-End Transition Account by Owner. Prior to the end of each month during the period in which Operator performs the Back-End Transition Services, Operator shall deliver to Administrator an estimate of the anticipated Back-End Transition Service Fee for the following four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*). No later than the tenth (10th) Business Day of each month during the period in which Operator performs the Back-End Transition Services, Owner shall replenish the Back-End Transition Account so as to maintain a balance in the Back-End Transition Account at the end of each calendar month equal to the sum of the anticipated Back-End Transition Service Fee for the subsequent four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*), and so on subsequently until the Back-End Transition Services conclude.

(iii)      In the event a Dispute arises between Operator and Administrator in connection with Operator's estimate of the anticipated Back-End Transition Service Fee, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Back-End Transition Service Fee Estimate Dispute").

(d)      Invoices.

(i)      On or prior to the tenth (10th) day of each month during which Operator is performing the Back-End Transition Services, Operator shall provide Administrator with a monthly invoice describing in reasonable detail the prior calendar month's Back-End Transition Services and the corresponding Back-End Transition Service Fee for such prior calendar month. All invoices shall comply with the requirements set forth in Section 9.2(c) (*Anti-Corruption and Sanctions Laws – Policies and Procedures*).

(ii)      Operator shall provide promptly to Administrator such additional supporting documentation evidencing the provision of the Back-End Transition Services, if any, and the calculation of the Back-End Transition Service Fee related thereto, as Administrator may reasonably request and as may be required by Applicable Law. Administrator shall promptly advise Operator of any disputed invoice amounts, and all such disputes which Operator and Administrator are unable to resolve shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Back-End Transition Service Fee Dispute").

CONFIDENTIAL

(iii)   Payments of undisputed amounts under any invoice shall be due within thirty (30) days of Administrator's receipt of such invoice.

(e)   Audits. At any time and from time to time during and until the expiration of six (6) years following the end of the period during which Operator performs the Back-End Transition Services, Administrator may, upon reasonable prior notice, Audit (or cause to be Audited) the books and records of Operator or any Subcontractor in connection with any requests for payment of the Back-End Transition Service Fee, together with the supporting vouchers and statements, and the calculation of the Back-End Transition Service Fee. Subject to the dispute resolution provisions in Article 15 (*Dispute Resolution*), each payment made by Owner hereunder shall be subject to subsequent adjustment. Following the determination that any such payment adjustment is required, the Party required to make payment shall do so within thirty (30) days of the date of such determination.

**Section 16.5   Surrender of the T&D System**. Upon completion or the earlier expiration of the obligation to provide the Back-End Transition Services in accordance with this Article 16 (*Back-End Transition*), Operator and, if and to the extent Administrator requests, its Contractors and Subcontractors shall peaceably leave and surrender the T&D System to Owner or its designee in a condition consistent with Operator's responsibilities hereunder.

CONFIDENTIAL

# ARTICLE 17
# FORCE MAJEURE EVENTS

**Section 17.1   Notice; Mitigation**.

(a)       Notice. The Party claiming a Force Majeure Event (the "Claiming Party") shall notify the other Party in writing, on or promptly after the date it first becomes aware of such Force Majeure Event, followed within five (5) Business Days by a written description of (i) the Force Majeure Event and the cause thereof (to the extent known), (ii) the date the Force Majeure Event began and its estimated duration, (iii) the manner in which and the estimated time during which the performance of the Claiming Party's obligations hereunder will be affected, and the impact, if any, on any scheduled completion dates for Capital Improvements, and (iv) mitigating actions that the Claiming Party plans to take in order to reduce the impact of the Force Majeure Event; provided that the Claiming Party's failure to promptly notify the other Party shall not preclude the Claiming Party from obtaining relief with respect to the Force Majeure Event if the other Party has not been prejudiced by the Claiming Party's delay to provide prompt notice.

(b)       Mitigation. Whenever a Force Majeure Event shall occur, the Claiming Party shall, as promptly as reasonably possible, use commercially reasonable efforts to mitigate or eliminate the cause therefor, reduce costs resulting therefrom, mitigate and limit damage to the other Party and resume full performance under this Agreement.

(c)       Burden of Proof. The Claiming Party shall bear the burden of proof as to the existence and impact of the Force Majeure Event, and shall furnish promptly in writing (if and to the extent available to it) any additional documents or other information relating to the Force Majeure Event reasonably requested by the other Party. While the Force Majeure Event continues, the Claiming Party shall give notice to the other Party before the first day of each succeeding month updating the information previously submitted with respect to the nature, cause, impact and potential duration of the Force Majeure Event pursuant to this Section 17.1 (*Notice; Mitigation*). The Parties hereby agree that, in the event that a Dispute arises between the Parties in connection with whether and to the extent an event, circumstance or condition constitutes a Force Majeure Event, or whether such Force Majeure Event continues, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Force Majeure Event Dispute").

(d)       Notice of Cessation of Force Majeure Event. Upon the cessation of a Force Majeure Event, including a determination by the Independent Expert that a Force Majeure Event no longer exists, the Claiming Party shall (i) promptly (but in any event within five (5) Business Days) provide notice to the other Party and (ii) promptly thereafter resume compliance with this Agreement.

**Section 17.2   Relief**.

(a)       Generally. If and to the extent a Force Majeure Event interferes with, delays or increases the cost of, a Party's performance of its obligations under this Agreement, and such Party has given timely notice and description as required by Section 17.1 (*Notice; Mitigation*), such Party shall be excused from performance and any associated Events of Default except to the

CONFIDENTIAL

extent contemplated in Section 17.2(c) (*Relief – Extended Event*). In the event Operator is the party claiming the Force Majeure Event, Operator shall be (i) excused with respect to the achievement of any Performance Metrics affected by the Force Majeure Event and (ii) entitled to request appropriate adjustments to the Budgets or the Performance Metrics in accordance with Section 7.4 (*Budget Policy*).

(b)  Limitations. The occurrence of Force Majeure Event shall not excuse or delay the performance of (i) a Party's obligation to pay amounts previously accrued and owing under this Agreement, including any earned but unpaid Service Fees, (ii) Owner's obligation to continue to pay the Fixed Fee and to deposit and make funds available for Operator's use in the Service Accounts in accordance with Article 7 (*Compensation; Budgets*) and (iii) any obligation hereunder not affected by the occurrence of the Force Majeure Event.

(c)  Extended Event. In addition to all other relief pursuant to this Agreement, including under Section 4.1(f) (*Front-End Transition Period Generally – Liability Waiver*), Section 4.8(c) (*Failure of Service Commencement Conditions – Effect of Force Majeure Events or Owner Fault*) and Section 7.4 (*Budget Policy*), if and to the extent a Force Majeure Event continues for a period in excess of one hundred twenty (120) consecutive days and materially interferes with, delays or increases the cost of the O&M Services in accordance herewith, and a Party has given timely notice and description as required by Section 17.1 (*Notice; Mitigation*), Administrator and Operator shall negotiate in good faith to determine whether modifications to the Service Fee, Term or other provisions of this Agreement are appropriate under the circumstances; provided any such modification (i) shall not be effective until Administrator has obtained, at the cost of Owner or Administrator, a Tax Opinion and a Reliance Letter with respect to any such modification and (ii) shall be subject to approval by PREB in accordance with Applicable Law.

CONFIDENTIAL

# ARTICLE 18
# INDEMNIFICATION

**Section 18.1   Indemnification by Operator**.

(a)      Generally. Subject to the limitations on liability set forth in this Section 18.1 (*Indemnification by Operator*), Section 18.3 (*Limitation on Liability*), Section 18.4 (*Insurance and Other Recovery*), Section 18.5 (*Liability Limitation for Certain Damages*) and Section 18.6 (*Additional Liability Limitation for Certain Damages*), Operator shall indemnify, defend and hold harmless Owner, Administrator and their respective Affiliates and Representatives (each, including Owner, an "Owner Indemnitee"), from and against (and pay the full amount of) any and all Losses incurred by an Owner Indemnitee to the extent arising or resulting from, in each case, as determined by a final and non-appealable judgment by a court of competent jurisdiction: (i) any breach by Operator of any representation or warranty of Operator in this Agreement that has a material adverse effect on the T&D System or on the performance or the cost of performance by any Party of its respective obligations under this Agreement; or (ii) the negligence (including gross negligence) or willful misconduct of Operator Indemnitees in connection with the performance of Operator's obligations under this Agreement, except in connection with Section 5.10 (*Environmental Health and Safety Matters*) where the applicable standard shall be gross negligence or willful misconduct to the extent provided therein. Operator's indemnification obligations hereunder shall not be limited by any coverage exclusions or other provisions in any insurance policy maintained by Operator which is intended to respond to such events.

(b)      Limitations. Notwithstanding the foregoing, Operator shall not be required to reimburse or indemnify any Owner Indemnitee for any Losses to the extent caused by or due to (i) Owner Fault, (ii) a Force Majeure Event, other than to the extent caused by the gross negligence or willful misconduct of any Operator Indemnitee in responding to such Force Majeure Event, (iii) the negligence (including gross negligence) or willful misconduct of any Owner Indemnitee), (iv) any matter for which Owner expressly indemnifies Operator pursuant to Section 18.2 (*Indemnification by Owner*), or (v) events or circumstances arising prior to the Service Commencement Date, in each case as determined by a final and non-appealable judgment by a court of competent jurisdiction.

(c)      Notice, Defense and Survival. An Owner Indemnitee shall promptly notify Operator in writing pursuant to Section 20.2 (*Notices*) of this Agreement of the assertion of any claim against it for which it is entitled to be indemnified hereunder, and Operator shall have the right to assume the defense of the claim in any Legal Proceeding and to approve any settlement of the claim, such approval not to be unreasonably withheld, delayed or conditioned. For the avoidance of doubt, any Fees-and-Costs associated with Operator defending Owner Indemnitees pursuant to this Section 18.1 (*Indemnification by Operator*) shall be T&D Pass-Through Expenditures, except to the extent Operator's liability to pay such Fees-and-Costs is determined by a final and non-appealable judgment by a court of competent jurisdiction. The indemnification provisions in this Section 18.1 (*Indemnification by Operator*) are (i) for the protection of Owner Indemnitees only and shall not establish, of themselves, any liability to any Person not party to this Agreement and (ii) shall survive termination of this Agreement.

CONFIDENTIAL

**Section 18.2   Indemnification by Owner**.

(a)     Generally. Subject to the limitations on liability set forth in this Section 18.2 (*Indemnification by Owner*), Section 18.3 (*Limitation on Liability*), Section 18.4 (*Insurance and Other Recovery*), Section 18.5 (*Liability Limitation for Certain Damages*) and Section 18.6 (*Additional Liability Limitation for Certain Damages*), Owner shall indemnify, defend and hold harmless Operator and the Equity Participants and its and their respective Affiliates and Representatives (each, including Operator, an "Operator Indemnitee"), from and against (and pay the full amount of) any and all Losses incurred by an Operator Indemnitee to the extent arising or resulting from, in each case, as determined by a final and non-appealable judgment by a court of competent jurisdiction: (i) any breach by Owner or Administrator of any of its respective representations or warranties in this Agreement that has a material adverse effect on the T&D System or on the performance or the cost of performance by any Party of its respective obligations under this Agreement; (ii) any failure by Owner or Administrator to perform its obligations under this Agreement or resulting from any Owner Fault; (iii) claims of any nature relating to the T&D System, Owner's operation thereof or any matter in the nature of the services to be provided by, or any other obligations imposed on, Operator hereunder, in each case based on events or circumstances to the extent arising prior to the Service Commencement Date or relating to Legacy Generation Assets, or any fiber optic cable infrastructure or other facilities, equipment and other assets related to telecommunications in which Owner or PREPA Networks, LLC has an ownership or leasehold interest (other than in connection with Operator's obligations under Section I.A(6) of Annex I (*Scope of Services*)); (iv) the negligence (including gross negligence) or willful misconduct of Owner Indemnitees in connection with this Agreement; (v) claims brought by Owner employees or former employees with respect to the non-payment or underfunding of benefits under Owner's pension or other employee benefit plans; (vi) claims brought against Operator by a T&D Customer in connection with the T&D System or Operator's performance of the O&M Services; (vii) claims brought against Operator by a Person not party to this Agreement in connection with the T&D System or Operator's performance of the O&M Services for loss of profits or revenues or special, exemplary, punitive, indirect or consequential damages, howsoever or whensoever arising and whether or not caused by the negligence of any Operator Indemnitee; or (viii) Pre-Existing Environmental Conditions, other than an exacerbation of such Pre-Existing Environmental Conditions to the extent caused by the gross negligence or willful misconduct of any Operator Indemnitee.

(b)     Limitations. Owner's indemnification obligations hereunder shall not be limited by any coverage exclusions or other provisions in any insurance policy maintained by Owner which is intended to respond to such events. Notwithstanding the foregoing, other than with respect clauses (vii) and (viii) of Section 18.2(a) (*Indemnification by Owner – Generally*), to which the following statement shall not apply, Owner shall not be required to reimburse or indemnify any Operator Indemnitee for any Losses to the extent caused by or due to: (i) a Force Majeure Event, other than to the extent caused by the gross negligence or willful misconduct of any Owner Indemnitee in responding to such Force Majeure Event; (ii) the negligence (including gross negligence) or willful misconduct of any Operator Indemnitee; or (iii) any matter for which Operator expressly indemnifies Owner pursuant to Section 18.1 (*Indemnification by Operator*), in each case as determined by a final and non-appealable judgment by a court of competent jurisdiction.

CONFIDENTIAL

(c)  Notice, Defense and Survival. An Operator Indemnitee shall promptly notify Owner in writing pursuant to Section 20.2 (*Notices*) of this Agreement of the assertion of any claim against it for which it is entitled to be indemnified hereunder, and Owner shall have the right to assume the defense of the claim in any Legal Proceeding and to approve any settlement of the claim, such approval not to be unreasonably withheld, delayed or conditioned. Any amount payable by Owner to any Operator Indemnitee pursuant to this Section 18.2 (*Indemnification by Owner*) that remains unsatisfied for a period of sixty (60) days shall be treated as a T&D Pass-Through Expenditure; provided, however, that the foregoing shall not limit Owner's ability to contest whether such payment is due. The provisions in this Section 18.2 (*Indemnification by Owner*) (i) are for the protection of Operator Indemnitees only and shall not establish, of themselves, any liability to any Person not party to this Agreement and (ii) shall survive termination of this Agreement.

**Section 18.3  Limitation on Liability**. Notwithstanding anything contained in this Agreement to the contrary:

(a)  Operator General Limitations.

(i)  Except as set forth in Section 18.3(b) (*Limitation on Liability – Gross Negligence; Willful Misconduct*), Operator's liability to Owner Indemnitees under Section 18.1 (*Indemnification by Operator*), including Disallowed Costs, shall be limited to US$35,000,000 in the aggregate for Losses occurring in any Contract Year; and US$105,000,000 in the aggregate for all Losses during the Term.

(ii)  From the Effective Date until the end of the second (2nd) Contract Year, Operator shall not be liable for any Loss incurred by an Owner Indemnitee pursuant to Section 18.1 (*Indemnification by Operator*) unless and until the aggregate amount of such Losses in such Contract Year exceeds US$5,000,000 (as adjusted on a Pro Rata basis for a partial Contract Year), in which event Operator shall then be liable for all Losses in excess of US$5,000,000 (as adjusted on a Pro Rata basis for a partial Contract Year), subject to the limitation on liability set forth in Section 18.3(a) (*Limitations on Liability – Operator General Limitations*).

(iii)  From the beginning of the third (3rd) Contract Year until the end of the Term, Operator shall not be liable for any Loss incurred by an Owner Indemnitee pursuant to Section 18.1 (*Indemnification by Operator*) unless and until the aggregate amount of such Losses in such Contract Year exceeds US$2,500,000 (as adjusted on a Pro Rata basis for a partial Contract Year), in which event Operator shall then be liable for all Losses in excess of US$2,500,000 (as adjusted on a Pro Rata basis for a partial Contract Year), subject to the limitation on liability set forth in Section 18.3(a) (*Limitations on Liability – Operator General Limitations*).

(iv)  For the avoidance of doubt, Operator shall not be liable to Owner Indemnitees to the extent Owner is determined, by a final and non-appealable judgment by a court of competent jurisdiction, to have acted or refrained from acting in accordance with the terms of this Agreement.

(b)  Gross Negligence; Willful Misconduct.

CONFIDENTIAL

(i)     Operator's liability to Owner Indemnitees for any Losses attributable to any Operator Indemnitee's gross negligence or willful misconduct under this Agreement, including under Section 18.1 (*Indemnification by Operator*) and any Disallowed Costs attributable to Operator Indemnitees' gross negligence or willful misconduct, shall be limited to:

(A)     US$35,000,000 for all Losses occurring in each Contract Year for each of the first five (5) Contract Years;

(B)     US$52,500,000 for all Losses occurring in each Contract Year for each subsequent Contract Year, and

(C)     a total maximum of US$105,000,000 in the aggregate for all Losses during the Term.

(ii)     If any liability for Losses is attributable in part to gross negligence and in part to negligence, then such liability shall be apportioned such that the portion of the Loss attributable to negligence shall be subject to the limitation on liability set forth in set forth in Section 18.3(a)(i) (*Limitations on Liability – Operator General Limitations*).

(c)     <u>No Administrator Liability</u>. Administrator shall not be liable to Operator Indemnitees under this Agreement.

## Section 18.4   Insurance and Other Recovery.

(a)     <u>Generally</u>. The amount of any Losses that are subject to indemnification, compensation or reimbursement under this Agreement shall be reduced by the amount of any insurance proceeds and any indemnity, contribution or other similar payment actually received by Owner Indemnitee or Operator Indemnitee, as applicable, in respect of such Losses or any of the events, conditions, facts or circumstances resulting in or relating to such Losses ("<u>Third-Party Payments</u>"). If an Owner Indemnitee or Operator Indemnitee, as applicable, receives any Third-Party Payment with respect to any Losses for which it has previously been indemnified (directly or indirectly) by an Indemnifying Party, Owner Indemnitee or Operator Indemnitee, as applicable, shall promptly (and in any event within five (5) Business Days after receiving such Third-Party Payment) pay to the Indemnifying Party an amount equal to such Third-Party Payment or, if it is a lesser amount, the amount of such previously indemnified Losses. Owner Indemnitee or Operator Indemnitee, as applicable, shall use commercially reasonable efforts to recover under insurance policies or indemnity, contribution or other similar agreements other than this Agreement for any Losses to the same extent such Party would if such Losses were not subject to indemnification, compensation or reimbursement hereunder.

(b)     <u>Subrogation of Claims</u>. If a Party makes any indemnity payment for any Losses suffered or incurred by an Owner Indemnitee or Operator Indemnitee, as applicable, pursuant to the provisions of this Article 18 (*Indemnification*), such indemnifying Party shall be subrogated, to the extent of such payment, to all rights and remedies of the Owner Indemnitee or Operator Indemnitee, as applicable, to any insurance benefits or other claims of the Owner Indemnitee or Operator Indemnitee, as applicable, with respect to such Losses and with respect to the matter giving rise to such Losses.

CONFIDENTIAL

**Section 18.5 Liability Limitation for Certain Damages**. TO THE FULLEST EXTENT PERMITTED BY LAW, NEITHER OPERATOR INDEMNITEES NOR OWNER INDEMNITEES SHALL BE LIABLE, WHETHER IN CONTRACT, INDEMNITY, TORT (INCLUDING NEGLIGENCE, GROSS NEGLIGENCE AND STRICT LIABILITY) OR OTHERWISE, FOR ANY LOSS OF PROFITS OR REVENUES (OTHER THAN COMPENSATION DUE BY OWNER TO OPERATOR UNDER THIS AGREEMENT), OR ANY SPECIAL, EXEMPLARY, PUNITIVE, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES WHICH ARISE FROM, RELATE TO OR ARE CONNECTED WITH THIS AGREEMENT OR THE PERFORMANCE OF OR FAILURE TO PERFORM THEIR RESPECTIVE OBLIGATIONS HEREUNDER EXCEPT FOR CLAIMS OF FRAUD OR INTENTIONAL MISREPRESENTATION.

**Section 18.6 Additional Liability Limitation for Certain Damages**.

(a) OWNER AND ADMINISTRATOR UNDERSTAND THAT OPERATOR MAY BE PROVIDING O&M SERVICES THAT:

(i) AS OF THE SERVICE COMMENCEMENT DATE, INCORPORATE OR ARE RELIANT UPON ASSETS (INCLUDING THE T&D SYSTEM) THAT ARE IN A CONDITION REQUIRING REPAIRS OR IMPROVEMENTS; AND

(ii) INCORPORATE OR ARE RELIANT UPON INFORMATION, SYSTEMS, DATA OR INSTRUCTIONS THAT HAVE BEEN, ARE OR ARE TO BE PROVIDED BY OWNER OR THIRD-PARTIES.

(b) AS SUCH, OWNER AND ADMINISTRATOR ACKNOWLEDGE AND AGREE THAT, EXCEPT TO THE EXTENT ARISING OR RESULTING FROM THE NEGLIGENCE (INCLUDING GROSS NEGLIGENCE) OR WILLFUL MISCONDUCT OF OPERATOR INDEMNITEES IN CONNECTION WITH THIS AGREEMENT, OPERATOR INDEMNITEES:

(i) SHALL HAVE NO RESPONSIBILITY OR LIABILITY FOR ANY MATTER THAT IS THE SUBJECT OF THE SYSTEM REMEDIATION PLAN DURING THE PERIOD OPERATOR IS REPAIRING OR IMPROVING THE T&D SYSTEM ASSETS, BUSINESS PROCESS OR CONTROLS, WHETHER FORMAL OR INFORMAL, INCLUDING ACCOUNTING, INFORMATION, TECHNOLOGY AND ADMINISTRATIVE FUNCTIONS, IN EACH CASE RELATED TO SUCH MATTER IN ACCORDANCE WITH THE SYSTEM REMEDIATION PLAN (FOR THE AVOIDANCE OF DOUBT, OPERATOR SHALL NOT BE LIABLE FOR DAMAGES ARISING FROM CYBERSECURITY BREACHES OCCURING DURING THE PERIOD OPERATOR IS REPAIRING OR IMPROVING THE T&D SYSTEM ASSETS, BUSINESS PROCESS OR CONTROLS, WHETHER FORMAL OR INFORMAL, IN ACCORDANCE WITH THE IMPLEMENTATION OF THE SYSTEM REMEDIATION PLAN IN SECTION 4.1(D) (*FRONT-END TRANSITION PERIOD GENERALLY – TRANSITION TO STANDARD OF PERFORMANCE*).); AND

(ii) SHALL HAVE NO LIABILITY HEREUNDER FOR ANY DEFECT, ERROR, DEFAULT, DELAY OR LOSSES ARISING AS A RESULT OF ANY

CONFIDENTIAL

PROCESSING DEFICIENCY, INACCURACY, ERROR OR OMISSION TO THE EXTENT CAUSED BY A THIRD-PARTY OR BY INFORMATION, SYSTEMS, DATA OR INSTRUCTIONS PROVIDED BY A THIRD-PARTY, OWNER, ADMINISTRATOR OR THEIR RESPECTIVE REPRESENTATIVES.

CONFIDENTIAL

# ARTICLE 19
# REPRESENTATIONS AND WARRANTIES

**Section 19.1   Representations and Warranties of Owner**. Owner hereby represents and warrants to Operator that:

(a)      Existence and Powers. Owner is a public corporation and instrumentality of the Commonwealth duly organized, validly existing and in good standing under the laws of the Commonwealth. Owner has the required corporate power and authority to enter into this Agreement, carry out its obligations hereunder and consummate the transactions contemplated hereby. Administrator has the required corporate power and authority to carry out its obligations under this Agreement and on behalf of Owner, including the power and authority to bind Owner with respect to any matter contemplated under this Agreement.

(b)      Due Authorization and Binding Obligation. The execution and delivery by Owner of this Agreement, the performance by Owner of its obligations hereunder and the consummation by Owner of the transactions contemplated hereby have been duly and validly authorized and approved by the required corporate or other similar action on the part of Owner. This Agreement has been duly and validly executed and delivered by Owner, and (assuming due authorization, execution and delivery by Operator) this Agreement constitutes a legal, valid and binding obligation of Owner enforceable against Owner in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium or similar Applicable Law affecting creditors' rights generally and by general equity principles.

(c)      No Conflicts. Neither the execution, delivery or performance by Owner of this Agreement, nor the consummation of the transactions contemplated hereby will: (i) result in a material violation or breach of, or material default under, any provision of the organizational documents of Owner; (ii) result in a violation of, or give any Governmental Body the right to challenge any of the transactions contemplated hereby under, any Applicable Law applicable to Owner; (iii) (A) result in a violation or breach of, (B) constitute a default under, (C) result in the acceleration of or create in any party the right to accelerate, terminate or cancel or (D) require the consent of any other Person under, any material contract to which Owner is a party; or (iv) result in the creation or imposition of any Lien on any properties or assets of Owner.

(d)      No Consents. No consent, declaration or filing with, or notice to, any Governmental Body is required by or with respect to Owner in connection with (i) the execution and delivery of this Agreement or (ii) the performance by Owner of its obligations hereunder, except (A) such as have been duly obtained or made and (B) in the case of clause (ii), for those Governmental Approvals to be obtained after the Effective Date but before the Service Commencement Date.

(e)      No Litigation. There is no action, suit or other proceeding, at law or in equity, before or by any court or Governmental Body pending against Owner or, to Owner's knowledge, threatened against Owner, which if determined adversely against Owner would reasonably be expected to materially and adversely affect (i) the validity or enforceability of this Agreement or (ii) the performance by Owner or Operator of their respective obligations hereunder.

CONFIDENTIAL

(f)       <u>No Legal Prohibition</u>. There is no Applicable Law in effect on the date hereof that would prohibit the execution, delivery or performance by Owner of this Agreement and the transactions contemplated hereby.

(g)       <u>Title III Approval</u>. No approval of the Title III Court is required for Owner to enter into this Agreement. Owner's entry into, and the Parties' performance of, this Agreement, constitutes use or enjoyment by Owner of its revenue-producing property within the meaning of section 305(3) of PROMESA.

(h)       <u>Charges</u>. As of the Service Commencement Date, there will be no Liens on the System Revenues other than those specified in or permitted under any Title III Plan and its related implementing documents.

(i)       <u>Intellectual Property</u>. Owner has the right to grant the Intellectual Property licenses that are granted and conveyed to Operator in this Agreement, and Operator's exercise of the rights granted to it in this Agreement as contemplated in this Agreement will not infringe, violate or misappropriate the Intellectual Property of any third party. There are no suits or other legal actions pending or, to Owner's knowledge, threatened in writing against Owner alleging infringement, violation or misappropriation of any Owner Intellectual Property.

(j)       <u>System Contracts</u>. To Owner's knowledge and except as otherwise disclosed to Operator, (i) each material System Contract is in full force and effect and was procured in accordance with applicable Commonwealth law, (ii) there are no pending claims by or against any counterparty to a material System Contract, (iii) neither Owner nor any counterparty to a material System Contract is in default of its obligations under any material System Contract and (iv) Operator is permitted to administer and perform Owner's obligations under each material System Contract on Owner's behalf.

(k)       <u>Operation of T&D System</u>. Without limiting any other representations or warranties set out herein, from the Effective Date to the Service Commencement Date, Owner has, except as otherwise permitted by this Agreement or required by Applicable Law (including requirements related to the Title III Case), operated the T&D System in the ordinary course.

(l)       <u>Pre-Existing Environmental Conditions</u>. As of the Service Commencement Date, after commercially reasonable inquiry, Owner is not aware of any Pre-Existing Environmental Conditions on or at the T&D System Site which has not been disclosed to Operator pursuant to the Baseline Environmental Study.

**Section 19.2  Representations and Warranties of Operator**. Operator hereby represents and warrants to Owner that:

(a)       <u>Existence and Powers</u>. ManagementCo is a limited liability company duly organized, validly existing and in good standing under the laws of Puerto Rico, and is qualified to do business and in good standing in the Commonwealth. ServCo is a limited liability company duly organized, validly existing and in good standing under the laws of Puerto Rico, and is qualified to do business and in good standing in the Commonwealth. Each of ManagementCo and

CONFIDENTIAL

ServCo has the required corporate power and authority to enter into this Agreement, carry out its obligations hereunder and consummate the transactions contemplated hereby.

(b)　　　Due Authorization and Binding Obligation. The execution and delivery by Operator of this Agreement, the performance by Operator of its obligations hereunder and the consummation by Operator of the transactions contemplated hereby have been duly and validly authorized and approved by the required corporate or other similar action on the part of Operator. This Agreement has been duly and validly executed and delivered by Operator, and (assuming due authorization, execution and delivery by Owner) this Agreement constitutes a legal, valid and binding obligation of Operator enforceable against Operator in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium or similar Applicable Law affecting creditors' rights generally and by general equity principles.

(c)　　　No Conflicts. Neither the execution, delivery or performance by Operator of this Agreement, nor the consummation of the transactions contemplated hereby will: (i) result in a material violation or breach of, or material default under, any provision of the organizational documents of Operator; (ii) result in a violation of, or give any Governmental Body the right to challenge any of the transactions contemplated hereby under, any Applicable Law applicable to Operator; (iii) (A) result in a violation or breach of, (B) constitute a default under, (C) result in the acceleration of or create in any party the right to accelerate, terminate or cancel or (D) require the consent of any other Person under, any material contract to which Operator is a party; or (iv) result in the creation or imposition of any Lien on any properties or assets of Operator.

(d)　　　No Consents. No consent, declaration or filing with, or notice to, any Governmental Body is required by or with respect to Operator in connection with (i) the execution and delivery of this Agreement or (ii) the performance by Operator of its obligations hereunder, except (A) such as have been duly obtained or made and (B) in the case of clause (ii), for those Governmental Approvals to be obtained after the Effective Date but before the Service Commencement Date.

(e)　　　No Litigation. There is no action, suit or other proceeding, at law or in equity, before or by any court or Governmental Body pending against Operator or, to Operator's knowledge, threatened against Operator, which if determined adversely against Operator would reasonably be expected to materially and adversely affect (i) the validity or enforceability of this Agreement or (ii) the performance by Operator or Owner of their respective obligations hereunder.

(f)　　　No Legal Prohibition. There is no Applicable Law in effect on the date hereof that would prohibit the execution, delivery or performance by Operator of this Agreement and the transactions contemplated hereby.

(g)　　　Intellectual Property. Operator has the right to grant the Intellectual Property licenses that are granted and conveyed to Owner in this Agreement, and Owner's exercise of the rights granted to it in this Agreement as contemplated in this Agreement will not infringe, violate or misappropriate the Intellectual Property of any third party. There are no suits or other legal actions pending or, to Operator's knowledge, threatened in writing against Operator alleging infringement, violation or misappropriation of any Operator Intellectual Property.

CONFIDENTIAL

(h)      Applicable Law Compliance.

(i)      None of Operator or its subsidiaries or, when acting on behalf of Operator or its subsidiaries, any director, officer, manager, administrator or employee of Operator or its subsidiaries or, in connection with this Agreement or the O&M Services, any Affiliates of Operator has:

(A)      violated, conspired to violate, aided and abetted the violation of any Anti-Corruption Laws or committed any felonies or misdemeanors under Articles 4.2, 4.3 or 5.7 of Act No. 1-2012, known as the Organic Act of the Office of Government Ethics of Puerto Rico, any of the crimes listed in Articles 250 through 266 of Act 146-2012, known as the Puerto Rico Penal Code, any of the crimes typified in Act 2, or any other felony that involves misuse of public funds or property, including the crimes mentioned in Article 6.8 of Act 8-2017, known as the Act for the Administration and Transformation of Human Resources in the Government of Puerto Rico;

(B)      failed to comply at any time with the Anti-Corruption Laws and any other Applicable Law that prohibit corruption and regulate criminal acts involving public functions or public funds applicable to Operator under state, Commonwealth or federal law, or solely with respect to Operator, failed to furnish a Sworn Statement; or

(C)      been convicted of offenses against public integrity, as defined in the Puerto Rico Penal Code, or of embezzlement of public funds, or has been found guilty of any such type of offense in the courts of the Commonwealth, the courts of the United States or any court of any jurisdiction.

(ii)      Operator has not, directly or indirectly, made or received, and will not make or receive, any payments in connection with this Agreement or the O&M Services in order to illegally or improperly to obtain business or other rights.

(iii)      Operator is not aware that it is being investigated as part of a criminal or civil process by any law enforcement or regulatory authority in connection in any way with the Anti-Corruption Laws or any criminal laws or regulations.

(iv)      None of Operator, its subsidiaries, Parent Company or any directors, officers or employees of any thereof is (A) a Person, or is a Person owned or controlled by a Person (a "Sanctioned Person"), with whom dealings are restricted or prohibited by, or are sanctionable under, any economic sanctions or trade restrictions administered or enforced by the U.S. government (including the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State or the Bureau of Industry and Security of the U.S. Department of Commerce), the United Nations Security Council, the European Union or Her Majesty's Treasury or any other authority with jurisdiction over Operator, its subsidiaries or its Affiliates (collectively, "Sanctions") or (B) located, organized or resident in a country or territory with which dealings are broadly restricted, prohibited or made sanctionable under any Sanctions (currently, the Crimea, Cuba, Iran, North Korea and Syria) (each, a "Sanctioned Country"). Operator and its subsidiaries have not violated and have not engaged in any conduct sanctionable under Sanctions. There are not now, nor have there been within the past five (5) years, any formal

151

CONFIDENTIAL

or informal proceedings, allegations, investigations or inquiries pending, expected or, to the knowledge of the Parent Company, threatened against the Parent Company, Operator, its subsidiaries, or any of their respective officers or directors concerning violations or potential violations of, or conduct sanctionable under, any Sanctions.

(v)     No official or employee of Owner has a direct or indirect economic interest in Operator's rights under this Agreement in accordance with the provisions of Act 2, which Operator herein certifies it has received a copy of, read, understood and complied with at all times prior to the execution of this Agreement and will subsequently comply with it in its entirety.

(vi)     Operator does not represent particular interests in cases or matters that imply conflicts of interest, or of public policy, between Owner and the particular interests it represents.

(i)     <u>Accuracy of Information</u>. All of the information relating to Operator or any of its Affiliates delivered by or on behalf of Operator to Owner and Administrator in connection with the execution of this Agreement was true, accurate and complete in all material respects when delivered.

(j)     <u>Ability to Perform Obligations</u>. Operator has the required authority, ability, skills, access to funds, technical support and capacity to perform all its obligations with respect to the O&M Services and all of its other obligations under this Agreement, all in accordance with the Transaction Documents.

(k)     <u>Knowledge of Requirements</u>. Operator has knowledge in all material respects of all legal requirements and business and engineering practices that must be followed in performing its obligations under this Agreement.

(l)     <u>No Litigation with Owner</u>. Neither Operator nor any of its shareholders or its or their Affiliates are involved in any litigation, arbitration or claim against Owner, Administrator, AAFAF or the FOMB.

CONFIDENTIAL

# ARTICLE 20
## MISCELLANEOUS

**Section 20.1   Fees and Expenses**. Except as otherwise expressly provided in this Agreement, all costs and expenses incurred, including fees and disbursements of counsel, financial advisors and accountants, in connection with the negotiation and execution of this Agreement shall be borne by the Party incurring such costs and expenses; provided, however, that, in the event this Agreement is terminated in accordance with its terms, the obligation of each Party to bear its own costs and expenses shall be subject to any rights of such Party arising from a breach of this Agreement by the other Party prior to such termination.

**Section 20.2   Notices**. All notices or other communications to be delivered in connection with this Agreement shall be in writing and shall be deemed to have been properly delivered, given and received (a) on the date of delivery if delivered by hand during normal business hours of the recipient during a Business Day, otherwise on the next Business Day, (b) on the date of successful transmission if sent via email (with return receipt) during normal business hours of the recipient during a Business Day, otherwise on the next Business Day, or (c) on the date of receipt by the addressee if sent by a nationally recognized overnight courier or by registered or certified mail, return receipt requested, if received on a Business Day, otherwise on the next Business Day. Such notices or other communications must be sent to each respective Party at the address, email address set forth below (or at such other address, email address as shall be specified by a Party in a notice given in accordance with this Section 20.2 (*Notices*)):

If to Owner:

Puerto Rico Electric Power Authority
PO BOX 364267
San Juan, Puerto Rico 00936-4267
Attention: Chief Executive Officer – José F. Ortiz Vázquez
Telephone: (787) 521-4666
Email: Jose.Ortiz@prepa.com

with copies to:
Administrator
PO BOX 42001
San Juan, Puerto Rico 00940-2001
Attention: Executive Director – Fermín E. Fontanés Gómez
Telephone: (787) 722-2525 Ext. 15330
Email: Fermin.Fontanes@p3.pr.gov and Administrator@p3.pr.gov
*and*
PREB
268 Avenida Muñoz Rivera
Edificio World Plaza
Piso 7, Suite 704
Hato Rey, Puerto Rico 00918
Attention: President - Edison Avilés Deliz

CONFIDENTIAL

Telephone: (787) 523-6262
Email: eavilesdeliz@energia.pr.gov

If to Administrator:                    Administrator
                                        PO BOX 42001
                                        San Juan, Puerto Rico 00940-2001
                                        Attention: Executive Director – Fermín E. Fontanés
                                        Gómez
                                        Telephone: (787) 722-2525 Ext. 15330
                                        Email: Fermin.Fontanes@p3.pr.gov and
                                        Administrator@p3.pr.gov

If to Operator:                         LUMA Energy, LLC
                                        644 Fernandez Juncos Ave., Suite 301
                                        San Juan, Puerto Rico 00907
                                        Attention: General Counsel
                                        Email: Legal@lumamc.com

                                        with copies to:
                                        LUMA Energy, LLC
                                        644 Fernandez Juncos Ave., Suite 301
                                        San Juan, Puerto Rico 00907
                                        Attention: President/CEO

**Section 20.3   Amendments**. Neither this Agreement nor any provision hereof may be changed, modified, amended or waived, except by written agreement duly executed by the Parties. Any such amendment shall not be effective until (i) to the extent required by Applicable Law, approved by PREB and the FOMB (if then in existence) and (ii) Administrator has obtained a Tax Opinion and a Reliance Letter, at the cost of Owner or Administrator, with respect to any such amendment. Wherever this Agreement requires the Parties to use good faith, reasonable, commercially reasonable or other efforts to amend the terms of this Agreement, Operator shall not be deemed to be in breach of such requirement as a result of its insistence that such amendment not adversely affect Operator's compensation under, or its return on investment or other economic interests with respect to, this Agreement, except to the extent such adverse effect results solely from inflation or the imposition of a Tax or an increase in Taxes of general application.

**Section 20.4   Entire Agreement**. This Agreement, together with the Annexes and Exhibits attached hereto, constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes any and all prior oral or written agreements, understandings, proposals, representations or warranties relating to this Agreement. Without limiting the generality of the foregoing, this Agreement shall completely and fully supersede all other understandings and agreements among the Parties with respect to such transactions, including those contained in the RFP, the Proposal by Operator or its Affiliate and any amendments or supplements to the RFP or the Proposal.

154

CONFIDENTIAL

**Section 20.5  Relationship of the Parties**. Nothing in this Agreement is intended to create, or shall be deemed or construed as creating, any partnership, joint venture or other legal entity, or give rise to any fiduciary duty, among the Parties. Except as otherwise expressly provided in this Agreement, no Party shall have the authority or right, or hold itself out as having the authority or right, to assume, create or undertake any obligation of any kind whatsoever, express or implied, on behalf of or in the name of any other Party, except as expressly provided herein. No provision in this Agreement shall result in Operator or any of its employees, Subcontractors, agents or Representatives being considered an employee, contractor or Representative of Owner. Operator shall be an independent contractor and shall be responsible for and have control over the performance of the O&M Services hereunder, subject to the standards set forth in this Agreement. Nothing in this Agreement shall be interpreted to create a relationship of co-employer between Owner and Operator or Administrator and Operator as to the employees of Operator or any of its respective subcontractors, nor to make Operator an alter ego or a successor employer of Owner.

**Section 20.6  Assignment and Transfer**.

(a)  <u>By Operator</u>. Except as provided in Section 16.3 (*Transfer Obligation*), Operator shall not assign, transfer, convey, lease, encumber or otherwise dispose of its rights or obligations under this Agreement or related to the O&M Services without the prior written consent of Administrator, which consent shall not be unreasonably withheld, delayed or conditioned, and to the extent required by Applicable Law, PREB; <u>provided</u>, <u>however</u>, that Operator may, without the prior written consent of Administrator, assign or otherwise dispose of any of its rights and obligations hereunder to an Affiliate of Operator so long as: (i) such Affiliate is (A) a Controlled direct or indirect subsidiary of the Parent Company, (B) reasonably capable of discharging the duties and obligations of Operator hereunder and (C) assumes in writing all of Operator's obligations hereunder; and (ii) such assignment is otherwise permitted under, and in compliance with, Applicable Law. Any such consent given in one instance shall not relieve Operator of its obligation to obtain the prior written consent of Administrator to any further assignment. Any assignment of this Agreement that is approved by Administrator shall require the assignee of Operator to assume the performance of and observe all obligations, representations and warranties of Operator under this Agreement, and no such assignment shall relieve Guarantor(s) of any of its obligations under the Guarantee. The consent to any assignment, transfer or conveyance shall not operate to release Operator in any way from any of its obligations under this Agreement unless such consent specifically provides otherwise. Any amendments to this Agreement requested by a potential assignee or transferee of Operator shall be submitted to and approved by the board of directors of Administrator pursuant to Section 10(a)(19) of Act 29.

(b)  <u>By Owner</u>. Owner shall not assign, transfer, convey, lease, encumber or otherwise dispose of its rights or obligations under this Agreement without the prior written consent of Operator; <u>provided</u>, <u>however</u>, that Owner may, without the prior written consent of Operator, assign or otherwise dispose of any of its rights and obligations hereunder: (i) to Administrator; or (ii) with prior approval of the FOMB (if then in existence and to the extent such approval is required by Applicable Law), to another Governmental Body if such assignee assumes, and is reasonably and legally, operationally and financially capable of discharging, the duties and obligations of Owner hereunder.

CONFIDENTIAL

**Section 20.7   Interest on Overdue Obligations**. Except as otherwise provided herein, all amounts due hereunder, whether as fees, damages, credits, revenue, charges or reimbursements, that are not paid when due shall bear interest at the Overdue Rate, on the amount outstanding from time to time, and all such interest accrued at any time shall, to the extent permitted by Applicable Law, be deemed added to the amount due, as accrued.

**Section 20.8   Waivers**. Either Operator or Administrator may, at any time, (i) extend the time for the performance of any of the obligations or other acts of the other Party, (ii) waive any inaccuracies in the representations and warranties of the other Party contained herein or (iii) waive compliance by the other Party with any of the agreements or conditions contained herein. No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in a written instrument executed and delivered by the Party so waiving. No waiver by any Party of any breach of this Agreement shall operate or be construed as a waiver of any preceding or subsequent breach, whether of a similar or different character, unless expressly set forth in such written waiver. Neither any course of conduct or failure or delay of any Party in exercising or enforcing any right, remedy or power hereunder shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy or power hereunder, or any abandonment or discontinuance of steps to enforce such right, remedy or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right, remedy or power.

**Section 20.9   Severability**. If any term or provision of this Agreement is invalid, illegal or incapable of being enforced in any situation or in any jurisdiction, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other term or provision hereof or the offending term or provision in any other situation or any other jurisdiction, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible, in a mutually acceptable manner, in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

**Section 20.10 Survival**. The rights and obligations of the Parties pursuant to this Section 20.10 (*Survival*), Article 13 (*Intellectual Property; Proprietary Information*), Article 15 (*Dispute Resolution*), Article 16 (*Back-End Transition*), Article 18 (*Indemnification*), Section 20.2 (*Notices*) and Section 20.15 (*Governing Law*) shall survive the expiration or termination of this Agreement. No expiration or early termination of this Agreement shall (i) limit or otherwise affect the respective rights and obligations of the Parties accrued prior to the date of such termination or (ii) preclude any Party from impleading any other Party in any Legal Proceeding originated by a third-party as to any matter occurring during the Term.

**Section 20.11 No Third-Party Beneficiaries**. Unless specifically set forth herein, this Agreement is exclusively for the benefit of the Parties and shall not provide any third-parties with any remedy, claim, liability, reimbursement, cause of action or other rights.

CONFIDENTIAL

**Section 20.12 Remedies.**

(a) <u>Cumulative and Non-Exclusive Remedies</u>. Except as otherwise provided in this Agreement, any and all remedies herein expressly conferred upon a Party shall be deemed cumulative with and not exclusive of any other remedy expressly conferred hereby, and the exercise by a Party of any one such remedy shall not preclude the exercise of any other such remedy.

(b) <u>Irreparable Damage and Harm</u>. The Parties agree that irreparable damage and harm would occur in the event that any provision of this Agreement were not performed in accordance with its terms and that, although monetary damages may be available for such a breach, monetary damages would be an inadequate remedy therefor. Accordingly, each of the Parties agrees that, in the event of any breach or threatened breach of any provision of this Agreement by such Party, the other Party shall be entitled to an injunction or injunctions, specific performance and other equitable relief to prevent or restrain breaches or threatened breaches hereof and to specifically enforce the terms and provisions hereof. A Party seeking an order or injunction to prevent breaches of this Agreement or to enforce specifically the terms and provisions hereof shall not be required to provide, furnish or post any bond or other security in connection with or as a condition to obtaining any such order or injunction, and each Party hereby irrevocably waives any right it may have to require the provision, furnishing or posting of any such bond or other security. In the event that any Legal Proceeding should be brought in equity to enforce the provisions of this Agreement, each Party agrees that it shall not allege, and each Party hereby waives the defense, that there is an adequate remedy available at law.

**Section 20.13 Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document. A signed copy of this Agreement transmitted by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Agreement for all purposes.

**Section 20.14 Office of the Comptroller.** Owner agrees to file this Agreement with the Comptroller of the Commonwealth promptly after its execution and to provide Operator with evidence of its filing within fifteen (15) days following the Effective Date. The Parties acknowledge and agree that the obligations and considerations under this Agreement shall not be enforceable until this Agreement shall have been registered with the Office of the Comptroller of the Commonwealth as provided by Act No. 18 of the Legislative Assembly of Puerto Rico, enacted on October 30, 1975.

**Section 20.15 Governing Law.** This Agreement and all matters, claims, controversies, disputes, suits, actions or proceedings arising out of or relating to this Agreement and the negotiation, execution or performance of this Agreement or any of the transactions contemplated hereby, including all rights of the Parties (whether sounding in contract, tort, common or statutory law, equity or otherwise) in connection therewith, shall be interpreted, construed and governed by and in accordance with, and enforced pursuant to, the internal laws of the Commonwealth

CONFIDENTIAL

(excluding any conflict of laws rule or principle which might refer such interpretation to the laws of another jurisdiction), except where the federal supremacy clause requires otherwise.

**Section 20.16 Commonwealth Obligations**. THE OBLIGATIONS OF OWNER AND ADMINISTRATOR UNDER THIS AGREEMENT SHALL NOT BE DEEMED OBLIGATIONS OF THE COMMONWEALTH OR ANY INSTRUMENTALITY OF THE COMMONWEALTH OTHER THAN OWNER AND ADMINISTRATOR.

**Section 20.17 PREB Authority**. Notwithstanding anything to the contrary herein, no provision of this Agreement shall be interpreted, construed or deemed to limit, restrict, supersede, supplant or otherwise affect, in each case in any way, the rights, responsibilities or authority granted to PREB under Applicable Law with respect to the T&D System, Owner or Operator.

*[Signature page follows]*

CONFIDENTIAL

**IN WITNESS WHEREOF**, Owner, Administrator, ManagementCo and ServCo each has caused this Agreement to be duly executed as of the day and year first above written.

**PUERTO RICO ELECTRIC POWER AUTHORITY**

By: _____

Name: _____

Title: _____

**PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY, solely in its capacity as ADMINISTRATOR**

By: _____

Name: _____

Title: _____

*[Signature Page to Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement]*

CONFIDENTIAL

**LUMA ENERGY, LLC**

By: _____

Name: _____
Wayne Stensby

Title: _____
President & CEO


By: _____

Name: _____
Gerald A Ducey Jr

Title: _____
Senior Vice President

*[Signature Page to Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement]*

CONFIDENTIAL

**LUMA ENERGY SERVCO, LLC**

By:

Name: President & CEO

Title: Wayne Stensby

By:

Name: Gerald A Ducg Jr

Title: Senior Vice President

*[Signature Page to Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement]*

CONFIDENTIAL

**Annex I**

**Scope of Services**

*This Annex I (Scope of Services) is designed to set forth certain O&M Services in addition to those contained in Article 5 (O&M Services) to the Agreement. This Annex I (Scope of Services) is not intended, nor should it be deemed, to be an exclusive list of O&M Services. However, the Agreement, including this Annex I (Scope of Services), absent subsequent changes agreed to by the Parties, sets forth the entire scope of O&M Services to be provided by pursuant to the Agreement. Capitalized terms used but not defined in this Annex I (Scope of Services) have the respective meanings set forth in the Agreement. All obligations of Operator set forth herein shall be performed in accordance with and are subject to the requirements of the main body of the Agreement.*

I.      <u>T&D System Operation Services</u>.

     A.     <u>General</u>. Operator shall be responsible for all electric transmission, distribution, load serving and related activities for the safe and reliable operation and maintenance of the T&D System, subject to the terms and conditions of the main body of the Agreement, including (1) expansions and replacements to meet the Contract Standards, including fleet, asset management, asset acquisition/procurement, IT infrastructure, as further provided in this document and preparation and implementation of required components of the Integrated Resource Plan, while prioritizing expansion and replacement projects that improve the safe, reliable and economic dispatch of the T&D System's connected generating units; (2) management and performance of construction of improvements thereto, including compliance with approved FEMA scope of work for projects that are eligible for Federal Funding and required maintenance; (3) delivery of electricity to customers, including the implementation of the activities set forth in Sections II.A and II.B of this Annex I (*Scope of Services*); (4) billing and collections implementation and optimization; (5) maintenance and improvement of public lighting system; (6) maintenance of fiber optic cable structure infrastructure, as set forth in lease agreement between Owner and PREPA Networks, LLC, a wholly-owned subsidiary of Owner incorporated in April 2004 to execute the Optical Telecommunications Infrastructure Lease Agreement for dedicated provision of local wholesale telecommunication services (for the avoidance of doubt, the Parties acknowledge and agree that, except as specified in this item (6), Operator shall have no other responsibility relating to PREPA Networks, LLC); (7) compliance with interconnection of renewables in accordance with Applicable Law; (8) management of the System Operation Principles to meet safe and reliable system operations in accordance with Prudent Utility Practices and the System Operation Principles; and (9) recordkeeping and reporting in accordance with Applicable Law or Prudent Utility Practices.

     B.     <u>Day-to-Day Operation</u>. Operator shall be responsible for the day-to-day operation of the T&D System, including: (1) maintaining, improving and developing a culture of safety; (2) management of all aspects of customer relationships, as required under Contract Standards and Applicable Law; (3) physical operation and maintenance of the T&D System; (4) maintaining T&D System reliable electric service (including any changes thereto as a result of reconstruction of any section thereof to address reliability, resiliency, efficiency and/or compliance with Applicable Law); (5) maintenance of applicable communications equipment and protocols with

CONFIDENTIAL

generating units and contracted power plants as needed; (6) operating within the Contract Standards while operating to improve: reliability, cost of electricity to end users, cost and impact of planned maintenance and use of load shedding if required; (7) producing, reviewing and maintaining all operating logs and maintenance records to meet regulatory and contractual requirements; (8) all human resources functions, including hiring and training employees; and (9) maintaining and improving information technology systems that satisfies the needs of the business in accordance with the requirements of the Agreement.

C.     <u>System Operator Activities</u>. Operator shall serve the role of T&D System operator, including (1) managing control center operations, including generation scheduling and economic/reliable T&D System dispatch; (2) balancing the supply and demand of electricity, including reacting to changes in demand in real time, adjusting generation dispatch to be in balance with demand and maintaining the T&D System at safe operating levels in accordance with Prudent Utility Practices and System Operation Principles; (3) conduct T&D System planning activities; (4) develop and implement reliability standards appropriate for the conditions in Puerto Rico; and (5) manage a transparent, equitable and open generator interconnection process.

D.     <u>Engineering Activities</u>. Operator shall be responsible for all engineering activities related to the operation of the T&D System, including: (1) analyses related to, and maintenance of records and standards for design and engineering, design standards, construction standards, system mapping and related information, system performance, reliability, root cause analysis, equipment ratings, customer contact and needs assessment; (2) administration of customer contribution in aid of construction; (3) managing an effective environmental, health and safety program; (4) maintenance of environmental, health, safety, regulatory and other compliance and the documentation thereof; (5) process to serve (evaluate and approve) new customers (distribution engineering); and (6) expansions and replacements to meet the Contract Standards and Owner's then applicable Integrated Resource Plan, prioritizing expansion or replacement projects that are identified by Owner that will reduce System Power Supply costs by improving the economic/reliable dispatch of all generating units connected to the T&D System.

E.     <u>Maintenance of Technical Documentation</u>. Operator shall be responsible for the improvement of existing, or development of additional/new, and the on-going maintenance of revisions to all T&D System drawings, specifications, construction manuals, equipment diagrams and other technical documentation, including: (1) management of T&D System generation interconnection applications and processing thereof (including negotiation and administration of generation interconnection agreements of any voltage class connected to the T&D System); and (2) preparing capital project close-out reports.

F.     <u>Energy Efficiency Activities</u>. Operator shall be responsible for promoting, administering, planning, developing and implementing energy efficiency, demand response, load management and renewable energy programs and policies for the T&D System as required under Applicable Law, regulation or the Owner's then applicable Integrated Resource Plan, including:

1.     research and demonstration projects for the T&D System and Owner's customers, coordination with third parties or other resources necessary or desirable to develop and implement such programs and responding to customer inquiries with respect to such programs or service; and

CONFIDENTIAL

2.      implementing the customer energy efficiency programs and customer-sited renewable energy programs, as well as any other customer incentive programs that are intended to promote (a) customer adoption of energy and/or capacity saving measures; and/or (b) customer-sited green and/or alternative generation or storage technologies (the "Energy Efficiency Programs") pursuant thereto.

G.      <u>Planning, Environmental and Regulatory</u>. Operator shall be responsible for (1) preparing, presenting, defending current or future Integrated Resource Plans, rate cases or other regulatory or legal matters as they relate to the Agreement, as the Owner's representative before the PREB and any other local, state or federal government agencies, (2) environmental compliance, maintenance of documentation and acquisition of permitting and Easements as required for the T&D System operations, (3) compliance with applicable regulatory and legislative requirements such as energy efficiency mandates and renewable portfolio standards subject to operating constraints and Prudent Utility Practice, and (4) any allocated management obligations of existing power purchase agreements, including the coordination with and support of the Puerto Rico Public-Private Partnerships Authority procurement activities for new power purchases. In performing these services and any other services under the Agreement, nothing shall require, or shall be construed as requiring, Operator to act as legal counsel to, or to provide legal advice or representation to, Owner.

H.      <u>Legal Services</u>. Operator shall be responsible for (1) day-to-day legal responsibilities relating to the O&M Services, in coordination with Owner and Administrator in accordance with processes set forth in this Annex I (*Scope of Services*), and (2) preparing, presenting, defending current or future Integrated Resource Plan, rate cases, or other regulatory or legal matters as they relate to the Agreement, as the Owner's representative before the PREB and any other local, state or federal government agencies, as well as preparing, presenting, and defending any non-compliance with local legislative requirements such as energy efficiency mandates. In performing these services and any other services under this Agreement, nothing shall require, or shall be construed as requiring, Operator to act as legal counsel to, or to provide legal advice or representation to, Owner.

I.      <u>Insurance and Claims</u>. Operator shall maintain the appropriate level of insurance as to cover claims that arise after executing the Agreement and following the Service Commencement Date, consistent with Prudent Utility Practices and with the requirements of the Agreement. As part of the Front-End Transition Plan, Operator shall develop a comprehensive insurance program, to be reviewed and approved by Administrator, which approval shall not be unreasonable withheld, delayed or conditioned. The insurance program shall be provided to PREB for its knowledge. Operator shall be responsible for preparing and submitting insurance claims (including claims that may have arisen prior to the Effective Date and/or the Service Commencement Date) on behalf of Owner as well as keeping Administrator timely informed of such claims processes.

J.      <u>Outsourcing</u>. Operator shall evaluate opportunities for the outsourcing of any specific activities associated with this Annex I (*Scope of Services*) that will provide greater efficiencies and value to customers and the T&D System's operation and seek to implement such activities within budget and regulatory constraints (e.g., fleet management, vegetation management and/or customer service call center).

CONFIDENTIAL

K.     Other. Operator shall be responsible for other activities necessary, appropriate or advisable, including research and development, to operate and maintain the T&D System in accordance with the Contract Standards, including cooperation, as specified in the Agreement, of Operator's performance of the O&M Services under the Agreement, with third parties providing services to Owner with respect to Owner's provision of electric service, provided Owner shall impose similar obligations on such third parties to also cooperate with Operator.

II.     Asset Management and Maintenance Services.

A.     General. Operator shall be responsible for managing and maintaining all assets of the T&D System, including machinery, equipment, structures, improvements and condition assessment of the electrical system components, in accordance with the Contract Standards, including the following: (1) development and implementation of asset management strategies and risk optimization for combined technical performance, life cycle cost, safety, customer satisfaction and regulatory compliance; (2) real estate management, Easements, leases and agreements, pole attachments (including billing and collection for pole attachment fees, as well as maintaining a complete inventory of type and location of each attachment and plans for revenue optimization), joint use agreements and telecommunications for the provision of electric service, including cybersecurity in the manner specified and subject to the provisions set forth in the main body of the Agreement; (3) meter strategy development, maintenance or replacement; (4) fleet management, including evaluation of potential outsourcing; (5) materials and services procurement and inventory management; (6) T&D System security in accordance with Applicable Law and to protect the T&D System from vandalism, terrorism or other acts; (7) emergency preparedness and planning; (8) warehousing; (9) maintenance of the PREPA fiber optic infrastructure; (10) vegetation management in accordance with Prudent Utility Practice and Applicable Law; and (11) preparation of T&D condition assessment report.

B.     Inventory Control. Operator shall, consistent with the Contract Standards, the Agreement and this Annex I (*Scope of Services*): (1) maintain an inventory of equipment, spare parts, materials and supplies (appropriate for day-to-day operations and Emergencies), and shall maintain and document an inventory control program; (2) comply with the inventory policy provided in this Annex I (*Scope of Services*); (3) purchase, maintain and store inventory in a manner also consistent with the T&D System policies and procedures adopted from time to time by Operator in accordance with Prudent Utility Practice and provided in writing to Owner and Administrator and the Emergency Response Plan, and/or the Federal Funding Procurement Manual as applicable and agreed to between Operator and Owner and/or approved by FEMA; and (4) complete, on an agreed-upon cycle count basis, a physical inventory and a condition assessment of the equipment, spare parts, materials and supplies and reconcile the same with the inventory assets carried on the balance sheet and provide the information to Owner and Administrator, in accordance with its reporting obligations set forth in Section 6.3 (*Reporting: Audits*) of the main body of the Agreement.

C.     Fleet Management; Refueling. Operator shall, consistent with the Contract Standards, the Agreement and this Annex I (*Scope of Services*), provide fleet management and vehicle refueling operations, including scheduling of vehicle replacements, specification of technical requirements, compliance with Commonwealth and federal alternative fuel

CONFIDENTIAL

environmental compliance programs, performance of maintenance activities, maintenance of vehicle signage and other similar functions.

D.    Necessary Equipment and Systems. Operator shall, consistent with the Contract Standards, the Agreement and this Annex I (*Scope of Services*), determine, acquire, deploy and maintain tools, equipment and Information Systems necessary to perform all O&M Services under the Agreement.

E.    Information Technology. Operator shall, consistent with the Contract Standards, the Agreement and this Annex I (*Scope of Services*), be responsible for providing information technology systems maintenance support and improvements in accordance with (1) strategic goals of achieving interoperability and flexibility of open design and standard-based data architecture and in compliance with requirements for applicable technical architecture, data modeling and software development life cycle; and safeguarding the system software and data; (2) cybersecurity requirements that support network and day-to-day activities; and (3) developing and maintaining a business continuity plan in the event of natural, man-made or cyber-attack incidents. Operator shall periodically provide Administrator (with copy to PREB) the most current versions of the business continuity plan.

F.    Public Lighting. Operator shall be responsible for operating and maintaining the public lighting system, as well as pursuing the installation of highly efficient Light-Emitting Diode (LED) technology in accordance with Prudent Utility Practices and Applicable Law.

G.    Generator Interconnection. Operator shall be responsible for the furtherance or development of (1) necessary generator interconnection agreements for new generation or in the event of the sale of an Owner generating unit, (2) appropriate points of generator interconnections demarcation points, where the point is not clearly defined, and (3) a work plan to delineate the generator interconnection points as part of the Front-End Transition Plan.

III.    Continuous Improvement Services. Operator shall be responsible for continuous improvement of the T&D System, including the implementation of the following activities: (A) development and administration of research and development, the goal of which is to increase operational efficiency and effectiveness, reduction of line losses (technical and non-technical losses), prevention of congestion and improvement of maintenance practices in accordance with Prudent Utility Practices; (B) establishing and conducting a continuous improvement program designed to enhance Operator's performance, operational efficiency and the cost-effective delivery of services to customers; and (C) monitoring industry advancements and technological changes in the operation, maintenance, repair and expansion of transmission and distribution systems, including customer care and related services, by electric utilities.

IV.    Government, Community and Media Relations.

A.    General. Operator shall be responsible for (1) conducting government, community and media relations with respect to the management, operation and maintenance of the T&D System in accordance with such policies and procedures as Operator may from time to time adopt in accordance with Applicable Law; and (2) staffing public events and presenting workshops, seminars and similar activities during normal business hours, evenings, weekends and holidays.

CONFIDENTIAL

B.    <u>Communications</u>. It is the Parties' intention that, to enable Operator to effectively communicate with the customers and government officials regarding T&D System matters, Operator shall have direct responsibility for media and other public communications on all T&D utility-related matters, including communications with public officials, regulators and local municipalities and counties regarding storm preparation, management, coordination and response, customer communications, programs and complaints and related matters. Accordingly, Operator shall have full authority to determine all communications policies and procedures relating to its provision of O&M Services under the Agreement. Nevertheless, Operator agrees that (i) during Emergency Operating Conditions as defined and described in the System Operation Principles inclusive of major events (e.g., Outage Events and Declared Emergency or Major Disaster) or (ii) if it takes actions in Operator's capacity as Operator, that could be reasonably be expected to have broader impacts on public safety and/or public health, Operator will endeavor to keep Owner and Administrator, and, as appropriate, other local, state, and federal government entities, informed and act in consultation with Owner and Administrator. These communications will be made in accordance with the System Operation Principles.

C.    <u>Government Relations</u>. Operator shall be responsible for coordinating, conducting and formulating communications with municipal, local, state and federal representatives and organizations relating to operation and maintenance of the T&D System and provision of utility-related services by Operator, in accordance with such policies and procedures as Operator may from time to time adopt in its sole and absolute discretion.

D.    <u>Community and Media Relations</u>. Operator shall be responsible for the performance of customer service functions related to the provision of electric service, except as otherwise provided in the Agreement or herein, including the following: (1) achieving a high level of customer satisfaction, as defined in the relevant Performance Metrics; (2) maintaining customer contact; (3) marketing and sales for retail system expansion, retail customer retention, and customer care and service programs; and (4) performing other activities necessary, appropriate or advisable to implement customer service programs in accordance with Sections IV.E of this Annex I (*Scope of Services*), the Contract Standards or as Applicable Law may require.

E.    <u>Customer Contact</u>. Operator shall be responsible for establishing and maintaining customer contact by performing the following customer service functions at minimum:

1.    maintaining customer contact through call centers with toll free service numbers, customer offices, authorized payment centers; this customer contact should include maintaining a phone line for outage calls, until there is an alternative communication system or technology that makes this information otherwise available. The information provided by the customer will be necessary to verify that the outage/emergency has been corrected and power restored;

2.    maintaining and overseeing a customer online and mobile website, mobile applications including iPhone and Android, and other electronic media, inbound and outbound customer communication systems;

I-6

CONFIDENTIAL

3.      management of customer loyalty and satisfaction programs, customer services field operations and customer care and institutional communications and responding to customer inquiries regarding services;

4.      marketing and sales for retail system expansion, retail customer retention and customer care and service programs, including all aspects of marketing planning and implementation activities, promotion and communications; market research; account relationship management; economic development; field sales; trade ally relations; and demand response, renewable and Energy Efficiency Programs;

5.      developing and maintaining customer education programs for customer programs, including cost of service, demand side management, net energy metering, etc.; and

6.      development of plan to enhance the existing outage management system that connects to the customer service interface so customers can be kept apprised of system status and individual service orders in real-time.

V.      <u>Testing, Reports and Records</u>. Operator shall be responsible for (A) preparing a monthly operations report; (B) producing and delivering to Administrator information as Administrator may reasonably request to determine Operator's performance under the Agreement; and (C) developing and maintaining a comprehensive document management program with records storage, retention and destruction guidelines and procedures, in accordance with applicable Commonwealth and federal guidelines and regulations, and as otherwise provided for under the Agreement.

VI.      <u>Finance and Accounting Services</u>.

A.      <u>General</u>. Operator shall be responsible for all finance, accounting, budgeting, longer-term financial forecasting and treasury operations related to the T&D System, including the implementation of the activities set forth in Sections VI.A through VI.F of this Annex I (*Scope of Services*). In the exercise of the responsibilities described in this Section **VI** of this Annex I (*Scope of Services*), the Operator may utilize Owner's existing accounting system.

B.      <u>Accounting and Reporting</u>. Operator shall be responsible for accounting and reporting operations including the following activities:

1.      maintenance of a complete and separate set of financial and accounting records relating to the O&M Services, in accordance with GAAP and other applicable standards (including with FERC's Uniformed System of Accounts, the 1974 Puerto Rico Electric Power Authority Trust Agreement and other accounting best practices);

2.      maintenance of a general ledger and all subledgers in accordance with Applicable Law regarding accounts necessary to support the preparation of monthly financial statements and management reports for Operator;

3.      on a monthly basis, provision of (i) a balance sheet, an income statement (including a revenue analysis) and a cash flow statement for Operator, and (ii) budget to actuals analyses to explain the month's results with explanations; in each case not later than five (5)

**CONFIDENTIAL**

Business Days following Operator's receipt thereof from Administrator until the expiration or earlier termination of the Front-End Transition Period;

4.      year-end and interim unaudited financial statements for Operator within one hundred twenty (120) days after the end of each fiscal year and forty-five (45) days after the end of each fiscal quarter;

5.      analysis of all accounts, providing variance analysis of and explanations for both actual period-to-period variances (on a quarterly basis) and budget versus actual variances (on a monthly basis) to the extent reasonably requested by Administrator;

6.      (i) performance of all accounting and reporting functions necessary to support the T&D System operations, (ii) performance of federal and commonwealth tax and Contribution in Lieu of Taxes ("CILT"), subsidies and public lighting reporting functions, provision of information to Owner and Administrator in connection with Owner's contesting of CILT-related assessments and (iii) the maintenance of the fixed assets records in accordance with PREB and other applicable regulatory or accounting requirements;

7.      separate accounting and reporting that may be required from time to time for any federal and Commonwealth grants received by Owner to the extent reasonable prior notice of any such grants obtained is provided to Operator;

8.      development and management of billing, tracking, reporting, managing and collecting of all attachment fees, rents and other "non-product" revenues due to Owner associated with services provided or related to lighting, telecommunications and other equipment attached to or located on the T&D System sites and structures/infrastructure for which Operator has responsibilities pursuant to this Agreement;

9.      provision of accounting memorandum documenting procedures used in creating journal entries related to the T&D System;

10.      accounting for and documenting the costs and revenues resulting from Operator's performance under the Agreement in accordance with GAAP and any other applicable accounting requirements as determined necessary by Administrator (including in accordance with FERC's Uniformed System of Accounts, the 1974 Puerto Rico Electric Power Authority Trust Agreement, and other accounting best practices, as applicable) in compliance with Section 6.3 (*Reporting: Audits*) of the main body of the Agreement;

11.      reconciliations (including bank account reconciliations), which will be performed monthly, quarterly or annually based on the risk associated with the account being reconciled, in each case (i) if the month in which the reconciliation is being performed is a quarter-ending month (other than December), by the end of the subsequent month or (ii) if the month in which the reconciliation is being performed is a non-quarter ending month or December, within forty-five (45) days after the end of such month; and

12.      preparation from time to time as requested by PREB, but no less frequently than every three (3) years, of a depreciation study, the goal of which is to determine consolidated

CONFIDENTIAL

annual depreciation accrual rates for preparation of financial statements and factors that relate to the fair and timely recovery of capital invested in the assets of Owner, including the T&D System.

C.    Budgeting and Financial Forecasting. Operator shall be responsible for budgeting and longer-term financial forecasting operations, including the following activities:

1.    preparing and monthly monitoring of budgets necessary for both capital and operating expenses for the services provided by Operator under the Agreement;

2.    analyzing monthly and year-to-date budget to actual variances, and explanations thereof and formulating financial projections based on the variance analyses;

3.    analyzing revenue and expenditure projections for the annual or multi-year period beyond the period of actual results;

4.    preparing and delivering sales, revenues and costs budget input data for the annual budgeting processes, the Integrated Resource Plan and Owner's and Administrator's other long-range financial planning processes; and

5.    risk management operations consistent with Parent Company enterprise risk management practices covering the potential risks involved in the conduct of the O&M Services, including the following activities: (i) managing counterparty credit risk, (ii) managing commodity market risk, and (iii) conducting a risk management program.

D.    Auditing. Operator shall be responsible for auditing operations, including the following activities:

1.    auditing of third-party pole-attachment rents and other revenues due to Owner associated with services provided on or related to public lighting, telecommunications and other equipment attached to or located on the T&D System Site;

2.    internal audit function to perform annual risk assessment related to the T&D System for the purpose of developing the appropriate risk-based audit universe and associated annual audit plan as well as performing financial, regulatory and third-party contract compliance and operational audits and reviews, including review of the associated internal controls, based on the results of the annual risk assessment and associated annual audit plan;

3.    provision of all necessary information and assistance to Owner's external auditors in connection with their audit of the financial statements and underlying financial records maintained by Operator related to the services provided under the Agreement; and

4.    provision of copies of, and reasonable access to, the risk based audit universe and associated annual audit plan referenced in Section VI.D.2 of this Annex I (*Scope of Services*); and the right of Administrator to inspect, during normal business hours and upon reasonable prior notice, internal audit reports and recommendations of Operator and management responses thereto; it being agreed, however, that the foregoing information shall be deemed to be confidential and shall therefore not be used by Owner or Administrator except with respect to any fraudulent conduct or willful misconduct identified in such reports and recommendations.

CONFIDENTIAL

E.   _Treasury_. Operator shall be responsible for treasury operations, including the following activities:

1.   timely and accurate collection of customer remittances and other "non-product" revenue on Owner's behalf through lockbox operations, customer centers and other sources, and transfer of funds as required for operations and other necessary payments;

2.   timely and accurate payment of vendor invoices, including power purchase agreements and technical and professional outsourced services, and acting as servicer to collect and deposit transition charges, as may be required to satisfy legacy obligations for bonded debt and unfunded pension liability;

3.   monthly or as requested cash flow projections (including daily, weekly and monthly forecasts of customer cash receipts) and cash management services; and

4.   monthly reconciliations of Owner bank accounts that are managed on behalf of Owner by Operator for the provision of O&M Services.

F.   _Other_. any other accounting and finance related activities necessary or advisable to support the operations of a stand-alone electric transmission and distribution business as Administrator may request from time to time, including:

1.   provision of information and data (both financial and operational) to support Owner's financing activities and the administration of Owner's and its Affiliates' debt service and required disclosure requirements;

2.   provision of assistance (including provision of information and data (both financial and operational)) to Owner and Administrator in connection with the preparation of reports and other documents to satisfy Owner's reporting requirements including: quarterly and annual (year-end) financial reporting; monthly and annual federal agency reporting requirements; PREB reporting requirements, Budget Reconciliation Act of 2017 and other federal and Commonwealth stimulus or funding program reporting requirements; Department of Energy reporting requirements; and filings relating to O&M Services in compliance with Applicable Law, and in accordance with Section 6.3 (_Reporting: Audits_) of the main body of the Agreement; and

3.   record keeping in compliance with Applicable Law.

VII.   _Emergency Response_.

A.   _Curtailments and Shutdowns_. If delivery of electricity through the T&D System is temporarily reduced, curtailed or shut down for any reason, including due to an Emergency including storms, Operator shall, with due consideration of its responsibility for safety and system reliability, as promptly as possible, advise Owner and Administrator (and other Stakeholders as defined in the Emergency Response Plan) as to the nature, reason and probable duration thereof and the expected effect thereof on the operation of the T&D System. Such notices shall be given as provided in this Annex I (_Scope of Services_). Any announcement concerning such events made to the public or the media shall be made by Operator in accordance with the provisions of the Emergency Response Plan and Section IV of this Annex I (_Scope of Services_).

CONFIDENTIAL

B.      Implementation of the Emergency Response Plan. Operator will be responsible for developing (in consultation with Administrator) and implementing an Emergency Response Plan that addresses, disaster recovery and emergency response and restoration, and all necessary emergency response, business continuity, reporting and communication functions relating to the T&D System, and coordinating such plans with the plans of Owner and Administrator's other service providers for business continuity and disaster recovery, including response, reporting and public communications relating to storms, other unusual weather occurrences and other Emergencies as follows, including the following activities:

1.      (i) timely reporting to such Governmental Bodies as may be necessary, appropriate or advisable of such emergency conditions including timely regular updates as to the courses of action taken in response thereto or in anticipation thereof and progress made in responding to such emergency conditions and (ii) periodic reporting to Administrator of such emergency conditions as necessary or appropriate to permit Administrator to exercise proper Oversight of Operator's response to emergency conditions;

2.      storm monitoring and mobilization of Operator or Subcontractor's workforce (including workforce available under any Mutual Assistance Agreements) in connection with anticipated storms and other electrical system emergencies. Operator shall have the responsibility to negotiate Mutual Assistance Agreements with the US Mainland's Regional Mutual Assistance Groups (RMAG's). The closest RMAG's being Southeastern Electric Exchange (SEE), North Atlantic Mutual Assistance (NAMA) or the Texas Mutual Assistance Group (TMAG);

3.      media, fire, police and government coordination (municipal, state and federal);

4.      customer communications, including all inbound and outbound customer communication systems;

5.      system condition monitoring;

6.      repair and replacement of damaged components of the T&D System, including due to Outage Events or Declared Emergencies or Major Disasters;

7.      public safety activities;

8.      restoration of the T&D System to pre-emergency conditions;

9.      conducting periodic drills, including as required by Applicable Law; at a minimum, Operator shall conduct at least one system wide test of the Emergency Response Plan processes and procedures, technical and communications equipment, and personnel readiness (a "Emergency Mock Drill") per year, which shall take place three (3) months prior to the commencement of the Atlantic Hurricane Season[2]. The Emergency Mock Drill taking place before the Atlantic Hurricane Season will replicate a Category 5 Hurricane with a planned direct hit to

---

[2] June 1 through November 30.

CONFIDENTIAL

Puerto Rico. Senior management of Operator and Owner, as well as many office employees and relevant outside observers, will participate and simulate the necessary actions that will be taken, and the appropriate internal and external communications needed. Operator will document all issues observed and follow-up on all measures and steps to remedy identified deficiencies that should be completed in advance of future events. This will test the validity of the Emergency Response Plan. Operator will also conduct post-event analysis and incorporate lessons learned from all drills and actual events to improve the overall state of readiness, including periodic drills with federal, state, Commonwealth, municipal, local and private critical load stakeholders (including hospital, police, telecommunication, water and sewer and critical manufacturing operations); and

      10.     preparing and analyzing all information and data required to support qualification for, and/or claims for reimbursement from, FEMA, CDBG (HUD), and similar federal funds, for costs incurred due to Outage Events (including funds for emergency response and/or permanent work). This preparation should be completed within ninety (90) days of total restoration.

VIII.   <u>Maintenance</u>.

     A.    <u>Generally</u>. Operator shall perform all normal and ordinary maintenance of all property constituting the T&D System, including machinery, structures, improvements and electrical system components, keep the T&D System in operational condition and repair, in a neat and orderly condition and in accordance with the Contract Standards. This provision includes the entire fleet of T&D System vehicles and machinery/tools used for the daily operation of the electric utility. Operator shall provide or make provisions for all labor, materials, supplies, equipment, spare parts, consumables and services that are necessary for the normal and ordinary maintenance of the T&D System consistent with Contract Standards and Prudent Utility Practice and its vehicle/machinery assets and conduct predictive, preventive and corrective maintenance of the T&D System as required by the Contract Standards. Operator shall consider the adoption and implementation of the Electric Power Research Institute's (EPRI) Reliability Center Maintenance (RCM) principles, as relevant and applicable.

     B.    <u>Maintenance Logs</u>. Operator shall keep maintenance logs in accordance with the Contract Standards.

     C.    <u>Safety and Security</u>. Operator shall maintain the T&D System with due regard for public health and safety and at a safe level at least consistent with Contract Standards, including the following:

      1.     establishing and prioritizing workplace safety initiatives to bring the current T&D System up to Prudent Utility Practices, by systematically evaluating all T&D System sites to address immediate safety issues, including grounding, tripping hazards and lighting;

      2.     taking reasonable precautions in the performance of the O&M Services for the health and safety of all persons working at the T&D System, to prevent damage, injury or loss to the T&D System and to other T&D System property;

CONFIDENTIAL

3.      establishing and enforcing all reasonable safeguards for health and safety and protection, including fencing, posting danger signs and other warnings against hazards and promulgating safety regulations;

4.      giving all notices and complying with all Applicable Law relating to the health and safety of persons or property or their protection from damage, injury or loss;

5.      designating qualified and responsible employees whose duty shall be the supervision of T&D health and safety, the prevention of fires and accidents and the coordination of such activities as shall be necessary with federal and local officials;

6.      designing and implementing cybersecurity measures in accordance with Contract Standards and in the manner specified and subject to the provisions set forth in the main body of the Agreement; and

7.      developing and maintaining a physical security program in accordance with Prudent Utility Practice and other application regulations/law for the protection of the T&D System critical infrastructure, other assets and persons.

IX.     <u>Customer Service</u>.

A.      <u>Generally</u>. Operator shall provide customer service for the T&D System in compliance with the requirements of Section IX of this Annex I (*Scope of Services*). Operator shall update and implement the customer service manual which shall be consistent with the Contract Standards, as well as this Annex I (*Scope of Services*) and Annex IX (*Performance Metrics*) within one hundred eighty (180) days after the Service Commencement Date and shall deliver a certificate to Administrator to the effect that such customer service manual has been so updated. The manual shall be revised as necessary or appropriate from time to time.

B.      <u>Customer Service Requirements</u>. Operator shall perform the customer services in accordance with the following minimum requirements, in accordance with the Contract Standards:

1.      Operator shall maintain a staff dedicated to assisting customers. The customer service staff shall be trained, as needed, to answer questions related to the T&D System and customer bills, based on having appropriate visibility into the T&D System to address customer questions and complaints.

2.      Operator shall establish and maintain toll-free customer service hotlines to allow customers to ask questions, raise issues and lodge complaints.

3.      Operator shall establish and maintain a twenty-four (24) hour per day toll-free hotline, with adequate capacity and personnel (personnel that Operator deems qualified for customer service), that will be answered at all times by a Person and not a voicemail or other automated recorder, for the receipt of reports of emergencies relating to the T&D System.

4.      Operator shall establish and maintain a website that is capable of receiving customer inquiries and complaints.

CONFIDENTIAL

5.      Operator shall respond to customer questions and complaints that Operator receives (however received) pertaining to its Scope of Services.

6.      Operator shall respond to emergencies in the T&D System, including temporary reductions, curtailments or shut downs of deliveries of electricity for any reason, including due to an Outage Event.

7.      Operator shall develop and update a customer service manual explaining processes and procedures followed in the performance of customer services, in accordance with Prudent Utility Practice.

C.      <u>Reports</u>. Operator shall submit as part of its reports delivered pursuant to Section IV of this Annex I (*Scope of Services*), and the information required with respect to the public outreach education campaign.

D.      <u>Public Outreach and Education Campaign</u>. Operator shall develop public outreach and education campaigns designed to inform customers generally and first responders specifically, about the scope, nature and extent of the T&D System programs and operations as required by the PREB or Administrator.

E.      <u>Customer Service Surveys</u>. No later than three (3) months following the Service Commencement Date, Operator, on behalf of Owner, will engage the services of an independent, qualified professional survey firm selected mutually by Administrator and Operator to develop and implement a customer satisfaction survey. If the Parties are not able to agree on a survey firm, either Party may refer the matter to an Independent Expert as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) in the main body of the Agreement. The initial customer satisfaction survey shall be used to develop an overall customer satisfaction rating, which shall provide the basis for evaluating and measuring Operator's performance of its customer service obligations. Operator is required to perform its customer service obligations in a manner that improves the overall customer satisfaction rating determined each Contract Year through subsequent annual customer service satisfaction surveys conducted by the independent, qualified professional survey firm.

F.      <u>Customer Satisfaction</u>. Operator shall be responsible for achieving a level of customer satisfaction consistent with the agreed to Performance Metrics by performing the following customer service functions at minimum:

1.      determining the approach and methodology for measuring, monitoring and optimizing customer satisfaction;

2.      monitoring customer satisfaction results;

3.      overseeing the performance of perception-based and transactional-based customer satisfaction surveys for other service providers; and

4.      interpreting and communicating the results of customer surveys; and coordinating initiatives aimed at improving the product portfolio, service delivery mechanisms and overall customer satisfaction across the full spectrum of services provided, such as system

CONFIDENTIAL

operations and electronic transaction and self-help options, customer interactions and back-office functions.

G.     Meter-Related Services. Operator shall perform all residential and commercial customer meter reading, installation, replacement and maintenance functions, including checking for open meter bypasses within the T&D System, in accordance with the requirements of Section IX of this Annex I (*Scope of Services*). Operator shall, within one hundred eighty (180) days of the Service Commencement Date, develop a quality assurance program for meter functions as part of the manuals and related computer programs developed by Operator in accordance with Contract Standards which shall (i) provide a detailed description of the means and methods of properly operating and managing the applicable managed asset and all sampling, testing and measurement procedures; (ii) document predictive, preventive and corrective maintenance procedures, practices and schedules for the managed assets; and (iii) be reviewed and approved by any relevant Governmental Body, in accordance with Applicable Law and shall provide a certificate to Administrator as to the existence of such program. Such program shall also include the planned meter replacement program. The quality assurance program shall be revised as necessary from time to time.

1.     Meter-Related Requirements. Operator shall perform existing and future metering system-related services in accordance with, and the quality assurance program shall address, the following minimum requirements:

(a)     To the extent Operator uses meter readers, Operator shall establish and maintain a staff dedicated to reading meters. All such employees shall be skilled in reading meters, and in performing meter reading services, and shall always carry proper identification.

(b)     Operator shall read residential meters on a monthly basis or such other frequency as mutually agreed by the Parties during the Term.

(c)     Operator shall read commercial, industrial and government accounts meters on a monthly basis.

(d)     Operator shall, upon request and reasonable notice, obtain final meter readings and render closing bills for property title transfers.

(e)     Operator shall, upon request and reasonable notice, obtain re-readings for residential and commercial customers.

(f)     Operator shall provide the meter readings in an electronic format compatible with the billing system for the T&D System.

(g)     Operator shall be responsible for all repairs and services required to maintain the proper operation and accurate reporting of all new and existing meters, meter reading systems and associated components.

CONFIDENTIAL

(h)     For both existing and new meters installed by Operator, Operator shall maintain, repair, replace or otherwise take action to resume proper meter operation as soon as practicable but not later than the requirements of Annex IX (*Performance Metrics*).

(i)     Operator shall maintain a sufficient supply of spare parts for meter and all ancillary components.

(j)     Operator shall inspect all meters upon receipt of meter data that indicates unusually high or low energy usage compared to historical usage to ensure proper calibration of all components of the meter system, as well as reduce the amount of non-technical losses (e.g., theft).

(k)     Operator shall develop a practice that assures new meters are within the established tolerance level for accuracy.

(l)     Operator shall agree a plan with Administrator for the periodic inspection of commercial and industrial meter installations to check proper operation and to check that devices to prevent tampering of a meter or bypassing of a meter are intact and shall maintain all records and provide a Certificate to Administrator that such inspection has been completed.

(m)     Operator shall, as part of the overall meter related services, maintain and train its crews to be able to detect and prosecute infrastructure misuse, and shall keep records of and remedy any meter that has not been measuring the correct energy usage because of unauthorized or willfully intended damage, defacing or tampering with any meter component. Such cases shall also be timely processed by Operator for the corresponding enforcement action in accordance with Applicable Law.

(n)     Operator shall, upon request by customers and reasonable notice, disconnect and reconnect meters.

H.     <u>Repair and Replacement of Meters</u>. Operator shall be responsible for all repairs, replacements, upgrades and maintenance of the meters, transmitters and appurtenant wiring, computer system and software necessary to ensure the proper operation and accurate reporting of the meters, transmitters, computer system and remote reading equipment during the Term, following the Service Commencement Date.

CONFIDENTIAL

## Schedule 1 to Annex I

## System Operation Principles

**Definitions**.

"<u>Agreed Operating Procedures</u>" means detailed written operating procedures that are established between the Operator and Generating Facility Operators to facilitate dispatch operations.

"<u>Dependable Generation Capacity</u>" means the net electrical generating capacity of the generating facility (gross electric generating capacity less station use) expressed in kilowatts as determined pursuant to testing (as may be conducted from time to time by the generating facility) and made available from the generating facility at the interconnection point.

"<u>Economic Dispatch</u>" means the distribution of available supply sources to meet the total electricity demand in consideration of total, average and marginal per-unit generation costs, generator capabilities and constraints, and the operational limits of the T&D System.

"<u>Energy Control Center</u>" means the central control center for the power system.

"<u>Emergency Operating Conditions</u>" means a condition or situation which in the sole judgement of the Operator is likely to result in imminent significant disruption of service to a significant number of customers or is imminently likely to endanger life or property.

"<u>Energy Management System</u>" means supervisory and data acquisition system that is used to balance and operate the power system.

"<u>Forced Outage</u>" means unplanned disconnection or stoppage of a generating unit due to failure or defect of the unit, its equipment or other event.

"<u>Frequency Response</u>" means services provided to restore grid frequency when there is a mismatch in the energy added to the electrical supply system by generators and the energy withdrawn from the electrical supply system by consumers.

"<u>Generating Facility Operators</u>" means either the operator(s) of Legacy Generation Assets or IPP-Owned Generation Assets connected to the electricity supply system.

"<u>Integrated Resource Plan</u>" or "<u>IRP</u>" means the 20-year long range plan for the Puerto Rico power system and supporting infrastructure.

"<u>IPP-Owned Generation Assets</u>" means any existing or future generation assets and generation facilities in which Owner, GenCo or their respective affiliates have no ownership interest.

"<u>Load Shed</u>" means the controlled reduction of load by shutting off non-critical demand areas.

CONFIDENTIAL

"Net Electrical Output" means the net electricity energy output (expressed in kWh) from a generating facility measured at the interconnection point.

"Non-Scheduled Outage" means an interruption of all or a portion of the electrical output of a generating facility that is required for any purpose including inspection, preventative maintenance or corrective maintenance and which has not been designated as a Scheduled Outage.

"Operating Reserves" means available generating capacity available to supply electricity or reactive power services on short notice and includes the following:

- "Synchronized Spinning Reserve" means the capacity of online spinning reserve that is synchronized with the electrical supply system and ready to meet the demand in a period no longer than ten minutes of an interruption.

- "Supplemental Reserves" means the non-spinning and non-synchronized reserve capacity that is obtained using units that are not online but that can enter service and reach their available power in less than ten minutes.

"Power Purchase and Operating Agreements" or "PPOA" means any contract relating to the generation, sale and purchase of Power and Electricity by, and operation of, IPP-Owned Generation Assets or Legacy Generation Assets.

"Puerto Rico Energy Board" or "PREB" means the regulator that provides oversight of all of the Puerto Rico power system to ensure compliance with policy and regulations.

"Reactive Power" means the capacity of generating facilities available to provide voltage support to maintain a constant voltage level and ensure system stability.

"Reliability Target" means the power system is operated with a N-1 contingency. The electrical supply system is to be operated to withstand the loss of the largest unit that is running.

"Scheduled Outage" means a planned interruption of the Net Electrical Output of a generating facility that has been coordinated in advance with the Operator with a mutually agreed start and duration.

"Target System Frequency" means 60Hz, managed within 59.8 Hz - 60.2 Hz (+/-0.2 Hz).

"Operator" means the third-party transmission and distribution operator selected by Administrator who will provide planning, operations and communication services on behalf of PREPA to the people of Puerto Rico, pursuant to this Agreement. The Operator will control the day-to-day dispatch and transmission of electricity throughout Puerto Rico and will be responsible for ensuring that the T&D System and all IPP-Owned Assets and Legacy Generation Assets operate in a reliable and economic fashion, and that sufficient generation capacity is available and maintained to meet resource adequacy goals.

CONFIDENTIAL

## Introduction.

The Operator will operate the electricity supply system in a safe and reliable manner. It will also use Economic Dispatch principles and Prudent Utility Practices to operate the electricity supply system as economically as possible in consideration of the electricity supply system constraints and PPOA obligations.

The Operator will be expected to balance electricity supply from available generating facilities and coordinate and communicate with Generating Facility Operators in regards to the system planning and operations functions outlined below.

During the Front-End Transition Period, the Parties shall prepare and agree to System Operation principles, which shall be generally consistent with this Schedule I (*System Operation Principles*) to Annex I (*Scope of Services*). Such System Operation Principles shall be subject to the review and approval of Administrator and PREB. The System Operation Principles shall be subject to further review and update pursuant to Section 5.13(c) (*Generation-Related Services – Review of System Operation Principle* of the Agreement.

## System Planning.

The Operator will be responsible for short and long-term supply and demand forecasting, reliability planning studies, the economic and technical assessment of new projects, deactivation studies for generating facilities and other assets, and other studies and evaluations that identify and address the reliability needs of the electricity supply system, and the current and future state of the Puerto Rico electricity supply system.

The Operator will manage the new interconnection process and implement procedures as required for large and small generators, and will periodically update the Integrated Resource Plan, all of the aforementioned as required by the PREB.

## Agreed Operating Procedures.

The Operator and Generating Facility Operators shall maintain detailed written operating procedures based on the Operator's standard operating procedures, taking into consideration the design of each generating facility and its interconnection to the electricity supply system. These written operating procedures shall also take into account security-constrained economic dispatch, ensuring non-discriminatory treatment of resources. The Agreed Operating Procedures shall define the procedures to be used to integrate the generating facility's output into the electricity supply system. Topics shall include, but not be limited to:

1. A method of day-to-day and real-time communications;

2. Clearances and switching practices;

3. Outage scheduling;

4. Daily available energy reports;

CONFIDENTIAL

5.  Economic Dispatch of Dependable Capacity, Spinning Reserve Capacity and Excess Capacity;

6.  The generating facility's operating log;

7.  Reactive power support;

8.  Voltage scheduling; and

9.  Emergency procedures.

The Agreed Operating procedures may be modified only with the written consent of both the Operator and Generation Facility Operators.

**Generating Unit Scheduling**.

The Operator and Generating Facility Operators shall coordinate on the availability of and need for each generating facility's Net Electric Output. Planning shall include target dispatch levels (annual basis), daily dispatch scheduling (monthly basis) and hourly dispatch scheduling (weekly basis). The Operator will record Non-Scheduled Outages for purposes of calculating compensation and will coordinate Scheduled Outages with the Generating Facility Operators to allow for maintenance and repairs, according to each party's respective PPOA. The Operator shall also receive from each generating facility a weekly fuel availability report specifying the existing and planned fuel inventory.

**Dispatch Operations**.

The Operator shall utilize the Agreed Operating Procedures and other operational principles to ensure that the Dependable Generating Capacity is sufficient to cover the hourly demand for electricity.

The Operator will determine the appropriate level of dispatch for each generating facility by means of its AGC system and the use of Prudent Utility Practices.

The Operator shall, using AGC, or by directing the Generating Facility Operator on a manual basis, adjust the Reactive Power generation and/or the terminal voltage of generating facilities, as well as obtain Frequency Response services to maintain the Target System Frequency. These ancillary services will be in consideration of generating facility design limits and PPOA contractual terms.

**Reserve Operations**.

The Operator shall operate the electricity supply system with a level of Operating Reserves above the scheduled load that is sufficient to protect the power system against the uncertain occurrence of operating events that include unplanned loss of generation or load forecasting errors. Operating Reserves shall include both Synchronized Spinning Reserves and Supplemental Reserves (non-synchronized and non-spinning).

CONFIDENTIAL

The level of Synchronized Spinning Reserves and Supplemental Reserves shall be determined daily by the Energy Control Center as a function of:

1.  The availability of generating units;

2.  Agreed upon Operating Reserve availability specified in PPOAs;

3.  Energy not supplied due to capacity limitations;

4.  Deviations from the forecasted demand;

5.  The schedule planned environmental inspections;

6.  The level of fuel inventory in the different generating stations;

7.  Compliance with the Mercury and Toxics Emission Standards ("<u>MATS</u>"); and

8.  Any other material considerations.

During Normal Operating Conditions, the minimum target level of Synchronized Spinning Reserves shall be equal to the generating unit with the highest dispatched capacity in order to cover the potential s electricity supply system outage in the event of a forced outage of the largest generator running on the electricity supply system.

During periods in which the reliability of the electricity supply system is compromised by operational issues with generating units, substations, transmission lines, and/or distribution, the Synchronized Spinning Reserve may be increased to more than the capacity of the generating unit with the highest dispatched capacity.

Synchronized Spinning Reserves and Supplemental Reserves shall be established and maintained in consideration of Economic Dispatch principals and Prudent Utility Practices.

### **Communications**.

The Generating Facility Operator shall supply and maintain at all times appropriate radio, voice and data communication facilities linking the generating facility with the Operator for the purpose of planning, telemetering, data acquisition, AGC, Remote Terminal Unit communication, emergency response and other exchanges of information.

During Emergency Operating Conditions, the Operator shall implement the Emergency Response Plan per established protocols. After Emergency Operating Conditions have passed, the Operator shall conduct post-event reviews with stakeholders, gather and analyze data from the Energy Management System to determine appropriateness of actions taken during the Emergency Event, and communicate and implement lessons learned.

The Operator shall maintain and enhance the customer outage data and information on the Operator managed web page and in other communication channels consistent with the Emergency Response Plan.

**CONFIDENTIAL**

The Operator will develop a plan as part of the System Remediation Plan designed to attain cybersecurity compliance with appropriate NERC Critical Infrastructure Protection ("CIP") standards, including reporting as required by NERC, and implement said plan to the extent this can be achieved taking into consideration the time and Budget constraints and other adjustments being made to the electricity supply system.

The Operator will collect and analyze NERC Generating Availability Data System ("GADS") and Transmission Availability Distribution System data in order to support and report on the state of the electricity supply system and generator reliability trends.

CONFIDENTIAL

## Annex II

## Front-End Transition Plan

**INTRODUCTION**

Operator acknowledges the goal to complete the Front-End Transition Services in a timely manner and as soon as practical. Operator's schedule achieves a January 1, 2021 Service Commencement Date, based on:

- An Effective Date of February 16, 2020, corresponding to Operator's scheduled completion of the Front-End Transition Services by December 3, 2020; and
- Meaningful participation by existing Owner and Administrator employees and/or contractors, as applicable, including Owner and Administrator management, all of whom will be required to dedicate significant time and resources during the Front-End Transition period.

The Front- End Transition Plan is as follows:

- Developing a post-commencement strategy that appropriately balances near- and longer-term initiatives;
- Immediately addressing the urgent issues of storm response planning as well as critical safety and operational deficiencies;
- Working towards accelerating (where reasonably practical) the timing for completion of the various work streams set out herein by drawing upon Operator's equity holders to supplement (under appropriate Subcontracts) the transition team during the initial months;
- Drawing upon Operator's equity holders' (under appropriate Subcontracts):
  - proven internal processes that have been employed to support such equity holders respective acquisition strategy, and
  - collaborative, proven P3 model;
- Working to developing an internal culture around project management skills, accountability, elevating issues as they occur, developing work-around solutions and communicating frequent status updates to internal and external stakeholders; and
- Developing a communication plan that works to create a well-orchestrated and consistent message to Operator's employees regarding expectations.

All of Operator's obligations herein are subject to terms of the main body of the O&M Agreement including Section 2.2 (Effective Date) and Section 4.6 (Front-End Transition Period Compensation).

CONFIDENTIAL

**Mobilization**

Following the Effective Date and Owner's compliance with Section 4.6(c) (*Front-End Transition Period Compensation – Funding*), the Operator's transition teams will commence their work in order to complete the critical path activities identified in this Annex II. Team leaders will be drawn from Operator's pool of experienced managers. A number of these professionals will also be designated to serve as senior leadership for the Operator after the Service Commencement Date and will be moving to Puerto Rico on a permanent basis.

The manhour budgets assigned to each team reflect the level of change management associated with most of the workstreams. These are illustrated in the Figure 1 below:



*Figure 1: Transition Estimate by Workstream*

The overall Front-End Transition Plan has been divided into three primary phases:

1. Assess,
2. Analyze,
3. Act.

These are not distinct phases with clear separation between them, but rather they indicate the general focus of activities that will gradually evolve as Operator arrives on site in Puerto Rico following commencement of the Front-End Transition Services. Operator will work toward completing our assessments and work with the Owner's and Administrator's respective employees to develop our improvement initiatives.

CONFIDENTIAL

This approach is summarized in Table 1 below.

*Table 1: Mobilization Phases*

| 1.0 | | 2.0 PHASE 1 | 3.0 PHASE 2 | 4.0 PHASE 3 |
|---|---|---|---|---|
| **5.0** | | **6.0   ASSESS** | **7.0   ANALYZE** | **8.0   ACT** |
| **9.0** | **Tasks** | <ul><li>Detailed data review</li><li>Interview Owner rank & file</li><li>Assess performance trends & issues</li><li>Confirm or modify hypotheses</li></ul> | <ul><li>Understand root causes of performance issues</li><li>Identify potential solutions</li><li>Work with employees to understand constraints & implementation challenges</li></ul> | <ul><li>Consolidate solutions into initiatives</li><li>Quantify costs and benefits of solutions</li><li>Prioritize initiatives into near– and longer-term schedule</li></ul> |
| **10.0** | **Major Attributes of Each Phase** | <ul><li>Large team supplemented from Operator affiliate</li><li>Compile performance data on consistent basis for future</li><li>Set expectation that how business is conducted is being transformed</li><li>Identify internal champions & leaders</li></ul> | <ul><li>Invest time to understand local constraints, but always driving schedule progress</li><li>Catalog potential issues & initiatives</li><li>Start work in collaborative teams with rank & file; internal champions emerge and assume more active roles</li><li>Business process re-engineering requirements being identified</li></ul> | <ul><li>Internal champions take leadership roles as new attitude becomes understood</li><li>Develop implementation plans that cut across organization for efficiency</li><li>Gather input and perspective from broad set of internal & external stakeholders</li></ul> |

Operator's staffing ramp-up plan recognizes the phased approach and is designed to coordinate staff resources, logistics, and to interface with Administrator and Owner (and their respective employees) to support the required deliverables.

The time to receive regulatory approvals creates a schedule where most workstreams of both Operator and each of Administrator and Owner will quickly ramp up to full resource loading, and thereafter involve work on full-time basis to achieve the mid-year milestones identified herein. While there is a critical path to completion, there are several other secondary and tertiary critical paths that are to be addressed as well. While, when viewed on a roll-up basis by consolidating major activities, it can look as if each workstream is running full-out to completion

CONFIDENTIAL

(because activity scheduling is done on a "finish as early as possible" basis) there are a number of key activities that will drive the overall timeline. These key activities are:

- Mobilization of transition team members after commencement of Front-End Transition Services (which will depend on scheduled date for Effective Date and satisfaction of requirements of Section 4.6 (Front-End Transition Period Compensation) being met (i.e. to permit early kick-off).
- Several IT-related system development tasks, but most critically, the path to implement and stand up the new payroll module;
- In accordance with the terms of the Agreement development of the following as contemplated in Article IV of the main body of the Agreement:
    o Emergency Response Plan;
    o Physical Security Plan;
    o Data Security Plan; and
    o Vegetation Management Plan;
- In accordance with the terms of the Agreement development of, and work towards obtaining the requisite approvals as per main body of the Agreement for the items specified in Article IV of the main body of the Agreement including:
    o the System Remediation Plan;
    o the Federal Funding Procurement Manual and Non-Federal Funding Procurement Manual;
    o the Systems Operation Principles;
    o Initial Budgets;
    o Performance Metrics matters as contemplated by Section 4.2(f) of the main body of the Agreement;
    o Liability Waiver,
    o Governmental Approvals, and
    o Back-End Transition Plan.


**Views on Feasibility of 2020 Target Commencement**

The overarching indicative schedule for completion of the Front-End Transition Services set out herein in Appendix 1 (herein the "Schedule") for completion of the Front-End Transition Services will depend on the full, timely and complete support of Administrator and Owner, and on the assumption that this same support will also be obtained from PREB, all in accordance with the requirements of the Agreement as a whole. Operator will collaborate to obtain alignment from Administrator, Owner and PREB in order to not adversely impact Operator's ability to meet the proposed Schedule. In addition, predecessor and successor activities have

CONFIDENTIAL

been identified and a critical path analysis has been conducted to ensure the robustness of the overall Schedule.

## Transition Communications Plan

A robust communications plan (the "Transition Communications Plan") will be developed and implemented early following commencement of Front-End Transition Services. A well-designed communications plan, which will deliver communications in Spanish and English, will help meet the goal of ensuring the Front-End Transition Services can be performed efficiently and will help prepare both Owner's employees who may be hired by Operator and the public at large for the transition to Operator performing the O&M Services as contemplated in the Agreement once Service Commencement Date is achieved.

Key milestones in the Front-End Transition period will be identified by Operator as the provision of the Front-End Transition Services progresses and targeted messages will be delivered by Operator to coincide with those milestones. At a very high level, these messages will include introductory materials, periodic status updates and a report on transition period achievements that includes a plan for the future.

The Transition Communications Plan will also define our management vision and expectations, mission statement and core values. We will seek input from Administrator and Owner in developing this Transition Communications Plan. Generally the Transition Communications Plan is intended to feature the following:

- A commitment from the Operator's senior leadership to communicate with its current and prospective employees transparently and frequently. Communications will work to express empathy for these employees in the face of the uncertainty arising from the changes. The Operator will also communicate plans for increased on-going dialogue with employees to keep them motivated and productive in the provision of the O&M Services.
- The use of multiple communication channels to reinforce our key messages. This will include townhall meetings, one-on-one meetings with prospective employees, group sessions, intranet updates and posting of frequently asked questions (FAQs), memos and other forms of media to communicate applicable information.
- The development of an employee value proposition that defines why prospective employees will want to work for ServCo if offered employment.

To enhance communications, we will include the following meetings and status reporting:

- Daily meetings between transition team leaders and the transition program manager to identify and resolve any emergent items and assist with other teams' data, analytical or other issues

CONFIDENTIAL

- Bi-weekly progress meetings between the Operator and the Administrator's and Owner leads involved with the transition program. These meetings will be action oriented, with summary progress reported. Materials widely reported may be edited to protect Operator's confidential information.

- Monthly progress meetings with Administrator and Owner and the Operator's transition program leadership

- Supplemental progress meetings with Administrator and Owner executives as appropriate

- General public progress reporting updates every three months with other stakeholders as determined following consultation with Administrator and Owner (and potentially PREB and interested political leaders as deemed appropriate by Operator)

Figure 2 below shows the structure, purpose and proposed frequency of transition program meetings.



*Figure 2: Transition Program Meetings*

CONFIDENTIAL

**Management Transition Plan**

To set a new management tone, and to increase expectations of how the Operator will operate in the future, Operator's management transition plan reflects Operator's philosophy, approach and major themes. Based on Operator's understanding of the drivers behind Owner's operating track record, Operator is not looking to focus on prior faults. Instead Operator's focus, as a new permanent organization, will be towards improving service and rebuilding the system together with Owner.

As part of the transition towards Operator providing O&M Services, Operator intends to tap into the institutional knowledge of Owner's employees that it ultimately hires to help increase overall buy-in. The transformation of the T&D System operations will depend on further developing the talents and resourcefulness of these Owner employees that are offered positions with and that choose to join the Operator. Operator will work to improve the employee experience in order to stem the rate of attrition and increase employee morale.

**Approach to Interacting with Spanish-Speaking Workforce**

Operator's transition team has a number of fluent Spanish speakers, including several senior members who have lived and managed businesses in several different Latin American countries. It is envisioned that these bilingual senior team members should be able to handle most interactions with senior officials, regulators, politicians, or members of the media where important internal employee messaging in the Spanish language would be more productive. Operator anticipates that those meetings could be led by our native-speaking or fluent non-native senior team members as necessary.

Interacting with the broader Owner employee workforce does represent some potential challenges, but Operator anticipates these can be overcome in several ways. Operator's plan to do so will include mandatory internal training sessions for all transition members regarding personal and professional manners and expectations, an orientation on Puerto Rico's history and culture, and sensitivity to language issues.

**Handover Check List**

Operator's plan to manage the Handover Checklist is to continually maintain a checklist and submit updates on or before the 10th of every month to the Administrator. These updates will include reporting checklist items that have been completed, as well as identifying any checklist items that might have emergent issues or problems that need to be escalated for resolution. In addition, if any new emergent items are identified that are not currently known, they will be proposed to be added to the handover checklist to be reviewed with Administrator.

CONFIDENTIAL

The current handover checklist is shown in Table 2 below. During the course of the Front-End Transition Period, the Handover Checklist may be adjusted or otherwise modified by mutual agreement of ManagementCo and Administrator.

*Table 2: Handover Checklist*

| | PRELIMINARY HANDOVER CHECKLIST ITEM | REQUIRED FOR COMMENCEMENT? (Y/N) | COMPLETED? (Y/N) |
|---|---|---|---|
| ☐ | **I.    General & Transition Management** | | |
| ☐ | 1.    Government Approvals | | |
| ☐ | 2.    Plan to Address Gaps in Assets, Technology, Processes, etc. (plan to include cost estimates) | | |
| ☐ | 3.    PREB Rate Order Filing (Initial Budgets and Liability Waiver approvals) | | |
| ☐ | **II.   T&D Services Milestones** | | |
| ☐ | 1.    Development and Implementation of an Operations Takeover Plan for Transmission and Sub-Transmission Inside and Outside of the Plant | | |
| ☐ | 2.    Development and Implementation of an Operational Takeover Plan for the Electric Distribution System | | |
| ☐ | 3.    Development and Implementation of Additional Takeover plans | | |
| ☐ | A.  Transition Plan for T&D Control Centers | | |
| ☐ | B.  Transition Plan for Operations and Maintenance (O&M) Activities | | |
| ☐ | C.  Emergency Response/Disaster Recovery/Business Continuity Plans | | |
| ☐ | D.  Fleet Management Plan | | |
| ☐ | E.  Asset Management (included in 8. Engineering and Asset Management) | | |

**CONFIDENTIAL**

| | PRELIMINARY HANDOVER CHECKLIST ITEM | REQUIRED FOR COMMENCEMENT? (Y/N) | COMPLETED? (Y/N) |
|---|---|---|---|
| ☐ | F.  Workforce Management & Training Plan | | |
| ☐ | G.  Safety Management Plan | | |
| ☐ | H.  Engineering and Asset Management | | |
| ☐ | I.  Identification of Real Estate | | |
| ☐ | J.  Materials Management & Warehouse Plan | | |
| ☐ | K.  System Operations Plan | | |
| ☐ | L.  Vegetation Management Plan | | |
| ☐ | 4.  Update Emergency Operations Manual and Business Continuity/Disaster Recovery Plan | | |
| ☐ | 5.  Environmental Exposure Management Plan | | |
| ☐ | **III.  System Remediation Plan Milestones** | | |
| ☐ | 1.  Remediation Plan Proposal | | |
| ☐ | 2.  Development of Improvement Initiatives | | |
| ☐ | 3.  Consolidate Plans from All Areas | | |
| ☐ | 4.  Development of System Remediation Plan | | |
| ☐ | 5.  Approval of System Remediation Plan | | |
| ☐ | **IV. Customer Services** | | |
| ☐ | 1.  Evaluating Customer Service Facilities and Assets | | |
| ☐ | 2.  Evaluating and Updating Customer Service Policies and Procedures | | |
| ☐ | 3.  Development of a Meter Reading Plan | | |
| ☐ | 4.  Development of a Customer Service Transition Plan | | |
| ☐ | 5.  Development and Implementation of a Service Start and Shut-Off Plan | | |

CONFIDENTIAL

| | PRELIMINARY HANDOVER CHECKLIST ITEM | REQUIRED FOR COMMENCEMENT? (Y/N) | COMPLETED? (Y/N) |
|---|---|---|---|
| ☐ | 6.   Development of a Meter Asset Management (MAM) Plan | | |
| ☐ | 7.   Development and Implementation of a Customer Service Technology | | |
| ☐ | 8.   Develop and Implement a Non-Technical Energy Loss Reduction Plan | | |
| ☐ | 9.   Establish Integration Between Customer Services & T&D Ops | | |
| ☐ | **V.   IT** | | |
| ☐ | 1.   Development of IT/OT Communication Plan and Acceptance Criteria | | |
| ☐ | 2.   Identification and Gap Analysis | | |
| ☐ | 3.   Evaluating IT/OT Applications and Infrastructure | | |
| ☐ | 4.   Development of Cyber Security and Business Continuity Plan | | |
| ☐ | 5.   Development of an IT Asset Management Program | | |
| ☐ | 6.   Development of an IT/OT Transition Plan and Schedule | | |
| ☐ | 7.   Commencement Cutover Planning | | |
| ☐ | 8.   Training and Communication Plan | | |
| ☐ | **VI.   Financial Management** | | |
| ☐ | 1.   Detailed Description of Approach to Budgeting and Reporting | | |
| ☐ | 2.   Description of Approach to Complying with Initial Budget Obligations | | |
| ☐ | 3.   Approach to Formalizing Changes to Control Processes | | |
| ☐ | 4.   Establishing a Financial Accounting System and Account Structure | | |

CONFIDENTIAL

| | PRELIMINARY HANDOVER CHECKLIST ITEM | REQUIRED FOR COMMENCEMENT? (Y/N) | COMPLETED? (Y/N) |
|---|---|---|---|
| ☐ | 5.   Preparing Initial Budgets and Other Financial Forecasts | | |
| ☐ | 6.   Establishing Bank Accounts | | |
| ☐ | 7.   Evaluating and Updating Payroll and Labor Cost Reporting systems | | |
| ☐ | 8.   Establishing a Delegation of Authority Matrix and Process | | |
| ☐ | 9.   Processes & Procedures and Overall Internal Controls | | |
| ☐ | **VII.   FEMA Funds and Federal Funding Procurement Manual** | | |
| ☐ | 1.   Set Up Governance Framework | | |
| ☐ | 2.   Policies and Procedures | | |
| ☐ | 3.   Staffing Plan | | |
| ☐ | 4.   Surge Staffing | | |
| ☐ | 5.   Project Worksheet Assessment (also covered under Section 4.3) | | |
| ☐ | 6.   Handoff of Project Worksheet Activity from COR[3] and Vendors | | |
| ☐ | 7.   Project Procurement Planning | | |
| ☐ | 8.   Drafting, Revising and Finalizing Federal Funding Procurement Manual | | |
| ☐ | **VIII.   Staffing for Front-End Transition Period** | | |
| ☐ | 1.   Draft, Revise and Finalize Operator Employment Requirements | | |
| ☐ | 2.   Recruiting and Staffing | | |
| ☐ | 3.   Redesign and Staff New Organization | | |
| ☐ | 4.   Proposed Recruitment and Staffing Plan | | |
| ☐ | 5.   Stand Up Human Capital Management (HCM) System | | |

CONFIDENTIAL

| | PRELIMINARY HANDOVER CHECKLIST ITEM | REQUIRED FOR COMMENCEMENT? (Y/N) | COMPLETED? (Y/N) |
|---|---|---|---|
| ☐ | 6.    Communication Plan | | |
| ☐ | 7.    Training (Workforce Development) Plan | | |
| ☐ | 8.    Develop Employee Retirement Plan | | |
| ☐ | 9.    Occupational Health and Wellness | | |
| ☐ | 10.   Compliance Plan | | |
| ☐ | 11.   Engagement Plan | | |
| ☐ | 12.   Develop a Community Investment Plan | | |
| ☐ | **IX.    Additional Front-End Transition Period Activities** | | |
| ☐ | 1.    Genco Shared Services Agreement Approval | | |
| ☐ | 2.    Emergency Response Plan Approval | | |
| ☐ | 3.    Non-Federal Funding Procurement Manual Approval | | |
| ☐ | 4.    Physical Security Plan Approval | | |
| ☐ | 5.    Data Security Plan Approval | | |
| ☐ | 6.    Vegetation Management Plan Approval | | |
| ☐ | 7.    System Operation Principles Regulatory Approval | | |
| ☐ | **X.    Asset Acquisition (Supply Chain)** | | |
| ☐ | 1.    Evaluating Existing Procurement and Subcontracting Policies, Procedures and Systems | | |
| ☐ | 2.    Assuming Responsibility for Securing Use of Assets, Facilities, IT / OT, etc. | | |
| ☐ | 3.    Assuming Existing Subcontracts | | |
| ☐ | **XI.  Back-End Transition Plan** | | |
| ☐ | 1.   Develop Back-End Transition Plan | | |

CONFIDENTIAL

| PRELIMINARY HANDOVER CHECKLIST ITEM | REQUIRED FOR COMMENCEMENT? (Y/N) | COMPLETED? (Y/N) |
|---|---|---|
| ☐ **XII. Front-End Transition Plan (Additional Requirements)** | | |
| ☐ 1. Confirmation of Acceptable Operator Security | | |
| ☐ 2. Required Insurance | | |
| ☐ 3. Baseline Performance Levels | | |
| ☐ 4. Back-End Transition Plan | | |
| ☐ 5. Representations | | |
| ☐ 6. Operator Representations and Warranties | | |
| ☐ 7. Section 4.3: Owner and Administrator Responsibilities | | |
| ☐ 8. Owner Representations and Warranties | | |
| 9. Section 4.4 Governmental Approvals | | |
| ☐ 10. Section 4.5: Conditions Precedent to Service Commencement Date | | |
| ☐ 11. Section 4.7: Closing the Front-End Transition Period | | |
| ☐ 12. Service Commencement Begins | | |

## I.      General Transition Management

The General Transition Management activities are comprised of the contents of this Annex.

## II.      T&D Services Milestones

The T&D group will be one of the largest teams during the Front-End Transition period in terms of the number of people involved and sites and facilities visited. The primary critical path

CONFIDENTIAL

activities that determine the portion of the Schedule applicable to this process for the T&D transition program are as follows:

- Logistical requirements to visit and assess the large number of physical sites and assets throughout Puerto Rico;
- Time required to interview and assess the large Owner employee base currently working for Owner in relation to the T&D System and to reorganize and staff the new T&D organization within Operator;
- Time required to conduct a thorough assessment of all capital and O&M work requirements and to identify, quantify and prioritize improvement initiatives; and
- Completion of key work products needed to ensure no impact to reliability or resiliency after Service Commencement Date (such as the Emergency Response Plan).

Within this section (T&D services), Operator has developed a comprehensive operational takeover plan for all the identified items. Operator's fundamental approach is to assemble its team to finalize the necessary due diligence, identify any gaps, and develop a robust plan to ensure continuity of service to the business, employees and our customers. The Front-End Transition Project Office established by Operator will work to implement controls to deal with the expected large volume of activity occurring from workstream to workstream that will be seeking similar information with the goal of reducing the burdens and additional costs this might otherwise create.

### III.    System Remediation Plan Milestones

The current state of the T&D System as viewed through site visits and our review of information in the data room and the Q&A log during the RFP process is that the current T&D System consists of aging infrastructure that has been poorly maintained due to lack of funding and inconsistent maintenance practices that are largely undocumented. The control, monitoring and information equipment is aged, underutilized and in some cases obsolete. Hardware, Information Systems and software are underutilized, fragmented and unsupported. Therefore, these systems lack the ability to provide the required visibility of the system and implement programs such as Distribution Automation (DA), condition monitoring/analytics and situational awareness regarding outage management. Strategies to manage assets over their life cycle have not been developed. System Planning tools to effectively model the system, which is an industry best practice, are not being used due to a lack of confidence in their accuracy.

Operator's approach to developing the System Remediation Plan will be a collaborative effort with key stakeholders generally but also including the Administrator and Owner. The plan should align with various reports such as the GridMod Plan, the IRP, Sargent & Lundy's Capital Plan, Build Back Better, and the Energy Resiliency Solutions for the Puerto Rico Grid (from the Department of Energy).

CONFIDENTIAL

## IV.     Customer Service Milestones

Operator views Customer Service as an integral component in the Operator's transformation of the T&D System. The Front-End Transition period will be used by Operator to thoroughly assess the existing T&D Customer service organization of Owner, with a focus on customer experience quality and operational efficiency. Operator will take the opportunity during the Front-End Transition period to help it implement quick "wins" following the Service Commencement Date that will enable T&D Customers to see and feel post-commencement improvements in the customer experience. These quick "wins" will act as a catalyst for T&D Customer engagement and the launch of the Voice of the Customer program.

In addition to assessing Owner's existing operations and identifying opportunities for improvement, Operator's Customer Service group will be fundamentally transforming the manner in which the Operator will deliver the customer experience. Operator will need time to communicate the changes and train the workforce on how things will be different. It is critically important to make T&D Customers aware immediately after commencement that a new priority has been established to improve their interactions with the Operator.

The primary critical path activities that determine the schedule for the proposed T&D Customer service transition program are as follows:

- Visit and assess the large number of physical sites and assets throughout Puerto Rico.
- Interview Owner's current T&D Customer service employees to identify key leaders who can implement the transformed customer service vision and reorganize and staff the new organization as required.
- Work to instill the culture and values of the transformed T&D Customer Service group throughout the workforce.
- Ensure a consistent message is communicated to T&D Customers beginning on the first day of Service Commencement Date.

## V.     Information Technology (IT)/Operation Technology (OT) Systems

The scope and schedule of Operator's IT group are driven by the need to begin defining new requirements for a large number of critical systems and processes. These new systems and processes will represent a massive degree of change in how every employee performs his or her daily job.

This level of change requires a structured, well-defined multi-year time frame for implementation. The primary critical path activities that determine the schedule for the IT transition program are as follows:

- A comprehensive assessment and due diligence review of over 15 major systems, which begins on immediately on commencement of the Front-End Transition Services and

CONFIDENTIAL

includes each team (including Owner's and Administrator's) running full out for the first three months following start of the Front-End Transition Services.

- A high degree of coordination between the IT team and other functional area teams (both within Operator and by Owner and Administrator's teams as well) to ensure the future owners of these new systems within Operator have the chance to fully define their requirements.
- A thorough workforce assessment to identify any skill gaps that must be addressed to meet the organization's strategic objectives.
- A concentrated focus on the large number of system cutovers that will be required to support the transfer after commencement. It is essential that these cutovers be well planned and executed.

## VI.    Financial Management Milestones

The Financial Management group's scope and schedule are driven by assessing and improving risk management, the internal control environment and underlying business processes. This is critical to setting the overall financial foundation, evaluating the integrity of the financial compilation and reporting processes, mitigation of fraud and other risks, and the transition, design and implementation of the capital and operating budgets for the organization.

The primary critical path activities that determine the schedule are as follows:

- Redesign the budgeting process and have each functional team restructure its operational areas and adjust staffing size. Roll these inputs into a new approved budget, including the Initial Budgets;
- Beginning immediately on commencement of the Front-End Transition Services and running full-out for the first three months, perform a comprehensive assessment and due diligence review of all major systems; and
- Recognize the high degree of coordination that will be required from the IT team and the other functional area teams (both within Operator and by Owner and Administrator's teams as well) to ensure that owners of these new systems within Operator have the chance to fully define their requirements.

The Operator's approach to financial management during the front-end transition will continue to evolve as we gain a deeper understanding of Owner's administrative and operational routines. Our efforts will be focused on understanding and evaluating Owner's:

- Significant financial risks;
- Management and operational reporting;
- Regulatory reporting and compliance requirements;
- Business processes; and
- Resources for matters that could affect the seamless transition of services at commencement.

CONFIDENTIAL

Our plan will leverage current Owner management and financial personnel to analyze the existing state of department processing and output, transition risks and stakeholder needs (customers, operations, regulators) in the following major areas:

- All significant financial statement accounts and assertions;
- All significant accounting and reporting processes, including:
- Cash management and controls;
- Payroll and benefits;
- Transaction processing;
- Fixed asset management;
- Job costing for projects;
- Debt/credit management;
- Accounting close;
- Management; and
- Regulatory reporting

### VII.    FEMA Funds and Federal Funding Procurement Manual

Operator will engage and be working with IEM (as its Subcontractor) to deal with federal funds management. The Operator's first step following commencement of the Front-End Transition Services is to ensure a proper governance framework is established before it can manage a long-term recovery using federal funding on behalf of the Owner. The IEM team is best suited to ensure that the Operator is operating under a federal funds management framework with an effective procurement policy that is inclusive of all federal, territorial, and COR3 requirements that also emphasizes performance. Further, IEM's own monitoring and internal controls included in the newly created Owner Disaster Recovery Federal Funds Management Guide (Operator DRFFMG) will ensure that the procurement policy is not merely aspirational but in fact is used for procurement and for the management and monitoring of the Operator's contractors.

### VIII.   Staffing for Front-End Transition Period Milestones

Operator's current organization chart for its transition team is shown in the Figure 3 below.

CONFIDENTIAL



*Figure 3: Front End Transition Organization Chart*

## IX.   Additional Front-End Transition Period Milestones

As requested by the Administrator, Operator will create specific teams to provide an extra focus on seven key items that are important to a successful transition which are:

- GenCo Shared Services
- Emergency Response Plan
- Non-Federal Funding Procurement Manual
- Physical Security Plan
- Data Security
- Vegetation Management Plan
- System Operation Principles.

## X.   Asset Acquisition

Operator's procurement team will review existing procurement and subcontracting policies, procedures and systems governing and implemented by Owner. Once Operator is able to execute a more granular review of the contracts (including System Contracts), procedures and systems that Owner has in place, Operator will develop a more robust plan and recommendation for

CONFIDENTIAL

enhancements or improvements. Upon completion of procurement procedure documentation for goods and services, a training plan will be established for procurement staff as required. Subsequently, documentation will be integrated into the compliance strategy and procurement procedure manuals.

The Operator will collaborate with Owner to identify assets related to the facilities, furnishings, material, supplies, equipment and IT systems required for T&D System operations. Upon completion of asset identification, the Operator, by performing due diligence in each functional area, plans on identifying and documenting these assets (with the assistance and reliance on Owner for appropriate information) and develop a detailed plan and recommendation for securing them. The plan will be submitted to the Owner and Administrator for review and approval as required by the Agreement. Operator will coordinate with the Owner on executing the approved plan. The completion of the Front-End Transition Services is dependent on timely alignment between the Operator and each of the Administrator and the Owner on the assets required to run the operation.

Upon completion of the identification and assumption of responsibility for Owner's existing contracts, including System Contracts and subcontracts, the Operator will work to evaluate Owner's identified contractors, subcontractors and vendors and perform outreach and evaluation. Operator will work with Owner and the applicable Operator functional areas to determine which contracts and subcontracts should be continued and assumed by the Operator or provided by other means. The Operator's procurement team will develop a plan and recommendation for assuming responsibilities for Owner's existing contracts and subcontracts and submit the plan for Owner and Administrator review and approval as required by the Agreement. Upon approval, the Operator's procurement team will assume the applicable existing contracts and subcontracts with appropriate assignment from Owner and further develop the Operator approval process for contractors and subcontractors.

### XI.    Back-End Transition Plan

A key component of the Agreement is the development and execution of a Back-End Transition Plan (the "BET Plan"). The BET Plan will enable the seamless, safe and effective transfer of the management of the T&D System and O&M Services either back to the Owner or to a successor operator at the expiration of the Agreement or, under certain conditions, an earlier time.

We have identified the members of the team, our approach and implementation, and proposed a detailed outline of the plan. This BET Plan outline in its entirety can be viewed in Annex III of the Agreement.

CONFIDENTIAL

# APPENDIX 1

Indicative schedule of activity listing is contained on following pages.

Front End Transition Plan Schedule*

CONFIDENTIAL

| ID | Task Name | Duration | M1 M2 M4 M6 M8 M10 M12 |
|---|---|---|---|
| 7 | *Transition Starts - Effective Date Occurs* | *0 days* | |
| 8 | **Front-End Transition Plan** | **249 days** | |
| 9 | 1. General and Transition Management | 249 days | |
| 10 | 1.c Mobilization of Transition Team | 24 days | |
| 58 | 1.i  Governmental Approvals | 163 days | |
| 76 | 1.j  System and Generation Contracts | 124 days | |
| 81 | 1.k Plan to Address Gaps in Assets, Technology, Processes, etc. (plan to include estimates of cost) | 249 days | |
| 175 | 1.l Handover Checklist | 65 days | |
| 178 | 1.m PREB Rate Order Filing | 186 days | |
| 203 | **2. T&D Services Milestones** | **244 days** | |
| 204 | 2.a  Development and Implementation of an Operations Takeover Plan for Transmission and Sub-Transmission Inside and Outside of the Plant | 180 days | |
| 228 | 2.b  Development and Implementation of an Operational Takeover Plan for the Electric Distribution System | 55 days | |
| 250 | 2.c  Development and Implementation of Additional Take-over plans | 244 days | |
| 251 | 2.c.i  Transition Plan for T&D Control Centers | 151 days | |
| 267 | 2.c.ii  Transition Plan for Operations and Maintenance (O&M) Activities | 40 days | |
| 270 | 2.c.iii  Emergency Response / Disaster Recovery / Business Continuity Plans | 69 days | |
| 277 | 2.c.iv  Fleet Management Plan | 105 days | |
| 288 | 2.c.v  Asset Management (included in (viii) Engineering and Asset Management) | 1 day | |
| 290 | 2.c.vi  Workforce Management and Training Plan | 244 days | |
| 321 | 2.c.vii  Safety Management Plan | 125 days | |
| 336 | 2.c.viii  Engineering and Asset Management | 137 days | |
| 366 | 2.c.ix  Identification of real estate | 40 days | |
| 367 | 2.c.x  Materials Management and Warehouse Plan | 211 days | |
| 416 | 2.c.xi  System Operations Plan | 40 days | |
| 420 | 2.c.xii  Vegetation Management Plan | 24 days | |
| 426 | 2.d  Update Emergency Operations Manual  and Business Continuity / Disaster Recovery Plan | 45 days | |
| 432 | 2.e  Environmental Exposure Management Plan | 174 days | |
| 480 | Asset-Based Assessment Report | 15 days | |
| 483 | **3.  System Remediation Plan Milestones** | **201 days** | |
| 484 | Remediation Plan Proposal | 11 days | |
| 488 | Transition Teams Review of the Current State of the T&D System Perform Gap Analysis | 35 days | |
| 492 | Development of Improvement Initiatives | 34 days | |
| 504 | Consolidate Plans from All Areas | 34 days | |
| 516 | Development of Roadmap(s) | 18 days | |

**CONFIDENTIAL**

| ID | Task Name | Duration | M1 | M2 | M4 | M6 | M8 | M10 | M12 |
|----|-----------|----------|----|----|----|----|----|-----|-----|
| 521 | Development of System Remediation Plan | 27 days | | | | | | | |
| 525 | Approval of System Remediation Plan | 99 days | | | | | | | |
| 543 | **4.  Customer Service** | **146 days** | | | | | | | |
| 544 | Evaluating Customer Service Facilities and Assets | 65 days | | | | | | | |
| 548 | Evaluating and Updating Customer Service Policies and Procedures | 120 days | | | | | | | |
| 552 | Development of a Meter Reading Plan | 90 days | | | | | | | |
| 555 | Identification and Analysis of Gaps | 122 days | | | | | | | |
| 565 | Develop a Customer Service Transition Plan | 70 days | | | | | | | |
| 570 | Approach to the Acquisition and Replacement of Customer Service Assets | 120 days | | | | | | | |
| 573 | Development and Implementation of a Service Start and Shut-Off Plan | 134 days | | | | | | | |
| 579 | Develop a Meter Asset Management (MAM) Plan | 95 days | | | | | | | |
| 585 | Development and Implementation of a Customer Service Technology | 120 days | | | | | | | |
| 591 | Develop and Implement an Non Technical Energy Loss Reduction Plan | 60 days | | | | | | | |
| 598 | Develop a Quality Culture Integration Plan | 120 days | | | | | | | |
| 604 | Establish Integration Between Customer Services & T&D Ops | 100 days | | | | | | | |
| 608 | **5.  IT** | **214 days** | | | | | | | |
| 609 | Pre-Landing Technology Configuration | 20 days | | | | | | | |
| 610 | 5.a  Development of an IT/OT communication plan and acceptance criteria | 80 days | | | | | | | |
| 619 | 5.b  Identification and analysis of gaps | 10 days | | | | | | | |
| 620 | 5.c  Evaluating IT/OT Applications and Infrastructure | 60 days | | | | | | | |
| 647 | 5.d  Development of Cyber Security and Business Continuity Plan | 80 days | | | | | | | |
| 652 | 5.e  Development of an IT Asset Management program | 60 days | | | | | | | |
| 653 | 5.f  Development of an IT/ OT Transition plan and schedule | 60 days | | | | | | | |
| 656 | Implement IT Systems (GL & Payroll) - Transition Period | 180 days | | | | | | | |
| 662 | Commencement Cutover Planning | 60 days | | | | | | | |
| 665 | Training and Communication Plan | 40 days | | | | | | | |
| 668 | External Reporting | 40 days | | | | | | | |
| 671 | Organizational Review | 80 days | | | | | | | |
| 674 | Talent Management | 120 days | | | | | | | |
| 679 | IT Budget Review | 80 days | | | | | | | |
| 682 | IT Projects Review | 82 days | | | | | | | |
| 688 | **6.  Financial Management** | **234 days** | | | | | | | |
| 689 | 6.a  Detailed Description of Approach to Budgeting and Reporting | 10 days | | | | | | | |
| 690 | 6.b  Description of Approach to Complying with Initial Budget Obligations | 10 days | | | | | | | |
| 691 | 6.c Approach to formalizing changes to control processes | 10 days | | | | | | | |

**CONFIDENTIAL**

| ID | Task Name | Duration | M1 | M2 | M4 | M6 | M8 | M10 | M12 |
|---|---|---|---|---|---|---|---|---|---|
| 692 | 6.d  Identifying and evaluating business processes | 20 days | | | | | | | |
| 693 | 6.e  Establishing a financial accounting system and account structure | 10 days | | | | | | | |
| 694 | 6.f  Preparing Initial Budgets and other Financial Forecasts | 210 days | | | | | | | |
| 695 | Initial Budgets | 210 days | | | | | | | |
| 725 | 6.g  Establishing bank accounts | 20 days | | | | | | | |
| 726 | 6.h  Evaluating and updating payroll and labor cost reporting systems | 10 days | | | | | | | |
| 727 | 6.i  Establishing a delegation of authority matrix and process | 10 days | | | | | | | |
| 728 | Processes & Procedures and Overall Internal Controls | 160 days | | | | | | | |
| 741 | Financial Status and Account Structure | 60 days | | | | | | | |
| 746 | **7.  FEMA Funds and Federal Funding Procurement Manual** | **161 days** | | | | | | | |
| 747 | Federal Funds Management | 120 days | | | | | | | |
| 748 | Set up Governance Framework | 30 days | | | | | | | |
| 750 | Policies and Procedures | 45 days | | | | | | | |
| 752 | Staffing Plan | 40 days | | | | | | | |
| 754 | Surge Staffing | 60 days | | | | | | | |
| 758 | Project Worksheet Assessment (Also covered under Section 4.3.j) | 100 days | | | | | | | |
| 761 | Recovery Project Sequencing | 30 days | | | | | | | |
| 765 | Handoff of Project Worksheet Activity from COR3 and Vendors | 120 days | | | | | | | |
| 768 | Project Procurement Planning | 60 days | | | | | | | |
| 770 | 7.d  Drafting, revising and finalizing Federal Funding Procurement Manual | 161 days | | | | | | | |
| 788 | **8.  Staffing for Front-End Transition Period** | **184 days** | | | | | | | |
| 789 | 8.d  Draft, revise and finalize Operator Employment Requirements | 184 days | | | | | | | |
| 790 | Recruiting and Staffing | 184 days | | | | | | | |
| 895 | **9.  Additional Front-End Transition Period Activities** | **194 days** | | | | | | | |
| 896 | 9.c  Regulatory Approvals and Coordinating Subsequent Implementation | 194 days | | | | | | | |
| 897 | Meet with PREB to better understand their priorities and approval processes for plans under 9.c | 1 day | | | | | | | |
| 898 | 9.c.i  Genco Shared Services and the related Shared Services Agreement | 121 days | | | | | | | |
| 945 | 9.c.ii  Emergency Response Plan Approval | 13 days | | | | | | | |
| 955 | 9.c.iii  Non-Federal Funding Procurement Manual Approval | 101 days | | | | | | | |
| 969 | 9.c.iv  Physical Security Plan | 83 days | | | | | | | |
| 987 | 9.c.v  Data Security Plan | 17 days | | | | | | | |
| 997 | 9.c.vi  Vegetation Management Plan | 52 days | | | | | | | |
| 1007 | 9.c.vii  System Operation Principles | 169 days | | | | | | | |
| 1031 | **10.  Asset Acquisition (Supply Chain)** | **120 days** | | | | | | | |
| 1032 | 10.a  Evaluating Existing Procurement and Subcontracting Policies, Procedures and Syst... | 120 days | | | | | | | |
| 1044 | 10.b  Assuming Responsibility for Securing Use of Assets, Facilities, IT / OT, etc. | 120 days | | | | | | | |
| 1067 | 10.c  Assuming Existing Subcontracts | 120 days | | | | | | | |

CONFIDENTIAL

| ID | Task Name | Duration | M1 | M2 | M4 | M6 | M8 | M10 | M12 |
|---|---|---|---|---|---|---|---|---|---|
| 1084 | **11.  Back-End Transition Plan** | **65 days** | | | | | | | |
| 1085 | Back End Transition Plan | 65 days | | | | | | | |
| 1093 | **Performance Metrics** | **158 days** | | | | | | | |
| 1094 | Initial Analysis | 59 days | | | | | | | |
| 1101 | Approval of Performance Metrics | 139 days | | | | | | | |
| 1119 | **Front End Transition Period (Additional Requirements in Agreement)** | **191 days** | | | | | | | |
| 1120 | Operator Responsibilities | 157 days | | | | | | | |
| 1121 | Handover Checklist (Prior to the 10th of every month) | 191 days | | | | | | | |
| 1122 | Obtain Updates and Additions (if any) to Checklist from Transition Working Teams | 191 days | | | | | | | |
| 1134 | Confirmation of Acceptable Operator Security | 2 days | | | | | | | |
| 1137 | Required Insurance | 96 days | | | | | | | |
| 1142 | Employment Interviews (See Recruitment and Staffing Plan Project for Activity details) | 66 days | | | | | | | |
| 1146 | Employment Offers | 158 days | | | | | | | |
| 1151 | Representations | 107 days | | | | | | | |
| 1152 | Operator Representations and Warranties | 1 day | | | | | | | |
| 1164 | SECTION 4.3 Owner and Administrator Responsibilities | 1 day | | | | | | | |
| 1178 | SECTION 4.4 Governmental Approvals | 107 days | | | | | | | |
| 1184 | **SECTION 4.5 Conditions Precedent to Service Commencement Date** | **225 days** | | | | | | | |
| 1214 | **SECTION 4.7 Closing the Front-End Transition Period** | **17 days** | | | | | | | |
| 1222 | *Transition Ends* | **1 day** | | | | | | | |
| 1223 | Establishment of Service Commencement Date | 1 day | | | | | | | |
| 1226 | *Service Commencement Begins* | **11 days** | | | | | | | |

\* - Indicative Gantt chart of total workdays based on Operator Proposal (which is equivalent to 320 days).

CONFIDENTIAL

## Annex III

## Back-End Transition Plan

The Back-End Transition Services shall include any of the following.

### *Owner Rights*

- Audit
- Engagement of Subcontractors

### *Operator Rights*

- Baseline Environmental Study
- Engagement of Subcontractors
- Use of Affiliate Personnel

### *Owner Responsibilities*

- Access to Office Space, Facilities
- Cooperation with Operator
- Establishment of New Bank Accounts
- Notification of Customers to New Payment Accounts
- Timely Payment of Back-End Transition Fees

### *Operator Responsibilities*

- Safety
  - Review of Overall Safety Program
- T&D Operations
  - Review of Current State of System
  - Review of System Operator Principles and Emergency Response Plans
  - Review of Vegetation Management Plan and Physical Security Plan
  - Review of Integrated Resource Plan
  - Delivery of List of Fleet Vehicles
  - Review of System Remediation Plan (if Applicable)
  - Sale of Materials and Supplies
  - Preservation of Materials, Tools and Equipment
  - Removal of Equipment and Tools from T&D System Sites
  - Maintenance of Consumable and Spare Part Inventory at Sites
  - Removal of Operator Employees from T&D Sites upon Exit
  - Condition of T&D Sites Upon Exit
  - Delivery of Current Maps of the T&D System

CONFIDENTIAL

- ▪ Provision of Technological and Design Support
- ● Regulatory
  - ▪ Review of any Regulatory Reporting and Compliance Requirements and Open Discussions  with PREB
  - ▪ Review of Regulatory Filing Priorities and Timeline
- ● Customer Service
  - ▪ Review of Policies, Processes and Procedures Captured Under the Document and Record  Control Register
- ● Human Resources
  - ▪ Delivery of Information Regarding Staffing, Benefits and Labor Contracts
  - ▪ Retention of Senior Management for Six Month Period
  - ▪ Stability of ServCo employees - fair and appropriate treatment of the ServCo employees,  including possible sale of ServCo to facilitate stability
  - ▪ Evaluate circumstances and consider other appropriate options to facilitate employee stability  in transition
- ● Capital Projects
  - ▪ Delivery of List of Materials and Equipment Delivered to Work Sites
  - ▪ Status of Federally Funded Projects
- ● Information Technology
  - ▪ Review of the Data Security Plan
  - ▪ Delivery of all Computer Programs used at T&D Sites
  - ▪ List of Files, Access and Security Codes
  - ▪ Delivery of System Information and Customer Databases
  - ▪ Delivery of a Document Management Program
- ● Finance
  - ▪ Estimate of Back-End Transition Service fee for 4.5 Months
  - ▪ Monthly Invoice for Back-End Transition Services
  - ▪ Review of Current Budgets
- ● Risk Management
  - ▪ Notice of Termination of Insurance Policies
- ● Environmental
  - ▪ Review of Status of Environmental Work
  - ▪ Review of Pending Permitting and Reporting
- ● Legal
  - ▪ List of Legal Proceedings Involving Contractors or Subcontractors
  - ▪ Provision of Work Product and Owner Intellectual Property
- ● Supply Chain
  - ▪ Review of Procurement Manuals
  - ▪ Delivery of Copies of All Contracts and Subcontracts
  - ▪ Termination or Assignment of Contracts and Subcontracts
  - ▪ Cessation of Entering into New Contracts

**CONFIDENTIAL**

- ▪ Transfer of Title to Special Order items
- ▪ Transfer of Warranties
- Administrative
  - ▪ Removal of Branding
  - ▪ Termination of Shared Service Agreements (if Applicable)
  - ▪ Milestone Reporting
  - ▪ Delivery of all Books, Records, Customer Lists and Other Information
  - ▪ Delivery of List of all Facilities
  - ▪ Develop and Execute a Handover Checklist

CONFIDENTIAL

**Annex IV**

**Operator Employment Requirements**

To be eligible for employment, all applicants must:

- Be legally authorized to work in the United States;
- Be at least 18 years of age (some positions may have other age requirements);
- Be able to pass a thorough background check (including criminal history record checks, previous employment verifications and references);
- Be able to pass a drug screening and medical assessment (where necessary); and
- Have a safe driving record (if applicable to the position).

In addition to the above list, a comprehensive list of individual job requirements will be listed on each job description. A preliminary listing of job descriptions for core, strategic, and support jobs has been developed. These job descriptions have been assembled to reflect the needs of the business.

Although these job descriptions are industry standard and reflective of the roles outlined, Operator intends to finalize all individual job descriptions as early as practical during the Front-End Transition Period.

**CONFIDENTIAL**

## Annex V

## Front-End Transition Hourly Fully Allocated Rates

| Employee Category | Hourly Rates (US$) |
|---|---|
| Vice President | 325 |
| Sr. Director | 300 |
| Director | 275 |
| Senior Manager | 210 |
| Field Crew Leader | 205 |
| Trainer | 200 |
| Manager | 200 |
| Field Technician | 195 |
| Senior Analyst | 160 |
| Engineer / Field Supervisor | 160 |
| Analyst | 125 |
| Administrative Support | 50 |

CONFIDENTIAL

## Annex VI

### GenCo Shared Services

I.    <u>Current Owner Services</u>.

In addition to the power supply dispatch, scheduling and coordination currently performed by the Puerto Rico Electric Power Authority ("<u>PREPA</u>"), PREPA performs certain administrative, managerial and operational services in connection with the operation and management of the Legacy Generation Assets and their delivery of Power and Electricity, and certain fuel supply and procurement functions.

II.   <u>PREPA Reorganization</u>.

Prior to the Service Commencement Date, PREPA shall be reorganized into two entities: (1) GenCo, acquiring or obtaining ownership of the Legacy Generation Assets, and (2) GridCo, acquiring or obtaining ownership of the T&D System. GenCo may eventually transfer to one or more private partners certain of GenCo's operations, including the operating, administrative and/or maintenance functions in connection with the Legacy Generation Assets prior to the end of their remaining useful life. The period prior to such transfer is referred to as the "<u>Shared Services Period</u>." During the Shared Services Period, Operator shall, on behalf of Owner, provide certain administrative, managerial and operational services (the "<u>Shared Services</u>") to GenCo, which were historically provided by PREPA. The Shared Services shall be performed according to the standards set forth in the Shared Services Agreement (as defined below), thereby ensuring the continuity of operations by GenCo and complying with the Contract Standards and Prudent Utility Practice as defined in the Agreement.

III.  <u>Shared Services Agreement</u>.

Prior to the Service Commencement Date, Operator shall be required to enter into a shared services agreement consistent with the terms and conditions summarized in this Annex VI (*GenCo Shared Services*) and reasonably acceptable to Operator (the "<u>Shared Services Agreement</u>" or "<u>SSA</u>") to provide the Shared Services to GenCo, on behalf of Owner, and in accordance with the Contract Standards, utilizing GridCo assets as necessary, and throughout the term of the SSA, which term shall not exceed three (3) years from the effective date of the SSA (unless otherwise extended with the consent of the Operator); <u>provided</u> that any Shared Service may be terminated or suspended earlier by GenCo for convenience following at least sixty (60) days prior written notice to Operator.

A.    <u>Shared Services</u>. Pursuant to the Shared Services Agreement, Operator shall provide the Shared Services to GenCo in a manner, amount and quality substantially consistent with the manner, amount or quality of the Shared Services currently provided by PREPA or otherwise in accordance with Prudent Utility Practice, unless otherwise specified in the Shared Services Agreement. Operator and GenCo shall cooperate in good faith with each other on all matters relating to the provision and receipt of the Shared Services. Operator shall cause its employees, or the employees of Owner, as the case may be, to devote such time and effort to the business of GenCo as shall be reasonably necessary to perform the Shared Services; <u>provided</u> that

CONFIDENTIAL

the employees shall not be precluded from engaging in other business activities for or on behalf of Operator, Owner or their affiliates and no Shared Services will be provided in contravention of Applicable Law.

The Shared Services may include any of the following:

1. Administrative
   a. Human Resources
      i. Recruiting
      ii. Labor Relations
      iii. Payroll and Benefits Administration

2. Regulatory and Public Affairs
   a. File, execute and prosecute applications with Governmental Authorities for the acquisition, construction, ownership and operation of power generation facilities
   b. Provide or cause to be provided services for governmental and public affairs, including, but not limited to press releases, community events, contacts with county, state and federal officials, and communications with landowners

3. Finance and Accounting
   a. Internal Audit and Tax
   b. Risk Management (including financial risk management and enterprise risk management)
   c. Treasury and Controller
   d. Insurance Renewals and Claims
   e. Loss Control Inspections
   f. Vendor payments and Contract Administration
   g. Insurance

4. Information Technology
   a. Communications
   b. Hardware/Software/Licensing Support
   c. Cyber-Security

5. Legal

6. Bookkeeping

7. Environmental
   a. Permitting and Reporting
   b. Mitigation
   c. Compliance

8. Procurement and Supply Chain

CONFIDENTIAL

9.  Outage Support

10. Fleet Vehicle Services

11. Capital Improvements Analysis and Determination

12. Real Estate

    a.  Bidding/ Selling Property
    b.  Lease Management
    c.  Portfolio Optimization

13. Facilities

    a.  Facilities and Property Administration/ Management/ Maintenance
    b.  Food / Mail Services

14. Physical Security

The parties may agree to modify the terms and conditions of Operator's performance of any Shared Service in order to reflect new procedures, processes or other methods of providing such service. The parties shall negotiate in good faith the terms and conditions upon which Operator would be willing to implement such change.

B.    <u>Additional, Reduced or Modified Services</u>. In the event that GenCo requests an increase or decrease in the manner, amount or quality of any Shared Service, GenCo shall notify Operator and request such modification of service, and Operator shall (x) in the case of a decrease, following the expiration of the relevant notice period, decrease the manner, amount or quality of such Shared Service and (y) in the case of an increase, consider GenCo's request, in accordance with terms to be set forth in the Shared Services Agreement.

C.    <u>Liability</u>. Operator shall not have any liability, whether direct or indirect, to GenCo for or in connection with the Shared Services or any other services provided or to be provided by Operator pursuant to the Shared Services Agreement except to the extent of (i) any negligence or willful misconduct of Operator or any of its Affiliates, or any of their employees, representatives, agents, contractors, subcontractors or suppliers or (ii) any failure to comply with the Shared Services Agreement (including a failure to deliver such Shared Servces in accordance with the Contract Standards).

IV.    <u>Compensation; Set-off</u>.

As compensation for the performance of the Shared Services, GenCo shall pay a shared service fee (without markup for profit) to be determined in, and in accordance with, the allocation methodology of the Shared Services Agreement; <u>provided</u> that payments of the service fee to the Operator may, at the request of GenCo or the Administrator at any time and from time to time, be reduced by amounts owed by GridCo to GenCo consisting of Generation Pass-Through Expenditures and applied by Operator in accordance with the allocation methodology. The allocation methodology shall seek to reflect the amount of Shared Services actually provided to GenCo (as opposed to GridCo or other parties) and may be (i) based on the following approaches, (ii) assigned, distributed or allocated on a service-by-service basis, and (iii) further developed and determined subsequent to input from the relevant Owner or GenCo personnel and Operator:

CONFIDENTIAL

    A.  internal resource time allocation, e.g., full-time equivalent or employee hours;

    B.  employee count (considering pending retirements and anticipated recruiting); and

    C.  equipment, data or inventory volume, e.g., number of workstations, vehicles or gigabytes used.

Allocators may be based on either budget or historical data, which shall be assessed and determined with inputs from PREPA personnel and Operator.

CONFIDENTIAL

## Annex VII

## ManagementCo Costs

The costs listed below shall be paid by ManagementCo from the Fixed Fee (or otherwise absorbed or paid for by ManagementCo without reimbursement hereunder) as set forth in Section 7.1(a) (*Service Fee – Generally*) of the main body of the Agreement. Capitalized terms used but not defined in this Annex VII (*ManagementCo Costs*) have the respective meanings set forth in the Agreement. For the avoidance of doubt, these costs shall be the sole responsibility of ManagementCo and shall not be treated as T&D Pass-Through Expenditures or as Generation Pass-Through Expenditures.

1.      Wages, salaries, bonuses, employer contributions to pension and employee medical plans, any mandatory employment related insurance and taxes, vacation, sick leaves and other mandatory leaves with pay, overtime compensation and associated benefits and other post-employment benefits incurred in connection with the following roles (or any substantially similar role or position): (i) Chief Executive Officer, (ii) Chief Financial Officer, (iii) Head of Human Resources, (iv) Head of Capital Programs, (v) Head of Information Technology and (vi) Head of Customer Service.

2.      Establishment and maintenance of a ManagementCo Board of Directors to provide strategy and oversight.

3.      Costs incurred with any third party advisors hired by ManagementCo for the purposes of fulfilling ManagementCo's responsibilities set forth in this Agreement.

4.      Any costs relating to the Puerto Rico Lineworkers College.

5.      Administration of ManagementCo, including bookkeeping, contract administration, filings, financial / operational audits, etc.

CONFIDENTIAL

# Annex VIII

## Service Fee

| Contract Year | Fixed Fee |
|:---:|:---:|
| 1 | US$70,000,000 |
| 2 | US$90,000,000 |
| 3 | US$100,000,000 |
| 4 | US$105,000,000 |
| 5 | US$105,000,000 |
| 6 | US$105,000,000 |
| 7 | US$105,000,000 |
| 8 | US$105,000,000 |
| 9 | US$105,000,000 |
| 10 | US$105,000,000 |
| 11 | US$105,000,000 |
| 12 | US$105,000,000 |
| 13 | US$105,000,000 |
| 14 | US$105,000,000 |
| 15 | US$105,000,000 |
| 16 | US$105,000,000 |

| Contract Year | Incentive Fee |
|:---:|:---:|
| 1 | US$13,000,000 |
| 2 | US$17,000,000 |
| 3 | US$19,000,000 |
| 4 | US$20,000,000 |
| 5 | US$20,000,000 |
| 6 | US$20,000,000 |
| 7 | US$20,000,000 |
| 8 | US$20,000,000 |
| 9 | US$20,000,000 |
| 10 | US$20,000,000 |
| 11 | US$20,000,000 |
| 12 | US$20,000,000 |
| 13 | US$20,000,000 |
| 14 | US$20,000,000 |
| 15 | US$20,000,000 |
| 16 | US$20,000,000 |

- The amounts set forth above are in 2020 Dollars. For purposes of this Annex VIII, the phrase "2020 Dollars" means that the relevant amount will be adjusted to account for inflation, at the start of each Contract Year, by the respective annual CPI Factor(s) to reflect a nominal value for the Contract Year. For illustrative purposes only, if Contract Year four (4) starts in calendar year 2023, then the adjustment for inflation to yield the Fixed Fee for Contract Year four (4) would be as follows: Contract Year four (4)'s Fixed Fee or Incentive Fee, as applicable (as set forth in this Annex VIII, in 2020 Dollars), *multiplied by* the CPI Factor for 2021 *multiplied by* the CPI Factor for 2022 *multiplied by* the CPI Factor for 2023.

CONFIDENTIAL

## Annex IX

## Performance Metrics

I.    <u>General</u>.

For each Contract Year, the Operator shall be eligible to receive financial incentive compensation ("<u>Incentive Fee</u>") based on the Operator's performance during the Contract Year as measured against the performance goals set forth by the Performance Metrics as described in this Annex IX (*Performance Metrics*). The Incentive Fee calculation is described in Annex X (*Calculation of Incentive Fee*) with a maximum amount that can be earned (the "<u>Incentive Compensation Pool</u>").

II.    <u>Performance Categories</u>.

To ensure that all performance goals are met, the Operator will be evaluated in three major Performance Categories: (i) Customer Satisfaction, (ii) Technical, Safety and Regulatory, and (iii) Financial Performance. Likewise, the Incentive Compensation Pool will be allocated across the Performance Categories in such a way as to align the Operator's incentive compensation with the performance goals.

### Table 1. Summary of Performance Categories

| Performance Category | Performance Goal | Allocation of Incentive Compensation Pool |
|---|---|---|
| 1.   Customer Satisfaction | Achieve a high-level of customer satisfaction across all customer classes. | 25% |
| 2.   Technical, Safety and Regulatory | Operate a safe, reliable electric grid while remaining complaint with applicable safety, environmental and other regulations. | 50% |
| 3.   Financial Performance | Meet the approved Operating Budget, Capital Budget – Federally Funded and Capital Budget – Non-Federally Funded. | 25% |

CONFIDENTIAL

III.   In Compliance with Docket NEPR – MI – 2019 – 0014.

A.   For each Contract Year, the level of performance in each Performance Category shall be measured based on actual results achieved for the Contract Year. Levels of performance and achievement of results will be adjusted proportionately during the initial Contract Year commencing on the Service Commencement Date and ending on the following June 30. For this purpose, one or more Performance Metrics shall be associated with each Performance Category.

B.   For all Performance Categories the Operator performance shall be determined by the level of achievement of the Performance Objective for each Performance Metric under a Performance Category as described in Section V. Such level of achievement will determine the portion of the allocated Incentive Compensation Pool earned by the Operator as described in Annex X (*Calculation of Incentive Fee*).

C.   Each Performance Metric will have an assigned point weighting ("<u>Base Points</u>"). For all Performance Metrics except for the Binary Metrics as described in Section III(D), a baseline performance level will be established prior to the beginning of the first Contract Year (the "<u>Baseline Performance Level</u>"). The Baseline Performance Level will be based on either historical operating data confirmed during the Front-End Transition Period, performance during the Front-End Transition Period, or through independent analysis. The initial baseline levels will be agreed upon by the Operator and PREB in the manner set forth in the main body of the Agreement. The Baseline Performance Level sets the starting point for each metric relative to the target performance level to be achieved in the fifth Contract Year (the "<u>Target Performance Level</u>"). The baseline target over the initial five-year period is determined by a straight line between the Baseline Performance Level and the Target Performance Level. The Minimum Performance Level set for each Performance Metric establishes the value that must be exceeded to qualify for Base Points and is established as the straight line between the Baseline Performance Level and achieving the Target Performance Level in the tenth Contract Year. In Contract Years where the Minimum Performance Level is exceeded, the Operator has the ability of earning 25%, 50%, 100%, 125% or 150% (the "<u>Base Point Multipliers</u>") of the Base Points depending on the metric result relative to the established baseline for the Contract Year. That is, for a result between the Minimum Performance Level and the 25% tier, the Operator would receive points equal to 25% of the Base Points, for a result between the 25% threshold and the 50% threshold, the Operator would receive points equal to 50% of the Base Points, etc.

Performance ranges for determination of Base Points earned shall be based on achieving performance improvement from the Baseline Performance Level to the Target Performance Level over the initial five-year period.

CONFIDENTIAL

**Chart 1. Example of Performance Metric Mechanism**



D.      Several Performance Metrics are evaluated differently than the mechanism outlined above either because there is a binary nature to the result or because the baseline is independent year to year (the "Binary Metrics"). For the Occupational Safety and Health Administration ("OSHA") Fatalities and OSHA Severe Injuries metrics, a value of zero results in full Base Points and a value other than zero results in no points. For the three approved budget-related metrics, Operating Budget, Capital Budget – Federally Funded and Capital Budget – Non-Federally Funded, exceeding 102% of the applicable Budget results in no points while spending less than or equal to 100% of the applicable Budget results in awarding full Base Points. The Operator can earn full Base Points by spending up to 102% of the budget, pending Administrator approval.


IV.      Summary of Performance Metrics.

The Performance Metrics that form the basis for the Incentive Compensation Pool are summarized in Table 2. Details of these Performance Metrics are described in the text following Table 2.

CONFIDENTIAL

## Table 2. Summary of Performance Metrics

*Note: Any Baseline Performance Level set using PREPA historical data will be subject to confirmation during the Front-End Transition Period.*

| Performance Metric | Description | Baseline Performance Level Derivation | Base Points | Effective Weight |
|---|---|---|---|---|
| **A. Customer Satisfaction** | | | | |
| 1. J.D. Power Customer Satisfaction Survey (Residential Customers) | 3rd party measure of customer satisfaction | Set during Front-End Transition Period | 5.0 | 4% |
| 2. J.D. Power Customer Satisfaction Survey (Business Customers) | 3rd party measure of customer satisfaction | Set during Front-End Transition Period | 5.0 | 4% |
| 3. Average Speed of Answer (minutes)* | Time it takes on phone to reach an agent | PREPA historical data verified during Front-End Transition Period | 5.0 | 4% |
| 4. Customer Complaint Rate | Total monthly complaints registered with PREB | PREPA historical data verified during Front-End Transition Period | 5.0 | 4% |
| 5. First Call Resolution* | % of calls with issues that are escalated | Set during Front-End Transition Period | 5.0 | 4% |
| 6. Abandonment Rate | # of abandoned calls per calls received | PREPA historical data verified during Front-End Transition Period | 5.0 | 4% |
| **B. Technical, Safety & Regulatory** | | | | |
| 1. OSHA Recordable Incidence Rate | # of work-related OSHA recordable injury cases | PREPA historical data verified during Front-End Transition Period | 5.0 | 6% |
| 2. OSHA Fatalities* | # of work-related fatalities | Industry standard specified herein | 5.0 | 6% |
| 3. OSHA Severe Injuries* | # of total work-related injury cases with severity days | Set during the Front-End Transition Period | 5.0 | 6% |
| 4. OSHA DART Rate | # of work-related injury cases incidents resulting in 1 or more lost days | Set during Front-End Transition Period | 5.0 | 6% |
| 5. System Average Interruption Frequency Index (SAIFI)* | Measures avg. outage frequency | PREPA historical data verified during Front-End Transition Period | 5.0 | 6% |
| 6. Customer Average Interruption Duration Index (CAIDI)* | Measures avg. restoration time | PREPA historical data verified during Front-End Transition Period | 5.0 | 6% |
| 7. System Average Interruption Duration Index (SAIDI)* | Measures avg. outage duration | PREPA historical data verified during Front-End Transition Period | 5.0 | 6% |

IX-4

**CONFIDENTIAL**

| Performance Metric | Description | Baseline Performance Level Derivation | Base Points | Effective Weight |
|---|---|---|---|---|
| 8. Customers Experiencing Multiple Interruptions (CEMI) | Measures multiple outages in a given period | Set during Front-End Transition Period | 5.0 | 6% |
| 9. Momentary Average Interruption Frequency Index (MAIFI) | Measures avg. # of momentary interruptions | PREPA historical data verified during Front-End Transition Period | 5.0 | 6% |
| **C. Financial Performance** | | | | |
| 1. Operating Budget* | Measures ability to stay within budget | Budget agreed by PREB, P3A and Operator | 7.5 | 5% |
| 2. Capital Budget – Federally Funded* | Measures ability to stay within budget | Budget agreed by PREB, P3A and Operator | 7.5 | 5% |
| 3. Capital Budget – Non-Federally Funded* | Measures ability to stay within budget | Budget agreed by PREB, P3A and Operator | 7.5 | 5% |
| 4. Days Sales Outstanding | Measures ability to collect bills | PREPA historical data verified during Front-End Transition Period | 5.5 | 4% |
| 5. Reduction in Network Line Losses | Measures ability to reduce electric losses | Set during Front-End Transition Period | 5.0 | 3% |
| 6. Overtime | Measures ability to manage salary expense | Set during Front-End Transition Period | 5.0 | 3% |

*These Performance Metrics are also Key Performance Metrics (as defined below).

V.     Performance Metrics.

A.      Customer[3] Satisfaction

1.   J.D. Power Customer Satisfaction Survey (Residential)

Performance Objective: To incentivize sufficient customer service.

Description: The metric measures customer satisfaction through a third-party survey that examines six (6) factors (power quality and reliability, price, billing and payment, corporate citizenship, communications and customer service). The Baseline Performance Level will be set during the Front-End Transition Period. The Target Performance Level has been set as the "South Large Utility" average, as defined by J.D. Power.

Points Assigned: 5

---

[3] A customer is a metered electrical service point for which an active bill account is established at a specific location, per IEEE 1366-2012.

CONFIDENTIAL

Baseline Performance Level: TBD.

Target Performance Level: J.D. Power Residential Score of 714.

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: Third party survey that examines six (6) factors (power quality and reliability, price, billing and payment, corporate citizenship, communications and customer service).

Metric Schedule:

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 1 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 2 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 3 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 4 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 5 | 714 | TBD | TBD | TBD | 714 | TBD | TBD |

2. **J.D. Power Customer Satisfaction Survey (Business)**

Performance Objective: To incentivize sufficient customer service.

Description: The metric measures customer satisfaction through third party survey that examines six (6) factors (power quality and reliability, price, billing and payment, corporate citizenship, communications and customer service). The Baseline Performance Level will be set during the Front-End Transition Period. The Target Performance Level has been set as the "South Large Utility" average.

Points Assigned: 5

Baseline Performance Level: TBD.

Target Performance Level: J.D. Power Business Score of 760.

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: Third party survey that examines six factors (power quality and reliability, price, billing and payment, corporate citizenship, communications and customer service).

CONFIDENTIAL

Metric Schedule:

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 1 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 2 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 3 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 4 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 5 | 760 | TBD | TBD | TBD | 760 | TBD | TBD |

3.   Average Speed of Answer (minutes)

Performance Objective: To incentivize efficient call center service.

Description: The average speed of answer is measured as a combination of those customers who have their question or issue resolved via the automated Integrated Voice Response system ("IVR") and those customers who opt out of the IVR and wait to speak with a customer. The Baseline Performance Level has been set using PREPA historical data subject to confirmation during the Front-End Transition Period.

Points Assigned: 5

Baseline Performance Level: Average of 10.0 minutes.

Target Performance Level: Average of 1.0 minutes.

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: Average number of minutes from when the customer goes through the integrated voice response system until reaching an agent.

**CONFIDENTIAL**

Metric Schedule:

| | **Target Threshold** | **Minimum Performance Level** | **150%** | **125%** | **100%** | **50%** | **25%** |
|---|---|---|---|---|---|---|---|
| Baseline | 10.0 | 10.0 | N/A | N/A | 10.0 | N/A | N/A |
| Year 1 | 10.0 | 10.0 | N/A | N/A | 10.0 | N/A | N/A |
| Year 2 | 8.5 | 9.1 | 4.0 | 6.3 | 8.5 | 8.8 | 9.0 |
| Year 3 | 7.5 | 8.2 | 2.5 | 5.0 | 7.5 | 7.8 | 8.0 |
| Year 4 | 5.0 | 7.3 | 1.0 | 3.0 | 5.0 | 6.0 | 7.0 |
| Year 5 | 2.5 | 6.4 | 0.5 | 1.5 | 2.5 | 4.3 | 6.0 |

4.   Customer Complaint Rate

Performance Objective: To incentivize enough customer service.

Description: This metric measures the total number of initial customer complaints registered with the Puerto Rico Energy Bureau ("PREB"). The Baseline Performance Level will be set based on PREPA historical data subject to confirmation during the Front-End Transition Period.

Points Assigned: 5

Baseline Performance Level: 11.3% complaint rate.

Target Performance Level: 2.5% complaint rate.

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: The monthly value is calculated by taking the total number of initial complaints divided by the total utility customer population and then multiplying by 100,000.

**CONFIDENTIAL**

Metric Schedule:

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | 11.3% | 11.3% | N/A | N/A | 11.3% | N/A | N/A |
| Year 1 | 11.3% | 11.3% | N/A | N/A | 11.3% | N/A | N/A |
| Year 2 | 10.7% | 10.4% | 5.0% | 7.8% | 10.7% | 10.3% | 10.0% |
| Year 3 | 10.0% | 9.5% | 4.0% | 7.0% | 10.0% | 9.5% | 9.0% |
| Year 4 | 7.5% | 8.7% | 3.0% | 5.3% | 7.5% | 7.8% | 8.0% |
| Year 5 | 5.0% | 7.8% | 2.0% | 3.5% | 5.0% | 6.0% | 7.0% |

**CONFIDENTIAL**

5. First Call Resolution

Performance Objective: To incentivize efficient call center service.

Description: This metric is a measure of efficiency of the call center. It also impacts customer satisfaction because the customer will notice a difference in how they are treated while on the call and the company's willingness to address their questions/concerns quickly and without escalation. The Baseline Performance Level will be set during the Front-End Transition Period.

Points Assigned: 5

Baseline Performance Level: To be determined ("TBD").

Target Performance Level: 15% first calls resolved.

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: The metric is calculated as the percentage of calls with issues that are escalated.

Metric Schedule:

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 1 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 2 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 3 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 4 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 5 | 15.0% | TBD | TBD | TBD | 15.0% | TBD | TBD |

6. Abandonment Rate

Performance Objective: To incentivize efficient call center service.

Description: Abandoned calls occur when customers waiting for service on the phone, after opting to speak with a person, hang up before receiving service. The Baseline Performance Level has been set using PREPA historical data and the S&L report. The Target Performance Level has been set using the S&L report recommendations.

Points Assigned: 5

Baseline Performance Level: 50% calls abandoned.

Target Performance Level: 25% calls abandoned.

CONFIDENTIAL

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: The metric is calculated as abandoned calls divided by calls received.

Metric Schedule:

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | 50.0% | 50.0% | N/A | N/A | 50.0% | N/A | N/A |
| Year 1 | 50.0% | 50.0% | N/A | N/A | 50.0% | N/A | N/A |
| Year 2 | 45.0% | 47.5% | 25.0% | 35.0% | 45.0% | 46.0% | 47.0% |
| Year 3 | 40.0% | 45.0% | 20.0% | 30.0% | 40.0% | 42.0% | 44.0% |
| Year 4 | 35.0% | 42.5% | 15.0% | 25.0% | 35.0% | 37.5% | 40.0% |
| Year 5 | 30.0% | 40.0% | 12.5% | 21.3% | 30.0% | 33.8% | 37.5% |

B.     Technical, Safety & Regulatory

The Technical Performance Metrics will be measured and calculated in accordance with IEEE 1366-2012, including the terms as defined therein. The calculation of Technical Performance Metrics excludes (i) interruptions associated with Outage Event days using the IEEE 2.5 Beta Method, (ii) planned interruptions and (iii) interruptions caused by generation events.

1.  OSHA Recordable Incident Rate ("OSHA IR")[4]

Performance Objective: To incentivize employee safety.

Description: OSHA requires Recordable Incident Rate be reported to OSHA on a yearly basis. An OSHA recordable incident is a work-related injury or illness that results in one of more of the following: death, days away from work, restricted work or transfer to another job, medical treatment beyond first aid, loss of consciousness, a significant injury or illness diagnosed by a physician or other licensed health care professional. The Baseline Performance Level has been set using PREPA historical data subject to confirmation during the Front-End Transition Period.

Points Assigned: 5

Baseline Performance Level: OSHA IR of 11.3.

Target Performance Level: OSHA IR of 6.28.

---

[4] As defined by OSHA.

CONFIDENTIAL

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: The metric is calculated as the total number of recordable incident cases over a set time period multiplied by a scaling factor and divided by the total number of labor hours the company recorded during that time period (OSHA uses 200,00 as a scaling factor, which equates to one hundred (100) employees working forty (40) hours per week, fifty (50) weeks of the year).

Metric Schedule:

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | 11.30 | 11.30 | N/A | N/A | 11.30 | N/A | N/A |
| Year 1 | 10.68 | 10.80 | 7.00 | 8.84 | 10.68 | 10.59 | 10.50 |
| Year 2 | 10.05 | 10.30 | 6.00 | 8.03 | 10.05 | 10.03 | 10.00 |
| Year 3 | 8.79 | 9.79 | 5.00 | 6.90 | 8.79 | 9.15 | 9.50 |
| Year 4 | 7.34 | 9.29 | 4.00 | 5.67 | 7.34 | 8.04 | 8.75 |
| Year 5 | 6.28 | 8.79 | 3.00 | 4.64 | 6.28 | 7.14 | 8.00 |

2.  OSHA Fatalities[5]

Performance Objective: To incentivize employee safety.

Description: OSHA requires all work-related fatalities be reported to OSHA within eight (8) hours. The industry standard target is 0 fatalities, which has determined the Baseline and Target Performance Levels.

Points Assigned: 5

Baseline Performance Level: 0 fatalities.

Target Performance Level: 0 fatalities.

Minimum Performance Level: 0 fatalities.

Calculation: This metric measures the number of OSHA-reportable fatalities (i.e. employee fatalities that occur on the job within OSHA jurisdictions).

---

[5] As defined by OSHA.

CONFIDENTIAL

Metric Schedule:

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | 0 | 0 | N/A | N/A | 0 | N/A | N/A |
| Year 1 | 0 | 0 | N/A | N/A | 0 | N/A | N/A |
| Year 2 | 0 | 0 | N/A | N/A | 0 | N/A | N/A |
| Year 3 | 0 | 0 | N/A | N/A | 0 | N/A | N/A |
| Year 4 | 0 | 0 | N/A | N/A | 0 | N/A | N/A |
| Year 5 | 0 | 0 | N/A | N/A | 0 | N/A | N/A |

3.  OSHA Severity Rate[6]

Performance Objective: To incentivize employee safety

Description: Utilized as a metric to measure the severity of workplace injuries, the OSHA Severity Rate is commonly used to measure safety performance across the utility industry. The Severity Rate takes into account the total number of restricted and lost time days incurred as a result of a work-related injury. The Baseline and Target Performance Levels will be set during the Front-End Transition Period.

Points Assigned: 5

Baseline Performance Level: TBD

Target Performance Level: TBD

Minimum Performance Level: TBD

Calculation: This metric is calculated by dividing the product of the total number of severity days (both restricted and lost time days) and 200,000 (OSHA scaling factor) by the total number of work hours.

Metric Schedule:

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 1 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 2 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 3 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |

---

[6] As defined by OSHA.

**CONFIDENTIAL**

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Year 4 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 5 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |

4.  OSHA Days Away Rate (Severity) ("DART")[7]

Performance Objective: To incentivize employee safety.

Description: Utilized as a metric to measure the severity of workplace injuries, the OSHA DART Rate is commonly used to measure safety performance across the utility industry. The DART Rate takes into account the total number of injury cases that resulted in either lost time, restricted time, or a transfer from the employee's regular job. The Baseline Performance Level will be set during the Front-End Transition Period.

Points Assigned: 5

Baseline Performance Level: TBD

Target Performance Level: DART of 4.0.

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: This metric is calculated by dividing the product of the total number of DART Cases (OSHA injury cases with either lost time days, restricted days, or results in a job transfer) and 200,000 (OSHA scaling factor) and the total number of work hours.

Metric Schedule:

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 1 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 2 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 3 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 4 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 5 | 4.0 | TBD | TBD | TBD | 4.0 | TBD | TBD |

---

[7] As defined by OSHA.

CONFIDENTIAL

5.  System Average Interruption Frequency Index ("SAIFI")[8]

Performance Objective: To incentivize system reliability.

Description: This metric indicates how often the average customer experiences a sustained interruption over a predefined period of time. The baseline target level has been set using PREPA historical data subject to confirmation during the Front-End Transition Period.

Points Assigned: 5

Baseline Performance Level: 4.6 outages per year.

Target Performance Level: 1.89 outages per year.

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: This metric is calculated by dividing the total number of customers interrupted by the total number of customers served. Each sustained interruption experienced by a specific customer counts towards the total in the numerator. A sustained interruption is defined as "Any interruption not classified as a part of a momentary event. That is, any interruption that lasts more than five minutes."

Metric Schedule:

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | 4.60 | 4.60 | N/A | N/A | 4.60 | N/A | N/A |
| Year 1 | 4.19 | 4.33 | 2.00 | 3.09 | 4.19 | 4.24 | 4.30 |
| Year 2 | 3.77 | 4.06 | 1.75 | 2.76 | 3.77 | 3.89 | 4.00 |
| Year 3 | 2.94 | 3.79 | 1.50 | 2.22 | 2.94 | 3.32 | 3.70 |
| Year 4 | 2.42 | 3.52 | 1.25 | 1.84 | 2.42 | 2.84 | 3.25 |
| Year 5 | 1.89 | 3.25 | 1.00 | 1.45 | 1.89 | 2.45 | 3.00 |

6.  Customer Average Interruption Duration Index ("CAIDI")[9]

Performance Objective: To incentivize system reliability.

---

[8] As defined in *IEEE Guide for Electric Power Distribution Reliability Indices, IEEE P1366-2012.*

[9] As defined in *IEEE Guide for Electric Power Distribution Reliability Indices, IEEE P1366-2012.*

IX-15

CONFIDENTIAL

Description: This metric measures the average restoration time a customer may experience. The Baseline Performance Level has been set using PREPA historical data subject to confirmation during the Front-End Transition Period.

Points Assigned: 5

Baseline Performance Level: 147 minutes.

Target Performance Level: 147 minutes.

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: This metric is calculated by summing the product of the length of each interruption and the number of customers impacted by that interruption for all sustained interruptions during the measurement period then dividing by the total number of customers interrupted. Note that each interruption experienced by a specific customer counts towards the total in the denominator.

This is a sustained interruption index. A sustained interruption is defined as "Any interruption not classified as a part of a momentary event. That is, any interruption that lasts more than five minutes." It also represents SAIDI divided by SAIFI.

Metric Schedule:

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | 147 | 147 | N/A | N/A | 147 | N/A | N/A |
| Year 1 | 147 | 147 | 120 | 134 | 147 | N/A | N/A |
| Year 2 | 147 | 147 | 115 | 131 | 147 | N/A | N/A |
| Year 3 | 147 | 147 | 110 | 129 | 147 | N/A | N/A |
| Year 4 | 147 | 147 | 105 | 126 | 147 | N/A | N/A |
| Year 5 | 147 | 147 | 100 | 124 | 147 | N/A | N/A |

7.  System Average Interruption Duration Index ("SAIDI")[10]

Performance Objective: To incentivize system reliability

Description: This metric indicates the total duration of interruption for the average customer. The Baseline Performance Level has been set using PREPA historical data.

Points Assigned: 5

---

[10] As defined in *IEEE Guide for Electric Power Distribution Reliability Indices, IEEE P1366-2012.*

CONFIDENTIAL

Baseline Performance Level: 675 minutes.

Target Performance Level: 277 minutes.

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: This metric is calculated by summing of the of each interruption and the number of customers impacted by that interruption divided by the total number of customers served. Each interruption experienced by a specific customer counts towards the total in the denominator. This is a sustained interruption index. A sustained interruption is defined as any interruption not classified as a part of a momentary event. That is any interruption that lasts more than five minutes.

Metric Schedule:

|          | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|----------|------------------|---------------------------|------|------|------|-----|-----|
| Baseline | 675 | 675 | N/A | N/A | 675 | N/A | N/A |
| Year 1   | 615 | 635 | 550 | 582 | 615 | 622 | 630 |
| Year 2   | 554 | 595 | 450 | 502 | 554 | 570 | 585 |
| Year 3   | 432 | 556 | 375 | 404 | 432 | 466 | 500 |
| Year 4   | 355 | 516 | 250 | 303 | 355 | 403 | 450 |
| Year 5   | 277 | 476 | 150 | 214 | 277 | 339 | 400 |

8. Customers Experiencing Multiple Interruptions ("CEMI")[11]

Performance Objective: To incentivize system reliability.

Description: This metric indicated the ratio of individual customers experiencing one or more sustained interruptions to the total number of customers served. The Baseline Performance Level will be set during Year 3. It is anticipated that the number of interruptions to be tracked are three (3), five (5) and eight (8) interruptions (i.e., CEMI-3, CEMI-5 and CEMI-8).

Points Assigned: 6

Baseline Performance Level: TBD.

Target Performance Level: TBD

---

[11] As defined in *IEEE Guide for Electric Power Distribution Reliability Indices, IEEE P1366-2012.*

CONFIDENTIAL

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: This metric is calculated by dividing the total number of customers that have experienced some number of outages more sustained interruptions by the total number of customers served. This is sustained interruption index. A sustained interruption is defined as any interruption not classified as a part of a momentary event. That is, any interruption that lasts more than five minutes.

Metric Schedule:

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 1 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 2 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 3 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 4 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 5 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |

9. Momentary Average Interruption Frequency Index ("MAIFI")[12]

Performance Objective: To incentivize system reliability.

Description: This metric indicates the average frequency of momentary interruptions experienced by the average customer. It is calculated from customer level data but it is not a customer specific index – it is a system level index. MAIFI is typically caused by natural causes such as animal contacts, lightning strikes, or vegetation temporarily contacting a power line. The Minimum Performance Level and Target Performance Level will be set in Year 3.

Points Assigned: 5

Baseline Performance Level: 6 events per year.

Target Performance Level: 2 events per year.

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: This metric is calculated by dividing the total number of customer interruptions, which last less than a set amount of time, by the total number of customers served. This is

---

[12] **As defined in *IEEE Guide for Electric Power Distribution Reliability Indices, IEEE P1366-2012.***

**CONFIDENTIAL**

momentary interruption index. A momentary interruption is an interruption of duration limited to the period required to restore service by an interrupting device. Such switching operations must be completed within a specified time of five minutes or less. This definition includes all reclosing operations that occur within five minutes of the first interruption. If a recloser or circuit breaker operates two, three, or four times and then holds (within five minutes of the first operation), those momentary interruptions shall be considered one momentary interruption event.

Metric Schedule:

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | 6.00 | 6.00 | N/A | N/A | 6.00 | N/A | N/A |
| Year 1 | 5.50 | 5.60 | 4.50 | 5.00 | 5.50 | 5.53 | 5.55 |
| Year 2 | 5.00 | 5.20 | 4.00 | 4.50 | 5.00 | 5.08 | 5.15 |
| Year 3 | 4.00 | 4.80 | 3.00 | 3.50 | 4.00 | 4.25 | 4.50 |
| Year 4 | 3.00 | 4.40 | 2.00 | 2.50 | 3.00 | 3.50 | 4.00 |
| Year 5 | 2.00 | 4.00 | 1.00 | 1.50 | 2.00 | 2.75 | 3.50 |

    C.    Financial Performance

1. Operating Budget

Performance Objective: To incentivize accurate cost management.

Description: This metric measures the utility's ability to stay within its Operating Budget initially approved at the start of the Contract Year. The Baseline and Target Performance Levels have been set at 100% of the approved Operating Budget.

Points Assigned: 7.5

Baseline Performance Level: 100% of Operating Budget.

Target Performance Level: 100% of Operating Budget.

Minimum Performance Level: 100% of Operating Budget.[13]

Calculation: This metric will be evaluated as actual operating spend divided by Operating Budget.

Metric Schedule:

---

[13] **The Operator can earn 100% of Base Points by spending up to 102% of the Operating Budget pending Administrator approval.**

CONFIDENTIAL

| | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 1 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 2 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 3 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 4 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 5 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |

2.  Capital Budget – Federally Funded

Performance Objective: To incentivize accurate cost management.

Description: This metric measures the utility's ability to stay within its Capital Budget – Federally Funded initially approved at the start of the Contract Year. The Baseline and Target Performance Levels have been set at 100% of the approved Capital Budget – Federally Funded.

Points Assigned: 7.5

Baseline Performance Level: 100% of Capital Budget – Federally Funded.

Target Performance Level: 100% of Capital Budget – Federally Funded.

Minimum Performance Level: 100% of Capital Budget – Federally Funded.[14]

Calculation: This metric will be evaluated as actual operating spend divided by Capital Budget – Federally Funded.

Metric Schedule:

| | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 1 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 2 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 3 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 4 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 5 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |

---

[14] **The Operator can earn 100% of Base Points by spending up to 102% of the Capital Budget – Federally Funded pending Administrator approval.**

CONFIDENTIAL

3. Capital Budget – Non-Federally Funded

Performance Objective: To incentivize accurate cost management.

Description: This metric measures the utility's ability to stay within its Capital Budget – Non-Federally Funded initially approved at the start of the Contract Year. The Baseline and Target Performance Levels have been set at 100% of the Capital Budget – Non-Federally Funded.

Points Assigned: 7.5

Baseline Performance Level: 100% of Capital Budget – Non-Federally Funded.

Target Performance Level: 100% of Capital Budget – Non-Federally Funded.

Minimum Performance Level: 102% of Capital Budget – Non-Federally Funded.[15]

Calculation: This metric will be evaluated as actual operating spend divided by Capital Budget – Non-Federally Funded.

Metric Schedule:

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 1 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 2 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 3 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 4 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 5 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |

4. Days Sales Outstanding[16]

Performance Objective: To incentivize accurate cash management.

Description: This metric is a measure of the average number of days that it takes a company to collect payment after a sale has been made. It is a measure of cash management. The Baseline Performance Level has been set using PREPA historical data subject to confirmation during the Front-End Transition Period. The Target Performance Level has been set at an appropriate level for adequate cash management.

---

[15] The Operator can earn 100% of Base Points by spending up to 102% of the Capital Budget – Non-Federally Funded pending Administrator approval.

[16] This metric will reflect the impact of government collections, including critical service installations as defined in Law 57-2014, as amended by Law 17-2019, and CILT organizations.

CONFIDENTIAL

Points Assigned: 5.5

Baseline Performance Level: 150 days

Target Performance Level: 50 days

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: This metric is calculated as average annual Accounts Receivable divided by average annual Total Credit Sales, multiplied by 365.

Metric Schedule:

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | 150.00 | 150.00 | N/A | N/A | 150.00 | N/A | N/A |
| Year 1 | 137.50 | 140.00 | 125.00 | 131.25 | 137.50 | 138.25 | 139.00 |
| Year 2 | 125.00 | 130.00 | 100.00 | 112.50 | 125.00 | 125.38 | 125.75 |
| Year 3 | 100.00 | 120.00 | 75.00 | 87.50 | 100.00 | 107.50 | 115.00 |
| Year 4 | 75.00 | 110.00 | 65.00 | 70.00 | 75.00 | 87.50 | 100.00 |
| Year 5 | 50.00 | 100.00 | 50.00 | 50.00 | 50.00 | 62.50 | 75.00 |

5. Reduction in Network Line Losses

Performance Objective: To incentivize efficient line usage.

Description: This metric measures the utility's ability to reduce line losses, which occur due to resistance along the electrical lines. The baseline and target performance metrics will be set during the Front-End Transition Period.

Points Assigned: 5

Baseline Performance Level: TBD.

Target Performance Level: TBD.

Minimum Performance Level: TBD.

Calculation: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

CONFIDENTIAL

Metric Schedule:

| | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 1 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 2 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 3 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 4 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 5 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |

6.  Overtime

Performance Objective: To incentivize efficient payroll expense.

Description: This metric measures the utility's ability to manage salary expense. The Baseline and Target Performance Levels will be set during the Front-End Transition Period.

Points Assigned: 5

Baseline Performance Level: TBD.

Target Performance Level: TBD.

Minimum Performance Level: TBD.

Calculation: The sum of all hours worked beyond scheduled hours in a given period.

Metric Schedule:

| | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 1 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 2 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 3 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 4 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 5 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |

VI.   Operator Event of Default.

Section 14.1(k) (*Events of Default by Operator – Failure to Meet Minimum Performance Threshold*) of the Agreement provides for an Operator Event of Default if, during three (3) or more consecutive Contract Years, Operator fails to meet the Minimum Performance Level for any three

CONFIDENTIAL

(3) of the following Performance Metrics and no such failure has been excused by a Force Majeure Event, Outage Event or Owner Fault: (i) Average Speed of Answer; (ii) First Call Resolution; (iii) OSHA Fatalities; (iv) OSHA Severe Injuries; (v) System Average Interruption Frequency Index (SAIFI); (vi) System Average Interruption Duration Index (SAIDI); (vii) Customer Average Interruption Duration Index (CAIDI); (viii) Operating Budget; (ix) Capital Budget – Federally Funded; and (x) Capital Budget – Non-Federally Funded (each a "Key Performance Metric" and together the "Key Performance Metrics").

Section 7.1(c)(vii) (*Service Fee – Incentive Fee*) provides that if any Force Majeure Event (other than a Force Majeure Event that is a Major Outage Event) prevents Operator from achieving one or more of the Performance Metrics, Operator shall be entitled to earn the Incentive Fee for the period that such Force Majeure Event continues as long as, and to the extent that, Operator achieves the Key Performance Metrics during such period of time.

VII.   Operating Budget Overrun Default.

Section 14.5(e) (*Additional Termination Rights – Operating Budget Overrun*) of the Agreement provides Owner with an additional termination right in the event of an Operating Budget Overrun Default.

VIII.   Major Outage Event Performance Metrics

"Major Outage Event" means an event as a result of which (i) at least two hundred and five thousand (205,000) T&D Customers are interrupted or (ii) at least one thousand five hundred (1,500) outage jobs for the T&D System are logged, in each case within a twenty-four (24) hour period and due to an act of God or, in case of a storm, a storm that is designated as such by the U.S. National Weather Service, and shall end when a state in which fewer than ten thousand (10,000) T&D Customers remain interrupted for a continuous period of eight (8) hours following a Major Outage Event is achieved.

Section 7.1(c)(vi) (*Service Fee – Incentive Fee*) of the Agreement provides that if any Major Outage Event (including, for the avoidance of doubt, a Major Outage Event that is a Force Majeure Event) prevents Operator from achieving one or more of the Performance Metrics, Operator shall be entitled to earn the Incentive Fee for the period that such Major Outage Event continues as long as, and to the extent that, Operator achieves certain performance metrics to be agreed upon during the Front-End Transition Period and set forth below (the "Major Outage Event Performance Metrics") during such period of time.

The Major Outage Event Performance Metrics that form the basis for the Incentive Compensation Pool in such circumstances are summarized in Table 3.

**Table 3. Summary of Major Outage Event Performance Metrics**

*Note: The Major Outage Event Performance Metrics will be subject to confirmation during the Front-End Transition Period and review and approval by PREB.*

CONFIDENTIAL

| Major Outage Event Performance Metric | Description | Base Points | Effective Weight |
|---|---|---|---|
| 1. Event Application | Completion of steps to provide timely and accurate emergency event preparation following an alert from U.S. National Weather Service or the company's private weather service, in accordance with the Emergency Response Plan, for an event expected to impact the company's service territory. | TBD | TBD |
| 2. Down Wires | Response to downed wires reported by municipal public officials. | TBD | TBD |
| 3. Preliminary Damage Assessment | Completion of preliminary damage assessment. | TBD | TBD |
| 4. Crewing | 80% of the forecast crewing committed to the utility. | TBD | TBD |
| 5. Estimated Time of Restoration (made available by utility on web, IVR, to CSR's, etc.) | Publication of regional ETRs in accordance with guidelines.<br><br>Publication of municipal ETRs in accordance with guidelines. | TBD | TBD |
| 6. ETR Accuracy | Regional ETR accuracy as published in accordance with ETR requirement time.<br><br>Municipal ETR accuracy as published in accordance with ETR requirement time. | TBD | TBD |
| 7. Municipality Coordination | Coordination with municipalities regarding road clearing, down wires, critical customers, etc. | TBD | TBD |
| 8. Municipal EOC Coordination | Coordination with municipal EOCs. | TBD | TBD |
| 9. Utility Coordination | Coordination with other utilities (communications, water, etc.). | TBD | TBD |
| 10. Safety | Measure of any employee or contractor injured doing hazard work during storm/outage and restoration. | TBD | TBD |
| 11. Mutual Assistance | Crew requests made through all sources of mutual assistance. | TBD | TBD |

IX-25

CONFIDENTIAL

| Major Outage Event Performance Metric | Description | Base Points | Effective Weight |
|---|---|---|---|
| 12. Call Answer Rates | Customer calls answered by properly staffing call centers (use of IVR and other technology is an acceptable answer). | TBD | TBD |
| 13. Municipal Calls | Municipal call must be properly managed and provide, at minimum, baseline information (outages, ETRs, contact information, etc.), road clearing activities, and allow for Q&A. | TBD | TBD |
| 14. Web Availability | Company's web site, specifically the section pertaining to outage impact and restoration, must be available around the clock during a major storm event and information must be updated hourly until final restoration. In the event no new information is available, the web site must display the last time and date that information was updated. The web site and/or section pertaining to outage impact and restoration may be taken offline for a short period during off peak hours to perform system maintenance. | TBD | TBD |
| 15. PREB and Administrator Reporting | Provide storm event information to PREB and Administrator in accordance with Electric Outage Reporting System (EORS) guideline requirements. | TBD | TBD |
| 16. Customer Communications | Press releases, text messaging, email and social media. | TBD | TBD |
| 17. Outgoing message on telephone line | Recorded message providing callers with outage information is updated within two hours of communication of press releases. | TBD | TBD |
| 18. PREB and Administrator Complaints | Number of storm/outage related PREB and Administrator complaints received. | TBD | TBD |

IX.    Monitoring.

The set of Performance Metrics and the Target Performance Levels for the sixth Contract Year will be evaluated during the fifth Contract Year collectively by the Operator and Administrator to determine reasonability for subsequent years. Beginning in the sixth Contract Year Performance Metrics and the Target Performance Levels will be reevaluated on an annual basis. At this time, it will be determined whether additional metrics should be included, Base Points

CONFIDENTIAL

reallocated, and Target Performance Levels modified. The Operator and PREB may also consider whether adjustments to the Performance Metrics are appropriate prior to the fifth Contract Year based on business, operational or other considerations. Any adjustments will be dealt with in accordance with Section 7.1(c)(vi) (*Service Fee – Amendments to Performance Metrics*).

CONFIDENTIAL

**Annex X**

**Calculation of Incentive Fee**

I.      <u>General</u>.

For each Contract Year, the Operator shall be eligible to receive an Incentive Compensation Pool based on the Operator's performance during the Contract Year as measured against the performance goals set forth by the Performance Metrics.

II.     <u>Performance Categories</u>.

The Incentive Compensation Pool will be allocated across the three Performance Categories in such a way as to align the Operator's incentive compensation with the performance goals.

**Table 1. Summary of Performance Categories**

| Performance Category | Performance Goal | Allocation of Incentive Compensation Pool |
|---|---|---|
| 1.   Customer Satisfaction | Achieve a high-level of customer satisfaction across all customer classes. | 25% |
| 2.   Technical, Safety and Regulatory | Operate a safe, reliable electric grid while remaining complaint with applicable safety, environmental and other regulations. | 50% |
| 3.   Financial Performance | Meet the approved Operating Budget, Capital Budget – Federally Funded and Capital Budget – Non-Federally Funded. | 25% |

III.    <u>Calculation Methodology</u>.

A.      Each Performance Metric is assigned a Base Point level with the sum of Base Points of all Performance Metrics within a Performance Category representing the maximum number of Base Points the Operator can earn within a single Performance Category. As described in Annex IX (*Performance Metrics*), except for the Binary Metrics, assuming the Operator reaches the Minimum Performance Level it has the potential to earn either 25%, 50%, 100%, 125% or 150% of the Base Points for each Performance Metric. If the sum of the points awarded in a Performance Category meets or exceeds the sum of the Base Points, the Operator will receive 100% of the Incentive Pool Allocation for that Performance Category. In the event the Operator is awarded points less than the sum of the possible Base Points, the Operator would receive a Pro Rata portion of the Incentive Pool Allocation equal to the ratio of actual points received by the Operator to the total Base Points in the Performance Category.

CONFIDENTIAL

IV.     <u>Incentive Fee Calculation Example</u>.

A.     The table below includes an illustrative example of how the incentive compensation mechanism works. The metrics, base points and weightings are consistent with Annex IX (*Performance Metrics*), but the dollar values included in the table are for example only and are <u>not</u> meant to represent actual magnitude of payments or Operator scoring in any Contract Year.

CONFIDENTIAL

## Table 2. Incentive Fee Calculation Example

*Note: The example below assumes an illustrative total Incentive Compensation Pool of US$10M.*

| $ in millions | | Scenario 1: Top Performance | | Scenario 2: Selective Performance | | Scenario 3: Poor Performance | |
|---|---|---|---|---|---|---|---|
| **Performance Metrics** | **Base Points** | **% Achieved** | **Points Awarded** | **% Achieved** | **Points Awarded** | **% Achieved** | **Points Awarded** |
| **Customer Satisfaction** | | | | | | | |
| JD Power Customer Satisfaction Survey (Residential) | 5.0 | 150% | 7.5 | 150% | 7.5 | 50% | 2.5 |
| JD Power Customer Satisfaction Survey (Business) | 5.0 | 150% | 7.5 | 150% | 7.5 | 50% | 2.5 |
| Average Speed of Answer (minutes) | 5.0 | 150% | 7.5 | 0% | 0.0 | 50% | 2.5 |
| Customer Complaint Rate | 5.0 | 150% | 7.5 | 150% | 7.5 | 50% | 2.5 |
| First Call Resolution | 5.0 | 150% | 7.5 | 150% | 7.5 | 50% | 2.5 |
| Abandonment Rate | 5.0 | 150% | 7.5 | 0% | 0.0 | 50% | 2.5 |
| **Customer Satisfaction Points Available** | **30.0** | **150%** | **45.0** | **100%** | **30.0** | **50%** | **15.0** |
| | | | | | | | |
| **Technical, Safety & Regulatory** | | | | | | | |
| OSHA Recordable Incidence Rate | 5.0 | 150% | 7.5 | 150% | 7.5 | 50% | 2.5 |
| OSHA Fatalities | 5.0 | 100% | 5.0 | 100% | 5.0 | 0% | 0.0 |
| OSHA Severe Injuries | 5.0 | 100% | 5.0 | 100% | 5.0 | 0% | 0.0 |
| OSHA Days Away Rate (Severity) | 5.0 | 150% | 7.5 | 150% | 7.5 | 50% | 2.5 |
| System Average Interruption Frequency | 5.0 | 150% | 7.5 | 150% | 7.5 | 50% | 2.5 |
| Customer Average Interruption Duration | 5.0 | 150% | 7.5 | 150% | 7.5 | 50% | 2.5 |
| System Average Interruption Duration | 5.0 | 150% | 7.5 | 150% | 7.5 | 50% | 2.5 |
| Customers Experiencing Multiple Interruptions (CEMI) | 5.0 | 150% | 7.5 | 50% | 2.5 | 50% | 2.5 |
| Momentary Average Interruption | 5.0 | 150% | 7.5 | 0% | 0.0 | 50% | 2.5 |
| **Technical, Safety & Regulatory Subtotal** | **45.0** | **139%** | **62.5** | **111%** | **50.0** | **39%** | **17.5** |
| | | | | | | | |
| **Financial Performance** | | | | | | | |
| Operating Budget | 7.5 | 100% | 7.5 | 0% | 0.0 | 0% | 0.0 |
| Capital Budget - Federally Funded | 7.5 | 100% | 7.5 | 100% | 7.5 | 0% | 0.0 |
| Capital Budget - Non-Federally Funded | 7.5 | 100% | 7.5 | 100% | 7.5 | 100% | 7.5 |
| Days Sales Outstanding | 5.5 | 150% | 8.3 | 150% | 8.3 | 50% | 2.8 |
| Reduction in Network Losses | 5.0 | 150% | 7.5 | 150% | 7.5 | 50% | 2.5 |
| Overtime | 5.0 | 150% | 7.5 | 150% | 7.5 | 50% | 2.5 |
| **Financial Performance Subtotal** | **38.0** | **120%** | **45.8** | **101%** | **38.3** | **40%** | **15.3** |
| **Total** | **113.0** | | **153.3** | | **118.3** | | **47.8** |

| Performance Category *( $ in millions )* | Available Incentive Compensation | Base Points | Scenario 1: Top Performance | | Scenario 2: Selective Performance | | Scenario 3: Poor Performance | |
|---|---|---|---|---|---|---|---|---|
| | | | Points Awarded | Incentive Compensation Awarded | Points Awarded | Incentive Compensation Awarded | Points Awarded | Incentive Compensation Awarded |
| Customer Satisfaction | $2.50 | 30.0 | 45.0 | $2.50 | 30.0 | $2.50 | 15.0 | $1.25 |
| Technical, Safety and Regulatory | 5.00 | 45.0 | 62.5 | 5.00 | 50.0 | 5.00 | 17.5 | 1.94 |
| Financial Performance | 2.50 | 38.0 | 45.8 | 2.50 | 38.3 | 2.50 | 15.3 | 1.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Illustrative Total Incentive Compensation - Sample Year** | | | | **$10.00** | | **$10.00** | | **$4.20** |

X-3

CONFIDENTIAL

## Annex XI

## T&D Pass-Through Expenditures

T&D Pass-Through Expenditures shall be the types of costs and expenses incurred by ServCo in the course of providing O&M Services (without markup for profit and shall include all such costs except to the extent any such costs are determined to be Disallowed Costs in the manner set forth in Section 7.6 (*Disallowed Costs*) of the main body of the Agreement. Capitalized terms used but not defined in this Annex XI (*T&D Pass-Through Expenditures*) have the respective meanings set forth in the Agreement. Except as otherwise provided in the Agreement, T&D Pass-Through Expenditures shall include but are not limited to, the following items:

1.      wages, salaries, bonuses, employer contributions to pension and employee medical plans (including employer contributions for Hired Former Employees of Owner that elect to continue participating in Owner's defined benefit retirement plan), employer contributions to workmen's compensation, non-occupational disability and other mandatory employment related insurance and taxes, vacation, sick leaves and other mandatory leaves with pay, overtime and meal period compensation and associated benefits and other post-employment benefits incurred by ServCo in performing the O&M Services, including Capital Improvements, but excluding all costs resulting from noncompliance by ServCo with wage and hour, discrimination, wrongful dismissal or with any other applicable labor or employment related legislation, as well as the costs of defending such claims if such claims are found to be true by a final non-appealable judgment or administrative determination by a court of competent jurisdiction or other Governmental Body (including costs arising out of or related to additional compensation, damages, penalties, court costs and attorney's fees but excluding, for the avoidance of doubt, any costs incurred by Operator, including defense related costs, which are incurred at the direction or with the consent of Administrator);

2.      costs incurred by ServCo in performing the O&M Services, including costs of all subcontracted and seconded employees, all goods and services (including all materials, supplies, spare parts, vehicles and mileage, equipment rental, other transportation, freight, purchased services, training, Subcontractor costs, employee per diems, administrative costs such as dues, subscriptions, meals and entertainment, office supplies, postage, rent and travel communications, utilities and other costs), repair and maintenance costs, and the costs (including fees) incurred or payable with respect to banking services and accounts, cash management, leases, equipment rentals, easements, licenses, permits, consents and similar instruments;

3.      costs related to Capital Improvements to the system, including project management costs incurred by ServCo Employees and the cost of debt for long-lived assets and all other costs associated with funding these improvements, except for Capital Improvements owned by Operator as contemplated by Section 5.5(d) (*Capital Improvements – Option to Propose Operator-Owned Capital Improvements*) of the main body of the Agreement;

4.      costs incurred with respect to professional services, including legal, engineering, accounting, financial, auditing, information technology, telecommunication and other contracted services;

CONFIDENTIAL

5.      costs incurred with respect to the security of physical assets, information technology, operational technology and processes;

6.      claims, lawsuits, litigations, losses, fines, penalties, costs and expenses, judgments, liens, settlements, appeals, disbursements and similar expense (including reasonable and documented fees of external counsel; provided that ServCo shall not be required to provide documentation that would waive any privilege between ServCo and its external counsel), incurred in connection with the performance of the O&M Services;

7.      costs related to Outage Events;

8.      costs associated with the System Remediation Plan, the Emergency Operations Plan, and the other plans required under the Agreement;

9.      any Tax related to Owner-owned, leased or licensed assets or revenues, and costs incurred in connection with any tax audits of Owner;

10.     any Commonwealth sales or use taxes (including the additional taxes of Sections 4210.01 and 4210.02 of the Puerto Rico Internal Revenue Code of 2011, as amended (PRIRC)), municipal sales or use taxes, Commonwealth excise taxes, municipal license taxes, municipal excise taxes and any other taxes imposed by the Commonwealth, a municipality or any other Governmental Body on Owner or ServCo, if ServCo is acting on behalf of Owner pursuant to the Agreement, to the extent that Owner ever becomes subject to the payment of such taxes; provided that any (i) income taxes imposed on Operator by the PRIRC or Act 29, or (ii) other taxes imposed on Operator as a result of the establishment of its operations in the Commonwealth or the continuation thereof (including sales and use taxes and excise taxes on goods or services that are not required to be acquired by Operator on behalf of Owner for the performance of the O&M Services under the Agreement) shall not be T&D Pass-Through Expenditures;

11.     any municipal construction excise taxes related to construction work performed by ServCo in connection with the O&M Services;

12.     refunds to T&D Customers;

13.     costs to obtain and maintain in effect Required Insurance, including premium, claims and deductible payments;

14.     costs incurred in connection with Intellectual Property, including licensing of Intellectual Property for use in connection with this agreement, registration or maintenance fees, costs and expenses incurred in the enforcement or defense of Owner Intellectual Property but excluding any costs associated with developing, registering, enforcing, defending or maintaining Operator Intellectual Property (including Operator Marks), Subcontractor Intellectual Property or Third-Party Intellectual Property;

15.     costs incurred in connection with data security, including the implementation, operation and maintenance of a cybersecurity program;

16.     costs incurred in connection with ServCo's performance serving in the role of the T&D System operator, including the services set forth in Section I.C of Annex I (*Scope of Services*) to the Agreement;

17.     costs incurred in connection with ServCo's performance of the Back-End Transition Services;

18.     the costs of compliance with PREB or other regulatory requirements to which Owner or Operator is subject, including programmatic energy efficiency initiatives and demand response requirements mandated and approved by PREB;

19.     initial and ongoing costs necessary to achieve cost reductions, performance improvements, or operating initiatives for the benefit of T&D Customers, including the services set forth in Section VIII.C of Annex I (*Scope of Services*) to the Agreement;

20.     costs incurred in connection with branding and customer and public communications;

21.     costs incurred in connection with Owner's community service programs and community engagement; and

22.     costs incurred in connection with the administration and performance of the System Contracts including as required by Section 5.2 (*System Contracts*) in the main body of the Agreement.

For the avoidance of doubt, in no event shall Operator be responsible for any cost or expense related to the Title III Case.

CONFIDENTIAL

## Annex XII

## Insurance Specifications

I.     Operator shall purchase and maintain, on Owner's behalf, the following insurance coverage for the benefit of Owner from the Service Commencement Date and for the remainder of the Term thereafter, without limitation:

A.     property damage, business interruption coverage and extra expense coverage for the T&D System covering direct damage from all perils (excluding overhead transmission and distribution lines), which shall, among other things, (i) comply with any requirements resulting from the T&D System's receipt of Federal Funding and (ii) provide at least US$550 million in coverage or the minimum amount of property and casualty insurance coverage required in connection with the T&D System's receipt of Federal Funding, whichever is greater; provided that coverage shall have no more than a US$2 million per occurrence deductible;

B.     primary general liability insurance with limits of not less than US$10 million per occurrence and US$10 million aggregate, and a deductible/self-insured retention no greater than US$1 million;

C.     excess general liability insurance with limits of not less than US$65 million in excess liability insurance;

D.     cyber insurance with limits of not less than US$20 million, and a deductible or self-insured retention of no more than US$1 million, for first and third-party losses, liabilities, judgments, settlements, lawsuits, regulatory actions, remediation and other costs or damages arising out of or resulting from any Cybersecurity Breach relating to the operation of the T&D system or non-compliance with Applicable Law relating to privacy or data protection, including coverage for breach response costs, PCI-DDS assessments, ransomware and denial of service, property damage and business interruption, and extra expense, as well as third-party claims and investigations arising out cyber incidents, including any negligent or otherwise wrongful acts or omissions by Operator or any employee or agent thereof;

E.     pollution legal liability insurance covering third-party bodily injury, property damage and other losses caused by pollution during the Term with limits of not less than US$5 million per occurrence and US$25 million in aggregate; provided that coverage shall include environmental cleanup, remediation, transportation and disposal;

F.     boiler and machinery insurance with at least US$200 million in limits per accident, with repair and/or replacement included; at least US$10 million in debris removal limits; and at least US$5 million in additional extra expense limits; provided that coverage shall (i) be comprehensive and (ii) cover boilers, pressure vessels, electrical machines including air conditioning, refrigeration equipment, electrical apparatus and electronic data processing equipment including production machines;

CONFIDENTIAL

G.      commercial auto insurance, providing at least US$15,000 in coverage per accident for liability, medical payments, and physical damage;

H.      (i) aviation liability and physical damage insurance, including liability coverage of at least US$100 million per occurrence and US$250,000 per passenger/crewmember, (ii) replacement cost coverage for physical damage to each scheduled aircraft, (iii) at least US$2.2 million in coverage for physical damage to spare engines and/or spare parts not attached to or forming a part of any aircraft and being property of others for which the named insured is legally liable and (iv) rental expense coverage of at least US$50,000 per accident;

I.      crime insurance providing limits of at least US$10 million in coverage per incident and in the aggregate, and covering employee dishonesty, forgery or alteration, dissolution of assets, computer fraud fund transfer, theft of client property, and credit card coverage;

J.      builder's risk/installation floater insurance covering losses arising out of Operator's and or Operator's subcontractors' construction, maintenance or repairs to T&D and fiber optic infrastructure, including improvements and betterments pursuant to the Agreement; provided that limits for such coverage for each project shall be in amounts consistent with market practice and the magnitude of each construction project;

K.      protective liability insurance for Owner's contractors with a limit of not less than US$2 million per occurrence, including coverage for bodily injury and/or property damage claims arising out of negligent acts or omissions of independent contractors or subcontractors of Operator;

L.      management liability/EPL/fiduciary liability coverage, including at least US$65 million in wrongful acts coverage for Owner and directors and officers of Owner, and US$5 million in fiduciary liability and employment practices liability coverage; and

M.      business travel accident insurance, providing at least US$150,000 in coverage per accident and at least US$3 million in aggregate limits.

Operator shall be listed as an additional insured on all aforementioned coverages, and Operator shall provide evidence of coverage through additional insured endorsements on or before the Service Commencement Date. Moreover, all the aforementioned coverages shall apply on a primary and non-contributory basis.

II.      In addition to and separate from the foregoing, Operator shall maintain, on its own behalf, the following insurance coverage from the Service Commencement Date and for the remainder of the Term thereafter, without limitation:

A.      Commonwealth of Puerto Rico's Workmen's Compensation Insurance (as required by the Workmen's Compensation Act 45-1935 of the Commonwealth of Puerto Rico), employer's liability insurance and all other employee required insurance; and

B.      fiduciary liability insurance, providing limits not less than US$5 million per claim and in the aggregate; and

CONFIDENTIAL

C.      professional liability insurance, with limits of not less than US$5 million per occurrence and US$5 million in the aggregate, covering work performed by any architects, engineers, project managers, construction managers or other professional consultants pursuant to the Agreement. In addition, any architects, engineers or other consultants engaged by Operator with respect to any construction project undertaken by Operator pursuant to the Agreement shall maintain separate coverage with limits of not less than the completion cost of the construction project undertaken. When any policies purchased pursuant to this paragraph are renewed or replaced, the retroactive date in any new or replacement policy shall coincide with or precede the start of work in connection with the Agreement and any claims-made policy that is not renewed shall have an extended reporting period of at least six years.

CONFIDENTIAL

## Annex XIII

## Operator Termination Fee Multiplier

| Contract Year | Multiplier |
|---|---|
| 1 | 1.00x |
| 2 | 1.00x |
| 3 | 1.00x |
| 4 | 1.00x |
| 5 | 1.00x |
| 6 | 1.00x |
| 7 | 0.95x |
| 8 | 0.90x |
| 9 | 0.85x |
| 10 | 0.80x |
| 11 | 0.75x |
| 12 | 0.70x |
| 13 | 0.65x |
| 14 | 0.60x |
| 15 | 0.55x |
| 16 | 0.50x |

CONFIDENTIAL

## Annex XIV

## Operator Marks

LUMA

LUMA ENERGY



CONFIDENTIAL

## Annex XV

### Owner Marks

Name (Spanish):    Autoridad de Energía Eléctrica de Puerto Rico

                    Autoridad de Energía Eléctrica

                    AEE

Name (English):    Puerto Rico Electric Power Authority

                    PREPA

Logo:

Letterhead:

CN 078-04495
Rev. 11/17



GOVERNMENT OF PUERTO RICO
Puerto Rico Electric Power Authority

Webpage:            https://aeepr.com

Email:                FirstName.LastName@prepa.com

Facebook:          @aeepronline

Twitter:             @aeeonline

Instagram:          aeeonline

YouTube:           aeeonline

CONFIDENTIAL

## Exhibit A

## Form of Federal Funding Certifications

To the extent Owner and Operator determine to submit any of the costs incurred by Contractors or Subcontractors under the Agreement for Federal Funding reimbursement, such Contractors and Subcontractors will be required to comply with all applicable federal certifications and requirements, including the execution by Contractors and Subcontractors of these two (2) certifications. Contractors and Subcontractors shall be required to apply these certifications and requirements to any federally funded lower-tier contracts and subcontracts. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement dated _____.

## CERTIFICATION REGARDING DEBARMENT, SUSPENSION AND OTHER RESPONSIBILITY MATTERS

INSTRUCTIONS FOR CERTIFICATION

1.  By executing the Agreement, [Contractor or Subcontractor] (referred to herein as the "prospective lower tier participant") is providing the certification set out below.

2.  The certification in this Exhibit A (*Form of Federal Funding Certifications*) is a material representation of fact upon which reliance was placed when this transaction was entered into. If it is later determined that the prospective lower tier participant knowingly rendered an erroneous certification, in addition to other remedies available to the United States federal government, the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

3.  The prospective lower tier participant shall provide immediate written notice to the person to which this proposal is submitted if, at any time, the prospective lower tier participant learns that its certification was erroneous when submitted or had become erroneous by reason of changed circumstances.

4.  The terms covered transaction, debarred, suspended, ineligible, lower tier covered transaction, participant, person, primary covered transaction, principal, Agreement and voluntarily excluded, as used in this Exhibit A (*Form of Federal Funding Certifications*), have the respective meanings set out in the Definitions and Coverage sections of rules implementing Executive Order 12549.

5.  The prospective lower tier participant agrees by executing the Agreement that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is proposed for debarment under 48 CFR part 9, subpart 9.4, debarred, suspended, declared ineligible or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency with which this transaction originated.

A-1

CONFIDENTIAL

6.  The prospective lower tier participant further agrees by executing the Agreement that it will include this clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transaction," without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions.

7.  A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that it is not proposed for debarment under 48 CFR part 9, subpart 9.4, debarred, suspended, ineligible or voluntarily excluded from covered transactions, unless it knows that the certification is erroneous. A participant may decide the method and frequency by which it determines the eligibility of its principals. Each participant may, but is not required to, check the List of Parties Excluded from Federal Procurement and Non-procurement Programs.

8.  Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of a participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

9.  Except for transactions authorized under paragraph 5 of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is proposed for debarment under 48 CFR part 9, subpart 9.4, suspended, debarred, ineligible or voluntarily excluded from participation in this transaction, in addition to other remedies available to the United States federal government, the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

## CERTIFICATION REGARDING DEBARMENT, SUSPENSION, INELIGIBILITY AND VOLUNTARY EXCLUSION LOWER TIER COVERED TRANSACTIONS

(1)  The prospective lower tier participant certifies, by execution of the Agreement, that neither it, nor its principals, is presently debarred, suspended, proposed for debarment, declared ineligible or voluntarily excluded from participation in this transaction by any Federal department or agency.

(2)  Where the prospective lower tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to the Agreement.

_____          _____
[CONTRACTOR OR SUBCONTRACTOR]          Contract Number
Company Name


_____
Name of [Contractor or Subcontractor's]
Authorized Official


_____
Title

CONFIDENTIAL

_____     _____
Signature of [Contractor or Subcontractor's]          Date
Authorized Official

## CERTIFICATION REGARDING LOBBYING FOR
## CONTRACTS, GRANTS, LOANS AND COOPERATIVE AGREEMENTS

The undersigned [Contractor or Subcontractor] certifies, to the best of its knowledge and belief, that:

1.  No Federal appropriated funds have been paid or will be paid, by or on behalf of [Contractor or Subcontractor] or any Affiliate, to any person for influencing or attempting to influence an officer or employee of an agency, a member of the United States Congress, an officer or employee of the United States Congress, or an employee of a member of the United States Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement and the extension, continuation, renewal, amendment or modification of any Federal contract, grant, loan or cooperative agreement.

2.  If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a member of the United States Congress, an officer or employee of the United States Congress, or an employee of a member of the United States Congress in connection with this Federal contract, grant, loan or cooperative agreement, the undersigned shall complete and submit Standard Form- LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

3.  The undersigned shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subcontracts, subgrants and contracts under grants, loans and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by 31 U.S.C. § 1352 (as amended by the Lobbying Disclosure Act of 1995). Any person who fails to file the required certification shall be subject to a civil penalty of not less than US$10,000 and not more than US$100,000 for each such failure.

[CONTRACTOR OR SUBCONTRACTOR] certifies or affirms the truthfulness and accuracy of each statement of its certification and disclosure, if any. In addition, [CONTRACTOR OR

CONFIDENTIAL

SUBCONTRACTOR] understands and agrees that the provisions of 31 U.S.C. § 3801 et seq., apply to this certification and disclosure, if any.

_____
[CONTRACTOR OR SUBCONTRACTOR] Name


_____
Signature of [Contractor or Subcontractor's]
Authorized Official


_____          _____
Name and Title of [Contractor or Subcontractor's]          Date
Authorized Official

CONFIDENTIAL

## Exhibit B

## Form of Commonwealth Certifications

Operator, for itself and Parent Company (if Operator is a partnership under the Puerto Rico Internal Revenue Code), represents that as of the Effective Date (i) neither it nor Parent Company has any outstanding debts for unemployment insurance, temporary disability (workmen's compensation), or chauffeur's social security with the Department of Labor and Human Resources of the Commonwealth, income taxes with the Department of Treasury of the Commonwealth or real or personal property taxes with the Municipal Revenues Collection Center ("CRIM") or (ii) it or Parent Company have a payment plan in place with respect to any outstanding debt for the foregoing items and have complied therewith.

Operator shall deliver to Owner prior to the Effective Date a copy of its Certificate of Incorporation, Certificate of Organization and Certificate of Authorization to do Business in Puerto Rico issued by the Puerto Rico Department of State, as applicable.

Operator shall also obtain and deliver to Owner, in each case dated no earlier than sixty (60) days prior to the Effective Date, the following:

(i)     a copy of Operator's Merchant's Registration Certificate (Form SC 2918);

(ii)     a Certificate of Good Standing issued by the Puerto Rico Department of State;

(iii)     a certification issued by the Puerto Rico Treasury Department indicating that Operator and Parent Company (if Operator is a Partnership under the Puerto Rico Internal Revenue Code) do not have any debts under any concept, including income tax, with the Commonwealth (Form SC 6096);

(iv)     a Puerto Rico Sales and Use Tax Filing Certification issued by the Puerto Rico Treasury Department reflecting that Operator has filed its Puerto Rico Sales and Use Tax returns for the last sixty (60) tax periods (Form SC 2942);

(v)     an all concepts debt certification issued by CRIM reflecting that Operator does not owe any taxes to CRIM with respect to real or personal property; and

(vi)     a certification issued by the Puerto Rico Child Support Administration for Operator reflecting that Operator is in compliance with the withholdings required to be made by employers under Applicable Law.

Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement dated _____.

By:_____
Name:
Title:

CONFIDENTIAL

## Exhibit C

## Form of Anti-Corruption Certifications

We certify under penalty of nullity that no public servant of Owner will derive or obtain any benefit or profit of any kind from the contractual relationship which is the basis of this invoice. If such benefit or profit exists, the required waiver has been obtained prior to entering into the Agreement. The only consideration to be received in exchange for the delivery of goods or for the O&M Services provided is the agreed-upon price that has been negotiated with Owner or its Representatives. The total amount shown on this invoice is true and correct. The O&M Services have been rendered, and no payment has been received.

Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement dated _____.

By:_____
Name:
Title:

C-1

<span style="font-variant: small-caps">Confidential</span>

## Exhibit D

## Form of Guarantee Agreement

THIS GUARANTEE AGREEMENT (the "Guarantee") is made and entered into as of this [●] day of [●], 2020 by and among: (i) [●] ("Guarantor"), a [●] organized under the laws of [●]; and (ii) the Puerto Rico Electric Power Authority ("Owner" and, together with Guarantor, the "Parties" and each a "Party"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, created by Act No. 83 of the Legislative Assembly of Puerto Rico, enacted on May 2, 1941.

## RECITALS

WHEREAS, Owner, the Puerto Rico Public-Private Partnerships Authority ("Administrator"), a public corporation of the Commonwealth of Puerto Rico, created by Act No. 29 of the Legislative Assembly of Puerto Rico, enacted on June 8, 2009, LUMA Energy, LLC ("ManagementCo"), a limited liability company organized under the laws of Puerto Rico, and LUMA Energy ServCo, LLC ("ServCo" and, together with ManagementCo, "Operator") a limited liability company organized under the laws of Puerto Rico, have entered into the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement (as amended, modified or supplemented from time to time in accordance with its terms, the "O&M Agreement"), whereby Operator has agreed to provide the O&M Services for the T&D System in accordance with the terms of the O&M Agreement;

WHEREAS, Guarantor [indirectly] owns [●]% of the equity interests of each of ManagementCo and ServCo; and

WHEREAS, Owner and Administrator will enter into the O&M Agreement only if Guarantor guarantees the performance by Operator of all of Operator's responsibilities and obligations, including amounts payable by, and the covenants and agreements of, Operator under the O&M Agreement, but in all cases subject to the limitations set forth herein, including Section 3.10 (*Limitation on Liability*) (all such obligations and responsibilities, the "Obligations") as set forth in this Guarantee.

NOW THEREFORE, in order to induce the execution and delivery of the O&M Agreement by Owner and Administrator and in consideration thereof, Guarantor agrees as follows:

CONFIDENTIAL

# ARTICLE 1
# DEFINITIONS; INTERPRETATION

**Section 1.1     Definitions**. Capitalized terms used but not defined herein shall have the respective meanings set forth in the O&M Agreement.

**Section 1.2     Interpretation; Construction**.

(a)     <u>Headings</u>. Articles, titles and headings to sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Guarantee. Except as otherwise indicated, all references in this Guarantee to "Articles" and "Sections" are intended to refer to Articles and Sections of this Guarantee.

(b)     <u>Construction</u>. For purposes of this Guarantee: (i) "include", "includes" or "including" shall be deemed to be followed by "without limitation"; (ii) "hereof", "herein", "hereby", "hereto" and "hereunder" shall refer to this Guarantee as a whole and not to any particular provision of this Guarantee; (iii) "extent" in the phrase "to the extent" shall mean the degree to which a subject or other item extends and shall not simply mean "if"; (iv) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including"; (v) "dollars" and "US$" shall mean United States Dollars; (vi) the singular includes the plural and vice versa; (vii) reference to a gender includes the other gender; (viii) "any" shall mean "any and all"; (ix) "or" is used in the inclusive sense of "and/or"; (x) reference to any agreement, document or instrument means such agreement, document or instrument as amended, supplemented and modified in effect from time to time in accordance with its terms; (xi) reference to any Applicable Law means such Applicable Law as amended from time to time and includes any successor legislation thereto and any rules and regulations promulgated thereunder; and (xii) reference to any Person at any time refers to such Person's permitted successors and assigns.

(c)     <u>Days and Time</u>. All references to days herein are references to calendar days, unless specified as Business Days, and, unless specified otherwise, all statements of or references to a specific time in this Guarantee are to Atlantic Standard Time.

(d)     <u>Accounting Principles</u>. All accounting and financial terms used herein, unless specifically provided to the contrary, shall be interpreted and applied in accordance with then generally accepted accounting principles in the United States, consistently applied.

(e)     <u>Negotiated Agreement</u>. The Parties have participated jointly in the negotiation and drafting of this Guarantee with the benefit of competent legal representation, and the language used in this Guarantee shall be deemed to be the language chosen by the Parties to express their mutual intent. In the event that an ambiguity or question of intent or interpretation arises, this Guarantee shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provisions hereof.

**CONFIDENTIAL**

   (f) <u>Payments</u>. All payments required to be made by Guarantor hereunder shall be made in dollars.

CONFIDENTIAL

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES

**Section 2.1     Representations and Warranties of Guarantor.** Guarantor hereby represents and warrants that:

(a)      Existence and Powers. Guarantor is a [●] duly organized, validly existing and in good standing under the laws of [●]. Guarantor has the required corporate power and authority to enter into this Guarantee, carry out its obligations hereunder and consummate the transactions contemplated hereby.

(b)      Due Authorization and Binding Obligation. The execution and delivery by Guarantor of this Guarantee, the performance by Guarantor of its obligations hereunder and the consummation by Guarantor of the transactions contemplated hereby have been duly and validly authorized and approved by the required corporate or other similar action on the part of Guarantor. This Agreement has been duly and validly executed and delivered by Guarantor, and (assuming due authorization, execution and delivery by Owner) this Guarantee constitutes a legal, valid and binding obligation of Guarantor enforceable against Guarantor in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium or similar Applicable Law affecting creditors' rights generally and by general equity principles.

(c)      No Conflicts. Neither the execution, delivery or performance by Guarantor of this Guarantee, nor the consummation of the transactions contemplated hereby will: (i) result in a material violation or breach of, or material default under, any provision of the organizational documents of Guarantor; (ii) result in a violation of, or give any Governmental Body the right to challenge any of the transactions contemplated hereby under, any Applicable Law applicable to Guarantor; (iii) (A) result in a violation or breach of, (B) constitute a default under, (C) result in the acceleration of or create in any party the right to accelerate, terminate or cancel or (D) require the consent of any other Person under, any material contract to which Guarantor is a party; or (iv) result in the creation or imposition of any Lien on any properties or assets of Guarantor.

(d)      No Consents. No consent, declaration or filing with, or notice to, any Governmental Body is required by or with respect to Guarantor in connection with (i) the execution and delivery of this Guarantee or (ii) the performance by Guarantor of its payment or other obligations hereunder, except such as have been duly obtained or made.

(e)      No Litigation. There is no action, suit or other proceeding, at law or in equity, before or by any court or Governmental Body pending against Guarantor or, to Guarantor's knowledge, threatened against Guarantor, which if determined adversely against Guarantor would reasonably be expected to materially and adversely affect (i) the validity or enforceability of this Guarantee or (ii) the performance by Guarantor of its respective obligations hereunder.

D-4

**CONFIDENTIAL**

(f)     <u>No Legal Prohibition</u>. There is no Applicable Law in effect on the date hereof that would prohibit the execution, delivery or performance by Guarantor of this Guarantee and the transactions contemplated hereby.

(g)     <u>Consent to Agreements</u>. Guarantor is fully aware of the terms and conditions of the O&M Agreement.

(h)     <u>Consideration</u>. The Guarantee is made in furtherance of the purposes for which Guarantor has been organized, and the assumption by Guarantor of its obligations hereunder will result in a material benefit to Guarantor.

CONFIDENTIAL

## ARTICLE 3
## GUARANTEE COVENANTS

**Section 3.1    Guarantee to Owner**. Subject to Section 3.10 (*Limitation on Liability*), Guarantor hereby absolutely, presently, irrevocably and unconditionally guarantees to Owner: (i) the full and prompt payment when due of each and all of the payments required to be credited or made by Operator under the O&M Agreement to, or for the account of, Owner, as the case may be, when the same shall become due and payable pursuant to this Guarantee; and (ii) the full and prompt performance and observance of each and all of the Obligations. Notwithstanding the unconditional nature of Guarantor's obligations as set forth herein, Guarantor shall have the right to assert the defenses provided in Section 3.4 (*Defenses, Set-Offs and Counterclaims*) against claims made under this Guarantee.

**Section 3.2    Right of Owner to Proceed Against Guarantor.**

(a)    Generally. This Guarantee shall constitute a guarantee of payment and of performance and not of collection, and Guarantor specifically agrees that in the event of a failure by Operator to pay or perform any Obligation guaranteed hereunder, subject to any notice and cure periods under the O&M Agreement, Owner shall have the right to proceed first and directly against Guarantor under this Guarantee and without proceeding against Operator or exhausting any other remedies against Operator which Owner may have.

(b)    No Conditions for Enforcement. Without limiting the foregoing, Guarantor agrees that it shall not be necessary, and that Guarantor shall not be entitled to require, as a condition of enforcing the liability of Guarantor hereunder, that Owner:

(i)    file suit or proceed to obtain a personal judgment against Operator or any other person that may be liable for the Obligations or any part of the Obligations;

(ii)    make any other effort to obtain payment or performance of the Obligations from Operator other than providing Operator with any notice of such payment or performance as may be required by the terms of the O&M Agreement or required to be given to Operator under Applicable Law;

(iii)    foreclose against or seek to realize upon any security for the Obligations; or

(iv)    exercise any other right or remedy to which Owner or Administrator is or may be entitled in connection with the Obligations or any security therefor or any other guarantee thereof, except to the extent that any such exercise of such other right or remedy may be a condition to the Obligations of Operator or to the enforcement of remedies under the O&M Agreement.

(c)    Unexcused Failure; Single Full Performance. Upon any unexcused failure by Operator in the payment or performance of any Obligation and the giving of such notice or demand, if any, to Operator and Guarantor as may be required in connection with such Obligation

D-6

CONFIDENTIAL

and this Guarantee, the liability of Guarantor shall be effective and shall immediately be paid or performed. Notwithstanding Owner's right to proceed directly against Guarantor and subject to Section 3.10 (*Limitation on Liability*), Owner (or any successor) shall not be entitled to more than a single full performance of the Obligations in regard to any breach or non-performance thereof.

### Section 3.3    Guarantee Absolute and Unconditional.

(a)    <u>Generally</u>. The obligations of Guarantor hereunder are absolute, present, irrevocable and unconditional and shall remain in full force and effect until Operator shall have fully discharged the Obligations in accordance with their respective terms and conditions and, except as provided in Section 3.4 (*Defenses, Set-Offs and Counterclaims*), shall not be subject to any counterclaim, set-off, deduction or defense (other than full and strict compliance with, or release, discharge or satisfaction of, such Obligations) based on any claim that Guarantor may have against Operator, Owner, Administrator or any other person. Without limiting the foregoing, the obligations of Guarantor hereunder shall not be released, discharged or in any way modified by reason of any of the following (whether with or without notice to, knowledge by, or further consent of, Guarantor):

(i)    the extension or renewal of this Guarantee or the O&M Agreement up to the specified term of each agreement;

(ii)    any exercise or failure, omission or delay by Owner or Administrator in the exercise of any right, power or remedy conferred on Owner or Administrator, as the case may be, with respect to this Guarantee or the O&M Agreement except to the extent such failure, omission or delay gives rise to an applicable statute of limitations defense with respect to a specific claim;

(iii)    any permitted transfer or assignment of rights or obligations under the O&M Agreement or under any other Transaction Document by any party thereto, or any permitted assignment, conveyance or other transfer of any of their respective interests in the O&M Agreement or in, to or under any of the Transaction Documents;

(iv)    any permitted assignment for the purpose of creating a security interest or mortgage of all or any part of the respective interests of Owner or any other person in any Transaction Document or in the T&D System;

(v)    any renewal, amendment, change or modification in respect of any of the Obligations or terms or conditions of any Transaction Document;

(vi)    any failure of title with respect to all or any part of the respective interests of any person in the T&D System;

(vii)    the voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all the assets, marshaling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, moratorium,

CONFIDENTIAL

arrangement, composition with creditors or readjustment of, or other similar proceedings against or affecting Operator or Guarantor, or any of the property of either of them, or any allegation or contest of the validity of this Guarantee or the O&M Agreement in any such proceeding (it being specifically understood, consented and agreed to that, to the extent permitted by Applicable Law, this Guarantee shall remain and continue in full force and effect and shall be enforceable against Guarantor to the same extent and with the same force and effect as if any such proceeding had not been instituted and as if no rejection, stay, termination, assumption or modification has occurred as a result thereof, it being the intent and purpose of this Guarantee that Guarantor shall and does hereby waive all rights and benefits which might accrue to it by reason of any such proceeding);

(viii)   except as permitted by Section 4.1 (*Maintenance Of Corporate Existence*), Section 4.2 (*Guarantor Reports*) or the O&M Agreement, any sale or other transfer by Guarantor or any Affiliate of any of the capital stock or other interest of Guarantor or any Affiliate in Operator now or hereafter owned, directly or indirectly, by Guarantor or any Affiliate, or any change in composition of the interests in Operator;

(ix)   any failure on the part of Operator for any reason to perform or comply with any agreement with Guarantor;

(x)   the failure on the part of Owner to provide any notice to Guarantor which is not required to be given to Guarantor pursuant to this Guarantee and to Operator as a condition to the enforcement of Obligations pursuant to the O&M Agreement;

(xi)   any failure of any party to the O&M Agreement to mitigate damages resulting from any default by Operator or Guarantor under the O&M Agreement;

(xii)   the merger, consolidation or amalgamation of any party to the O&M Agreement into or with any other person, or any sale, lease, transfer, abandonment or other disposition of any or all of the property of any of the foregoing to any person;

(xiii)   any legal disability or incapacity of Operator or Guarantor with respect to the O&M Agreement; or

(xiv)   the fact that entering into the O&M Agreement by Operator or Guarantor was invalid or in excess of the powers of such party.

(b)   <u>Recovery of Money Due or Owing</u>. Should any money due or owing under this Guarantee not be recoverable from Guarantor due to any of the matters specified in Section 3.3(a) (*Guarantee Absolute and Unconditional - Generally*), then, in any such case, such money, together with all additional sums due hereunder, shall nevertheless be recoverable from Guarantor as though Guarantor were principal obligor in place of Operator pursuant to the terms of the O&M Agreement and not merely a guarantor and shall be paid by Guarantor forthwith subject to the terms of this Guarantee.

CONFIDENTIAL

(c)      Scope. Notwithstanding anything to the contrary expressed in this Guarantee, nothing in this Guarantee shall be deemed to amend, modify, clarify, expand or reduce Operator's rights, benefits, duties or obligations under the O&M Agreement.

**Section 3.4      Defenses, Set-Offs and Counterclaims**. Notwithstanding any provision contained herein to the contrary, Guarantor shall be entitled to exercise or assert any and all legal or equitable rights or defenses which Operator may have under the O&M Agreement or under Applicable Law (other than bankruptcy or insolvency of Operator and other than any defense which Operator has expressly waived in the O&M Agreement or Guarantor has expressly waived in Section 3.5 (*Waivers by Guarantor*) or elsewhere hereunder), and the obligations of Guarantor hereunder are subject to such counterclaims, set-offs or deductions which Operator is permitted to assert pursuant to the O&M Agreement, if any.

**Section 3.5      Waivers by Guarantor**. Guarantor hereby unconditionally and irrevocably waives:

(a)      notice from Owner of its acceptance of this Guarantee;

(b)      notice of any of the events referred to in Section 3.3 (*Guarantee Absolute and Unconditional*), except to the extent that notice is required to be given as a condition to the Obligations or the enforcement of remedies under the O&M Agreement;

(c)      to the fullest extent lawfully possible, all notices that may be required by statute, rule of law or otherwise to preserve intact any rights against Guarantor, except any notice to Operator required pursuant to the O&M Agreement or Applicable Law as a condition to any Obligation or the enforcement of remedies under the O&M Agreement;

(d)      to the fullest extent lawfully possible, any statute of limitations defense based on a statute of limitations period which may be applicable to guarantors (or parties in similar relationships) which would be shorter than the applicable statute of limitations period for the underlying claim;

(e)      any right to require a proceeding first against Operator;

(f)      any right to require a proceeding first against any person or the security provided by or under the O&M Agreement, except to the extent the O&M Agreement specifically requires a proceeding first against any person (except Operator) or security;

(g)      any requirement that Operator be joined as a party to any proceeding for the enforcement of any term of the O&M Agreement;

(h)      the requirement of, or the notice of, the filing of claims by Owner or Administrator in the event of the receivership or bankruptcy of Operator; and

(i)      all demands upon Operator or any other person and all other formalities the omission of any of which, or delay in performance of which, might, but for the provisions of

CONFIDENTIAL

this Section 3.5 (*Waivers by Guarantor*), by rule of law or otherwise, constitute grounds for relieving or discharging Guarantor in whole or in part from its absolute, present, irrevocable, unconditional and continuing obligations hereunder.

**Section 3.6    Payment of Costs and Expenses**. Guarantor agrees to pay Owner and Administrator on demand all Fees-and-Costs incurred by or on behalf of Owner in successfully enforcing by Legal Proceeding observance of the covenants, agreements and obligations contained in this Guarantee against Guarantor, other than the Fees-and-Costs that Owner or Administrator incurs in performing any of its obligations under the O&M Agreement where such obligations are a condition to performance by Operator of its Obligations.

**Section 3.7    Subordination of Rights**. Guarantor agrees that any right of subrogation or contribution which it may have against Operator as a result of any payment or performance hereunder is hereby fully subordinated to the rights of Owner and Administrator hereunder and under the O&M Agreement and that Guarantor shall not recover or seek to recover any payment made by it hereunder from Operator until Operator and Guarantor shall have fully and satisfactorily paid or performed and discharged the Obligations giving rise to a claim under this Guarantee.

**Section 3.8    Separate Obligations; Reinstatement.**

(a)    <u>Separate Obligations</u>. The obligations of Guarantor to make any payment or to perform and discharge any other duties, agreements, covenants, undertakings or obligations hereunder shall: (i) to the extent permitted by Applicable Law, constitute separate and independent obligations of Guarantor from its other obligations under this Guarantee; (ii) give rise to separate and independent causes of action against Guarantor; and (iii) apply irrespective of any indulgence granted from time to time by Owner.

(b)    <u>Reinstatement</u>. Guarantor agrees that this Guarantee shall be automatically reinstated if and to the extent that for any reason any payment or performance by or on behalf of Operator is rescinded or must be otherwise restored by Owner, whether as a result of any proceedings in bankruptcy, reorganization or similar proceeding, unless such rescission or restoration is pursuant to the terms of the O&M Agreement or Operator's enforcement of such terms under Applicable Law.

**Section 3.9    Term**. This Guarantee shall remain in full force and effect from the date of execution and delivery hereof until all of the Obligations of Operator have been fully paid and performed.

**Section 3.10    Limitation on Liability**. Notwithstanding anything herein or otherwise to the contrary, the aggregate liability of Guarantor under or with respect to this Guarantee with respect to all matters whatsoever or howsoever arising, including where arising from gross negligence and willful misconduct of Operator, any Operator Indemnitee or Guarantor, and regardless of any other rights and remedies that Owner or Administrator may have against Operator under the O&M Agreement, under Applicable Law or otherwise, shall in no event exceed, when added to the aggregate liability of any other guarantor of the Obligations, US$105,000,000. Without limiting the foregoing, to the fullest extent permitted by law, in no event

**CONFIDENTIAL**

shall Guarantor be liable, whether in contract, indemnity, tort (including negligence, gross negligence and strict liability) or otherwise, for any loss of profits or revenues, special, exemplary, punitive, indirect, incidental or consequential damages which arise from, relate to or are connected with this Guarantee or the performance of or failure to perform the Obligations except for claims of fraud or intentional misrepresentation.

CONFIDENTIAL

# ARTICLE 4
# GENERAL COVENANTS

### Section 4.1    Maintenance Of Corporate Existence

(a)    <u>Consolidation, Amalgamation, Merger, Sale or Transfer</u>. Guarantor covenants that during the term of this Guarantee it will maintain its corporate existence, will not dissolve or otherwise dispose of all or substantially all of its assets and will not consolidate or amalgamate with or merge into another entity or permit one or more other entities to consolidate or amalgamate with or merge into it unless the successor is Guarantor; <u>provided</u>, <u>however</u>, that Guarantor may consolidate or amalgamate with or merge into another entity, or permit one or more other entities to consolidate or amalgamate with or merge into it, or sell or otherwise transfer to another entity all or substantially all of its assets as an entirety and thereafter dissolve if the successor entity (if other than Guarantor) (i) is acceptable to Owner, acting reasonably, (ii) assumes in writing all the obligations of Guarantor hereunder and (iii) delivers to Owner an opinion of counsel to the effect that its obligations under the Guarantee are legal, valid, binding and enforceable subject to applicable bankruptcy and similar insolvency or moratorium laws.

(b)    <u>Continuance of Obligations</u>. If a consolidation, amalgamation, merger or sale or other transfer is made as permitted by this Section 4.1 (*Maintenance Of Corporate Existence*), the provisions of this Section 4.1 (*Maintenance Of Corporate Existence*) shall continue in full force and effect and no further consolidation, amalgamation, merger or sale or other transfer shall be made except in compliance with the provisions of this Section 4.1 (*Maintenance Of Corporate Existence*). No such consolidation, amalgamation, merger or sale or other transfer shall have the effect of releasing the initial Guarantor from its liability hereunder unless a successor entity has assumed responsibility for this Guarantee in accordance with this Section 4.1 (*Maintenance Of Corporate Existence*).

### Section 4.2    Guarantor Reports. While this Guarantee is outstanding, Guarantor shall assist Operator in delivering to Administrator the reports required pursuant to Section 8.2 (*Guarantor Reports*) of the O&M Agreement.

### Section 4.3    Assignment. Except as permitted pursuant to Section 4.1 (*Maintenance Of Corporate Existence*), Guarantor shall not assign, transfer, convey, lease, encumber or otherwise dispose of its rights or obligations under this Guarantee without the prior written consent of Administrator, which consent shall not be unreasonably withheld, delayed or conditioned.

CONFIDENTIAL

## ARTICLE 5
## MISCELLANEOUS

**Section 5.1    Consent to Jurisdiction**. Any dispute between the Parties arising out of, relating to or in connection with this Guarantee or the existence, interpretation, breach, termination or validity thereof shall be resolved in accordance with the procedures set forth in Article 15 (*Dispute Resolution*) of the O&M Agreement as if it were a Dispute, *mutatis mutandis*; <u>provided</u> that, for the avoidance of doubt, Guarantor hereby irrevocably: (i) agrees that any Legal Proceeding related to this Guarantee or to any rights or relationship between the Parties arising therefrom (other than any negotiation between the Parties in accordance with Section 15.3 (*Negotiation*) of the O&M Agreement) shall be solely and exclusively initiated and maintained in the Commonwealth Court; (ii) consents to the jurisdiction of the Commonwealth Court in any such Legal Proceeding; (iii) waives any objection which it may have to the laying of the jurisdiction of any such Legal Proceeding in the Commonwealth Court; and (iv) waives its right to a trial by jury in any Legal Proceeding in the Commonwealth Court.

**Section 5.2    Notices**. All notices or other communications to be delivered in connection with the Guarantee shall be in writing and shall be deemed to have been properly delivered, given and received (i) on the date of delivery if delivered by hand during normal business hours of the recipient during a Business Day, otherwise on the next Business Day, (ii) on the date of successful transmission if sent via email (with return receipt) during normal business hours of the recipient during a Business Day, otherwise on the next Business Day, or (iii) on the date of receipt by the addressee if sent by a nationally recognized overnight courier or by registered or certified mail, return receipt requested, if received on a Business Day, otherwise on the next Business Day. Such notices or other communications must be sent to each respective Party at the address, email address set forth below (or at such other address, email address as shall be specified by a Party in a notice given in accordance with this Section 5.2 (*Notices*)):

If to Owner:                      Puerto Rico Electric Power Authority

                                         [•]
                                         [•]
                                       Attention: [•]
                                       Telephone: [•]
                                       Email: [•]

                                       with a copy to:
                                     Administrator
                                       [•]
                                       [•]
                                       Attention: [•]
                                       Telephone: [•]
                                       Email: [•]

CONFIDENTIAL

If to Guarantor:                          [●]
                                          [●]
                                          [●]
                                          Attention: [●]
                                          Telephone: [●]
                                          Email: [●]

**Section 5.3     Amendments**. Neither this Guarantee nor any provision hereof may be changed, modified, amended or waived except by written agreement duly executed by the Parties. To the extent required by Applicable Law, any such amendment shall not be effective until approved by the FOMB (if then in existence) and PREB.

**Section 5.4     Entire Agreement**. This Guarantee constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes any and all prior oral or written agreements, understandings, proposals, representations or warranties relating to this Guarantee. Without limiting the generality of the foregoing, this Guarantee shall completely and fully supersede all other understandings and agreements among the Parties with respect to such transactions, including those contained in the RFP, the Proposal by Operator or its Affiliate and any amendments or supplements to the RFP or the Proposal.

**Section 5.5     Interest on Overdue Obligations**. Except as otherwise provided herein, all amounts due hereunder, whether as fees, damages, credits, revenue, charges or reimbursements, that are not paid when due shall bear interest at the Overdue Rate, on the amount outstanding from time to time, and all such interest accrued at any time shall, to the extent permitted by Applicable Law, be deemed added to the amount due, as accrued.

**Section 5.6     Waivers**. Either Guarantor or Owner may, at any time, (a) extend the time for the performance of any of the obligations or other acts of the other Party, (b) waive any inaccuracies in the representations and warranties of the other Party contained herein or (c) waive compliance by the other Party with any of the agreements or conditions contained herein. No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in a written instrument executed and delivered by the Party so waiving. No waiver by any Party of any breach of this Guarantee shall operate or be construed as a waiver of any preceding or subsequent breach, whether of a similar or different character, unless expressly set forth in such written waiver. Neither any course of conduct or failure or delay of any Party in exercising or enforcing any right, remedy or power hereunder shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy or power hereunder, or any abandonment or discontinuance of steps to enforce such right, remedy or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right, remedy or power.

**Section 5.7     Survival**. The rights and obligations of the Parties pursuant to Section 5.1 (*Consent to Jurisdiction*), Section 5.2 (*Notices*) and Section 5.12 (*Governing Law*) shall survive the expiration or termination of this Guarantee. No expiration or early termination of this

D-14

CONFIDENTIAL

Guarantee shall (i) limit or otherwise affect the respective rights and obligations of the Parties accrued prior to the date of such termination or (ii) preclude any Party from impleading any other Party in any Legal Proceeding originated by a third-party as to any matter occurring during the term of this Guarantee.

Section 5.8    **Severability**. If any term or provision of this Guarantee is invalid, illegal or incapable of being enforced in any situation or in any jurisdiction, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other term or provision hereof or the offending term or provision in any other situation or any other jurisdiction, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Guarantee so as to effect the original intent of the Parties as closely as possible, in a mutually acceptable manner, in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 5.9    **Remedies**

(a)    Cumulative and Non-Exclusive Remedies. Except as otherwise provided in this Guarantee, any and all remedies herein expressly conferred upon a Party shall be deemed cumulative with and not exclusive of any other remedy expressly conferred hereby, and the exercise by a Party of any one such remedy shall not preclude the exercise of any other such remedy.

(b)    Irreparable Damage and Harm. The Parties agree that irreparable damage and harm would occur in the event that any provision of this Guarantee were not performed in accordance with its terms and that, although monetary damages may be available for such a breach, monetary damages would be an inadequate remedy therefor. Accordingly, each of the Parties agrees that, in the event of any breach or threatened breach of any provision of this Guarantee by such Party, the other Party shall be entitled to an injunction or injunctions, specific performance and other equitable relief to prevent or restrain breaches or threatened breaches hereof and to specifically enforce the terms and provisions hereof. A Party seeking an order or injunction to prevent breaches of this Guarantee or to enforce specifically the terms and provisions hereof shall not be required to provide, furnish or post any bond or other security in connection with or as a condition to obtaining any such order or injunction, and each Party hereby irrevocably waives any right it may have to require the provision, furnishing or posting of any such bond or other security. In the event that any Legal Proceeding should be brought in equity to enforce the provisions of this Guarantee, each Party agrees that it shall not allege, and each Party hereby waives the defense, that there is an adequate remedy available at law.

Section 5.10    **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document. A signed copy of this Guarantee transmitted by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Guarantee for all purposes.

CONFIDENTIAL

**Section 5.11   Office of the Comptroller**. Owner agrees to file this Guarantee with the Comptroller of the Commonwealth promptly after its execution and to provide Guarantor with evidence of its filing within fifteen (15) days following the execution of this Guarantee. The Parties acknowledge and agree that the obligations and considerations under this Guarantee shall not be enforceable until this Guarantee shall have been registered with the Office of the Comptroller of the Commonwealth as provided by Act No. 18 of the Legislative Assembly of Puerto Rico, enacted on October 30, 1975.

**Section 5.12   Governing Law**. This Agreement and all matters, claims, controversies, disputes, suits, actions or proceedings arising out of or relating to this Guarantee and the negotiation, execution or performance of this Guarantee or any of the transactions contemplated hereby, including all rights of the Parties (whether sounding in contract, tort, common or statutory law, equity or otherwise) in connection therewith, shall be interpreted, construed and governed by and in accordance with, and enforced pursuant to, the internal laws of the Commonwealth (excluding any conflict of laws rule or principle which might refer such interpretation to the laws of another jurisdiction), except where the federal supremacy clause requires otherwise.

**Section 5.13   COMMONWEALTH OBLIGATIONS**. THE OBLIGATIONS OF OWNER UNDER THIS AGREEMENT SHALL NOT BE DEEMED OBLIGATIONS OF THE COMMONWEALTH OR ANY INSTRUMENTALITY OF THE COMMONWEALTH OTHER THAN OWNER.

**CONFIDENTIAL**

      **IN WITNESS WHEREOF,** Guarantor has caused this Guarantee to be duly executed as of the day and year first above written.

**[*GUARANTOR*]**

By:           _____

Name:      _____

Title:        _____

Accepted and agreed to by:

**PUERTO RICO ELECTRIC POWER AUTHORITY**

By:           _____

Name:      _____

Title:        _____

CONFIDENTIAL

**Exhibit E**

**Form of Sworn Statement**

**SWORN STATEMENT**

**ACT 2-2018**

I, _____, of legal age, single/married, _____ and resident of the _____, hereby solemnly swear:

1.      That my personal status is the one stated above.

2.      That   I   hold   the   position   of   _____ _____ (hereinafter referred to as the "Company") organized as a _____ under the laws of _____ with the Federal Identification No. _____.

3.      That I am authorized to represent the Company and all of its partners and owners for purposes of this affidavit.

4.      That neither the Company nor any of its presidents, vice-presidents, directors, managers, executive directors or members of its Board of Directors, or persons that fulfil similar tasks, have been convicted of, nor have they pleaded guilty to, any of the crimes in Article 6.8 of Puerto Rico Act No. 8-2017, as amended, known as the "Act for the Management and Transformation of the Human Resources of the Government of Puerto Rico" or for any of the crimes listed in Puerto Rico Act No. 2-2018, known as the "Anti-Corruption Code for a New Puerto Rico".

5.      No commissions or bonuses have been paid, in cash or in kind, and there is not commitment for the future payment of any such commissions or bonuses to any public official, employee or any former public official that participated in the negotiations and transactions contemplated by the Company's agreement with _____ while working for the Government of Puerto Rico.

6.      That everything stated above is true to the best of my knowledge, information and belief and thus, to make it public I sign this declaration in _____, this _____ day of _____, 20____.

By:_____
Name:
Title:

Affidavit No. _____

**CONFIDENTIAL**

Sworn and subscribed before me by _____, of the personal circumstances stated above, in his/her capacity as _____ of _____; who is personally known to me or whom I have identified pursuant the following form of identification: _____, this ____ day of _____, 20____.

CONFIDENTIAL

**Exhibit F-1**

**Form of Tax Opinion – Effective Date**

_____, 202_

Ladies and Gentlemen:

We have served as tax counsel to the Federal Oversight and Management Board for Puerto Rico ("FOMB") with respect to the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement dated as of ____, 2020 (the "Agreement") by and among the Puerto Rico Electric Power Authority (the "Authority"), as owner, the Puerto Rico Public-Private Partnerships Authority, as administrator (the "Administrator"), LUMA Energy, LLC ("ManagementCo"), and LUMA Energy ServCo, LLC ("ServCo" and, together with ManagementCo, the "Operator" and, together with Authority, Administrator and ManagementCo, the "Parties").  Pursuant to the terms of the Agreement, the Operator will provide management, operation, maintenance, repair, restoration and replacement and other related services for the Authority's transmission and distribution system (the "T&D System"). In addition, pursuant to the Puerto Rico Transmission and Distribution System Supplemental Terms Agreement dated as of ____, 2020 (the "Supplemental Agreement") by and among the Parties, the Operator will provide the O&M Services prior to the Service Commencement Date.  The Authority, its Affiliates, and other Governmental Bodies currently have outstanding obligations the interest on which is excluded from gross income for federal income tax purposes (the "Existing Bonds").  On the date of issuance of each of the bond issues comprising the Existing Bonds, the respective bond counsel for each such issuance delivered an opinion (each an "Approving Opinion") that interest on the related Existing Bonds is excluded from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code (the "Code").  Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

Pursuant to Section 4.5 of the Agreement, the handover to the Operator of the O&M Services shall not occur until all of the conditions precedent listed therein (the "Service Commencement Date Conditions") have been satisfied as specified in the Agreement.  Among the Service Commencement Date Conditions set forth in Section 4.5 of the Agreement are the following: all Commencement Date Governmental Approvals have been issued, no Governmental Body shall have enacted any Applicable Law that would make it illegal, or otherwise prohibit, the Parties' performance of their obligations from or after the Service Commencement Date, the Authority shall have received Title III Approvals from the Title III Court reasonably acceptable to the Operator, PREB shall have approved a Rate Order within the parameters detailed therein, and the Puerto Rico Treasury Department shall have issued certain tax assurances, among others. Under Section 4.7 of the Agreement, the satisfaction or waiver of the Service Commencement Date Conditions is required for the achievement of the Service Commencement Date.  In addition, the Supplemental Agreement requires that the Operator commence the O&M Services even if the Authority has not exited the Title III Case and to agree to other changes to the form of the Agreement.  Accordingly, pursuant to Section 2.2 thereof, the Supplemental Agreement shall automatically become effective, on the date on which all the Service Commencement Date Conditions shall have been satisfied or waived in accordance with the requirements of the Agreement, except that the Title III Exit shall have not yet occurred and the Tax Opinion and

CONFIDENTIAL

Reliance Letter required by Section 4.5(v) of the Agreement shall have not yet been delivered. As a result, our final opinions with respect to the Agreement and the Supplemental Agreement cannot be delivered until, in the case of the Agreement, the Service Commencement Date Conditions are fully satisfied or waived and, in the case of the Supplemental Agreement, the conditions set forth in the preceding sentence are satisfied and the Supplemental Agreement becomes automatically effective, and this opinion is subject to certain caveats described below.

This opinion is being delivered in accordance with Section 2.2(b)(viii) of the Agreement.

In rendering the opinion set forth herein, we have reviewed (i) the Agreement, including the exhibits thereto, (ii) the Supplemental Agreement, (iii) the System Contracts in effect as of the date hereof, (iv) the opinion of Sargent and Lundy or another nationally recognized engineering firm acceptable to the Parties, dated ____, 202_, which sets forth, among other things, the reasonably expected weighted average economic life of the T&D System, and (v) such other opinions, certificates and documents as have been provided to us by the Authority and others in connection with the Agreement. We have also relied upon the facts set forth in the representations made by the Parties to the Agreement and such other documents and opinions to the extent we deemed necessary to render the opinions set forth herein. We have not undertaken an independent audit or investigation of the matters set forth in any of the foregoing and our opinion assumes the accuracy of the information and any conclusions set forth therein and compliance with any covenants and directions set forth in said documents, including the Agreement and the Supplemental Agreement.

In addition, the Code and the Revenue Procedure (as defined below), impose certain requirements that must be met subsequent to the issuance and delivery of the Existing Bonds and subsequent to the execution of the Agreement and the Supplemental Agreement for interest on the Existing Bonds thereon to be and remain excluded from gross income for federal income tax purposes. Noncompliance with such requirements could cause the interest on the Existing Bonds to be included in gross income for federal income tax purposes retroactive to the date of issue of each issue of the Existing Bonds.

Section 103 of the Code provides generally that interest on a "private activity bond" is not excluded from gross income. Section 141 of the Code, in part, provides that a private activity bond is an obligation issued as part of an issue that meets the private business tests. Under the private business tests, bonds are treated as private activity bonds if the issue of which those bonds are a part satisfy both the private business use test and the private security or payment test. The private business use test is met if more than 10 percent of the proceeds of an issue are used in the trade or business of a nongovernmental person ("private business use"). Under Treasury regulation section 1.141-3, private business use can result from the use of the facilities financed by the issue, including as a result of a lease of such property to a nongovernmental person or a management contract with respect to such property. The private security or payment test is generally met if the payment of the principal of, or the interest on, more than 10 percent of the proceeds of an issue is (under the terms of such issue or any underlying arrangement) directly or indirectly: (A) secured by any interest in property used or to be used for a private business use, or payments in respect of such property, or (B) to be derived from payments (whether or not to the issuer) in respect of property, or borrowed money, used or to be used for a private business use.

CONFIDENTIAL

Under Treasury regulation section 1.141-3(b)(4), a management contract with respect to financed property may result in private business use of that property, based on all of the facts and circumstances. The regulations provide that a management contract with respect to financed property generally results in private business use of that property if the contract provides for compensation for services rendered with compensation based, in whole or in part, on a share of net profits from the operation of the facility, or if the service provider is treated as the lessee or owner of financed property for federal income tax purposes.

Treasury regulation section 1.141-3 defines a management contract as a management, service, or incentive payment contract between a governmental person and a service provider under which the service provider provides services involving all, a portion of, or any function of, a facility. For example, a contract for the provision of management services for an entire hospital, a contract for management services for a specific department of a hospital, and an incentive payment contract for physician services to patients of a hospital are each treated as a management contract.

In Revenue Procedure 2017-13 (the "Revenue Procedure") the Internal Revenue Service provided a safe harbor under which a management contract can be treated as not resulting in private business use. The Revenue Procedure refers to the governmental owner of the related facilities as the "qualified user" and the manager or operator as the "service provider." Under the Revenue Procedure, a management contract that satisfies the following conditions will not be treated as resulting in private business use:

(1) The payments to the service provider under the contract must be reasonable compensation for services rendered during the term of the contract. "Compensation" includes payments to reimburse actual and direct expenses paid by the service provider and related administrative overhead expenses of the service provider.

(2) The contract must not provide to the service provider a share of net profits from the operation of the managed property. Compensation to the service provider will not be treated as providing a share of net profits if no element of the compensation takes into account, or is contingent upon, either the managed property's net profits or both the managed property's revenues and expenses (other than any reimbursements of direct and actual expenses paid by the service provider to unrelated third parties) for any fiscal period. For this purpose, the elements of the compensation are the eligibility for, the amount of, and the timing of the payment of the compensation. Incentive compensation is not treated as providing a share of net profits if eligibility is determined by the service provider's performance in meeting one or more standards that measure quality of services, performance or productivity.

(3) The contract must not, in substance, impose upon the service provider the burden of bearing any share of net losses from the operation of the managed property.

(4) The term of the contract, as of the beginning of the term of the contract, including all renewal options must not be greater than the lesser of 30 years or 80 percent of the weighted average reasonably expected economic life of the managed property.

CONFIDENTIAL

(5) The qualified user must exercise a significant degree of control over the use of the managed property. This control requirement is met if the contract requires the qualified user to approve the annual budget of the managed property, capital expenditures with respect to the managed property, each disposition of property that is part of the managed property, rates charged for the use of the managed property, and the general nature and type of use of the managed property (for example, the type of services).

(6) The qualified user must bear the risk of loss upon damage or destruction of the managed property (for example, due to force majeure).

(7) The service provider must agree that it is not entitled to and will not take any tax position that is inconsistent with being a service provider to the qualified user with respect to the managed property. For example, the service provider must agree not to claim any depreciation or amortization deduction, investment tax credit, or deduction for any payment as rent with respect to the managed property.

(8) The service provider must not have any role or relationship with the qualified user that, in effect, substantially limits the qualified user's ability to exercise its rights under the contract, based on all the facts and circumstances. A service provider will not be treated as having a role or relationship prohibited by this provision if: (a) no more than 20 percent of the voting power of the governing body of the qualified user is vested in the directors, officers, shareholders, partners, members, and employees of the service provider, in the aggregate; (b) the governing body of the qualified user does not include the chief executive officer of the service provider or the chairperson (or equivalent executive) of the service provider's governing body; and (c) the chief executive officer of the service provider is not the chief executive officer of the qualified user or any of the qualified user's related parties.

Based upon our review of the foregoing documents, and assuming the accuracy of the information and certifications, and compliance with the covenants, representations, and directions set forth therein, and assuming compliance with the terms of the Agreement and the Supplemental Agreement, but subject to the conditions provided in the following sentence, we are of the opinion that neither the Agreement nor the Supplemental Agreement nor any provision thereof, nor the performance by each Party to the Agreement and the Supplemental Agreement of its respective obligations thereunder (including Operator's administration of the System Contracts), adversely affects the exclusion from gross income of interest on the Existing Bonds of the Authority, its Affiliates or another Governmental Body for federal income tax purposes under Section 103 of the Code. This opinion is not final and is subject to the following conditions to be determined as of the Service Commencement Date that: (1) there have been no amendments to the Agreement or the Supplemental Agreement that would adversely affect the exclusion from gross income of interest on the Existing Bonds of the Authority, its Affiliates or another Governmental Body for federal income tax purposes under Section 103 of the Code, (2) there have been no changes in federal income tax law that apply to the Agreement or the Supplemental Agreement, (3) there has been no breach of any provision of the Agreement or the Supplemental Agreement that would adversely affect the exclusion from gross income of interest on the Existing Bonds of the Authority, its Affiliates or another Governmental Body for federal income tax purposes under Section 103 of the Code, in particular, but not limited to, the provisions relating to the Service

CONFIDENTIAL

Commencement Date Conditions, and (4) Sargent and Lundy or another nationally recognized engineering firm acceptable to the Parties has confirmed as of the Service Commencement Date that the reasonably expected weighted average economic life of the T&D System is at least 19 years.  Accordingly, this opinion will be redelivered in final form as of the Service Commencement Date taking into account the foregoing conditions.

This opinion is limited to the specific matter addressed herein and shall not be construed as confirming or restating the Approving Opinions. We have not been engaged to, nor have we undertaken to, determine whether the interest on the Existing Bonds continues to qualify as of this date for exclusion from gross income for federal income tax purposes. Accordingly, we express no opinion on such matter.

This opinion is delivered as of the date hereof and relates solely to the Internal Revenue Code and Treasury regulations as in effect on the date hereof.  We disclaim any obligation to advise you or any other person of developments of law or fact covered by this opinion that may occur after the date hereof, including any amendments made subsequent to the date hereof to the documents described above.  Furthermore, we express no opinion as to any federal, state or local tax law consequences with respect to the Existing Bonds, or the interest thereon, if any action is taken with respect to the Agreement or the Supplemental Agreement or the proceeds thereof upon the advice or approval of other counsel.

**CONFIDENTIAL**

This opinion is being delivered by us as tax counsel to the FOMB in connection with the Agreement or the Supplemental Agreement and may not be relied upon by any other person, or used or reproduced for any other purpose, without our prior written consent.

Sincerely,

Nixon Peabody LLP

CONFIDENTIAL

**Exhibit F-2**

**Form of Final Tax Opinion**

_____, 202_

Ladies and Gentlemen:

We have served as tax counsel to the Federal Oversight and Management Board ("FOMB") with respect to the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement dated as of ____, 2020 (the "Agreement") by and among the Puerto Rico Electric Power Authority (the "Authority"), as owner, the Puerto Rico Public-Private Partnerships Authority, as administrator (the "Administrator"), _____ ("ManagementCo"), and _____ ("ServCo" and, together with ManagementCo, the "Operator" and, collectively with the Authority and the Administrator, the "Parties"). Pursuant to the terms of the Agreement, the Operator will provide operation and management services relating to the Authority's transmission and distribution system (the "T&D System"). The Authority, its Affiliates, and other Governmental Bodies currently have outstanding obligations the interest on which is excluded from gross income for federal income tax purposes (the "Existing Bonds"). On the date of issuance of each of the bond issues comprising the Existing Bonds, the respective bond counsel for each such issuance delivered an opinion (each an "Approving Opinion") that interest on the related Existing Bonds is excluded from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code (the "Code"). Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

This opinion is being delivered in accordance with Section 4.5(v) of the Agreement.

In rendering the opinion set forth herein, we have reviewed (i) the Agreement, including the exhibits thereto, (ii) the Puerto Rico Transmission and Distribution System Supplemental Terms Agreement dated as of ____, 202_ (the "Supplemental Agreement") by and among the Parties, (iii) the System Contracts in effect as of the date hereof, (iv) the opinion of Sargent and Lundy or another nationally recognized engineering firm acceptable to the Parties, dated ____, 202_, which sets forth, among other things, the reasonably expected weighted average economic life of the T&D System, and (v) such other opinions, certificates and documents as have been provided to us by the Authority and others in connection with the Agreement. We have also relied upon the facts set forth in the representations made by the Parties to the Agreement and such other documents and opinions to the extent we deemed necessary to render the opinions set forth herein. We have not undertaken an independent audit or investigation of the matters set forth in any of the foregoing and our opinion assumes the accuracy of the information and any conclusions set forth therein and compliance with any covenants and directions set forth in said documents, including the Agreement.

In addition, the Code and the Revenue Procedure (as defined below), impose certain requirements that must be met subsequent to the issuance and delivery of the Existing Bonds and subsequent to the execution of the Agreement for interest on the Existing Bonds thereon to be and remain excluded from gross income for federal income tax purposes. Noncompliance with such

CONFIDENTIAL

requirements could cause the interest on the Existing Bonds to be included in gross income for federal income tax purposes retroactive to the date of issue of each issue of the Existing Bonds.

Section 103 of the Code provides generally that interest on a "private activity bond" is not excluded from gross income. Section 141 of the Code, in part, provides that a private activity bond is an obligation issued as part of an issue that meets the private business tests.  Under the private business tests, bonds are treated as private activity bonds if the issue of which those bonds are a part satisfy both the private business use test and the private security or payment test.  The private business use test is met if more than 10 percent of the proceeds of an issue are used in the trade or business of a nongovernmental person ("private business use").  Under Treasury regulation section 1.141-3, private business use can result from the use of the facilities financed by the issue, including as a result of a lease of such property to a nongovernmental person or a management contract with respect to such property.  The private security or payment test is generally met if the payment of the principal of, or the interest on, more than 10 percent of the proceeds of an issue is (under the terms of such issue or any underlying arrangement) directly or indirectly: (A) secured by any interest in property used or to be used for a private business use, or payments in respect of such property, or (B) to be derived from payments (whether or not to the issuer) in respect of property, or borrowed money, used or to be used for a private business use.

Under Treasury regulation section 1.141-3(b)(4), a management contract with respect to financed property may result in private business use of that property, based on all of the facts and circumstances. The regulations provide that a management contract with respect to financed property generally results in private business use of that property if the contract provides for compensation for services rendered with compensation based, in whole or in part, on a share of net profits from the operation of the facility, or if the service provider is treated as the lessee or owner of financed property for federal income tax purposes.

Treasury regulation section 1.141-3 defines a management contract as a management, service, or incentive payment contract between a governmental person and a service provider under which the service provider provides services involving all, a portion of, or any function of, a facility. For example, a contract for the provision of management services for an entire hospital, a contract for management services for a specific department of a hospital, and an incentive payment contract for physician services to patients of a hospital are each treated as a management contract.

In Revenue Procedure 2017-13 (the "Revenue Procedure") the Internal Revenue Service provided a safe harbor under which a management contract can be treated as not resulting in private business use.  The Revenue Procedure refers to the governmental owner of the related facilities as the "qualified user" and the manager or operator as the "service provider."  Under the Revenue Procedure, a management contract that satisfies the following conditions will not be treated as resulting in private business use:

(1)  The payments to the service provider under the contract must be reasonable compensation for services rendered during the term of the contract. "Compensation" includes payments to reimburse actual and direct expenses paid by the service provider and related administrative overhead expenses of the service provider.

**CONFIDENTIAL**

(2)   The contract must not provide to the service provider a share of net profits from the operation of the managed property. Compensation to the service provider will not be treated as providing a share of net profits if no element of the compensation takes into account, or is contingent upon, either the managed property's net profits or both the managed property's revenues and expenses (other than any reimbursements of direct and actual expenses paid by the service provider to unrelated third parties) for any fiscal period. For this purpose, the elements of the compensation are the eligibility for, the amount of, and the timing of the payment of the compensation. Incentive compensation is not treated as providing a share of net profits if eligibility is determined by the service provider's performance in meeting one or more standards that measure quality of services, performance or productivity.

(3)   The contract must not, in substance, impose upon the service provider the burden of bearing any share of net losses from the operation of the managed property.

(4)   The term of the contract, as of the beginning of the term of the contract, including all renewal options must not be greater than the lesser of 30 years or 80 percent of the weighted average reasonably expected economic life of the managed property.

(5)   The qualified user must exercise a significant degree of control over the use of the managed property. This control requirement is met if the contract requires the qualified user to approve the annual budget of the managed property, capital expenditures with respect to the managed property, each disposition of property that is part of the managed property, rates charged for the use of the managed property, and the general nature and type of use of the managed property (for example, the type of services).

(6)   The qualified user must bear the risk of loss upon damage or destruction of the managed property (for example, due to force majeure).

(7)   The service provider must agree that it is not entitled to and will not take any tax position that is inconsistent with being a service provider to the qualified user with respect to the managed property. For example, the service provider must agree not to claim any depreciation or amortization deduction, investment tax credit, or deduction for any payment as rent with respect to the managed property.

(8)   The service provider must not have any role or relationship with the qualified user that, in effect, substantially limits the qualified user's ability to exercise its rights under the contract, based on all the facts and circumstances.  A service provider will not be treated as having a role or relationship prohibited by this provision if: (a) no more than 20 percent of the voting power of the governing body of the qualified user is vested in the directors, officers, shareholders, partners, members, and employees of the service provider, in the aggregate; (b) the governing body of the qualified user does not include the chief executive officer of the service provider or the chairperson (or equivalent executive) of the service provider's governing body; and (c) the chief executive officer of the service provider is not the chief executive officer of the qualified user or any of the qualified user's related parties.

**CONFIDENTIAL**

Based upon our review of the foregoing documents, and assuming the accuracy of the information and certifications, and compliance with the covenants, representations, and directions set forth therein, and assuming compliance with the terms of the Agreement, we are of the opinion that neither the Agreement nor any provision thereof, nor the performance by each Party to the Agreement of its respective obligations thereunder (including Operator's administration of the System Contracts), adversely affects the exclusion from gross income of interest on the Existing Bonds of the Authority, its Affiliates or another Governmental Body for federal income tax purposes under Section 103 of the Code.

This opinion is limited to the specific matter addressed herein and shall not be construed as confirming or restating the Approving Opinions. We have not been engaged to, nor have we undertaken to, determine whether the interest on the Existing Bonds continues to qualify as of this date for exclusion from gross income for federal income tax purposes. Accordingly, we express no opinion on such matter.

This opinion is delivered as of the date hereof and relates solely to the Internal Revenue Code and Treasury regulations as in effect on the date hereof.  We disclaim any obligation to advise you or any other person of developments of law or fact covered by this opinion that may occur after the date hereof, including any amendments made subsequent to the date hereof to the documents described above.  Furthermore, we express no opinion as to any federal, state or local tax law consequences with respect to the Existing Bonds, or the interest thereon, if any action is taken with respect to the Agreement or the proceeds thereof upon the advice or approval of other counsel.

**CONFIDENTIAL**

This opinion is being delivered by us as tax counsel to the FOMB in connection with the Agreement and may not be relied upon by any other person, or used or reproduced for any other purpose, without our prior written consent.


Sincerely,


Nixon Peabody LLP

CONFIDENTIAL

## Exhibit G

## Form of Reliance Letter

\_\_\_\_\_, 2020

Puerto Rico Transmission and Distribution System Operation and
Maintenance Agreement dated as of \_\_\_\_, 2020

Ladies and Gentlemen:

In connection with the execution of the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement dated as of \_\_\_\_, 2020 by and among the Puerto Rico Electric Power Authority, the Puerto Rico Public-Private Partnerships Authority, _____, and _____ (the "Agreement") we have delivered our [final] legal opinion relating to the impact of the Agreement on the federal income tax status of interest on bonds issued by the Authority, its Affiliates, and other Governmental Bodies (the "Bonds"), dated the date hereof and addressed to the Federal Oversight and Management Board. Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

CONFIDENTIAL

You may rely on said opinion as though the same were addressed to you. No attorney-client relationship has existed or exists between any addressee of this letter and our firm in connection with the Agreement or the Bonds or by virtue of this letter.

Very truly yours,

CONFIDENTIAL

# Exhibit H

# Term Sheet for GridCo-GenCo PPOA

**TERM SHEET FOR**
**GRIDCO-GENCO POWER PURCHASE & OPERATING AGREEMENT**

*The summary of terms and conditions is provided for discussion purposes only and is not a commitment to enter into a power purchase and operating agreement (the "**PPOA**"). The terms and conditions contained below are an indication of the terms and conditions that the Puerto Rico Public-Private Partnerships Authority (the "**Authority**") and the Puerto Rico Electric Power Authority ("**PREPA**") believe should be included in any negotiated PPOA for capacity and energy purchased from PREPA's legacy generation assets. It is the intention to use the terms and conditions below as the basis for a definitive PPOA; provided, however, that the terms and conditions set forth below are subject to change.*

*Neither this term sheet (the "**Term Sheet**") nor any of its contents may be used for any other purpose without the prior written consent of the Authority. No legal obligation or liability shall arise between the parties with respect to the subject matter hereof unless and until the PPOA shall have been finalized in mutually acceptable form, approved by the parties' respective governing bodies and by the relevant Puerto Rico governmental authorities and executed by both parties, and then only in accordance with the terms and conditions thereof.*

| 1. | GENERAL |
|---|---|

| | | |
|---|---|---|
| 1.1. | **Parties:** | The owner of the transmission and distribution system ("**GridCo**"), as buyer, [the owner of PREPA's legacy generation assets ("**GenCo**")][17], as seller, the Authority, as contract administrator (the "**Administrator**"), and the operator of the T&D System (the "**T&D Operator**"), as agent of GridCo and dispatch manager (together, the "**Parties**"). |
| 1.2. | **Proposed Project:** | Pursuant to the PPOA, GenCo agrees to sell and GridCo agrees to accept delivery of and purchase the Energy and/or Dependable Capacity of the Generating Facilities (as defined below), which shall not be reduced except as provided by the PPOA. |
| 1.3. | **Term:** | The PPOA shall become effective on the date on which it is executed and the Conditions to Effectiveness (as defined below) have been satisfied (the "**Effective Date**"),[18] and shall remain in full force and effect for the remaining useful life of the Generating Facilities, unless earlier terminated[19] in accordance with the terms of the PPOA (the "**Term**"). |
| 1.4. | **Conditions to Effectiveness:** | The PPOA shall come into full force and effect upon receipt of approvals from the board of directors of each of GridCo and GenCo; the applicable regulatory bodies; and all other relevant governmental authorities under applicable law |

---

[17] **The creation of one or more GenCo entities subject to PR law provisions currently under analysis.**

[18] **The PPOA contemplates becoming effective the same date as the T&D O&M Agreement.**

[19] **Early termination provisions expected to consider, among others, the retirement, decommissioning, sale or concession of the Generating Facilities as part of PPP or other transactions, or if required by the Puerto Rico Energy Bureau ("PREB") or for purposes of complying with the Integrated Resource Plan ("IRP").**

CONFIDENTIAL

|          |          |
|----------|----------|
|          | (including the Fiscal Oversight and Management Board) (the "**Conditions to Effectiveness**"). |
| **1.5.** | **Generating Facilities** | For purposes of the PPOA, "**Generating Facilities**" means the electric generating facilities owned and operated by GenCo listed below: |

- [*List of generating facilities subject to this PPOA to be included*].

The Generating Facilities shall include: (a) all systems, structures, equipment and appurtenances associated with each Generating Facility's operation and forming a part thereof; (b) permanent administrative offices and building structures housing Generating Facilities equipment; (c) the land on which each Generating Facility is located and all site improvements such as roads, drainage, fencing and landscaping therein; and (d) structures, pipelines and equipment for: (i) the delivery of fuel from the fuel delivery point to the Generating Facility; (ii) the transport of water, waste water and other waste disposal; and (iii) other materials, supplies and commodities required to operate the Generating Facilities.

**1.6. Products and Quantities**

Each Generating Facility will be assigned a "**Dependable Capacity**" which is the net electric generating capacity (gross electric generating capacity less station use) in kW, as determined by testing to be performed from time to time pursuant to the PPOA, which shall also determine the optimal output to meet system load requirements at the lowest possible cost to reliably service customers while recognizing the operational limits of the generation facilities, and made available from each Generating Facility to GridCo at their applicable interconnection point; <u>provided</u> that any excused or unexcused failure by GenCo to the make available the contractually-required quantity of Dependable Capacity shall be promptly notified in writing to GridCo, the Authority, the T&D Operator and PREB, which notice shall be for administrative purposes only, and shall not give rise to any rights or obligations.

Upon the retirement or decommissioning or ramp-down of any Generating Facility, or unit within a Generating Facility, the Dependable Capacity relating to such Generating Facility will be automatically adjusted as necessary and removed for all purposes from the PPOA.

"**Energy**", defined as the net electrical output of each Generating Facility measured in kWh at the interconnection point, in amounts up to the Dependable Capacity of each Generating Facility.

GenCo will also provide ancillary services as required by GridCo, consistent with Prudent Utility Standards and within each Generating Facility's operational limits.

## 2. BUDGETS AND PAYMENTS

**2.1. Budgets** <u>General</u>

CONFIDENTIAL

For any contract year[20] (other than the first contract year, or a year in which a rate adjustment approved by PREB[21] enters into effect, in which case the Budgets used in connection with obtaining such rate adjustment shall be used), GenCo shall prepare and deliver to the T&D Operator (with copy to GridCo), not less than one hundred (100) days prior to the commencement of such contract year and sufficiently in advance to allow the T&D Operator to comply with the applicable budget delivery requirements under the T&D O&M Agreement, its proposed operations and maintenance budget (the "**Operating Budget**") and proposed capital budget (the "**Capital Budget**", together with the Operating Budget, the "**Budgets**") for such year, together with financial forecasting for the following two (2) contract years.

Promptly following the Effective Date, GenCo shall prepare and deliver to the T&D Operator (with copy to GridCo), the proposed Budgets for the initial contract year.

The T&D Operator and the Administrator, as applicable, shall promptly notify GenCo of any changes needed to make the proposed Operating Budget and proposed Capital Budget compliant with the applicable rate order. GenCo shall cooperate with the T&D Operator and Administrator to resolve any differences with respect to the proposed budgets.

Operating Budget

The Operating Budget for any contract year shall include a month-by-month estimate of (i) the working capital reasonably determined by GenCo to be needed for the day-to-day operation of GenCo, (ii) fixed and variable operations and maintenance costs and (iii) costs and expenses associated with fuel purchases (including a two percent (2%) in excess of the total amount for excess expenditures that may arise in any contract year), in each case for the following contract year. Within forty-five (45) days following its receipt of such Operating Budget, Administrator shall notify GenCo (with copy to GridCo) whether the proposed Operating Budget is compliant with the applicable rate order.

GenCo shall be entitled to supplement or adjust any month of the Operating Budget by delivering to the T&D Operator (with copy to GridCo) revisions to the Operating Budget at least 30 days prior to the beginning of such monthly period; *provided* that such revisions will be subject to approval by the Administrator acting reasonably, or, if such adjustment or supplement would cause the Operating Budget to not comply with the applicable rate order, PREB. Such revisions may include any additional working capital or fuel

---

[20] **A contract year shall means the period from July 1 through June 30 for each year during that portion of the Term commencing on the Effective Date. The initial contract year shall be a partial contract year commencing on the Effective Date and ending on the following June 30.**

[21] **As discussed in Section 5.6(g) of the T&D O&M Agreement, a rate adjustment approved by PREB constitutes a change in customer rates or charges as required by Applicable Law or proposed by the Operator. If approved by PREB pursuant to Applicable Law, it may result in a change in customer rates or charges consistent with the scope of PREB's approval. Any Budget prepared by GenCo and submitted by the T&D Operator to the Authority and approved by the Authority shall be consistent with the determinations, directives and requirements established by PREB through a rate review proceeding.**

CONFIDENTIAL

charges that may be necessary, as well as adjustments on account of the ramp down or retirement of units and/or Generating Facilities.

Capital Budget

The Capital Budget for any contract year shall include a month-by-month estimate of the capital expenditures and working capital needed to maintain the Generating Facilities and justify how each expenditure is required to maintain legal and regulatory compliance, personnel and public safety, electric system or Generating Facility reliability, to improve plant efficiency or to retire or demolish a Generating Facility, and associated facilities, which is selected for decommissioning (in accordance with the IRP or as otherwise approved by PREB) and remediate and restore the related site in accordance with the directions of the Administrator or otherwise in accordance with applicable law and the IRP.

The Parties intend that the amounts provided in each approved Capital Budget for capital expenditures will be sufficient to enable GenCo to continue providing Dependable Capacity and to otherwise maintain the Generating Facilities in good working order consistent with Prudent Utility Practice. However, GenCo will promptly notify Administrator and GridCo when an unplanned event occurs, or is anticipated to occur, which would result in any required unbudgeted expenditures.

**2.2.    Fuel Charges[22]**

During the Term, GenCo shall (directly or through one or more agents or managers appointed by it) be responsible for managing, procuring, nominating, scheduling, and coordinating the transportation and delivery of all the fuel requirements of each Generating Facility. GridCo shall pay for all fuel purchases after GenCo certifies receipt and quality, and authorizes payment.

All charges in connection with the foregoing shall be "**Fuel Charges**", which shall be payable on a monthly basis in arrears.

On or before the first day of the Term, GridCo will advance to GenCo an amount equal to [US$[●] million][23] to finance GenCo fuel purchases for the first month of the Term, which shall be deposited in an account specifically created or designated by GenCo for such purpose (which may be increased as reasonably requested by GenCo). Excess or unused amounts shall be credited to the following Billing Period's Fuel Charges.

**2.3.    Generation Charges**

GridCo shall pay GenCo a monthly amount based on the approved budgets, including any costs and expenses for approved capital improvements relating to the Generating Facilities and related supplemental working capital and all costs and expenses associated with the operation and maintenance of a ramped

---

[22] **Although subject to further discussions and analysis by the P3 advisory team, fuel supply and procurement responsibilities may continue through PREPA's existing fuel procurement and supply office assumed by GenCo (*e.g.*, FuelCo). Upon dissolution of GenCo (*i.e.*, legacy generation assets are sold, retired or useful life runs out), only FuelCo operations remain procuring and selling fuel to GridCo. To the extent PREPA's reorganization includes the formation of multiple GenCo entities, fuel procurement and supply functions may need to be channeled through an independent FuelCo, or transferred to a private partner, and the payment of fuel charges under the PPOA may need to be modified accordingly.**

[23] **Amount should reflect estimated non-fuel working capital costs for the first four months of the Term.**

CONFIDENTIAL

down unit and/or Generating Facility (the "**Monthly Generation O&M Charge**"). The Monthly Generation O&M Charge will be determined based on the approved Operating Budget and Capital Budget, in each case as adjusted or revised pursuant to the PPOA.

Variable costs and expenses of the Generating Facilities that vary according to the dispatched output of Energy and any interim adjustments to the Monthly Generation O&M Charge and rates due to emergency and unforeseen expenses will be made as directed by the Administrator and included as an adjustment charge ("**Monthly O&M Adjustment Charge**") in the invoice delivered for the following Billing Period.

Any reconciliation of actual payments and actual costs will be performed as directed by the Administrator pursuant to the terms of the PPOA.

| 2.4. | **Working Capital** | No later than ninety (90) days before the Effective Date, GridCo will advance to GenCo an amount equal to the estimated non-fuel working capital costs for the first twelve (12) months of the Term, of which the first month of working capital shall be deposited in an account specifically created or designated by GenCo for such purpose (the "**Operating Account**") and the remaining amounts intended to cover the rest of months shall be deposited in a separate operating reserve account (the "**Operating Reserve Account**"). |
|---|---|---|

On the last day of each calendar month after the first calendar year of the Term, GridCo shall deposit in the Operating Account an amount of "working capital" equal to (x) the following calendar month's estimated working capital as set forth in the Budgets less (y) the sum of (A) the Monthly Generation O&M Charge, Monthly O&M Adjustment Charge (if any) and Fuel Charge and (z) any funds remaining in the Operating Account on such date.

| 2.5. | **Invoices** | Invoices for the Monthly Generation O&M Charge, Fuel Charge and the Monthly O&M Adjustment Charge (if any), shall be delivered by GenCo to GridCo no more than 15 days after the conclusion of each Billing Period, and GridCo shall pay such charges no later than the last day of the month following such monthly period. GridCo shall have no obligation to verify any invoice submitted by GenCo. |
|---|---|---|

## 3. OPERATING PROVISIONS

| 3.1. | **Dispatching** | The T&D Operator, as agent of GridCo and dispatch manager, shall at its sole discretion have the right to dispatch the units at the Generating Facilities within their operational limits and in accordance with the principles related to the dispatch of power and electricity set forth in Schedule 1 to Annex I (*Scope of Services*) of the T&D O&M Agreement. |
|---|---|---|

GridCo's operations center will determine the appropriate level of dispatch by means of its automatic generation control ("**AGC**") system and the use of Prudent Utility Practices. GenCo will give the dispatcher a status report every eight (8) hours regarding each Generating Facility's conditions, including any Generating Facility restrictions and the hourly integrated net generation. GenCo shall notify the dispatcher immediately if there is any significant change in the Facility's status. GenCo shall make available through the

CONFIDENTIAL

Facility's Remote Terminal Unit (RTU) the actual Facility load limit adjustment.

By the Friday of each week, T&D Operator, as agent of GridCo and dispatch manager, shall provide GenCo with an estimated schedule of operations for the succeeding week. The actual schedule shall be determined by the requirements for operation in accordance with "economic dispatch" principles or GridCo's AGC system, which may be substantially different than the estimated schedule previously provided for such week.

If the cost of the Energy from the Generating Facilities becomes more costly on an incremental basis than other sources available to GridCo, the output from the Generating Facilities shall be reduced to zero, if GridCo so requests, and the Budgets shall be adjusted accordingly to account for the effect for this reduced output; provided that such output reduction shall not affect the payment of charges (as adjusted pursuant to the revised Budgets) as described above except as it relates to any variable component tied to making such output available.

| 3.2. | **Agreed Operating Procedures**[24] | The Parties shall mutually develop written operating procedures (the "**Agreed Operating Procedures**"). Topics covered shall include, but not necessarily be limited to, method of day-to-day communications, key personnel lists for both GenCo and GridCo's dispatching centers, clearances and switching practices, outage scheduling, daily available capacity and energy reports, Generating Facility operations log, reactive power support, operation of the ACG system, economic dispatch practices and emergency procedures. The Parties shall jointly establish plans for operating the Generating Facilities during an emergency. |
|---|---|---|
| | | The Agreed Operating Procedures shall be consistent with the principles related to the dispatch of power and electricity set forth in the System Operation Principles (as defined in the T&D O&M Agreement). |
| 3.3. | **Interconnection Facilities** | The Parties shall take such actions and execute such agreements and other documents as may be necessary or appropriate to provide for the continued interconnection of the Generating Facilities to the T&D System. |
| 3.4. | **Maintenance** | GenCo shall inspect, maintain and repair the Generating Facilities in accordance with Prudent Utility Practices. GenCo shall maintain, and deliver to GridCo upon request, maintenance and repair records of the Generating Facilities. |
| 3.5. | **Records** | Each Party shall keep complete and accurate records and all other data required by each of them for the purposes of proper administration of the PPOA. Such records shall be maintained until the expiration of the Term. Either Party shall have the right from time to time, upon written notice to the other Party and during regular business hours, to examine the relevant records and data of the other Party. |

---

[24] **The Agreed Operating Procedures are expected to largely track analogous procedures included in the AES and EcoElectrica PPOAs, on which PREPA's system operations currently relies.**

CONFIDENTIAL

**3.6.  Outages**

GenCo shall, at least thirty (30) Days prior to the Effective Date, submit a written scheduled outage program (the "**Scheduled Outage Program**") for the remaining portion of the first year of each Generating Facility's operations, and by September 1 of each year, its desired Scheduled Outage Program for the next year. If GridCo cannot accept any of the requested scheduled outage periods in the Scheduled Outage Program, GridCo shall advise GenCo of the time period closest to the requested period when the outage can be scheduled. GenCo shall use all reasonable efforts to comply with the Scheduled Outage Program.

GenCo shall use reasonable efforts to notify GridCo of and coordinate all non-scheduled outages with GridCo. To the extent possible, GenCo shall use reasonable efforts to have such non-scheduled outages occur during times when the applicable Generating Facility is not projected to be dispatched, during scheduled outages or at such other times as will minimize any adverse effect on the operation of GridCo's electric system. Should a forced outage occur at any of the Generating Facilities, GenCo shall use commercially reasonable efforts to notify GridCo of the forced outage, the cause of the outage, and provide a schedule to make the applicable Generating Facility available for dispatch.

**3.7.  Metering**

All Energy and Capacity delivered by GenCo and supplied to GridCo shall be measured by meters, which shall be used for administrative purposes only. GenCo may also install meters and metering devices on each Generating Facility site for backup purposes; provided that such meters and metering devices shall be subject to GridCo's approval. GridCo shall own and maintain all meters and metering devices.

Unless otherwise specified, all meters and metering devices shall be located at the interconnection point of each Generating Facility and GridCo shall reimburse GenCo for all reasonable expenses incurred by the GenCo for the installation and testing of meters and metering devices; provided that GenCo shall relocate to the applicable interconnection point of each Generating Facility the meters and metering devices not otherwise located therein as of the Effective Date.

At least once a year at GridCo's cost and, in addition, from time to time upon two (2) weeks prior written notice by GenCo, at GenCo's cost, GridCo will test and calibrate the meter(s), including any backup meters, in accordance with the provisions for meter testing as established in American National Standards Institute (ANSI) Code for Electricity Metering Standard. GridCo shall read the meters monthly to determine the amount of Energy delivered to GridCo during the prior month (the "**Billing Period**"). GenCo may be present, at its option, during all meter readings.

**3.8.  Billing**

Following each meter reading, and continuing through and including the first month following the end of the Term, GenCo shall provide to GridCo a report covering the actual Energy and Capacity delivered, and actual Fuel Charges incurred, during the prior month (the "**Billing Period**").

CONFIDENTIAL

| | | |
|---|---|---|
| 3.9. | **Capacity Ramp Down** | During the Term, GridCo shall have the right, subject to the IRP, to reduce all or any portion of Generating Facility capacity which GridCo accepts from GenCo pursuant to the terms of the PPOA ("**Ramp Down**"). |
| | | Following the receipt of a Ramp Down notice from GridCo, GenCo shall provide written notice to GridCo on whether it will continue operating or otherwise retire the applicable Generating Facility. |
| | | Costs and expenses associated with the operation and maintenance of a ramped down unit and/or Generating Facility shall be included in the Operating Budget, which shall be modified or adjusted as necessary to account for ramped down units and/or Generating Facilities. |
| 3.10. | **Retirements, Decommissioning, Sales or Transfers of Generating Facilities** | GenCo shall notify GridCo, the Authority, the T&D Operator and the PREB of its intent to retire, decommission, sell or transfer to an private operator all or certain units of a Generating Facility, including due to catastrophic failures and/or legal and regulatory compliance requirements. |

## 4. TERMINATION

| | | |
|---|---|---|
| 4.1. | **Termination of Agreement** | Termination of the PPOA shall only occur upon the expiration of the Term (subject to early termination) or the mutual written consent of the Parties. |

## 5. INDEMNIFICATION AND FORCE MAJEURE

| | | |
|---|---|---|
| 5.1. | **Indemnification Generally** | As of the Effective Date and for the Term (subject to the survival provisions), each Party shall indemnify and hold harmless the other Party and each of its affiliates and each of their respective directors, officers, shareholders, partners, employees, agents and representatives and each of their respective heirs, successors and assigns from and against any and all damages, claims, losses, liabilities, actions, causes of action, costs, expenses and obligations (including, without limitation, all reasonable attorneys' fees) whether arising in contract, tort or otherwise to third parties for or on account of injury, bodily or otherwise, to or death of persons or for damage to or destruction of property, in each case resulting from, arising out of or in connection with such indemnifying Party's negligent performance or failure to perform under the PPOA. |
| 5.2. | **Environmental Compliance** | GenCo shall comply in all material respects with all applicable environmental laws including all applicable laws regulating or affecting any spill, discharge, or release of any hazardous substances. |
| 5.3. | **No Consequential or Punitive Damages** | In no event shall any Party or any affiliate thereof or any of their respective directors, officers, agents, or employees be liable to any other Party or any affiliate thereof or any of their respective directors, officers, agents, or employees for any indirect, consequential, punitive, special, incidental or exemplary losses or damages (including without limitation lost profits or lost business opportunity), whether such liability arises in contract, tort or otherwise. |

CONFIDENTIAL

| 5.4. | **Force Majeure Event** | A Force Majeure Event shall excuse the performance of the Party claiming a Force Majeure Event if such event causes the non-performance or inability to perform. The burden of proof as to whether a Force Majeure Event has caused a non-performance or inability to perform shall be on the Party claiming the Force Majeure Event. The Parties shall be excused from performing under the PPOA and shall not be liable in damages or otherwise to the extent the non-performance or inability to perform is due to a Force Majeure Event. |
|---|---|---|
| | | "**Force Majeure Event**" means any event or circumstance to the extent beyond the control of, and not the result of the negligence of, or caused by, the Party seeking to have its performance obligation excused thereby, which by the exercise of due diligence such Party could not reasonably have been expected to avoid and which by exercise of due diligence it has been unable to overcome. |

## 6. MISCELLANEOUS

| 6.1. | **GridCo Representations and Warranties** | GridCo (for the sake of clarity, GridCo for itself and not T&D Operator acting as GridCo's agent) shall provide representations and warranties covering the following matters (among others), as shall be further specified in the PPOA: |
|---|---|---|

- organization, power and authority;
- enforceability of the PPOA;
- compliance with law; and
- no adverse legal proceedings.

| 6.2. | **GenCo Representations and Warranties** | GenCo shall provide representations and warranties covering the following matters (among others), as shall be further specified in the PPOA: |
|---|---|---|

- organization, power and authority;
- enforceability of the PPOA;
- compliance with law;
- no adverse legal proceedings; and
- contractual commitments for or access to a reliable supply of fuel.

| 6.3. | **Insurance** | GenCo shall maintain, from a reputable insurance company or other providers reasonably acceptable to GridCo, policies of insurance as set forth in the PPOA, including, without limitation: |
|---|---|---|

- workmen's compensation insurance;
- comprehensive or commercial general liability insurance;
- excess liability insurance;
- all risk physical damage insurance;
- marine cargo insurance; and
- pollution legal liability insurance.

CONFIDENTIAL

**6.4.** **Assignment**    GenCo shall not assign or transfer its rights and obligations under the PPOA without the prior written consent of GridCo and the Administrator. Any attempt by GenCo to assign its rights or obligations under the PPOA without the prior written consent of the corresponding Party shall be void. Notwithstanding the foregoing, GridCo may assign, without the consent of GenCo, its rights, duties, obligations and benefits, in their entirety to any entity that is designated or approved as the lawful operator of an electricity transmission and/or distribution system in the Commonwealth of Puerto Rico.

**6.5.** **Governing Law**    The PPOA shall be governed by, construed and enforced in accordance with the laws of the Commonwealth of Puerto Rico and, to the extent applicable, the laws of the United States of America, in each case without regard to the principles of conflicts of law.

**6.6.** **Severability**    If a court of competent jurisdiction declares any of the provisions of the PPOA as invalid, illegal or unenforceable, such holding will not affect the validity, effectiveness or enforceability of the remaining provisions of the PPOA.

**6.7.** **Survival**    All indemnification rights shall survive the end of the Term for an additional twelve (12) months and all post-closing obligations shall survive the end of the Term.

*Execution Version*

CONFIDENTIAL

## PUERTO RICO TRANSMISSION AND DISTRIBUTION SYSTEM
## SUPPLEMENTAL TERMS AGREEMENT

This PUERTO RICO TRANSMISSION AND DISTRIBUTION SYSTEM SUPPLEMENTAL TERMS AGREEMENT (this "Supplemental Agreement") is made and entered into as of this 22nd day of June, 2020 by and among: (i) the Puerto Rico Electric Power Authority ("Owner"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, created by Act No. 83 of the Legislative Assembly of Puerto Rico, enacted on May 2, 1941; (ii) the Puerto Rico Public-Private Partnerships Authority ("Administrator"), a public corporation of the Commonwealth of Puerto Rico, created by Act No. 29 of the Legislative Assembly of Puerto Rico, enacted on June 8, 2009; (iii) LUMA Energy, LLC ("ManagementCo"), a limited liability company organized under the laws of Puerto Rico; and (iv) LUMA Energy ServCo, LLC ("ServCo" and, together with ManagementCo, "Operator" and, together with Owner, Administrator and ManagementCo, the "Parties" and each a "Party"), a limited liability company organized under the laws of Puerto Rico. Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to them in Article 1 (*Definitions; Interpretation*), and any such capitalized terms used herein but not defined herein shall have the respective meanings ascribed to them in the O&M Agreement, as the same may be amended or supplemented by this Supplemental Agreement.

## RECITALS

**WHEREAS**, the Parties are party to that certain Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement, dated as of the date hereof (as amended, supplemented or restated from time to time in accordance with its terms, the "O&M Agreement");

**WHEREAS**, the Parties have agreed to enter into this Supplemental Agreement, which shall be applicable to the Parties only upon the Supplemental Agreement Effective Date and for the duration of the Interim Period, including through the date of any termination of the O&M Agreement during the Interim Period pursuant to the terms of this Supplemental Agreement;

**WHEREAS**, all conditions to the Effective Date of the O&M Agreement have been satisfied as of the date hereof; and

**WHEREAS**, the Parties' execution, delivery and performance of this Supplemental Agreement have been authorized and/or approved by all Governmental Bodies required to have authorized and/or approved the Parties' execution, delivery and performance of the O&M Agreement as a condition to the Effective Date, including by the FOMB.

**NOW THEREFORE**, in consideration of the mutual covenants, representations, warranties and agreements contained herein and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties covenant and agree as follows:

CONFIDENTIAL

# ARTICLE 1
## DEFINITIONS; INTERPRETATION

**Section 1.1** **Definitions**. As used in this Supplemental Agreement, the following capitalized terms have the respective meanings set forth below.

"Administrator" has the meaning set forth in the introductory paragraph.

"Interim Costs and Expenses" has the meaning set forth in Section 3.4 (*Operator's Title III Costs and Expenses*).

"Interim Period" has the meaning set forth in Section 2.4 (*Term*).

"Interim Period Service Commencement Date" has the meaning set forth in Section 2.3 (*Interim Period Service Commencement Date*).

"Interim Period Service Fee" has the meaning set forth in Section 3.3 (*Operator's Compensation*).

"Interim Period Services" has the meaning set forth in Section 3.1 (*Operator's Services During Interim Period*).

"Interim Period Termination Date" has the meaning set forth in Section 7.1(a) (*Additional Termination Events – Interim Period Termination Date*).

"ManagementCo" has the meaning set forth in the introductory paragraph.

"O&M Agreement" has the meaning set forth in the Recitals.

"Operator" has the meaning set forth in the introductory paragraph.

"Owner" has the meaning set forth in the introductory paragraph.

"Party" has the meaning set forth in the introductory paragraph.

"ServCo" has the meaning set forth in the introductory paragraph.

"Service Fee" has the meaning set forth in Section 3.3 (*Operator's Compensation*).

"Supplemental Agreement" has the meaning set forth in the introductory paragraph.

"Supplemental Agreement Effective Date" has the meaning set forth in Section 2.2 (*Effectiveness*).

"Supplemental Agreement Reliance Letter" means a letter from tax counsel, substantially in the form set forth in Exhibit B hereto (*Form of Supplemental Agreement Reliance Letter*) that shall accompany a Supplemental Agreement Tax Opinion and shall permit Operator to rely on such Supplemental Agreement Tax Opinion.

CONFIDENTIAL

"Supplemental Agreement Tax Opinion" means an opinion, substantially in the form set forth in Exhibit A hereto (*Form of Supplemental Agreement Tax Opinion*), of Nixon Peabody LLP as counsel to the FOMB or other tax counsel reasonably acceptable to Administrator, rendered in connection with this Supplemental Agreement and providing that neither this Supplemental Agreement nor any provision hereof, nor the O&M Agreement nor any provision thereof, nor the performance by each Party of its obligations hereunder and thereunder during the Interim Period (including Operator's administration of the System Contracts), adversely affects the exclusion from gross income of interest on obligations of Owner, its Affiliates or another Governmental Body for federal income tax purposes under the Internal Revenue Code.

**Section 1.2    Interpretation; Construction**. Section 1.2 (*Interpretation; Construction*) of the O&M Agreement is incorporated herein by reference, *mutatis mutandis*.

## ARTICLE 2
## EFFECT OF AGREEMENT; EFFECTIVENESS; TERM

**Section 2.1    Effect of this Supplemental Agreement**. This Supplemental Agreement constitutes an integral part of the O&M Agreement. On and after the Supplemental Agreement Effective Date, each reference in the O&M Agreement to "this Agreement," "hereunder," "hereof" or "herein" shall mean and be a reference to the O&M Agreement, as supplemented and amended by this Supplemental Agreement, unless the context otherwise requires. The Parties hereby agree that this Supplemental Agreement constitutes an amendment to the O&M Agreement and constitutes and shall be deemed a Transaction Document. The O&M Agreement, except as supplemented and amended by this Supplemental Agreement, is in full force and effect and is in all respects hereby ratified and confirmed. In the event of any conflict during the Interim Period between a provision of the O&M Agreement and a provision of this Supplemental Agreement, the provisions of this Supplemental Agreement shall control.

**Section 2.2    Supplemental Agreement Effective Date; Agreement Regarding Service Commencement Date**. This Supplemental Agreement shall automatically become effective, without further action by the Parties, on the date on which all Service Commencement Date Conditions shall have been satisfied or waived in accordance with the requirements of the O&M Agreement, except that the Title III Exit shall have not yet occurred and the Tax Opinion and Reliance Letter required by Section 4.5(v) (*Conditions Precedent to Service Commencement Date – Tax Opinion*) of the O&M Agreement shall have not yet been delivered (such date, if it occurs, the "Supplemental Agreement Effective Date"). If the Supplemental Agreement Effective Date does not occur, this Supplemental Agreement shall not become effective and shall be deemed void *ab initio* and terminated automatically without any further action by the Parties. Upon the occurrence of the Supplemental Agreement Effective Date, notwithstanding anything to the contrary in the O&M Agreement, the Parties agree that the Service Commencement Date shall not be deemed to have occurred and that this Supplemental Agreement shall govern the process for determining whether the Service Commencement Date has occurred.

**Section 2.3    Interim Period Service Commencement Date**. The "Interim Period Service Commencement Date" shall be the first (1st) Business Day of a calendar month that is at least three (3) Business Days following the date on which the Administrator delivers a certificate

CONFIDENTIAL

to Operator confirming that the following conditions have been met to the satisfaction of each of Operator and Administrator:

(a)      the O&M Agreement shall remain in full force and effect, subject to this Supplemental Agreement;

(b)      the Title III Court shall have entered, on a final and non-appealable basis, an order or orders (i) to the extent required by Applicable Law, authorizing Owner's entry into and performance of this Supplemental Agreement, and (ii) granting administrative expense treatment for any amounts required to be paid by Owner under this Supplemental Agreement and the O&M Agreement during the Interim Period, and in the case of each of (i) and (ii), such approvals and orders shall be reasonably acceptable to Operator;

(c)      a number of Owner Employees and Other Employees necessary for Operator to perform the Interim Period Services shall have accepted offers to commence employment as ServCo Employees beginning on the Interim Period Service Commencement Date and, without limiting the generality of the foregoing, Owner shall have provided communications to all Owner Employees regarding Owner's pension obligations going forward reasonably acceptable to Owner and Operator;

(d)      Owner shall have provided Operator with written notice of the System Contracts and Generation Supply Contracts that have been assumed and those that have been rejected as at the Interim Period Service Commencement Date;

(e)      all Service Accounts shall have been established, and all Service Accounts other than the Contingency Reserve Account shall have been funded, in each case as required by Section 4.7 (*Establishment and Funding of Service Accounts*);

(f)      Owner shall have received a Supplemental Agreement Tax Opinion and ManagementCo shall have received a Supplemental Agreement Reliance Letter, at the expense of Owner or Administrator; and

(g)      all Service Commencement Date Conditions, other than delivery of the Tax Opinion and Reliance Letter required by Section 4.5(v) (*Conditions Precedent to Service Commencement Date – Tax Opinion*) of the O&M Agreement, shall have been satisfied after giving effect to the amendments to the O&M Agreement set forth herein.

**Section 2.4    Term**. This Supplemental Agreement shall be in effect from the Supplemental Agreement Effective Date through the earlier of (a) the Service Commencement Date and (b) the Interim Period Termination Date (such period of time, the "Interim Period"), unless earlier terminated in accordance with the terms hereof. Notwithstanding anything to the contrary herein or in the Transaction Documents, the occurrence of the Interim Period shall not in any way reduce or be applied against the Initial Term.

CONFIDENTIAL

## ARTICLE 3
## INTERIM PERIOD SERVICES; COMPENSATION; COSTS AND EXPENSES

**Section 3.1    Operator's Services During Interim Period**. Commencing on the Interim Period Service Commencement Date and for the duration of the Interim Period thereafter, subject to the terms and conditions of this Supplemental Agreement and for the compensation described herein, Operator shall perform all services with respect to the T&D System constituting O&M Services under the O&M Agreement (the "Interim Period Services"), notwithstanding the fact that the Service Commencement Date has not yet occurred. Operator shall perform the Interim Period Services subject to the terms and conditions of the O&M Agreement, except as the same may be amended or supplemented by this Supplemental Agreement. For purposes of the foregoing sentence, each term and condition with respect to the O&M Services referring to "during each Contract Year," "after the Service Commencement Date" or any similar term, shall be read to refer to the Interim Period and Interim Period Service Commencement Date, as applicable, with respect to Interim Period Services.

**Section 3.2    System Contracts and Generation Supply Contracts**. During the Interim Period, Sections 4.3(d) (*Owner and Administrator Responsibilities – Additional System Contracts and Generation Supply Contracts*) and 4.3(e) (*Owner and Administrator Responsibilities – Notices with respect to System Contracts and Generation Supply Contracts*) of the O&M Agreement shall continue to apply to System Contracts and Generation Supply Contracts that have not yet been assumed or rejected in the Title III Case.

**Section 3.3    Operator's Compensation**. In addition to Owner's funding or payment of T&D Pass-Through Expenditures, Generation Pass-Through Expenditures, Capital Improvements, Outage Event Costs and any other amounts that become due and owing to Operator hereunder and under the O&M Agreement (other than the Service Fee, as defined in the O&M Agreement), as compensation for Operator's performance of the Interim Period Services, and solely for the duration of the Interim Period, Owner shall pay ManagementCo an annual fixed management service fee equal to One Hundred Fifteen Million Dollars (US$115,000,000.00) in 2020 Dollars, such amount to be adjusted for inflation in the manner set forth in Annex VIII (Service Fee) to the O&M Agreement on the Interim Period Service Commencement Date and each twelve (12) month anniversary of the Interim Period Service Commencement Date thereafter (such fee, as adjusted, the "Interim Period Service Fee").  The Interim Period Service Fee shall be invoiced and paid on the same terms as the Fixed Fee as set forth in the O&M Agreement, provided that notwithstanding anything to the contrary in the O&M Agreement, the Interim Period Service Fee shall be paid in monthly installments, each due and payable by Owner monthly in advance on the first Business Day of each month following the month in which Operator has submitted an invoice pursuant to Section 7.1(b)(iii) (*Service Fee – Fixed Fee*) of the O&M Agreement, which invoice shall specify the monthly portion of the Interim Period Service Fee for the next succeeding month.

**Section 3.4    Operator's Title III Costs and Expenses**. Without limitation or duplication of Owner's indemnification obligation in Section 18.2(a)(ix) (*Indemnification by Owner – Generally*) of the O&M Agreement, during the Interim Period, all of the following (without duplication) shall be considered T&D Pass-Through Expenditures and shall be deemed administrative expenses of Owner: all costs and expenses, including Fees-and-Costs, arising from, related to or in connection with any participation by Operator in, or any other action taken by

CONFIDENTIAL

Operator in connection with, PROMESA, the Title III Case or any other Legal Proceeding related thereto ("Interim Costs and Expenses"). Notwithstanding anything to the contrary herein or in the O&M Agreement, (a) Operator's inclusion in any applicable Operating Budget of any line item related to the Interim Costs and Expenses shall not be held against Operator for purposes of determining whether an Operator Event of Default has occurred, (b) any Interim Costs and Expenses in excess of the applicable Operating Budget line item shall not be counted against any limitation on Excess Expenditures and (c) all Interim Costs and Expenses shall be deemed to be included in the applicable Operating Budget regardless of whether such Interim Costs and Expenses are delineated in such Operating Budget.

Section 3.5    **Administrative Expense Treatment**. All amounts payable by Owner to Operator hereunder and under the O&M Agreement during the Interim Period shall be deemed to be administrative expenses of Owner.

Section 3.6    **Contract Principles**. Each of the Parties hereby agrees, during the Interim Period, to uphold the principles of good faith and fair dealing in performing their obligations throughout the term of and under this Supplemental Agreement, and that any dispute with respect to the interpretation of this Supplemental Agreement or the O&M Agreement shall be determined consistent with the foregoing.

## ARTICLE 4
## ADJUSTMENTS TO O&M AGREEMENT

Section 4.1    **Effect of Amendments and Modifications**. Any amendments or supplements to the O&M Agreement made herein shall be effective only during the Interim Period, provided that such amendments or supplements shall survive if the O&M Agreement is terminated during the Interim Period pursuant to the terms of this Supplemental Agreement.

Section 4.2    **Defined Terms**. Section 1.1 (*Definitions*) of the O&M Agreement is amended by making the changes below.

(a)    Additional Defined Terms. The following defined terms are added to Section 1.1 (*Definitions*) of the O&M Agreement in the appropriate alphabetical order:

"Interim Costs and Expenses" has the meaning set forth in the Supplemental Agreement.

"Interim Period" has the meaning set forth in the Supplemental Agreement.

"Interim Period Service Commencement Date" has the meaning set forth in the Supplemental Agreement.

"Interim Period Service Fee" has the meaning set forth in the Supplemental Agreement.

"Material Adverse Effect" means a material adverse effect on (i) the ability of Operator or Owner, as applicable, to perform its obligations under the Supplemental Agreement and/or this Agreement or (ii) the rights of

CONFIDENTIAL

Operator or Owner, as applicable, under the Supplemental Agreement and/or this Agreement.

"Postpetition Financing" means any financing facility entered into by Owner during the administration of the Title III Case pursuant to section 364 of the Bankruptcy Code, provided that any Liens or priority payment terms granted under such facility under section 364(c) or (d) of the Bankruptcy Code shall be subject and subordinate to any amounts required to be paid by Owner under this Agreement.

"Supplemental Agreement" means that certain Supplemental Terms Agreement among the Parties, dated as of the Effective Date.

(b) Change in Law. The definition of "Change in Law" is amended by:

(i) adding the following text as a new clause (iv):

"any event or circumstance, or order or judgment of any Governmental Body, requiring Operator or any Operator Related Parties to become a party to any Legal Proceeding related to the Title III Case or if Operator commences or becomes a party to any action or contested matter in the Title III Case in order to protect its rights under the Supplemental Agreement."; and

(ii) inserting the following text immediately preceding the period at the end of the proviso:

", except where arising out of the Title III Case".

(c) Force Majeure Event. The definition of "Force Majeure Event" is amended by:

(i) deleting and restating the text of clause (I) as follows:

"strikes, boycotts, work stoppages, lockouts or other labor or employment disputes or disturbances with respect to the employees of ServCo occurring during the Interim Period; and"

(ii) deleting the text "increases in wage rates of Operator's employees and Subcontractors, insurance costs," in clause (2);

(iii) adding the word "and" to the end of clause (8);

(iv) deleting the text "; and" at the end of clause (9) and replacing it with "."; and

(v) deleting clause (10).

CONFIDENTIAL

(d)　　Operator Termination Fee. The definition of "Operator Termination Fee" is amended by adding the following text immediately preceding the period at the end of such definition:

"provided, that during the Interim Period, the Operator Termination Fee shall equal the Interim Period Service Fee".

(e)　　Permitted Liens. The definition of "Permitted Liens" is amended by deleting and restating the text thereof as follows:

""Permitted Liens" means (i) Liens arising by operation of law that are either contested in good faith and for which Operator or any Subcontractor has established adequate reserves or that are discharged promptly, (ii) Liens existing as of the Effective Date, if any, (iii) Liens that result from any act or omission by any Owner Related Party, Administrator or any other Governmental Body, (iv) purchase money Liens or similar Liens securing rental payments under capital lease arrangements, (v) Liens to secure Postpetition Financing, and (vi) Liens on System Revenues specified in or permitted under any Title III Plan and its related implementing documents, provided that in the case of each of clauses (v) and (vi), such Permitted Liens would not reasonably be expected to have a Material Adverse Effect on the rights of Operator hereunder or the ability of Owner or Operator to perform their respective obligations under this Agreement.".

(f)　　Service Fee. The definition of "Service Fee" is amended by adding the following text immediately preceding the period at the end of such definition:

"provided, that during the Interim Period, no Service Fee shall be payable hereunder and, in lieu thereof, the Interim Period Service Fee shall be payable, subject to the terms and conditions of the Supplemental Agreement.

(g)　　Transaction Documents. The definition of "Transaction Documents" is amended by adding the following text after the words "means this Agreement,":

"the Supplemental Agreement,".

**Section 4.3　　Ownership of System Revenues**. Section 3.2 (*Engagement of Operator*) of the O&M Agreement is amended by deleting the text reading "(subject only to Liens on System Revenues specified in the Title III Plan and the related disclosure statement)" and replacing it with the following text:

"(subject only to Permitted Liens)".

**Section 4.4　　Tax Assurance**. Section 4.5(t) (*Conditions Precedent to Service Commencement Date - Tax Matters*) of the O&M Agreement is amended by adding the following text after the words "the Service Fee" in each of clauses (i) and (ii):

CONFIDENTIAL

"(including the Interim Period Service Fee)".

**Section 4.5    Front-End Transition Service Fixed Fee**. Section 4.6(b) (*Front-End Transition Period Compensation - Front-End Transition Service Fee*) is amended by deleting the text "Service Commencement Date" in the two places where it appears in clause (iii)(B) and replacing it with the following text:

"Interim Period Service Commencement Date".

**Section 4.6    Collection of Charges**. Section 5.3(b) (*Billing and Collection – Collection of Charges*) of the O&M Agreement is amended by deleting the text reading "(subject only to Liens on System Revenues specified in the Title III Plan and the related disclosure statement)" and replacing it with the following text:

"(subject only to Permitted Liens)".

**Section 4.7    Establishment and Funding of Service Accounts**.

(a)    <u>Contingency Reserve Account</u>.  Notwithstanding anything to the contrary in the O&M Agreement, Owner shall (i) establish the Contingency Reserve Account not less than ten (10) Business Days prior to the Interim Period Service Commencement Date, (ii) no later than the tenth (10th) Business Day of each month during the Interim Period (beginning in the month in which the Interim Period Service Commencement Date occurs) Owner shall fund the Contingency Reserve Account in an amount equal to 1/24 of the Contingency Reserve Amount, (iii) following any withdrawal from the Contingency Reserve Account during the Interim Period, Owner shall replenish the Contingency Reserve Account by depositing no later than the tenth (10th) Business Day of each month (beginning in the month following that in which the withdrawal occurred) the amount withdrawn, which shall be in addition to the funding required by the preceding clause (ii), and (iv) the failure to fund and replenish the Contingency Reserve Account as required by this Section shall constitute an Owner Event of Default. For the avoidance of doubt, except as amended by this Section, the provisions of Section 7.5(f) (*Service Accounts - Contingency Reserve Account*) of the O&M Agreement continue to apply.

(b)    <u>All Other Service Accounts</u>. Notwithstanding anything to the contrary in the O&M Agreement, Owner shall establish each Service Account other than the Contingency Reserve Account, and shall fund each such Service Account other than the Contingency Reserve Account, in the full amount required by the O&M Agreement to be in place as of the Service Commencement Date, in each case not less than ten (10) Business Days prior to the Interim Period Service Commencement Date.

**Section 4.8    Owner Event of Default**. Section 14.3(c) (*Events of Default by Owner – Failure to Perform a Material Obligation*) of the O&M Agreement is amended by deleting the text reading "including the obligation to keep System Revenues free and clear of Liens other than Liens specified in the Title III Plan and the related disclosure statement" and replacing it with the following text:

"including the obligation to keep System Revenues free and clear of Liens other than Permitted Liens".

CONFIDENTIAL

**Section 4.9     Back-End Transition Services**.

(a)     <u>Specific Amendments to O&M Agreement</u>.

(i)     In Section 14.6(b) (*Remedies Upon Early Termination – Back-End Transition Service Fee*) of the O&M Agreement, prior to the words "Section 14.2", the following words are inserted: "the Supplemental Agreement,".

(ii)     In Section 16.1 (*Successor Operator*) of the O&M Agreement: (A) the words "Interim Period" should be added before the words "Service Commencement Date" in two places; and (B) after the words "Article 14 (*Events of Default; Remedies*)" in clause (i) thereof, the following words are inserted:   ", or Administrator's receipt of a termination notice from Operator under the Supplemental Agreement (or upon the automatic termination of this Agreement pursuant to the terms of the Supplemental Agreement),".

(b)     <u>Back-End Transition Period Compensation</u>. If the Back-End Transition Commencement Date occurs as a result of the termination of the O&M Agreement pursuant to this Supplemental Agreement, then notwithstanding anything to the contrary in the O&M Agreement, Operator shall invoice Owner on or prior to the tenth (10th) day of each month for both (i) the prior calendar month's or months' Back-End Transition Services and the corresponding Back-End Transition Service Fee, as applicable, to the extent not previously paid, and (ii) the next succeeding month's anticipated Back-End Transition Services and the corresponding Back-End Transition Service Fee. Owner shall pay the Back-End Transition Service Fee monthly in advance on the first Business Day of each calendar month, subject to deduction by the amount of any overage in the Back-End Transition Service Fee paid by Owner in the previous month.  The Back-End Transition Service Fee shall be prorated for any partial monthly period during the Back-End Transition Period.

**Section 4.10     Indemnification**. Section 18.2(a) (*Indemnification by Owner – Generally*) of the O&M Agreement is amended to delete the word "or" immediately preceding clause (viii), and to insert the following text immediately preceding the period at the end of such section:

"; or (ix) all claims brought against Operator after the Interim Period Service Commencement Date by any creditor or other Person (A) in connection with or related to the Title III Case or (B) in connection with or arising out of the negotiation and execution of the Supplemental Agreement.".

**Section 4.11     Representations and Warranties of Owner**. Section 19.1(h) (*Charges*) of the O&M Agreement is amended by deleting the text reading "other than those specified in or permitted under any Title III Plan and its related implementing documents" and replacing it with the following text:

 "other than Permitted Liens".

CONFIDENTIAL

## ARTICLE 5
## RESPONSIBILITIES OF OWNER AND ADMINISTRATOR

**Section 5.1    Responsibilities of Owner and Administrator**. In addition to and not in limitation of their respective responsibilities set forth in the O&M Agreement, each of Owner and Administrator, as applicable, shall (a) exercise all reasonable efforts to cause the Title III Exit to occur as promptly as possible after the Supplemental Agreement Effective Date, (b) keep Operator informed with respect to the Title III Case, (c) provide Operator with copies of all of Owner's financial statements and reports concurrently with its provision of same to the Title III Court or any creditors, (d) agree to Operator's assertion of standing and appearance in the Title III Case and (e) allow Operator to speak on behalf of Owner with respect to the Interim Period Services. Neither Owner nor Administrator shall take any steps to appoint Operator or any Affiliate of Operator as a receiver in the Title III Case without the prior written consent of Operator in its sole and absolute discretion, and notwithstanding anything to the contrary in the O&M Agreement, any other Transaction Document or any other document, neither Operator nor any Affiliate of Operator shall have any obligation to act as a receiver in the Title III Case without its prior written consent in its sole and absolute discretion.

## ARTICLE 6
## CLOSING THE INTERIM PERIOD

**Section 6.1    Confirming Service Commencement Date**. The Parties agree that, notwithstanding anything to the contrary in the O&M Agreement, in order for the Service Commencement Date to occur, all Service Commencement Date Conditions must be satisfied or waived in accordance with their terms and for purposes of the foregoing, in addition to the Service Commencement Date Conditions set forth in the O&M Agreement, it shall be a Service Commencement Date Condition that the Title III Exit shall have occurred and that the Title III Plan and order of the Title III Court confirming same shall be reasonably acceptable to Operator. The Parties shall follow the process set forth in the O&M Agreement for establishing the Service Commencement Date, upon which date this Supplemental Agreement shall terminate and be null and void.

## ARTICLE 7
## TERMINATION

**Section 7.1    Additional Termination Events and Rights**.

(a)    Interim Period Termination Date. This Supplemental Agreement and the O&M Agreement shall automatically terminate without further action by Operator, and without need for a court decision or arbitral award confirming such termination, in the event that the Service Commencement Date does not occur on or prior to the date that is eighteen (18) months after the Supplemental Agreement Effective Date (such date, the "Interim Period Termination Date"), which Interim Period Termination Date may, if requested by Administrator, be extended by the mutual agreement of the Parties prior to the then-current Interim Period Termination Date.

(b)    Operator Termination Right Due to Material Adverse Effect. In addition to Operator's termination rights set forth in the O&M Agreement, which shall continue to apply,

CONFIDENTIAL

Operator may terminate this Supplemental Agreement and the O&M Agreement during the Interim Period upon the occurrence of a Material Adverse Effect arising out of the Title III Case as a result of a filing in the Title III Case or a ruling or order of the Title III Court, upon not less than one hundred twenty (120) days prior written notice to Administrator, without need for a court decision or arbitral award confirming Operator's right to terminate.

(c)　　Cross-Termination. In the event that, during the Interim Period, either Operator or Administrator exercises its rights to terminate the O&M Agreement pursuant to the terms thereof, this Supplemental Agreement shall terminate concurrently with the termination of the O&M Agreement.

(d)　　No Termination or Liquidated Damages Under O&M Agreement for Failure of Service Commencement Date Conditions. From and after the Interim Period Service Commencement Date and continuing after the Service Commencement Date, each Party hereby permanently waives its rights and remedies set forth in Section 4.8 (*Failure of Service Commencement Date Conditions*) of the O&M Agreement, except that any Delay Liquidated Damages that may have accrued and become payable thereunder prior to the Interim Period Service Commencement Date shall continue to be payable and shall be paid pursuant to the terms thereof.

### Section 7.2　　Remedies Upon Early Termination.

(a)　　Accrued and Unpaid Amounts. In addition to the payment of all accrued and unpaid amounts required to be paid by Owner under the O&M Agreement, in the event of an early termination of this Supplemental Agreement and the O&M Agreement, Owner shall indefeasibly pay any accrued and unpaid amounts required to be paid to Operator pursuant to this Supplemental Agreement, including the Interim Period Service Fee, in each case, as of the effective date of such termination.

(b)　　Back-End Transition Service Fee. In the event of an early termination of this Supplemental Agreement and the O&M Agreement pursuant to Section 7.1 of this Supplemental Agreement (*Additional Termination Events and Rights*), and if Operator is performing the Back-End Transition Services, Owner shall be responsible for payment of the Back-End Transition Service Fee, which shall be deemed to be an administrative expense of Owner.

(c)　　Termination Fee.

(i)　　Notwithstanding anything to the contrary in the O&M Agreement, in the event this Supplemental Agreement and the O&M Agreement are terminated pursuant to Section 7.1(a) of this Supplemental Agreement (*Additional Termination Events and Rights – Interim Period Termination Date*), Owner shall pay Operator the Operator Termination Fee, which shall be deemed to be an administrative expense of Owner.

(ii)　　The Parties hereby acknowledge and agree that, notwithstanding anything to the contrary in this Supplemental Agreement or the O&M Agreement, in the event this Supplemental Agreement and the O&M Agreement are terminated pursuant to Section 7.1(a) (*Additional Termination Events and Rights – Interim Period Termination Date*), Operator's damages would be difficult or impossible to quantify with reasonable certainty, and accordingly,

CONFIDENTIAL

the payment to Operator of the Operator Termination Fee (x) is a payment of liquidated damages (and not penalties), which is based on the Parties' best estimate of damages Operator would suffer or incur, and (y) shall constitute Operator's sole and exclusive remedy for all monetary damages, costs, losses and expenses of whatever type or nature arising from or related to this Supplemental Agreement due to the events described in this sentence, with any and all other rights and remedies hereunder, at law, in equity or otherwise, being herein irrevocably waived by the Operator.

(iii)      Each of Administrator and Owner hereby irrevocably waives any right it may have to raise as a defense that the Operator Termination Fee is excessive or punitive.

## ARTICLE 8
## REPRESENTATIONS AND WARRANTIES

**Section 8.1      Representations and Warranties of Owner**. Owner hereby represents and warrants to Operator that:

(a)      <u>Existence and Powers</u>. Owner is a public corporation and instrumentality of the Commonwealth duly organized, validly existing and in good standing under the laws of the Commonwealth. Owner has the required corporate power and authority to enter into this Supplemental Agreement, carry out its obligations hereunder and consummate the transactions contemplated hereby. Administrator has the required corporate power and authority to carry out its obligations under this Supplemental Agreement and on behalf of Owner, including the power and authority to bind Owner with respect to any matter contemplated under this Supplemental Agreement.

(b)      <u>Due Authorization and Binding Obligation</u>. The execution and delivery by Owner of this Supplemental Agreement, the performance by Owner of its obligations hereunder and the consummation by Owner of the transactions contemplated hereby have been duly and validly authorized and approved by the required corporate or other similar action on the part of Owner. This Supplemental Agreement has been duly and validly executed and delivered by Owner, and (assuming due authorization, execution and delivery by Operator) this Supplemental Agreement constitutes a legal, valid and binding obligation of Owner enforceable against Owner in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium or similar Applicable Law affecting creditors' rights generally and by general equity principles.

(c)      <u>No Conflicts</u>. Neither the execution, delivery or performance by Owner of this Supplemental Agreement, nor the consummation of the transactions contemplated hereby will: (i) result in a material violation or breach of, or material default under, any provision of the organizational documents of Owner; (ii) result in a violation of, or give any Governmental Body the right to challenge any of the transactions contemplated hereby under, any Applicable Law applicable to Owner; (iii) (A) result in a violation or breach of, (B) constitute a default under, (C) result in the acceleration of or create in any party the right to accelerate, terminate or cancel or (D) require the consent of any other Person under, any material contract to which Owner is a party; or (iv) result in the creation or imposition of any Lien on any properties or assets of Owner.

CONFIDENTIAL

(d)    <u>No Consents</u>. No consent, declaration or filing with, or notice to, any Governmental Body is required by or with respect to Owner in connection with (i) the execution and delivery of this Supplemental Agreement or (ii) the performance by Owner of its obligations hereunder, except (A) such as have been duly obtained or made and (B) in the case of clause (ii), for those Governmental Approvals to be obtained after the Effective Date but before the Interim Period Service Commencement Date.

(e)    <u>No Litigation</u>. There is no action, suit or other proceeding, at law or in equity, before or by any court or Governmental Body pending against Owner or, to Owner's knowledge, threatened against Owner, which if determined adversely against Owner would reasonably be expected to materially and adversely affect (i) the validity or enforceability of this Supplemental Agreement or (ii) the performance by Owner or Operator of their respective obligations hereunder.

(f)    <u>No Legal Prohibition</u>. There is no Applicable Law in effect on the date hereof that would prohibit the execution, delivery or performance by Owner of this Supplemental Agreement and the transactions contemplated hereby.

**Section 8.2    Representations and Warranties of Operator**. Operator hereby represents and warrants to Owner that:

(a)    <u>Existence and Powers</u>. ManagementCo is a limited liability company duly organized, validly existing and in good standing under the laws of Puerto Rico, and is qualified to do business and in good standing in the Commonwealth. ServCo is a limited liability company duly organized, validly existing and in good standing under the laws of Puerto Rico, and is qualified to do business and in good standing in the Commonwealth. Each of ManagementCo and ServCo has the required corporate power and authority to enter into this Supplemental Agreement, carry out its obligations hereunder and consummate the transactions contemplated hereby.

(b)    <u>Due Authorization and Binding Obligation</u>. The execution and delivery by Operator of this Supplemental Agreement, the performance by Operator of its obligations hereunder and the consummation by Operator of the transactions contemplated hereby have been duly and validly authorized and approved by the required corporate or other similar action on the part of Operator. This Supplemental Agreement has been duly and validly executed and delivered by Operator, and (assuming due authorization, execution and delivery by Owner) this Supplemental Agreement constitutes a legal, valid and binding obligation of Operator enforceable against Operator in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium or similar Applicable Law affecting creditors' rights generally and by general equity principles.

(c)    <u>No Conflicts</u>. Neither the execution, delivery or performance by Operator of this Supplemental Agreement, nor the consummation of the transactions contemplated hereby will:  (i) result in a material violation or breach of, or material default under, any provision of the organizational documents of Operator; (ii) result in a violation of, or give any Governmental Body the right to challenge any of the transactions contemplated hereby under, any Applicable Law applicable to Operator; (iii) (A) result in a violation or breach of, (B) constitute a default under, (C) result in the acceleration of or create in any party the right to accelerate, terminate or cancel or

14

CONFIDENTIAL

(D) require the consent of any other Person under, any material contract to which Operator is a party; or (iv) result in the creation or imposition of any Lien on any properties or assets of Operator.

(d)     No Consents. No consent, declaration or filing with, or notice to, any Governmental Body is required by or with respect to Operator in connection with (i) the execution and delivery of this Supplemental Agreement or (ii) the performance by Operator of its obligations hereunder, except (A) such as have been duly obtained or made and (B) in the case of clause (ii), for those Governmental Approvals to be obtained after the Effective Date but before the Interim Period Service Commencement Date.

(e)     No Litigation. There is no action, suit or other proceeding, at law or in equity, before or by any court or Governmental Body pending against Operator or, to Operator's knowledge, threatened against Operator, which if determined adversely against Operator would reasonably be expected to materially and adversely affect (i) the validity or enforceability of this Supplemental Agreement or (ii) the performance by Operator or Owner of their respective obligations hereunder.

(f)     No Legal Prohibition. There is no Applicable Law in effect on the date hereof that would prohibit the execution, delivery or performance by Operator of this Supplemental Agreement and the transactions contemplated hereby.

# ARTICLE 9
## DISPUTE RESOLUTION

**Section 9.1     Disputes**. Any dispute among the Parties arising out of, relating to or in connection with this Supplemental Agreement or the existence, interpretation, breach, termination or validity thereof shall constitute a Dispute and shall be resolved pursuant to the Dispute Resolution Procedure.

# ARTICLE 10
## MISCELLANEOUS

**Section 10.1   Fees and Expenses; Notices; Amendments; Relationship of the Parties**. Sections 20.1 (*Fees and Expenses*), 20.2 (*Notices*), 20.3 (*Amendments*) and 20.5 (*Relationship of the Parties*) of the O&M Agreement are incorporated herein by reference, *mutatis mutandis*.

**Section 10.2   Entire Agreement**. This Supplemental Agreement, together with the O&M Agreement, constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes any and all prior oral or written agreements, understandings, proposals, representations or warranties relating to this Supplemental Agreement. Without limiting the generality of the foregoing, this Supplemental Agreement taken together with the O&M Agreement shall completely and fully supersede all other understandings and agreements among the Parties with respect to such transactions, including those contained in the RFP, the Proposal by Operator or its Affiliate and any amendments or supplements to the RFP or the Proposal. If this Supplemental Agreement does not become effective pursuant to its terms, then this Supplemental Agreement shall not be deemed to amend or supplement the O&M Agreement and shall not be consulted or used by the Parties to interpret any terms or conditions of the O&M Agreement.

CONFIDENTIAL

### Section 10.3   Assignment and Transfer.

(a)     By Operator. Operator shall not assign, transfer, convey, lease, encumber or otherwise dispose of its rights or obligations under this Supplemental Agreement except to the same Person or Persons to which it assigns, transfers, conveys, leases, encumbers or otherwise disposes of its rights or obligations under the O&M Agreement, provided such action is permitted by the O&M Agreement.

(b)     By Owner. Owner shall not assign, transfer, convey, lease, encumber or otherwise dispose of its rights or obligations under this Supplemental Agreement except to the same Person or Persons to which it assigns, transfers, conveys, leases, encumbers or otherwise disposes of its rights or obligations under the O&M Agreement, provided such action is permitted by the O&M Agreement.

### Section 10.4   Interest on Overdue Obligations; Waivers; Severability; Survival; No Third Party Beneficiaries; Remedies; Counterparts; Office of the Comptroller; Governing Law; Commonwealth Obligations.

Sections 20.7 (*Interest on Overdue Obligations*), 20.8 (*Waivers*), 20.9 (*Severability*), 20.10 (*Survival*), 20.11 (*No Third Party Beneficiaries*), 20.12 (*Remedies*), 20.13 (*Counterparts*), 20.14 (*Office of the Comptroller*), 20.15 (*Governing Law*) and 20.16 (Commonwealth Obligations) of the O&M Agreement are incorporated herein by reference, *mutatis mutandis*.

[*Signatures follow on next page*]

CONFIDENTIAL

**IN WITNESS WHEREOF**, Owner, Administrator, ManagementCo and ServCo each has caused this Supplemental Agreement to be duly executed as of the day and year first above written.

**PUERTO RICO ELECTRIC POWER AUTHORITY**

By: _____
Name: _____
Title: _____

**PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY, solely in its capacity as ADMINISTRATOR**

By: _____
Name: _____
Title: _____

**LUMA ENERGY, LLC**

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

**LUMA ENERGY SERVCO, LLC**

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

*[Signature Page to Puerto Rico Transmission and Distribution System Supplemental Terms Agreement]*

CONFIDENTIAL

## Exhibit A

## Form of Supplemental Agreement Tax Opinion

_____, 202_

Ladies and Gentlemen:

We have served as tax counsel to the Federal Oversight and Management Board ("FOMB") with respect to the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement dated as of _____, 2020 (the "Agreement") by and among the Puerto Rico Electric Power Authority (the "Authority"), as owner, the Puerto Rico Public-Private Partnerships Authority, as administrator (the "Administrator"), _____ ("ManagementCo"), and _____ ("ServCo" and, together with ManagementCo, the "Operator" and, collectively with the Authority and the Administrator, the "Parties"). Pursuant to the terms of the Agreement, the Operator will provide operation and management services relating to the Authority's transmission and distribution system (the "T&D System"). In addition, pursuant to the Puerto Rico Transmission and Distribution System Supplemental Terms Agreement dated as of _____, 2020 (the "Supplemental Agreement") by and among the Parties, the Operator is commencing the O&M Services as of the date hereof, although the Service Commencement Date has not occurred. The Authority, its Affiliates, and other Governmental Bodies currently have outstanding obligations the interest on which is excluded from gross income for federal income tax purposes (the "Existing Bonds"). On the date of issuance of each of the bond issues comprising the Existing Bonds, the respective bond counsel for each such issuance delivered an opinion (each an "Approving Opinion") that interest on the related Existing Bonds is excluded from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code (the "Code"). Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

This opinion is being delivered in accordance with Section 2.3(f) of the Supplemental Agreement.

In rendering the opinion set forth herein, we have reviewed (i) the Agreement, including the exhibits thereto, (ii) the Supplemental Agreement, (iii) the System Contracts in effect as of the date hereof, (iv) the opinion of Sargent and Lundy or another nationally recognized engineering firm acceptable to the Parties, dated _____, 202_, which sets forth, among other things, the reasonably expected weighted average economic life of the T&D System, and (v) such other opinions, certificates and documents as have been provided to us by the Authority and others in connection with the Agreement. We have also relied upon the facts set forth in the representations made by the Parties to the Agreement and such other documents and opinions to the extent we deemed necessary to render the opinions set forth herein. We have not undertaken an independent audit or investigation of the matters set forth in any of the foregoing and our opinion assumes the accuracy of the information and any conclusions set forth therein and compliance with any covenants and directions set forth in said documents, including the Agreement.

CONFIDENTIAL

In addition, the Code and the Revenue Procedure (as defined below), impose certain requirements that must be met subsequent to the issuance and delivery of the Existing Bonds and subsequent to the execution of the Agreement for interest on the Existing Bonds thereon to be and remain excluded from gross income for federal income tax purposes.  Noncompliance with such requirements could cause the interest on the Existing Bonds to be included in gross income for federal income tax purposes retroactive to the date of issue of each issue of the Existing Bonds.

Section 103 of the Code provides generally that interest on a "private activity bond" is not excluded from gross income. Section 141 of the Code, in part, provides that a private activity bond is an obligation issued as part of an issue that meets the private business tests.  Under the private business tests, bonds are treated as private activity bonds if the issue of which those bonds are a part satisfy both the private business use test and the private security or payment test.  The private business use test is met if more than 10 percent of the proceeds of an issue are used in the trade or business of a nongovernmental person ("private business use").  Under Treasury regulation section 1.141-3, private business use can result from the use of the facilities financed by the issue, including as a result of a lease of such property to a nongovernmental person or a management contract with respect to such property.  The private security or payment test is generally met if the payment of the principal of, or the interest on, more than 10 percent of the proceeds of an issue is (under the terms of such issue or any underlying arrangement) directly or indirectly: (A) secured by any interest in property used or to be used for a private business use, or payments in respect of such property, or (B) to be derived from payments (whether or not to the issuer) in respect of property, or borrowed money, used or to be used for a private business use.

Under Treasury regulation section 1.141-3(b)(4), a management contract with respect to financed property may result in private business use of that property, based on all of the facts and circumstances. The regulations provide that a management contract with respect to financed property generally results in private business use of that property if the contract provides for compensation for services rendered with compensation based, in whole or in part, on a share of net profits from the operation of the facility, or if the service provider is treated as the lessee or owner of financed property for federal income tax purposes.

Treasury regulation section 1.141-3 defines a management contract as a management, service, or incentive payment contract between a governmental person and a service provider under which the service provider provides services involving all, a portion of, or any function of, a facility. For example, a contract for the provision of management services for an entire hospital, a contract for management services for a specific department of a hospital, and an incentive payment contract for physician services to patients of a hospital are each treated as a management contract.

In Revenue Procedure 2017-13 (the "Revenue Procedure") the Internal Revenue Service provided a safe harbor under which a management contract can be treated as not resulting in private business use.  The Revenue Procedure refers to the governmental owner of the related facilities as the "qualified user" and the manager or operator as the "service provider."  Under the Revenue Procedure, a management contract that satisfies the following conditions will not be treated as resulting in private business use:

CONFIDENTIAL

(1) The payments to the service provider under the contract must be reasonable compensation for services rendered during the term of the contract. "Compensation" includes payments to reimburse actual and direct expenses paid by the service provider and related administrative overhead expenses of the service provider.

(2) The contract must not provide to the service provider a share of net profits from the operation of the managed property. Compensation to the service provider will not be treated as providing a share of net profits if no element of the compensation takes into account, or is contingent upon, either the managed property's net profits or both the managed property's revenues and expenses (other than any reimbursements of direct and actual expenses paid by the service provider to unrelated third parties) for any fiscal period. For this purpose, the elements of the compensation are the eligibility for, the amount of, and the timing of the payment of the compensation. Incentive compensation is not treated as providing a share of net profits if eligibility is determined by the service provider's performance in meeting one or more standards that measure quality of services, performance or productivity.

(3) The contract must not, in substance, impose upon the service provider the burden of bearing any share of net losses from the operation of the managed property.

(4) The term of the contract, as of the beginning of the term of the contract, including all renewal options must not be greater than the lesser of 30 years or 80 percent of the weighted average reasonably expected economic life of the managed property.

(5) The qualified user must exercise a significant degree of control over the use of the managed property. This control requirement is met if the contract requires the qualified user to approve the annual budget of the managed property, capital expenditures with respect to the managed property, each disposition of property that is part of the managed property, rates charged for the use of the managed property, and the general nature and type of use of the managed property (for example, the type of services).

(6) The qualified user must bear the risk of loss upon damage or destruction of the managed property (for example, due to force majeure).

(7) The service provider must agree that it is not entitled to and will not take any tax position that is inconsistent with being a service provider to the qualified user with respect to the managed property. For example, the service provider must agree not to claim any depreciation or amortization deduction, investment tax credit, or deduction for any payment as rent with respect to the managed property.

(8) The service provider must not have any role or relationship with the qualified user that, in effect, substantially limits the qualified user's ability to exercise its rights under the contract, based on all the facts and circumstances. A service provider will not be treated as having a role or relationship prohibited by this provision if: (a) no more than 20 percent of the voting power of the governing body of the qualified user is vested in the directors, officers, shareholders, partners, members, and employees of the service provider, in the aggregate; (b) the governing body of the qualified user does not include

CONFIDENTIAL

the chief executive officer of the service provider or the chairperson (or equivalent executive) of the service provider's governing body; and (c) the chief executive officer of the service provider is not the chief executive officer of the qualified user or any of the qualified user's related parties.

Based upon our review of the foregoing documents, and assuming the accuracy of the information and certifications, and compliance with the covenants, representations, and directions set forth therein, and assuming compliance with the terms of the Supplemental Agreement, we are of the opinion that neither the Supplemental Agreement nor any provision thereof, nor the performance by each Party to the Supplemental Agreement of its respective obligations thereunder (including Operator's administration of the System Contracts), adversely affects the exclusion from gross income of interest on the Existing Bonds of the Authority, its Affiliates or another Governmental Body for federal income tax purposes under Section 103 of the Code.

This opinion is limited to the specific matter addressed herein and shall not be construed as confirming or restating the Approving Opinions. We have not been engaged to, nor have we undertaken to, determine whether the interest on the Existing Bonds continues to qualify as of this date for exclusion from gross income for federal income tax purposes. Accordingly, we express no opinion on such matter.

This opinion is delivered as of the date hereof and relates solely to the Internal Revenue Code and Treasury regulations as in effect on the date hereof.  We disclaim any obligation to advise you or any other person of developments of law or fact covered by this opinion that may occur after the date hereof, including any amendments made subsequent to the date hereof to the documents described above.  Furthermore, we express no opinion as to any federal, state or local tax law consequences with respect to the Existing Bonds, or the interest thereon, if any action is taken with respect to the Supplemental Agreement or the proceeds thereof upon the advice or approval of other counsel.

**CONFIDENTIAL**

This opinion is being delivered by us as tax counsel to the FOMB in connection with the Supplemental Agreement and may not be relied upon by any other person, or used or reproduced for any other purpose, without our prior written consent.


Sincerely,


Nixon Peabody LLP

CONFIDENTIAL

**Exhibit B**

**Form of Supplemental Agreement Reliance Letter**


_____, 2020



Puerto Rico Transmission and Distribution System Supplemental Terms
Agreement dated as of _____, 202_


Ladies and Gentlemen:

  In connection with the execution of the Puerto Rico Transmission and Distribution System Supplemental Terms Agreement dated as of _____, 202_ by and among the Puerto Rico Electric Power Authority, the Puerto Rico Public-Private Partnerships Authority, _____, and _____ (the "Supplemental Agreement") we have delivered our final legal opinion relating to the impact of the Supplemental Agreement on the federal income tax status of interest on bonds issued by the Authority, its Affiliates, and other Governmental Bodies (the "Bonds"), dated the date hereof and addressed to the Federal Oversight and Management Board. Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Supplemental Agreement.

**Confidential**

You may rely on said opinion as though the same were addressed to you. No attorney-client relationship has existed or exists between any addressee of this letter and our firm in connection with the Supplemental Agreement or the Bonds or by virtue of this letter.


Very truly yours,

# Exhibit B

**PUBLIC·PRIVATE
PARTNERSHIPS**

AUTHORITY

GOVERNMENT OF PUERTO RICO

Eng. Josué A. Colón Ortiz I Executive Director

July 22, 2025

**BY ELECTRONIC MAIL**
juan.saca@lumapr.com

**Mr. Juan Saca**
President & Chief Executive Officer
LUMA Energy, LLC
PO Box 363508
San Juan, PR 00936-3508

Dear Mr. Saca,


Initial
JCO

**Re.:  Notice of Disputes to LUMA Energy, LLC and LUMA Energy ServCo, LLC,
under Article 15 of the T&D OMA**

Reference is made to the *Puerto Rico Transmission and Distribution Operating
and Maintenance Agreement* ("T&D OMA"), executed on June 22, 2020, between
the Puerto Rico Electric Power Authority ("PREPA") as Owner; the Puerto Rico
Public-Private Partnerships Authority ("P3A"), as Administrator; and LUMA Energy,
LLC and LUMA Energy ServCo, LLC, (jointly, "LUMA") as Operator. Capitalized terms
used but not defined herein have the meanings set forth in the T&D OMA.
Pursuant to Sections 15.1, 15.2(a) and 15.3 of the OMA, P3A hereby serves this Notice
of Disputes on LUMA.

Puerto Rico's electric customers have endured nearly four years of rolling outages,
ballooning costs, and broken promises - even as billions in federal reconstruction
dollars sit idle. Despite repeated written notices and good faith attempts to secure
voluntary compliance, LUMA continues to flout its most basic obligations under
the T&D OMA. The ten sections that follow chronicle a pattern of chronic non-
performance - from vegetation management failures that have plunged
the Island into darkness, to stone-walled audits, seconded-employee cost
overruns, and a reimbursement backlog starving the grid of the very funds meant
to rebuild it.

Docusign Envelope ID: D12C752B-AFEB-464E-A922-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 2 of 81

When the Government launched its 2020 procurement, LUMA cast itself as the transformative operator uniquely qualified to greatly improve Puerto Rico's electric system. Its proposal boasted "unparalleled, hands-on experience" with FEMA-funded megaprojects, a disaster-recovery *résumé* spanning 300 jurisdictions, and a front-end transition plan that would slash costs, curb theft, and unleash a flood of federal dollars - all without raising rates. Over an eleven-month transition, PREPA opened every door: asset tours, data rooms, and unrestricted systems access - all bankrolled by millions in customer funds to ensure LUMA knew exactly what it was taking on.

Fast-forward five years and close to $3 billion in operational budgets, including $500 million in Service Fees to LUMA, those representations and assurances were wholly unfounded.  LUMA has only received $345 million in federal reimbursements out of approximately $10 billion federally assigned funds for T&D projects for permanent works under the Hurricane María disaster, whereas PREPA has secured about $1.3 billion on its own.  Alarmingly, LUMA has been further unsuccessful in achieving the obligation of $385 million in projects incurred under Hurricane Fiona's emergency work withdrawn from its operation account.



Initial

Reliability metrics remain flat or falling; island-wide blackouts on June 12 and December 31 of 2024 and again on April 16 of this year, underscored how little progress has been made to clear trees or harden lines. Meanwhile, PREPA has been forced to pump more than $500 million of its own federal reimbursements into LUMA's accounts just to keep the lights on. In short, the promises of world-class expertise and financial discipline have not merely gone unmet—they have boomeranged into new crises of liquidity, transparency, and public confidence. The people of Puerto Rico, and the Government that represent them, are fed up.

Most recently - while outages mount and billions in federal dollars remain untapped - LUMA asked the Energy Bureau for a provisional base-rate hike that would add roughly $30.04 to the average 400-kWh residential bill every month, a 32.75 % jump even before the formal case is heard. In its own Executive Summary, LUMA concedes the increase would bankroll five "major investments": $800 million for distribution hardening, $300 million for substation upgrades, $250 million for transmission repairs, $240 million for a one-time vegetation reset, and $220 million for a preventive-maintenance program. Four out of these five categories are precisely the kind of permanent-work and § 406/428 hazard-mitigation projects FEMA has already approved and funded across Puerto Rico's T&D system. Put simply, LUMA wants consumers to pre-pay for capital work the federal government stands ready to reimburse, while also

Mr. Juan Saca
July 22, 2025
Page 3 of 81

footing the bill for everyday maintenance that FEMA will never cover. P3A rejects that premise outright: when LUMA's actual revenues fall short of its optimistic forecasts, the remedy is internal cost discipline—trimming seconded-employee expenses, attacking technical and non-technical losses—not conscripting Puerto Rican families to subsidize managerial inefficiency through higher rates.

In light of the foregoing, P3A hereby enumerates a non-exhaustive sample of each instance in which LUMA has exhibited a flagrant deficiency in transparency and accountability, deliberately distorted material facts, and demonstrably failed to comply with its contractual obligations since assuming operation of the T&D System. Such conduct has compelled P3A, in its capacity as Administrator, to issue the following Notice of Disputes under Sections 15.2(a) and 15.3(b) of the T&D OMA. For each of the ten (10) disputes identified, we set forth below a detailed exposition of its nature, together with the corresponding formal demands served upon LUMA. Therefore, P3A, as the Administrator of the T&D OMA, demands the immediate commencement of the Dispute Resolution Procedures concerning each dispute. Should LUMA fail to remedy these violations within the contractually prescribed windows, PREPA and P3A will pursue every remedy the T&D OMA allows - including, if necessary, termination of the agreement - to protect public funds, restore reliable electric service, and hold LUMA fully accountable.



Initial
JCO

## I.   <u>Notice of Technical Dispute: Federal Funding:</u>

P3A, in its role as Administrator of the T&D OMA, notifies this dispute due to LUMA's persistent failures to comply with its federal funding obligations. Despite repeated warnings and formal letters (included herein), LUMA has continued to exhibit systemic deficiencies in cash flow reporting, reconciliation of federal expenditures, and timely submission of Requests for Reimbursements.

1. <u>March 7, 2025- P3A (J. Colón Ortiz- Exec. Dir.) Letter to LUMA (J. Saca - CEO) – Unauthorized Use of Seconded Employees Under the Operation and Maintenance Agreement</u>

   • Non-compliance by LUMA:

     o LUMA's use of seconded employees violated federal procurement rules under 2 C.F.R. Part 200. Specifically, LUMA engaged in self-performed work with seconded employees without adhering to federal procurement standards applicable to state entities.

Docusign Envelope ID: D12C752D-AEEB-464E-A922-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 4 of 81

- o FEMA classified LUMA's secondment arrangement with Quanta and its affiliates as a contract requiring full and open competition, which LUMA failed to conduct.

- o LUMA failed to include mandatory federal contract provisions, such as those required by 2 C.F.R. § 200.327 and Appendix to Part 200, in its Secondment Agreements.

- o LUMA created organizational conflicts of interest by employing secondees from Quanta while Quanta was a major subcontractor in federally funded projects.

- o LUMA violated its own procurement standards as established under the T&D OMA.


Initial

- The continued use of seconded employees directly violates P3A's obligations under Section 5.9 of the T&D OMA, which mandates compliance with applicable laws and maximization of project eligibility for federal funds.

- Request for Action and Information (including due date):

- o P3A directed LUMA to immediately cease the use of seconded employees in all federally funded projects, effective upon receipt of the letter. LUMA is unauthorized to engage seconded employees for any work under the T&D OMA.

- o Within ten (10) business days, LUMA must:

- Provide a written plan detailing measures to ensure full compliance with FEMA's procurement requirements and specific steps to eliminate seconded employees from all projects.

- Submit a comprehensive accounting of any ongoing or completed projects that involved seconded employees, including contract values, funding sources, and scope of work performed.

- Demonstrate its plan to mitigate future violations and ensure all contracting practices align with federal and Commonwealth regulations.

Mr. Juan Saca
July 22, 2025
Page 5 of 81

2. <u>December 10, 2024- PREPA (J. Colón Ortiz-Exec. Dir.) Letter to LUMA (J. Saca-CEO)– Re.: Compliance with Section 7.5 of the T&D OMA: Federally Funded Capital Improvements</u>

- The letter was a response to LUMA's December 6, 2024-Letter regarding compliance with Section 7.5 of the T&D OMA concerning Federally Funded Capital Improvements.

- PREPA noted LUMA's failure to identify its obligations under Section 7.5(b) of the T&D OMA as referenced in a previous December 4, 2024, letter from PREPA. This failure underscored a persistent and troubling pattern of non-compliance and misunderstanding of LUMA's contractual obligations under the T&D OMA.

- PREPA stated that LUMA's arguments were "either disingenuous or denote a surprising lack of understanding of the RFR procedures [and WCA]". PREPA asserted that these deficiencies hindered PREPA's ability to secure timely reimbursements and jeopardized compliance with federal funding requirements essential to Puerto Rico's recovery.

- Specifically, there was a lack of a detailed schedule of Federally Funded Capital Improvements and a timeline of planned improvements for the next 4.5 months, preventing PREPA from ensuring adequate funding.

- LUMA's actions in neglecting its responsibilities violated the terms of the T&D OMA and placed critical projects and funding at risk. LUMA exhibited systemic noncompliance by failing to adhere to guidelines under Chapter 7 of the Central Office for Recovery, Reconstruction, and Resiliency (COR3) Payment and Cash Management Policy.

- Submissions by LUMA for COR3 compliance contained significant deficiencies, including insufficient descriptions, lack of supporting


Initial

Docusign Envelope ID: D12C7F52B-AFEB-464E-A922-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 6 of 81

documentation, and issues requiring Requests for Information (RFIs). PREPA indicated that LUMA had only withdrawn $564 million from the Federally Funded Account to replenish its operating account but secured only $235 million in reimbursements, forcing PREPA to transfer $496 million of its funds to cover the gap caused by LUMA's failures.

- PREPA demanded immediate corrective action from LUMA, including:

  o Submission of accurate and complete reconciliations for all outstanding Work Cost Accounts (WCAs) with supporting documentation as per COR3 guidelines.

  o Delivery of the detailed schedule of Federally Funded Capital Improvements required under Section 7.5(b) of the T&D OMA.

  o Submission of a detailed listing of all Federally Funded Expenditures incurred and reported to the Puerto Rico Energy Bureau (PREB), including reconciliation to approved Capital Budgets and corresponding RFRs.

  o Resolution of deficiencies in RFR submissions to ensure future requests comply with COR3 standards.

- PREPA stated that any deficiencies in LUMA's performance that threaten PREPA's compliance with federal requirements would continue to be addressed forcefully and appropriately.

3. December 4, 2024- PREPA (J. Colón Ortiz-Exec. Dir.) Letter to LUMA (J. Saca-CEO)– Re.: Compliance with Section 7.5 of the T&D OMA: Federally Funded Capital Improvements Schedule and Reconciliation Deficiencies


Initial

Mr. Juan Saca
July 22, 2025
Page 7 of 81

- PREPA asserted that LUMA failed to comply with its obligation under Section 7.5(b) of the T&D OMA. This obligation required LUMA to provide PREPA with a detailed schedule of Federally Funded Capital Improvements. This omission by LUMA included a failure to provide a timeline of planned improvements for the next four and a half (4.5) months, which significantly hindered PREPA's ability to ensure sufficient funding and jeopardized critical projects due to non-compliance with Federal Funding Requirements.

- LUMA received $839 million in funding but only reconciled $146 million, representing a mere 17% of the funds. This severe insufficient reconciliation undermined LUMA's capacity to request advances and jeopardized PREPA's access to federal funds, with LUMA's delays and inefficiencies adversely impacting PREPA's participation in the program.

- PREPA demanded immediate corrective action from LUMA. The specific requests for documents and information were:

  o Submission to PREPA of a comprehensive schedule of Federally Funded Capital Improvements as required by Section 7.5(b) of the T&D OMA.

  o Delivery of a detailed analysis of expenses incurred for the projects outlined in the aforementioned schedule.

  o Reconciliation of the detailed analysis of expenses with the Federally Funded Expenditures reported to the Puerto Rico Energy Bureau (PREB) under the quarterly reporting requirements in case No. NEPR-MI-2021-00043.

  o Identification of all reimbursed expenses along with their corresponding Request for Reimbursement ("RFR") numbers.


Initial

Mr. Juan Saca
July 22, 2025
Page 8 of 81

     o  Linking unreimbursed expenses to the Project Worksheet ("PW") obligations under which LUMA intended to request reimbursement.

4. <u>December 4, 2024- PREPA (J. Colón Ortiz-Exec. Dir.) Letter to FOMB (R. Mujica-Exec. Dir.) & COR3 (M. Laboy Rivera-Exec. Dir.)– Re.: Financial and Operational Concerns Regarding FEMA Cost-Share Requirement and Project Reconciliation</u>



- PREPA expressed concern regarding the allocation of approximately $1.5 billion for the acquisition of generators and other equipment to reconstruct Puerto Rico's transmission and distribution system. PREPA stated it was required to secure a 10% cost-share ($150 million) to fulfill Federal Emergency Management Agency ("FEMA") requirements but currently lacked the necessary funds to meet this obligation.

- PREPA communicated that the $1.5 billion allocation would not immediately impact its cash flow unless LUMA and Genera completed the necessary reconciliation processes and executed the associated projects.

- Regarding noncompliance, LUMA (along with Genera) had received $858 million in advanced funding through the WCA Program but had only reconciled $146 million, representing a mere 17% of the funds. This low reconciliation rate severely limited their ability to request additional advances.

- PREPA asserted that this situation placed it at significant risk as FEMA evaluated the recipient, and the deficiencies and inefficiencies by LUMA and Genera could jeopardize PREPA's continued participation in the program.

- PREPA requested that LUMA and Genera fulfill their responsibilities promptly and efficiently regarding COR3's continued oversight to ensure the effective utilization of the allocated $1.5 billion. The letter

Docusign Envelope ID: D12C752B-AFEB-464E-A922-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 9 of 81

did not specify a precise due date for the submission of any requested information, instead calling for prompt and efficient action.

5. <u>September 24, 2024- PREPA (J. Colón Ortiz-Exec. Dir.) Letter to FOMB (R. Mujica- Exec. Dir.)-Re: FOMB's Notice of Violation on PREPA's Proposed 2024 Fiscal Plan Updated Response</u>

- PREPA highlighted to the FOMB that due to LUMA's non-compliance in receiving its required inputs after the response deadline and integrating them into the revised proposed PREPA Fiscal Plan.

- PREPA emphasized each instance of non-compliance by LUMA to provide the required input:

  o Delayed Submission of Required Inputs: PREPA received the required inputs from LUMA Energy, LLC, that were outlined in the FOMB's Notice of Violation (NOV) after the response deadline. This directly indicates a delay on LUMA's part in providing essential information for PREPA's updated fiscal plan.

  o Challenges in Developing a Unified CapEx Roadmap: PREPA, LUMA, and Genera were tasked with developing a comprehensive capital expenditures roadmap. However, after discussions, all three parties, including LUMA, agreed that it is "infeasible to jointly develop a unified, holistic plan". The letter attributes this difficulty to the "discrete interests of each party" and their specific requirements under their respective O&M agreements, suggesting a lack of cohesive planning despite the recognized need. While not solely LUMA's non-compliance, it points to a collective failure to achieve a unified plan, in which LUMA is a participant.

  o Receipt of O&M Expense Projections via the FOMB: PREPA received information on LUMA's O&M expense projections


Initial
JCO

Docusign Envelope ID: D12CZ52R-AFEB-464E-A922-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 10 of 81

from the FOMB on Thursday, September 19th, 2024. This phrasing suggests an indirect channel for receiving LUMA's projections, rather than directly from LUMA, potentially indicating a prior delay or issue with direct submission.

- PREPA also noted that it received additional information from LUMA on September 17th, 2024, regarding load and customer forecasts, which will be incorporated into the revised fiscal plan.

6. <u>Aug. 28, 2024-PREPA (F. Berríos Portela-Chairman of PREPA's Governing Board) Letter to LUMA (J. Saca-CEO)– Re.: Federally funded works cash flow</u>

- During meetings of the Committee on Assets Under OMA of the PREPA Governing Board (the "Committee"), LUMA was requested to include detailed information in its reports regarding the cash flow of federally funded projects, specifically focusing on expenditures and the number of reimbursements received. This request was deemed crucial given the current fiscal constraints and PREPA's cash flow limitations.

- LUMA did not submit the requested information on July 22, 2024, despite a prior indication that failure to provide the data would result in limiting delegated authorities and management access for federally funded works. LUMA again did not provide the requested updated cash flow information for federally funded projects during the Committee meeting on August 26, 2024.

- A report provided on July 23, 2024, indicated expenditures of $748.8 million from May 2023 to May 2024 for federally funded projects. RFRs submitted for FY2024 totaled $230.6 million, but only $140 million was reimbursed. This indicated that a significant amount of funds had yet to be reimbursed by federal agencies, and LUMA had yet to request such reimbursements.


Initial

Mr. Juan Saca
July 22, 2025
Page 11 of 81

- PREPA's cash flow was under significant pressure, and a July 23, 2024-Report noted that PREPA had transferred at least $540.8 million from available cash to replenish service accounts. LUMA was requested to provide the information and include an action plan to address and reconcile the existing cash flow gap between expenditures, submitted RFRs, and reimbursements no later than August 30, 2024. It was emphasized that should LUMA not provide this information, the PREPA Governing Board might need to review and potentially limit access to manage these federally funded projects to address the cash flow concerns.

- LUMA was urged to diligently and timely request federal reimbursements to stop or significantly reduce the drainage of state funds and to replenish accounts for the benefit of LUMA's clients.



7. <u>August 21, 2024- PREPA (J. Colón Ortiz-Exec. Dir.) Letter to LUMA (J. Saca-CEO)– Re.: Urgent Notice Regarding Timely and Accurate Cash Flow Data from LUMA</u>

- Under the T&D OMA, LUMA is responsible for generating sufficient revenues from both collections for power services and obtaining federal reimbursements for the federally funded T&D projects it oversees.

- Since the Commencement Date, LUMA has failed to adequately perform these responsibilities, leading to unnecessary and unreasonable expenses that contributed to PREPA's depleted liquidity. LUMA's "blanket denial" in its August 16, 2024-Letter did not address these specific concerns.

- According to information provided by Mr. Nelson Morales, PREPA's Chief Financial Officer, LUMA had begun providing daily bank balances and cash flow information, as recommended in PREPA's July 29th-Letter. This change was noted to have reduced errors and

Mr. Juan Saca
July 22, 2025
Page 12 of 81

improved PREPA's ability to submit timely reports to stakeholders. PREPA remained vigilant and reserved its rights to further comment and demand accurate and timely reporting of financial information under Section 3.8 of the T&D OMA. Following the recommendations in the July 29th-Letter, LUMA had "noticeably improved its reporting behavior," making PREPA's work more efficient.

- PREPA expected LUMA to continue to deliver daily cash reports to various stakeholders.

8.  <u>July 29th, 2024- PREPA (N. Morales- CFO) Letter to LUMA (K. Hasan-CFO)– Urgent Notice Regarding Timely and Accurate Cash Flow Data from LUMA</u>


Initial

- This letter highlighted PREPA's ongoing challenges in collecting timely and accurate cash flow information from LUMA, stating that LUMA's actions regarding federal funds management and customer collections were depleting PREPA's liquidity.

- Historically, PREPA received daily bank balance and cash flow files from LUMA, which were essential for monitoring liquidity and reporting. However, these files often contained errors and delays, complicating PREPA's ability to submit timely reports to stakeholders. PREPA had repeatedly prompted LUMA for corrections, but the cash flow files frequently remained unrevised by LUMA or were held up.

- This noncompliance meant PREPA was unable to publish accurate cash flow files and lacked adequate visibility into its liquidity, a practice deemed "wholly negligent" and "unacceptable" in a bankruptcy context. PREPA asserted that LUMA had failed to acknowledge and correct the problem and had not demonstrated commitment to improving the flow and accuracy of financial information.

Mr. Juan Saca
July 22, 2025
Page 13 of 81

- LUMA's failure to provide the required information constituted a violation of Section VI of Annex I (Scope of Services) of the Transmission and Distribution Operating and Maintenance Agreement (T&D OMA), which mandates the operator (LUMA) to provide all financial activities and assist in the preparation of reports. PREPA stated it was imperative that LUMA immediately begin to provide PREPA with the relevant financial information in a timely and accurate way.

- PREPA requested immediate attention to this matter and prompt confirmation of LUMA's corrective actions. No specific calendar due date was given, but the urgency for immediate action was emphasized. The letter was copied to a comprehensive list of stakeholders, including key officials from FOMB, PREPA, P3A, Genera, AAFAF, PREB, and PROMESA.


Initial

9. June 27, 2024-PREPA (J. Colón Ortiz-Exec. Dir.) Letter to FOMB (R. Mujica-Exec. Dir.)–Re: PREPA's proposed alternatives to cover the difference between PREPA's FY24 certified budgets and PREPA's FY25 proposed budgets

- PREPA emphasized that LUMA expends "exorbitant amounts of money" without a demonstrated need or benefit, specifically related to its Seconded Employees Program (where salaries/wages exceed local employee compensation and over 20% of the allocation is used for miscellaneous expenses like plane tickets and hotel stays for employees and spouses) and publicity/marketing. PREPA notes that these lavish expenses are unjustified.

- LUMA has shown resistance to disclose information regarding its Seconded Employees Program.

- LUMA's mismanagement has caused a severe liquidity shortfall for PREPA, characterized by a backlog of over $550 million in delayed reimbursements and working capital advances for federally funded projects.

Mr. Juan Saca
July 22, 2025
Page 14 of 81

- LUMA expended over $950 million in federally funded CapEx but only obtained $451 million in FEMA reimbursements and Working Capital Advances through Q3 2024, leading to a negative liquidity impact of over $550 million on PREPA.

- LUMA has not been required to correct its "glaring inefficiencies" in obtaining federal funds.

- PREPA deemed LUMA's unjustified overspending and inability to generate sufficient revenues from collection efforts or to oversee federally funded projects as "unjustifiable".

- Despite repeated warnings and invitations from PREPA to discuss LUMA's modus operandi, LUMA has taken no action to address these issues.

- PREPA described LUMA's operations as "drastically less economic and human resources" compared to PREPA.


Initial

- PREPA emphasized that LUMA has failed to secure reimbursements for Emergency Measures (Category B), Permanent Work (Category F), and Management Cost (Category Z) at a rate comparable to PREPA. PREPA highlights that LUMA's failure to generate sufficient revenues and obtain reimbursements has hindered its capacity to perform necessary repairs and maintenance of the T&D systems.

- PREPA reiterated that LUMA attempted to transfer the burden of its inefficiencies to rate-payers by demanding budget increases.

- PREPA requested the FOMB to investigate LUMA's Seconded Employees Program to ascertain its necessity and the reasonableness of the associated salaries, wages, and benefits.

- PREPA proposed that the $36.4 million variance between the certified FY24 and proposed FY25 budgets for HoldCo and HydroCo be reduced by the amounts authorized for LUMA's Seconded Employees Program and its marketing and publicity programs.

Docusign Envelope ID: D12C752B-AFEB-464E-A922-64A65Z85BB4E

Mr. Juan Saca
July 22, 2025
Page 15 of 81

- PREPA moved the FOMB to revise and redistribute P3A's Budget Allocation efficiently and fairly to fully cover PREPA's budgetary needs for FY25 without requiring rate increases.

- PREPA asserted that $40.1 million of interest income from PREPA's accounts, which is currently contributing to PREPA's liquidity shortfall due to LUMA's reimbursement backlog, should be attributed directly to PREPA's operating entity budgets.

- PREPA advised the FOMB to reject LUMA's request for a budget increase given LUMA's demonstrated inefficiencies.

10. <u>June 5, 2024- PREPA (J. Colón Ortiz-Exec. Dir.) Letter to LUMA (J. Saca-CEO)– Re.: Follow up on PREPA's March 15, 2024, Letter denouncing LUMA's Inability to generate sufficient revenues and obtain federal reimbursements and inviting LUMA to discuss specific measures to improve revenues and federal reimbursement rate</u>


Initial

- PREPA reiterated its position from the March 15, 2024-Letter to Mr. Cory Schneider, LUMA's Chief Financial Officer, stating that LUMA's failure to generate sufficient revenues and secure reimbursements from federally funded projects hindered PREPA's ability to fund its Service Accounts.

- PREPA asserted that LUMA had displayed a lack of understanding of its obligations and the T&D OMA business model by refusing to acknowledge its responsibility. LUMA also appeared to incorrectly present unvalidated working capital advances and unapproved RFRs as revenue sources.

- LUMA failed to obtain any reimbursement dollars under applicable disaster declarations in Categories B, F, and Z. PREPA denounced that LUMA often failed to pursue reimbursements diligently. Many RFRs submitted by LUMA were returned by FEMA and/or COR3 due to significant deficiencies. For instance, even eighteen months after Hurricane Fiona, LUMA had not secured a single obligation for

Docusign Envelope ID: D12C752B-AFEB-464E-A922-64A65Z85BB4E

Mr. Juan Saca
July 22, 2025
Page 16 of 81

over $465 million in incurred eligible expenses, which PREPA viewed as either an inability or disregard of duty by LUMA.

- LUMA failed to respond to PREPA's March 15, 2024-Letter and refused to take any action to correct its inefficiencies regarding revenue generation and federal reimbursements. Between LUMA's Interim Period Service Commencement Date and May 2024, LUMA had expended over $950 million of federally funded Capital Expenditures ("CapEx") but only obtained $381 million in FEMA reimbursements and WCAs ($69 million in FEMA reimbursements and $312 million in WCAs). This resulted in a net negative liquidity impact on PREPA of over $550 million through Q3 2024.

- To compensate for LUMA's inefficiency, PREPA was forced to transfer over $430 million from its restricted federal funds account to LUMA. Due to LUMA's inaction, PREPA's liquidity had been significantly impacted, leading to an anticipated cash shortfall for the June 2024 Service Account Funding Cycle, which was due on July 15, 2024.

- To resolve this problem, PREPA demanded that LUMA take immediate action to:

  o Resolve federal reimbursement delays with COR3 to address the backlog of over $550 million in reimbursements.

  o Correct any incomplete RFRs.

  o Submit all accumulated and delayed RFRs and reduce delays in incurring eligible expenses, submitting RFRs, and securing reimbursements.

  o Transfer all overfunding from its T&D Federally Funded Capital Account.


Initial

Docusign Envelope ID: D12C753B-AFEB-464E-A922-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 17 of 81

- PREPA invited LUMA to urgently schedule a meeting to discuss specific measures to achieve the obligation of funds and improve its reimbursement rate. No specific due date for this meeting or the requested immediate actions was provided within this letter, beyond emphasis on urgency.

11. <u>June 5, 2024- PREPA (J. Colón Ortiz-Exec. Dir.) Letter to P3A (F. Fontanés Gómez)– Re.: PREPA's Urgent Demand for LUMA to take immediate corrective action regarding its reiterated failure to generate sufficient revenues from collections efforts, inefficient federal reimbursement rate, and delays in transferring overfunding from the Capital Account</u>

- PREPA asserted that LUMA had failed to generate sufficient revenues and secure reimbursements from federally funded projects, which hindered PREPA's ability to fund its Service Accounts. Between LUMA's Interim Period Service Commencement Date and May 2024, LUMA had expended over $950 million of federally funded CapEx but had only obtained $381 million in FEMA reimbursements and (WCAs. This resulted in a net negative liquidity impact on PREPA of over $550 million through Q3 2024.


Initial

- PREPA stated that LUMA has not corrected its "glaring inefficiencies," and PREPA was forced to transfer over $430 million from its restricted federal funds account to compensate for LUMA's inefficiency. PREPA highlighted that LUMA's unjustified overspending and inability to generate sufficient revenues from federal T&D projects were "unsustainable". Despite PREPA's repeated warnings and invitations to discuss solutions, LUMA took no action to address these issues.

- PREPA had previously warned P3A and LUMA about potential cash shortfalls since August 2023. On August 16, 2023, during a meeting, it was noted that PREPA had obtained approximately $300 million in FEMA reimbursements, but LUMA had only obtained $46 million.

Docusign Envelope ID: D12C752B-AEEB-464E-A922-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 18 of 81

By August 2023, PREPA had already transferred approximately $376 million to LUMA's operating accounts. PREPA further informed that on August 17, 2023, it sent an email to Mr. Juan Saca, LUMA's President and CEO, denouncing that over $700 million in federal reimbursements had not been obtained.

- PREPA also noted that LUMA had failed to respond to PREPA's March 15, 2024-Letter, which reiterated concerns and denounced LUMA's inability to generate sufficient revenues and secure reimbursements, and that LUMA refused to take any action to correct its inefficiencies.

- PREPA stated that LUMA's apparent lack of understanding of its obligations and the T&D OMA business model, its incorrect presentation of unvalidated working capital advances and unapproved RFRs as revenue sources.

- In many instances, LUMA failed to obtain any reimbursement dollars under applicable disaster declarations (Categories B, F, and Z) and often failed to pursue reimbursements diligently. Many RFRs submitted by LUMA were returned by FEMA and/or COR3 due to significant deficiencies. For example, eighteen months after Hurricane Fiona, LUMA had not secured a single obligation for over $465 million in incurred eligible expenses.

- As a direct consequence of LUMA's inabilities, PREPA confirmed it would face an anticipated and projected cash shortfall for the June 2024 Service Account Funding Cycle, due on July 15, 2024.

- PREPA demanded LUMA take immediate action to:

  o Resolve federal reimbursement delays with COR3 to address the backlog of over $550 million in reimbursements.

  o Correct any incomplete RFRs.


Initial

Docusign Envelope ID: D12C752B-AFEB-464E-A922-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 19 of 81

> o Submit all accumulated and delayed RFRs and reduce delays in incurring eligible expenses, submitting RFRs, and securing reimbursements.
>
> o Transfer all overfunding from its T&D Federally Funded Capital Account into the Operating Account.

- PREPA requested that P3A, as Administrator of the T&D OMA, take immediate and decisive action against LUMA on or before five (5) days from the letter's date (implying June 10, 2024) to avoid underfunding the June 2024 Service Account.

- PREPA indicated that if LUMA did not take effective remedial action, PREPA would have no choice but to exercise the mechanisms in Section 15.2(a) of the T&D OMA.



Initial

12. <u>March 15, 2024- PREPA (J. Colón Ortiz-Exec. Dir.) Letter to LUMA (C. Schneider-CFO)–Re.: Response to LUMA Letter regarding Misrepresentations</u>

- This letter served as PREPA's response to LUMA's March 5, 2024-Letter (Transmittal # LUMA-PREP-T-00703)1. PREPA's addressed what it considered to be LUMA's misrepresentations and to set the record straight regarding LUMA's alleged inability to generate sufficient revenues from collection efforts or obtain reimbursements from federally funded projects.

- PREPA highlighted significant noncompliance and inefficiencies on LUMA's part:

> o LUMA failed to generate sufficient revenues from power service collections and to secure reimbursements from federally funded T&D projects.
>
> o LUMA's actions thwarted PREPA's ability to fully fund its Service Accounts.

Mr. Juan Saca
July 22, 2025
Page 20 of 81

     o   LUMA refused to acknowledge its responsibility demonstrating a lack of understanding of its obligations under the T&D OMA business model.

     o   LUMA misrepresented unvalidated working capital advances and unapproved RFRs as revenue sources to fund Service Accounts, which PREPA labeled as "deceptive in nature".

- In many instances, LUMA failed to secure a single reimbursement dollar under applicable disaster declarations (Categories B, F, and Z). For instance, for Hurricane Fiona (Public Assistance 4671), PREPA received $68,764,676.91, while LUMA received $0. For Hurricane Fiona, PREPA received $152,283.41, with LUMA again receiving $0.



- Eighteen months after Hurricane Fiona, LUMA had not achieved a single obligation.

- Many RFRs submitted by LUMA were returned by FEMA and/or COR3 due to significant deficiencies.

- PREPA characterized LUMA's complaints about Service Account replenishments as "petulant letters" and their lack of a concrete plan to correct deficiencies as a "waste of time" and a "misuse of ratepayers' funds".

- PREPA contended that LUMA's overall reimbursement rate was "drastically less economic" than PREPA's.

P3A hereby demands that LUMA (i) immediately halt the use of seconded employees on any federally funded work, (ii) produce within ten (10) days a detailed cost-justification and head-count plan that reduces Seconded-Employee spending by at least $36.4 million for FY 2026 deliver, (iii) produce within ten (10) days a written compliance plan that (a) reconciles every outstanding Work-in-Capital Advance, (b) produces an accurate schedule of Federally Funded Capital Improvements required by § 7.5(b) of the T&D OMA and (c) cures all deficiencies in pending Requests for Reimbursement, and (iv) reimburse PREPA for any federal-

Mr. Juan Saca
July 22, 2025
Page 21 of 81

funds gap PREPA has back-filled since June 2024. Pursuant to §§ 15.2(a) and 15.3(b), P3A hereby commence the Article 15 dispute-resolution procedure for this matter.

## II.   **Notice of Technical Dispute: Service Account Funding-Compensation & Budgets**

P3A, as Administrator of the T&D OMA, issues this Notice of Technical Dispute due to LUMA's persistent and material breaches of its contractual obligations, which have culminated in a liquidity crisis for PREPA and a direct threat to the continuity of public electric service.  Despite being responsible, under the T&D OMA, for securing sufficient revenues and timely reimbursements for federally funded projects, LUMA has failed to do so.

1. <u>February 13, 2025</u>: <u>P3A Letter (J. Colón Ortiz-Exec. Dir.) to LUMA (J. Saca-CEO)- Re: URGENT ACTION REQUIRED- Fuel Account Funding</u>


Initial
JCO

   - On February 11, 2025, P3A received an alarming communication from Genera informing PREPA that LUMA had refused to transfer $4.5 million in PREPA-authorized funds to Genera's Fuel Account to fund December 2024-fuel purchases, despite formal approval on February 11, 2025.

   - Consequently, P3A issued an urgent notice to address a critical issue and demand LUMA, emphasizing LUMA serious non-compliance with the T&D OMA as LUMA's inaction is a direct violation of the agreement.

   - This inaction jeopardized continuity of power generation, risking: (i) shutdown of generation assets; (ii) breach of fuel supply contracts; (iii) damage to credit lines and suspension of future deliveries; and (iv) severe impact on Puerto Rico's electrical grid.

   - This crisis was created due to LUMA's mismanagement of federal funds, specifically its misuse of operational funds for capital expenditures and failure to secure timely federal reimbursements.

Mr. Juan Saca
July 22, 2025
Page 22 of 81

- P3A warned LUMA against further aggravating the situation it has created by withholding funds.

- P3A concluded that LUMA's conduct has created a critical and avoidable emergency and demanded immediate compliance.

2. <u>December 2, 2024[1]-PREPA (J. Colón Ortiz-Exec. Dir.) to the Incoming Transition Committee Re: Request for Additional Information on the Breakdown of Transfers from the Reimbursement Account to LUMA Energy, LLC and Genera PR, LLC</u>

- This letter provided a table detailing the distribution of <u>$496.1</u> million transferred from the Federal Reimbursement Account to LUMA and Genera, with transfer dates ranging from December 2022 to July 2024.

- Of the total $496.1 million transferred, <u>$433.1</u> million was transferred to LUMA and $63.1 million to Genera. The specific transfers listed in the table total $496,070,448, of which $433,012,073 were allocated to LUMA and $63,058,375 to Genera.

3. <u>November 27, 2024</u>: <u>PREPA Letter (J. Colón Ortiz-Exec. Dir.) to LUMA (J. Saca-President & CEO) Re: PREPA's Response to LUMA's November 25, 2024, Notice of PREPA Non-Compliance with Service Accounts Funding – October 2024 (Transmittal # LUMA-PREP-T-00833)</u>

- PREPA confirmed that it had authorized a transfer of <u>$189,783,000</u> to replenish LUMA's Service Accounts and <u>$15,121,000</u> to replenish Genera's Service Accounts.

- PREPA emphasized that it is facing a predictable cash shortfall, which impacts its ability to fund LUMA and Genera's Service Accounts. This shortfall is due to reasons outlined in PREPA's

Initial *JCO*

---

[1] The original letter is in Spanish.

Docusign Envelope ID: D12C752B-AFEB-464E-A922-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 23 of 81

various letters to LUMA on this matter. Specifically, it stated that its severe liquidity shortfall is driven solely by LUMA's backlog of delayed reimbursements for WCAs and reconciliation for federally funded projects.

- LUMA has received to date <u>$858M</u> in funding, including working capital advance, but has only reconciled <u>$146M</u>, representing a mere 17%. Consequently, limiting LUMA's ability to request advances, compromising the WCA Program.

- More than 24 months after Hurricane Fiona, LUMA has obtained no obligation of PWs for RFRs or WCAs, despite potential out of pocket expenses of over <u>$300M</u>.

- PREPA noted LUMA has taken no action to correct its inefficiencies.

- PREPA has been forced to transfer <u>over $496M</u> from its restricted federal funds account to compensate for LUMA's failure to fulfill its obligations.

- PREPA stated that due to LUMA's overspending, along with its inability to generate sufficient revenues either from its collection efforts for power services or its endeavors to obtain reimbursements from the federally funded T&D projects, is simply unsustainable.

4. <u>November 1, 2024- PREPA Letter (J. Colón Ortiz-Exec. Dir.) to AAFAF (O. Marrero Díaz-Exec. Dir.) Re: Confidential Communication to the Energy Bureau of PR regarding PREPA's Liquidity Challenges</u>

- This letter refers to a Resolution and Order issued on October 30, 2024, by PREB, in the case NEPR-MI-2020-0001, to assign a Hearing Examiner to address PREPA's liquidity issues. The letter was sent because, in this Resolution, PREB referenced confidential


Initial

Mr. Juan Saca
July 22, 2025
Page 24 of 81

communication regarding the problem, and PREPA filed a motion before PREB requesting access to it.

- PREPA also requested AAFAF consent to be granted access to confidential communication.

- The letter had six (6) attached letters as follows:

  o October 4, 2024[2]-PREPA Letter (J. Colón Ortiz-Exec. Dir.) to the President of PREPA's Governing Board (NAME) Re: Letter received from AAFAF– PREPA attributed its liquidity crisis to LUMA's persistent failure to comply with its obligations under the T&D OMA to secure sufficient reimbursements for federally funded projects. Between 2021 and June 2024, LUMA incurred $1.2 billion CapEx eligible for reimbursement; however, it secured only $588 million in reimbursements, consisting of $167,846,002.42 in RFRs and $420,850,002.60 WCAs. This resulted in a $600 million shortfall that has significantly impacted PREPA's liquidity position.

  o October 3, 2024: PREPA (J. Colón Ortiz-Exec. Dir.) to Genera (B. McElmurray-CEO)-Re: CDBG-DR Cost Share Request for Generation Assets Reconstruction Projects- PREPA acknowledged Genera's request to be designated as agent for the purpose of accessing CDBG-DR funds. PREPA agreed but emphasized the designation is for specific legacy generation projects and reiterated that Genera remains bound by PREPA's oversight and applicable federal and Puerto Rico law requirements.

  o September 24, 2024: PREPA (J. Colón Ortiz-Exec. Dir.)-to FOMB (R. Mujica-Exec. Dir.)-Re: FOMB's Notice of Violation on PREPA's Proposed 2024 Fiscal Plan Updated Response- PREPA responding to FOMB's *Notice of Violation* regarding

---

[2] The original letter was in Spanish.

Mr. Juan Saca
July 22, 2025
Page 25 of 81

the proposed 2024 PREPA Fiscal Plan.  PREPA emphasized that delays in completing the fiscal plan revisions are due to LUMA's failure to provide customer count data necessary for accurate forecasts and submit consolidated budget materials as part of the required roadmap for federal fund planning.

o   <u>September 16, 2024: PREPA (J. Colón Ortiz-Exec. Dir.) to FOMB (R. Mujica, Exec. Dir.) Re: FOMB's Notice of Violation on PREPA's Proposed 2024 Fiscal Plan</u>- PREPA detailed obstacles and dependencies related to LUMA (and Genera) that impact the fiscal planning process and PREPA's overall financial health.  Specifically:


Initial

▪   FOMB found information submitted by LUMA to be incomplete.

▪   As of the date of this letter LUMA had not provided PREPA with the required information regarding Energy Efficiency, internally. PREPA noted that there was a lack of coordination and information fragmentation of information regarding federal funds.

▪   PREPA found it unfeasible to jointly develop a unified, holistic plan for the capital expenditure roadmap with LUMA and Genera under the PREB process, because of issues in collaboration or alignment necessary for this critical planning function.

▪   PREPA noted that FOMB approved the *Outage Event Reserve Account*, however, LUMA "failed to act one way or another" on including this account in its annual budget submissions despite repeated invitations.

Mr. Juan Saca
July 22, 2025
Page 26 of 81

- ▪ PREPA suggested that the PREB and the FOMB should call out LUMA when it fails to act.

- ▪ PREPA also noted that any rate increase should only be considered after confirming that extravagant or exaggerated expenses have not been incurred by the private operators, including LUMA.  Therefore, it called out for full transparency regarding the true needs of the electrical system and the cost-effectiveness of expenses incurred by LUMA and Genera.

- o <u>September 16, 2024: PREPA (J. Colón Ortiz-Exec. Dir) to PREPA's Finance Director (N. Morales)-Re: Transfers to Service Accounts Supplemental Information-</u> PREPA was experiencing financial constraints due to the slow-paced reimbursement of federally funded projects to replenish LUMA and Genera's service accounts.  PREPA confirmed its responsibility to cover the 10% cost share on federally funded projects carried out by LUMA and Genera.


Initial

5. <u>October 30, 2024- PREPA Letter (J. Colón Ortiz-Exec. Dir.) to LUMA (J. Saca-CEO)-Re: PREPA's Response to LUMA's October 22nd, 2024, Notice of PREPA Non-Compliance with Service Account Funding- September 2024 (Transmittal # LUMA-PREP-T-00817)</u>

- • PREPA acknowledged receipt of LUMA's letter from October 8th and October 22nd, 2024.

- • PREPA confirmed authorization of a transfer of $176,956,000 to replenish LUMA's Service Accounts and $76,884,000 to replenish Genera's Service Accounts.

- • Funding for returns to Accounts Receivable for Reserve details will not be provided until a required report is submitted and approved by P3A.

Mr. Juan Saca
July 22, 2025
Page 27 of 81

- PREPA attributed its predictable cash shortfall and inability to fully fund accounts, including reserve accounts, partly to factors including LUMA's backlog of over $550M in delayed reimbursements and WCAs for federally funded projects.

- PREPA emphasized a net negative liquidity impact of over $550M through Q3 2024, stemming from LUMA expensing over $950M in federally funded CapEx but only securing $451M in FEMA reimbursements and WCAs, during the specified period.

- PREPA noted its limited progress on Hurricane Fiona federal funds, with FEMA denying $267.6M in costs and only one (1) obligation of PWs for $800,000.00 for RFPs/WCAs over two (2) years post-landfall.


Initial

- PREPA stated that despite multiple requests, LUMA has taken no action to correct its inefficiencies, forcing PREPA to transfer over $445.4M from restricted federal funds to compensate.

- PREPA characterized LUMA's unbridled overspending, along with its inability to generate sufficient revenues either from its collection efforts for power services or its endeavors to obtain reimbursements, is simply unsustainable.

- PREPA requested LUMA make necessary adjustments to comply with its obligations under the T&D OMA.

6. August 21, 2024- PREPA letter (J. Colón Ortiz-Exec. Dir.) to LUMA (J. Saca-CEO)-Re: PREPA's Response to LUMA's August 16th Letters re: Service Account Funding (LUMA-PREP-T-00788) (LUMA-PREP-T-00784)

- PREPA categorized LUMA's August 16th, 2024-Letters as containing "misconstructions about the Parties obligations under the T&D OMA and Applicable Law regarding PREPA's liquidity," making misleading claims, and refusing to acknowledge its

Docusign Envelope ID: D12C752D-AFEB-464E-A922-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 28 of 81

responsibility regarding a liquidity issue. Therefore, PREPA stated it was left with no other choice but to reassert its position to set the record straight.

- PREPA stated it "categorically rejects LUMA's statement that 'PREPA is solely responsible for its own … liquidity position".

- Under the T&D OMA, LUMA is responsible for generating sufficient revenues from power service collections and obtaining federal reimbursements for federally funded T&D projects.

- PREPA stated that since the Commencement Date, LUMA has failed to meet both revenue generation/collection and reimbursement obligations, leading to LUMA's poor financial position.  PREPA referred to LUMA's model as unsustainable.


Initial
JCA

- PREPA attributed its cash shortfall and inability to fully fund Service Accounts partly to LUMA's actions.

- PREPA reiterated its severity of shortfalls driven by LUMA's backlog of over $550M in delayed reimbursements and WCAs for federally funded projects.

- PREPA claimed that LUMA had expensed over $950M in federally funded CapEx from Commencement Date through June 2024 but only obtained $451M in FEMA reimbursements and WCAs during this period. This resulted in a net negative liquidity impact on PREPA of over $550M through Q3 2024.

- PREPA noted its limited progress on Hurricane Fiona federal funds, stating FEMA denied $267.6M in costs and only obligated one $800,000.00 PWs for RFPs/WCAs over two years post-landfall. PREPA, with drastically fewer economic and human resources, obtained $1.2B in reimbursements, out of which it was forced to transfer over $445.4M to compensate for LUMA's incompetence.

Mr. Juan Saca
July 22, 2025
Page 29 of 81

- PREPA characterized LUMA's unbridled overspending, along with its inability to generate sufficient revenues either from its collection efforts for power services or its endeavors to obtain reimbursements, is simply unsustainable.

- PREPA requested LUMA to make necessary adjustments to comply with its T&D OMA obligations and emphasized that LUMA must improve its reimbursement rate.

7. <u>August 16, 2024-PREPA Letter (J. Colón Ortiz-Exec. Dir.) to FOMB (R. Mujica-Exec. Dir.) & AAFFAF (O. Marrero-Exec. Dir.)-Re: PREPA's Anticipated Inability to Replenish LUMA's Service Account for the August 2024 Service Account Funding Cycle</u>

- Referencing the T&D OMA, PREPA acknowledged receiving LUMA's request from August 8th, 2024, for a transfer of $824.920M to its Service Accounts.


Initial

- PREPA stated it had authorized a transfer of only $262.486M to replenish LUMA's Service Accounts.

- PREPA stated that, according to its numerous letters, for over a year, it had consistently warned LUMA about an expected liquidity shortfall driven solely by LUMA's backlog of over $550M in delayed reimbursements and WCAs related to federally funded projects.

- The letter claimed that from the T&D OMA Commencement Date through June 2024, LUMA had expended over $950M in federally funded CapEx but only secured $451M in FEMA reimbursements and WCAs during that specific period.

- PREPA asserted that this led to a net negative liquidity impact on PREPA exceeding $550M through Q3 2024. PREPA also mentioned it had obtained a total of $1.2B in reimbursements during that time.

Docusign Envelope ID: D12C752B-AFEB-464E-A922-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 30 of 81

- The letter further noted that despite potential out-of-pocket expenses surpassing $300M in the two years following Hurricane Fiona's landfall, LUMA had secured no obligation of PWs for RFPs or WCAs related to that event. PREPA highlighted that FEMA had denied $267.6 million in costs submitted by FEMA to date.

- LUMA's "unjustified overspending, along with its inability to generate sufficient revenues either from its collection efforts for power services or its endeavors to obtain reimbursements from the federally funded T&D projects it oversees, has reached its tipping point; PREPA no longer has sufficient funds to replenish LUMA's Service Accounts".

- PREPA proposed an urgent meeting involving representatives from the FOMB, AAFAF, P3A, and LUMA to discuss these matters and identify ways to maintain sufficient liquidity.


Initial

8. <u>August 9, 2024- PREPA (J. Colón Ortiz-Exec. Dir) Letter to LUMA (J. Saca-CEO- and J. Laird-VP, Customer Exp.)-Re: LUMA CC&B Write-Off Process Initiative Notification</u>

- This letter was in response to LUMA's August 5th, 2024-Letter.

- LUMA requested PREPA's confirmation for a write-off of over $300 million in public assets.

- PREPA did not accept LUMA's proposed five-day timelines to evaluate and confirm the write-off, especially one exceeding $300 million.

- PREPA explicitly stated that it did not confirm or authorize the requested write-off of $366,013,251.73 as of the letter date, stating that LUMA has not shared its write-off policy.

Docusign Envelope ID: D12C752D-AFEB-464E-A922-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 31 of 81

- Under the T&D OMA, LUMA is responsible for all billing and collection services for the T&D System, including accumulated debt.

- PREPA noted that LUMA's letter does not clearly outline its responsibility for debt recovery.

- PREPA stated it was not aware of LUMA's efforts to collect on 148,900 service agreements with balances that are deemed to be non-collectible.

- PREPA stated that the lack of information in LUMA's letter hinders an informed analysis of the proposed write-off and policy.


Initial
JCO

- PREPA required LUMA to provide detailed proof of its efforts to collect before any write-off is considered.

- PREPA viewed writing off over $300 million in public assets with no collection efforts or transparency as "profoundly detrimental to the public interest" and would not allow it.

- Appendix A to the letter details the non-electric and electric service agreements proposed for a write-off, totaling over $366 million.

9. July 15, 2024- PREPA Letter (J. Colón Ortiz-Exec. Dir.) to LUMA (C. Schneider-CFO)-Re: PREPA's Response to LUMA's July 9th, 2024 Letter requesting Service Account Funding for the June 2024 Service Account Funding Cycle (Transmittal # LUMA-PREP-T-00771)

- Pursuant to the T&D OMA, PREPA confirmed it had authorized a transfer of $205.697M to replenish LUMA's Service Accounts and $169.271M to replenish Genera's Service Accounts. A certification attached as Annex A confirmed these specific transfer amounts made on July 15th, 2024.

Mr. Juan Saca
July 22, 2025
Page 32 of 81

- Details for funding LUMA Purchase Power Account and Genera Reserve Accounts would not be provided until a required report was submitted and approved by P3A. Other LUMA Service Accounts were scheduled to receive two-thirds funding, in compliance with Section 14.3(f) of the T&D OMA.

- PREPA referenced a previous letter of June 3, 2024, where it had warned LUMA it would be unable to fund the LUMA Service Accounts for the June 2024 cycle.



- Despite that warning and a significant effort, PREPA reported it had been able to cover the June 2024 Service Account funding. However, PREPA cautioned that, following the June transfer and as previously warned, it would face a predictable cash shortfall and would be unable to fund LUMA and Genera Service Accounts for the July 2024 Service Account Funding cycle, which was due in August 2024.

- PREPA attributed the anticipated July 2024 liquidity shortfall to reasons outlined in previous letters, specifically reiterating the severe shortfall driven solely by LUMA's backlog of over $550M in delayed reimbursements and WCAs related to federally funded projects.

- The letter claimed that from the Interim Period Service Commencement Date through June 2024, LUMA had expensed more than $950M in federally funded CapEx but only secured $451M in FEMA reimbursements and WCAs during that specific period.

- PREPA asserted that this resulted in a net negative impact on PREPA's liquidity, exceeding $550M through Q3 2024. PREPA also noted it had obtained a total of $1.2B in reimbursements during that same time.

Docusign Envelope ID: D12C752P-AEEB-464E-A922-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 33 of 81

- Regarding Hurricane Fiona, PREPA pointed out that despite 18 months after landfall, LUMA had obtained no obligation of PWs for RFRs or WCAs related to that event.

- PREPA also highlighted that FEMA had issued Ineligibility Determination Memos denying Fiona's costs totaling $267.6M as submitted by FEMA to date.

- PREPA contended that despite its multiple requests, LUMA had taken no action to correct its inefficiencies.

- Instead, PREPA reported it had been forced to transfer over $484.4 million from its restricted federal funds account to compensate for LUMA's failure.


Initial

- LUMA's unjustified overspending and inability to generate sufficient revenues either from its collection efforts for power services or its endeavors to obtain reimbursements from federally funded projects it oversees as "simply unsustainable".

- To address the situation, PREPA urged LUMA again to make the necessary adjustments to comply with its obligations under the T&D OMA.

10. June 27, 2024-PREPA Letter (J. Colón Ortiz-Exec. Dir) to FOMB (R. Mujica-Exec. Dir.)-Re: PREPA's proposed alternatives to cover the difference between PREPA's FY24 certified budgets and PREPA's FY25 proposed budgets

- PREPA submitted proposed budgets for fiscal year 2025 (FY2025) for HoldCo ($62.634M) and HydroCo ($26.175M). Also, it stated no rate increase would be necessary to fund these proposed budgets, as all necessary expenses can be covered through an efficient and fair redistribution of the budget allocation made by P3A.

Docusign Envelope ID: D12C752B-AFEB-464E-A922-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 34 of 81

- PREPA highlighted a $36.4M variance between the FY24 certified budgets and the FY25 proposed budgets for HoldCo and HydroCo.

- PREPA identified areas of exorbitant spending by LUMA, particularly criticizing its "Seconded Employees Program", seconded from the companies that comprise LUMA: the Canada firm ATCO and the U.S. based companies Quanta Services, Inc. and IEM, which <u>cost over $200M</u> and involved unnecessary expenses <u>funded by rate-payers</u>.

- PREPA suggested the $36.4M variance could be covered by reducing authorized amounts for LUMA's Seconded Employees Program and its marketing/publicity programs.



- PREPA requested the FOMB to investigate LUMA's Seconded Employees Program.

- PREPA argued the budget allocation should be redistributed due to LUMA's mismanagement and a significant backlog of over $550M in delayed reimbursements and WCAs.

- PREPA stated LUMA's failure to generate sufficient revenues and obtain reimbursements for federally funded T&D projects had a significant negative impact on PREPA's liquidity, resulting in PREPA being forced to transfer over $445.4M from its restricted federal funds account to compensate for LUMA's inefficiencies.

- PREPA requested the FOMB to revise and redistribute the P3A's Budget Allocation to fully cover PREPA's FY25 budgetary needs without rate increases.

- PREPA emphasized its critical role and the importance of budget allocations reflecting true operational needs to ensure the stability of Puerto Rico's electric infrastructure.

Docusign Envelope ID: D12C752B-AFEB-464E-A922-64A657B5BB4E

Mr. Juan Saca
July 22, 2025
Page 35 of 81

11. <u>June 3, 2024- PREPA (N. Morales- CFO) Letter to LUMA (C. Schneider-
CFO)-Re: Projected Shortfalls for Service Account Funding for June 2024,
due on July 15, 2024, under T&D OMA</u>

- This letter was a follow-up to PREPA's May 13, 2024-Letter, which
expressed urgent concerns regarding the deterioration of
PREPA's liquidity and related service account funding risk. PREPA
had not received a response to the May 13 Letter.

- This letter confirmed and expanded upon the anticipated and
projected cash shortfall for the June 2024 Service Account
Funding cycle, which was primarily driven by LUMA-controlled
events.


Initial

- Based on available information, PREPA projected that it would be
unable to complete two-thirds of funding for LUMA, in compliance
with the T&D OMA. This inability was based on recent funding
requests from LUMA and Genera for their respective Service
Accounts. PREPA anticipated a predictable cash shortfall and
stated it would be unable to fully fund LUMA and Genera Service
Accounts due on July 15, 2024.

- The anticipated and previously informed liquidity shortfall was
due to various reasons outlined in PREPA's letters, including
upcoming financial obligations in June and July, such as insurance
premiums and PREB fees. PREPA anticipated an insurance
premium payment of approximately $65 million due at the end of
July 2024 and stated it was disbursing $10 million related to PREB
fees at the end of June 2024.

- PREPA urged LUMA to immediately resolve its federal
reimbursement delays, including addressing a backlog of over
$550 million in reimbursements financed through PREPA's cash,
correcting any incomplete or insufficient RFRs, submitting all
accumulated and delayed RFRs, and reducing delays between

Mr. Juan Saca
July 22, 2025
Page 36 of 81

incurring eligible expenses and submitting compliant RFRs and securing federal funds.

- PREPA referenced its May 13-Letter, which highlighted LUMA's T&D Federally Funded Capital Account.  PREPA was reportedly pleased to see that on May 29, LUMA had returned $33.9 million in overstated amounts from its Federally Funded Capital Account to the T&D Operations Account, as had been requested by PREPA and P3A.  Therefore, it stated LUMA must continue this practice on a timely and recurrent basis, consistent with prudent and responsible management of public funds.

- PREPA asserted that LUMA's failure to urgently implement the necessary measures and secure sufficient federal funds reimbursements would jeopardize PREPA's ability to fund LUMA and Genera's Service Accounts for June 2024 and July 2024.

- LUMA is contractually responsible for customer billing and revenues, collections, and management of federal funds for T&D reconstruction efforts, all of which have a direct and material impact on PREPA's liquidity and ability to fund the Service Accounts.

- PREPA proposed an urgent meeting with P3A, LUMA, and PREPA to discuss these matters and other suggestions to regain and maintain sufficient liquidity for the benefit of all stakeholders.

12. May 13, 2024-PREPA (J. Colón Ortiz-Exec. Dir.) Letter to LUMA (C. Schneider-CFO) Re: Response to LUMA Letters Regarding Service Account Funding dated March 19, 2024, and April 16, 2024

- PREPA stated it had funded the pertinent Service Accounts in an amount that was two-thirds (2/3) of the requisite funding LUMA had notified us, explaining this was due to PREPA's insufficient liquidity to fund the full amount and that this funding level was compliant with the T&D OMA.


Initial

Mr. Juan Saca
July 22, 2025
Page 37 of 81

- PREPA noted that neither of LUMA's letters mentioned the overfunding of the Capital Account (Federally Funded), (Section 7.5(b) of the T&D OMA) from which PREPA believed funds should be transferred to the Operating Account.

- PREPA stated the Outage Event Reserve Account was not funded because there was no revenue source to replenish it or an approved budgetary income source, a fact LUMA had acknowledged in writing.

- PREPA stated the GenCo Reserve Account was not budgeted or contemplated for funding from PREPA's existing rate structure, and funding it from PREPA cash would reduce liquidity, pending P3A confirmation of Genera's submission.


Initial

- PREPA expressed serious concerns about LUMA's management of federal funds, citing issues with understanding rules for reimbursement, recordkeeping, validation, and timeliness.

- Based on data LUMA released, PREPA's analysis indicated a net negative liquidity impact exceeding $500 million on PREPA cash, primarily due to delays in federal capital reimbursement funding by COR3, which PREPA linked to LUMA's management issues and states it as the main reason it had been unable to fund LUMA and Genera Service Accounts fully.

- PREPA stated LUMA had provided no indication or commitment that it would promptly stabilize or reverse this worsening negative liquidity trend.

- PREPA urged LUMA's Finance Department to demonstrate the required expertise and immediately take steps with COR3 to correct incomplete/delayed federal fund reimbursement requests. PREPA noted it had invited LUMA to discuss urgently recommended remedial measures, but LUMA had unfortunately never agreed to meet.

- PREPA reiterated that LUMA was responsible for billing, collecting, and effectively managing federal funds for T&D reconstruction

Mr. Juan Saca
July 22, 2025
Page 38 of 81

efforts, highlighting the direct and material impact this had on PREPA's cash.

13. April 18, 2024- P3A (F. Fermín Fontanés Gómez-Exec. Dir.) Letter to LUMA (CFO-C. Scheider)-Re: Federally Funded Projects and Management of Operating Account

- PREPA repeatedly communicated with LUMA regarding concerns about PREPA's liquidity, LUMA's management of service account funding, and federal funding reimbursements from COR3 and FEMA.  LUMA did not respond to some of PREPA's letters and never confirmed its availability to meet with PREPA to discuss the issues.

- PREPA stated it had funded two-thirds of the required Service Account funding for LUMA, consistent with the T&D OMA.  However, PREPA warned LUMA that it would face a shortfall and be unable to fully fund the Service Accounts for the June 2024 and July 2024 cycles due to LUMA's failures.

- The Capital Account, managed by LUMA, had been overfunded, and PREPA/P3A requested that these funds be transferred to the Operating Account.  This transfer did not appear to be done promptly or consistently.

- PREPA and P3A raised significant concerns about LUMA's handling of the federal reimbursement process, identifying it as a primary driver of PREPA's liquidity issues.

- LUMA had not submitted RFRs below a $1M threshold, contrary to COR3/FEMA guidelines.  Specific RFRs submitted by LUMA have remained uncertified by COR3 since July 2022. Many RFRs were returned by FEMA and/or COR3 due to significant deficiencies, including issues with the format and detail of submitted task details, missing required information (i.e., mileage maps and travel reports), and generic replies to Requests for Information (RFIs).

- LUMA failed to obtain any reimbursement for specific disaster declarations or categories of work, including Category B (Emergency Measures), Hazard Mitigation Grant Program, and


Initial
JCO

Docusign Envelope ID: D12C7522D-AEEB-464E-A922-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 39 of 81

Category Z (Management Cost) for Hurricane Maria, and Category B and Z for Hurricane Fiona. PREPA highlighted that it had obtained reimbursements in these categories while LUMA did not.

- PREPA was forced to transfer significant amounts (over $430-$445 million) from its federal funds account to compensate for LUMA's inefficiencies and fund Service Accounts. Despite repeated warnings and invitations to discuss solutions and implement improvements in areas like billing, collections, meter operations, project management, and the reimbursement process, LUMA took no action whatsoever to correct its inefficiencies.

- As a direct consequence of LUMA's failure to urgently implement necessary measures, PREPA faced projected cash shortfalls and noted its inability to fund the Service Accounts in upcoming cycles fully.


Initial

14. <u>January 26, 2024-PREPA (J. Colón Ortiz-Exec. Dir.) Letter to LUMA (C. Schneider-CFO)-Re: Response to LUMA's January 17th, 2024, Letter Regarding Service Accounts Funding (Transmittal # LUMA-PREP-T-00683)</u>

- PREPA rejected all explicit and implicit allegations of purported non-compliance or breach of the T&D OMA made by LUMA concerning Service Accounts funding. It reiterated that it funded the Service Accounts in an amount that was two-thirds (2/3) of the sums LUMA notified, which PREPA stated was compliant with Section 14.3(f) of the T&D OMA, indicating no default event had occurred. Therefore, PREPA had consistently funded two-thirds (2/3) of the sums for T&D Service Accounts in the past months as a necessary measure to maintain sufficient liquidity under HoldCo.

- PREPA stated that LUMA's ability to fund the Service Accounts depended primarily on LUMA's proper execution of its contractual obligations, which include timely and accurate billing, collection from customers, ensuring proper meter operation, suspending service to delinquents, and managing federally funded T&D

Mr. Juan Saca
July 22, 2025
Page 40 of 81

projects.   PREPA asserted that LUMA's failure or inefficient
execution of its contractual duties thwarted PREPA's ability to
adequately fund the Service Accounts.

- As of September 2021, PREPA obtained over $664,620,311 in federal
reimbursements from federally funded projects, while LUMA had
only obtained approximately $43M during the same period.

- Additionally, PREPA had been required to allocate over
$411,474,000 from its federal reimbursements to fund LUMA's
Service Accounts and other fiscal deficiencies, instead of the
reconstruction projects it intended to develop.

- PREPA viewed LUMA's claims as disconnected, incomplete, and
believed a fair discussion required LUMA to acknowledge its
shortcomings in raising sufficient revenues, deeming LUMA's
attempt to blame PREPA as misleading and counterproductive.

15. October 5, 2024-PREPA (J. Colón Ortiz-Exec. Dir.) Letter to LUMA (J. Saca-
President & CEO)-Re: LUMA Response to Josué Colón's Email August
17th, 2023

- PREPA emphasized that in the past few months both it and LUMA
had exchanged multiple letters regarding Service Account
funding.

- Nonetheless, PREPA again rejected all explicit and implicit
allegations of purported non-compliance or breach of the T&D
OMA made by LUMA concerning Service Account funding.  It
reiterated it had funded the T&D Service Accounts at two-thirds
(2/3) of the sums LUMA notified, which PREPA asserted was
compliant with Section 14.3(f) of the T&D OMA. PREPA indicated
this funding level was necessary to preserve its minimum liquidity,
given growing funding obligations.


Initial

Mr. Juan Saca
July 22, 2025
Page 41 of 81

- PREPA specifically highlighted LUMA's "double counting" of certain funding requested for Purchased Power, noting that this funding was now directly funded to Genera under the LGA OMA. This indicated a financial mismanagement issue on LUMA's part in their funding requests.

- PREPA also raised the issue of the outstanding Outage Events Reserve Account funding request from LUMA that remained unfunded, indicating a lack of a proper revenue source for its replenishment.


Initial

- PREPA stressed that LUMA's ability to fund its Service Accounts depended primarily on LUMA's proper execution of its contractual obligations, which included timely and accurate billing, collection from customers, ensuring proper meter operation, suspending service to delinquents, and managing federally funded T&D projects. PREPA implied that LUMA's inefficient execution of these duties impacted on PREPA's ability to fulfill its funding obligations.

16. August 30, 2023-PREPA (N. Morales-CFO) Letter to LUMA (C. Schneider-CFO)-Re: Service Account Funding – July 2023

- PREPA yet again asserted that it had funded two-thirds (2/3) of the sums LUMA requested for the Operating Account + Capital Account – Non-Federally Funded, which PREPA stated was compliant with Section 14.3(f) of the T&D OMA. PREPA highlighted that LUMA's request for $98,645,000 for the Purchased Power Account double-counts over $52M of funds already provided to GenCo Operating Account (Genera), under the LGA OMA. PREPA only funded two-thirds of the amount LUMA estimated was needed ($31,014,000).

- PREPA also noted it had not funded LUMA's Outage Event Reserve Account because there was no recurrent revenue source to replenish this account.

Mr. Juan Saca
July 22, 2025
Page 42 of 81

- PREPA urged LUMA to optimize the use of available funding and its collections, and federal funds reimbursements to enhance collective liquidity.

- PREPA rejected all explicit and implicit allegations of purported non-compliance or breach of the T&D OMA made by LUMA concerning Service Account funding.

17. <u>October 15, 2021-PREPA (J. Colón Ortiz-Exec. Dir.) Letter to P3A (F. Fontanés Gómez-Exec. Dir.)-Re: LUMA Financial Reports Accounting Information Reporting Obligations under T&D OMA</u>

- PREPA rejected all explicit and implicit allegations of purported non-compliance or breach of the T&D OMA made by LUMA against it concerning Service Account funding.

- PREPA noted that LUMA's letter contained "irrelevant and incorrect data" and that LUMA misrepresented valid revenue sources in its funding requests.

- PREPA presented data indicating that LUMA largely failed to obtain federal reimbursements for disaster declarations, showing zero reimbursement in many categories where PREPA secured millions.

- PREPA highlighted LUMA's inability to secure disaster relief funds and its inefficient execution of duties such as timely and accurate billing, collection from customers, proper meter operation, and managing federally funded T&D projects.  PREPA stated that LUMA's expenditure significantly exceeded its budget, spending over $730 million.

- PREPA concluded that LUMA's "underperformance" was not cause for celebration and that the people of Puerto Rico were suffering


Initial

Docusign Envelope ID: D12C752D-AFEB-464E-A922-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 43 of 81

the consequences of LUMA's mistakes, deeming LUMA's "petulant letters" a "misuse of taxpayers' funds".

P3A hereby demands that LUMA (i) submit within seven (7) days a remediation schedule that eliminates the reimbursement backlog and restores statutory reserve levels, and (ii) refund PREPA the $500 million advanced to cover LUMA's federal-funding failures. PREPA/P3A submit this dispute to Article 15 for adjudication.

### III. <u>Notice of Technical Dispute: Outages- Performance of O&M Services</u>

P3A, as Administrator of the T&D OMA, issues this Notice of Dispute against LUMA, due to its failure to comply with its contractual obligations following the island-wide blackout of April 16, 2025.


Initial
JCO

1. <u>April 19, 2025- P3A (J. Colón Ortiz-Exec. Dir.) to LUMA (J. Saca- CEO)- Re: Request for Information in Connection with the April 16, 2025 Power Outage (April 16 Outage)</u>

   - P3A issued this request for information following a power outage on April 16, 2025, which initial reports attributed to vegetation on Line 50,100 of 230kV between the Cambalache Power Plant and Manatí, leading to a cascade effect and the exit of all generation units.

   - P3A characterized the April 16-outage as the "most recent manifestation of a prolonged and deeply troubling trend" of recurring service interruptions.

   - Between June 5, 2024, and April 16, 2025, Puerto Rico experienced at least six outages affecting over 70,000 customers, with three resulting in total system collapse. Notable incidents included:

     o A failure on Line 39,000 on June 5, 2024, affecting over 123,000 customers.

Mr. Juan Saca
July 22, 2025
Page 44 of 81

   o  A total blackout on June 12, 2024, caused by "unaddressed
      vegetation problem".

   o  An outage on July 2, 2024, affecting over 71,000 customers.

   o  An extended outage on August 24, 2024, affecting over
      728,000 customers due to system-wide instability.

   o  Another total blackout on December 31, 2024, leaving most
      of the Island without power.
   o  The April 16, 2025, event resulted in all 1,468,223 customers
      losing power in an island-wide outage.


Initial

•  P3A stated that these "recurring service interruptions – many
   preventable – are embarrassing and unacceptable" and are
   incompatible with the promised service quality, resilience, and
   reliability as obligated by the T&D OMA.

•  As Administrator under the T&D OMA, P3A is compelled to ensure
   LUMA takes appropriate and timely steps to diagnose and
   respond to incidents and assess system reliability risks.

•  Under the reporting obligations in Articles 5 and 6 of the T&D OMA,
   P3A requested LUMA to provide specific information no later than
   Friday, April 25, 2025.

•  The requested information included:

   o  Root Cause Analysis and Incident Reporting:

      ▪  Copies of all incident reports, root cause analyses,
         operational logs, and internal memoranda from the past
         twelve months related to the April 16-Outage.

      ▪  This includes inspection, maintenance, and
         thermography records for Line 50,100 of 230kV, patrol

Docusign Envelope ID: D12C752B-AFEB-464E-A922-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 45 of 81

and inspection records for the same line, and information on the maintenance and calibration of related switches and protection devices (Relays and Breakers).

- Also requested were assessments of the failure's origin, sequence of events, system impacts, and immediate/planned remedial measures, along with any reports provided or to be provided to PREB, FEMA, or other government agencies.
- P3A also requested prompt notification of any ongoing developments, filings, or updates related to the April 16 Outage.

o Current Organizational Chart and Key Personnel:

- A detailed and up-to-date organizational chart for both LUMA Energy ServCo and ManageCo, showing departmental structure, employee counts per department, job titles for all critical or leadership roles (e.g., System Operations, Grid Control, Maintenance, Customer Service, IT/Cybersecurity, and Regulatory Compliance), and a list of current vacant positions.

o System Status Summary:

- A report detailing the operational status of the transmission and distribution infrastructure as of April 19, 2025, identifying any major components (lines, substations, transformers, control systems) currently out of service, under repair, operating under constraints, or affected by recent contingency events.

- P3A expressed confidence that LUMA shares its interest in ensuring transparency, stability, and public accountability, and


Initial

Mr. Juan Saca
July 22, 2025
Page 46 of 81

that prompt cooperation would assist in identifying improvements to mitigate future service disruptions.

P3A hereby requires that LUMA (i) submit a comprehensive root-cause analysis for each island-wide or major outage since June 2024, together with a corrective-action program that restores SAIFI/SAIDI to pre-2021 benchmarks, (ii) publicly report progress to P3A each quarter, and (iii) reimburse PREPA for outage-related emergency costs attributable to LUMA's negligence. PREPA/P3A invoke Article 15 and demand immediate initiation of the dispute-resolution process.

## IV.   **Notice of Technical Dispute: Vegetation, Transmission Lines and Public Lighting- Performance of O&M Services**

P3A, as Administrator of the T&D OMA, issues this Notice of Dispute to LUMA for its repeated and ongoing noncompliance with its contractual obligations, particularly in vegetation management.  Despite multiple letters from as early as August 2022 through as recent as April 2025-LUMA has failed to address critical deficiencies, such as unsafe vegetation proximity to high-voltage lines, inadequate inspection protocols, ahead of the 2025 hurricane season, and persistent delays in submitting compliant work plans a documentation, as required by the T&D OMA.


Initial

1.  <u>January 26, 2025- P3A (J. Colón Ortiz-Exec. Dir.) Letter to LUMA (J. Saca-CEO)- Re: Maintenance and Inspection of Transmission Lines during 2025 Hurricane Season</u>

    - P3A expressed concerns regarding the "proximity of vegetation within the easement to the lines" and "vegetation is within unsafe clearance distances, creating potential risks to the safe operation of the T&D System".

    - The "massive power outage of June 12, 2024, was directly attributed to inadequate vegetation oversight".

    - LUMA itself has identified vegetation as the primary cause of approximately fifty percent (50%) of power outages.

Mr. Juan Saca
July 22, 2025
Page 47 of 81

- P3A emphasized that it is "imperative that any deficiencies, particularly related to vegetation clearance, are promptly identified and addressed" through daily inspections. The recurring issue indicated a potential lack of readiness for the upcoming hurricane season by not maintaining safe vegetation clearances and implementing required measures as outlined in the Emergency Response Plan.

- P3A requested LUMA to provide relevant documentation and/or information demonstrating compliance with Section 4.2 of the T&D OMA.

  - Specifically, including details regarding measures currently being implemented in preparation for the 2025 hurricane season.

  - P3A required LUMA to provide the pertinent documentation and information no later than noon on Friday, January 31st, 2025.


Initial

2. <u>January 22, 2025- P3A (J. Colón Ortiz-Exec. Dir.) to LUMA (J. Saca-CEO)- Re: LUMA's Work Plan for the Maintenance of the Public Lighting System</u>

- P3A referenced LUMA's obligation under Annex I (Scope of Services) of the T&D OMA to "operate and maintain the public lighting system" and to "prepare, develop, and maintain a work plan to establish priorities and a major maintenance plan for public lighting". This includes the installation of highly efficient Light-Emitting Diode (LED) technology.

- The P3A highlighted that "Public lighting is an essential service that directly impacts public safety across all island municipalities".

- A key concern was that "Adequate lighting has extraordinarily vexed, hereby residents of Puerto Rico for years", indicating that the failure to adequately maintain public lighting has been a

Docusign Envelope ID: D12C752B-ACFB-464E-A922-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 48 of 81

"long-standing issue". This suggested a perceived ongoing failure by LUMA to meet its operational and maintenance obligations regarding public lighting.

- P3A requested that LUMA "submit within five (5) calendar days, due on <u>January 27, 2025,</u> a detailed work plan outlining its approach to fulfilling this obligation".  This plan must be "organized by municipality and specify the sectors within each municipality to be addressed".

3. <u>January 4, 2023- PREPA (J. Colón Ortiz-Exec. Dir.) Letter to FEMA (J. Baquero Tirado-Federal Disaster Recovery Coordinator), COR3 (M. Laboy Rivera- Exec. Dir.), P3A (F. Fontanés Gómez-Exec. Dir.), and LUMA (W. Stensby-President and CEO)-Re: Regulations and Permitting Process for New Projects</u>


Initial JCO

- PREPA identified several areas where LUMA's previously submitted documentation for FEMA-funded projects require clarification, correction, or additional detail to comply with regulations and ensure proper project execution and FEMA reimbursements.  PREPA acts as the recipient of FEMA funds and owner of assets, making it responsible for the development of projects in compliance with federal laws, regulations, and engineering best practices.

- PREPA requested LUMA to clarify or correct the following matters:

  o Vegetation Management: While agreeing with vegetation management in project scopes, PREPA indicated that LUMA must consider specific factors regarding when and where to cut/prune vegetation (i.e., avoiding unnecessary pruning for underground/submarine lines, high-altitude transmission lines, and agricultural land easements).

  o Cost and Documentation for Distribution Projects: For distribution feeders, pole, and conductor repair projects,

Mr. Juan Saca
July 22, 2025
Page 49 of 81

LUMA's documentation needed to clearly explain repair estimates. This includes justifying unit costs of poles (with LUMA Standard Material Price), detailing labor costs (including field workers, transportation), separating hardware and installation costs for fittings, specifying cable type and installation cost, justifying A&E and Project Management/Administration costs, marking pole routes in the FAAS document, providing design guides for pole replacement, and justifying pole material choices (e.g., why steel is cheaper than concrete).



o Infrastructure Project Design and Justification: For electrical infrastructure projects connected to the transmission or sub transmission system, LUMA was required to submit detailed planning studies and design criteria if projects increase transformation capacity or add circuits/bundles and are *not* included in PREPA's 10-Year Infrastructure Plan or the IRP 2019. PREPA also clarifies that changes in bus configurations in substations do not necessarily improve resilience after atmospheric events5. Specific criteria and justifications are required for FEMA 406 mitigation projects (i.e., conversion to gas-insulated substations, SCADA redundancy).

o Financial and Administrative Documentation: LUMA needed to ensure consistency between tasks/activities in FEMA documents and its own Scope of Work (SOW), submit engineering documents to verify A&E costs, clarify state/municipal taxes (as they don't apply to PREPA), detail unit costs for equipment (not aggregated), justify contingency calculations (by LUMA Risk Analyst), and explain escalation, overhead, and profit expenses which may inflate costs for government utility projects.

Mr. Juan Saca
July 22, 2025
Page 50 of 81

  o Project Design Drawings: Project design drawings must be included in the SOW and signed by a licensed and collegiate engineer in Puerto Rico.

  o PREPA requested LUMA address the identified deficiencies and provide the necessary clarifications, corrections, and supporting documentation for the FEMA-funded projects. PREPA implied these corrections are necessary for the ongoing development and evaluation of the projects and for FEMA reimbursement.

4. <u>August 1, 2022-PREPA (J. Colón Ortiz-Exec. Dir.) Letter to LUMA (W. Stensby-President and CEO)-Re: Easements Conditions on Transmission Lines 230kV, 115 kV, and 38 kV</u>


Initial
JCO

- PREPA expressed significant concerns regarding the "condition of the vegetation in the easements and their proximity to the lines" within the electrical system.

- PREPA highlighted that "in some areas the distance between the vegetation and the lines' conductors and structures, appears to be less than the required clearance for safe operation".

- PREPA emphasized that "daily inspection of the transmission lines by helicopter and other means is of utmost importance to detect and attend in time the most critical areas that put at risk the continuity of the electric service".

- LUMA was not performing these essential inspections or addressing the identified vegetation issues effectively.

P3A hereby directs LUMA to (i) present, within five (5) calendar days, a hurricane-season vegetation-clearance plan that satisfies Annex I, § II(B); (ii) clear all unsafe easement intrusions on 230 kV, 115 kV and 38 kV lines; and (iii) certify monthly compliance through third-party inspections. Failure to do so will expose LUMA to

Docusign Envelope ID: D12C7252B-AFEB-464E-A922-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 51 of 81

indemnity for any vegetation-caused outage. This dispute is submitted to Article 15 for formal resolution.

### V.  <u>Notice of Technical Dispute: Financial Statements/Audit/Comptroller</u>

P3A, as Administrator to the T&D OMA, issues this Notice of Dispute due to LUMA's persistent and material noncompliance with its audit and financial reporting obligations.  Despite multiple directives and extensive time afforded, LUMA has failed to provide accurate and timely financial data.

1.  <u>February 4, 2025-PREPA (M. Zapata Acosta-Exec. Dir.) Letter to LUMA (J. Saca-CEO)-Re: Urgent Request for Data and Analysis for PREPA's External Audit</u>


Initial

- PREPA stated that for its Fiscal Year 2023 financial statement audit, it was concerned are underscored regarding LUMA's continued delays in providing essential data and analyses.  Under Annex I, Section V(F)(2) of the T&D OMA, LUMA is obligated to aid, including necessary information and data, to support PREPA's annual reporting requirements.

- Additionally, PREPA emphasized that Section 3.5 of the T&D OMA, titled *Right of Access*, grants PREPA the right to access PREPA's System Information to oversee LUMA's performance under the T&D OMA.

- PREPA has repeatedly raised concerns to P3A about LUMA's failure to supply critical audit information promptly.

- P3A's January 17, 2025-letter reiterated the urgency for LUMA to comply with its obligations, as LUMA's continued failure to provide requested data and analyses and its ongoing refusal to provide access impedes PREPA's ability to meet audit and financial statement issuance deadlines.

Docusign Envelope ID: D12C752D-AFEB-464E-A922-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 52 of 81

- PREPA requested specific items for auditor analyses, detailed in Attachment I (*Prepared by Client-PBC items, which PREPA relies on LUMA to provide for auditor analyses*).

- To facilitate the audit process, PREPA requested LUMA to provide Oracle IT personnel, support for depreciation issues, payroll details, cash receipt details, access to journal entries, accounts payable files, and system access to Project Accounting Modules.

- PREPA emphasized that this information had to be provided by LUMA on <u>Friday, February 7, 2025</u>.

2. <u>January 30, 2025-PREPA (M. Zapata Acosta-Exec. Dir) Letter to LUMA (J. Saca-CEO) RE: Response to LUMA's January 21, 2025, Letter Regarding Audit Obligations</u>


Initial

- PREPA emphasized that finally with its January 21, 2025-Letter LUMA responded to PREPA's November 27, 2024-Letter.

- PREPA stated LUMA has repeatedly demonstrated non-compliance, evasion, and delay in addressing the audit, leading to an overall lack of diligence.

- PREPA stated that LUMA agreed to assume its responsibility under the T&D OMA and the SSA with full knowledge of the challenges involved, including the volume and complexity of financial reporting. LUMA has certified its ability to perform these obligations and is being compensated accordingly.

- PREPA claimed that LUMA's deficiencies in financial accounting responsibilities led to over 381 correcting journal entries identified in PREPA's October 31, 2024-Letter.

- PREPA asserted that LUMA's claim of having addressed 180 out of 188 shared service audit-related requests is misleading, as many remain unresolved, and LUMA had unilaterally marked detailed

Mr. Juan Saca
July 22, 2025
Page 53 of 81

information requests on pass-through expenses as "closed" without providing the necessary documentation.

- External auditors were forced to step away from the audit in December 2024 due to LUMA's "backlog of pending information requests".

- PREPA listed several critical audit requests that remain overdue, including:

  o T&D Federal Revenues: Overdue 6 months (since July 7, 2024).

  o Fringe Benefits LUMA employees: Overdue 7 months (since June 9, 2024).

  o Pass-Through Expenses incurred by LUMA: Overdue 3 months (since September 27, 2024).

  o Seconded Payroll incurred by LUMA: Overdue 3 months (since October 16, 2024).

  o Depreciation Analysis (errors that originated during FY23): 7 months overdue (since June 23, 2024).

  o AP samples: Overdue 2 months (since November 11, 2024).

- PREPA attributed the outstanding audit issues to LUMA's lack of cooperation and failure to meet its contractual obligations, impacting PREPA's and the Government of Puerto Rico's financial statements.

- PREPA stated that it expected LUMA to take immediate corrective action by <u>Thursday, February 6, 2025</u>.  PREPA demanded LUMA to:

  o Fully comply with all outstanding audit-related requests.


Initial
JCO

Mr. Juan Saca
July 22, 2025
Page 54 of 81

     o  Cease unilateral closure of requests without resolving underlying issues.

     o  Provide PREPA with full system access to streamline the audit process.

     o  Adhere to established deadlines for document submissions.

     o  Cease bypassing PREPA in the audit process and respect PREPA's role as the owner of the financial statements.

     o  Reopen PREPA FY2023 accounting periods to post pending accounting entries as requested by the P3A.


Initial

- PREPA maintained that LUMA's continued failure to meet its contractual obligations is obstructing progress and will not accept further delays.

3. <u>January 26, 2025-P3A (J. Colón Ortiz-Exec. Dir.) Letter to LUMA (J. Saca-CEO) Re: LUMA's Continued Noncompliance with Audit and Financial Obligations</u>

- This letter highlighted LUMA's persistent non-compliance with audit and financial obligations is severely hindering PREPA's financial restructuring and Puerto Rico's fiscal stability.

- LUMA had failed to respond to previous P3A letters from December 15, 2024, January 15 and 17, 2025.

- PREPA emphasized LUMA's failure to grant access to System Information, lack of cooperation in providing accurate financial data for audits, and unresolved 24 outstanding audit items (some overdue by over 200 days), causing significant delays in PREPA's FY23 financial statements.

Mr. Juan Saca
July 22, 2025
Page 55 of 81

- PREPA emphasized that the T&D OMA imposes extensive obligations on LUMA to provide timely and accurate financial and operational information necessary for the proper functioning and reporting of PREPA's financial operations.  Hence, LUMA's actions are in violation of multiple provisions of the T&D OMA:

  - Section 3.5: requires LUMA to provide access to all System Information to enable PREPA's compliance with its oversight and reporting responsibilities.

  - Section 5.15(c)(i): mandates LUMA's full cooperation in providing complete and accurate financial data required for audits and financial statements.

  

  - Annex I, Section VI: further obligates LUMA to deliver all financial and operational data necessary for audits in compliance with Generally Accepted Accounting Principles ("GAAP").

- These actions were a violation of the T&D OMA and compromise the credibility of Puerto Rico's financial reporting. P3A demanded immediate compliance with the November 13, 2024-directive to reopen PREPA's FY23 accounting periods, resuming participation in weekly financial audit meetings to resolve all outstanding audit items within five calendar days, and submission of a detailed corrective action plan by January 30, 2025.

4. January 30, 2025 - PREPA (M. Zapata-Exec. Dir.) Letter to LUMA (J. Saca - CEO) – Response to LUMA's January 21, 2025, Letter Regarding Audit Obligations

   - LUMA's Noncompliance and Deficiencies:

     - LUMA's response to PREPA's audit obligations is characterized as an instance of evasion and delay, contributing to overall audit delays.

Docusign Envelope ID: D12C752D-AFEB-464E-A922-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 56 of 81



Initial

o LUMA is criticized for not fully assuming its responsibilities under the Transmission and Distribution (T&D) and Shared Services Agreements (SSA) concerning financial reporting, which PREPA states has become an unfulfilled and burdensome obligation.

o On October 31, 2024, a letter from PREPA detailed deficiencies in LUMA's financial reporting, including over 381 uncorrected journal entries, errors in audit corrections, and unclosed information requests.

o LUMA's T&D and Operations and Maintenance Agreement (OMA) Division failed to ensure the accurate and timely closing of financial information, impacting the T&D general ledger's completion.

o LUMA's refusal to provide PREPA with information is cited as non-compliance with federal revenue accounting and potentially discriminatory.

o LUMA has consistently slowed the audit process by delaying access to information and documentation.

o As of December 2024, and January 15, 2025, 120 and 15 pending information requests respectively remained overdue.

o LUMA committed to delivering 15 PBCs (Prepared by Client) by January 17, 2025, but only one was provided.

o LUMA's claim that 188 of 190 shared service audit-related requests were "closed" was refuted, as 180 were either not addressed or improperly marked closed.

o Several specific items remain overdue, including T&D/Federal Revenues (over 6 months since July 7, 2024),

Mr. Juan Saca
July 22, 2025
Page 57 of 81

Fringe Benefits LUMA (over 6 months since September 27, 2024), Pass-Through Expenses (over 3 months since September 27, 2024), Seconded Payroll (over 3 months since October 16, 2024), Depreciation Analysis (over 7 months since November 11, 2024), and AP samples (over 2 months since November 11, 2024).

o LUMA's lack of cooperation and failure to meet its obligations prevents external auditors from issuing financial statements, with 100% of the PBCs still outstanding.

o LUMA has failed to participate in critical audit meetings and provide overdue financial data, directly impacting the issuance of PREPA's financial statements.


Initial

• Requests for Action and Information (Due Date: February 6, 2025):

o PREPA demands immediate corrective action from LUMA on or before Thursday, February 6, 2025.

o LUMA must fully comply with all outstanding audit-related requests without further delay.

o LUMA must cease the unilateral closure of requests without resolving the underlying issues.

o LUMA must provide PREPA with full system access to streamline the audit process.

o LUMA must adhere to established deadlines and commitments for document submissions.

o LUMA must cease attempts to bypass PREPA in the audit process and respect PREPA's role as the owner of the financial statements.

Mr. Juan Saca
July 22, 2025
Page 58 of 81

        o   LUMA is requested to reopen PREPA FY23 accounting periods to post pending accounting entries, as previously requested verbally, in writing, and ordered by the PJA.

        o   PREPA expects LUMA's full cooperation to resolve these outstanding issues immediately.

5.   <u>January 17, 2025 - P3A (J. Colón-Executive Director) Letter to LUMA (J. Saca-CEO)-Re: LUMA's Continued Noncompliance with Audit Obligations</u>

- LUMA has repeatedly failed to provide critical information necessary for the completion of PREPA's consolidated financial statements and audits, which is deemed a clear breach of LUMA's obligations under the T&D OMA.

- This noncompliance includes LUMA's refusal to participate in weekly audit meetings with the Puerto Rico Treasury Department.

- Outstanding items such as federal revenue details (193 days overdue) and Governmental Accounting Standards Board ("GASB 68") items (249 days overdue) directly impeding PREPA's ability to produce accurate financial statements and comply with reporting obligations.

- LUMA's actions have already caused PREPA to miss the December 2024 and January 2025 deadlines for establishing GAAP, and the March 31st, 2025, deadline for the final financial statements is at risk.

- LUMA's conduct is a breach of Sections 3.5 and 6.15(O) of the T&D OMA, which require timely access to System Information and support for PREPA's oversight and financial reporting responsibilities.

- Request for Action:

        o   P3A expects LUMA to take immediate action within the next seven (7) days to address these deficiencies.


Initial

Mr. Juan Saca
July 22, 2025
Page 59 of 81

      o  This includes participation in upcoming meetings on Tuesday, January 21st, and Wednesday, January 22nd.

      o  LUMA is requested to demonstrate a renewed commitment to the attestation of trust, which has been undermined by its recent actions.

6.  <u>January 15, 2025- P3A (J. Colón-Executive Director) Letter to LUMA (J. Saca-CEO)-Re: Authorization to Reopen FY2023 Accounting Periods</u>

- LUMA has failed to comply with P3A's directive, issued on November 13, 2024, which mandated the reopening of PREPA's FY2023 accounting periods.

- LUMA had previously requested reconsideration of this directive but has not complied with the P3A's reaffirmation of the original directive.


Initial

- This noncompliance is an urgent and important obligation for PREPA and the Commonwealth, exacerbating risks related to Puerto Rico's audited financial reporting, compliance, and the issuance of government financial statements. It also undermines ongoing Title III proceedings.

- Requested Action:

      o  The P3A is giving LUMA a final opportunity to comply with the directive to reopen and report PREPA's FY2023 accounting periods.

      o  LUMA is requested to take immediate action to comply as directed.

      o  The P3A will engage PREPA, the Puerto Rico Treasury Department, and respective auditors to work with LUMA on

Mr. Juan Saca
July 22, 2025
Page 60 of 81

these effects immediately, and this subject will be incorporated into weekly financial statement audit meetings.

7. <u>December 26, 2024- PREPA (J. Colón-Executive Director) Letter to LUMA (J. Saca-CEO) & P3A (Gerardo Loran, Esq., Interim Executive Director)-Re: Response to LUMA's December 10, 2024, Letter Regarding Reopening FY23 Accounting Periods</u>

- **Delayed Response and Defiance:** LUMA's month-long delay in contesting P3A's directive to reopen PREPA's FY23 accounting periods is deemed unjustifiable and part of a pattern of defiance that has directly contributed to delays in issuing PREPA's financial statements.


Initial

- **Contradictory Arguments:** LUMA's reliance on the Committee of Sponsoring Organizations (COSO) framework, US Generally Accepted Accounting Principles (GAAP), and Generally Accepted Government Auditing Standards (GAGAS) as arguments against reopening accounting periods is considered unsubstantiated and contradictory, especially given the scale of required adjustments.

- **Distortion of Financial Reporting:** LUMA's proposal to delay material adjustments into future periods would distort PREPA's financial reporting, mislead stakeholders, and create significant cut-off issues, compromising audit accuracy. This approach also disregards KPMG's observation that it would increase audit complexity and delay timelines.

- **Compromised Internal Controls:** LUMA's suggestion to move journal entries to top-level Excel files would result in a significant deficiency in PREPA's internal controls over financial reporting and material noncompliance with US GAAP. Managing PREPA's financial reporting through spreadsheets, instead of Oracle, is considered untenable and prone to errors and manipulation.

Mr. Juan Saca
July 22, 2025
Page 61 of 81

- Violation of Agreement: LUMA's refusal to comply with P3A's directive is a significant obstacle to completing PREPA's financial statements and directly contradicts LUMA's obligations under the Transmission and Distribution Operating and Maintenance Agreement (T&D OMA), which requires supporting PREPA's audits, maintaining GAAP-compliant records, and ensuring timely financial reporting.

- Request for Action:

    o  PREPA emphasizes that the directive to reopen FY23 accounting periods is necessary and appropriate and must be implemented immediately to safeguard the integrity of PREPA's and the Government of Puerto Rico's financial reporting.

    o  The letter implicitly requests that P3A, as the sole entity empowered to enforce compliance, act swiftly and decisively to compel LUMA's compliance and ensure it fulfills its responsibilities without further obstruction. No specific due date is provided beyond "immediately" and "swiftly".

8.  <u>November 27, 2024 - PREPA (J. Colón-Executive Director) Letter to P3A (Fermín Fontanés, Esq., Executive Director)-Re: Response to LUMA's November 25, 2024, Letter on FY23 Financial Statements Audit Meetings</u>

- PREPA stated that LUMA's letter contained "unfounded" and "inaccurate" statements, including a false claim that a meeting occurred on November 24, 2024 (a Sunday); the meeting took place on November 15, 2024. PREPA asserts LUMA's claims misrepresent facts and are an attempt to deflect from its own failures.

- LUMA was "conspicuously absent" from the weekly Financial Statements Audit Meeting held on November 27, 2024, demonstrating a lack of commitment.


Initial

Mr. Juan Saca
July 22, 2025
Page 62 of 81

- LUMA has failed to meet its obligations under T&D OMA, causing significant delays in the audit process and jeopardizing PREPA's ability to meet critical deadlines for financial statements.

- LUMA has not provided timely and accurate information, leading to extensive delays and errors, including unresolved critical audit items, missed deadlines, and an inability to reconcile key financial data.

- Despite authorization from P3A on November 13, 2024, to reopen necessary closed accounting periods for accurate financial reporting (a critical GAAP compliance step), LUMA has failed to act, obstructing PREPA's ability to meet its obligations.

- LUMA is responsible for 29 open audit items, comprising 36% of all unresolved issues, including critical areas like payroll details, federal revenue reconciliation, and depreciation analysis. Some of these items have been overdue for up to 145 days. This violates Annex I, Section VI of the T&D OMA.

  o Violation of T&D OMA Provisions: LUMA's actions contravene Sections 3.5 and 5.15(c)(i) of the T&D OMA, which mandate timely access to System Information, including financial data and records, for PREPA's oversight and compliance responsibilities. Annex I, Section VI further delineates LUMA's duty to provide accurate, complete, and GAAP-compliant information for PREPA's audits and reports.

  o LUMA's decision to bypass PREPA and engage directly with auditors is a "clear violation of its contractual obligations", undermines PREPA's oversight of the audit process.

- PREPA emphasized the urgency, stating that "LUMA's time is up".

- PREPA urged LUMA to act on P3A's authorization to reopen accounts.


Initial

Docusign Envelope ID: D12CZ52B-AFEB-464E-A922-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 63 of 81

- PREPA reiterated to LUMA that it must comply with the T&D OMA, which includes full participation in audit meetings, compliance with authorized protocols, and the timely provision of accurate financial data. LUMA's cooperation is "not optional" and is an "essential requirement".

  o Deadlines for Financial Statements:

    ▪ Second draft of financial statements: December 20, 2024.

    ▪ Final issuance of financial statements: January 18, 2025.

9. <u>November 26, 2024- PREPA (J. Colón-Exec. Dir.) Letter to LUMA (J. Saca - CEO)-Re: Response to Notification Regarding the Decommissioning or Disabling of Servers</u>



- LUMA's proposed decommissioning of servers on November 27, 2024, is inconsistent with the timeline and constitutes a breach of the express terms of the Extended Amended and Restated Shared Services Agreement (A&R SSA). The A&R SSA, which was extended to an effective September 30, 2024, explicitly stipulates that services under the agreement are to remain operational until February 28, 2025, to allow for the proper completion of migration, validation, and commissioning activities.

- The servers LUMA intended to decommission (specifically STREBS-SRV1, SRETLNS-SRV1, SRETLXEB$, SRETWEB-WS1, SRETEBS-SRV2, and PREPA-SRET-IVR) are critical to PREPA's essential operations. Their premature decommissioning would paralyze functions like the administration of accounting for loans, retiree payroll, and the printing of checks and reports. This action would result in severe operational disruptions, significant legal and financial risks, and a failure to comply with the A&R SSA terms. It would also disrupt vital interfaces with Oracle-ERP, halt financial accounting processes, and

Mr. Juan Saca
July 22, 2025
Page 64 of 81

impact the Retirement System's functions. These servers also contain highly sensitive and legal data, risking damages and violations of federal and local laws.

- PREPA asserted that LUMA has not provided the requested work plan for the migration of the aeeppr.com and prepa.com domains, thereby impeding progress on a critical component of the migration process. This failure undermines LUMA's ability to justify decommissioning these servers, especially with the February 28, 2025, deadline still three months away.

- PREPA demanded the immediate postponement of the proposed server decommissioning scheduled for November 27, 2024.



- PREPA stated that if LUMA insists on proceeding with the decommissioning, PREPA will file for injunctive relief as well as other appropriate legal remedies.

- PREPA invited LUMA to engage in constructive discussions to establish a timeline consistent with the February 28, 2025, extension of the A&R SSA, while ensuring compliance and safeguarding critical systems and services.

10. November 6, 2024- PREPA (J. Colón-Exec. Dir. Letter to LUMA (J. Saca - CEO)-Re: Response to LUMA's October 24, 2024, Internal Controls Memo

- Noncompliance made by LUMA:

  o LUMA failed to adequately apply Generally Accepted Accounting Principles (GAAP).

  o LUMA did not maintain permanent documentation to support revenues and expenses.

  o These deficiencies are considered a significant internal control deficiency.

Mr. Juan Saca
July 22, 2025
Page 65 of 81

    o  The noncompliance creates a risk of presenting outdated or incomplete financial data, as material financial events were not properly accounted for.

- Request for information or action:

    o  This letter is a response to LUMA's prior internal controls memo.

    o  It notes that the P3 authority authorized LUMA to proceed with reopening necessary closed accounting periods to make material adjustments and correct accounting.



    o  PREPA's Remediation Plan continues to actively collaborate with LUMA and Genera to implement improvements and address internal control findings.

    o  The letter itself does not issue a new direct request for information or action from PREPA to LUMA with a specific due date.

11. <u>October 31, 2024 - PREPA (J. Colón-Executive Director) Letter to P3A (Fermin Fontanez- Exec. Dir.)-Re: Response to LUMA's October 24, 2024, Internal Controls Memo</u>

- LUMA's Noncompliance and Failures Identified by PREPA in this letter:

    o  Diverting Attention and Shifting Responsibility: LUMA's assertions were characterized as an attempt to divert P3A's attention and shift responsibility for potential delays in financial statement issuance onto PREPA.

    o  Mismanagement and Failure to Fulfill OMA Obligations: Any delays in the issuance of financial statements are directly attributed to LUMA's mismanagement and its failure to fulfill obligations under the T&D OMA.

Docusign Envelope ID: D12C752D-AFEB-464E-A922-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 66 of 81

    o    **Refusal to Align Accounting Policy:** LUMA's refusal to align with PREPA's policy of reopening closed accounting periods for material adjustments, which is consistent with GAAP and essential for transparency in the Title III process, is delaying the audit process.

    o    **Failure to Support Audit Processes:** LUMA failed to meet its contractual obligation under Annex I, Section VI.D of the T&D OMA by questioning PREPA's policy on material adjustments, which requires LUMA to support PREPA's audit processes, provide access to financial records, and ensure information accuracy.



    o    **Poor Quality of Accounting Services:** Issues have been identified within LUMA's accounting shared services, leading PREPA to request approximately 155 correcting journal entries after the FY2023 audit began in April 2024, impacting critical areas like cash, receivables, accruals, and intercompany transactions. This called into question the quality of LUMA's financial data and the effectiveness of its internal controls.

    o    **Disregard for Prudent Utility Practices:** LUMA's objections to PREPA's accounting practices disregard the "Prudent Utility Practices" standard outlined in Annex I, Section I.A part of the T&D OMA, which mandates adherence to recognized industry practices for reliability, transparency, and accuracy.

    o    **Delayed Financial Reporting and Non-Compliance:** LUMA's actions resulted in significant financial reporting delays. LUMA is obligated under Annex I, Section VI.F of the OMA to provide timely financial information for PREPA's reporting, including federal filings, and under Annex I, Section VI.B, to maintain GAAP-compliant records.

Mr. Juan Saca
July 22, 2025
Page 67 of 81


Initial

  o 15-Month Delay in Federal Revenue Recognition: As of October 2024, LUMA has a 15-month delay in recording approximately $65 million in federal revenues for FY2023, a clear failure to meet its obligations under Annex I, Section VI.F of the OMA, and compromising PREPA's compliance with federal reporting standards.

  o Incorrect Capitalization of Expenses: LUMA capitalized approximately $60 million in Category Z Administrative Expenses without adhering to GAAP, violating Annex I, Section VI.B of the T&D OMA. This misclassification led to audit adjustments and compounded audit delays.

  o Consistent Missed Audit Deadlines: Throughout the FY23 audit, LUMA has consistently missed deadlines, with 30 of 66 outstanding audit items unresolved as of October 18, violating its obligations under Annex I, Section VI.D of the OMA.

- PREPA highlighted that LUMA's actions are delaying the audit process for PREPA's FY2023 audited financial statements, which the Puerto Rico Treasury Department mandated to be completed by December 2024.

- PREPA expressed confidence that LUMA can fulfill its obligations and align with OMA standards by following the guidance provided in the letter, implicitly requesting LUMA to correct its deficiencies and comply with the contractual requirements.

12. <u>October 30, 2024-PREPA (N. Morales-CFO) Letter to P3A (-G. Lorán-Dir.- Project Monitoring) Re: LUMA's Letter of September 27, 2024, to P3A Regarding Accounting Documentation</u>

- PREPA reaffirmed its full compliance with documentation requests, stating it had provided the requisite accounting records. It contended that LUMA's request for P3A intervention

Mr. Juan Saca
July 22, 2025
Page 68 of 81

disregarded PREPA's prior communications and efforts in sharing
information pertinent to audit work.

- PREPA detailed that, as of August 2023, it had provided the
requested accounting documentation, and that in bi-weekly
meetings, specifically on May 22, 2024, the agenda indicated
LUMA was reviewing this information.

- PREPA clarified that information requests related to FY2020 and
FY2021 financial statement audits were irrelevant or outdated,
given that those audited statements had been issued on
September 30, 2022, and March 3, 2023, respectively.


Initial

- PREPA, as the System's Owner, had not received any
communication from external auditors regarding open items
pertinent to the FY2020 and FY2021 financial statement audits.

- Despite PREPA's extensive efforts, LUMA had reportedly declined
to acknowledge the provided documentation, opting instead to
escalate the matter without a justifiable basis.

- PREPA stated that its prior references to liquidity challenges were
not to detract from the documentation issue, but to highlight
critical operational challenges, primarily stemming from over $550
million in delayed federal reimbursements for LUMA-managed
CapEx, for which LUMA had yet to present a structured resolution
plan.

13. September 9, 2024-PREPA (N. Morales-CFO) Letter to LUMA (Corey
Schneider-CFO) Re: LUMA Letter of July 24, 2024-Accounting
Documentation

- PREPA asserted that LUMA's allegations regarding accounting
documentation were secondary issues that distracted the critical
liquidity crisis.

Mr. Juan Saca
July 22, 2025
Page 69 of 81

- PREPA contended that the liquidity crisis was caused by LUMA's deficient federal funds management process, citing over $550 million in LUMA Federally Funded Capital Expenses that remained unreimbursed due to LUMA's mismanagement of federal funds and has to correct, improve, disclose, secure material reimbursements, or present a credible plan to accelerate and improve the go-forward FEMA reimbursement process or to address the substantial Hurricane Fiona-related claims.

- This liquidity depletion significantly strained PREPA's operational account and impacted its ability to meet various contractual obligations.


Initial

- PREPA, P3A, and FOMB had previously requested information and demanded action from LUMA to immediately address these federal funds matters, noting LUMA's responsibility under the T&D OMA for collecting System Revenues and securing federal reimbursements.

- Regarding LUMA's accounting allegations, PREPA characterized them as incorrect and misleading.

- PREPA stated that LUMA's letter was a "feeble and belated attempt to distract" from LUMA's unilateral obstruction and delay of data and information necessary for PREPA to complete its FY2023 financial statement audit process.

- PREPA asserted that it had provided the accounting documentation requested by LUMA since at least August 2023, and that LUMA was reviewing this information as of a May 22, 2024-meeting.

- PREPA deemed any requests related to FY2020 and FY2021 financial statement audits irrelevant or outdated, as the audited financial statements for those fiscal years had already been issued.

Mr. Juan Saca
July 22, 2025
Page 70 of 81

- PREPA, as System Owner, confirmed it had not received any communication from external auditors about open items related to the FY2020 and FY2021 financial statement audits.

- PREPA further noted that "Attachment A" referenced in LUMA's letter was never received.

- PREPA concluded by expressing its anticipation of LUMA's prompt response concerning the federal funds reimbursement and Fiona claim matters, and LUMA's normalization of PREPA's access to System Information in compliance with the T&D OMA.

14. <u>July 29, 2024- PREPA (Nelson Morales, Chief Financial Officer) Letter to LUMA (Kazi Hasan – Chief Financial Officer)-Re: Urgent Notice Regarding Timely and Accurate Cash Flow Data from LUMA</u>


Initial
JCO

- Noncompliance by LUMA that PREPA identified:

  o LUMA has failed to provide daily bank balance and cash flow files to PREPA, instead providing them only twice per week over the past two months. These files are crucial for PREPA to monitor liquidity and comply with the FOMB Certified Fiscal Plan.

  o The cash flow data supplied by LUMA frequently contains errors, which complicates and delays PREPA's ability to submit timely reports to stakeholders.

  o LUMA has not acted to correct these issues despite PREPA's repeated relaying of the importance of this information, both in-person and in writing.

  o This failure by LUMA has resulted in PREPA being unable to publish accurate cash flow files and lacking adequate visibility into its liquidity, a practice deemed "wholly negligent" and

Mr. Juan Saca
July 22, 2025
Page 71 of 81

"unacceptable". This is particularly critical as a significant deterioration in PREPA's liquidity is projected to lead to a cash flow shortfall within 30 calendar days.

- o LUMA's failure to provide the required information constitutes a violation of the T&D OMA, Section 3.8.

- PREPA requested immediate attention to this matter and prompt confirmation of LUMA's corrective actions. PREPA specifically asked that LUMA immediately begin to provide the relevant financial information in a way that is timely and accurate.


Initial

- o While no specific future due date is given for the confirmation of corrective actions, the request stresses the need for "immediate" action regarding the provision of accurate and timely data.

15. April 11, 2024-PREPA (J. Colón Ortiz-Exec. Dic.) Letter to P3A (R. Lugo Mas-Contract Compliance Manager)– Re: OIG Report OIG-E-24-004

- Under Section 5.3 and Annex 1 Section 1(A)(4) of the Transmission and Distribution Operating and Maintenance Agreement (T&D OMA), LUMA (collectively referring to LUMA Energy, LLC and LUMA Energy ServCo, LLC) is responsible for performing all billing and collection services for the T&D System. Furthermore, LUMA is responsible for managing the information systems that contained historical data, balances, and payments for all PREPA clients, including central government agencies and corporations, and for providing said information. While the letter did not explicitly use the term "noncompliance," it indicated that PREPA was providing information that was explicitly LUMA's responsibility, specifically "LUMA's pre-commencement (June 1, 2021) historical accounts receivable" and data related to the Global Settlement Agreement, implying a failure by LUMA to provide this information as per their contractual obligations. PREPA reminded P3A that LUMA was responsible for these data management and provision tasks.

Docusign Envelope ID: D12C752D-AFEB-464E-A922-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 72 of 81

16. <u>December 8th, 2023- PREPA (J. Colón Ortiz-Exec. Dir.) letter to LUMA (C.
Schneider) – Re: FY22 Audit – Construction Work in Progress (CWIP)
Project Status</u>

- Historically, PREPA had Construction Work in Progress (CWIP) projects that were not reclassified to depreciable assets due to pending paperwork. While PREPA acknowledged ownership of this responsibility, the current operating structure left PREPA without the necessary resources to continue these capitalization efforts.



Initial

- Under the new structure, the custody, maintenance, and accounting of these assets were transferred to operators, including LUMA Energy, LLC.

- Auditors from KPMG, LLC, required the ability to assert the existence and status of these CWIP projects for the FY22 audit. The urgency stemmed from the Governor's requirement for PREPA's audited financial statements for FY22 to be finalized by December 31st, 2023. The letter implied that LUMA's lack of action or status reporting on these transferred assets prevented PREPA from completing its audit obligations.

- PREPA requested LUMA to examine a provided list of open CWIP projects (including those with no movement in the last two years).

- LUMA was specifically asked to verify the existence of these projects and report on their current status (completed, in progress, abandoned/impaired).

- The response for each CWIP estimate should have indicated whether the asset existed, whether construction was completed, or whether it was impaired and should have no longer been reported as construction in progress.

Mr. Juan Saca
July 22, 2025
Page 73 of 81

- PREPA also noted the need to coordinate the capitalization of these projects.

- The due date for LUMA to advise on the current status of the CWIP projects was December 11th, 2023, by the end of business.

17. <u>January 11, 2023-Email from OCPR to LUMA (Reporting and Regulatory H. Leyendecker & L. Jiménez Torres) - Re: Requests for Information from the Office of the Comptroller of Puerto Rico – Data from Information Systems of Files in LUMA Custody.[3]</u>

- The Office of the Comptroller stated that the information previously provided was incomplete, noting that "the request for information is not yet complete". This indicates a lack of full compliance with the Comptroller's data request.

- Specifically, the pending and missing information for the period from January 1, 2000, to June 30, 2020 (prior to LUMA's Commencement in June 2021), included:

  o Rate revenue, detailed by residential, commercial, and government customers, by fiscal year.

  o Accounts receivable, detailed by residential, commercial, and government customers, by fiscal year.

  o Loss from energy theft, detailed by residential, commercial, and government customers, by fiscal year.

- An internal PREPA email further explained that PREPA does not have access to the systems required to coordinate the missing information with LUMA. It also noted that the Authority (PREPA) had not directly requested LUMA to send the information and only became aware of LUMA's January 10, 2023, letter because they were copied on an email.


Initial

---

[3] This email was originally in Spanish.

Mr. Juan Saca
July 22, 2025
Page 74 of 81

This suggests a gap in direct information exchange between PREPA and LUMA regarding the Comptroller's requests.

- The Office of the Comptroller requested the outstanding detailed information listed above.

- It also requested to be informed of a contact person for follow-up on the information request.



- While the Comptroller's email itself did not state a new due date for the remaining information, an internal PREPA email confirmed that an "expiration date" was in January (partially visible as "Janu" in source), and that PREPA is preparing a letter to request an extension for the delivery of the remaining information. This indicates that the original deadline for providing the complete information was either missed or imminent.

18. <u>August 1st, 2022- PREPA (J. Colón Ortiz) Letter to LUMA (W. Stensby President & CEO) – Re: Letter from the Office of Comptroller of PR – Audit 15592 Term</u>

- The letter indicated a procedural difficulty where PREPA was unable to respond promptly to the Comptroller's Office regarding Audit 15592 because the necessary information was under the control and custody of LUMA. While not explicitly stated as "noncompliance," this situation highlighted that LUMA's control over information impeded PREPA's ability to fulfill its obligations to the Comptroller's Office in a timely manner.

- PREPA requested LUMA's intervention to establish a more agile mechanism to respond promptly to the Comptroller's Office in cases where LUMA holds the required information. Additionally, PREPA asked LUMA to identify a point of contact within LUMA to discuss viable alternatives for this process.

Mr. Juan Saca
July 22, 2025
Page 75 of 81

19. <u>June 21, 2022 - PREPA (J. Colón Ortiz-Exec. Dir.) Letter to P3A (Fermin Fontanes, Executive Director) & FOMB (Alejandro Figueroa, Director) - FY23 Budget</u>

- Noncompliance by LUMA:

    o LUMA failed to properly consolidate PREPA's Generation Budget, instead submitting it as an exhibit without consolidation, which PREPA views as a deceptive and misleading representation.

    o LUMA's proposed FY23 budget, including the HoldCo and Generation budgets, does not comply with the Transmission and Distribution (T&D) Operating and Maintenance Agreement (OMA) requirement that expenses must be adjusted to avoid a base rate increase.

    o The consolidated budget proposed by LUMA exceeds the 2017 Rate Order revenue cap, making it noncompliant with the applicable Rate Order.

    o LUMA did not agree to additional scheduled budget meetings following a courtesy meeting on March 3, 2022, regarding the FY23 Generation Budget.

    o By March 11, 2022, LUMA had not contacted PREPA to request information necessary for PREPA to prepare the FY23 Generation budget, despite the April 1, 2022, deadline for consolidated budget submission.

    o LUMA's initial revenue allocation proposal to PREPA on March 17, 2022, suggested an approximate $54 million reduction to PREPA's generation budget, which PREPA contends ignored historical trends and the availability of federal funds for generation purposes.


Initial

Mr. Juan Saca
July 22, 2025
Page 76 of 81

> o On March 31, 2022, LUMA submitted a counterproposal that deviated from the 2017 Rate Order.
>
> o The P3A's certification of LUMA's proposed FY23 Budget as compliant with the Rate Order was impaired due to LUMA's non-compliance with the T&D OMA, specifically the requirement that LUMA submit a budget prepared and delivered by PREPA to LUMA for consolidation.

- Request for Action:

> o PREPA requests that the P3A reverse its certification of LUMA's proposed FY23 budget.
>
> o PREPA requests that the P3A coordinate a meeting to review LUMA's proposed budget to ensure it responsibly serves the needs of the electric system.
>
> o No specific due dates for these requested actions are mentioned in the source.

20. <u>November 8, 2021 - PREPA (J. Colón Ortiz-Exec. Dir.) Letter to FOMB (Alejandro Figueroa, Director) – PREPA Audited Financial Statements FY 2019</u>

- Noncompliance: The source details noncompliance by PREPA, not LUMA. PREPA was in a "pattern of noncompliance" regarding the timely issuance of its financial statements. Specifically, PREPA acknowledged that the proposed issuance date for the 2019 Financial Statement "does not comply with the timeline established in Circular Letter No. 1300-33-21". PREPA received the audited financial statements for FY 2018 on November 4, 2021. Delays in completing the FY 2019 audit were attributed to PREPA Management's efforts to prepare financial statements for previous fiscal years (2015, 2016, 2017, and 2018) and for the PREPA Employee Retirement System (2015, 2016, 2017, and 2018). Further delays for the 2018 audit were attributed to internal quality control


Initial

process issues and "external delays" from other financial stakeholders, including the Treasury Department.

- Request for Information or Action: The sender (PREPA) did not request specific information or action from the receiver (Financial Oversight and Management Board) with a due date for the receiver. Instead, the letter provides updates on PREPA's efforts and projected timelines for its own deliverables, while also stating a need for "constructive support":


Initial
JCO

  o PREPA anticipated KPMG would issue the 2018 Audited Financial Statement by the end of the week of October 7, 2021.

  o An initial draft of the 2019 financial statements was established to be submitted by October 31, 2021.

  o The second draft of the 2019 Financial Statements was scheduled for submission to the Treasury Department on December 10, 2021.

  o The projected issuance date for the 2019 financial statements is January 31, 2022.

  o PREPA committed to doing "everything possible to accelerate the schedule" with "constructive support" from the representatives of the Financial Oversight and Management Board and KPMG to achieve the requested milestones.

P3A require LUMA to (i) clear the open items required to complete the financial statements for FY 2023 audit items—including federal-revenue detail, depreciation analysis, and GASB 68 schedules—within seven (7) calendar days, (iii) deliver the outstanding historical revenue, accounts-receivable, and energy-loss data demanded by the Comptroller for FY 2000-FY 2020 within ten (10) business days, (ii) establish a permanent one-stop audit liaison, and (iii) bear any fines or

Docusign Envelope ID: D12C252D-AFEB-464E-A923-64A65785BB4E

Mr. Juan Saca
July 22, 2025
Page 78 of 81

penalties resulting from delayed production. PREPA/P3A escalate this issue under Article 15.

## VI. **Notice of Technical Dispute: Pole Attachment**

P3A, as Administrator of the T&D OMA, issues this Notice of Technical Dispute due to LUMA's ongoing failure to comply with its core billing and collection obligations under the T&D OMA. Specifically, LUMA has refused to collect pole attachment fees owed by third-party telecommunications and cable entities.

1. <u>February 2, 2024</u>-<u>PREPA Letter to LUMA (President & CEO- J. Saca) – Billing & Collection of Pole Attachment Fees</u>
   - PREPA stated that it received LUMA's January 12, 2024, proposal to split all pole (third-party) attachment fees, but states it is unable to proceed as requested by LUMA.

   - PREPA emphasized that based on the T&D OMA is that the responsibility for collecting pole attachment fees owed to PREPA by telecommunications and cable companies is exclusively LUMA's.

   - PREPA stated that under the OMA, LUMA is solely responsible for "all electric transmission, distribution, load serving, and related activities for the safe and reliable operation and maintenance of the T&D system.

   - Section 5.3 of the OMA explicitly states LUMA's responsibility to "perform all billing and collection services for the T&D System by the Contract Standards, including the requirements outlined in Annex I (Scope of Services).
   - Annex I, Section II(A) of the OMA further indicates LUMA (the operator) is responsible for managing and maintaining all T&D System assets, including billing and collection for pole attachment fees.


Initial

Mr. Juan Saca
July 22, 2025
Page 79 of 81

- PREPA further emphasized that it lacks the personnel, infrastructure, or budget to assist LUMA in collecting delinquent attachment fees.

2. <u>May 21, 2024- PREPA Letter (J. Colón-Executive Director) to LUMA (-J. Saca, President & CEO) Re: Assignment of Pole Attachment Billing to HUB Advanced Networks, LLC</u>

- PREPA notified LUMA that the billing and collection of PREPA's Pole Attachment fees for specific past due periods will be assigned to HUB Advanced Networks, LLC.

- The past due periods assigned to HUB were July 2018-June 2019, July 2019-June 2020, and July 2020-June 2021.


Initial

- PREPA emphasized to LUMA that it owns the electrical infrastructure and poles and has designated HUB as its representative to invoice all past due payments related to joint pole attachment fees for PREPA's infrastructure used by private companies.

3. <u>August 28, 2024-Resolution and Order-Case No. NEPR-MI-2019-0007; Subject: <i>Request for Extension of Time to Submit Updated Data Template for Quarterly Reporting in Response to April 2024 Quarterly Report</i></u>

- The Resolution and Order took notice and granted LUMA the extension of time it requested to submit its responses to ROIs, until <u>August 30, 2024.</u>

- It includes as an attachment PREPA's <i>Motion in Compliance with Resolution and Order of October 16, 2024</i>, which:

  o PREPA asserted that its financial liquidity is severely impacted by LUMA's inefficiencies in critical operational areas, despite LUMA being compensated for these services.

Mr. Juan Saca
July 22, 2025
Page 80 of 81

     o   PREPA argued that LUMA's responsibility for collecting pole attachment fees and other revenue streams is integral to PREPA's financial health, and LUMA's refusal to acknowledge this responsibility is a misinterpretation of the T&D OMA, making LUMA's business model "unsustainable" and contributing to PREPA's liquidity shortfall.

     o   PREPA highlighted LUMA's "deficient collection for power services, collection and suspension of power service to delinquent customers, collection of pole attachments fees, among others," as well as issues with the administration of federally funded T&D system capital projects.


Initial

     o   PREPA stated it has repeatedly alerted LUMA about its inefficiencies and underperformance that negatively impact its liquidity.

     o   PREPA explicitly noted a net negative liquidity impact of over $550 million due to receiving less than expected in FEMA reimbursements and WCA.

P3A insists that LUMA (i) assume immediate responsibility for billing and collecting all pole-attachment charges, including delinquent balances for FY 2018-FY 2021, and (ii) file within thirty (30) days a revised revenue-collection plan that aligns with § 5.3 and Annex I of the OMA. PREPA/P3A commence Article 15 proceedings on this rate-related dispute.

## **Conclusion**

The litany of failures cataloged above - federal-funding lapses, grid-crippling outages, vegetation hazards, budget overruns, and stone-walled audits - has pushed Puerto Rico's patience to the breaking point. The P3A therefore invokes Article 15's dispute-resolution mechanism forthwith and puts LUMA on formal notice: the Government of Puerto Rico will no longer subsidize incompetence or excuse defiance. Puerto Ricans deserve a power-grid operator that keeps the

Docusign Envelope ID: D12C7252D-AFEB-464E-A922-64A65Z85BB4E

Mr. Juan Saca
July 22, 2025
Page 81 of 81

lights on, respects public money, and obeys the terms and conditions of the contract it signed.

Should LUMA fail to cure each breach during the Article 15 process, the P3A stands ready to exercise the OMA's ultimate remedy - early termination of the contract. Upon an Operator Event of Default, including chronic non-performance and other material violations as detailed herein, the P3 Authority is empowered under Section 14.2 to declare LUMA in default, terminate the OMA, and recover all damages while orchestrating an orderly, LUMA-funded transition to a qualified successor operator. The P3A will not hesitate to pursue that remedy, together with all attendant transition and recovery measures, to protect the public interest and restore accountability to Puerto Rico's energy system.

Cordially,

Signed by:

*Josué A. Colón Ortiz*

ACAE19A8DEEE49C

Josué A. Colón Ortiz
Executive Director

Annexes

C    Francisco J. Domenech, Executive Director, AAFAF, fjdomenech@aaaf.pr.gov
     Robert F. Mujica, Executive Director, FOMB, robert.mujica@promesa.gov
     Mary C. Zapata Acosta, Executive Director, PREPA, mary.zapata@prepa.pr.gov
     Ángel Rotger Sabat, Chief Legal Officer, LUMA, angel.rotger@lumapr.com
     Francisco Prego, OMA Contract Management, LUMA, francisco.prego@lumapr.com
     Alejandro J. Figueroa Ramírez, CRO, LUMA, alejandro.figueroara@lumapr.com
     Lionel Santa, General Counsel, P3A; lionel.santa@p3..pr.gov

# Exhibit C

Transmittal # LUMA-P3A-T-01616

July 25, 2025

**To: Puerto Rico Public-Private Partnership Authority**
Attention: Eng. Josué E. Colón Ortiz
Executive Director
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, PR 00907

**Re: Article 15 of the Transmission and Distribution OMA**

Dear Mr. Colón:



---

[1]  Capitalized terms used but not defined in this letter shall have the meaning ascribed to them in the T&D OMA.





this communication shall be deemed a formal Notice of Dispute intended to address the parties' disagreement concerning the interpretation of the terms "Technical Dispute" and "Dispute" as defined under the T&D OMA.

Cordially,

*Juan Saca*

Juan Saca (Jul 25, 2025 20:46:19 EDT)

**Juan D. Saca**
President & Chief Executive Officer

cc:   Robert F. Mujica, Executive Director, FOMB; robert.mujica@promesa.gov
Francisco J. Domenech, Executive Director, AAFAF; fjdomenech@aaaf.pr.gov
Rubén Lugo, Contract Compliance and Control Manager, P3A; ruben.lugo@p3.pr.gov
Lionel E. Santa Crispín, General Counsel, P3A; lionel.santa@p3.pr.gov
Irma Rosario, Administrator, P3A; irma.rosario@p3.pr.gov
Mary C. Zapata Acosta, Executive Director, PREPA; mary.zapata@prepa.pr.gov



Alejandro J. Figueroa Ramírez, Chief Regulatory Officer, LUMA; alejandro.figueroara@lumapr.com
Francisco Prego, Vice President T&D OMA Contract Management, LUMA; francisco.prego@lumapr.com
Ángel Rotger Sabat, Chief Legal Officer, LUMA; angel.rotger@lumapr.com
Andrew Smith, Chief Financial Officer, LUMA; andrew.smith@lumapr.com



# Exhibit D

Docusign Envelope ID: 78F1A7F0-A407-4654-B93B-3404813AA006

# PUBLIC-PRIVATE PARTNERSHIPS

**AUTHORITY**

GOVERNMENT OF PUERTO RICO

Eng. Josué A. Colón Ortiz I Executive Director

August 2, 2025

**BY ELECTRONIC MAIL**
juan.saca@lumapr.com

Mr. Juan Saca
President and Chief Executive Officer
LUMA Energy, LLC and
LUMA Energy ServCo, LLC (LUMA)
San Juan, Puerto Rico 00936-3508

Mr. Saca,


Initial

**Re: Notice of Disputes Article 15 Meeting**



Mr. Juan Saca
August 2, 2025
Page 2 of 3



Mr. Juan Saca
August 2, 2025
Page 3 of 3



Cordially,

Signed by:

*Josué A. Colón Ortiz*

ACAE19A8D5F549C

Josue A. Colon Ortiz
Executive Director

c  Francisco J. Domenech, Executive Director, AAFAF, fjdomenech@aaaf.pr.gov
   Mary C. Zapata Acosta, Executive Director, PREPA, mary.zapata@prepa.pr.gov
   Robert F. Mujica, Executive Director, FOMB, robert.mujica@promesa.gov
   Francisco Prego, Vice President T&D OMA Contract Management, LUMA, francisco.prego@lumapr.com
   Alejandro J. Figueroa Ramírez, Chief Regulatory Officer, LUMA, alejandro.figueroara@lumapr.com
   Ángel Rotger Sabat, Chief Legal Officer, LUMA, angel.rotger@lumapr.com
   Lionel Santa, General Counsel, P3A; lionel.santa@p3.pr.gov
   Andrew Smith, LUMA CFO; andrew.smith@p3.pr.gov
   Administrator@p3.pr.gov

# Exhibit E



PUBLIC-PRIVATE
PARTNERSHIPS
**AUTHORITY**
GOVERNMENT OF PUERTO RICO

August 15th, 2025

**BY ELECTRONIC MAIL**
andrew.smith@lumapr.com

**Mr. Andrew Smith**
Chief Financial Officer
LUMA Energy, LLC and
LUMA Energy ServCo, LLC (LUMA)
San Juan, Puerto Rico 00936-3508

Mr. Smith,

**Re.: P3A Response to LUMA's August 11, 2025 Letter – Article 15 Dispute Process**

**Mr. Andrew Smith**
August 15, 2025
Page 2 of 3



**Mr. Andrew Smith**
August 15, 2025
Page 3 of 3



Sincerely,

**Lionel E. Santa Crispín**
General Counsel
Puerto Rico Public-Private Partnerships Authority
Designated Person – Article 15, T&D OMA

Annex

c    Josué A. Colón Ortiz, Executive Director, P3A; josue.colon@p3.pr.gov
     Mary C. Zapata Acosta, Executive Director, PREPA, mary.zapata@prepa.pr.gov
     Alejandro J. Figueroa Ramírez, Chief Regulatory Officer, LUMA, alejandro.figueroara@lumapr.com

Exhibit F

August 15, 2025

**To: Puerto Rico Public-Private Partnership Authority**
Attention: Lionel Santa Crispín
Designated Person
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, PR 00907

**Re: Article 15.5(a) of the Transmission and Distribution OMA – Notice of Mediation**

Dear Mr. Santa Crispín,

LUMA Energy, LLC and LUMA Energy ServCo, LLC, (jointly, "LUMA") hereby issues this Notice of Mediation to Puerto Rico Public-Private Partnerships Authority's ("P3A") for purposes of mediating certain of the issues (the "Issues") raised in P3A's July 22, 2025 letter.[1]

LUMA's position is that the purported technical disputes raised by P3A do not constitute "Technical Disputes" as defined in the Transmission and Distribution System Operation and Maintenance Agreement (the "T&D OMA"). ████████████████████████████ ████████████████████████████████████ ████████████████████████████

Because all of the Issues are "Disputes" pursuant to Section 15.1 of the T&D OMA LUMA hereby refers those Disputes to mediation pursuant to Section 15.5 of the T&D OMA.

Please indicate your willingness to meet and confer at the conclusion of the Negotiation Period to discuss the appointment of a mediator.

LUMA expressly reserves all of its rights and remedies.  We look forward to receiving your prompt response.

Sincerely,


**Andrew Smith**
Designated Person
LUMA Energy

cc:     Alejandro J. Figueroa Ramírez, Chief Regulatory Officer, LUMA; alejandro.figueroara@lumapr.com
        Angel Rotger Sabat, Chief Legal Officer, LUMA; angel.rotger@lumapr.com
        Luis A. Santiago Zambrana, VP, General Counsel, LUMA; luis.santiagoz@lumapr.com

---

[1] LUMA does not agree that all of the Issues raised in P3A's July 22 letter are either Technical Disputes or Disputes and reserves all rights with respect to that issue.



# Exhibit G

**PUBLIC-PRIVATE PARTNERSHIPS**

AUTHORITY

GOVERNMENT OF PUERTO RICO

August 20th, 2025

**BY ELECTRONIC MAIL**
andrew.smith@lumapr.com

**Mr. Andrew Smith**
Chief Financial Officer
LUMA Energy, LLC and
LUMA Energy ServCo, LLC
San Juan, Puerto Rico 00936-3508

**Re: P3A Response to LUMA's August 15, 2025 Letter – Article 15.5(a) Notice of Mediation**

Mr. Smith:

P3A Response to LUMA's Notice of Mediation
Page 2





Sincerely,

**Lionel E. Santa Crispín**
General Counsel
Puerto Rico Public-Private Partnerships Authority
Designated Person – Article 15, T&D OMA

c.  Eng. Josué A. Colón Ortiz, Executive Director, P3A
    Mary C. Zapata Acosta, Executive Director, PREPA, mary.zapata@prepa.pr.gov
    Alejandro J. Figueroa Ramírez, Chief Regulatory Officer, LUMA,
     alejandro.figueroara@lumapr.com
    Ángel Rotger Sabat, Chief Legal Officer, LUMA, angel.rotger@lumapr.com

# Exhibit 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>               Debtors.[1] | 3:17-BK-3283 (LTS)<br><br>PROMESA Title III<br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>     as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY<br><br>               Debtor. | 3:17-BK-4780 (LTS)<br><br>PROMESA Title III<br>(Jointly Administered) |
| LUMA ENERGY, LLC and LUMA ENERGY SERVCO, LLC<br>               Plaintiffs.<br>      v.<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY and PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY, | Adv. Proc. No. 25-00043 (LTS) in 17 BK 4780-LTS |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

| Defendant. |
|---|

## [PROPOSED] ORDER GRANTING MOTION TO SEAL PORTIONS OF LUMA'S MOTION FOR PROVISIONAL RELIEF AND CERTAIN EXHIBITS

Upon consideration of the *Motion to Seal Portions of Luma's Motion for Provisional Relief and Certain Exhibits* (the "Motion"), the Court FINDS AND DETERMINES that LUMA's Motion for Provisional Relief and certain accompanying exhibits may be filed under seal to the extent sought by the Motion for the reasons stated therein. The Puerto Rico Electric Power Authority ("PREPA") and Puerto Rico Public-Private Partnerships Authority ("P3A") shall have access to the documents under seal. The documents shall remain under seal unless and until LUMA, PREPA, and P3A agree that they may be unsealed.

This order is without prejudice to the rights of any party in interest to seek to unseal the documents or any part thereof.

ORDERED THAT:

1. The Motion is GRANTED as set forth herein.

SO ORDERED.

Dated: _____, 2025

_____
THE HON. LAURA TAYLOR SWAIN
UNITED STATES DISTRICT JUDGE